# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

PORCHA WOODRUFF,
    an individual,               Case No. 5:23-cv-11886
          Plaintiff,           Hon. Judith E. Levy

V

CITY OF DETROIT
a municipal corporation,

LaSHAUNTIA OLIVER,
City of Detroit Police Detective,
Individually, and in her Official
Capacities, and

        Defendants.

---

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, Porcha Woodruff, through her attorneys the Law Offices of Ivan L. Land, P.C., and she states the following for her complaint.

### INTRODUCTION

1.    Facial recognition technology has long been known for its inherent flaws and unreliability, particularly when attempting to identify black individuals such as Porcha Woodruff. It should be understood that facial recognition alone cannot serve as probable cause for arrests, as a computer's

1

identification is prone to errors that humans might also make. Therefore, law enforcement must conduct thorough investigations to avoid wrongful arrests and protect innocent lives.

2.  Porcha Woodruff, a 32-year-old resident of Detroit who lives with her two children (ages 12 and 6), and her fiancé. Notably, at the time of her arrest for robbery and carjacking, she was eight months pregnant.

 

3.  On February 16, 2023, at 7:50 a.m., Ms. Woodruff was preparing her children for school when she was confronted by six Detroit police officers at her doorstep. They presented her with an arrest warrant for robbery and carjacking, leaving her baffled and assuming it was a joke, given her visibly pregnant state. However, the officers made it clear they were serious and proceeded to arrest her.

4.  Ms. Woodruff later discovered that she was implicated as a suspect through a photo lineup shown to the victim of the robbery and carjacking, following an unreliable facial recognition match.

5.    This case highlights the significant flaws associated with using facial recognition technology to identify criminal suspects. Despite its potential, law enforcement's reliance on facial recognition has led to wrongful arrests, causing humiliation, embarrassment, and physical injury, as evident in this particular incident.

6.    The Detroit Police Department has faced similar situations in the past, with individuals like Robert Williams and Michael Oliver two highly publicized cases. These two individuals were also falsely accused by the Detroit Police due to the reliance of facial recognition.

7.    The need for reform and more accurate investigative methods by the Detroit Police has become evident, as we delve into the troubling implications of facial recognition technology in this case.

## JURISDICTION AND VENUE

8.    This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

9.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, §1343, and §1367.

10.   Venue is proper under 28 U.S.C. §1391 (b), as the events giving rise to the claims asserted in this complaint occurred within this district.

**PARTIES**

11. Plaintiff, PORCHA WOODRUFF, (hereinafter "PLAINTIFF"), is a resident of the County of Wayne, State of Michigan.

12. Defendant, City of Detroit (hereinafter "DEFENDANT DETROIT"), is a municipal corporation located in the County of Wayne, State of Michigan.

13. Defendant, LaSHAUNTIA OLIVER (hereinafter "DETECTIVE OLIVER"), was at all relevant times a City of Detroit Police Officer and/or employed by DEFENDANT DETROIT and acting under color of law and within the scope of her employment.

**FACTS**

14. On January 29, 2023, Laurence Walker (hereinafter "VICTIM") reported to the Detroit Police Department that he had been robbed at gunpoint for his personal property and his vehicle (See Exhibit 1).

15. On January 30, 2023, DETECTIVE OLIVER from the commercial auto theft unit of the Detroit Police Department was assigned VICTIM's case.

16. On January 31, 2023, DETECTIVE OLIVER contacted the VICTIM and was informed that VICTIM's cellphone that was stolen during the robbery had been returned to 6240 Van Dyke Detroit, MI 48213 (hereinafter "BP gas station").

17. DETECTIVE OLIVER learned that the cellphone was returned to the BP gas station by a female.

18. DETECTIVE OLIVER went to the BP gas station to view the video footage of the individual female that had returned the cellphone.

19. DETECTIVE OLIVER submitted an AVERT request to members of the Detroit Police Department to extract the video.

20. Once the video was extracted, DETECTIVE OLIVER submitted a facial recognition request on the female that returned the cellphone to the BP gas station.

21. Facial recognition returned identification for PLAINTIFF (Porcha Woodruff).

22. Several days later, on February 2, 2023, DETECTIVE OLIVER had an interview with VICTIM who stated that he met a female named Trinidad at the Hoover Market on January 29, 2023.

23. VICTIM stated that he and the female had engaged in sexual intercourse at a liquor store (a fact that VICTIM had not disclosed during the initial interview with police).

