**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN – SOUTHEASTERN DIVISION**

| | |
|---|---|
| PORCHA WOODRUFF, | Hon. Judith E. Levy |
| Plaintiff, | Case No.: 5:23-cv-11886 |
| - vs - | |
| CITY OF DETROIT and LASHAUNTIA OLIVER, | |
| Defendants. | |

| | |
|---|---|
| LAW OFFICES OF IVAN L. LAND, P.C., | CITY OF DETROIT LAW DEPARTMENT |
| Ivan L. Land Sr. (P65879) | Gregory B. Paddison (P75963) |
| Attorney for Plaintiff | Attorney for Defendants |
| 25900 Greenfield, Rd., Ste. 210 | Coleman A. Young Municipal Center |
| Oak Park, MI 48237 | 2 Woodward Avenue, Suite 500 |
| (248) 968-4545 | Detroit, MI 48226 |
| Ill4law@aol.com | (313) 237-0435 |
| | paddisong@detroitmi.gov |

## JOINT RULE 26(F) DISCOVERY PLAN

**NOW COME** the parties, by and through their respective counsel, and in accordance with the Court's August 25, 2023, Text Only Order, submit the following Joint Discovery Plan:

Appearing for the parties as counsel will be:

**Plaintiff's Counsel**:   Ivan L. Land Sr. (P65879)
**Defense Counsel**:   Gregory B. Paddison (P75963)

**RELATED CASES**: None.

**SUBJECT MATTER JURISDICTION:** The basis for the Court's jurisdiction is 28 USC § 1331. Brought pursuant to 42 USC §1983, Plaintiff's Complaint asserts claims

under the Constitution and laws of the United States specifically, alleged violations of Plaintiff's rights under the Fourth and Fourteenth Amendments.

<u>V</u><u>ENUE</u>: This Court is the proper venue pursuant to 28 USC § 1391(b), as all parties reside in this judicial district and, as alleged, the acts and omissions giving rise to this complaint occurred in this judicial district.

<u>P</u><u>LAINTIFF'S</u> <u>F</u><u>ACTUAL</u> <u>S</u><u>UMMARY</u>:

On January 29, 2023, Laurence Walker (hereinafter "Victim") reported to the Detroit Police Department that he had been robbed at gunpoint for his personal property and his vehicle.

On January 30, 2023, LaShauntia Oliver (hereinafter "Detective Oliver") from the commercial auto theft unit of the Detroit Police Department was assigned Victim's case.

On January 31, 2023, Detective Oliver contacted the Victim and was informed that Victim's cellphone that was stolen during the robbery had been returned to 6240 Van Dyke Detroit, MI 48213 (hereinafter "BP gas station"). Detective Oliver learned that the cellphone was returned to the BP gas station by a female. Detective Oliver went to the BP gas station to view the video footage of the individual female that had returned the cellphone. Detective Oliver submitted an AVERT request to members of the Detroit Police Department to extract the video. Once the video was extracted, Detective Oliver submitted a facial recognition request on the female that returned the cellphone to the BP gas station. Facial recognition returned identification for Plaintiff, Ms. Porcha Woodruff (hereinafter "Ms. Woodruff").

Several days later, on February 2, 2023, Detective Oliver had an interview with Victim who stated that he met a female named Trinidad at the Hoover Market on January 29, 2023. Victim stated that he and the female had engaged in sexual intercourse at a liquor store. Victim then stated that he and the female went to the same BP gas station early that day, and the female interacted with several individuals at the gas station. Victim stated that after he and the female left the BP gas station, they traveled to Bessemore and Gratiot where Victim was robbed and carjacked by a black male. Victim stated that the black male suspect was one of the individuals that the female interacted with at the BP gas station earlier. Detective Oliver returned to the BP gas station a second time to view additional video

footage since Victim claimed that he and the female stopped there before he was robbed and carjacked. Detective Oliver stated in detail in her report what she observed in the video footage, and there was no mention of the female suspect being pregnant.

