<div align="center">

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN – SOUTHEASTERN DIVISION**

</div>

PORCHA WOODRUFF,                                    Hon. Judith E. Levy
   Plaintiff,                                    Case No.: 5:23-cv-11886

- vs -

~~CITY OF DETROIT and~~ LASHAUNTIA OLIVER,
   Defendant.

_____/

<div align="center">

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

</div>

**NOW COMES**, Defendant, LASHAUNTIA OLIVER, by and through her attorney, Gregory B. Paddison, and for her Brief in Support of Defendant's Motion for Summary Judgment, Defendant states as follows:

<div align="center">

**INTRODUCTION**

</div>

Lawrence Walker ("Mr. Walker") was the victim of a carjacking and armed robbery. Less than five (5) days later, Mr. Walker identified Porcha Woodruff ("Ms. Woodruff" or "Plaintiff") as an accomplice to the crime after picking her out of a photographic lineup. LaShauntia Oliver ("Officer Oliver"), the Officer in Charge of the criminal investigation, sought a warrant for Plaintiff's arrest based upon Mr. Walker's identification that was reviewed and approved by the Wayne County Prosecutor's Office and a magistrate. Less than two (2) weeks later, Plaintiff was arrested pursuant to that warrant. When Officer Oliver arrived at the Detroit Detention Center ("DDC") a few hours later to interrogate Plaintiff, she immediately

<div align="center">1</div>

recognized that Plaintiff was roughly eight (8) months pregnant and could not have been the female accomplice. Officer Oliver immediately calling multiple prosecuting attorneys and the Magistrate presiding over arraignments in an effort to secure Plaintiff's release from custody.  After being told that dismissal of the criminal charges had to come from the Prosecutor or Judge that would preside over the case, Plaintiff was arraigned and released on a personal bond, after spending approximately eight (8) hours in custody at the DDC.  The following day, Officer Oliver was able to reach a prosecuting attorney and explain the mistake.  The criminal charges against Plaintiff were voluntarily dismissed at her Preliminary Examination.

Plaintiff has attempted to blame her arrest on facial recognition technology. However, Plaintiff ignores the fact that the Warrant Request authored by Officer Oliver, that was reviewed and approved by the Wayne County Prosecutor and signed by the Magistrate, were all supported by an eyewitness identification.  The eyewitness identification provided probable cause to arrest and prosecute Plaintiff and all of her claims should be dismissed.

> "**The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted—indeed, for every suspect released**." *Baker v. McCollan*, 443 US 137, 145 (1979) [**emphasis added**].

## CLAIMS ASSERTED

2

Plaintiff's Complaint was filed on August 10, 2023, consisting of seven (7) Counts. ECF No.: 4. Counts I and V assert a False Arrest and Imprisonment claim against Officer Oliver pursuant to Federal and State Law, respectively. Counts II and VI similarly assert claims of Malicious Prosecution against Officer Oliver under Federal and State Law. Count III is brought pursuant to Michigan's Elliot-Larsen Civil Rights Act ("ELCRA") and Count VII asserts an Intention Infliction of Emotional Distress ("IIED") claim.[1]

## FACTUAL BACKGROUND

Shortly before 8:00 p.m. on January 29, 2023,[2] the Detroit Police Department ("DPD") received a 911 call from a liquor store on Gratiot Ave., where Mr. Walker had sought refuge to report that he'd just been carjacked at gunpoint. DPD Event Report, Exhibit "B" at Pg. 1. Minutes later, Officers Kelly Larsen and Gregory Scouten arrived at the location, where Mr. Walker reported:

> [H]e picked up an unknown female near 7 Mile and Hoover and drove her to [] Gratiot and Bessemore to drop her off. When he parked so the female could get out, he saw her get into a black Tahoe on the other side of the street. A male then exited the Tahoe and approached, stating, "she forgot her phone in your car." Mr. Walker exited his vehicle to look for the phone, when the male produced a handgun and said, "take everything off, where's the gun?" After Mr. Walker removed his clothes, the male then got into Mr. Walker's [vehicle] and drove off...

---

[1] Plaintiff has agreed to voluntarily dismiss her claims against the City (Counts I and IV). ECF No.: [  ]; Exhibit "A".

[2] All dates referenced refer to the year 2023, unless otherwise noted.

The female is a black female, brown complexion, brown and blond long hair, slim build, about 5'4" in height, wearing a black jacket.

Mr. Walker stated while he dove the female from 7 Mile and Hoover, she was on the phone stating she was getting a ride from someone. Mr. Walker noted that he mentioned to her that he has a gun, but did not mention to the female he did not have a gun on him…

Mr. Walker's phone and wallet were in the vehicle when it was taken. Larsen Daily Detail, Exhibit "C" at Pg. 6 [cleaned up].

