UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PORCHA WOODRUFF,
An individual
Plaintiff
v.
CITY OF DETROIT
A municipal corporation,
LaSHAUNTIA OLIVER,
City of Detroit Police Detective,
Individually, and in her Official Capacities, and Defendants.

Case Number:

Rule 26(a) Report of Steven L. Johnson

July 26, 2024

## Table of Contents

1. **Declaration of Steven L. Johnson**..................................................................................... 2
2. **Introductory Statements** ................................................................................................. 2
   *Acknowledged Report Intent*............................................................................................ 2
   *Case Credibility Determinations*...................................................................................... 3
   *Case Specific Limitation* .................................................................................................. 3
   *Degree of Certainty*......................................................................................................... 3
   *Discussions and Explanations of Underlying Issues*........................................................ 3
   *Expert Capacity*................................................................................................................ 3
   *Further Development*...................................................................................................... 3
   *Newly Identified Issues* ................................................................................................... 3
   *Not Commenting Does Not Imply Agreement*................................................................. 3
   *Not Legal Advice or the Practice of Law*.......................................................................... 3
   *Not Medical Diagnosis or Opinion*................................................................................... 3
   *Report Focus*.................................................................................................................... 3
   *Right to Amend*................................................................................................................ 3
   *Specific References*.......................................................................................................... 3
3. **Provisos.** ............................................................................................................................ 4
   *Case Training Specificity*.................................................................................................. 4
   *Contemporaneous Content*............................................................................................. 4
   *Exhibit Attachments*........................................................................................................ 4
   *Format Simplification*...................................................................................................... 4
   *Gender Specificity*............................................................................................................ 4
   *Rebuttal Report*................................................................................................................ 4
   *References to the Record*................................................................................................. 4
   *Supplemental Report*....................................................................................................... 4
   *Supplemental/Rebuttal Report*........................................................................................ 4
4. **Executive Summary and Précis**......................................................................................... 4
   Incident Synopsis.............................................................................................................. 5
   Opinions in Brief............................................................................................................... 5
5. **Expert Qualifications**........................................................................................................ 5
   Introduction to Qualifications.......................................................................................... 5
   Credentials in Brief........................................................................................................... 5
       *Formal Education*....................................................................................................... 6
       *Training Completed/Certifications Earned*................................................................ 6
       *Memberships*............................................................................................................. 6
       *Training Delivered*..................................................................................................... 6
       *Authorship*................................................................................................................. 6
       *Currently*................................................................................................................... 7
           Maintaining and furthering of my professional skills and knowledge................ 7
   Expert Case Consultancy Objectivity................................................................................ 7
6. **Analysis Protocol**.............................................................................................................. 7
   Preparation for Case Review............................................................................................ 7
   Methodology..................................................................................................................... 7

    Terminology.................................................................................................................... 7
    Truth, Veracity and Bias................................................................................................. 7
    Relevance and Reliability............................................................................................... 8
7.  **Scope of Report**............................................................................................................. 8
    Nature and Status of Opinion......................................................................................... 8
    Claims Asserted.............................................................................................................. 8
    8General Assertions........................................................................................................ 8
    Focus of Review............................................................................................................. 8
8.  **Background**................................................................................................................... 8
9.  **Facts or Data Considered**........................................................................................... 8
10. **Review of Department Policy**....................................................................................... 9
11. **Summary and Conclusion**............................................................................................ 10

1. **Declaration of Steven L. Johnson**

   I, Steven L. Johnson, being of legal age and under penalty of perjury, state as follows:
   a. I am a competent adult and have personal knowledge of the following facts or believe them to be true based on information provided and the belief that said information was founded in fact. Facts about which I do not have personal knowledge are of the type reasonably relied upon by experts in this field and have probative value to me in rendering my opinions.
   b. Attached hereto is a true and accurate copy of my expert report in this matter.
   c. This report summarizes my analyses and findings to include a statement of my opinions and the bases and reasons for them. The report also includes facts or data considered by me in forming said opinions and sets out my qualifications (including curriculum vitae).
   d. My opinions are expressed to a reasonable, or higher, degree of professional certainty.
   e. I affirm under penalty of perjury that the foregoing statements are true and correct.

