STATE OF MINNESOTA                                          DISTRICT COURT

COUNTY OF RAMSEY                                    SECOND JUDICIAL DISTRICT

---

State of Minnesota,                                        File No. 62-CR-20-5866

　　　　　　　Plaintiff
　　　　　　　　　　　　　　　　　　　　　　**ORDER**
vs.

Gerald Paul Archambault,

　　　　　　　Defendant

---

　　　　The Ramsey County Attorney's Office alleged, via complaint, that on or about May 28, 2020, Gerald Paul Archambault did commit:

1. Burglary-3rd Degree-Steal/Commit Felony or Gross Misdemeanor in violation of Minn. Stat. § 609.582.3.

The Complaint was filed on September 15, 2020. On May 2, 2022, Mr. Archambault filed a motion seeking to prohibit the State from offering HCSO analyst Nicole Hughes's testimony and any facial recognition "match" under *Frye-Mack* and Minnesota Rules of Evidence 702. The Court heard part of the motion on November 8, 2022, but did not take up the *Frye-Mack* issue at that time. On March 15, 2024, Mr. Archambault filed a motion for an order seeking, in relevant part: (1) dismissal of the complaint due to lack of probable clause, (2) preclusion of IIT results as not generally accepted, (3) preclusion of IIT results as foundationally unreliable, and (4) preclusion or dismissal on due process grounds.  The matter came before the Court for an all-day contested hearing on May 14, 2024. The issue was taken under advisement as of July 15, 2024. The Court has reviewed the submissions of the parties. Based on the following *Findings of Fact* and *Conclusions of Law*, the Court makes the following:

1

## ORDER

1. FaceVACS Investigative Imaging Technology and the process employed here in determining an investigatory lead do not reliably and consistently produce accurate results. They fail the *Frye/Mack* test.

2. Mr. Archambault's motion to suppress evidence pertaining to the use of that facial recognition technology is **GRANTED**.

3. The due process concerns raised by Mr. Archambault are moot.

4. The Court takes no action on the discovery violations noted by Mr. Archambault because they relate to the use of facial recognition technology in this case.

5. The independent tip provided to law enforcement that identifies Mr. Archambault as the suspect in this case is enough for this matter to survive a challenge for probable cause.

6. Mr. Archambault's motion to dismiss for lack of probable cause is **DENIED**.

Dated: September 13, 2024

BY THE COURT:

Gordon,
Andrew (Judge)

Digitally signed by
Gordon, Andrew (Judge)
Date: 2024.09.13
10:01:45 -05'00'

Andrew S. Gordon
Judge of District Court

**FINDINGS OF FACT**

1. On May 28, 2020—amidst the period of civil unrest prompted by the murder of George Floyd—HealthEast Midway Clinic in Saint Paul, Ramsey County, was burglarized.

2. The Saint Paul Police Department's ("SPPD") Civil Unrest Task Force obtained and reviewed surveillance footage from the clinic. They observed footage of a man taking a large television from the clinic. Several other individuals were also observed on surveillance footage committing other independent acts.

3. Task Force members took screenshots of suspects seen on the surveillance footage. These images were disseminated to other law enforcement agencies, the public at large, and to the Criminal Information Sharing and Analysis ("CISA") Unit of the Hennepin County Sheriff's Office ("HCSO"). Analyst Nicole Hughes ("Analyst Hughes") received and reviewed these screenshots.

4. One of the screenshots provided to Analyst Hughes was of the aforementioned man seen on footage carrying the television out of the clinic.

5. On September 8, 2020, Analyst Hughes ran this image through the FaceVacs Investigative Imaging Technology ("IIT") program at the HCSO. She reviewed the FaceVacs results, which included 20 booking photos. Analyst Hughes ruled out several individuals from the photos based on physical dissimilarities. She then did a subjective visual comparison of Mr. Archambault's booking photos with the suspect photo and determined Mr. Archambault was possibly the person depicted in the HealthEast Midway Clinic footage. She did not retain the IIT run results but did provide Mr. Archambault as a potential lead to the taskforce.

6.  On that same day, Sergeant Jennifer O'Donnell ("Sergeant O'Donnell"), who was a member of the Civil Unrest Taskforce, received and reviewed an anonymous email alleging that Mr. Archambault was the person seen removing the television from the clinic.

7.  Sergeant O'Donnell then reviewed the surveillance footage and compared it to a prior booking photo of Mr. Archambault. Sergeant O'Donnell thought that Mr. Archambault's booking photo matched the man seen in the surveillance footage in question.

8.  On September 15, 2020, Mr. Archambault was charged with a single count of felony third-degree burglary based almost entirely on the identifications noted above.