24. VICTIM then stated that he and the female went to the same BP gas station early that day, and the female interacted with several individuals at the gas station.

25.   VICTIM stated that after he and the female left the BP gas station, they traveled to Bessemore and Gratiot where VICTIM was robbed and carjacked by a black male.

26.   VICTIM stated that the black male suspect was one of the individuals that the female interacted with at the BP gas station earlier.

27.   DETECTIVE OLIVER returned to the BP gas station a second time to view additional video footage since VICTIM claimed that he and the female stopped there before he was robbed and carjacked.

28.   DETECTIVE OLIVER stated in detail in her report what she observed in the video footage, and there was no mention of the female suspect being pregnant.

29.   On February 2, 2023, a black male was arrested driving VICTIM's vehicle.

30.   VICTIM was brought to the Detroit Detention Center to view a live line up of the male suspect that was driving VICTIM's vehicle.

31.   VICTIM positively identified the male suspect that was driving his vehicle as the individual that robbed and carjacked him at gun point.

32.   DETECTIVE OLIVER interviewed the male suspect who admitted that he knew a female named Trinadad, but DETECTIVE OLIVER failed to show the suspect a photo of PLAINTIFF.

33. VICTIM was shown a six-pack lineup, and VICTIM allegedly identified PLAINTIFF, Porcha Woodruff, as the female who was present when the robbery and carjacking occurred.



34. The photo used in the lineup of PLAINTIFF was from an arrest in Canton, Michigan from 2015.

35. Despite having access to PLAINTIFF's current Driver's License, it was not used in the photo lineup.



36. DETECTIVE OLIVER requested a warrant for PLAINTIFF's arrest following an unreliable facial recognition hit, and from VICTIM allegedly identifying PLAINTIFF in a lineup from a photo that was eight years old.

## ARREST

37. On Thursday, February 16, 2023, at 7:50 a.m., PLAINTIFF was helping her two children get ready for school when she heard a loud knock at her door.

38. PLAINTIFF approached her front door and observed six Detroit Police Officers.

39. One of the officers asked PLAINTIFF when she answered the door "if she was Porcha Woodruff," and PLAINTIFF responded "yes."

40. The officer informed PLAINTIFF that, "I have a warrant for your arrest, step outside."

41. PLAINTIFF assumed the officer was joking.

42. PLAINTIFF asked the officer what the warrant was for.

43. The officer refused to tell PLAINTIFF what the warrant was for.

44. Another officer finally informed PLAINTIFF that she had a warrant for her arrest for robbery and carjacking.

45. PLAINTIFF asked the officer, "Are you kidding, carjacking? Do you see that I am eight (8) months pregnant?"

46. On that date, PLAINTIFF was approximately eight months pregnant PLAINTIFF realized that the officers were serious, so she was forced to tell her two children, who stood there crying, to go upstairs and wake PLAINTIFF's fiancé to tell him that "Mommy is going to jail."

47. PLAINTIFF's fiancé rushed downstairs to figure out what was taking place.

48. Once downstairs, PLAINTIFF's fiancé learned that PLAINTIFF was being arrested for robbery and carjacking.

49. PLAINTIFF and PLAINTIFF's fiancé urged the officers to check the warrant to confirm the female who committed the robbery and carjacking was pregnant, but the officers refused to do so.

50. PLAINTIFF also called her mother before being arrested and reluctantly informed her mother that the police were at her home arresting her for robbery and carjacking.

51. PLAINTIFF's mother attempted to explain to the officers over the cellphone, that it is not possible, stating, "she is eight months pregnant, there is no way she can carjack anyone pregnant."

52. Despite PLAINTIFF and her family's pleas, PLAINTIFF was taken to the police vehicle, searched, handcuffed, and arrested for her family and neighbors to witness. *

*PLAINTIFF'S fiancé recorded this arrest on his cellphone.

53. PLAINTIFF was taken to the Detroit Detention Center where she arrived around 8:20 a.m., and she was processed and booked.



54. While being booked, PLAINTIFF disclosed that she was diagnosed with gestational diabetes from her pregnancy.

55. While at the Detroit Detention Center, PLAINTIFF was not able to consume the foods or beverages offered because of her diagnosis.

56. PLAINTIFF was able to talk to a court-appointed attorney at around 1:30 p.m. via video.

57. PLAINTIFF informed the court-appointed attorney that she was eight (8) months pregnant.

58. The court-appointed attorney informed PLAINTIFF that she would request a personal bond at arraignment since PLAINTIFF was pregnant.