On February 2, 2023, a black male was arrested driving Victim's vehicle. Victim was brought to the Detroit Detention Center to view a live lineup of the male suspect that was driving Victim's vehicle. Victim positively identified the male suspect that was driving his vehicle as the individual that robbed and carjacked him at gunpoint. Detective Oliver interviewed the male suspect who admitted that he knew a female named Trinidad, but Detective Oliver failed to show the suspect a photo of Ms. Woodruff. Victim was shown a six-pack lineup, and Victim allegedly identified Ms. Woodruff, as the female who was present when the robbery and carjacking occurred. Detective Oliver relied on the Victim's memory despite the fact that he was drinking alcohol, he thought he was drugged, and he took several days to recall what actually happened the night of the incident. The photo used in the lineup of Ms. Woodruff was from an arrest in Canton, Michigan from 2015. Despite having access to Ms. Woodruff's current Driver's License, it was not used in the photo lineup. Detective Oliver requested a warrant for Ms. Woodruff's arrest following an unreliable facial recognition hit, and from Victim allegedly identifying Ms. Woodruff in a lineup from a photo that was eight years old.

On Thursday, February 16, 2023, at 7:50 a.m., Ms. Woodruff was helping her two children get ready for school when she heard a loud knock at her door. Ms. Woodruff approached her front door and observed six Detroit Police Officers. One of the officers asked Ms. Woodruff when she answered the door "if she was Porcha Woodruff," and Ms. Woodruff responded "yes." The officer informed Ms. Woodruff that, "I have a warrant for your arrest, step outside." Ms. Woodruff assumed the officer was joking. Ms. Woodruff asked the officer what the warrant was for. The officer refused to tell Ms. Woodruff what the warrant was for. Another officer finally informed Ms. Woodruff that she had a warrant for her arrest for robbery and carjacking. Ms. Woodruff asked the officer, "Are you kidding, carjacking? Do you see that I am eight (8) months pregnant?" On that date, Ms. Woodruff was approximately eight months pregnant. Ms. Woodruff realized that the officers were serious, so she was forced to tell her two children, who stood there crying, to go upstairs and wake Ms. Woodruff 's fiancé to tell him that "Mommy is going to jail." Ms. Woodruff 's fiancé rushed downstairs to figure out what was taking place. Once downstairs, Ms. Woodruff's fiancé learned that she was being arrested for robbery and carjacking. Ms. Woodruff and her fiancé urged the officers to check the warrant to confirm the female who committed the robbery

and carjacking was pregnant, but the officers refused to do so. Ms. Woodruff also called her mother before being arrested and reluctantly informed her mother that the police were at her home arresting her for robbery and carjacking. Ms. Woodruff's mother attempted to explain to the officers over the cellphone, that it is not possible, stating, "she is eight months pregnant, there is no way she can carjack anyone pregnant." Despite Ms. Woodruff and her family's pleas, Ms. Woodruff was taken to the police vehicle, searched, handcuffed, and arrested for her family and neighbors to witness.

Ms. Woodruff was taken to the Detroit Detention Center where she arrived around 8:20 a.m., and she was processed and booked. While being booked, Ms. Woodruff disclosed that she was diagnosed with gestational diabetes from her pregnancy. While at the Detroit Detention Center, Ms. Woodruff was not able to consume the foods or beverages offered because of her diagnosis. Ms. Woodruff was able to talk to a court-appointed attorney at around 1:30 p.m. via video. Ms. Woodruff informed the court-appointed attorney that she was eight (8) months pregnant. The court-appointed attorney informed Ms. Woodruff that she would request a personal bond at arraignment since Ms. Woodruff was pregnant. After Ms. Woodruff was interviewed by the court-appointed attorney, Ms. Woodruff was taken back to the holding cell. Approximately 30 minutes later, Ms. Woodruff was taken back out of the holding cell, and taken to a room to talk to Detective Oliver and an unknown detective. Despite knowing that Ms. Woodruff was not involved in the robbery or carjacking, Detective Oliver directed Ms. Woodruff back to the holding cell. Ms. Woodruff was arraigned approximately two hours later on the charges of robbery and carjacking. Ms. Woodruff received a $100,000 personal bond and was told not to leave the state by the magistrate. Ms. Woodruff was released from the Detroit Detention Center at approximately 7:00 p.m. While at the Detroit Detention Center, Ms. Woodruff stood and/or sat on a concrete bench for approximately eleven (11) hours before being released since there were no beds or chairs available. Once released, Ms. Woodruff was taken to St. John's Hospital by her fiancé because she was suffering from stomach tightness and pain, whole body pains, headaches, and body weakness. While at the hospital, Ms. Woodruff was taken to an examination room for observation. Ms. Woodruff was diagnosed with a low heart rate because of dehydration, and given two bags of fluid intravenously. Ms. Woodruff also learned that she was having contractions due to stress from that day's events. Ms. Woodruff was discharged from the hospital and instructed to take medication, maintain a healthy diet, stay hydrated, and ensure ample rest to safeguard the well-being of her unborn child, who was impacted by the situation. Hospital staff also told Ms. Woodruff that her doctor would be in contact with her in the next 24 hours. The following day, Ms. Woodruff contacted Detective Oliver