Roughly ninety (90) minutes later, Mr. Walker was taken to a DPD Precinct and was interviewed by Detective Anthony Fletcher ("Det. Fletcher") a member of DPD's Commercial Auto Theft Section ("CATS"). There, Mr. Walker added that he and the female had been consuming alcohol, suspected that he may have been drugged but would recognize his assailant, and provided a few minor additional details. Fletcher Statement, Exhibit "D" at Pgs. 1-2. Although the investigation would be assigned to Officer Oliver the next day, because she was assisting other on-going CATS investigations, her investigation didn't begin until January 31st. Activity Log, Exhibit "E" at Pgs. 1-2.

On January 31st, Officer Oliver called Mr. Walker on his mother's phone number which he'd provided to Det. Fletcher. Exhibit "D". Mr. Walker stated that, according to a store clerk, his phone had been returned to a BP Gas Station on Van Dyke ("BP Station"), by an unidentified female. Warrant Request, Exhibit "F" at Pg. 2.[3]

---

[3] The Request was drafted on February 4th but is referenced here to provide chronology.

4

Accordingly, Officer Oliver visited the location to view surveillance video that showed a woman matching the description of the female accomplice returning the phone. *Id*. Suspecting this woman may be the female accomplice, Officer Oliver requested video extraction by the Audio/Video Evidence Response Team ("AVERT"). *Id*.

The next day, Officer Oliver submitted the extracted images to DPD's Crime Intelligence Unit ("CIU"), requesting a Facial Recognition search. *Id*. The search was performed by CIU Analyst Nathan Howell ("Analyst Howell"), whose training in "Face Comparison and Identification" by the Federal Bureau of Investigation ("FBI") enabled him to narrow the field of computer-generated matches to a single Investigative Lead. Howell Report Supplement, Exhibit "G". See also, CIU Report, Exhibit "H".[4] Analyst Howell's findings were reviewed and approved by a second CIU Analyst, Kamrin Dean ("Analyst Dean"), who is similarly trained by the FBI, before being reviewed again by David Collins, the CIU's Executive Manager at the time. Exhibits "G"-"H". Once approved, on February 2nd, Analyst Howell's findings were provided to Officer Oliver, giving the name "Porcha Woodruff" as an Investigative Lead. *Id*.

---

[4] A person identified as an 'investigative lead' does not necessarily mean that they will become a suspect in a criminal investigation absent independent corroboration. Michigan State Police ("MSP") Statewide Network of Agencies ("SNAP") Acceptable Use Policy, Exhibit "I" at Pg. 2; and DPD Manual Section 307.5, at Pgs. 1, 4, Exhibit "J".

Also on February 2nd, Officer Oliver interviewed Mr. Walker again, during which he stated that he'd begun to recall additional details about the night of January 29th. He now added that he and the female suspect, who he knew as "Trinidad," had met at the Hoover Market before heading to a Liquor Store parking lot where they had sex, after which they drove to the BP Station where the woman interacted with several people before they left the BP Station and drove to the location where he was carjacked. Exhibit "F" at Pg. 2. See also, Feb. 2 Statement, Exhibit "K". Learning that Mr. Walker and the female suspect had visited the same BP Station that his phone had been returned to, Officer Oliver returned to the location to check for additional video. _Id_. This time, Officer Oliver reviewed video corroborating Mr. Walker's recollection of events prior to the carjacking, namely that he may have been drugged, as the video showed "Mr. Walker's brake lights and gas being pressed several times even though the vehicle was parked." _Id_. at Pgs. 2-3. Officer Oliver submitted an AVERT request for extraction of this video the following day. Feb. 3rd AVERT Request, Exhibit "L".

As Officer Oliver was conducting her second interview with Mr. Walker and revisiting the BP Station on February 2nd, other CATS Officers were canvassing the area where the carjacking had occurred and spotted Mr. Walker's stolen vehicle. After brief mobile surveillance, Officers initiated a traffic stop of the vehicle and arrested the driver, Daniel White ("Mr. White"), taking him to the DDC without

incident. Exhibit "F" at Pg. 3; CATS Report Supplement, Exhibit "M".