   07/30/2024  
   Date  
                                             Steven Johnson, IAI CLPE, CFA  
                                             Arlington, VA

2. **Introductory Statement**

   The following introductory statements apply to this entire report, including any attached exhibits, which are to be incorporated as integral parts thereof. Some of these introductory statements may be reiterated in the body of this report.
   *Acknowledged Report Intent*. Nothing in this report intends to, or should be understood as an attempt to, usurp or subvert the function of the Court, or to intrude upon or inappropriately influence the role of the Jury or other trier of fact.
   *Case Credibility Determinations*. It is not my intent to make any credibility determinations in developing or expressing my opinions in this case.
   *Case Specific Limitation*. Any actions, statements, writings, this report, information, any testimony, etc., are specifically limited to this case.
   *Degree of Certainty*. All opinions stated in this report are in direct regard to the case captioned, and the underlying incident or events leading to this case, and are expressed to a reasonable, or higher, degree of professional certainty.

*Discussions and Explanations of Underlying Issues.* Any discussion or explanation of underlying issues is intended to assist the reader with understanding some of the concepts that inform my opinions in this matter.

*Expert Capacity.* This report and any subsequent reports, testimony, opinions, etc., are within my capacity as an independent criminal justice and governmental risk management expert.

*Further Development.* The opinions expressed in this report are not necessarily final in nature. Rather, they are listed to comply with current report requests. Each opinion may be further developed through research, investigation, during deposition, and/or trial testimony.

*Newly Identified Issues.* If new issues are opined, identified, and/or developed subsequent to submission of this report, I reserve the right to supplement this report, as allowed by the Federal Rules of Civil Procedure, and as allowed by the Court.

*Not Commenting Does Not Imply Agreement.* While I am commenting on numerous facts, issues, statements, and opinions of others, including experts etc., the absence of a comment – or the presence of highlighting emphasis or bolding – does not in any way imply agreement, unless so stated.

*Not Legal Advice or the Practice of Law.* The expert services rendered in this case and this document are not legal advice, and are not to be construed, in any way, as legal advice, or as the practice of law.

*Report Focus.* This report is focused solely on the incident captioned and related concerns and/or issues.

*Right to Amend.* The statements and opinions in this report are living opinions. That is, should additional discovery material be received, and/or additional research be completed, and then reviewed, these statements and opinions may be altered and/or reinforced depending upon what information is obtained, reviewed, considered, researched, and/or studied.

*Specific References.* Some of the opinions in this report may list or cite specific references to some of the documents or research reviewed and/or considered. These listings and citations are not intended to be exhaustive or exclusive. I specifically reserve the right to supplement the support for each of the opinions in this report.

4. **Provisos.**

    a. *Bracketed Comments*. Unless otherwise noted, comments and information appearing in brackets – particularly in conjunction with quoted text passages – have been inserted by the author of this report, to assist the reader, to aid in clarity, or in the interest of brevity.
    b. *Case Training Specificity*. I note that, while officers are trained in the concepts and constructs that may be discussed in this report, as they have evolved from various Court rulings, many may not be trained as to the specifics of individual cases.
    c. *Contemporaneous Context*. Unless otherwise noted, identifying a reference in this report in the present context, *i.e.*, is, is not meant to imply that the same reference was not identified in a past context, *i.e.*, was, contemporaneous to the events being discussed.
    d. *Exhibit Attachments*. Several exhibits are attached to this report; a Documents/Materials Reviewed/Considered List, my detailed Curriculum Vitae, a listing of cases wherein I have testified at deposition and/or trial in the past four years, and my full Fee Schedule. Additionally, other exhibits may be attached, as necessary. Some of these attached exhibits may be synopsized within the body of this report. However, the attached exhibits – whether synopsized or not – should be considered as an integral, incorporated, part of this report.

     e. *Format Simplification*. In the interest of clarity, this report will forego standard APA formatting for any in-text case citations, and will instead utilize footnotes.
     f. *Gender Specificity*. Unless referring – in context – to a specific individual, the use of masculine or feminine pronouns, *i.e.*, he, she, her, his, etc., in this document is not intended to be gender specific.
     g. *Rebuttal Report*. If this is a rebuttal report, addressing information, statements, opinions, documents, or other information, that opposing counsel and/or opposing putative expert have proffered following the submission of my original report in this matter, some portions of my original report and/or the opposing statements or documents may be reiterated here, in order to reacquaint and orient the reader.
     h. *References to the Record*. Unless otherwise specified, references to "the record" cited herein refer to the documents of record provided to me during the course of my review and analysis.
     i. *Supplemental Report*. If this is a supplemental report, addressing information and documents that have become available following the submission of my original report in this matter, some portions of my original report may be reiterated here, in order to reacquaint the reader.
     j. *Supplemental/Rebuttal Report*. If this is a combined supplemental/rebuttal report, it addresses both information and documents that have become available following the submission of my original report in this matter, as well as information, statements, opinions, documents, or other information, that opposing counsel and/or opposing putative expert have proffered following the submission of my original report in this matter. In such cases, some portions of my original report may be reiterated here, in order to reacquaint the reader.