9.  At the May 14, 2024 *Frye-Mack* hearing, the State called three witnesses: Dr. Manjeet Rege,[1] Joseph Courtesis,[2] and Analyst Hughes. Mr. Archambault called two witnesses: Thomas Runyon[3] and Dr. Michael King.[4] Each witness has some experience with the use of

---

[1] Dr. Rege is a professor of data science at the University of St. Thomas. Dr. Rege has a PhD in Computer Science from Wayne State University. Dr. Rege's expertise is in artificial intelligence, machine learning, big data management, data visualization, and statistical data analysis. (Ex. 5.). Dr. Rege has written or collaborated on nearly eighty peer-reviewed articles in his related fields of expertise.

[2] Mr. Courtesis served with the New York Police Department ("NYPD") for twenty-seven years. He is the former Commander of the NYPD Central Investigations Division. His work included direct supervision of the NYPD's facial recognition technology unit. He oversaw thousands of investigations that utilized facial recognition technology. Mr. Courtesis helped other police departments build out their own policies. He wrote and co-wrote several working documents, position papers, and policy documents on the subject. Mr. Courtesis is a member of several relevant organizations and committees, including the Facial Identification Scientific Working Group, the Biometric Institute's Technology and Innovation Group, the Security Industry Association's Facial Recognition Working Group, the International Association of Chiefs of Police Crime Prevention Committee, and the IIJS Institute's Law Enforcement Committee.

[3] Mr. Runyon possesses two math degrees, worked for the National Security Agency (doing pattern recognition in large-scale datasets), and now works for the Maryland Test Facility—which supports the work of the Department of Homeland Security. He has spent 15 years building systems and applications that perform identifications in large-scale datasets.

[4] Dr. King has a doctorate in electrical engineering and has spent much of his career studying neural networks. After receiving his PhD, he started work with the NSA. Dr. King focuses his research on FRT. Shortly after Dr. King began at the NSA, he started working on face recognition with a human interface security focus. After the NSA, he moved to the Central Intelligence Agency ("CIA"), researching biometrics. Dr. King then went to the Intelligence Advanced Research Projects Activity ("IARPA").[4] Since leaving IARPA, Dr. King has worked in academia, researching FRT relative to demographics. Lastly, Dr. King participated as a committee member on the National Academies of Sciences, Engineering, and Medicine's recent facial recognition technologies study.

facial recognition technology, the policies underlying its use, and best practices in the appropriate scientific field. However, it was Dr. Rege, Mr. Courtesis, Mr. Runyon, and Dr. King who were presented as expert witnesses.[5]

### *The technology.*

10. FaceVACS Investigative Imaging Technology ("IIT") is a facial recognition technology ("FRT") software produced by the company Cognitec.[6] FRT captures facial information from a photo, often referred to as a "probe photo," and creates a template that is then compared to other facial templates. In doing so, the algorithm will produce a similarity score or confidence score that indicates how similar the probe template is to the existing templates in a dataset. IIT specifically "compares digital facial images from different sources to large facial image databases." (Ex. 2 at 6.) In doing so, for a given probe photo, IIT returns the top twenty results. It does indicate a confidence score, but no threshold is used; results with low confidence scores could show up in the top twenty results if there are no results with higher confidence scores. The technology is not absolute—it is evolving and remains a "hit-or-miss technology" that "is not a method to positively identify an individual." (Ex. 6). IIT is not reliable. *Id*.

11. But FRT, of which IIT is an implementation, is not new. Neither are its uses. The public uses it daily to unlock their phones with their face. Law enforcement uses it on license plate readers. Social media companies use it to suggest individuals whom a user might tag in posts and photos.

---

[5] Both the State and the Defense did excellent jobs summarizing the respective testimony of each of the witnesses. The Court will not reproduce their work and will instead more generally summarize the salient information.

[6] When discussing facial recognition technology generally, the Court will refer to it as FRT. When discussing the specific implementation at issue here, the Court will refer to it as IIT.

12. Each of these implementations involve the use of a probe image and the search of some kind of image repository or database; often, implementations involve processes which calculate a confidence score and determine whether there is "a match" between faces based on that confidence score. In some cases, like when we unlock our phone, it is a "one-to-one" use. When a picture of our friends and family gets uploaded to the cloud and those images get grouped into categories such as "spouse's images" or "your friends," the involved FRT employs a "one-to-little-n" use. Last, when a photo is uploaded to Facebook or Instagram and the service prompts us to tag a friend, FRT has been used in a "one-to-big-N" manner.