59. After PLAINTIFF was interviewed by the court-appointed attorney, PLAINTIFF was taken back to the holding cell.

60. Approximately 30 minutes later, PLAINTIFF was taken back out of the holding cell, and taken to a room to talk to DETECTIVE OLIVER and an unknown detective.

61.    The following is a summary of the conversation between DETECTIVE

OLIVER and PLAINTIFF:

>   DETECTIVE OLIVER: Do you know someone named Daniel White?
>   PLAINTIFF: No
>   DETECTIVE OLIVER: Do you frequently visit a BP gas station on
>   94 and Van Dyke.
>   PLAINTIFF: No
>   DETECTIVE OLIVER: A person made a report that he was carjacked
>   by a black male and you were with the black male.
>   PLAINTIFF: That is impossible.
>   DETECTIVE OLIVER: How many tattoos do you have?
>   PLAINTIFF: Five
>   DETECTIVE OLIVER: Can I see the ones on your right arm and
>   wrist?
>   PLAINTIFF: Yes. PLAINTIFF showed the tattoos.
>   DETECTIVE OLIVER: Are those the only ones you have on your
>   arm?
>   PLAINTIFF: Yes
>   DETECTIVE OLIVER: What kind of cellphone do you have and who
>   is your carrier?
>   PLAINTIFF: An iPhone and Xfinity mobile.
>   PLAINTIFF: How did my name come up?
>   DETECTIVE OLIVER: You were identified by the victim in a photo
>   lineup as the individual that was with the male that robbed and
>   carjacked him.
>   PLAINTIFF: Did the victim say the female was 8 months pregnant?
>   DETECTIVE OLIVER: No

62.    Despite knowing that PLAINTIFF was not involved in the robbery or

carjacking, DETECTIVE OLIVER directed PLAINTIFF back to the holding

cell.

63.    PLAINTIFF was arraigned approximately two hours later on the charges of

robbery and carjacking.

64. PLAINTIFF received a $100,000 personal bond and was told not to leave the state by the magistrate.

65. PLAINTIFF was released from the Detroit Detention Center at approximately 7:00 p.m.

66. While at the Detroit Detention Center, PLAINTIFF stood and/or sat on a concrete bench for approximately eleven (11) hours before being released since there were no beds or chairs available.

67. Once released, PLAINTIFF was taken to St. John's Hospital by her fiancé because she was suffering from stomach tightness and pain, whole body pains, headaches, and body weakness (See Exhibit 2).

68. While at the hospital, PLAINTIFF was taken to an examination room for observation.

69. PLAINTIFF was diagnosed with a low heart rate because of dehydration, and given two bags of fluid intravenously.

70. PLAINTIFF also learned that she was having contractions due to stress from that day's events.

71. PLAINTIFF was discharged from the hospital and instructed to take medication, maintain a healthy diet, stay hydrated, and ensure ample rest to safeguard the well-being of her unborn child, who was impacted by the situation.

72. Hospital staff also told PLAINTIFF that her doctor would be in contact with her in the next 24 hours.

73. The following day, PLAINTIFF contacted DETECTIVE OLIVER to have her cellphone returned.

74. Although DETECTIVE OLIVER knew PLAINTIFF was not involved in the robbery or carjacking, DETECTIVE OLIVER refused to release PLAINTIFF's cellphone to PLAINTIFF.

75. DETECTIVE OLIVER informed PLAINTIFF that a warrant was obtained to get a call detail from Xfinity Mobile to determine if PLAINTIFF was in the area when the robbery and carjacking occurred. **

76. PLAINTIFF pleaded with DETECTIVE OLIVER to return her cellphone immediately because her children and her doctor had no other way to get in contact with PLAINTIFF other than her cellphone, but DETECTIVE OLIVER refused.

77. Finally, PLAINTIFF's cellphone was returned to PLAINTIFF three hours later.

78. On February 27, 2023, PLAINTIFF appeared for her Probable Cause Conference in the 36th District Court before the Honorable Aliyah Sabree, and PLAINTIFF demanded to hold her Preliminary Examination.

79. The Preliminary Examination was scheduled for March 6, 2023.

**PLAINTIFF recorded this conversation.

80. On March 7, 2023, PLAINTIFF appeared for her Preliminary Examination, and the Wayne County Prosecutor's Office dismissed the case against PLAINTIFF for insufficient evidence (See Exhibit 3).