to have her cellphone returned. Although Detective Oliver knew Ms. Woodruff was not involved in the robbery or carjacking, Detective Oliver refused to release Ms. Woodruff 's cellphone to her. Detective Oliver informed Ms. Woodruff that a warrant was obtained to get a call detail from Xfinity Mobile to determine if Ms. Woodruff was in the area when the robbery and carjacking occurred. Ms. Woodruff pleaded with Detective Oliver to return her cellphone immediately because her children and her doctor had no other way to get in contact with Ms. Woodruff other than her cellphone, but Detective Oliver refused. Finally, Ms. Woodruff's cellphone was returned to her three hours later.

On February 27, 2023, Ms. Woodruff appeared for her Probable Cause Conference in the 36th District Court before the Honorable Aliyah Sabree, and Ms. Woodruff demanded to hold her Preliminary Examination. The Preliminary Examination was scheduled for March 7, 2023. On March 7, 2023, Ms. Woodruff appeared for her Preliminary Examination, and the Wayne County Prosecutor's Office dismissed the case against Ms. Woodruff for insufficient evidence.

**DEFENDANT'S FACTUAL SUMMARY**: This matter began on January 29, 2023, at approximately 7:30 p.m., when Lawrence Walker ("Victim") reported to the Detroit Police Department ("DPD") that he had been carjacked and robbed at gunpoint. Members of the Commercial Auto Theft Section ("CATS") would respond shortly thereafter to take Victim's statement.

Summarily, Victim reported that earlier in the day, he'd met an unidentified black woman who appeared visibly distraught. Victim stated that he and the woman began to talk while drinking liquor inside his vehicle, before eventually dropping the unidentified woman off at a nearby location. When the unidentified woman exited Victim's vehicle, she immediately entered a dark colored Chevrolet Tahoe. Before Victim could depart, an unidentified black man exited the Tahoe under the guise of retrieving the woman's cell phone which had been 'inadvertently' left in Victim's vehicle. As Victim attempted to locate the woman's phone inside his vehicle, the unidentified man drew a weapon, demanding Victim's cell phone, wallet, and jewelry, before departing in Victim's vehicle.

Officer LaShauntia Oliver ("Officer Oliver") from CATS was assigned as the Officer-in-Charge of the investigation the following day.

On January 31st, Officer Oliver contacted Victim on his mother's cell phone and was advised that Victim's cell phone had been returned by an unidentified black woman to a gas station located on Van Dyke Avenue. Officer Oliver traveled to the gas

station and was able to review surveillance video noting that the woman who'd returned Victim's cell phone fit the physical description of the unidentified woman who had facilitated the carjacking and armed robbery two days prior. Accordingly, Officer Oliver submitted an Audio-Video Evidence Response Team ("AVERT") Request for video extraction, which was completed by DPD Investigator Gary Guarino on February 1st and promptly submitted by Officer Oliver as a Facial Recognition Request.

The following day, February 2nd, DPD Crime Analyst Nathan Howell ("Analyst Howell") conducted the Facial Recognition Search, which used biometric indicators to produce a list of seventy-three (73) potential matches.[1] Analyst Howell was then able to parse the potential matches down to a preliminary Investigative Lead for Porcha Woodruff ("Ms. Woodruff"). Analyst Howell's work was then reviewed first by Crime Analyst Karmin Dean, and then confirmed by DPD's Crime Intelligence Unit, specifically Executive Manager David Collins. After Analyst Howell's report was twice reviewed and approved, Officer Oliver was provided with the name Porcha Woodruff as an Investigative Lead.