With Mr. White in custody, on February 3rd, Mr. Walker went to the DDC for a line-up of Mr. White and a photo line-up of Plaintiff. Without enough men for a live line-up however, Officer Oliver prepared a photo line-up for Mr. White, while Deputy Donald Greenwald ("Dep. Greenwald") assisted by preparing the photo line-up for Plaintiff. White Photo Line Up, Exhibit "N". See also, Plaintiff Photo Line Up, Exhibit "O".[5] In the presence of a stand-in attorney, Mr. Walker easily identified Mr. White as the male suspect and Plaintiff as the female accomplice. Exhibit "F" at Pg. 3. See also, Line Up Statement, Exhibit "P".[6] Based on these identifications, on February 4th, Officer Oliver prepared the Warrant Request for Mr. White and Plaintiff, which was reviewed by Captain Anthony O'Rourke, submitted to the Prosecutor's Office, and signed by Magistrate Rodney Johnson. Exhibit "F". See also, Oliver Supplemental Report, Exhibit "R"; and Signed Warrant Documents, Exhibit "S". Plaintiff's arrest warrant was forwarded to the Fugitive Apprehension Services Team ("FAST"), the unit tasked with locating persons with outstanding arrest warrants. PO Perkins Deposition, Exhibit "T" at Pg. 5, L. 15; Pg. 6, L.25 – Pg.

---

[5] Dep. Greenwald is an Oakland County Sherriff's Deputy who was assigned to the CATS Unit as part as a joint task force among multiple metro-Detroit Law Enforcement Agencies.

[6] During the line ups of Mr. White and Plaintiff, Officers Ned Gray and Quentin Glover interrogated Mr. White. White Interrogation, Exhibit "Q".

<u>7, L. 2; Pg. 8, L. 1-9</u>.

Twelve days later, on the morning of February 16th, FAST Team members were provided a "Violent Crimes Reduction Initiative Intelligence Work Up" (<u>Exhibit "U"</u>) and at roughly 8:00 a.m., approached Plaintiff's home, knocked on her door, and explained that she had an outstanding warrant. After a brief verbal protest, Plaintiff complied with instructions to exit the home, was handcuffed, and taken into custody without incident. <u>PO McBee Supplemental Report, Exhibit "V"</u>.

At the time of her arrest, Plaintiff was eight months pregnant. While the FAST Team recognized this when they detained Plaintiff, it was the first time **any** Officer saw her in person or was made aware of her pregnancy, and it did not lead the FAST Team to question the Warrant's validity. <u>Exhibit "U" at Pg. 15, L. 12-19; Pg. 16, L. 19 – Pg., 17, L. 9; Pg. 18, L. 15-24; Pg. 19, L. 11-15, L. 21 – Pg. 21, L.9; Pg. 23, L. 15-25; Pg. 24, L. 7-25</u>. No FAST Team members are named Defendants in this suit.

After Plaintiff was booked at the DDC, Officer Oliver was notified that her suspect was in custody. Unfortunately, Officer Oliver was attending mandatory firearms training until approximately 2:45 p.m. that day. When her training was completed, Officer Oliver retrieved her investigative file and drove to the DDC to interview Plaintiff, with Dep. Greenwald assisting. <u>Oliver Deposition, Exhibit "W" at Pg. 90, L. 19 – Pg. 91, L.21</u>.

Seeing Plaintiff in person, Officer Oliver immediately realized that the wrong

person had been arrested (the female suspect seen on video was not visibly pregnant). Unsure what to do, Officer Oliver called her supervisors to explain the situation and was advised to take a brief statement and return to the station. After interviewing Plaintiff for roughly thirty minutes (Woodruff Interrogation, Exhibit "X"), Officer Oliver and Dep. Greenwald told Plaintiff that they would do everything in their power to secure her release before she was returned to her cell.[7] After returning to the station, Officer Oliver began calling multiple Wayne County Prosecutors, to explain the situation and have Plaintiff released from the DDC. While unable to reach a Prosecutor, Officer Oliver was able to reach Magistrate Laura A. Echartea who was presiding over arraignments.   Officer Oliver explained the situation but was told that she would need the Prosecutor or the Judge that would preside over the criminal proceedings to dismiss the charges.   The Magistrate did however note that she would take the information into consideration. Feb. 16 Tracking Note, Exhibit "Y".[8] Plaintiff was arraigned that afternoon and released that evening on a personal bond, after spending approximately eight hours in custody. 36th DC Register of Actions, Exhibit "AA".

---

[7] Officers cannot unilaterally release the subject of an Arrest Warrant from custody.

[8] See also, Phone Records, Exhibit "Z"; and Exhibit "W" at:
Pg. 44, L. 19 – Pg. 46, L. 7;          Pg. 57, L. 17 – Pg. 58, L. 4;
Pg. 46, L. 18 – Pg. 48, L. 21;        Pg. 68, L. 7 - Pg. 69, L. 9;
Pg. 51, L. 5-18;                              Pg. 91, L. 25 – Pg. 99, L. 23
Pg. 53, L. 24 – Pg. 54, L. 13

The next morning, Officer Oliver was able to reach Prosecuting Attorney, Garret Garcia ("Mr. Garcia"), and explain the situation. After informing Mr. Garcia that Ms. Woodruff was not the female suspect, Mr. Garcia stated that he would "update the case." Feb. 17 Tracking Note, Exhibit "BB". See also, Exhibit "Z". For reasons not entirely clear, the Prosecutor's Office did not dismiss the charges at or prior to the Preliminary Examination on February 27, despite representing to her counsel that the case would be dismissed. Preliminary Examination, Exhibit "CC". The Examination was adjourned to Mar. 7, when it was voluntarily dismissed. Exhibit "AA".