**5. Executive Summary and Précis**

My name is Steven L. Johnson. My company, Ideal Innovations, Inc. (I$^3$) was contacted by defense counsel on or about February 7th, 2024, and ultimately engaged in the above captioned matter – for the purposes of providing review, analysis, and opinions – regarding the allegations made against certain employees of the Detroit (Michigan) Police Department and the City of Detroit.

Incident Synopsis.  See generally, "Joint Rule 26(f) Discovery Plan." (ECF No.: 11 at Pg. ID 175-182).[1]

Opinion in Brief. For the reasons set forth in this report, and to a reasonable – or higher – degree of professional certainty, I hold the following opinions:
     a. It is my opinion that – based upon the policies, procedures and protocols that existed at the time of the alleged incident – the employees of the Detroit Police Department's Crime Intelligence Unit acted with good faith and in compliance with Departmental Policies when issuing an investigative lead based on probe images of Porcha Woodruff submitted into the department's facial recognition system (FRS), which in conjunction with the subsequent positive eyewitness identification of the subject of the probe image, led to the arrest of Porcha Woodruff.

---

[1] For a list of all materials provided to me for purposes of review in developing this Report, please refer to Attachment "A".

Page | 4

  b. Since this event, the Detroit Police Department has initiated additional guardrails for action on any similarly developed investigative leads that include developing additional physical and/or circumstantial evidence to proceed with actionable detainment or arrest.

  c. *Training*. It is my opinion that the policies, procedures, and protocols followed by DPD Crime Analyst Nathan Howell are consistent with the training and experience he had to act as a facial reviewer and to assess data returned by the FRS after submission of the probe image.  Additionally, Ms. LaShauntia Oliver acted in accordance with existing DPD policy (permitted limited use of Facial Recognition Technology when investigating car jackings and robberies, among other serious crimes) by utilizing the investigative lead provided by Mr. Howell in conjunction with the victim's identification of Woodruff as one of the perpetrators of the criminal act.

  d. *Procedural Guidelines*.  It is my opinion that the Detroit Police employees involved in this incident acted in good faith based on the existing facial recognition policy and did not violate procedural guidelines that were in place that the time.

6. **Expert Qualifications**[2]

Introduction to Qualifications. This report is provided based upon my personal and professional skill, knowledge, experience, education, and/or training, in and of the law enforcement, biometrics, criminal justice, and governmental service, gained over the past 35 years and more.
I am a retired law enforcement officer, formerly employed as a full-time, sworn police officer, and law enforcement supervisor, trainer, and manager. As such, I have supervised and instructed law enforcement, facial analysts, and crime scene investigators – as well as supervisors, managers, and executives – in the performance of their duties, to include crime scene exploitation, latent print examination, forensic art, biometrics, and facial examination. I have instructed others outside the law enforcement community on all elements of facial identification and comparison.

Credentials in Brief. More specifically, I served for 18 years as a professional, credentialed, certified – sworn and fully empowered – law enforcement officer, trainer, with approximately one-half of that time as a supervisor, field supervisor, and manager. In addition to my certification as an Iowa police officer, I earned and was awarded the "Good of the Association" and "Distinguished Member" awards from the International Association for Identification (IAI), the world's oldest and largest forensic practitioner organization, the Davenport (IA) American Legion "Officer of the Year of Valor", and numerous other awards and citations while in the employ of the Davenport Police Department. Upon retirement from the Davenport Police Department in 2005, I was employed by the Iowa Department of Criminal Investigation (2005-2006) as a Criminalist with expertise in Latent Print & Footwear Examination and Forensic Art. I later deployed to Iraq during Operation Iraqi Freedom (2006-2007) in support of U.S. Department of Defense (DoD) biometrics, forensic, and counter-IED operations.  My support of the DoD continued from 2007 through 2019 as a manager of the DoD's Biometrics Operation Directorate in West Virginia. I current serve as a Senior Advisor and Facial Identification Trainer for Ideal Innovations, Inc.