13. Despite the seeming ubiquitousness of FRT, the technology can and does make mistakes. A false positive occurs when a result indicates a match that should not be a match. A false negative occurs when the technology fails to return a positive result when the result should be a match. Low-quality probe images[7] have significant impacts on whether FRT can produce an accurate result. The underlying algorithms also struggle with persons of color because, for better or worse, they are not routinely trained on datasets that include populations of color.[8]

14. To reduce the chances that FRT produces an inaccurate result, most implementations employ the use of a threshold on its confidence scores. That threshold determines whether the technology categorizes a probe photo as a match to one or more images in its database.[9] The

---

[7] For example, where an individual may be wearing a mask, or the lighting is poor, or where both eyes cannot be seen. Similarly, a low-quality probe image may be the result of the distance of the subject or even whether their face is seen at an angle as opposed to directly in front of an individual's face. Dr. King specifically noted that surveillance footage often produces low-quality probe photos because they are almost always from a vantage point above an individual. See also Ex. 16 at pgs. 47, 52 and 56.

[8] Dr. Rege specifically notes that an algorithm "not trained on a large number of Native American faces . . . could have a hard time correctly identifying people of a Native American descent." (T. 56).

[9] When a threshold setting is set higher, the technology will require more similarities between the probe image and the images in its database. A higher threshold will potentially generate fewer match results following a search. A lower threshold will require fewer similarities between the probe image and the images in the technology's database. In turn, the technology will then likely consider more database images to be a match with the probe image.

Filed in District Court
State of Minnesota
9/13/2024 10:23 AM

lower the threshold, the higher the likelihood that any given results will return false positives. The higher the threshold, the higher the likelihood you may get false negative results. The threshold setting is adjusted with those two outcomes in mind and whichever of those outcomes the user is more willing to accept. The larger a dataset gets, the more difficult it is to find a balance between false positives and false negatives. A large dataset and a low threshold—or no threshold at all—will always return false positives.

15. As a result, human interaction with FRT results is essential. And more specifically, in the context of the use of FRT in criminal investigations, the technology cannot be relied on to produce an accurate identification, but it is instead an aid to a human identification. Each of the expert witnesses here agreed that FRT can only be used to generate a lead[10] that requires further investigation and subsequent validation.[11]

16. Humans are generally bad at recognizing faces. This is especially true for strangers. One study of this phenomenon used commercial Cognitec software to search a large image database to return the eight highest ranking results for a probe photo.[12] Participants were presented with the probe photo and the results and asked to decide if the person in the probe photo was present in those results. The person was present only half of the time. When the probe individual was completely absent from the results, participants correctly concluded the probe individual was absent only 40-45% of the time. They identified the wrong person as the probe individual 30-

---

[10] Though only Dr. Rege attempted to define "lead," it is clear that what all the witnesses referred to was the narrowing down of a suspect list from a large set of possibilities to a much smaller number of possible suspects—maybe one or two. Dr. Rege said that explicitly. (Tr. at pgs. 50-51.)

[11] This conclusion is also supported by the National Academies of Sciences, Engineering, and Medicine ("NASEM"). *See* Ex. 16 at pg. 102 (FRT is best used by law enforcement as a component of developing investigative leads).

[12] *See* Ex. 10.

40% of the time. In other words, they produced false positives. The errors persisted across both conditions, regardless of whether the probe individual was absent or present.

17. Humans can be influenced by suggestions that a match has already been made. A study of that phenomenon involved three groups: (i) a control group who were simply presented with two faces and asked if they were a match, (ii) a human-source group who were told that a human source had already identified the images as a match/non-match, and (iii) a computer-source group who were told that a computer source had already identified the images as a match/non-match.[13] When participants were told that either a human or computer had already determined the images were a match, the false positive rate was 25% (compared with 19% when no information was provided). Participants were also much more confident in their conclusion that face pairs were a match when they were told either a human or computer had already determined they matched.

18. Various applications of FRT have been vetted by a peer-reviewed research process not dissimilar to what one would expect of scientific analysis. In addition, the National Institute of Standards and Technology ("NIST") is a third-party evaluator of various algorithms, including through its NIST Face Recognition Vendor Tests.[14] In these tests, a version of Cognitec's algorithm performed as well as other FRTs currently on the market. The specific algorithm that supports the IIT used in this case is not marketed as being NIST evaluated. The specific manner in which IIT was used here was not evaluated by NIST. However, both Dr. Rege and

---

[13] See Ex. 12.

[14] NIST sets benchmarking datasets and benchmarking evaluation. NIST acts as a judge of relevant scientific technologies and grades how reliable or accurate the evaluated technologies are functioning. NIST evaluates the technologies and then provides feedback on the strengths and weaknesses of that software.

Mr. Runyon—the experts who reviewed NIST data—agree that NIST's evaluation demonstrates that FRT, as tested, is generally reliable.

### *The use of IIT in this case.*

19. Analyst Hughes demonstrated her use of the IIT program in court.[15] Simultaneously, she recorded her computer screen. That recording was offered and received as Exhibit 3.