## COUNT I
## FALSE ARREST AND IMPRISONMENT IN VIOLATION OF THE FOURTH AMENDMENT AND 42 U.S.C. § 1983
## (DETECTIVE OLIVER)

81. PLAINTIFF incorporates by reference the above paragraphs.

82. The Fourth Amendment to the United States Constitution guarantees the right of the people "to be secure in their persons ... against unreasonable... seizures" and demands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."

83. In the warrant affidavit, DETECTIVE OLIVER omitted the fact that PLAINTIFF's facial recognition photo was eight (8) years old, and PLAINTIFF's recent Driver's License Photo was available.

84. DETECTIVE OLIVER deliberately omitted facts because the magistrate would have possibly denied the warrant.

85. The omitted facts were material in finding probable cause to obtain a warrant affidavit for PLAINTIFF's arrest.

## COUNT II
## 42 U.S.C. § 1983 MALICIOUS PROSECUTION
## (DETECTIVE OLIVER)

86.     PLAINTIFF incorporates by reference the above paragraphs.

87.     DETECTIVE OLIVER initiated the criminal proceedings against

PLAINTIFF by submitting a warrant for robbery and carjacking.

88.     DETECTIVE OLIVER lacked probable cause to initiate the proceeding.

89.     On March 7, 2023, the criminal proceedings were dismissed in

PLAINTIFF's favor for insufficient evidence.

90.     DETECTIVE OLIVER's actions appeared to be driven by malice towards

PLAINTIFF.

91.     As a consequence of the proceeding, PLAINTIFF suffered a significant

deprivation of liberty as she was given a $100,000 personal bond and was

not allowed to leave the state following the arraignment.


## COUNT III
## ELLIOT LARSEN
## VIOLATION OF PUBLIC ACCOMMODATION
## OF PUBLIC SERVICE AT MCLA 37.2301
## (DEFENDANT DETROIT and DETECTIVE OLIVER)

92.     PLAINTIFF incorporates by reference the above paragraphs.

93.     PLAINTIFF was denied "full and equal enjoyment of . . . public service

because of . . . race . . ." MCL 37.2302.

94. DEFENDANT DETROIT's Police Department is a place of public accommodation, a public service, and law enforcement agency as defined in Michigan's Elliot-Larsen Civil Rights Act (the Act), MCL 37.2301.

95. DETECTIVE OLIVER is a person, as that term is defined in the Act, and is an agent of DEFENDANT DETROIT.

96. DEFENDANT DETROIT allowed DETECTIVE OLIVER and others to engage in a pattern of racial discrimination of PLAINTIFF and other Black citizens by using facial recognition technology practices proven to misidentify Black citizens at a higher rate than others in violation of the equal protection guaranteed by Elliott-Larsen Act.

97. DEFENDANT DETROIT violated the Act and deprived PLAINTIFF of her civil rights by, among other things, subjecting PLAINTIFF, because of her race, arresting PLAINTIFF and other inconvenient acts which had the purpose and effect of denying her the full benefit of public safety of the police department and denying PLAINTIFF full and equal access to the use and privileges of public accommodations, public service, and police protection.

98. As a direct and proximate result of the conduct of DEFENDANTS, PLAINTIFF has suffered injuries and damages, including but not limited to:

a. Past and future pain and suffering, embarrassment, humiliation, mortification;

b. Economic Damages;

c. Past and future emotional distress; and

d. Deprivation of equal protection and due process of law

**COUNT IV**
**MONELL LIABILITY FOR FALSE ARREST AND IMPRISONMENT IN VIOLATION OF THE FOURTH AMENDMENT AND 42 U.S.C. § 1983 (DEFENDANT DETROIT)**

99.  PLAINTIFF incorporates by reference the above paragraphs.

100.  PLAINTIFF was injured and had her Fourth Amendment right to be free of unreasonable seizures violated because DEFENDANT DETROIT's Police Department established inadequate policies, failed to train officers, and exhibited a custom of acquiescence regarding deficient facial recognition practices.

101.  Given the publicly known flaws of facial recognition technology are prone to misidentifying individuals, DEFENDANT DETROIT's Police Department violated her Fourth Amendment rights by failing to guard against foreseeable errors and their consequences.

102. Moreover, DEFENDANT DETROIT did not adequately train its officers, including DETECTIVE OLIVER, to properly utilize facial recognition technology.