Simultaneously on February 2nd, Officer Jacob Hebner and fellow members of CATS were canvassing the area where Victim's vehicle had reportedly been observed. Eventually, Victim's vehicle was located and after a brief term of mobile surveillance, CATS Officers executed a traffic stop where Daniel White ("Suspect White") was taken into custody without incident.

Also on February 2nd, Officer Oliver conducted an additional follow-up interview with Victim. Victim stated as a few days had gone by, he was able to recall more details of the carjacking and the events leading up to it. Victim now stated that after

---

[1] Contrary to misleading media reports, this is not an unusual number of potential matches. As the software uses only designated biometric indicators, it is not uncommon for the list of potential matches to include members of a different sex, race/ethnicity, or other readily identifiable features such as tattoos, birthmarks, scars, piercings, etc., which Crime Analysts can quickly exclude from the pool of potential matches. From there, analysts can also exclude potential matches for persons who are incarcerated, deceased, or on a myriad of other basis. Once a pool of potential matches identified by the facial recognition technology is parsed down to viable potential matches, the Analysts' conclusions must be confirmed by two separate Officers, including at least one superior Officer, before being returned to the OIC as an Investigate Lead.

he'd met the unidentified black woman, whom Victim knew as "Trinidad," at the Hoover Market, the two went to parking lot where they engaged in sexual intercourse inside Victim's vehicle. Victim and Trinidad then drove to the aforementioned gas station on Van Dyke, where Victim observed Trinidad interact with several unidentified men. After departing the gas station, Victim stated that he drove Trinidad to the area of Bessemore and Gratiot where he was then carjacked by one of the unidentified men with whom Trinidad had interacted with while at the Van Dyke gas station. Victim added that he suspected that he'd been drugged by Trinidad before, during, or shortly after their sexual encounter.

With Suspect White in custody and with an Investigative Lead for Ms. Woodruff, on February 3rd, Victim came to the Detroit Detention Center ("DDC") for purposes of conducting a live line up. However, because there were not enough men in custody at the DDC to conduct a proper live lineup, Officer Oliver prepared a photo-array for Suspect White, asking Deputy Donald Greenwald ("Deputy Greenwald") to assist by preparing a photo-array for Ms. Woodruff. Deputy Greenwald selected a photo of Ms. Woodruff and placed it in a lineup alongside five (5) other individuals with similar physical characteristics.

> As an aside, Deputy Greenwald and members of CATS who may be deposed in this matter will explain that although State Driver's License and Identification Card (collectively, "State ID") photographs are typically accessible to members of law enforcement, it is generally impractical to use such photographs in photo-arrays. Specifically, State ID photographs feature a blue background, where as most law enforcement entities use shades of gray for the backgrounds of mug shots. Such a discrepancy in background colors has been found to be a factor in determining whether a photo-array is "unduly suggestive" and is therefore prohibited by DPD policy. Moreover, unlike DPD's database of mug shot photographs, which can be searched using limiting parameters such as age, race/ethnicity, body type, hair length and color, piercings, tattoos, etc., no such ability exists for searching the database of State ID photographs, meaning that Officers compiling a line-up consisting of only State ID photographs would need to scroll through thousands of photographs one-by-one, to compile a useable photo-array. For this reason, Deputy Greenwald used one (1) of the other photographs of Ms. Woodruff that was available to him.

Once the photo-arrays were prepared Officer Oliver and Deputy Greenwald showed the photo-array to Victim, in the presence of stand-in attorney Wyatt Harris, who

identified Suspect White as the previously unidentified black male suspect responsible for the armed robbery and carjacking, and identified (incorrectly) Ms. Woodruff as the woman known to him as Trinidad.

Also on February 3rd, and contrary to the assertions made in the Complaint, Suspect White was not interviewed by Officer Oliver, but rather by CATS Officers Glover and Gray.