## STANDARD OF REVIEW

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). "[T]he court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Sagan v United States, 342 F.3d 493, 497 (6th Cir. 2003). Where the movant carries its burden of showing the evidence in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, summary judgment is appropriate. Guiterrez v Lynch, 826 F.2d 1534, 1536 (6th Cir. 1987). The court does not weigh the evidence to determine the truth of the matter, but to determine if the evidence produced creates a genuine issue for trial. Sagan, supra.

The moving party discharges its burden by showing that there is an absence of evidence to support the nonmoving party's case. *Horton v Potter*, 369 F.3d 906, 909 (6th Cir. 2004).  The burden then shifts to the non-moving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts," [*Matasushita Electric v Zenith Radio*, 475 US 574, 586 (1986)] it must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton*, supra at 909.  A factual dispute alone does not defeat a properly supported motion for summary judgment; the disputed fact must be material. *Anderson v Liberty Lobby*, 477 US 242, 252 (1986). A fact is "material" when proof of that fact would establish or refute as essential element of a claim or a defense. *Kendell v Hoover*, 751 F.2d 171, 174 (6th Cir. 1984).

## APPLICABLE LAW & ARGUMENT

### 1) THE COURT SHOULD GRANT SUMMARY JUDGMENT AS TO PLAINTIFF'S FALSE ARREST/IMPRISONMENT CLAIMS BECAUSE PROBABLE CAUSE EXISTED FOR HER ARREST AND OFFICER OLIVER IS ENTITLED TO QUALIFIED IMMUNITY.

To prevail on claims of False Arrest/Imprisonment under State or Federal Law, Plaintiff must establish that probable cause for her arrest was lacking. "[A] plaintiff must show that the arrest was not legal, *i.e.*, that the arrest was not based on probable cause." *Peterson Novelties v. Berkley*, 259 Mich. App., 1, 18 (2003); *Voyticky v. Timberlake,* 412 F.3d 669, 677 (6th Cir. 2005) ["(F)ederal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff"].

> An eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation. This comports with the general notion that, since eyewitnesses' statements are based on firsthand observations, they are generally entitled to a presumption of reliability and veracity. _Ahlers v. Schebil_, 188 F.3d 365, 370 (6th Cir. 1999).

And once probable cause is established, an officer has "no duty to investigate further or to look for additional evidence which may exculpate the accused." _Id._ at 371.

Initially, it should be noted that Officer Oliver was not the arresting officer, nor part of the FAST Team that took Plaintiff into custody. A claim under 42 USC § 1983 must demonstrate that a defendant "through the official's own individual actions, has violated the Constitution." _Ashcroft v. Iqbal_, 556 US 662 (2009). The Plaintiff must prove that the alleged violation was committed **personally** by the defendant. _Robertson v. Lucas_, 753 F.3d 606, 615 (6th Cir. 2014) [**emphasis in original**]. In this case, there is no evidence that Officer Oliver personally arrested or seized Plaintiff, nor evidence of **any** violation of the Fourth Amendment. In other words, there is no evidence to create a genuine issue of material fact, and Officer Oliver is entitled to judgment as a matter of law.

Separately, even where probable cause for an arrest may later be found to be lacking, law enforcement officers are entitled to qualified immunity where an officer relies in good-faith upon the issuance of an arrest warrant.

> The prosecutor, having all the information Escola had about the photo ID, determined probable cause existed. Plaintiff cannot show that Escola knowingly or with a reckless disregard for the truth procured a warrant for Plaintiff's arrest or knew the warrant was based upon allegedly false information or a material omission. Escola had a good faith basis for relying upon the warrant, and, thus, Escola is entitled to qualified immunity for the individual claim of false arrest. _Ruble v. Escola_, 898 F. Supp. 2d 956, 974 (N.D. Ohio 2012) [citations omitted].

Although, "an officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant" [_Yancey v. Carroll Cnty., Ky._, 876 F.2d 1238, 1243 (6th Cir. 1989)], "[a]n arrest pursuant to a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest or false imprisonment made pursuant to § 1983." _Voyticky_, supra.