*Formal Education, Certifications and Additional Relevant Training*. I earned and was awarded a Bachelor of Science Degree in Psychology from the University of Iowa. I successfully completed police academy training, and earned and was awarded certification as an Iowa police officer and have accumulated over 2000 hours of additional law enforcement and forensics training over the course of

---

[2] For addition information please refer to my *Curriculum Vitae*, Attachment "B."

Page | 5

my career.  I am an IAI certified Latent Print Examiner and Forensic Artist and currently serve as the Chair of the IAI's Science & Practices subcommittee for Facial Identification.

*Memberships*. In order to remain professionally current, I maintain active and professional memberships in numerous associations and organizations. My memberships include, among others:
- International Association for Identification
    - Past President
    - Life Member
    - Current Chair of the Facial Identification subcommittee
- International Association of Cranio-Facial Identifiers
- International Association of Forensic Sciences
- American Academy of Forensic Sciences – Academy Standards Board (Member of the Friction Ridge Consensus Body)
- International Association of Chiefs of Police
- Organization of Scientific Area Committees (OSAC) for Forensic Science
    - Past Chair of the OSAC Forensic Science Standards Board
    - Current member of the Face and Iris Identification Subcommittee
- OSAC representative to the Facial Identification Scientific Working Group (FISWG)
- Membership in numerous subdivisions of the IAI
    - Chesapeake Bay Division
    - New York Division
    - South Carolina Division
    - Iowa Division
    - Florida Division

*Training Delivered/Presentations Conducted*. I have taught U.S. and international law enforcement agencies and in the private sector.  I've also presented on facial examination at numerous conferences, meetings, and symposia in the U.S. and abroad. I was a certified Field Training Officer while in the employ of the Davenport Police Department.  Additionally, I have been asked to speak at various venues regarding the state of facial identification as a forensic discipline, the need for training and the status of the discipline as it pertains to eventual certification.[3]

*Authorship*. Over the course of my career as a forensics and biometrics subject matter expert and standards advocate, I have authored and published more than 30 articles on various forensic, biometric, and standards related topics and have recently completed a chapter on the need for training in facial identification for Springer publishing.[4]

*In maintenance and furtherance of my professional skills and knowledge,* I attend annual conferences, maintain my certifications as a latent print examiner and forensic artist, and I continue my membership and active involvement in numerous professional organizations, as indicated above.

Expert Case Consultation Objectivity. I have testified in numerous criminal cases but, as yet, have not testified as an expert in facial identification.  Facial Identification, as a forensic discipline, is relatively new in the criminal justice arena (established in 2009 with the creation of the Facial Identification Scientific Working Group) and, as a result, opportunities to testify have been few and far between. In fact, there are less than five recorded examples of expert witness testimony specific to the facial

---

[3] For a list of Trainings I have taught, Presentations I have conducted, please refer to Attachment "C".
[4] For a list of my publications please refer to Attachment "D."

examination discipline to date.  I have been privileged to provide expert consultation and review in several cases since 2019, over half of which have been defense cases.

**7.   Analysis Protocol**

Preparation for Case Review. In preparation of my review and development of associated opinions in this matter, I have reviewed the documents and data provided, and will continue my analysis if and when additional data becomes available. The materials that I reviewed in this case are of the type relied upon by consultants and experts when conducting analyses of law enforcement, corrections, security, and criminal justice issues. The documents received, researched, and reviewed, thus far, have – upon information and belief – provided me with enough relevant data to develop my opinions to a reasonable, or higher, degree of professional certainty. In developing my opinions, in addition to my evaluation of documents and other materials, I rely upon my skill and/or knowledge – as gained through my many years of experience, education, and/or training – in the law enforcement, security, corrections, and risk management fields; consultation with peers, review of professional literature, and independent research; as well as my understanding of the instant case.

Terminology. Any opinions I proffer or statements that I make in this or other reports that relate to legal terminology, standards, best practices, preferred practices, case law, or similar constructs, are drawn from my training and/or experience as a criminal justice practitioner, manager, educator, and trainer, as well as my experience and/or training as a researcher, governmental risk manager, and advisor. I explicitly note that use of specific legal terminology in this report is not intended to usurp or subvert the function of the Court, or to intrude upon or inappropriately influence the role of the Jury or other trier of fact.

Truth, Veracity, and Bias. Any analysis incorporated into this or other reports – or in any subsequent testimony – is not intended to presume that any one version of the claims made in this case is more truthful than any other. Information drawn from various documents and other sources will generally be reported and contrasted for the purpose of relating events as they were perceived by those involved.