20. In her demonstration, an image of the suspect from the HealthEast surveillance footage was imported into the system and used as the probe photo. She demonstrated how the program returns the results and includes a confidence score. The confidence score is the program's accuracy estimate that the result is the same individual as in the probe photo. Analyst Hughes noted that they do not consider this confidence score when analyzing the results. It is simply ignored.

21. Analyst Hughes demonstrated how she ruled individuals out. Despite being one of the top twenty results, some rule-outs are obvious because the individuals clearly do not resemble the probe. Others are not. For example, Analyst Hughes was only able to rule out the individual in Result 4 because she determined that the neck tattoo visible in the 2017 booking photo does not appear in the probe photo. (Tr. at 79.) That individual shares the same last name as the defendant in this case. Having potential family members show up in results generated by IIT is commonplace.[16] (Tr. at 48.)

---

[15] She noted that the database the program uses has grown since the original use in Mr. Archambault's case. But asserted that this change would not alter the accuracy of the mock run done during the hearing. Mr. Runyon believed that the algorithm being utilized by IIT was different during the mock run. Approximately five of the photographs that were produced by the Cognitec software during the mock run were not in the initial results to first identify Mr. Archambault in 2020.

[16] FRT algorithms work because they turn identifiable facial structures into data points. False positives often come up where people share facial similarities—especially if they share facial structure. Dr. King noted that this drives false positives, and Analyst Hughes confirmed that such false positives are commonplace.

22. Ultimately, Analyst Hughes presented a lead to the task force responsible for investigating the underlying crime here. This was done consistent with how law enforcement around the country uses FRT.[17] But a lead could include a suspect who is known to be out of state when a particular offense is committed. (Tr. at 80.) That lead would be included because the result of this process is not meant to be an identification.

**PROCEDURAL POSTURE**

23. Mr. Archambault challenges the admissibility of evidence derived from the use of FRT and, specifically, evidence derived from the use of IIT in this case. He asserts that the use of IIT cannot survive either prong of the *Frye/Mack* admissibility standard—that this novel technology is not foundationally reliable. He asserts that, absent that evidence, the allegation against him must be dismissed for lack of probable cause and/or because due process demands it. Additionally, Mr. Archambault asserts that even if the identification evidence derived by IIT is admissible per *Frye/Mack*, such evidence should be excluded as a violation of due process—in short, that the use of IIT amounts to an unnecessarily suggestive out-of-court identification. The State objects and asks this Court to determine that the use of IIT here is foundationally reliable as required by the *Frye/Mack* standard. It asserts that Sergeant O'Donnell's investigation provides probable cause independent of any use of IIT.

---

[17] While Dr. King agreed that the process utilized here was proper, Mr. Courtesis was particularly adamant about that conclusion. Mr. Courtesis noted that multiple steps were taken to generate the lead and that Analyst Hughes reviewed the FRT system processing and ruled out results consistent with the guidelines laid out by the Facial Identification Scientific Working Group. The probe image used in the IIT system was suitable. Additionally, Analyst Hughes ruled out any leads of those that were incarcerated at the time and date of the alleged crime. Mr. Courtesis suggested that this step went above and beyond baseline procedures. He believed that, because the probe image identifying Mr. Archambault as the suspect was corroborated by an independent crime tip, the FRT use in this case was "consistent with utilizing the totality-of-the-circumstances approach to lead verification." (T. 90).

## CONCLUSIONS OF LAW

24. The experts who testified in this case all but agree that FRT has a place in the investigation of crimes. That role seems to be growing daily. All the experts agree that FRT can be used in a reliable and consistent way. That is because the underlying science that supports the use of FRT is generally accepted within the relevant scientific community. However, IIT—as an implementation of FRT—does not consistently and reliably produce accurate results as is required by law.

25. "Under Minn. R. Evid. 702, expert testimony is admissible if: (1) the witness is qualified as an expert; (2) the expert's opinion has foundational reliability; (3) the expert testimony is helpful to the jury; and (4) if the testimony involves a novel scientific theory, the proponent must show it is generally accepted in the relevant scientific community." *State v. Berry*, 982 N.W.2d 746, 755 (Minn. 2022). That fourth prong is the *Frye-Mack* analysis. "The *Frye-Mack* standard, which was incorporated into Minnesota Rules of Evidence 702 in 2006, governs the admissibility of expert testimony that involves a novel scientific theory or emerging scientific techniques." *State v. Garland*, 942 N.W.2d 732, 746 (Minn. 2020).