103. Considering the substantial emphasis DEFENDANT DETROIT's Police Department placed on facial recognition searches, the failure to implement proper regulations for the technology's use and adequately train its employees reveals a state of deliberate indifference towards the potential harm faced by individuals erroneously "identified." The inclusion of these individuals in six-pack photo lineups significantly increases the chances of further misidentification, especially since their appearance in such lineups could closely resemble the actual suspect due to prior identification as potential matches by the facial recognition technology.

## COUNT V
## FALSE ARREST AND IMPRISONMENT (STATE CLAIM)
## (DETECTIVE OLIVER)

104. PLAINTIFF incorporates by reference the above paragraphs.

105. PLAINTIFF was arrested and imprisoned as a result of DETECTIVE OLIVER's actions.

106. PLAINTIFF was aware of the arrest and imprisonment, and it was against PLAINTIFF's will.

107.  DETECTIVE OLIVER intended to arrest and imprison PLAINTIFF against PLAINTIFF's will.

108.  The arrest and imprisonment were unlawful as DETECTIVE OLIVER was aware PLAINTIFF had not committed the crime alleged prior to PLAINTIFF's arraignment, and DETECTIVE OLIVER failed to take any actions to have PLAINTIFF released.


## COUNT VI
## MALICIOUS PROSECUTION (STATE)
## (DETECTIVE OLIVER)

109.  PLAINTIFF incorporates by reference the above paragraphs.

110.  DETECTIVE OLIVER continued a prosecution against PLAINTIFF when DETECTIVE OLIVER was aware that PLAINTIFF had not committed a crime.

111.  On March 7, 2023, the criminal proceedings were dismissed in PLAINTIFF's favor for insufficient evidence.

112.  DETECTIVE OLIVER continued the proceeding without probable cause, as DETECTIVE OLIVER learned on February 16, 2023 at the Detroit Detention Center that PLAINTIFF was not the individual that had committed the crime of robbery and carjacking because PLAINTIFF was

eight months pregnant; however, DETECTIVE OLIVER made no attempts to stop the criminal proceedings.

113. DETECTIVE OLIVER continued the proceeding with malice as described more fully above in Paragraphs 108 and 112.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (DETECTIVE OLIVER)

114. PLAINTIFF incorporates by reference the above paragraphs.

115. In the manner described more fully above, DETECTIVE OLIVER engaged in extreme and outrageous conduct.

116. DETECTIVE OLIVER continued a criminal proceeding against PLAINTIFF where DETECTIVE OLIVER knew that PLAINTIFF was innocent.

117. DETECTIVE OLIVER knew that there was a high probability that her conduct would cause severe emotional distress to PLAINTIFF.

118. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of PLAINTIFF.

119. As a proximate cause of this misconduct, PLAINTIFF suffered injuries including but not limited to severe emotional distress.

**WHEREFORE**, PLAINTIFF prays for:

a.  Compensatory non-economic and economic damages that may be proven at trial to compensate PLAINTIFF;

b.  Exemplary/Punitive damages as may be proven at trial;

c.  Reasonable attorney fees, costs, and interest pursuant to 42 U.S.C. §1988; and,

d.  Such other and further relief as appears reasonable and just under the circumstances.

Dated: August 3, 2023                    /s/Ivan L. Land
                                           Ivan L. Land (P65879)
                                           Law Offices of Ivan L. Land, P.C.
                                           25900 Greenfield Rd., Suite 210
                                           Oak Park, MI  48237-1267
                                           248.968.4545 / (f) 248.968.4540
                                           ill4law@aol.com
                                           **Attorney for PLAINTIFF**

PORCHA WOODRUFF,
    an individual,             Case No. 5:23-cv-11886
        Plaintiff,            Hon. Judith E. Levy

V

CITY OF DETROIT
a municipal corporation,

LaSHAUNTIA OLIVER,
City of Detroit Police Detective,
Individually, and in her Official
Capacities, and

        Defendants.

---

**DEMAND FOR TRAIL BY JURY**

NOW COMES PLAINTIFF hereby demands a trial by jury.


Dated: August 3, 2023            /s/Ivan L. Land
                           Ivan L. Land (P65879)
                           Law Offices of Ivan L. Land, P.C.
                           25900 Greenfield Rd., Suite 210
                           Oak Park, MI  48237-1267
                           248.968.4545 / (f) 248.968.4540
                           ill4law@aol.com
                           **Attorney for PLAINTIFF**