Based on the positive identifications, on February 4th, Officer Oliver prepared the Arrest Warrant Request for Suspect White, who was still in custody at the time, and a Not-in-Custody ("NIC") Warrant for Ms. Woodruff. The Warrant Request prepared by Officer Oliver contained all relevant information, including notably, that the Victim's recitation of the event had changed and that he suspected having been drugged by Trinidad, believed at this point by members of CATS, to be one-in-the-same as Ms. Woodruff. Nonetheless, the Arrest Warrant Requests were approved by DPD Captain Anthony O'Rourke ("Captain O'Rourke"), a presently unidentified Assistant Prosecuting Attorney ("APA") from the Wayne County Prosecutor's Office ("WCPO"), and a Circuit Court Judge. The NIC Warrant for Ms. Woodruff was then forwarded to the Fugitive Apprehension Services Team ("FAST").

Approximately two (2) weeks later, at approximately 8:30 a.m. on February 16th, Ms. Woodruff was located at her home by FAST and taken into custody without incident. Unfortunately, as Ms. Woodruff was being arrested and transported to the DDC, Officer Oliver was participating in mandatory firearms training and was not notified that Ms. Woodruff was in custody until early that afternoon.

Approximately six (6) hours after Ms. Woodruff was taken into custody, Officer Oliver arrived at the DDC to interview Ms. Woodruff with Deputy Greenwald assisting. Both Officer Oliver and Deputy Greenwald immediately suspected that Ms. Woodruff was not Trinidad, as Ms. Woodruff was eight months pregnant at the time (the suspect captured on surveillance did not appear to be pregnant) and Ms. Woodruff's tattoos did not match those visible in the surveillance footage from the Van Dyke gas station.

After an abbreviated interview, Deputy Greenwald informed Ms. Woodruff that he and Officer Oliver would "make some calls" to try to secure her release as quickly as possible. Of importance, DPD personnel do not have unilateral authority to release a criminal suspect for whom an Arrest Warrant has been approved by a Prosecutor and signed by a Judge. Immediately, Deputy Greenwald informed Captain O'Rourke that Ms. Woodruff was no longer believed to be the suspect, Trinidad.

Concurrently, Officer Oliver enlisted the help of CATS Officer Hebner in an effort to halt the prosecution of Ms. Woodruff and secure her release. Phone records show that following her interview with Ms. Woodruff, Officer Oliver made five (5) separate phone calls to WCPO APAs on February 16th alone, but was unable to make contact. For his efforts, Officer Hebner was able to speak with Judge Laura A. Echartea ("Judge Echartea"), who was the Magistrate presiding over arraignments that afternoon, and explained to her that he, Officer Oliver, and Deputy Greenwald believed that Ms. Woodruff had been improperly identified by the Victim. Judge Echartea responded that she could not simply dismiss the charges at the Arraignment, but would "keep it (the information provided by Officer Hebner) in mind," ultimately releasing Ms. Woodruff on a personal bond after spending approximately eleven (11) hours at the DDC.

The following day Officer Oliver was able to speak with APAs from the WCPO, explaining to them her doubts about Ms. Woodruff's involvement in the armed robbery and carjacking, again asking them to halt the prosecution. Officer Oliver was also able to speak with Ms. Woodruff herself regarding the return of Ms. Woodruff's phone which was being held as potential evidence. After consulting with Captain O'Rourke and other superior officers within CATS, Officer Oliver was authorized to return Ms. Woodruff's phone, but was also instructed to prepare a Search Warrant to trace Ms. Woodruff's whereabouts though her cell phone, between January 28th and 30th, in the event that the WCPO declined Officer Oliver's request to dismiss the charges. Although the Search Warrant was signed by Judge Prentis Edwards, the Warrant was never executed as APAs informed CATS that it would be dismissing the charges against Ms. Woodruff.

LEGAL ISSUES:

False Arrest/Imprisonment (State & Federal):

- Federal:

    o False Arrest: To prove false arrest, a plaintiff must show: 1) an arrest; 2) of a person; 3) who is innocent of the charge on which he is arrested; 4) by the defendant or at his instigation; 5) without legal justification.

    o The elements of false imprisonment are 1) an act committed with the intention of confining another, 2) the act directly or indirectly results in such confinement, and 3) the person confined is conscious of his confinement.

- State:

  - False arrest or imprisonment is arrest or imprisonment 1) of a person; 2) who is innocent of the charge on which he is arrested; 3) by the defendant or at his instigation 4) without legal justification.

Malicious Prosecution (State & Federal):

- Federal:

  - In order to establish a claim for malicious prosecution, a plaintiff must prove that 1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; 2) there was no probable cause for the criminal prosecution; 3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and 4) the criminal proceeding was resolved in the plaintiff's favor."