In this case, Plaintiff's arrest was supported by an eye-witness identification and there was no apparent reason for Officer Oliver to disbelieve Mr. Walker's identification which established the requisite probable cause. _Ahlers_, supra. Accordingly, Plaintiff must overcome qualified immunity by showing that Officer Oliver "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood" and "such statements or omissions were material, or necessary, to the finding of probable cause." _Sykes v. Anderson_, 625 F. 3d 294, 305 (6th Cir. 2010) [citation omitted].[9] Qualified Immunity

---

[9] See also, _Smith v. Tolan,_ 158 Mich. 89, 93 (1909) ["in actions for malicious prosecution and false imprisonment, where a prosecuting witness has in good faith

applies if "a reasonable officer could have believed" that his or her actions were lawful "in light of clearly established law and the information the [officer] possessed." _Anderson v. Creighton_, 483 US 635, 641 (1987). A reasonable belief could be a mistaken belief, and the fact that it turns out to be mistaken does not undermine its reasonableness as considered at the time of the act. _Davenport v. Causey_, 521 F. 3d 544, 552 (6th Cir. 2008) [citation omitted]. In other words, immunity applies unless it is obvious that no reasonably competent official would conclude the actions were unlawful. _Chappell v. Cleveland_, 585 F. 3d 901, 907 (6th Cir. 2009). In sum, to prevail on her False Arrest/Imprisonment claim, Plaintiff must show that Probable Cause did not exist, and that Officer Oliver is not immune because she "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood" and "such statements or omissions were material, or necessary, to the finding of probable cause." _Sykes_, supra.

To begin, Plaintiff's identification as an "Investigative Lead" was not a basis for Officer Oliver's belief that probable cause existed and to seek a warrant for Plaintiff's arrest. See, Exhibits "G" – "J". Rather, the analysis must focus on: i) the reliability of Mr. Walkers' identification of Plaintiff; and ii) Officer Oliver's

---

fully and fairly stated all of the material facts within his knowledge to the prosecuting officer and acted upon his advice, proof of the fact establishes a case of probable cause"].

disclosure of the relevant facts in the Warrant Request. Exhibit "F".  As to the first inquiry, it is true, Mr. Walker's recollection of the circumstances surrounding the robbery and carjacking changed over time. Compare, Exhibits ""C" – "D" and "K". It is also true, that Mr. Walker admitted to drinking and suspected that he may have been drugged (Exhibits "D" and "K"), which may suggest that his identification of Plaintiff was unreliable. However, as discussed in the following, **all** of these considerations were included in the Warrant Request submitted to the Wayne County Prosecutor and approved by the Magistrate. Exhibit "F".

Conversely, Mr. Walker stated he spent "several hours" and engaged in sexual intercourse with the female suspect (Exhibits "K" and "P"). He also identified Mr. White (who was captured driving the stolen vehicle) and Plaintiff in under five (5) minutes combined, during a line-up occurring four (4) days after the incident (Exhibits "M" and "P"). And lastly, his story was generally supported by the BP Station surveillance video(s). All indicia of a reliable identification. Where indicia of both reliability and unreliability of a witness identification exists, the 6th Circuit advises, "probable cause does not require perfection, and witness identifications are entitled to a presumption of reliability and veracity." _Legenzoff v. Steckel_, 564 F. App'x. 136, 143 (6th Cir. 2014). Given these considerations, it cannot be argued that no reasonably competent official would conclude that probable cause did not exist and thus, Officer Oliver is entitled to qualified immunity. _Chappell_, supra.

However, *even if* no competent official would have concluded that probable cause existed, because Plaintiff's arrest was based upon a facially valid warrant, Officer Oliver is still immune unless she "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood" and "such statements or omissions were material, or necessary, to the finding of probable cause." <u>Sykes</u>, supra. In the Warrant Request Officer Oliver disclosed that: i) Mr. Walker's memory the event had changed with time; ii) he only knew the female suspect as "Trinidad"; iii) that he and Trinidad had engaged in sexual intercourse; iv) Mr. Walker acknowledged that he and Trinidad; and v) Mr. Walker suspected that he'd been drugged with the surveillance video depicted him behaving unusually, supporting this suspicion. <u>Exhibit "F" at Pgs. 2-3</u>. Additionally, Officer Oliver did not suggest that she'd met or seen Plaintiff in person, nor did she state any inculpatory information, aside from the positive identification by Mr. Walker. <u>See generally, Exhibit "F"</u>. Finally, she provided all documents and materials related to her investigation to the Prosecutor and Magistrate. <u>Subpoena Response, Exhibit "DD"</u>.[10]

---

[10] In the interests of efficiency, those documents contained in the Wayne County Prosecutor's Office Subpoena Response that are entirely redacted or are duplicative of the materials contained in the following Exhibits have been removed. <u>Exhibits: "B," "D," "F–H," "L-Q," and "S"</u>.