Methodology. I understand that a non–scientific expert must be qualified to offer expert testimony by "knowledge, skill, experience, training, or education".  Similarly, I understand that the role of the expert is to provide "specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue"; and that said expert's contribution must be "not only relevant, but reliable."

Relevance and Reliability. My experience, education, and training, provide the basis for my opinions regarding the issues surrounding the incident in this case. That is, my 15 years of active law enforcement experience, and my many certifications as a police management trainer, as well as my specialized training and education in the area of facial examination, directly relate to the issues that are in consideration. Additionally, the applicability of my knowledge, experience, education, and training, to my review of the issues within the context of the greater law enforcement community and its operational and managerial practices, underscore the reliability of my analysis and opinions. My analysis and opinions rest on a reliable foundation, in that my opinions have "a reliable basis in the knowledge and experience of [my] discipline." In this report I have provided both general and specific information that demonstrates and illustrates my qualifications to provide expert opinions and testimony regarding the issues anticipated to be raised in this case.

**7. Scope of this Report**

I was engaged by defense counsel (Gregory Paddison) and was asked to review and opine regarding the reported actions of a Detroit Police Officer, concerning the events that gave rise to this action, as well as appropriate ancillary issues. My expertise is specific to the end user analysis of facial recognition system searches and how candidate images are connected to a probe image submitted to the system for algorithmic assessment. Additionally, I was asked to review existing Detroit Police Department policies regarding the use of facial recognition as an investigative tool (specifically as an "investigative lead") and whether said policies (along with other determining factors) were appropriately followed in this incident.

**Claims Asserted.** It is my understanding that the following claims are asserted in this case.

- COUNT I: FALSE ARREST AND IMPRISONMENT IN VIOLATION OF THE FOURTH AMENDMENT AND 42 U.S.C. § 1983 (DETECTIVE OLIVER)
- COUNT II: 42 U.S.C. § 1983 MALICIOUS PROSECUTION (DETECTIVE OLIVER)
- COUNT III: ELLIOT LARSEN VIOLATION OF PUBLIC ACCOMMODATION OF PUBLIC SERVICE AT MCLA 37.2301 (DEFENDANT DETROIT and DETECTIVE OLIVER)
- COUNT IV: MONELL LIABILITY FOR FALSE ARREST AND IMPRISONMENT IN VIOLATION OF THE FOURTH AMENDMENT AND 42 U.S.C. § 1983 (DEFENDANT DETROIT)
- COUNT V: FALSE ARREST AND IMPRISONMENT (STATE CLAIM) (DETECTIVE OLIVER)
  COUNT VI: MALICIOUS PROSECUTION (STATE) (DETECTIVE OLIVER)
- COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (DETECTIVE OLIVER)

**8. Background**

This action arises out of allegations concerning an arrest incident that occurred during the morning hours of February 16, 2023, of Porcha Woodruff by Officer LaShauntia Oliver of the Detroit, Michigan, Police Department.

**9. Facts or Data Considered**

My analyses and opinion are limited to the actions taken based on existing Detroit Police Department policy at the time of the incident regarding the use of facial recognition technology pursuant to creating an investigative lead or pursuant to probable cause for arrest. This policy included other elements or steps that were necessary (at the time) to facilitate obtaining a warrant for or initiating an arrest. Unknown (probe) images of subjects of interest and the resulting data (images) returned after said probe is searched against a database of known, prior arrested/detained persons.

**10. Review of Relevant Passages from Detroit Police Policy**

DPD memorandum dated 05SEP2019:
1. NEW: Specific Purpose of the Facial Recognition Technology Use: The Department shall specify the purpose of the Facial Recognition Technology's permitted limited use.

Page | 8

    a. (Examples from Georgetown Law "The Perpetual Line-Up: Unregulated Face Recognition in America)
        i. (a) Face recognition refers to an automated process matching face images utilizing algorithms and biometric scanning technologies [and human component review].[5]
        ii. (b) The system aids in the support of an ongoing Part 1 Violent Crime Investigation or a Home Invasion I investigation.[6]
        iii. <u>Part 1 Violent Crimes</u>: Criminal Homicides, Sexual Assaults, Aggravated Assaults, Non-Fatal Shootings; **Robberies, and Carjacking**. (**emphasis added**)
        iv. <u>Home Invasion I Elements</u>:
            1. (1) entered a home without permission or broke in,
            2. (2) intended to commit or did commit a felony, larceny, or assault in the home, and
            3. (3) either was armed with a dangerous weapon or entered while another person was lawfully within the home.
            4. See MCL 750.110a(2).
        v. (c) The use of the Facial Recognition Technology is only utilized to identify investigative leads. The requesting investigator shall continue to conduct a thorough and comprehensive investigation.