26. If evidence sought to be admitted at trial involves a novel scientific theory or technique, the district court must hold a *Frye-Mack* hearing to "determine whether the underlying science is generally accepted within the relevant scientific community and whether the particular scientific evidence in the case is shown to have foundational reliability." *Id.* Scientific evidence is considered novel when its admission has not been litigated before a district court. *Goeb v. Tharaldson*, 615 N.W.2d 800, 814 (Minn. 2000). Minnesota courts apply the two-pronged *Frye-Mack* standard to analyze the "admissibility of expert testimony that involves a novel scientific theory or emerging scientific techniques." *Goeb*, 615 N.W.2d at 814. "First, a novel

11

scientific technique must be generally accepted in the relevant scientific community, and second, the particular evidence derived from that test must have a foundation that is scientifically reliable." *Id.* at 809. The proponent of the evidence has the burden of satisfying these two prongs. *Id.* at 810.

### *First Prong – General Acceptance*

27.  "The *Frye-Mack* standard asks first whether experts in the field widely share the view that the results of scientific testing are scientifically reliable." *State v. Roman Nose* 649 N.W.2d 815, 819 (Minn. 2002). "The results of mechanical or scientific testing are not admissible unless the testing has developed or improved to the point where experts in the field *widely share* the view that the results are scientifically reliable as accurate." *State v. Fenney*, 448 N.W.2d 54, 57 (Minn. 1989). "The scientific technique on which expert testimony is based must be scientifically reliable and broadly accepted *in its field*." *Fenny*, 448 N.W.2d at 58. Unanimity is not required. *Id.* Determining whether a scientific technique is generally accepted by the relevant scientific community is a question of law. *See State v. Dixon*, 822 N.W.2d 664, 672 (Minn. Ct. App. 2012). "Members of the relevant scientific community include those whose scientific background and training are sufficient to allow them to comprehend and understand the process and for a judgment about it." *United States v. Porter*, 618 A.2d 629, 635 (D.C. 1992).

### *Novelty*

28. The first step of the first prong is to determine if a "novel" scientific technique exists. The court in *Roman Nose* held that while DNA testing was generally accepted and had been extensively litigated, the particular technique the State introduced was a method of analysis that had not been reviewed by the court. *Roman Nose*, 649 N.W.2d at 820-21. The court stated

that the previous analysis of RFLP DNA testing had already been determined to be generally acceptable but that the new PCR-STR DNA testing had not been litigated. *Id.* The novelty component for a *Frye-Mack* hearing is based on whether a court has reviewed the technology, not whether the technology has been in use for a particular period of time. *See id.* at 821 (stating that even though the PCR-STR testing had been in use by the Bureau of Criminal Apprehension, it had never been reviewed by a court, rendering it a novel scientific technique). The court in *Roman Nose* then stated that the *Frye-Mack* hearing should involve both a look at the DNA testing procedures used in the underlying case and also a review on the "general acceptance of the technique within the relevant scientific community . . . ." *Id.* at 822.

29. The experts who testified in this case all agree that FRT has been in use for decades (at least in some form). Algorithms such as that used by the IIT program are only around a decade old. Their use in courts is novel, though. Minnesota courts have not yet addressed the use of such algorithms in criminal investigations and before criminal juries.

*Relevant Scientific Community*

30. Members of the relevant scientific community on FRT were well represented at the *Frye/Mack* hearing in this case. Each of the witnesses is well qualified to speak to FRT, its various implementations, and the specific use of IIT in this case. None of the witnesses claimed that FRT had no place in law enforcement investigations. It seemingly does. Sans Mr. Runyon, they also agreed that IIT, even as used here, was the best-practice implementation of FRT.

31. While the more ubiquitous uses of FRT (unlocking your phone or having a social media site automatically tag your friends and families in photos) may not be wholly appropriate in a criminal investigation setting, the experts agree that there is value in a tool that can help narrow down the identity of an unknown, individual suspect to a smaller candidate list. Once that

candidate list has been created, a human must intervene. That person must then manually review the smaller list and make an independent determination as to whether a prospective lead exists. That lead requires further investigation, validation, and confirmation. That process—employing the general use of FRT and the specific use of IIT—is generally accepted amongst the experts who testified here and generally accepted in the applicable scientific community.

### *Despite its general acceptance, IIT is unreliable. It fails the second prong of the Frye/Mack analysis.*

32. That a test enjoys general acceptance in its relevant scientific community does not mean that its results are admissible in criminal court.[18] While FRT plays a growing role in criminal investigations, it is not clear that IIT is foundationally reliable. The State has failed to meet its burden to show that, as used here, IIT can consistently produce accurate results. That is simply not what this version of the technology was designed to do. Instead of being designed to produce accurate results, it is designed to produce possibilities. And by Cognitec's own admission, this is evolving, unfinished, and unreliable technology that is, at best, hit-or-miss.