- State:

  - In a malicious prosecution action, the plaintiff has the burden of proving four elements: 1) that the defendant has initiated a criminal prosecution against him, 2) that the criminal proceedings terminated in his favor, 3) that the private person who instituted or maintained the prosecution lacked probable cause for his actions, and 4) that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice.

Elliot Larsen Civil Rights Act: Was Plaintiff denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status?

*Monell*: Did the City of Detroit have 1) an official "policy" or "custom," 2) created by the city, 3) which caused the particular alleged constitutional injury.

Intentional Infliction of Emotional Distress: Did Defendant engage in 1) extreme and outrageous conduct, 2) that was intentional or recklessness, 3) which caused Plaintiff to suffer, 4) severe emotional distress.

Defenses:

- Governmental Immunity [MCL § 691.1407(1)]: "Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function."

- Qualified Immunity [MCL § 691.1407(2)]: Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while acting on behalf of a governmental agency if all of the following are met: a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority; b) The governmental agency is engaged in the exercise or discharge of a governmental function; and c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

- Qualified Immunity: Qualified immunity protects public officials from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. In other words, government officials performing discretionary functions are shielded from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.

**CONTEMPLATED AMENDMENTS:** The parties do anticipate amendments to the pleadings.

**PROPOSED DISCOVERY PLAN AND ANTICIPATED DISPUTES:** The parties request six (6) months of fact discovery and propose the following discovery plan:

| Event/Deadline | Proposed Date |
|---|---|
| Fed. R. Civ. P. 26(a)(1) Initial Disclosures | October 02, 2023 |

| | |
|---:|:---:|
| Amendment of Pleadings | December 13, 2023 |
| Interim Status Conference | January, 2024 |
| Lay and Expert Witness Lists | January 15, 2024 |
| Fact Discovery Cutoff | February 12, 2024 |
| Expert Witness Disclosures/Report by Plaintiff | March 11, 2024 |
| Expert Witness Disclosures/Report by Defendant | April 09, 2024 |
| Expert Discovery Cutoff | May 14, 2024 |
| Dispositive Motions | June 11, 2024 |
| Challenges to Experts | July 16, 2024 |
| Motions *in Limine* | August 13, 2024 |
| Final Pretrial Conference | TBD |
| Jury Trial | TBD |

**JOINT DISCOVERY SUMMARY:** The discovery process will satisfy the proportionality requirements of Fed. R. Civ. P. 26(b)(1) by pursuing only the discovery that is truly necessary to resolve the case. This includes limiting discovery surrounding Plaintiff's allegations to the dates/times and individuals specifically identified in the Complaint. The most important subjects of the litigation include the Plaintiff's actions and Defendants' responses.

The Parties agree to the presumptive limits for interrogatories (25 per side) per individual party to balance the costs of discovery with the amount at stake in litigation.

The Parties anticipate that the presumptive federal limit of 10 depositions per side under Fed. R. Civ. P. 30 is sufficient in this case.

The Parties anticipate that the duration limits set for in Fed. R. Civ. P. 30(d) will be sufficient to fairly examine Plaintiff's claims and Defendants' defenses.

The Parties reserve the right to seek relief from such limitations to the extent necessary, but the Parties agree to work in good faith together prior to requiring the Court's intervention.

There is no need for changes in the timing, form or requirement for the disclosures under Rule 26(a)(1), but the Parties have not discussed exchanging initial disclosures at this time.

The Parties agree to exchange privilege logs if privilege issues arise. Anticipating the need for a reasonable protective order for Plaintiff's medical records, Defendants' sensitive personnel information, Defendant's proprietary/confidential business and/or operational information, as well as any other information the Parties identify as needing protection, the Parties will commence the process of developing such an order if necessary. Counsel will work in good faith to agree upon the terms. If unable to agree upon the appropriate terms, either party may move for a protective order as provided in the Federal Rules of Civil Procedure.