In sum, regardless whether the information Officer Oliver included the Warrant Request established probable cause, it was surely reasonable for her to believe as much, particularly as the Prosecutor and Magistrate agreed.  There is nothing to suggest that Officer Oliver "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood" and that "such statements or omissions were material, or necessary, to the finding of probable cause" (*Sykes*, supra), and accordingly, the facially valid warrant serves as a complete defense to Plaintiff's False Arrest/Imprisonment claims. *Tolan*, supra at 93; *Ruble*, supra at 974; *Voyticky*, supra at 677.[11]

## 2) SUMMARY JUDGMENT SHOULD BE GRANTED AS TO PLAINTIFF'S MALICIOUS PROSECUTION CLAIMS (COUNTS II & VI) BECAUSE:

### a. THE CRIMINAL PROCEEDINGS WERE VOLUNTARILY DISMISSED.

To establish a malicious prosecution claim under Federal Law, Plaintiff must prove that a criminal prosecution was initiated against her and the Officer Oliver made, influenced, or participated in the decision to prosecute; there was no probable cause for the criminal prosecution; as a consequence of the legal proceeding, **the plaintiff suffered a deprivation of liberty apart from the initial seizure**; and the

---

[11] See also, *Weiden v. Weiden*, 246 Mich. 347, 354 (1929) [It is the settled law in this state in actions of malicious prosecution and false imprisonment that, where a prosecuting witness has in good faith fully and fairly stated all of the material facts within his knowledge to the prosecuting officer and acted upon his advice, proof of the fact establishes a case of probable cause] (citations omitted).

criminal proceeding was resolved in the plaintiff's favor." _Johnson v. Moseley_, 790 F.3d 649, 654 (6th Cir. 2015) [**emphasis added**]. Under Michigan Law, Plaintiff has "the difficult burden of proving four elements: that the defendant has initiated **a criminal prosecution** against [her]; the criminal proceedings terminated in [her] favor; that the private person who instituted or maintained the prosecution lacked probable cause for [their actions; and that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice." _Peterson Novelties,_ supra at 21 (**emphasis added**). Moreover, the tort of "malicious prosecution is entirely distinct from that of false arrest, as the malicious-prosecution tort remedies detention accompanied not by absence of legal process, but by wrongful institution of legal process." _Sykes_, supra at 308; quoting, _Barnes v. Wright,_ 449 F.3d 709, 715–16 (6th Cir. 2006). In other words, the Preliminary Examination serves as the dividing line between claims of false arrest or imprisonment, and those of malicious prosecution.

Again, after realizing Plaintiff was not the female suspect, Officer Oliver did everything she could to halt the prosecution from proceeding and to secure Plaintiff's release from custody. Exhibits "Y" – "Z" and "BB" – "CC". While miscommunications in the Prosecutor's Office led Plaintiff's Preliminary Examination to be adjourned, the charges against her were voluntarily dismissed before the examination was held. Exhibits "AA" and "CC". Thus, because Plaintiff

was not 'prosecuted' she cannot bring a viable claim for malicious prosecution. _DJ., ex rel. York v. Ypsilanti Cmty._, 2015 WL 630860, at *10 (E.D. Mich. Feb 12, 2015) [Exhibit "EE"]; citing _Cheolas v. Harper Woods,_ 467 Fed. Appx. 374, 378 (6th Cir. 2012).[12]

### b. PROBABLE CAUSE EXISTED FOR PLAINTIFFS ARREST AND OFFICER OLIVER IS ENTITLED TO QUALIFIED IMMUNITY.

Assuming Plaintiff was 'prosecuted,' her Malicious Prosecution claims fail, regardless. As with False Arrest/Imprisonment claims, "Plaintiff must show, at a minimum, that there was no probable cause [for] the arrest and prosecution." _Barnes_, supra at 716. See also, _Sottile v. DeNike_, 20 Mich. App. 468, 471 (1969) [Probable cause precludes recovery for malicious prosecution] (citation omitted).   In the interests of brevity and for the reasons set forth in the discussion of Plaintiff's False Arrest/Imprisonment claims, because probable cause existed for Plaintiff's arrest and Plaintiff's arrest was based upon a facially valid warrant, Officer Oliver is entitled to qualified immunity as Plaintiff cannot demonstrate that Officer Oliver "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood" or that "such statements or

---

[12] See also, _Jones v. Clark Cnty.,_ 959 F.3d 748, 764, fn 8 (6th Cir. 2020) ["In _Cheolas_, the fact that charges against () plaintiffs were 'voluntarily dismissed' was only relevant to our finding that the plaintiff could not demonstrate that he suffered a deprivation of liberty as a result of the alleged malicious prosecution...] abrogated on other grounds; and _Mobley v. Detroit_, 938 F. Supp. 2d 669, 687 (E.D. Mich. 2012) [malicious prosecution claim fails because the charges were voluntarily dismissed"].

omissions were material, or necessary, to the finding of probable cause." *Sykes*, supra at 305; *Tolan*, supra at 93; *Ruble*, supra at 974; *Voyticky*, supra at 677; *Weiden*, supra at 354.