2. ***NEW: Required Facial Recognition Technology Training: The Department shall indicate that Department members utilizing the Facial Recognition technology system shall have ongoing, competent training from an experienced source to access and operate the Facial Recognition technology software (i.e. FBI Agency, Department-Approved Training, other nationally recognized Facial Recognition conferences, etc.).*** (emphasis added)

3. NEW: Specify Supervisor Responsibilities: The Department shall specify the Crime Intelligence Unit Supervisor's responsibilities within the proposed policy directive (i.e. Supervisory Review of all Peer-to-Peer evaluations, written evaluation required for each review, monitoring use of system, etc.).

4. NEW: Indicate Minimum Required Standard: ***The Department shall specify the minimum threshold standard at the beginning of the policy directive for the use of the Facial Recognition Technology. (also noted within the definition section)***
    a. i.e. Reasonable Suspicion – defined as "specific articulable facts coupled with rational inferences when taken together that reasonably warrant the degree of intrusion" or
    b. ***Heightened Standard: Probable Cause: "A reasonable belief that a person has committed, is committing, or will commit a crime."*** (emphasis added)

***Per Detroit Police Department Crime Intelligence Unit: Standard Operating Procedures (01APR2019 revision) Chapter 8. Facial Recognition, Section 2 (Purpose) & Section 5 (Use of Face Recognition Information)***

---

[5] Clare Garvie, Alvaro Bedoya & Jonathan Frankle, The Perpetual Line-Up: Unregulated Face Recognition in America (Oct. 16, 2016), https://www.perpetuallineup.org/recommendations.
[6] *Id*.

Page | 9

8.2. c) All deployments of the face recognition system are for official use only/law enforcement sensitive (FOUO/LES). The provisions of this policy are provided to support the following authorized uses of face recognition information:
> i. A reasonable suspicion that an identifiable individual has committed a criminal offense or is involved in or planning criminal (including terrorist) conduct or activity that presents a threat to any individual, the community, or the nation and that the information is relevant to the criminal conduct or activity.

8.5.(d).viii.g

> The following statement will accompany the released most likely candidate image(s) and any related records: "The result of a facial recognition search provided by the Detroit Police Department is only an investigative lead and is NOT TO BE CONSIDERED A POSITIVE IDENTIFICATION OF ANY SUBJECT. Any possible connection or involvement of any subject to the investigation must be determined through further investigation and investigative resources."

11. Facial Recognition is a relatively new tool for law enforcement investigations. Early algorithms developed in the 1990's and beyond were reasonably accurate when comparing facial images that were obtained in a "controlled environment" (e.g. arrest photos, driver's license photos, passport photos). These controlled captures generally have an established background, are face forward (portrait view) and limited expression by the subject. Utilization of Facial Recognition pursuant to criminal investigations by search closed-circuit or surveillance camera images or video stills was impractical for may years as the algorithms could not consistently connect images with a high degree of accuracy. With the rapidly evolving and improving technology in the Facial Recognition arena, systems are achieving higher levels of accuracy and success in linking images of subjects of interest captured in uncontrolled circumstances with known images that are stored in controlled capture databases. Another factor regarding the use of facial recognition systems is limited judicial review of the technology to date. There are fewer than ten cases in the U.S. wherein facial recognition is referenced or is a significant source of content in the final adjudication. One element of facial recognition systems use that is widely accepted in the law enforcement community is the establishment of an investigative lead should a probe image of a subject of interest meet the scoring threshold and end-user morphological review criteria to be considered support for the same source. This investigative lead, combined with the generally accepted practice of utilizing eyewitness and/or victim identification of a subject via a photo array other police arranged identification procedure, is considered reaching the level of probable cause for questioning and/or apprehension (arrest/detention) of said subject. In a National Academies report *Identifying the Culprit: Assessing Eyewitness Identification*, "(P)olice use identification procedures for numerous reasons. In some circumstances, the police identify a suspect during an investigation and use the identification procedure to test a witness' ability to identify the suspect as the perpetrator. In other instances, the identification procedure is used as an investigative tool to further an investigation. A positive identification might form probable cause for a search warrant or the apprehension and subsequent questioning of a suspect, or both".[7] The Detroit Police Department policy at the time of this incident included obtaining a warrant for arrest when an investigative lead was developed through facial recognition searching and having a positive identification from the victim of a serious crime, consistent with many law enforcement agencies

---

[7] 7. National Academies of Sciences, Engineering, and Medicine. 2014. Identifying the Culprit: Assessing Eyewitness Identification. Washington, DC: The National Academies Press. https://doi.org/10.17226/18891.

across the country. Additionally, like most law enforcement agencies, the Detroit Police Department regularly reviews its internal policies, protocols and standard operating procedures to ensure they protect the public and the public's civil rights.