33. "The *Frye-Mack* standard asks . . . second whether the laboratory conducting the tests in the individual case complied with appropriate standards and controls." *Roman Nose*, 649 N.W.2d at 819. "Foundational reliability 'requires the proponent of a test [to] establish that the test itself is reliable and that its administration in the particular instance conformed to the procedure necessary to ensure reliability.'" *Goeb*, 615 N.W.2d at 814 (citing *State v. Moore*, 458 N.W.2d 90, 98 (Minn. 1990)); *see also Doe v. Archdiocese of St. Paul*, 817 N.W.2d 150, 165 (Minn.

---

[18] For example, polygraph tests are generally accepted in the communities in which they are used. The results of a polygraph test are not admissible in a criminal court as evidence, though. *State v. Opsahl*, 513 N.W.2d 249, 253 (Minn. 1994) ("It is well established that the results of polygraph tests, as well as evidence that a defendant took or refused to take such a test, are not admissible in Minnesota in either criminal or civil trials.") Polygraph testing does not have "such scientific and psychological accuracy, nor its operators such sureness of interpretation of results" as to justify submission of that evidence to a jury. *State v. Kolander*, 236 N.W.2d 458m 465 (Minn. 1952).

2012). "Without a foundation guaranteeing the test's reliability, the test result is not probative . . . and hence is irrelevant." *State v. Dille*, 258 N.W.2d 565, 567 (Minn. 1977).

34. In *Berry*, the defendant argued that the State "needed to offer data about accuracy, error rates, and peer-reviewed studies to establish the foundational reliability" concerning cell phone site tracking analysis. *Berry*, 982 N.W.2d at 757. The court disagreed, noting that *Harvey* was able to establish foundational reliability without the demanded types of evidence. *Id.* (citing *State v. Harvey*, 932 N.W.2d 792, 808 (Minn. 2019)). What the *Berry* court did confirm, though, was that the State must show that the test or mechanism that generates the evidence it offers is generally reliable, consistent, and accurate. *Id.* (citing *Doe*, 817 N.W.2d at 168).

35. FaceVAC's IIT is designed to display its "top" results without regard to whether those results would otherwise meet an acceptable threshold of accuracy. This is problematic for at least two reasons. First, and most important, the "test" is designed to produce and display results that are clearly inaccurate and unreliable. Ms. Hughes demonstrated that through her testimony and through the demonstration conducted at the May hearing.



*Ex. 3. Screenshot at 7m00s showing Candidate 4.*

The IIT used in this case returned Candidate 4 as a result with a confidence score of 0.792—that is, it calculated with 79% certainty that the individual in that picture matched the probe photo. That individual is not Gerald Archambault. If you believe the State's assertions that Mr. Archambault is the suspect here, then the IIT returned an inaccurate result.

36. And in this specific instance, that inaccurate result might be understandable. That's because Candidate 4 shares the same last name as Mr. Archambault.



*Ex. 3. Screenshot at 10m27s showing the case details for Candidate 4.*

This is precisely that type of misidentification that some of our testifying experts were wary of. And apparently this is common. Analyst Hughes testified in November of 2023 that "among the results, there was another person, even, with the same last name, but that is common. I have seen family members show up because they have similar bone structures." (Tr. at 48.) At the end of the day, this type of inaccurate result appears to be commonly and reliably produced using IIT.

37. In addition, the existing software produces results that are woefully and obviously inaccurate. One need look no further than the rest of the run results generated in this case.



*Ex. 3. Screenshot at 11m37s showing the mock run results.*

The likelihood that an analyst would have selected Candidates 12 and 13 as leads is low. But the fact that the IIT used here generated those individuals as results in this investigation is either testament to how poorly it performs its job or evidence that it is not designed to produce results that are genuinely accurate. The parties disagree on whether the State need provide error rates, but what the law is clear on is that the State must show that the test or mechanism that generates the evidence it offers is generally reliable, consistent, and ***accurate***. That showing has not been made here, and this Court is not aware of any other tests or systems that form the basis for admissible evidence in which the underlying test or program produces results that are so wholly wrong and inaccurate—certainly none that produce inaccurate results by design.

38. Furthermore, because the IIT used here does not utilize a threshold to better discern more accurate results, nothing precludes an analyst from using a probe photo to generate a run result

of individuals who "match" the probe with a confidence score of less than 60%[19] (displayed as 0.60 and below)—that is, the IIT generates results where no individual is better than a 60% match to the probe. Analyst Hughes explained that it is her office's policy to ignore those scores and to plow ahead regardless, and if a lead is developed, it is passed along just like a lead was passed along in this case. That lack of discernment means that this technology cannot consistently, reliably, or accurately produce results. But then, it isn't trying to do that. Otherwise, it would employ the same protection utilized in other operational uses of FRT: the threshold. When accuracy and reliability matter, those who implement this technology do so in a way that utilizes a threshold. That such an implementation is missing here is telling.