**PLAINTIFF'S SUMMARY OF DISCOVERY:**

**Plaintiff seeks to discover:**
- Body Camera footage from all arresting officers
- Booking photos from arrest
- Booking Documents from arrest
- Releasing Documents from arrest
- Videos from Interview Inside the Detroit Detention Center with Detective Oliver and Deputy Greenwald
- Videos from gas station referenced in the report
- Documentation from Victim's Statement
- Any Video footage from Victim's Interview
- Photos of Victim
- All Detroit Police Department Facial Recognition Training Documentation
- Any documentation showing facial recognition training for the Detroit Police Department and its officers.
- Any Certificates for Facial Recognition Technology held by the Detroit Police Department and the officers involved

**Plaintiff plans to depose:**
Plaintiff
Plaintiff's Healthcare Providers Including Mental Health Experts
Facial Recognition Expert
Officer LaShauntia Oliver
DPD Investigator Gary Guarino
DPD Crime Analyst Nathan Howell
Crime Analyst Karmin Dean
DPD Captain Anthony O'Rourke
6 Unknown Arresting Officer

Expert witness accounts regarding damages

Any other information that is made available during the course of discovery.

**DEFENDANT'S SUMMARY OF DISCOVERY:** Defendants seek discovery relating to Plaintiff's claims and alleged damages. Specifically, Defendants intend to pursue the following discovery:

Production and identification of all social media accounts used by Plaintiff and production of all content loaded onto any identified social media platform, including but not limited to Facebook, Twitter, and YouTube, relevant to the claims and allegations identified in this lawsuit, and to produce any other additional photographs and videos (outside of content posted to social media accounts), text messages, and emails relevant to the claims and allegations identified in this lawsuit;

Written discovery, including interrogatories and the production of any relevant documents, records (including medical records), financial documents related to Plaintiff or other materials Plaintiff has substantiating his allegations and damages alleged in his Complaint that were not provided as part of (1);

Defendants intend to depose the following:
- Plaintiff;
- Plaintiff's healthcare providers;
- Plaintiff's identified expert witnesses;
- All key witnesses identified during discovery; and
- Other depositions, which may become necessary depending on Plaintiff's testimony and the information developed during discovery;

Expert witness reports regarding damages, including economic and noneconomic damages, as well as medical and mental health experts; and

Other discovery as is warranted by progression of this case.

**ELECTRONIC DISCOVERY:** The Parties do not anticipate any disputes regarding the format of documents that will be produced. Once written discovery is served, the Parties will continue to meet and confer regarding the development of protocol for discovery of electronically stored information and will consult the guidelines laid out in the Eastern District of Michigan's Model Order Relating to the Discovery of Electronically Stored Information.

It is anticipated that each side will request that the other preserve all electronically-stored information that may be relevant to the case. What is considered relevant will be identified by reasonable and targeted search parameters as described below. The Parties agree that production of ESI must satisfy Rule 26(b)(2)(B). Requests for ESI and related responses will be reasonably targeted, clear, and as explicit as practicable. To manage the cost of ESI discovery, the Parties will cooperate with each other to identify reasonable and targeted search parameters, i.e. custodians and search terms, reasonably calculated to lead to the discovery of admissible evidence.

Electronic discovery materials will be produced in the most cost effective and/or time efficient manner, which will typically be electronically in its native format to the extent such materials can be produced in their native format. If the electronically stored information is not reasonably useable or obtainable in its native format and/or an objection is made to the format requested, then the Parties will confer in an attempt to determine a mutually convenient format.

Should a dispute as to the creation date of electronically stored documents arise, the Parties reserve the right to obtain that document in its native form (with metadata if produced in PDF or other non-native format originally).

**SETTLEMENT**: The parties are not opposed to participating in non-binding mediation.

**CONSENT TO MAGISTRATE JUDGE**: The parties do not agree to have a United States Magistrate Judge conduct any and all further proceedings in the case, including trial and to order the entry of final judgment.

**TRIAL**: The case will be tried by a jury. Counsel estimates the trial will last approximately 7 days total, allocated as follows: 4 days for Plaintiff's case and 3 days for Defendants' case.

**MISCELLANEOUS**: Nothing at this time.

Respectfully Submitted,

/s/   <u>Ivan L. Land Sr.</u>                          /s/   <u>Gregory B. Paddison</u>
      Ivan L. Land Sr. (P65879)                        Gregory B. Paddison (P75963)
      Attorney for Plaintiff                           Attorney for Defendants

Dated: September 24, 2023