### c. There is no evidence that Officer Oliver acted with Malice.

In Michigan, Plaintiff must also show that the prosecution was undertaken with malice or a purpose besides bringing an offender to justice. *Peterson Novelties*, supra at 21.

> [This] prong sets a high bar, and the plaintiff must demonstrate that the defendant took actions that are willful, wanton, or reckless, or against the accuser's sense of duty. He can do so by providing proof of bad blood, ill will or retribution. A lack of probable cause does not alone suffice. When a malicious prosecution claim is brought against a police officer, he may avoid liability by showing that he made a full and fair disclosure of the material facts to the prosecutor. *Susselman v. Washtenaw Cnty.*, 109 F.4th 864, 872 (6th Cir. 2024) [interpreting Michigan Law] (citations and quotations omitted).

Here, not only is Plaintiff without **any** evidence of Officer Oliver acting maliciously, the record suggests the opposite. Again, upon realizing that Plaintiff was not the female suspect, Officer Oliver did everything possible to halt the prosecution and secure Plaintiff's release from the DDC. Exhibits "Y" – "Z" and "BB" – "CC".

### 3) Summary Judgment Should be Granted as to Plaintiff's Elliot-Larsen Claim (Count III) because There is no evidence of a discriminatory intent or purpose.

In Count III of Plaintiff's Complaint, it is alleged that the City:

> [A]llowed [Officer] Oliver and others to engage in a pattern of racial discrimination of Plaintiff and other black citizens by using facial

20

recognition technology practices proven to misidentify black citizens at a higher rate than others in violation of the equal protection guaranteed by [the] Elliott-Larsen [*sic*] Act." <u>ECF No.: 4, Pg. ID 76, at ¶ 96</u>.

Racial discrimination claims made under ELCRA are analyzed using the same framework as § 1983 claims for racial discrimination. <u>*Nelson v. Flint*, 136 F. Supp. 2d 703, 713 n.12 (E.D. Mich 2001)</u>. To prevail on a racial discrimination claim, plaintiff must show that the defendant's actions had a discriminatory effect and that it was motivated by a discriminatory purpose. <u>*Bey v. Falk*, 946 F.3d 304, 319 (6th Cir. 2019) [citation omitted]</u>. Discrimination may be proved by intentional discrimination or disparate treatment. <u>*Sanders v. Southwest Airlines*, 86 F. Supp. 2d 739, 744 (E.D. Mich. 2000)</u>. Intentional discrimination requires that the plaintiff is a member of a protected class, the decision-maker had a predisposition to discriminate against members of the protected class, and the decision-maker acted on that pre-disposition. <u>*Id*</u>. Disparate treatment may be proved by showing that plaintiff is a member of a protected class and was treated differently than persons of a different class for the same or similar conduct. <u>*Carter v. Shearer*, 596 F. Supp. 3d 934, 956 (E.D. Mich. 2022)</u>.

Simply, Plaintiff cannot prevail on her ELCRA claim under an intentional discrimination theory because, while Plaintiff is a member of a protected class, there is no physical or documentary evidence, nor has Plaintiff elicited any testimony, that either a decision maker of the City, or Officer Oliver (who is also African American),

21

had "a predisposition to discriminate against members of the protected class [or] acted on that pre-disposition." *Id*. Likewise, Plaintiff has no evidence suggesting that Officer Oliver or other DPD Officers would not have submitted the Warrant Request to the Prosecutor's Office under identical factual circumstances, had the female accomplice been of some other racial or ethnic background.

Additionally, Plaintiff has failed to allege or otherwise show, how the City or Officer Oliver's use of FR Technology has denied Plaintiff "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of ... [a] public service." MCL § 37.2302.  To this end, where there has not been a denial of access to public services or accommodations, it was beyond the scope of the legislative purpose underlying the Civil Rights Act to provide redress to the plaintiff. *Kassab v. Mich. Basic Prop. Ins.*, 441 Mich. 433, 439–441 (1992) [overruled on other grounds]; *Wilson v. Detroit*, 2001 WL 760020, at *2 (Mich. Ct. App. Jan. 30, 2001).