12. **Factual Summary and Conclusions**

    A. **Factual Summary**

1. At the time of this incident, there was very little guidance from the Federal Legislature and/or Judiciary regarding the constitutional boundaries and/or requirements relating to the use of Facial Recognition Technology ("FR technology") by State and Local Law Enforcement Agencies. As such, policies relating to, providing guidance for, and/or restricting the use of FR technology are promulgated by State and Local Governments and Law Enforcement Agencies. To this end, the policies relating to the use of FR technology had been established by DPD, and were in place at the time of the events underlying this matter, are generally consistent with those in place for similarly situated municipal police departments at the time, with few (if any) notable deviations.

2. Additionally, since the commencement of DPD's use of FR technology to assist in criminal investigations, regular updates and revisions to DPD's policies relating to the use of FR technology have been discussed, considered, and where appropriate, implemented in order to maximize the accuracy and utility of FR technology, while mitigating to the extent possible, the likelihood and frequency of suspect misidentification.

3. Consistent with such policies, the crimes that served as the genesis of the underlying criminal investigation were an armed robbery and carjacking; both of which are Part 1 Violent Crimes, authorizing Officer Oliver's request for assistance from DPD's Crime Intelligence Unit through the use of FR technology.

4. At the time DPD Crime Analyst Nathan Howell performed the FR search at the request of Officer Oliver, that led to Ms. Woodruff being identified as an Investigative Lead, he had completed the "Face Comparison and Identification Program," a training program sponsored by the United States Department of Justice, Federal Bureau of Investigation – Criminal Justice Information Services Division. This program is designed in accordance with existing, published standards and guidelines that were developed by the Facial Identification Scientific Working Group (FISWG), a working group established in 2009 to create documents that support the proper use of Facial Recognition technology. Among those documents is "Minimum Training Criteria When Using Facial Recognition Systems".[8] This document includes (but is not limited to) recommendations such as:

    a. Familiarization with facial identification history
    b. How humans perceive faces vs. algorithms
    c. The need for competency training
    d. Image quality issues
    e. Proper analysis techniques
    f. Differences between "class" and "individual" characteristics
    g. Familiarity with scientific research related to the validity of facial comparison methods

---

[8] Minimum Training Criteria When Using Facial Recognition Systems: posted 12/09/2021

      h. A general understanding of how automated facial recognition systems work

5. That the image submitted by Officer Oliver for purposes of conducting the FR technology search, were matched to a recent mugshot of Ms. Woodruff. Thereafter, and consistent with DPD Policy, Crime Analyst Howell's findings were reviewed and accepted by Crime Analyst Karmin Dean, who had similarly completed the Face Comparison and Identification Training Program. Thereafter, in further compliance with then-existing DPD policy, the findings of Analysts Howell and Dean were subjected to an additional layer of peer review, and approved by Executive Manager, David Collins.

6. In accordance with DPD Policy, after Ms. Woodruff had been identified by Crime Analyst Howell as an Investigative Lead with assistance from the use of FR technology, and this finding was twice peer reviewed and approved, Officer Oliver was provided with Ms. Woodruff's identity as an Investigative Lead, with a disclaimer explicitly stating that "the result of a facial recognition search is provided by the Detroit Police Department only as an investigative lead and is not to be considered a positive identification of any subject. Nor is it probable cause for an arrest. Any possible connection or involvement of any subject to the investigation must be determined through further investigation and investigative resources."

7. In compliance with this disclaimer, Officer Oliver **did not** submit an arrest warrant request upon receipt of the Investigative Lead from Crime Analyst Howell. Rather, Officer Oliver did so only after the victim of the underlying Robbery and Car Jacking identified Daniel White, who was apprehended while driving the stolen vehicle, as the male criminal suspect, and identified Ms. Woodruff as the female criminal suspect, as discussed hereinafter.