39. Instead, the IIT is designed to winnow down a much larger dataset of "suspects" to a list of twenty potential matches. At best, any one of those results is potentially a false positive. At worst, all results are undeniably false positives. The IIT cannot differentiate. It produces this cascade of inaccurate, false positives by design. Because of this a human analyst is required to sort through the muck to find the hidden treasure.

***Having an analyst review, rule-out, and otherwise process a "lead" does not make the test and this process any more reliable or accurate.***

40. Notwithstanding the design flaws inherent in the IIT, the State asserts that the test is saved by human involvement. The experts who provided their opinion on this issue mostly seem to agree as well that the best-case use of FRT in criminal investigations involves the use of a human to review results produced by the technology to produce a lead. But this Court disagrees,

---

[19] The Court uses 60% only because the run results demonstrated by Analyst Hughes suggest that even at that "high" of a confidence score, the results are subject to significant variance. You could imagine a run result where no confidence score got above 50% or 40% or even lower. The fact remains that, without the use of a threshold, such returns are entirely possible.

especially with regards to whether evidence derived from the use of IIT is admissible pursuant to our rules of evidence.

41. Of the experts who testified in this case, only one opined that the use of IIT here did not comport with best practices. The outlier was Thomas Runyon. He also happened to be the only individual who testified about his review of studies on bias and on how poorly a human being performs when asked to verify whether a result "matches" a probe—the type of search done in this case. Of specific note, Mr. Runyon testified—and the defense late submitted the relevant text—that, in a somewhat similar use of FRT, participants performed poorly. The study used commercial Cognitec software to import a probe photo and return the highest ranking eight results. The software in this study compared the probe photo against a large image database. Participants were presented with the probe photo and the results and asked to decide if the person in the probe photo was present in those results. The probe individual was intentionally omitted from the results half of the time. Participants correctly concluded the probe individual was absent only 40-45% of the time, and they identified the wrong person as the probe individual 30-40% of the time. The errors persisted across both conditions, regardless of whether the probe individual was absent or present.

42. Another study involved three groups:

- a control group who were simply presented with two faces and asked if they were a match,

- a human-source group who were told a human source had already identified the images as a match/non-match, and

- a computer-source group who were told that a computer source had already identified the images as a match/non-match.

When participants were told that either a human or computer had already determined the images were a match, the false positive rate was 25% (compared with 19% when no information was provided). Participants were also much more confident in their conclusion that face pairs were a match when they were told either a human or computer had already determined they matched.

43. Mr. Runyon opined that these studies demonstrate that humans are likely to be influenced by a computer's determination that a probe photo and another photo have "matched." He concluded that the use of IIT to suggest matches or identifications would unduly influence the human being asked to weed through the findings. The veracity of these studies and their conclusions were not challenged by the State, nor were they refuted by any of the other expert witnesses. The issues identified would seem to indicate that there is a real problem with FRT, and IIT specifically, influencing a human reviewer.

44. This Court imagines that one of the reasons Analyst Hughes and her team ignore the confidence scores is to avoid the influence problem noted above. However, as they go about their work, the analyst still knows that the program has indicated some kind of "match," even if it is with a low confidence score. The analysts know that these are the top results generated after an exhaustive search of a very large database of individuals. And while Analyst Hughes and her team are armed with information[20] that should make the job of ruling out a result easier, this case—like others could be—came down to her determination that a matched image generated by the softward showed an individual who best matched the probe photo. There is a process for that, but per Analyst Hughes's own testimony, that determination could result in the

---

[20] Analyst Hughes testified to being able to access demographic information about an individual present in the results. She demonstrated such access at the May hearing. Similarly, she can determine if someone was in custody on any relevant dates and can also determine when a particular photo was generated or taken.

production of a "lead" even if the individual suspect could not have committed the alleged offense:

> "Once I've ruled out as many as I can and if I think that -- after doing analysis for assessing the photo, doing comparisons from an unknown to many, I find a more recent photo that may not be among the booking pictures in here. It could be from another agency. It could be from social media. But I then compare that known party and their scars, marks, tattoos, hairstyle, height, weight as close as I can determine was known compared -- in reference to the day of the photo. And that's when I provide a lead to an investigator: "Here's who I think it could be. You should investigate further. Here's why." And if there are things like hair, scars, marks -- such as that -- or they were out of custody at the time or geographically, um -- if I can't rule them out of being in town at the time. *If I saw something on social media putting them out of state, I would probably hesitate and say, "Please investigate further before" -- but everything that I'm providing after that point is just a lead.*"

(Tr. at 79-80.) (Emphasis added).

If nothing in this process prevents the relay of an, at best, approximate lead when there is evidence that the person could not have committed the alleged offense, then the process is not reliable, nor is it accurate. It is flawed and may be inherently so.