In sum Plaintiff's ELCRA claim is without a *modicum* of evidentiary support. While evidence must be viewed in the light most favorable to the nonmoving party, "summary judgment does not allow, much less require that [courts] draw strained and unreasonable inferences in favor of the nonmovant." *Fox v. Amazon.com*, 930 F.3d 415, 425 (6th Cir. 2019) [internal quotations and citations omitted].

**5) S**UMMARY **J**UDGMENT **S**HOULD BE **G**RANTED AS TO **P**LAINTIFF'S **IIED C**LAIM **(C**OUNT **VII) B**ECAUSE**:**

### a. PROBABLE CAUSE EXISTED FOR PLAINTIFF'S ARREST.

To establish an IIED claim, Plaintiff must prove extreme and outrageous conduct, intent or recklessness, causation, and severe emotional distress. *Hayley v Allstate Ins.*, 262 Mich. App. 571, 577 (2004) [quotations and citation omitted]. "Liability attaches only when a plaintiff can demonstrate that the defendant's conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Lewis v LeGrow*, 258 Mich. App. 175, 196 (2003) [quotations and citation omitted]. "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Doe v Mills*, 212 Mich. App. 73, 91 (1995). The test is whether "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Roberts v Auto-Owners*, 422 Mich. 594, 603 (1985) (quotation marks and citation omitted).

Plaintiff has not supported her claim that Officer Oliver's behavior was extreme or outrageous. As outlined above, there is no question that Officer Oliver had probable cause to seek a Warrant for Plaintiff's arrest or that the Arrest Warrant was approved and signed by the Prosecuting Attorney and Magistrate. Thus, Plaintiff's IIED claim is premised on a legal assertion regarding probable cause that is unsupported by the record. Plaintiff has not alleged anything unusual or violent

about her arrest. In fact, Plaintiff's arrest was nothing other than ordinary, aside from being misidentified as the female suspect. Because the alleged "outrageous and extreme" conduct did not occur, *i.e.*, there was no unlawful arrest, Plaintiff's IIED claim fails as a matter of law. *Swain v Morse*, 332 Mich. App. 510, 534 (2020). Michigan courts have held as a matter of law that an officer whose actions are based upon a valid warrant or who makes an arrest based on probable cause "cannot be liable for intentional infliction of emotional distress.**"** *Walsh v. Taylor*, 263 Mich. App. 618, 634 (2004). Officer Oliver is therefore entitled to Summary Judgment.

**b. OFFICER OLIVER'S CONDUCT WAS NOT EXTREME OR OUTRAGEOUS AND PLAINTIFF CANNOT SHOW INTENT OR RECKLESSNESS.**

Moreover, there is no evidence that the Officer Oliver acted outside her authority, engaged in bad faith or acted with malice. As this Court has observed, "a plaintiff will only be able to recover for intentional infliction of emotional distress in the most egregious of cases." *Dominique v. United States*, 2021 WL 3053385 at *32 (ED Mich July 20, 2021) [citation and quotation omitted] (Exhibit "FF").

In *Dominique*, this Court explained that Plaintiff's IIED claim failed because the conduct of the government actors was not extreme or outrageous, and because Plaintiff produced no evidence that the government actors had a specific intent to cause emotion distress or acted recklessly. Like the present matter, in which Officer Oliver was unaware that Plaintiff was eight months pregnant at the time of her arrest, the government officials in *Dominique* had no knowledge that the Plaintiff was

receiving mental health treatment. Further, like in *Dominique*, Plaintiff's arrest was entirely uneventful. Again, the FAST Team simply approached Plaintiff's home, knocked on her door, and explained that she had an outstanding warrant. After a brief verbal protest from Plaintiff, she complied with the FAST Officers' instructions to exit the home and was handcuffed and taken into DPD custody without incident. Exhibit "V". In *Dominique* this Court concluded, as it should again here, "a reasonable jury would not be able to conclude that the second element of Plaintiff's intentional infliction of emotional distress claim is met because the jury would not find that Officer Oliver specifically intended to cause Plaintiff emotional distress or that their conduct was so reckless that any reasonable person would know emotional distress would result. *Dominique*, supra at 32-33; *Jaafar v. Dearborn Heights*, 2019 WL 247229, at *7 (E.D. Mich. Jan. 17, 2019).

## CONCLUSION

**WHEREFORE**, Defendant, LASHAUNTIA OLIVER, respectfully requests that this Honorable Court grant Defendant's Motion for Summary Judgment and further grant any other relief deemed just and appropriate.

<div style="margin-left:50%">

Respectfully Submitted,
CITY OF DETROIT LAW DEPARTMENT

</div>

Dated: November 4, 2024          /s/  Gregory B. Paddison
                                      Gregory B. Paddison (P75963)
                                      Attorney for Defendant