8. In conformity with DPD policy, as well as the "Michigan State Police Statewide Network of Agency Photos (SNAP) Acceptable Use Policy," Deputy Donald Greenwald, who was assisting Officer Oliver with the preparation of the photo line-up, used a prior mugshot of Ms. Woodruff in the photo array, rather than a Michigan Department of State photograph, or the mugshot that was matched to Ms. Woodruff during the search performed by Crime Analyst Howell.[9]

---

[9] The SNAP Acceptable Use Policy Provides in pertinent part:

IV. Michigan Department of State (MDOS) Images
The SOS database contains a copy of images captured by the MDOS. MDOS images are considered highly restricted personal information that may be used by a federal, state, or local governmental agency for a law enforcement purpose authorized by law.

    A. When possible, other photographs (e.g., criminal mug shots, personal photographs) should be used rather than MDOS images.

    C. MDOS images shall not be used for candidates other than the primary suspect in a photo lineup. An MDOS image of the primary suspect may be used as part of a photo lineup. Photo lineups shall not include individuals age 17 or under at the time of image capture. MCL 712A.32 provides the court with the power to order a juvenile to appear for identification by another person.

V. Criminal Mug Shots and Scar, Mark, and Tattoo (SMT) Images

Page | 12

9. Based on this eyewitness identification, only then did Officer Oliver submit a Not-in-Custody ("NIC") Warrant for Ms. Woodruff's arrest, consistent with DPD policy requiring "further investigation and investigative resources." Notably, Officer Oliver included in her Warrant Request the potentially exculpatory information that the criminal victim who had identified Ms. Woodruff and Daniel White as the perpetrators of the Robbery and Carjacking, had consumed alcohol and suspected that he may have been drugged on the night in question.

10. The NIC Warrant for Ms. Woodruff's arrest was then reviewed by DPD Captain Anthony O'Rourke, and approved by Assistant Wayne County Prosecutor Garrett Garcia.

11. That, shortly after arrest of Ms. Woodruff, and it was determined that she was not likely the suspect (obvious pregnancy and non-matching tattoos), every effort was made to facilitate the release of Ms. Woodruff as soon as legally and administratively possible.

12. In the months following Ms. Woodruff's arrest, and as mentioned in Paragraph 2 of this section, DPD again revisited its policies relating to the use of FR technology, to provide additional safeguards against suspect misidentification in situations sharing circumstantial similarities as those present in Ms. Woodruff's case.

B. **Opinions and Conclusions**

1. Since the commencement of DPD's use of FR technology to assist in criminal investigations, regular updates and revisions to DPD's policies relating to the use of FR technology have been discussed, considered, and where appropriate, implemented in order to maximize the accuracy and utility of FR technology, while mitigating to the extent possible, the likelihood and frequency of suspect misidentification.

2. The policies relating to the use of FR technology had been established by DPD, and were in place at the time of the events underlying this matter, are generally consistent with those in place for similarly situated municipal police departments at the time, with few (if any) notable deviations, and none that ignored deficiencies known to the biometric community, with respect to the use of FR technology.

3. That the members of DPD responsible for the image search and human identification assisted by FR technology (Crime Analysts Howell and Dean), had completed the training necessary to properly utilize this technology.

---

C. Criminal mug shot images may be used as the primary suspect and all other candidates in a photo lineup. Photo lineups shall not include individuals 17 or under at the time of image capture. MCL 712A.32 provides the court with the power to order a juvenile to appear for identification by another person.

Current DPD Policy prohibits the use of the same photograph matched by FR technology, in a photo-array line-up. At the time of Plaintiff's arrest, this prohibition had been suggested as an amendment to, but not yet formally codified in DPD Policy. DPD Manual Section 203.11-4.2.

Page | 13

4. That the actions of all involved members of DPD were consistent with DPD's policies governing the use of FR technology that were in place at all times relevant.

5. That Ms. Woodruff's arrest warrant was submitted upon the existence of probable cause premised upon witness identification, contained all relevant inculpatory and exculpatory information, and was approved by the Wayne County Prosecutor's Office.

6. That Officer Oliver and other DPD Members, made every effort to facilitate the release of Ms. Woodruff as soon as legally and administratively possible, after realizing that Ms. Woodruff had been misidentified by the victim of the Robbery and Car Jacking.

7. That DPD has attempted to mitigate the risk of similar occurrences in the future through the adoption and implementation of additional procedural safeguards against suspect misidentification.