45. The human intervention here cannot save those flaws. The human analyst is subject to the influence that IIT has produced a "match"—that is, the human analyst could produce a lead not because the results produced by IIT are accurate, but because the results *were* produced. And without a threshold, the system is designed to produce inaccurate results. Additionally, even once a human intervenes, the process outlined here allows an analyst to suggest a lead even in the face of evidence that would prevent that potential suspect from committing the crime.

46. Like the polygraph test before it, this Court has little doubt that FRT may be valuable in the course of investigative work. It could very well lead to arrests and the remedy of cases that would otherwise have gone unsolved. And much like polygraph testing, the State has not demonstrated that inaccuracies built into the use of IIT are saved by the interpretation and

Filed in District Court
State of Minnesota
9/13/2024 10:23 AM

intervention of a human analyst—not when humans are so easily influenced by indication that a "match" has been made and not when leads produced by this process could be produced even when evidence suggests that the potential suspect could not have committed the alleged crime. That is not a process designed to consistently and reliably produce accurate results. It cannot form the basis for admissible evidence of an individual's identification because it does not meet the requirements under *Frye/Mack*.

47. Because the Court has determined that the evidence derived directly from the use of IIT in this case is not foundationally reliable and is not admissible, it need not address the due process concerns articulated by Mr. Archambault and his counsel.

48. Similarly, because the discovery violations alleged exclusively relate to information about the technology used in this case, this Court need not articulate a response now that the evidence derived from that technology is not admissible. The Court does note that the most egregious issue raised by the defense relates to the failure of the State to preserve the initial run results. Those results could have had exculpatory value, but the failure to preserve them was not done in bad faith.

### *The investigation done by Sergeant O'Donnell provides enough probable cause for this case to continue.*

49. Mr. Archambault asserts that the "facial recognition 'lead' provided by Analyst Hughes is the sole evidence with which the State seeks to prove the identity of the perpetrator." If so, then he argues that there is not probable cause to charge him with a crime. The assertion and conclusion are based wholly on the premise that there is no other reliable evidence that could support a finding of probable cause. That premise is incorrect.

50. A person may be charged with a crime only where there is probable cause to believe that the person is guilty[21]—that is, where facts have been submitted to the district court showing a reasonable probability that the person committed the crime. Minn. R. Crim. P. 2.01; *State v. Lopez*, 778 N.W. 2d 700, 703 (Minn. 2010); *and see State v. Florence*, 239 N.W.2d 892, 896 (Minn. 1976).[22] Probable cause determinations are fact-intensive determinations that must be made on a case-by-case basis. *State v. Knoch*, 781 N.W.2d 170, 180 (Minn. Ct. App. 2010). Unlike proof beyond a reasonable doubt or preponderance of the evidence, "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *State v. Harris*, 589 N.W.2d 782, 790-91 (Minn. 1999) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n. 13 (1983). "The district court must view the evidence in the light most favorable to the State and may not assess the relative credibility or weight of conflicting evidence." *State v. Barker*, 888 N.W.2d 348, 353 (Minn. Ct. App. 2016) (citations and quotation omitted).

51. Probable cause is not a high bar to meet. It only requires that the State show a probability or substantial chance of criminal activity. That burden has been met here. Seemingly independent of the work of Analyst Hughes, Sergeant O'Donnell received a tip that the suspect they were looking for was Gerald Archambault. She conducted her own review and compared the images from the surveillance video with images of Mr. Archambault that she pulled. She determined that Mr. Archambault was the suspect they were looking for.

---

[21] Upon a defendant's motion to dismiss for lack of probable cause, the "court must determine whether probable cause exists to believe that an offense has been committed and that the defendant committed it." Minn. R. Crim. P. 11.04, subd. 1(a).

[22] The test of probable cause is whether the evidence worthy of consideration brings the charge against the defendant within reasonable probability.

52. While the defense is correct that an unverified anonymous tip cannot itself support a finding that probable cause exists, *see for e.g.*, *Olson v. Comm'r of Pub. Safety*, 371 N.W.2d 552, 556 (Minn. 1985) (finding an anonymous tip without indicia of reliability insufficient to establish reasonable suspicion to initiate a traffic stop), we don't have an unverified tip in this case. Sergeant O'Donnell followed up on the tip. It was investigated. Her work is the verification needed. Viewing that evidence in the light most favorable to the State, the Court must conclude that there is a substantial probability that Mr. Archambault has been linked to criminal activity. Probable cause exists for this case to continue to trial.

Dated: September 13, 2024

BY THE COURT:

Gordon, Andrew (Judge)

Digitally signed by Gordon, Andrew (Judge)
Date: 2024.09.13 10:02:05 -05'00'

Andrew S. Gordon
Judge of District Court