## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

PORCHA WOODRUFF,

    an individual,

        Plaintiff,

Case No. 5:23-cv-11886

Hon. Judith E. Levy

V

~~CITY OF DETROIT~~

~~a municipal corporation,~~

LaSHAUNTIA OLIVER,

City of Detroit Police Detective,
Individually, and in her Official
Capacities, and

        Defendant.

_____

### PLAINTIFF'S REPLY BRIEF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| 1 | Newspaper Article From CNN Detroit Police Chief |
| 2 | Press Conference Video of Detroit Police Chief |
| 3 | Plaintiff's Expert Witness Tim Dixon's Dep. |
| 4 | Michigan Civil Jury Ins. Malicious Prosecution |
| 5 | Plaintiff's Deposition. |
| 6 | Plaintiff's Expert Witness Tim Dixon's Report |

# EXHIBIT 1

# Detroit police chief says 'poor investigative work' led to arrest of Black mom who claims facial recognition technology played a role

By Isabel Yip, CNN

⏱ 3 minute read · Published 12:11 AM EDT, Thu August 10, 2023



Porcha Woodruff poses on August 7, 2023, in Oak Park, Michigan. Woodruff's lawsuit is the latest to zero in on facial recognition technology and its potential risks. Carlos Osorio/AP

**(CNN)** — Detroit's police chief on Wednesday blamed "poor investigative work," not the use of facial recognition technology, for the arrest of a Black mother who claims in a lawsuit that she was falsely arrested earlier this year while eight months pregnant.

Porcha Woodruff, 32, was home one morning in February helping her 6- and 12-year-olds get ready for school when six Detroit police officers arrived at her door with an arrest warrant for carjacking and robbery, according to a federal lawsuit she filed last week. She was handcuffed,

12/11/24, 4:24 PM          Detroit police chief says 'poor investigative work' led to arrest of Black mom who claims facial recognition technology played a role | CNN

taken to jail and booked, the lawsuit says.

On Wednesday, Detroit Police Chief James White told reporters that it was his department's inadequate work on the case that led to the arrest.


Black mom sues city of Detroit claiming she was falsely arrested while 8 months pregnant by officers using facial recognition technology

"I have no reason to conclude at this time that there have been any violations of the DPD facial recognition policy," White said during a news conference on Wednesday. "However, I have concluded that there has been a number of policy violations by the lead investigator in this case."

White held the news conference to address the allegations Woodruff made in her filing last week stemming from the February 16 arrest.

Woodruff said she learned she was implicated in the alleged incident after the facial recognition software hit as well as the carjacking victim's alleged identification of her in a lineup of six photos that included her mugshot from a 2015 arrest, the complaint states.

The lawsuit also alleges Detroit police engaged "in a pattern of racial discrimination of (Woodruff) and other Black citizens by using facial recognition technology practices proven to misidentify Black citizens at a higher rate than others in violation of the equal protection guaranteed by" Michigan's 1976 civil rights act.


Fed up with facial recognition cameras monitoring your every move? Italian fashion may have the answer

The police chief said a detective involved in the case incorrectly presented an image generated by facial recognition technology to the victim, which violated the department's policy of not using facial recognition photos in lineups.

The facial recognition software, White said, gave the investigator dozens of possibilities of who the suspect was and was meant to be the "launch of the investigative point" for detectives to determine who should be presented in a photo lineup.

"What this is, is very, very poor investigative work that led to a number of inappropriate decisions being made along the lines of the investigation, and that's something this team is

uccisions being made along the lines of the investigation, and that's something this team is committed to not only correcting, having accountability, having transparency with this community, and in building policy immediately to ensure regardless of the tool being used, this never happens," White said.

The Detroit Police Department plans to implement three reforms in response to the incident

≡  **CNN** US                                                    Subscribe      **Sign in**

presented in a lineup could have committed the crime.

ADVERTISING

The lawsuit comes as facial recognition technology and its potential risks are under scrutiny as experts warn about AI's tendency toward errors and bias, along with the dangers of inaccurate facial recognition usage.

In recent years, researchers have cautioned against the widespread use of technologies like facial recognition that may lead to race or gender discrimination.

A 2019 study conducted by the United States government found many facial recognition algorithms were far more likely to misidentify racial minorities than White people. Native American, Black and Asian people were all disproportionately more likely to be affected, according to the study by the National Institute of Standards and Technology.

Testing found that some algorithms were up to 100 times more likely to confuse two different non-White people, the agency said at the time. In the face of those concerns, several cities nationwide have banned the use of facial recognition by city officials, including San Francisco and Somerville, Massachusetts.

# EXHIBIT 2

# VIDEO OF PRESS CONFERENCE POLICE CHIEF

# EXHIBIT
# 3

**Timothy Dixon, J.D.**
**09/04/2024**

1    UNITED STATES DISTRICT COURT

2     EASTERN DISTRICT OF MICHIGAN

3      SOUTHERN DIVISION

4

5  PORCHA WOODRUFF,

6    Plaintiff,

7          Case No. 5:23-cv-11886

8  -vs-       Hon. Judith E. Levy

9

10  CITY OF DETROIT and

11  LASHAUNTIA OLIVER,

12    Defendants.

13  _____/

14

15  PAGE 1 TO 183

16

17   The Videoconference Deposition of:

18   TIMOTHY DIXON, J.D.,

19   Taken at Coleman A. Young Municipal Center,

20   2 Woodward Avenue,

21   Suite 500,

22   Detroit, Michigan,

23   Commencing at 10:00 a.m.,

24   Friday, September 4, 2024,

25   Before Jennie R. Spencer, CSR-3717.



**Timothy Dixon, J.D.**
**09/04/2024**                                                    **Page 2**

```
 1    APPEARANCES:  (Via Videoconference)

 2

 3    IVAN L. LAND, SR. (P65879)

 4    Law Offices of Ivan L. Land, P.C.

 5    25900 Greenfield Road

 6    Suite 210

 7    Oak Park, Michigan 48237

 8    (248) 968-4545

 9    Ill4law@aol.com

10            Appearing on behalf of Plaintiff.

11

12    GREGORY B. PADDISON (P75963)

13    City of Detroit Law Department

14    Coleman A. Young Municipal Center

15    2 Woodward Avenue

16    Suite 500

17    Detroit, Michigan 48226

18    (313) 237-0435

19    paddisong@detroitmi.gov

20            Appearing on behalf of Defendants.

21

22

23

24

25
```



HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

**Timothy Dixon, J.D.**
**09/04/2024**                                    **Page 3**

```
 1                     INDEX TO EXAMINATIONS

 2

 3   WITNESS                                    PAGE

 4   TIMOTHY DIXON, J.D.

 5

 6   EXAMINATION BY MR. PADDISON                4

 7   EXAMINATION BY MR. LAND                    113

 8   REEXAMINATION BY MR. PADDISON              137

 9   REEXAMINATION BY MR. LAND                  176

10   REEXAMINATION BY MR. PADDISON              181

11

12

13

14                     INDEX TO EXHIBITS

15

16   EXHIBIT                                    PAGE

17

18

19   (The exhibit was not marked by the court reporter and

20   was retained by Mr. Paddison.)

21

22   DEPOSITION EXHIBIT A

23   Copy of Photo Lineup              (Not marked on the

24                                      record.)

25
```



1    Detroit, Michigan

2    Friday, September 4, 2024

3    About 10:01 a.m.

4                    TIMOTHY DIXON, J.D.,

5    having first been duly sworn, was examined and

6    testified on his oath as follows:

7                    MR. PADDISON:  Let the record reflect this is

8     the discovery deposition of Mr. Timothy Dixon taken in

9     case number 5-23-cv-11886 in the United States

10    District Court for the Eastern District of Michigan,

11    Porcha Woodruff versus City of Detroit, et al.

12                   Let the record further reflect the testimony

13    given during this deposition may be used for any and

14    purposes allowable under the Federal Court Rules,

15    Federal Rules of Evidence and Federal Rules of Civil

16    Procedure.

17   EXAMINATION BY MR. PADDISON:

18   Q.   Mr. Dixon, how are you, sir?

19   **A.   I'm doing fine.  And yourself?**

20   Q.   Doing all right, doing all right.  Just for the

21        record, can you please state and spell your full legal

22        name?

23   **A.   Timothy M. Dixon.  T-i-m-o-t-h-y, M for Monroe,**

24   **M-o-n-r-o-e, Dixon, D-i-x-o-n.**

25   Q.   Mr. Dixon, I'd like to move through this pretty



Timothy Dixon, J.D.
09/04/2024                                    Page 5

1    quickly today.  I'd liked to jump right into it.  I

2    did receive a copy of your CV from Mr. Land yesterday.

3    I haven't had a chance to get through it in its

4    entirety, but if you need to take break towards the

5    end just let so you can take a quick look at that.

6              But what I'd like to do really is just start

7    and jump right into the report that you prepared in

8    this matter.  And if I understand correctly, that

9    report is 18 pages long and dated July 9th of 2024.

10   Is that correct?

11   **A.   Let me take a look.  Yes, 18 pages long, and my**

12   **signature and date of July 9.**

13   Q.   And have there been any supplements or additions to

14   this report?

15   **A.   No.**

16   Q.   All right.  Well, as I said, I'd like to jump right

17   into this.  At page ten of your report, near the end

18   of the third line, you wrote, "Nonetheless, Defendant

19   Oliver used a prior arrest photograph of Plaintiff for

20   a photo array that was presented to the victim by

21   another detective."  Did I read that correctly?

22   **A.   I'm sorry, page ten?**

23   Q.   Correct.

24   **A.   And where at, sir?**

25   Q.   It's beginning near the end of the third line of text.



Timothy Dixon, J.D.
09/04/2024                                          Page 6

1  A.   Yes, I see it.

2  Q.   Now, in fact, it was not Officer Oliver that prepared

3       the photo array involving Ms. Woodruff, is it?

4  A.   No.  Well, I assumed that they were doing what we call

5       a double-blind photo array where another detective

6       actually takes the information from the lead

7       detective, and they in fact generate the photo array

8       and show it to the victim.  But I -- yeah.  So maybe

9       I'm misunderstanding your question, Counsel.

10 Q.   Yeah.  My point is that it wasn't -- Detective Oliver

11      didn't use the prior arrest photograph; it was another

12      detective that used the prior arrest photograph of

13      Ms. Woodruff for the photo array, correct?

14 A.   No.  The lead detective is the detective that places

15      the suspect in the investigation.  It's just the other

16      detectives go through the actual action of presenting

17      the photo array and collecting the supplemental

18      photos.  But yeah, it's the lead detective who makes

19      the decision whether or not to present the photo

20      array.

21 Q.   You agree that Detective Oliver didn't actually choose

22      the photograph that went into the photo array?

23 A.   The photograph of?

24 Q.   Ms. Woodruff that was used in the photo array, you

25      agree that Officer Oliver did not select that



1      photograph?

**2   A.   I wouldn't agree with that.  I would assume that she**

**3        in fact, as the lead detective, made the decision to**

**4        put Ms. Woodruff in the photo array.**

5   Q.   I'm going to show you here a copy of the photo lineup.

6        Let me know if this is showing up on your screen.  And

7        we'll have this marked as Exhibit A.  Is this showing

8        up on your screen?

**9   A.   It is.**

10   Q.   And is this similar to what you have in Baltimore,

11        sir?

**12   A.   I'm confused again what the question is.**

13   Q.   As far as the actual presentation, does it provide you

14        with information about the name of the suspect, the

15        name and date of when the array was prepared, the

16        officer that prepared the array?

**17   A.   It is similar in the fact that it has six photos in it**

**18        and it has different suspects.**

19   Q.   And here we see that the officer on the top right here

20        that was preparing it was Deputy Donald.  That happens

21        to be Donald Greenwald.  Do you see that?

**22   A.   I do.**

23   Q.   And you reviewed Officer Oliver's deposition

24        transcript, correct?

**25   A.   I did.**



Timothy Dixon, J.D.
09/04/2024                                    Page 8

1  Q.  And during that deposition transcript, she testified

2      that she did not prepare the photo array, correct?

3  A.  **Yes, she did say that.**

4  Q.  And it was prepared by Deputy Donald Greenwald,

5      correct?

6  A.  **That's what she said.  And Counsel, I think that the**

7      **idea of physically preparing the photo array versus**

8      **leading the investigation that places Ms. Woodruff in**

9      **the photo array are two different things.**

10              **And what I'm saying is that it was**

11     **Detective Oliver's choosing to place Ms. Woodruff**

12     **in the photo array.  It's not the fact that she**

13     **actually prepared it or not.**

14              **She had others prepare it because that**

15     **apparently is the procedure in Detroit, like it is in**

16     **many, many departments where it's double-blind.**

17     **There's a different --**

18  Q.  My question is very --

19  A.  **I'm sorry, I didn't want to interrupt you.**

20  Q.  Let me narrow my question for you.

21  A.  **Umm-hmm.**

22  Q.  Do you agree that Officer Oliver did not select the

23      actual photograph of Ms. Woodruff that went into the

24      photo array?

25  A.  **If your question is did she pull the particular photo,**



1      **I would agree that she did not pull the particular**

2      **photo, but I would not agree that she did not cause**

3      **Ms. Woodruff to be in the photo array because she led**

4      **the investigation and she prompted the other**

5      **detectives to prepare the photo array.  So she did**

6      **not --**

7  Q.   My question was not -- Mr. Dixon, I would appreciate

8       it if you would just answer my question, and I believe

9       you did, that Officer Oliver did not select the

10      specific photo that was included in this photo array.

11      We agree on that, correct?

12            MR. LAND:  Counsel, let me him finish.  Let

13      him finish.  Don't cut him off.  Come on now.  Have

14      some professional courtesy here.

15 BY MR. PADDISON:

16 Q.   I'm asking a very narrow question, and I believe we

17      are in agreement.  Is that correct, sir?

18 **A.   I know she said she did.**

19 Q.   Is there any evidence you're aware of that she herself

20      selected this photograph?

21 **A.   No.**

22 Q.   Okay.  And doing these double-blind photo arrays, the

23      officer who investigates, Officer Oliver, wouldn't

24      have known what photo of Ms. Woodruff was being used

25      correct?



Timothy Dixon, J.D.
09/04/2024                          Page 10

1  A.   If it's done properly.  I don't know the procedure in

2       which it was done.

3  Q.   Well, we'll move past that then.  And you mentioned

4       that it was a prior arrest photograph of Plaintiff.

5       Why is that relevant, sir?

6  A.   I don't know that it's relevant.  I just know that

7       that's where the materials said the photograph came

8       from.

9  Q.   Okay.  And just to be clear, you did review the State

10      of Michigan SNAP acceptable use policy, correct?

11 A.   I did.

12 Q.   And that policy says that whenever possible, mugshots

13      rather than Secretary of State photographs should be

14      used, correct?

15 A.   I think it does say that.

16 Q.   And you're aware that DPD policy prohibits using the

17      same photograph that was linked by the facial

18      recognition of the Crime Intelligence Unit in the

19      photo lineup?

20 A.   I'm sorry, could you repeat the question?

21 Q.   Okay.  And you reviewed the DPD policy where it

22      prohibits using the exact same mugshot or photograph

23      that was identified by Crime Intelligence in

24      conducting the photo lineups?

25 A.   I think it does say that.



1  Q.   Okay, great.  Now, before we get into more of your

2       opinions here, you are a licensed attorney, correct?

3  **A.   I am.**

4  Q.   And you're familiar with the rule of completeness,

5       correct?

6  **A.   I am here in Maryland.  I'm not sure what Michigan's**

7  **     rule is.  I don't practice in Michigan.**

8  Q.   As a general legal principle, the rule of completeness

9       is basically saying that when referencing a document

10       or exhibit, that document or exhibit or item should be

11       considered in its entirety.  Fair?

12  **A.   I'd say certainly that sounds similar to my**

13  **     understanding.**

14  Q.   Great.  And the reason we do that is that so we don't

15       isolate statements that could be misleading versus the

16       entirety of the document or an exhibit, correct?

17  **A.   That's one interpretation.**

18  Q.   Okay.  Now, on page 11 here of your report, you have a

19       screenshot of Detective Oliver's Detroit Police

20       Request For Warrant.  Do you have that in front of

21       you?

22  **A.   Yes, I have page 11 in front of me.**

23  Q.   And you would agree that that screenshot is not the

24       entire Request For Warrant, correct?

25  **A.   I would agree with that.**



Timothy Dixon, J.D.
09/04/2024                              Page 12

 1  Q.   The entire Request For Warrant is actually four pages,
 2       right?
 3  A.   It is.
 4  Q.   Okay.  So --
 5  A.   I think it is.  I think it is.  I can't remember the
 6       exact number of pages, but --
 7  Q.   Okay.
 8  A.   It's more than what's in page 11.
 9  Q.   Okay.  Let's see if I can pull this here.  There we
10       go.  Is this now on your screen?
11  A.   I see -- it says Investigator's Report, a Bates stamp
12       of A000018.
13  Q.   At the top it says Detroit Police Request For Warrant,
14       correct?
15  A.   Yes.  It's very small on my screen, by the way.
16  Q.   Is there a way you can enlarge it?
17  A.   I don't think so on Zoom.  I don't think I have the
18       ability to do that.
19  Q.   Okay.  Well --
20  A.   I think -- I think it would require you to make it
21       larger, sir.
22  Q.   I can try and zoom in for you here.  Let's see.  All
23       right.  We see at the top here it says Detroit Police
24       Request For Warrant?
25  A.   Yes.



Timothy Dixon, J.D.
09/04/2024                              Page 13

 1  Q.  And we scroll down.  We have A000018, 19, 20, 21 and

 2      then the signature line, correct?

 3  A.  Yes.

 4  Q.  So that would be four pages, correct?

 5  A.  Yes.

 6  Q.  Now, let's take a look here at your report on page 11.

 7      I'm sorry.  Let's go ahead and start here on page 12

 8      where you provide some of these statements that you

 9      state are false or misleading.  Do you see those four

10      bullet points there?

11  A.  Yes.

12  Q.  And the first one is, "I also observed several

13      vehicles pull into the lot and Defendant Woodruff

14      approaching them."  Did I read that correctly?

15  A.  Yes.

16  Q.  And I see that you've bolded the words "observed" and

17      "Defendant Woodruff approaching them."  Correct?

18  A.  Yes.

19  Q.  So it's my understanding that it's that portion of the

20      statement that's bolded that you are suggesting are

21      false or misleading, correct?

22  A.  No.  The entire statement.

23  Q.  The entire statement.  Then what was the basis for

24      bolding "observed" and "Defendant Woodruff approaching

25      them"?



```
 1              MR. LAND:  Objection.  That's irrelevant,

 2      Counsel.

 3              MR. PADDISON:  It's his report.  I'm asking

 4      why he bolded certain portions of his report.

 5 BY MR. PADDISON:

 6 Q.   Mr. Dixon, you would agree that, generally speaking,

 7      bolding font is a form of drawing emphasis to certain

 8      things, correct?

 9 A.   I would.

10 Q.   Okay.

11 A.   And that's why I did it, to draw emphasis to it.

12 Q.   So you wanted to draw emphasis to the words "observed"

13      and "Defendant Woodruff approaching them"?

14 A.   Yes.

15 Q.   And you wanted to draw emphasis to the word

16      "observed," and if I've read your report correctly,

17      you suggest it's misleading because Officer Oliver

18      didn't personally observed this.  She viewed it on

19      video, right?

20 A.   No.

21 Q.   So why is the word "observed" misleading then?

22 A.   Because Officer or Detective Oliver said that she

23      observed Defendant Woodruff approaching them, when

24      she did not observe Defendant Woodruff approaching

25      them.
```



Timothy Dixon, J.D.
09/04/2024                                      Page 15

 1  Q.   Well, let's break this down.  What's wrong with the
 2       word "observed"?
 3  A.   **There's nothing wrong with the word "observed."  It's**
 4       **the fact that she said she observed Defendant Woodruff**
 5       **approaching them in the video, when in fact that's not**
 6       **true.**
 7  Q.   Oh, okay, okay.  So because she said "I observed
 8       Defendant Woodruff" rather than "I observed the
 9       suspect believed to be Defendant Woodruff," that's
10       what's misleading about it, correct?
11  A.   **I think there's a lot more than what you're saying,**
12       **but yeah, it's not a true statement.  She didn't**
13       **observe Defendant Woodruff.  She doesn't know that the**
14       **person in the video is Defendant Woodruff.  She's made**
15       **no effort to find out if the person is Defendant**
16       **Woodruff.**
17            **She just simply made the statement, and she**
18       **didn't know that it was true, and you're not supposed**
19       **to do that in a warrant.  It violates the rules of**
20       **generally acceptable policing practices, and she**
21       **should not have done that.**
22  Q.   We're going to get into those generally accepted
23       rules.  So you just observed the word -- or excuse me,
24       you bolded the word "observed" just because then?
25  A.   **I don't know what "just because" means.  But I placed**



Timothy Dixon, J.D.
09/04/2024                    Page 16

1    **emphasis on her saying she observed Defendant Woodruff**

2    **when she did not observe Defendant Woodruff.**

3  Q.   Okay.  So let me try and rephrase this then.  I want

4       to understand what would have been an acceptable way

5       to phrase this.  What if it was, "I also observed

6       several vehicles pull into the lot and a woman

7       approaching them"?

8            MR. LAND:  Objection, calls for speculation.

9  BY MR. PADDISON:

10 Q.   Would that be a --

11           MR. LAND:  Calls for speculation.

12           MR. PADDISON:  I'm asking an expert opinion.

13           MR. LAND:  It calls for speculation.

14           MR. PADDISON:  So if he's an expert and he's

15       speculating, he's not much of an expert then,

16       Mr. Land.

17           MR. LAND:  Go ahead with your question.

18 BY MR. PADDISON:

19 Q.   Would that be an appropriate way to phrase it then, "I

20       also observed several vehicles pull into the lot and a

21       female suspect approaching them"?

22 **A.   I'm sorry, Counsel.  Repeat your question again.**

23 Q.   Okay.  If as written this is a misleading statement,

24       if it were rewritten to say "I also observed several

25       vehicles pull into the lot and a female suspect



1       approaching them"?

2   A.  I don't know that that would be acceptable because at

3       the point that she wrote the warrant -- I'm not sure

4       of all the information that Detective Oliver had, but

5       I do know that what she said concerning the Plaintiff

6       was not true, and she placed that in the warrant

7       application.

8   Q.  I'm asking, as an expert, how would you rewrite what

9       Officer Oliver wrote so that it would be acceptable to

10      you as an expert witness?

11              MR. LAND:  Objection, asked and answered.

12              THE WITNESS:  I would not have written it

13      because it was not true.  If I were an expert and I

14      was advising Detective Oliver, I would have told her

15      to conduct a full investigation.

16  BY MR. PADDISON:

17  Q.  I'm asking specifically, sir --

18  A.  And at that point --

19  Q.  Sir.

20  A.  If you cut me off --

21  Q.  Sir.

22  A.  -- I'll stop talking.

23              MR. LAND:  Please don't cut him off.

24              MR. PADDISON:  Excuse me.  Mr. Land, this is

25      my deposition, sir.



Timothy Dixon, J.D.
09/04/2024                          Page 18

1            MR. LAND:  Please don't cut him off.  You keep

2       cutting him off.

3  BY MR. PADDISON:

4  Q.  Mr. Dixon, I asked you very simply, Officer Oliver is

5       describing what she's viewing in a video.  We can

6       agree on that, correct?

7  **A.  No.  She's describing things that she did not view in**

8       **the video.  That's why I placed it in my report, and I**

9       **placed emphasis on the fact that she said she saw**

10      **things in the video that she did not see.**

11 Q.  Let's take a look here at Officer Oliver's report.

12      Let's start there.  Maybe that will help us avoid

13      some of this confusion here.  So I'm going to pull

14      up here page two of the report, and if you want to

15      pull it up in a larger font, that would really help us

16      out.

17 **A.  I'm sorry, page two of my report or --**

18 Q.  No.  Officer Oliver's Request For Warrant.

19 **A.  Sir, as I was saying, I only have a digital copy of**

20      **it, but if you --**

21 Q.  That will work just fine.

22 **A.  Okay.  I'm going to have to reduce your screen and try**

23      **to find it.**

24 Q.  That's fine, sir.

25            MR. LAND:  You can't put it up on the screen,



Timothy Dixon, J.D.
09/04/2024                          Page 19

1    Counsel?

2              MR. PADDISON:  Well, I'd have to zoom way

3    in --

4              MR. LAND:  Okay.

5              MR. PADDISON:  -- and then it's difficult to

6    navigate it.

7              MR. LAND:  Yeah.

8              **THE WITNESS:  Okay.  It's putting me in the**

9    **same situation, so I'm going to ask you for your**

10   **patience as you try to direct me around it.**

11   BY MR. PADDISON:

12   Q.   Okay.

13   **A.   And which specific document is it?**

14   Q.   It's the Detroit Police Request For Warrant, the

15        warrant request.

16   **A.   And is it the document labeled Arrest Warrant**

17   **Documents?**

18   Q.   I would assume so.

19   **A.   Okay.  I think I may have the document, but you'll**

20   **have to direct me to the page.**

21   Q.   It is the second page of the Detroit Police Request

22        For Warrant.

23   **A.   Okay.  Can you tell me what language it starts with,**

24   **Counsel?**

25   Q.   On the top of the page it reads "and begun to look for



1      the female's phone when the males produced a handgun

2      stating."

**3  A.   Okay, I'm there.**

4  Q.   Okay.  Now, I want you to look down at the very last

5       couple lines there, all right, beginning with "After I

6       had spoken."  Do you see that?

**7  A.   Yes.**

8  Q.   Let's read this together.  "After I had spoken with

9       Mr. Walker and he advised me he recalls being at the

10       BP gas station prior to being carjacked, I made the

11       location a second time and checked for video."  Did I

12       read that correctly?

**13  A.   Yes.**

14  Q.   Okay.  "I observed Mr. Walker" -- if we turn the

15       page -- "gold Chevy Malibu pull into the parking lot

16       at approximately 5:53 on January 29th, 2023."  Did I

17       read that correctly?

**18  A.   Yes.**

19  Q.   And just as a quick aside, let's scroll down to the

20       last page here -- excuse me, the first page -- and

21       look at the date that this was written.  You see the

22       date of the Complaint on the first page, correct?

**23  A.   I'm sorry.  You mean the previous page we were on,**

**24       sir?**

25  Q.   Correct.  The first page of the Investigator's Report.


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO          313.567.8100

 1  A.   That's the page that's labeled Investigator's Report?

 2  Q.   Correct.

 3  A.   Okay, I'm there.

 4  Q.   And then the date of complaint is February 4th,

 5       correct?

 6  A.   I'm sorry, date of complaint?

 7  Q.   Correct.

 8  A.   You mean where it says date under prosecutor's case

 9       number?

10  Q.   Correct.

11  A.   Yes, February 4th.

12  Q.   So if we scroll back to the third page where we left

13       off reading, she writes -- at the top of the third

14       page it reads, "gold Chevy Malibu pulled into the

15       parking lot at approximately 5:53 on January 29th,

16       2023."  Did I read that correctly?

17  A.   Yes.

18  Q.   So clearly she's talking about an event that occurred

19       in the past, correct?

20  A.   Yes.

21  Q.   And she did indicate she was going there to view

22       video, correct?

23  A.   Yes.

24  Q.   Okay.  And then it continues.  "I observed on video

25       Defendant Woodruff exiting the passenger seat of the



```
 1     Malibu."  Did I read that correctly?
 2  A.  That's what she wrote, yes.
 3  Q.  So once again, she's describing what she believes
 4      she's seen on video, correct?
 5  A.  No.  That's where we have a disagreement, Counsel.
 6  Q.  Okay.
 7  A.  She's saying she saw Defendant Woodruff, and she
 8      didn't see Defendant Woodruff even in the video.
 9  Q.  And you are aware --
10  A.  She didn't clarify --
11  Q.  Mr. Dixon --
12  A.  Counselor, I'm trying to answer your question, but if
13      you want to cut me off, I will cease.
14  Q.  All right.  Mr. Dixon, I'm --
15          MR. LAND:  You have to let him talk, Counsel.
16      You have to let him talk.  Come on, Counsel.
17          MR. PADDISON:  I have seven hours, and I'm
18      happy to use all seven of them, and I'll get more if I
19      need to.
20  BY MR. PADDISON:
21  Q.  But Mr. Dixon, I'm asking a simple question.
22          MR. LAND:  You're not doing that.  But go
23      ahead.
24  BY MR. PADDISON:
25  Q.  Again, I'll rephrase.  Let me try this.  Had Officer
```



1    Oliver written, instead of what she did, "I observed

2    on video Defendant suspect exiting the passenger seat

3    of the Malibu," would you take issue with that

4    statement?

5  **A.  No.**

6  Q.  So your issue there is that she identified "Defendant

7    Woodruff" rather than "suspect"?

8  **A.  No, sir.  My issue is that she identified Defendant**

9  **Woodruff when she did not know that it was Defendant**

10  **Woodruff.  I've said it time and time again.  It's not**

11  **a play on semantics.**

12  **She said that it was Defendant Woodruff.**

13  **That leads the person reading the report to believe**

14  **that she had done some sort of investigation verifying**

15  **in fact it was Defendant Woodruff she placed in that**

16  **affidavit for a warrant.**

17  Q.  Right, sir.

18  **A.  She should know that the information is truthful --**

19  Q.  Correct, sir.

20  **A.  -- and she did not.**

21  Q.  And you would agree, sir, that every criminal suspect,

22    every single one of them, in American jurisprudence

23    history is innocent until proven guilty, correct?

24  **A.  That is the law.**

25  Q.  So the issue here is instead of saying "I observed on



1     video suspect or female suspect," your issue is with

2     it saying "Defendant Woodruff"?

3  A.  **That's one of the issues.**

4  Q.  What else about that sentence do you take issue with?

5  A.  **The fact that she didn't verify it was Defendant**

6     **Woodruff; that if she had followed generally**

7     **acceptable policing practices of fully investigating,**

8     **then she would have known it wasn't Defendant**

9     **Woodruff; and the fact that she placed it in an**

10    **affidavit, and police officers are trained not to**

11    **put things in affidavits -- information in affidavits**

12    **that they do not know to be true --**

13 Q.  Okay.

14 A.  **-- and so it's misleading.**

15 Q.  Okay.  So you're suggesting that Officer Oliver --

16 A.  **And -- Counsel, if you want me to finish, I'll finish.**

17 Q.  No, I --

18 A.  **And police officers are trained to understand that if**

19    **they do that, that it can cause people's rights to be**

20    **violated, it can cause folks to be arrested, and --**

21 Q.  Mr. Dixon, Mr. Dixon, we'll get to that.

22          MR. LAND:  You cut only off, Counsel.  You cut

23    him off.

24 BY MR. PADDISON:

25 Q.  Mr. Dixon, we will get to that, okay.  Again, Officer



1    Oliver is describing -- and let's agree on this --

2    that instead of "Defendant Woodruff," if it wrote

3    "female suspect."  That's one issue, correct?

4            MR. LAND:  That's asked and answered.  And

5    Counsel, I'm going to tell you this.  I'm going to end

6    this and we're going to go in front of the judge --

7            MR. PADDISON:  Mr. Land, I would love to do

8    that.  I would love to do that.

9            MR. LAND:  You're not getting the answers you

10   want.

11           MR. PADDISON:  I will get -- I will get --

12   just based on this, I will get Mr. Dixon stricken as a

13   witness, and I will get sanctions, all right.  I do

14   not want this to take all day.

15           MR. LAND:  You're not scaring me.  You're

16   taking this personal, and calm down.

17           MR. PADDISON:  No.  Mr. Land, it's very

18   simple.  I'm trying to get through this, and it's a

19   very fundamental, easy question here.

20   BY MR. PADDISON:

21   Q.   Is or is not Officer Oliver attempting to describe

22        what's on video?  Now, we agree that it was not

23        Ms. Woodruff.  We agree on that.  We know Ms. Woodruff

24        did not have anything to do with this carjacking,

25        okay.  We can set that aside, okay.  But with that



1      aside, can you agree that Officer Oliver is describing

2      what is being viewed on video?

3  **A.  No.  What she is saying is not true.  What she is**

4      **viewing on video is not what she wrote in the report,**

5      **so no, we cannot agree to that, counsel.**

6  Q.  Okay.  With the exception of the identification of

7      Ms. Woodruff, with the exception of that, is Officer

8      Oliver describing what she's viewing on video?

9  **A.  I don't know what Officer Oliver was viewing on video**

10     **at the time.  I know what I saw in the video, and even**

11     **what she says she saw is not consistent with what's on**

12     **the video.  She is adding information to the video**

13     **that is not truthful and that she did not know to be**

14     **true.**

15 Q.  Okay, okay.  So we'll get to that.  I just want to be

16     clear.  Is it your contention that this paragraph here

17     is misleading to the extent that it suggests that

18     Officer Oliver personally witnessed these things, or

19     is it clear that what she's attempting to describe is

20     based on a viewing of a video?

21 **A.  It's not either of those, sir.  It's that what she**

22     **placed in the affidavit is not information that she**

23     **knew to be true.**

24 Q.  Whether she was right or wrong, whether she honestly

25     believed it or was being reckless, regardless of that,



1    is this first paragraph misleading in the fact that it

2    suggests that Officer Oliver is describing something

3    she personally viewed?

4  **A.   Sir, I'm not sure I understand your question, but I'll**

5  **say it again, that when she says she observed**

6  **Defendant Woodruff, and it is not Defendant Woodruff,**

7  **and had she done a full and fair investigation, she**

8  **would have known it was not Defendant Woodruff, she**

9  **would not have placed it in the warrant and we would**

10 **probably not be having this conversation.**

11 Q.   Mr. Dixon --

12 **A.   So I am not sure the question you're asking, but I'll**

13 **answer it as best about as I can.**

14 Q.   Okay.  I'll rephrase this.  Nowhere in that paragraph

15      does Officer Oliver suggest that she personally, in

16      realtime, witnessed anything she's describing.  Is

17      that a fair statement?

18 **A.   Yes, and I'm not suggesting that she did.**

19 Q.   That was my question.  That's all I was trying to get

20      to, all right.  Now, let's take a look here.  Let's

21      see.  And we agree that this report was dated

22      February -- I believe it was February 4th, correct --

23      or excuse me -- February 2nd, right?

24 **A.   I'd have to go back.  I thought it was a different**

25 **date.  You mean this Request For Warrant, sir, or the**



1     Incident Report?

2  Q.  The Request For Warrant was written on February 2nd,

3     correct?

4  A.  **No.  I think it's a different date.**

5  Q.  You're correct, it's February 4th.  I apologize.  All

6     right.  So it was written out on February 4th, and

7     this paragraph here, she's writing in the middle of

8     the second page of the Request For Warrant, there's a

9     bolded term that says Investigation, correct?

10 A.  **Let me scroll to it.  You mean the second full**

11    **paragraph down?**

12 Q.  The second page of the Request For Warrant after the

13    second -- or there's only one full paragraph above it,

14    there's a bolded font that says, Investigation.

15 A.  **I see that.**

16 Q.  And it says Officer Oliver was assigned this case on

17    January 30th, 2023, correct?

18 A.  **She says I, OIC Oliver, of the Commercial Auto Theft**

19    **Unit was assigned, yes.**

20 Q.  And then January 31st, 2023, I contacted Mr. Walker

21    using his mother's phone number, correct?

22 A.  **Yes.**

23 Q.  The next paragraph, February 2nd, 2023, correct?

24 A.  **Yes.**

25 Q.  So it's fairly clear here that she is documenting what



1    she's doing during the course of her investigation,

2    correct?

3  A.  **She's documenting some of the things she says she's**

4      **doing.  I don't know --**

5  Q.  Okay.

6  A.  **I don't know what -- I don't know everything she did.**

7      **I only know what she says she did.**

8  Q.  Well, certainly, sir, as a practicing attorney, you

9      know we can't speculate, so all we know is what's in

10     the documents, right?

11 A.  **I don't understand your question.**

12 Q.  Well, you certainly can't speculate if there's things

13     that she did or didn't do that aren't in this,

14     correct?  You wouldn't know about that?

15 A.  **That's exactly what I'm telling you.  You're asking me**

16     **to agree that this is her investigation and she**

17     **documented it, and I'm just telling you I don't know.**

18     **I just know what she put in the report.**

19 Q.  So based on all of the information in the record; is

20     that fair?

21 A.  **Is what fair, sir?**

22 Q.  That based on all of the information we have in the

23     record, it appears that she's documenting what she was

24     doing during the course of her investigation.  That's

25     fair, isn't it?



1  A.   Sir, I won't agree with your summation of it.  I can

2       only say that that's what Detective Oliver wrote in

3       this affidavit or Request For Warrant.

4  Q.   Can you point me to any other evidence in the record

5       that suggests there were other things she did?

6  A.   In what record, sir?

7  Q.   Any of the documents that have been produced.

8  A.   Things that are material to this?

9  Q.   Correct.  Is there anything that she's not documenting

10      here?

11 A.   Sir, I wouldn't know.  That would require me to

12      speculate on what she did.

13 Q.   Okay.

14 A.   But, you know, I assume that she may have made phone

15      calls, I assume that she may have made appointments,

16      but again, I don't know.  And I'm not sure what you

17      want me to say.  I can only -- I can only base my

18      opinion regarding her actions on what she said she

19      did, okay, and her inactions on what she did not say

20      she did.

21 Q.   Okay.  So once again, based on all of the materials

22      available -- you understand the concept of evidence,

23      I'm sure.  Based on all of the evidence that's

24      available, you would agree that in this she is

25      documenting what she was doing during the course of



1    her investigation?

2  A.   No, sir.  Again, you're using language that I can't

3       agree with.

4  Q.   Okay.

5  A.   I mean, you're using terms like all the evidence,

6       sir.  Evidence is not just things that you see.

7       It's things that a person doesn't do when they should

8       do it.

9  Q.   And my question to you is, based on the documents, the

10      evidence that has been produced, okay, not what

11      possibly she did, not what she might have done --

12           MR. LAND:  It's been asked and answered.

13           MR. PADDISON:  It hasn't been answered,

14      Mr. Land.

15           MR. LAND:  It's asked and answered.

16           MR. PADDISON:  It's a very simple question.

17           MR. LAND:  He's not saying what you want him

18      to say, and you're getting frustrated, Counsel.

19           MR. PADDISON:  No, Mr. Land.  I'm getting

20      frustrated because this --

21           MR. LAND:  You asked him --

22           MR. PADDISON:  Mr. Land, this deposition

23      should take about two hours.  It's going to take a lot

24      longer with his obstructive responses.  It's a very

25      simple question.



1  BY MR. PADDISON:

2  Q.   Does it appear that Officer Oliver is providing a

3       timeline of what she's doing during the course of her

4       investigation?

**5  A.   It appears that Officer Oliver wrote down what she**

**6       thought was important to her to place in this warrant,**

**7       sir.  I can't explain her mindset, and I won't**

**8       characterize to.**

**9             I don't know what she saw, when she saw it.**

**10      I don't know everything she did.  I just know what she**

**11      wrote in the report, sir.  And that's the best answer**

**12      I can give you.**

13  Q.   And Mr. Dixon, in your experience as a police officer

14       and as a prosecutor, and I'm certain you've submitted

15       hundreds if not thousands of warrants, you've reviewed

16       and approved and denied I'm sure hundreds of thousands

17       of warrants --

18            MR. LAND:  That's irrelevant, Counsel.  It's

19       irrelevant.  Let's go on.

20            MR. PADDISON:  Well, Mr. Land, are you

21       suggesting that his experience being a police officer

22       and a prosecutor is not relevant to his ability to

23       testify as an expert?

24            MR. LAND:  Just ask the question.  You don't

25       have to --


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO    313.567.8100

1           MR. PADDISON:  I am asking.

2    BY MR. PADDISON:

3    Q.   So in a warrant such as this, would you read these

4         dates as an officer providing the timeline of their

5         investigation?

6    **A.   I'm not sure I understand your question.**

7    Q.   Okay.  We can break this down real quick.  Under

8         Investigation, "I, OIC Oliver, of Commercial Auto

9         theft, was assigned this case January 30th, 2023."

10        Did I read that correctly?

11   **A.   Yes, sir.**

12   Q.   And that tells me, as the prosecutor, that she was

13        assigned this case on January 30th of 2023, doesn't

14        it?

15   **A.   That's what she says, yes.**

16   Q.   January 31st, 2023 I contacted Mr. Walker using his

17        mother's phone number.  And I can read that entire

18        paragraph if I need to, but do you interpret that as

19        her telling the prosecutor that that's what she did on

20        January 31st of 2023?

21   **A.   Sir, I don't just -- I don't just interpret that as**

22   **her telling the prosecutor.  I interpret it as her**

23   **telling her supervisors, the prosecutor and the judge**

24   **who would review this application.  I mean, she's**

25   **telling anyone -- that she's telling anyone who would**



1    read this that she's saying that's what she did.

2  Q.  Okay, perfect.  Perfect.  So now we go to the next

3    paragraph.  February 2nd, 2023.  "I, OIC Oliver,

4    obtained a statement from Mr. Walker.  Mr. Walker

5    stated as a few days had gone by, he was able

6    to recall more details of the carjacking incident."

7          Now, again, I can read that, but that is

8    Officer Oliver telling everyone, her supervisor,

9    the prosecutor, the magistrate, anyone that would

10    read this, what she was doing on February 2nd,

11    correct?

12  A.  **That that's what she said she did.  Not necessarily in**

13    **its entirety, but that's what she felt was relevant or**

14    **germane to this investigation that she wanted to place**

15    **in the affidavit or application for a warrant, yes.**

16  Q.  And if we turn the page, there's another entry in the

17    middle still on February 2nd.  And then towards the

18    bottom of the page, "February 3rd, 2023, Mr. Walker

19    came to Detroit Detention Center to view a live

20    lineup."

21          It goes on to state, "Mr. Walker viewed a

22    photo lineup, which included a photo of Defendant

23    Woodruff."  Now, is that her telling her supervisor,

24    the prosecutor, the magistrate, anyone who's going

25    to read this, what she was doing on February 3rd of



1      2023?

2  A.   I'm sorry, sir.  I thought that said -- okay.  Yes, at

3       some point it says that on February 3rd that

4       Mr. Walker viewed a photo lineup including Defendant

5       Woodruff.

6  Q.   Right.  So she's then describing to everyone what

7       she's doing, and that could be everyone from her

8       supervisor to the prosecutor to the magistrate.  She's

9       describing what she did on February 3rd, correct?

10  A.  She's describing what she put in the warrant as to

11      what she did.

12  Q.  Okay.

13  A.  I can't agree that that's everything she did or didn't

14      do, Counsel, and that's what I'm trying to tell you.

15  Q.  Because you can't speculate, right, okay.  So in other

16      words, she's providing a timeline of what she thinks

17      is relevant as far as what she did during the course

18      of this investigation, correct?

19  A.  Yes, that she believed that that was important enough

20      to put in the affidavit.  I would agree with that.

21  Q.  Okay, all right.  And this Request For Warrant as

22      issued on February 4th.  We discussed that already,

23      right?

24  A.  That's the date on there at the top.

25  Q.  Correct, okay.  So what that would tell us then, that



1     on February 3rd Mr. Walker viewed a photo lineup,

2     which included a photo of Defendant Woodruff, and

3     positively identified her as being the female he was

4     with for hours and was with just before he was

5     carjacked on Bessemore and Gratiot.

6           Now, whether or not you agree with the

7     substance of that statement, you can agree that that's

8     accurate; Mr. Walker identified Ms. Woodruff,

9     incorrectly albeit, on February 3rd of 2023?

10  A.   **If I'm understanding your question correctly, if**

11       **you're asking me do the materials that I reviewed**

12       **indicate that Mr. Walker picked Ms. Woodruff out of a**

13       **photo array on February 3rd, I think he did, yes.**

14  Q.   Okay.

15  A.   **He reason behind it and should she have been in there,**

16       **those are all different questions.**

17  Q.   Okay.  Then that's fair.  Just out of curiosity, are

18       you familiar with the Sixth Circuit case, Ahlers

19       versus Schebil?

20  A.   **No.**

21  Q.   And Maryland is in the Fourth Circuit, correct?

22  A.   **Yes.**

23  Q.   What about the Fourth Circuit case Ng versus Clark?

24  A.   **No.**

25  Q.   What about the Fourth Circuit case Torchinsky versus



**Timothy Dixon, J.D.**
**09/04/2024**                                    Page 37

1       Siwinski?

**2  A.   No, sir.  I mean, if you told me about it, maybe I**

**3       have some familiarity with them, but without providing**

**4       the case, no, not --**

5  Q.   That's fair, that's fair.  So you're --

6             MR. LAND:  Counsel, can you give the cites of

7       those cases.

8             MR. PADDISON:  Absolutely.  I actually have

9       those.  I was going to offered them at the end.

10      Ahlers versus Schebil is 188 F.3d 365.

11            MR. LAND:  F3d 63.

12            MR. PADDISON:  Yes.  Ng versus Clark is 94

13      F.4th 636.

14            MR. LAND:  You said that's 94?

15            MR. PADDISON:  No.  Ng versus Clark is 90

16      F.4th.

17            MR. LAND:  90 F.4th.

18            MR. PADDISON:  Yes, 636.

19            MR. LAND:  636.

20            MR. PADDISON:  And Torchinsky versus Siwinski

21      is 942 F.2d 257.

22            MR. LAND:  Thank you.

23            MR. PADDISON:  Okay.

24  BY MR. PADDISON:

25  Q.   So we've got cases out of both the Sixth and Fourth


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO        313.567.8100

1    Circuits that both stand for the proposition that

2    one -- and I'm going to quote here -- "A law

3    enforcement officer is entitled to rely on eyewitness

4    identification to establish adequate probable cause

5    with which to sustain an arrest."

6          And also quoting, "Once probable cause is

7    established, an officer is under no duty to

8    investigate further or look for additional evidence

9    which may exculpate the accused."

10         Now, Mr. Dixon, I'm sure you're familiar

11   with those legal principles generally, but that is,

12   of course -- and we can agree on this -- regardless

13   of Fourth or Sixth circuit, that is unless the police

14   officer has a reason to believe that the eyewitness

15   identification was unreliable.  Is that fair?

16   **A.   Sir, I don't know that -- first of all, I don't know**

17   **that the cases you are quoting are even good law, I**

18   **don't know they've been shepardized.  I don't know**

19   **anything about those materials that you're even**

20   **citing.**

21         **And had I gotten them before today, I**

22   **might be able to give you a better answer.  So if**

23   **you're going to ask me to agree with your**

24   **interpretation of Sixth or Fourth circuit case law,**

25   **I cannot do that.**



Timothy Dixon, J.D.
09/04/2024                                    Page 39

1   Q.   Let me ask you this, Mr. Dixon.  In your time as a

2        prosecutor, I'm assuming you've approved warrants,

3        correct?

**4   A.   No.**

5   Q.   In your time as a police officer, I'm guessing you

6        drafted warrants?

**7   A.   Yes.**

8   Q.   Actually, that's interesting, because we sent a FOIA

9        request to the Baltimore Police Department asking for

10       copies of any warrants you drafted.  They didn't have

11       any.  Do you happen to know why that might be?

**12  A.   I wouldn't know.**

13  Q.   And you were a police officer for 20 years?

**14  A.   No, sir.**

15  Q.   How long were you a police officer for?

**16  A.   Eight years.**

17  Q.   Eight years, okay.  In those eight years, did you ever

18       write a warrant where the basis for probable cause was

19       an eyewitness identification?

**20  A.   An arrest warrant?**

21  Q.   Correct.

**22  A.   I'm sorry, sir.  I couldn't hear you.**

23  Q.   I'm asking, in your time as a police officer, did you

24       ever write an arrest warrant where the basis of

25       probable cause was an eyewitness or a victim



1    identification?

**2  A.   I believe I did, umm-hmm.**

3   Q.   Now, do you agree with the general principle that

4        unless there's a reason the officer should suspect

5        that the witness identification is unreliable or

6        untrustworthy, that an eyewitness identification can

7        serve as the basis for probable cause?

**8  A.   I would agree that it certainly can suggest probable**

**9       cause, it can be material to probable cause.  But I**

**10       think you hit on the important point here, that**

**11       reliability is the question.  In this case, I --**

12  Q.   Sir, we're going to get into that.  Sir, we're getting

13        into that.

14             MR. LAND:  Let him answer it.  Please let him

15        answer the questions.

16             MR. PADDISON:  I asked the question.  I am not

17        asking him for a narrative answer.  We'll get to it.

18  BY MR. PADDISON:

19  Q.   I know where you want to go with this, Mr. Dixon, and

20        I'll take you there, okay?

**21  A.   That's fine too, sir.**

22  Q.   Now, the victim in this case told Officer Oliver that

23        he'd been drinking on the night he was carjacked,

24        right?

**25  A.   He said he had been drinking, drugged and passed out.**



Timothy Dixon, J.D.
09/04/2024                                    Page 41

1   Q.   And again, I'll get you there, Mr. Dixon.  It will go

2        a lot faster and a lot smoother, all right.  So I

3        think you already answered it, but the victim also

4        told Officer Oliver that he suspected he may have been

5        drugged, correct?

6   A.   Yes.

7   Q.   Now, as a police officer or as a prosecutor, both of

8        those things might suggest that his identification

9        of Ms. Woodruff as the female suspect might not be as

10       reliable as if he would have been sober.  Is that

11       fair?

12  A.   **I think it's more than that.  It's not just it might**

13       **not be as reliable.  It's not as reliable because it's**

14       **not just that he's sober.  He said he's under the**

15       **influence, whether voluntarily or involuntarily, of a**

16       **controlled dangerous substance.  So the eyewitness is**

17       **inherently unreliable.**

18  Q.   Correct, it affects the reliability, that's all I'm

19       getting at, in a negative way.  It makes it less

20       reliable.  Is that fair?  I'm not disagreeing with

21       you.  I think we agree on this.

22  A.   **Yes.**

23  Q.   However, to be fair here, the victim also identified

24       Mr. Walker as the male suspect, right?

25  A.   **There is information to that, yes.**



1  Q.   Yes.  And Mr. Walker was apprehended while driving the

2       stolen vehicle, correct?

3  **A.   That's what the report says.**

4  Q.   And I mean, this might seem like common sense, but

5       while he was intoxicated, and that works against

6       the reliability, the fact that the victim identified

7       the male suspect and it happened to be the guy who

8       was driving the stolen car, that might just at least

9       suggest that it was somewhat reliable, correct?

10 **A.   No, sir.  The fact that --**

11 Q.   So it's a matter of a huge coincidence?

12 **A.   I hadn't finished my answer, but we can go ahead.**

13 Q.   So you, as a police officer or as a prosecutor, you

14      would view that as a sheer coincidence that the victim

15      picked the male suspect out of a photo lineup who

16      happened to be arrested driving the stolen car?

17 **A.   No, sir, I wouldn't say it's a coincidence.  I don't**

18      **know what happened during the photo array.  We don't**

19      **have a recording of him picking him out, we don't**

20      **know if there were suggestions made, we don't know**

21      **what preparation was made before he was given the**

22      **opportunity.**

23            **I have no idea why he picked Mr. Walker out,**

24      **just like I don't know why he would have picked**

25      **Ms. Woodruff out, when clearly she could not have been**



1    the person.  So if we're going to say that it's

2    reliable because he picked Mr. Walker out, then how

3    unreliable is it because he picked Ms. Woodruff out

4    this very same day, and it could not be true.

5  Q.  Mr. Dixon, I'm agreeing with you.  I'm actually

6    agreeing with you.  I'm saying that the fact that he

7    admitted to have been drinking and suspected he had

8    been drugged, that works against the reliability.

9         I'm just asking what I think is common

10   sense.  If he also picks out the person that was

11   apprehended in the stolen car, that would work at

12   least somewhat in favor of reliability.  You can't

13   meet me there?

14 A.  **No, sir, I can't, because oftentimes people who steal**

15   **cars, they exchange them, they give them to other**

16   **people.  Mr. Walker said he purchased the car, so I --**

17 Q.  But he was also identified by the victim.  If he was

18   just some random person that purchased the car and

19   happened to get identified by the victim then, like I

20   said, you're suggesting that it's more likely that

21   it's a sheer coincidence than it is no, he was

22   actually the male suspect?

23 A.  **Sir, I'm not speculating on if it was a coincidence**

24   **or if when the photo array was given information**

25   **was suggested to him, if he were prepared to pick**



1       **out Mr. Walker.  I have no idea of why he picked**

2       **Mr. Walker out, just like I have no idea why he would**

3       **have picked Ms. Woodruff out or why she would even**

4       **have been in the photo array.**

5    Q.  Well, we're not talking about Ms. Woodruff right now,

6        Mr. Dixon.  And again, you've acknowledged that you

7        can't speculate.  You can't speculate that there was

8        some defect in the process here.

9            I'm just asking very plainly, and I think

10       it's a relatively simple thing.  Without speculating

11       about the would haves, the might have happens or

12       coulds or I don't knows, just the fact that the victim

13       identified the male suspect who was apprehended

14       driving the stolen car, that doesn't suggest to you

15       that okay, maybe this guy does remember this or his

16       identification is at least a little bit reliable?

17   A.  **No, sir.  As I said --**

18   Q.  Okay.  That's all right.

19   A.  **-- what you're asking me to do is trust the process**

20       **that was used by your Detective Oliver, but it's the**

21       **very same process in the Ms. Woodruff was falsely**

22       **accused of this, so I can't speculate on it.**

23   Q.  Right.  And I'm not asking you to speculate.  And of

24       course you are aware, because you reviewed everything,

25       that Officer Oliver did not conduct the photo lineup



Timothy Dixon, J.D.
09/04/2024                          Page 45

1    with the male suspect.  You're aware of that, right?

2  A.  **I'm aware she didn't conduct it, but she's the lead**

3      **detective who caused her to be placed in the array.**

4  Q.  And just to be clear, you're also aware that she's not

5      a detective, right?  You're aware that she's a police

6      officer?

7  A.  **That's fine too, sir.**

8  Q.  Okay, okay.  So basically you're saying, I'm going to

9      speculate that there was a defect in the process

10     that these other two officers used, and that's why I

11     can't agree that there is some indicia of reliability

12     based on the fact that the victim ID'd the male

13     suspect who was apprehended driving the stolen car; is

14     that fair?

15 A.  **No, it's not.**

16 Q.  Okay.

17 A.  **I told you I won't speculate, and it seems like you're**

18     **asking me to.**

19 Q.  Okay.  So -- all right.  So don't speculate that there

20     was any defect in the process.  Don't speculate as to

21     that.  Without any defect in the process, does the

22     mere fact that the victim identified the male suspect

23     who was the apprehended driving the stolen car, does

24     that or does that not add a certain indicia of

25     reliability to the identification?



 1             MR. LAND:  Objection, asked and answered.

 2  BY MR. PADDISON:

 3  Q.   It's a yes or no question.

 4  **A.   Sir, what you're asking me is not a yes or no**

 5       **question.  You're asking me --**

 6  Q.   Without speculating about defects in the process --

 7             MR. LAND:  Please stop cutting him off,

 8       Counsel.

 9             MR. PADDISON:  It's a very simple question.

10  BY MR. PADDISON:

11  Q.   Without speculating as to any --

12             MR. LAND:  He's answered the question.

13             MR. PADDISON:  Mr. Land, we're not going to do

14       this, all right.  And if you want to go in front of

15       the judge, I promise you, she's going to side with a

16       me on this.

17             MR. LAND:  This is --

18             MR. PADDISON:  It is a very simple question.

19             MR. LAND:  He's answered this.

20             MR. PADDISON:  All right.

21  BY MR. PADDISON:

22  Q.   Mr. Dixon, let me ask you this.  Let's put it this

23       way.  You were a police officer.  Let's assume this is

24       your investigation, you're the one in charge, you're

25       making sure everything's being done right, okay.  You



1     know everything's above board, all right.

2             And the victim identifies a male suspect

3     who's apprehended driving a stolen car, the stolen car

4     that you're investigating.  It's your investigation.

5     You know that everything's being done right.  Does

6     that add an indicia of reliability to the witness's

7     identification?

8  A.  **If I were investigating and I'd done everything**

9     **properly -- and I would say that Detective or Officer**

10    **Oliver did not in this case.  Had she qualified this**

11    **witness, for example, asked them about had he got**

12    **interior medical attention, was he under the influence**

13    **of drugs or alcohol that day, okay.**

14            **If the process wasn't suggestive and I knew**

15    **it wasn't suggestive, if I had all those things in**

16    **place, and he still picked him out of the lineup, then**

17    **I would say that yes, it is material and it is**

18    **important and it is relevant and it would be reliable**

19    **then.**

20            **But I don't have those things based on the**

21    **information received in this case, and that's why it**

22    **seems as if you're asking me to speculate that she did**

23    **do those things, and I can't.**

24 Q.  No, what I'm asking you to do is to not speculate that

25    things were done, and you answered the question, so I


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO  313.567.8100

Timothy Dixon, J.D.
09/04/2024                                    Page 48

1    appreciate that.  Now, you were a police officer for

2    eight years, correct?

**3  A.  Yes.**

4  Q.  And you were trained on the concept of probable cause,

5    correct?

**6  A.  Yes.**

7  Q.  And before you became a prosecutor, I presume you went

8    to law school, correct?

**9  A.  I went to law school before I was a prosecutor, yes.**

10  Q.  And during law school, you studied the notion of

11    probable cause, correct?

**12  A.  Yes.**

13  Q.  And then when you became a prosecutor, you dealt with

14    probable cause on a daily basis, correct?

**15  A.  Yes.**

16  Q.  So you would agree with me then that a licensed

17    attorney, particularly a prosecutor, should have a

18    deeper understanding of the concept of probable cause

19    than a police officer, correct?

**20  A.  I would not agree with that under all circumstances,**

**21    no.**

22  Q.  You wouldn't agree with that, okay.

**23  A.  There are many new prosecutors who have far less**

**24    knowledge than many veteran, seasoned police officers.**

25  Q.  Okay, all right.  So how about this.  You have a



1      prosecutor with let's call it five, six years of

2      experience and a police officer with five, six years

3      of experience.

4              Based on the fact that the police officer

5      probably has a high school education and maybe at

6      community college a couple years, and the prosecutor

7      graduated law school, who would you expect to have

8      a deeper understanding of the concept of probable

9      cause?

10  A.  **Well, first of all, I find your concept of or your**

11      **statement regarding police officers a little insulting**

12      **toward their profession, but I think it depends on**

13      **what they do day to day.**

14              **I mean, you could have a prosecutor who**

15      **prosecutes only traffic cases or works in juvenile or**

16      **sentence hearings, and you might have a detective**

17      **who's investigating shootings and robberies after five**

18      **years.  So it really depends on what they've done day**

19      **to day and their level of experience.**

20  Q.  So what you're saying then is that there may be cases

21      where a prosecutor should just rubber stamp a police

22      officer's request warrant then because a police

23      officer might know more?

24  A.  **No, they shouldn't rubber stamp it.  I think that's**

25      **the problem in this case.**



1  Q.   Is that the problem, because you're suggesting that's

2       what happened here?

3  A.   **I'm suggesting that perhaps they did not ask questions**

4       **of Officer Oliver, but I don't know the process in**

5       **Detroit, so I can't say that happened or it didn't**

6       **happen, but --**

7  Q.   And just for the point of clarification, the education

8       and background of police officers I was referencing

9       was Officer Oliver's educational background.  And I

10      believe that the prosecuting attorney that signed this

11      warrant has a P number pretty close to mine, which

12      means they would have been practicing law for about

13      11 years.

14             So you can't tell me right now that you

15      would expect a prosecutor to have a deeper

16      understanding of probable cause than a police officer?

17      You don't agree with that?

18  A.  **In general?  I can't make a general statement because,**

19      **again, it depends on what they do day to day.  I've**

20      **seen prosecutors who spend their entire careers**

21      **working in juvenile and traffic, and I've seen police**

22      **detectives and police officers who spend their careers**

23      **working where they're investigating serious crimes,**

24      **and I would say that many of those police officers**

25      **have a better understanding of probable cause than say**


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO      313.567.8100

Timothy Dixon, J.D.
09/04/2024                          Page 51

1        the prosecutor does.

2   Q.   Now, you're right.  There are certain prosecutors'

3        offices where certain prosecutors only deal with

4        traffic tickets, other ones only deal with violent

5        felonies.  And auto theft is a felony, correct?

6   A.   In Maryland it is, yes.

7   Q.   And can you take me at my word that carjacking is a

8        felony in the State of Michigan?

9   A.   I would think that it should be.

10  Q.   Okay, we can agree on that.  And generally speaking,

11       you would expect that you wouldn't have a prosecutor

12       who only handles traffic warrants handling a felony

13       warrant, would you?

14  A.   I wouldn't, no.

15  Q.   Now, beyond prosecutors, we have a police officer that

16       writes the request for a warrant, right?  That's not a

17       warrant.  It's a request, right?

18  A.   Yes, I assume it's her request.

19  Q.   Okay.

20  A.   I don't know if it's the affidavit or the only

21       affidavit submitted or not, but that was what I drew

22       from it, that that was her application.

23  Q.   All right.  And then based on the documents you

24       reviewed, you understand the process then is it has to

25       get approved by a senior officer, in this case a



Timothy Dixon, J.D.
09/04/2024                    Page 52

1      captain, correct?

2  A.  **I thought that was the process, yes.**

3  Q.  Yes.  So then once it's requested by a police officer,

4      approved by a captain, it's then submitted to a

5      prosecutor, right?

6  A.  **I assume that's the process, based on what I read.**

7  Q.  And we don't know if this prosecutor knows what

8      they're doing operate, but -- let's hope they do, but

9      we don't know that, right?

10 A.  **I have no idea who the prosecutor is, nor the captain.**

11 Q.  Okay.  And then, even then, at that point it's still

12     not a warrant, correct?

13 A.  **I don't know, sir.**

14 Q.  No, no, it has to be --

15 A.  **It has to be presented to a judge.**

16 Q.  Right, right.  And judges shouldn't just rubber stamp

17     these either, should they?

18 A.  **They should not.**

19 Q.  All right.  Now, when you were a prosecutor, you know,

20     and you were look at whether or not to approve a

21     warrant, did all you do was review the Request For

22     Warrant, or did you actually look at the materials

23     that were submitted with the request?

24 A.  **I'm sorry, your question again?**

25 Q.  Let's start with your personal experience, and then we



Timothy Dixon, J.D.
09/04/2024                        Page 53

1     can hopefully broaden it out.  In your experience as a

2     prosecutor, I would presume that you were -- that's

3     right.  You did not approve warrants a prosecutor.  I

4     apologize.  You did testify to that, correct?

**5  A.   I did.**

6  Q.   Okay, all right.  But you would expect a prosecutor to

7     actually look past just the four-page request for a

8     warrant and actually look at the evidence?  You would

9     expect that, right?

**10  A.   I would expect there would be some review of all the**

**11      information with the officer.**

12  Q.   Okay.

**13  A.   And I would expect the officer would be truthful in**

**14      their conversation with the prosecutor.**

15  Q.   And you would expect that the judge would review the

16     evidence as well, correct?

**17  A.   Yes.**

18  Q.   And it doesn't actually become a signed arrest warrant

19     until the judge approves it, correct?

**20  A.   I'm only assuming that's the process in Michigan,**

**21      based on the information I received.**

22  Q.   So really there's four different people that have to

23     determine that they think there's probable cause in

24     order for a warrant to get signed, correct?

**25  A.   I'm assuming that that is the process that's in place,**



1      based on the information I received.

2  Q.  Okay.  Now, a couple things here.  In your report --

3      and I may have to jump around because we've kind of

4      gotten a little off topic here.  Well, actually, no,

5      we'll start here.  On page 12 of your report --

6  A.  Okay.

7  Q.  -- the second sentence, you wrote, "She did not inform

8      the neutral and detached magistrate that she had not

9      met, seen or ever made any attempt to locate Plaintiff

10     to investigate and corroborate with reliable evidence

11     that Porcha Woodruff could possibly have been the

12     person in the video."  Did I read that correctly?

13 A.  Yes.

14 Q.  Now, I've looked through this Request For Warrant

15     here, and I don't see anywhere where Officer Oliver

16     says she did meet with Ms. Woodruff.  Is that in

17     there?  Did I miss it?

18 A.  That she did meet with her?

19 Q.  Correct.

20 A.  I think that's part of the problem, that she did not

21     meet with her, that she didn't even try to locate her.

22 Q.  Okay.

23 A.  She didn't even try to verify that Porcha Woodruff was

24     even alive still or that she could have had the

25     ability or opportunity to carry out the crime.  That



Timothy Dixon, J.D.
09/04/2024                          Page 55

1    is the contention.

2  Q.  I'm asking did she ever represent that she did meet

3       with her?

4  **A.  No, she didn't.**

5  Q.  Did she represent that she did any more -- well, this

6       is kind of a circular question, but aside from what's

7       contained in the Request For Warrant, did she indicate

8       that she had done more investigation that she just

9       didn't include for some reason?

10 **A.  I'm not sure I understand your question, sir.**

11 Q.  Well, it's not as if there's any evidence she said oh,

12      I also did A, B, C and D to investigate this; I just

13      didn't put it in the warrant?

14 **A.  And your question is again?**

15 Q.  Is there anything in this that would lead a prosecutor

16      or presumably a judge to think that Officer Oliver

17      actually met with Ms. Woodruff?

18 **A.  Yes, and that's what I mentioned in the statements.**

19 **    When she said she observed Defendant Woodruff, she saw**

20 **    Defendant Woodruff, that she would know what Defendant**

21 **    Woodruff looks like and that she would have verified**

22 **    that's the person in the video.**

23 **         That's the problem with the false and**

24 **    misleading statements, that she's suggesting that she**

25 **    actually did know who Porcha Woodruff was, because if**



1      she had met with her she would have recognized that

2      she was in fact months pregnant and could not have

3      been the person in the video.

4   Q.  This is great.  We're going to back up here, because I

5      thought we were past this because I thought you agreed

6      that this Request For Warrant was Officer Oliver

7      giving a timeline about what she did, right, and those

8      statements that we discussed about what she observed

9      are from February 2nd of 2023.

10          Now, the crime occurred on January 31st --

11     or the 30th or 31st of 2023, several days prior.  So

12     is it your contention that Officer Oliver was

13     representing that she went to the location and saw

14     this series of events?  Where she mentions in that

15     paragraph "video" six times, you're suggesting that

16     that's misleading?

17          MR. LAND:  That's compounded.  We don't even

18     know what you just said, Counsel.  Slow down and just

19     give it in pieces.

20          MR. PADDISON:  Okay.  Let's go back.

21   BY MR. PADDISON:

22   Q.  You did agree that this Request For Warrant provided a

23     timeline of what Officer Oliver was doing during her

24     investigation.  You agreed with that?

25   A.  Those were your words, sir.



1  Q.   So what other reason would she put these dates in?  I

2       did this on January 30th, I did this on January 31st,

3       on February 2nd I did this.  That's not a timeline?

4  A.   **Sir, what you're calling a timeline, I don't**

5       **understand why -- I don't understand what you mean.**

6       **All I understand is, did she put that in her request**

7       **for an arrest warrant.**

8  Q.   Right.  And that's what the judge would have reviewed,

9       right?

10  A.  **I assumed that that was the request, and I assumed**

11      **that the information there was inclusive of what was**

12      **given during the request.**

13  Q.   And you agreed -- well, you agreed earlier that these

14       statements about what she observed on video was from

15       February 2nd of 2023, right?

16  A.  **I'd have to look back at the exact date she said she**

17      **viewed the video, so I --**

18  Q.   I guess we're going back on this.  That's fine.

19  A.  **Sir, sir, I didn't finish, but if you want to cut me**

20      **off, that's fine.**

21  Q.   Oh, no.  You said you'd have to go back, so let's go

22       back.

23  A.  **No, sir, I didn't say that.  I said that I'd have to**

24      **go back and see the day she reviewed the exact**

25      **video, but the point is that it doesn't matter what**



1    **day she reviewed the video.  She did not see Porcha**

2    **Woodruff in the video, and she's saying that she**

3    **did.**

4    Q.   Mr. Dixon, Mr. Dixon, we're getting off topic here.

5         My question is about whether Officer Oliver

6         represented to a prosecutor or to a magistrate that

7         she personally interacted with her or personally saw

8         Ms. Woodruff and you're suggesting that yes, when

9         those statements about "I observed."

10             Now, we previously -- and I thought we spent

11        a lot of time on that, all right -- discussed that

12        that was from an entry dated February 2nd where she

13        mentions --

14   **A.   No, sir, that's not what you said.  You brought up --**

15        **you brought up the video and --**

16   Q.   Okay.  Let's go back.  Let's go back to the second

17        page --

18             MR. LAND:  No.  Counsel, you gotta let him

19        answer it.  Come on, man.

20   BY MR. PADDISON:

21   Q.   Let's go back to the said page of the Request For

22        Warrant.  We'll take as much time as we need.  I want

23        to understand your opinions.

24             MR. LAND:  Don't cut him off.  That's fine,

25        but don't cut him off, Counsel.


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO      313.567.8100

Timothy Dixon, J.D.
09/04/2024                                    Page 59

1  BY MR. PADDISON:

2  Q.  Let's go back to the second page.  Tell me when you're

3      there.

**4  A.  I think I'm there.**

5  Q.  All right.  There's that bolded word Investigation,

6      right, in the middle of the page?

**7  A.  Yes.**

8  Q.  And once again, we've been through this.  I thought we

9      understood each other.  "I, OIC Oliver of Commercial

10     Auto Theft, was assigned the case on January 30th,

11     2023."  I read that correctly, right?

**12  A.  Yes.**

13  Q.  Okay.  "January 31st, 2023, I contacted Mr. Walker

14     using his mother's phone number."  I can read the rest

15     of the paragraph if I need to, but that suggests that

16     that's what she did on January 31st.

17          She may have done other things, I get that,

18     we've been through that, but she's describing to

19     everyone -- her supervisor, the prosecutor, the judge,

20     the whole world -- this is what she thinks is relevant

21     that she did on January 31st of 2023, correct?  We

22     agreed on that?

**23  A.  Yes.**

24  Q.  Okay.  The next paragraph, February 2nd.  Now, before

25     we get into this, can we agree that in the last



1    paragraph of she was describing what she did on

2    January 31st.  This paragraph is describing what she

3    was doing on February 2nd.  Can we agree on that

4    first?

**5  A.   That's what she says.**

6  Q.   So if we look at the last two lines, "After I had

7       spoken with Mr. Walker and he advised me he recalls

8       being at the BP gas station prior to being carjacked,

9       I made the location a second time and checked for

10      video."  Did I read that correctly?

**11  A.   That's what she wrote, yes.**

12  Q.   "I observed Mr. Walker's gold Chevy Malibu pull into

13      the parking lot at approximately 5:53 p.m. on

14      January 29th, 2023."  So she's clearly talking about

15      observing something that occurred in the past,

16      correct?

**17  A.   She's saying she saw it on the video.  That's what I**

**18       took it as, Counsel.**

19  Q.   Right, right.  So are you suggesting that this should

20      be read that Officer Oliver personally, in realtime,

21      had a face-to-face recognition with Ms. Woodruff?

**22  A.   No, sir, that's not what I'm saying.  What I'm saying**

**23       is that when reviewed the video, she -- when she**

**24       reviewed the video, she saw what she saw, but in the**

**25       warrant application she's indicating that she verified**



1      the person in the video to be Defendant Woodruff, when

2      she had not done so.  That's the problem.

3  Q.  But this brings me back to page 12 of your report

4      where you wrote, "She did not inform the neutral and

5      detached magistrate that she had not met -- she had

6      not met Ms. Woodruff."  And I paraphrased the end

7      there.  Now, I asked you if there was --

8  A.  Sir, that's not my statement.

9  Q.  I'll read it in full.  "She did not inform the neutral

10     and detached magistrate that she had not met, seen or

11     ever made any attempt to locate Plaintiff to

12     investigate and corroborate with reliable evidence

13     that Porcha Woodruff could possibly have been the

14     person in the video."

15          So I asked you, based on that, where in the

16     Request For Warrant did it indicate or did Officer

17     Oliver suggest that she had personally met with

18     Ms. Woodruff, and you pointed to those statements.

19     Now you're saying no, it's clear that she's saying

20     what is on the video?  That's what --

21  A.  That's not what I'm saying, sir.

22  Q.  We have the transcript.  We can have it read back, if

23     you need.  So I will ask you again --

24  A.  Sir, I don't need it.  That's just not what I'm

25     saying.



Timothy Dixon, J.D.
09/04/2024                                    Page 62

1  Q.   So Mr. Dixon --

2  A.   **But it seems like you won't give me a chance to**

3       **explain it, so --**

4  Q.   Mr. Dixon, how about this?  Is it your contention that

5       somewhere in this Request For Warrant, Officer Oliver

6       suggests that she personally met with Ms. Woodruff?

7  A.   **No, she's not saying that.  In fact, what she's saying**

8       **is that she did not meet with her, that she didn't**

9       **verify the information, yet she says that she**

10      **identified her as the person in the video, and I think**

11      **that's the problem.**

12              **She omitted information that had she told**

13      **the judge, prosecutors, and maybe even a supervisor,**

14      **the results would have been different.  It's the**

15      **omission of the information, Counsel.**

16 Q.   Mr. Dixon, if I told you that I happened to go a

17      Baltimore Ravens game, would you assume that I ran

18      into Ray Lewis while I was there?

19              MR. LAND:  Objection, that's irrelevant.

20      That's irrelevant, Counsel.

21 BY MR. PADDISON:

22 Q.   So based on your interpretation, Mr. Dixon, Officer

23      Oliver should have put in big, bold letters at the

24      top of the page, you know, bold font, I did not

25      personally with Ms. Woodruff.  Is that what you're



1    suggesting?

2  A.  **No, sir, I'm not suggesting that.  What I'm suggesting**

3      **is that a police officer -- an objectively reasonable**

4      **police officer adhering to generally accepted policing**

5      **practices would have went and verified, okay, that**

6      **Ms. Woodruff had an opportunity and the ability to**

7      **commit the crime.**

8              **And had she done so, she would have also**

9      **verified in her mind that Ms. Woodruff was the person**

10     **she saw on the video.  If she had done that, she would**

11     **have recognized she couldn't have possibly been the**

12     **person in the video.  That's what I'm saying.**

13  Q.  Right.  And you know what, Mr. Dixon.  I would agree

14     that Officer Oliver certainly could have done more.  I

15     actually agree with that.  In fact --

16  A.  **I didn't say "could have," sir.  I said "should have."**

17  Q.  Fair enough.  And I would opine that there is not a

18     single police investigation in the world where

19     officers couldn't or shouldn't do more, okay.  But

20     that's why we have those checks and balances, right,

21     sir?  That's why we have warrants get signed off by

22     senior officers, that's why we have warrants --

23  A.  **I don't agree with you, sir.**

24  Q.  You don't agree?  Well, you don't agree that having a

25     senior officer and then a magistrate and then a judge



1      review a warrant before it's signed isn't a form of

2      checks and balances to ensure that there's -- to

3      accept possible that there's probable cause?

4   A.   **No, sir.  I don't agree with your premise that in**

5      **every police investigation the police could have**

6      **or should have done more.  I think there are plenty**

7      **of investigations, okay, if not many or most**

8      **investigations, police officers do a very good job.**

9      **I just think in this investigation it was quite**

10     **lacking, and we got the result that we got, which is**

11     **Ms. Woodruff being arrested when she shouldn't have**

12     **been.**

13  Q.   But that didn't seem to be a problem for the captain

14     who approved it, and it didn't seem to be a problem

15     for the prosecutor who approved it, and it didn't

16     seem to be a problem for the judge who approved it,

17     did it?

18  A.   **I think that based on what we've read here that they**

19     **did approve it, but we don't know that they even asked**

20     **her the questions.  Maybe they assumed that she would**

21     **have followed generally accepted policing practices**

22     **and went and verified that Ms. Woodruff could have**

23     **been in person or had the opportunity the commit the**

24     **crime or had the ability to commit the crime.**

25         **I would think as a supervisor -- and I've**



1    supervised investigators and I've supervised police

2    officers.  You assume that they adhere to generally

3    accepted principles and practices like going to verify

4    this person could have done it, had the ability to do

5    it, is even in fact alive.  I mean, there's no

6    indication that Officer Oliver did this.  In fact, she

7    doesn't mention that she did, and we have the as a

8    result that we have.

9  Q.  You keep mentioning generally accepted principles, and

10    I was trying to figure out what generally accepted --

11 A.  Practices, sir.

12 Q.  Oh, practices.  Generally accepted practices.  Maybe

13    I'm confused.  I thought that --

14 A.  It's practices and principles.

15 Q.  Okay, policing practices.  All right.  I was trying to

16    figure that out because, you know, the Detroit Police

17    Department has their policies and their practices, I'm

18    sure Baltimore Police Department has their practices

19    and their policies.

20              And generally speaking, when you use the

21    word generally, it means widespread.  And I was

22    looking for a citation in your report as to where you

23    were getting these generally accepted practices, but

24    there is not a single citation in your report, is

25    there, sir?



Timothy Dixon, J.D.
09/04/2024                          Page 66

1  A.  As to where generally accepted policing practices come
2      from?

3  Q.  Correct.  There's not a single citation to that,
4      correct?

5  A.  No, there isn't.

6  Q.  So in other words, for purposes of this report, we're
7      accepting that they're generally accepted policing
8      practices because you say they are?

9  A.  Sir, I'm not suggesting you should accept everything I
10     say.  I think that most people commonly know that
11     police officers are taught how to investigate in
12     police academies, they're taught that they need to
13     do it according to the Constitution, they're taught
14     that you don't put things in warrant that aren't true,
15     and --

16  Q.  Okay.

17  A.  -- and that is in almost every police department's
18     policies, that you tell the truth.  I don't think you
19     need to make a citation for that, nor is there a book
20     that says you always tell the truth.  Police officers
21     are taught that, and they're taught the penalty of not
22     telling the truth.

23  Q.  So --

24  A.  It can be them being subjected to punishment, civil
25     liability, criminal liability or people being



Timothy Dixon, J.D.
09/04/2024                          Page 67

1    **wrongfully arrested, so no, there is no citation.**

2  Q.  So what you're saying is police training is strictly

3       word of mouth then?

4  **A.  No, sir, it's not word of mouth.**

5  Q.  So you would agree there are best practices that are

6       written?  There are policies and procedures that are

7       written, correct?

8  **A.  Yes.**

9  Q.  And you don't cite to any of them in your report, do

10      you?

11 **A.  I think I do cite to the Detroit Police policy about**

12     **how she used facial recognition and that she didn't**

13     **use it properly, and that contributed to her actions**

14     **here.**

15 Q.  Let's talk about that, because we've got a few things

16      to get to here.  But you say that she -- and I've

17      actually got this noted here.  Yes, there we go.  It's

18      on page 13.  Let me get back to my notes here.  And

19      let me know when you're on page 13 of your report.

20 **A.  I have it, sir.**

21 Q.  Okay.  Page 13 of your report.  Just above the

22      snapshot of Detroit Police Department manual it says,

23      "Also in violation of the policy, she indicated that

24      the facial recognition report was a positive

25      identification of the person in the video as being



HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO        313.567.8100

1       Porcha Woodruff, when agency policy clearly states

2       that the report was not a positive identification of

3       the suspect."  Did I read that correctly?

**4   A.   Yes.**

5   Q.   Now, can you point me to anywhere in the request --

6       oh, I'm not going to say can you.  I'm saying you

7       can't point me to anywhere in the Request For Warrant

8       where she says that she got a positive identification

9       from facial recognition technology?

**10   A.   Those were her words, sir.  What she actually did was**

**11       she said she saw Defendant Woodruff, and it was based**

**12       solely on the fact that she got the hit and the**

**13       unreliable identification of Mr. -- I can't remember**

**14       his name, the victim.**

15   Q.   Mr. Walker.  So in reality, when you write that she

16       based the positive identification on the facial

17       recognition, what you meant to write in that sentence

18       was she based the positive identification based on the

19       facial recognition and the unreliable witness

20       identification?  That's what you meant to write?

**21   A.   No, sir.  I meant to write what I wrote.  This --**

22   Q.   Okay.

**23   A.   Sir, and if you're going to cut me off, I'll yield to**

**24       you and I won't answer your question.**

25               MR. PADDISON:  Ms. Spencer, can you read back


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

1    his testimony from a moment ago?

2                    (The record was read back by the

3                    court reporter as follows:

4                    "Answer:  Those were her words, sir.  What she

5                    actually did was she said she saw Defendant

6                    Woodruff, and it was based solely on the fact

7                    that she got the hit and the unreliable

8                    identification of Mr. -- I can't remember his

9                    name, the victim.")

10   BY MR. PADDISON:

11   Q.   Okay.  Now that we've cleared up the testimony --

12   **A.   I don't think we have, sir, but go ahead.**

13   Q.   You said that you had -- let's keep this brief.  I'm

14        assuming you're referring to the facial recognition

15        hit, correct?

16   **A.   Sir --**

17   Q.   That's the hit?

18   **A.   Sir, you continue to cut me off whenever I try to**

19        **answer your questions, so I'll just do the best I can.**

20        **But you haven't let me finish answering the last**

21        **question, but go ahead.**

22   Q.   So when you said the word "hit," that meant the facial

23        recognition hit, correct?

24   **A.   The facial recognition lead she treated as more than a**

25        **lead.  She did not fully investigate it.  Then she**


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO      313.567.8100

1      coupled it with the identification by the victim,

2      whose identification was unreliable.

3               But as to the policy, your question was, was

4      there -- I think your question was, was there a

5      violation of the policy.  And yes, there was a

6      violation of the policy, if that in fact was your

7      question, sir.  I'm not sure.

8  Q.   Because what I see here, and maybe -- let's try and

9      get this timeline down.  So we get the name Porcha

10     Woodruff, which we agree, per policy, is an

11     investigative lead.  It's not probable cause, it's

12     not.  It's just an investigative lead.  We agree on

13     that, right?

14 A.   That's what the policy says.

15 Q.   And she took that investigative lead and said oh, we

16     have someone that might be of interest, and she showed

17     that to the victim, correct?  They did a lineup,

18     correct?

19 A.   No, sir.

20 Q.   No.  So she wrote this report on February 4th before

21     she got the ID on February 3rd?  Is that what you're

22     saying?

23 A.   No, sir.  You asked me if she showed it to the victim.

24     We've already clarified she had other detectives show

25     it to the victim.


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO    313.567.8100

Timothy Dixon, J.D.
09/04/2024                              Page 71

 1  Q.  Okay.  Well, that's right.  She and Deputy Greenwald

 2      did the double blind, we did talk about that.  And the

 3      victim -- reliable or unreliable, the victim

 4      identified Ms. Woodruff as the female suspect,

 5      correct?

 6  A.  **That's what it says in the report.  I don't know**

 7      **whether that's true or not.**

 8  Q.  Right.  And you can't speculate.  We know that.  Okay.

 9      And based on those two things, she positively

10      identified Ms. Woodruff as the person she was dealing

11      in the video that we're talking about top on the page

12      three of the warrant request?

13  A.  **No, sir, she didn't positively identify her.  She said**

14      **it was her based on that information, as best as I can**

15      **tell.  There was no positive identification.  Had she**

16      **met Ms. Woodruff, then she might have been able to**

17      **positively identify her and know that it was not her.**

18  Q.  So in your mind, a positive identification isn't when

19      a witness IDs them in a lineup; it's when the witness

20      IDs in the lineup and they get it right?  That's a

21      positive identification?

22  A.  **No, sir, that's not what I'm saying.  We all know**

23      **witness identifications are wrong a lot.  People pick**

24      **people out of lineups, and they often pick out the**

25      **wrong person or they're mistaken in picking out**



1     people.  They're not that reliable, and we all know

2     eyewitness testimony is just not that reliable.

3            In this case, where you have a witness who

4     says that he had been drinking, who says he thinks he

5     may have been drugged or exposed to some sort of

6     substance, who's been through a traumatic experience,

7     it's inherently unreliable.

8            She coupled that with the lead from the

9     facial recognition and put it in a warrant.  And the

10    way she wrote the warrant, the language she used was

11    that she recognized Defendant Woodruff from the video.

12    That is the problem, sir.

13  Q.  Can you show me where she used the word "recognized"?

14  A.  In multiple places when she says, "I observed

15    Defendant Woodruff," "I observed from the video

16    Defendant Woodruff," "Defendant Woodruff can be

17    observed," "Defendant Woodruff can be observed."

18            I can go back to page 12 and give you the

19    instances that I cite in the report.  At the top of

20    page 12 of my report, she writes, "I also observed

21    several vehicles pulling into the lot and Defendant

22    Woodruff approaching them."

23            She then says, "I observed on video

24    Defendant Woodruff open the driver's door of

25    Mr. Walker's Malibu and the Black male who exited the



1    Envoy at the passenger's door of Mr. Walker's" --

2    "of Mr. Walker vehicle."

3            She then says, "Both Defendant Woodruff and

4    the male subject can be observed pulling and tagging

5    and tugging on Mr. Walker, who was in the driver's

6    seat."

7            She says, "Defendant Woodruff can be

8    observed on video taking what appeared to be an item

9    from Mr. Walker."  She says that she identified the

10   person in the video as Ms. Woodruff, when in fact she

11   could not have.

12 Q.  Where does she use the word "identify"?  I don't see

13   that word either.  I see "observed."  We don't need to

14   go through "observed" again.  But I don't think she

15   says "identify."

16 A.  She's saying "identify" when she names her.

17 Q.  Okay.

18 A.  She's saying I know that person to be Defendant

19   Woodruff.

20 Q.  And this was written on February 4th, after -- and you

21   agree with this, that she got the identification from

22   the victim, Mr. Walker?

23 A.  And there's no evidence that she showed Mr. Walker the

24   video.

25 Q.  She showed him a photo lineup?



Timothy Dixon, J.D.
09/04/2024                    Page 74

 1  A.   Yeah, but the video itself.

 2  Q.   And is that part --

 3  A.   Sir, sir, you're not letting me finish.  She's not

 4       saying that she sat down with Mr. Walker and showed

 5       him the video and he in fact says, oh, yeah, that's

 6       the same woman.  She's cobbling the information

 7       together herself, and she's saying that she's

 8       verifying it to be true when she hasn't done that.

 9  Q.   I want to be perfectly clear on this because I am

10       familiar with this provision within the DPD policy.

11       Are you suggesting that it's proper police practice to

12       show the victim an actual video of the crime or the

13       occurrence in terms of identifying them?  Is that what

14       you're suggesting?  Because that's what it sounds

15       like.

16  A.   To identify the victim?  I'm not sure how --

17  Q.   I'm sorry, identify the suspect.  You're suggesting

18       that it's proper police practice to show the victim an

19       image of a suspect during the course of the crime for

20       the purposes of identification?  Is that what you're

21       suggesting?

22  A.   Under some circumstances, it could be.

23  Q.   Okay.

24  A.   But in this situation, I don't know all of her

25       interactions with Mr. Walker, just like I don't know



1    that she even qualified that he should have been shown

2    a photo array.  The man said he had been under the

3    influence of alcohol and perhaps drugs.  He may not

4    even have been someone who should have been shown a

5    photo array.

6            Again, I can't speculate on all of her

7    interactions with Mr. Walker.  So some of the opinions

8    you're suggesting would require me know all of those

9    interactions, and I do not.

10  Q.   We agree you can't speculate, right.  We understand

11       that, and I don't want you to speculate, all right.

12       But to be clear, you are suggesting that for purposes

13       of identification, it can be a best police practice

14       to actually show the victim a video recording of

15       the incident for purposes of obtaining an

16       identification?

17  A.   Solely for the purposes of obtaining an

18       identification, no.

19  Q.   No?

20  A.   Not solely for that, sir, no.

21  Q.   Okay.  What purposes?

22  A.   Sometimes victims are shown videos of the event so

23       that they can help aid the investigator in finding

24       locations where evidence is.  Sometimes it can often

25       offer a lead.  In this situation, she had already used



1   facial recognition to try to identify the person in

2   the video.

3 Q.  But to be clear, and we should agree on this, she used

4   facial recognition technology.  She didn't really

5   use it.  The Crime Intelligence Unit used it to gain

6   an investigative lead.  That's really what she did?

7 A.  **Yes, sir, yeah.  And when I say "she," I include her**

8   **resources as a Detroit police officer.**

9 Q.  Okay, all right.  So I guess where I'm getting hung

10   up -- and maybe I'm just confused.  I think we've

11   agreed that --

12           So your interpretation of the paragraph at

13   the bottom of page two of the warrant request and the

14   top of page three is Officer Oliver suggesting that

15   she positively identified Ms. Woodruff as the

16   Defendant in the video, correct?

17 A.  **Sir, can you point me to the paragraphs that you're**

18   **referring to?**

19 Q.  Okay.

20 A.  **We've talked about a lot of things, and I don't want**

21   **to misunderstand what you're saying.**

22 Q.  Let's back this up and make sure we're on the same

23   page.  The investigator's report was written on

24   February 4th.  We agree on that, right?  That's day

25   it's dated?



 1  **A.   That's the date on it.**

 2  Q.   Yes, okay.  Now, on February 2nd, at the bottom of

 3       page two it indicates, "After I had spoken with

 4       Mr. Walker and he advised me that he recalls being at

 5       the BP gas station prior to being carjacked, I made

 6       the location a second time and checked for video,"

 7       right?

 8              That's the paragraph where it starts, and

 9       then it continues on the next page.  So this is a

10       narrative of what she did on February 2nd that was

11       written on February 4th, okay.

12              And you've just testified a moment ago that

13       in this top paragraph of the continuance of that

14       paragraph on page three of the warrant request, she

15       positively identified Ms. Woodruff as the Defendant

16       based on the facial recognition hit and the unreliable

17       victim identification.  Are we understanding each

18       other so far?

19  **A.   Sir, I think you're leaving out some important**

20       **details.  For example, even when he picked out**

21       **Ms. Walker -- I mean Ms. Woodruff, he does not say she**

22       **is the person who participated in the robbery.  If you**

23       **look at paged 16 of my report, we can clearly see that**

24       **he doesn't even say that --**

25  Q.   Mr. Dixon, we'll get to that.  Don't jump ahead of me



Timothy Dixon, J.D.
09/04/2024                                    Page 78

1    now.  We'll get to that.  We'll get do that.

2  A.  **Don't patronize me.  I'd like to finish answering your**

3      **question.**

4  Q.  But you're not answering.  You're not answering.

5  A.  **Your summary of what I said is not accurate, but what**

6      **I put in my report is my understanding of the**

7      **incident.**

8  Q.  It is.  And we will get to page 16 in a moment, all

9      right.

10 A.  **So no, I would not agree with you.**

11 Q.  Okay.  Let's turn to page 14 here, all right.  You

12     write, "Defendant Oliver also failed to mention the

13     warrant affidavit request that victim stated that he

14     had sex with the female suspect and he identified to

15     police only as Trinidad."  Did I get that right?

16 A.  **Yes.**

17 Q.  Now, let's look back at page two of the warrant

18     request.  Let's see.  So you're suggesting that

19     Officer Oliver did not mention that they had sex and

20     that he knew the female suspect as Trinidad.  I read

21     that correctly, didn't I?

22 A.  **(No answer).**

23 Q.  Now let's look at page two under Investigation,

24     February 2nd, 2023.  "I, OIC Oliver, obtained a

25     statement from Mr. Walker.  Mr. Walker stated as a few


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO  313.567.8100

1      days had gone by, he was able to recall more details

2      of the carjacking incident and the events prior to.

3                "Mr. Walker stated after he met Defendant

4      Woodruff, who he named as Trinidad, at Hoover

5      Market located at 19934 Hoover, the two went to

6      Bellagio Liquor parking lot where they engaged in

7      sexual intercourse."  Did I read that correctly,

8      sir?

9   A.  You did.

10  Q.  So she did mention that the victim knew the female

11      as Trinidad, and Officer Oliver did inform that they

12      everyone gauged in sexual intercourse, correct?

13  A.  **No.  Again, that's the problem, where you have the**

14      **officer identifying the person in the video as**

15      **Trinidad, as the person who committed the robbery and**

16      **as Ms. Woodruff, when in fact that's not what**

17      **Mr. Walker said.**

18          **During the photo array, Mr. Walker does not**

19      **say in fact that Ms. Woodruff is the person who**

20      **participated or that he was with that evening, okay.**

21      **He doesn't say she participated even in the robbery.**

22      **And again, that's laid out in page 16 of the report.**

23  Q.  Stop.  Let me just stop you here?

24  A.  **Well, that's fine too, if you want to --**

25  Q.  On February 2nd, Mr. Walker -- from the third line,



Timothy Dixon, J.D.
09/04/2024                          Page 80

1        "Mr. Walker stated after he met Defendant Woodruff,

2        who he named as Trinidad," right?  That's what it

3        says?

4   A.   That's what she says.

5             MR. LAND:  He's trying to explain it, Counsel.

6        He's trying to explain it to you, Counsel.

7   BY MR. PADDISON:

8   Q.   She is describing how Mr. Walker referred to this

9        female suspect.  She's saying he named her Trinidad,

10       correct?

11  A.   That's what she says, but that's not what Mr. Walker

12       says in his writings.

13  Q.   Interesting.

14  A.   Well, it is quite interesting, sir, that she would say

15       that.

16  Q.   What does he say?  Because I'm pretty sure he

17       identifies her as Trinidad.

18  A.   That's what your officer says.

19  Q.   Okay.

20  A.   But I didn't see anywhere in the materials where

21       Mr. Walker identified a photo of Ms. Woodruff, okay,

22       as the person who participated in the robbery.

23  Q.   And you're referencing back to your page 16 comments,

24       right?

25  A.   In all the materials, sir, I don't see where



1        **Mr. Walker says that Ms. Woodruff is the person who**

2        **participates in the robbery.  In fact, it's the**

3        **detective that makes the statements regarding her**

4        **participation in the robbery.**

5   Q.   And that's what I wanted to get to.  That's what I

6        wanted to get to, all right.  So let's go to page 16,

7        all right.  And you quote from the warrant request.

8        "Walker viewed a photo lineup, which included a

9        photo of Defendant Woodruff, and positively identified

10       her as the female he was with for hours and was with

11       just before he was carjacked as Bessemore and

12       Gratiot."  That's quoting the warrant request.

13              And then you add, "The victim's statement at

14       the time of viewing the photo array does not affirm

15       Oliver's statement that the person he picked out

16       present at the time of the crime in his statement of

17       certainty.

18              "Defendant Oliver writes in her warrant

19       affidavit request that both statements were made at

20       the time of photo identification, despite victim's

21       actual statement being materially different."  Did I

22       read that correctly?

23   **A.**   **Yes.**

24   Q.   Now, if we look at page two of the warrant request,

25       all right -- and this is contained in the warrant



1    request.  This is still part of what is given to the

2    captain and the prosecutor and the judge and everyone

3    who's going to review this, right.

4              In the middle of the first full paragraph,

5    it reads, "Mr. Walker stayed to Detective Fletcher he

6    did not know the exact street he was on" --

**7    A.    I'm sorry, sir.  Where are you at, sir?**

8    Q.   All right.  We're on page two of the warrant request,

9    and if we look about halfway through the fourth line,

10   it begins, "Mr. Walker and the" -- I'm sorry.

11             There we go.  Paragraph -- let's see.  At

12   the very end of the 6th line, it starts request "Mr."

13   and then goes, "Walker stated Detective Fletcher.  Do

14   you see where I'm reading from?

**15   A.    Yes.**

16   Q.   "Mr. Walker stated to Detective Fletcher he did not

17   know the exact street he was on; however, stated he

18   believes it was two streets north of the 9963 Gratiot

19   when he was dropping the female off.  Once there,

20   the female exits and get into a dark-colored Chevy

21   Tahoe as a Black male exited the same vehicle and

22   approached him saying the female left her phone in his

23   car.

24             "While looking for the phone, the male

25   produced a handgun, pointed it at Mr. Walker 's chest,


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

1    demanding Mr. Walker's property."  Did I read that

2    correctly, sir?

3  **A.   Yes.**

4  Q.   Now, in any of the materials that you've reviewed,

5    there's nothing to suggest the victim was hanging out

6    with more than one woman on the night he was

7    carjacked, is there?

8  **A.   Yes, there is information to suggest there could have**

9  **been more one woman, and therein lies the problem**

10  **that your detective -- she says her observations**

11  **of Ms. Woodruff occur at the gas station, which**

12  **is a different location than where the robbery**

13  **occurred.**

14  **The video is from the gas station, not the**

15  **location where the robbery occurred, so there**

16  **certainly could have been more than one person.  It**

17  **could have been a different person.  There's nothing**

18  **in her --**

19  Q.   Okay.

20  **A.   There's nothing in her investigative reporting where**

21  **she even delved into that.**

22  Q.   But again, you remember the rule of completeness,

23    right, because we have to read the whole thing to

24    understand context.  As a responsible prosecutor, you

25    would agree with that right?



 1  A.  Sir, are you asking to testify as to prosecutor?

 2  Q.  I'm assuming, as a prosecutor, you would want to read

 3      everything.  You don't want to just pull out little

 4      excerpts, right?

 5  A.  Sir, I'm not doing that.  I think that's what you're

 6      doing, and I think that that's perhaps where we have a

 7      disagreement.

 8  Q.  Does Mr. Walker ever reference a second woman?  He

 9      doesn't, does he?

10  A.  As a matter of fact, he does when he doesn't say that

11      it's the same person.  In fact, when he says

12      that he picked out Ms. Woodruff, he says, "I picked

13      out number two based on seeing the individual in

14      person for multiple hours prior to being carjacked."

15      He says that she was there prior to him being

16      carjacked.  He doesn't say she was even there during

17      the robbery.

18  Q.  That's what he's saying on page two, right?

19  A.  No.  That's what he said in the photo array, the

20      statement -- the victim witness photo lineup

21      statement, that's what Mr. Walker says.

22  Q.  Right.

23  A.  So he's saying that she's there prior to the robbery

24      and there's a woman there during the robbery.  There

25      are two different women.



 1  Q.   That's your interpretation.  He says, "I was with her

 2       for several hours," and there's no reference in any of

 3       Mr. Walker's statements there was a second woman?

 4  **A.   I think that does reference a second person.**

 5  Q.   So when he says, "I was" --

 6  **A.   Or there could be no woman there at the time of the**

 7       **robbery.  I think that was up to Detective Oliver to**

 8       **investigate, and she did not.**

 9  Q.   But he did tell the Officers Don and Knight that the

10       woman was there at the time of the robbery, correct?

11  **A.   I'm sorry, your question?**

12  Q.   Okay.  We see here on page two that Mr. Walker told

13       the initial responding officer --

14  **A.   Can you direct to where you're referring to, Counsel?**

15       **I'm sorry.**

16  Q.   The portion I just read from --

17            MR. LAND:  I object to that.  This is her

18       writing.  You don't have a statement that Mr. Walker

19       stated these things.

20            MR. PADDISON:  Okay.  Mr. Land, you do have

21       Detective Fletcher's initial incident report or

22       investigation report.  It's contained in there, okay.

23  BY MR. PADDISON:

24  Q.   So Mr. Walker says that the woman was present at the

25       time --



Timothy Dixon, J.D.
09/04/2024                              Page 86

1  A.    Sir, what are you referring to, sir?

2  Q.    The portion I just read from, the first full paragraph

3        on page two of the warrant request.

4  A.    Okay.  Let me get to page two.  Okay, I think I'm on

5        page two.  Now, where at, sir, so I can make sure that

6        I'm following?

7  Q.    Okay.  The same exact spot we just read from on the

8        what, sixth line down.  It says "Mr." and contains on

9        the next line, "Walker stated to Detective Fletcher,"

10       all right.  We just read that --

11 A.    Sir, I'm not trying to detract from you, but I'm

12       looking at a very small screen on Zoom.  So we're in

13       paragraph one and --

14 Q.    The first full paragraph.

15 A.    Okay.  So where at and where do we start?

16 Q.    The exact same place we started the last section, six

17       lines down.  The last word on the right-hand side is

18       "Mr.," and it contains on the next line, "Walker

19       stated to Detective Fletcher he did not know the exact

20       street he was on; however, stated he believes it was

21       two streets north of the 9963 Gratiot when he was

22       dropping the female off.

23              "Once there, the female exited and gets into

24       a dark-colored Chevy Tahoe as a Black male exited the

25       same vehicle and approached him stating that the



1    female left her phone in his car.  While looking for

2    the phone, the male produced a handgun, pointed it at

3    Mr. Walker's chest, demanding Mr. Walker's property."

4    Did I read that correctly?

**5  A.   You did, sir.**

6  Q.   Okay.  Now, if we go down to February 2nd, under

7    Investigation, "I, OIC Oliver, obtained a statement

8    from Mr. Walker.  Mr. Walker stated as a few days had

9    gone by, he was able to recall more details of the

10   carjacking incident and the events prior to.

11        "Mr. Walker stated he met with Defendant

12   Woodruff" -- with that, I'll grant you, is who Officer

13   Oliver is interpreting as Defendant Woodruff -- "who

14   he named as Trinidad at the Hoover Market located on

15   19934 Hoover.

16        "The two went to Bellagio Liquor parking lot

17   where they engaged in sexual intercourse.  While

18   leaving, Mr. Walker drove to the BP gas station

19   located at 6420 Van Dyke."

20        He observed who Officer Oliver interprets as

21   Defendant Woodruff "has several interactions with

22   people.  Mr. Walker said after he and Defendant" --

23   who Officer Oliver interprets as Ms. Woodruff -- "left

24   the BP gas station, he drove to the area of Bessemore

25   and Gratiot where he was then carjacked."



1          So where from that do you draw that

2     Mr. Walker is suggesting that the woman he was with

3     and had sexual intercourse with was the different

4     than the woman who was there at the time of the

5     carjacking?

6  A.  **Sir, I draw the inference that he's not saying it's**

7     **the same persona, that it's only Detective Oliver**

8     **that's suggesting that he's interacting with the very**

9     **same person the entire evening, when in fact, his own**

10    **words, when he writes them, he says that the person he**

11    **picked out of the photo array was there prior to the**

12    **carjacking.  He doesn't say she's there at the time of**

13    **the carjacking.**

14         **And another thing Detective Oliver does is**

15    **she attributes the actions that she says contribute**

16    **to the robbery as to what's on the video, when the**

17    **robbery occurred at a different location.**

18         **So even if we accept what Officer Oliver**

19    **says she saw, it's not Defendant Woodruff and it's not**

20    **the actual robbery that she's even recounting having**

21    **seen on the video.  It's misleading in that way, and I**

22    **think that --**

23 Q.  That's actually a great point.  That's actually a

24    great point.

25 A.  **Thank you, sir.**



1  Q.  So if we actually take that entire paragraph out,

2      okay, we take that entire paragraph out about what

3      happened -- now, it is relevant -- you would agree

4      that the gas station is relevant because Mr. Walker

5      said they went to that gas station, and that's where

6      they got the image from, correct?

7  **A.  I don't know that Mr. Walker said that.  I know that**

8      **that's in the report that he was at the gas station,**

9      **and that appears to be him in the video based on the**

10     **information I received.**

11 Q.  So again, you're speculating that perhaps Officer

12     Oliver is mis-counting --

13 **A.  I'm not speculating, sir.  I'm --**

14 Q.  So you're basing this on the possibility that Officer

15     Oliver isn't accurately recounting what Mr. Walker

16     told her?

17 **A.  I'm saying I don't know that she is or she isn't.**

18 Q.  Okay.

19 **A.  I can only base my opinion on what's in the writing**

20     **and the other materials that I see.  I don't know.**

21     **That would be speculation for me to try to blame her**

22     **for something that --**

23 Q.  And so everything that's in the writing -- you're

24     suggesting that Officer Oliver, it's possible --

25     even though it's not in writing, it's possible that



Timothy Dixon, J.D.
09/04/2024                                      Page 90

1        she didn't accurately recount what Mr. Walker told

2        her?

3    A.  **Is it possible?**

4    Q.  Yes.

5    A.  **If you're going to ask me if it's possible, sure.  It**

6        **happens frequently in police work.**

7    Q.  But based on what's in the record, it was the same

8        individual and they went to the BP it was station,

9        right?

10   A.  **No, sir.**

11   Q.  That's what's in the record?

12   A.  **I would not agree with that.**

13   Q.  So realistically there's two options here, either A,

14       Officer Oliver wrote correctly what Mr. Walker said to

15       her or the information he relayed to her, or B,

16       Officer Oliver inaccurately wrote down the information

17       that was relayed to her.

18               And you suggested that there's nothing you

19       would speculate -- there's nothing to suggest that,

20       but that it's possible.  By definition, that is

21       speculation, and we don't want to do that, right?

22   A.  **Sir, I don't know what you just asked me.  I have no**

23       **idea what you just said.**

24   Q.  Okay.

25   A.  **If you can repeat it, I can try to understand it, but**



1       I don't understand that question.

2   Q.  Let me ask you this.  Can you point me to any evidence

3       in the record -- not speculation, not interpretation,

4       but actual evidence in the record where Officer Oliver

5       misrepresents what Mr. Walker informed her of or the

6       information he provided her with?

7   A.  **Well, I can tell you that when she says that she**

8       **observed Ms. Woodruff, okay.  And her basis for**

9       **concluding it's Ms. Woodruff who's involved in this**

10      **comes from Mr. Walker, and Mr. Walker says that,**

11      **again, "I picked out number two based on seeing the**

12      **individual in person multiple hours prior to being**

13      **carjacked."**

14              **And she suggests throughout the warrant**

15      **application that Ms. Woodruff is the person who**

16      **participated in the robbery.  I think that's**

17      **mischaracterizing her misleading or not what**

18      **Mr. Walker said.**

19  Q.  Mr. Dixon, it is 11:41 a.m.  We are currently taking

20      your deposition, correct?

21  A.  **Yes, sir.**

22  Q.  Okay.  And prior to 11:41 a.m., it was 11:30 a.m.,

23      correct?

24  A.  **Sir, yes.**

25  Q.  Is that correct?  Is 11:30 prior to 11:41?



```
 1  A.   I would think so, sir.

 2  Q.   So saying that you were with someone prior to an event

 3       does not imply that they weren't doing the same thing

 4       at the time of an event?

 5  A.   I think that if she were the person who participated

 6       in the carjacking he would have said it, and even if

 7       he didn't say it, why didn't Detective -- why didn't

 8       Officer -- why didn't your Officer Oliver ask more

 9       questions about it?

10            Why did Officer Oliver point out information

11       on the video indicating that she believed that that

12       was contributing to the robbery when the robbery

13       occurred at a different location, and attribute that

14       to being Ms. Woodruff?

15            Sir, I think that's where perhaps the

16       disagreement is, but I'll wait for your next question

17       because I'm not sure what you want me to do.

18  Q.   Okay, Mr. Dixon.  As a prosecutor then, you don't

19       believe that establishing a timeline is important to

20       a criminal investigation?  Is that what you're

21       suggesting?

22  A.   No, no.

23  Q.   Okay.

24  A.   It has to be accurate, though.

25  Q.   And with the exception of identifying Ms. Woodruff
```



1    instead of a woman by the name of Trinidad, you have

2    no reason to dispute what Officer Oliver -- her

3    recitation of what she observed in the video.  With

4    the exception of it being Ms. Woodruff, the rest of

5    that is accurate?

6  **A.   Sir, I don't understand what you're asking me.**

7  Q.   Okay.  If in paragraph two -- you know, actually, in

8    the entirety of this warrant request, instead of

9    referring to Defendant Woodruff, had Officer Oliver

10    put "female suspect"?

11           MR. LAND:  That's asked and answered over

12    1,000 times now.

13           MR. PADDISON:  Well, the problem is that we've

14    been going back and forth and getting inconsistent

15    testimony.

16           MR. LAND:  It's --

17           MR. PADDISON:  We've been getting

18    inconsistent -- I need to clarify these

19    inconsistencies.

20  BY MR. PADDISON:

21  Q.   So my question is, aside from that, what inaccuracies

22    are in this report?  There aren't any, are there?

23  **A.   Sir, I don't understand your question.**

24  Q.   Okay.

25  **A.   Can you rephrase it?**


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO        313.567.8100

 1  Q.  Okay, certainly.  If we take this investigation report

 2      and we replace "Defendant Woodruff" with the term

 3      "female suspect," okay, can you point me to an

 4      inaccuracy in this report?

 5  **A.  Well, first of all, you would not get a warrant for a**

 6      **female suspect.  It would have to be a person, and**

 7      **warrants are personalized to people.  So now you're**

 8      **asking me to speculate on something that just -- it**

 9      **just never happens, sir.  You can't get a warrant for**

10      **an unknown person.**

11  Q.  Fair enough.  Let's assume that Trinidad -- they were

12      able to ID Trinidad.  They will ID this person.  Let's

13      just say it's a single name, kind of like Prince, all

14      right.  Instead of "Defendant Woodruff" it just said

15      "Trinidad" and we knew who Trinidad was.  Then the

16      rest of this report is accurate, correct?

17  **A.  I don't know that it would be accurate because I**

18      **wasn't asked to examine materials related to**

19      **Trinidad.  I was asked to examine the materials as**

20      **they related to Ms. Woodruff.  You're asking me to**

21      **speculate again.**

22  Q.  Sir, your report is critical of this Request For

23      Warrant in many respects.  And my question to you is,

24      factually, based on the evidence in the record so that

25      you don't have to speculate, just based on the



1    evidence in the record, if "Defendant Woodruff" was

2    replaced with "Trinidad," there are no inaccuracies in

3    this Request For Warrant, correct?

4  A.  **Sir, again, that's not true.  What you're asking me**

5      **to do is to speculate on Ms. Woodruff not being the**

6      **subject of the warrant, but in fact she's is the**

7      **subject of the warrant.**

8          **If Trinidad were the subject of the warrant**

9      **and I was asked to examine that in that context, I**

10     **would have done so.  I have not done so.  So to ask me**

11     **to express an opinion today at 11:45 when I would**

12     **not -- I haven't examined it from that perspective, so**

13     **it's pure speculation.**

14 Q.  Okay.

15 A.  **So I can't answer that.**

16 Q.  So what you're saying is you can't speculate as to the

17     actual substance of the warrant; you just know they

18     got Woodruff wrong.  That's wrong.  And I agree with

19     you.

20 A.  **That's not what I'm saying, sir.**

21 Q.  Okay.  So again, if we take "Woodruff" out and we put

22     in "Trinidad" and Trinidad's a real person, where are

23     the deficiencies in this warrant?

24 A.  **When Officer Oliver makes statements in the warrant**

25     **that she does not know to be truthful -- if**



1       **Ms. Woodruff's name was Trinidad, okay, she would**

2       **still -- Officer Oliver would still be making**

3       **statements that she does not know to be truthful.**

4   Q.  Like what?  What statements were not truthful?

5       Because we established that she --

6   **A.  I'll go back to page 12 and read them again.**

7   Q.  The "observed"?  Because we've established that that

8       was on video.  We've established that she was

9       recanting what was on video.  And if Mr. Walker

10      correctly identified Trinidad, then those statements

11      would be true, right, because --

12  **A.  Not -- sir, not if Trinidad is Ms. Woodruff.**

13  Q.  No.  My point is, is if Trinidad -- if they had gotten

14      the right person, okay.  If Mr. Walker -- if the

15      facial recognition had identified Trinidad, Mr. Walker

16      identified Trinidad, okay, then everything else --

17              MR. LAND:  Asked and answered.

18              MR. PADDISON:  Excuse me.

19  BY MR. PADDISON:

20  Q.  Then everything else in this warrant is true, correct?

21  **A.  Sir, if you want me to speculate on Officer Oliver**

22      **doing her job properly, following generally accepted**

23      **policing practice and principles in investigating this**

24      **crime, locating the suspect and verifying that the**

25      **person she saw in the video is the suspect,**



1    **questioning Mr. Walker, and then showing that he was**

2    **able to make a reliable identification, if she'd done**

3    **all of those things and then come to the conclusion**

4    **that someone named Trinidad had committed the crime,**

5    **then we probably would not be having this**

6    **conversation, I would agree with you.**

7   Q.  So what you're saying then is even if they had gotten

8       the right person, even if the facial recognition

9       through CIU had returned Trinidad, Mr. Walker

10      identified Trinidad, they arrested Trinidad, Trinidad

11      was involved in the crime, she was the female suspect,

12      even if all that's true, then as a prosecutor you're

13      telling us no, this warrant still should not have been

14      submitted; there wasn't enough?

15  **A.  Sir, are you asking me to testify as an expert in**

16      **policing practices or as a prosecutor?**

17  Q.  Well, see, my concern here is you're critical of a

18      warrant request, correct?

19  **A.  Yes.**

20  Q.  And my question is, have they gotten the right

21      person -- so are you saying there was no probable

22      cause?  There was no probable cause to submit this

23      warrant request.  Is that your position?

24  **A.  Sir, if you're asking me to make a legal**

25      **determination, then I would say no, there isn't.**



1  Q.  All right.  So your point then is that even if they

2      got the right person, that this warrant was deficient.

**3  A.  And the evidence --**

4  Q.  No, I agree with you.

**5  A.  And the evidence of lack of probable cause is they**

**6      didn't get the right person, and the reason why**

**7      there's no probable cause is because she put things in**

**8      the warrant that were misleading and not truthful.**

9  Q.  Well, hold on.  I agree with you that they weren't

10     true.  They weren't true.  But if it said here,

11     Defendant -- if we look anywhere on all of these,

12     "I observed," "I observed," "I observed," look at

13     all of those, and we replace "Defendant Woodruff"

14     with "Trinidad," those statements would be true,

15     correct?

**16  A.  Sir, I do not know that to be true at all.  First of**

**17      all, we don't see anywhere where your officer, Officer**

**18      Oliver, pursued the idea of who Trinidad actually was,**

**19      so we don't even know if Trinidad is the person he was**

**20      with at the time of the robbery or if Trinidad is the**

**21      person that's at the gas station.**

**22              We don't know who Trinidad actually is.  And**

**23      Mr. Walker's identification and information is sorely,**

**24      sorely unreliable because he was intoxicated and may**

**25      have been drugged.**



Timothy Dixon, J.D.
09/04/2024                                    Page 99

```
 1  Q.   Okay.

 2  A.   He is the only connection between someone named

 3       Trinidad and your detective that connects -- and

 4       she is connecting Trinidad to Ms. Woodruff, not

 5       Mr. Walker.

 6  Q.   Because of Mr. Walker's unreliable identification,

 7       correct?

 8  A.   I don't know that that's the only reason, but I think

 9       that contributes to it, yes.

10  Q.   So aside from Mr. Walker's identification, how else

11       does she connect it?

12  A.   So now you're asking me for mother motive for making

13       the statement --

14  Q.   No.

15  A.   -- and I can't speculate on the officer's motive for

16       the incorrect --

17  Q.   I am not asking to speculate Mr. Dixon?

18            MR. LAND:  Let me him answer.  Let him answer.

19  BY MR. PADDISON:

20  Q.   Mr. Dixon, based on evidence in the record, not --

21       don't speculate.  Based on the evidence in the record,

22       there's nothing that causes Officer Oliver to tie

23       Trinidad or the female suspect to Defendant Woodruff

24       but for what you described as Mr. Walker's unreliable

25       identification; is that fair?
```



 1  A.   No.  There's nothing other than whatever her motive

 2       might be, and I won't speculate on that.

 3  Q.   So again, sir, based on the evidence in the record.

 4       That's what I want you to focus on.

 5            MR. LAND:  Asked and answered.  It's asked and

 6       answered.

 7            MR. PADDISON:  No, he hasn't, sir.  No, he

 8       hasn't answered it.

 9            MR. LAND:  It's not the answer you want.

10            MR. PADDISON:  No, no.

11  BY MR. PADDISON:

12  Q.   I'm asking based on the evidence in the record, don't

13       guess about what her motivations are --

14            MR. LAND:  He's answered that.

15            MR. PADDISON:  No, he did not, Mr. Land.

16            MR. LAND:  Yes, he did.

17  BY MR. PADDISON:

18  Q.   Mr. Dixon, Mr. Dixon --

19            MR. LAND:  I know what you're trying to do.

20       It's not going to work out for you, and you're

21       frustrated.

22            MR. PADDISON:  Mr. Land, you're -- thank you.

23  BY MR. PADDISON:

24  Q.   Mr. Dixon, limited just to the evidence in the record.

25       I don't want you to speculate about motivation or



1    would have, could have, maybe, thought of.  Based on

2    the evidence in the record, there's nothing aside from

3    Mr. Walker's what you call unreliable identification

4    that caused Officer Oliver to link Trinidad or the

5    female suspect to Ms. Woodruff, correct?

6  **A.   No, sir, that's not what I'm saying.**

7  Q.   Okay.  What happens --

8  **A.   What I'm saying, sir, is I cannot speculate on her**

9  **motive for putting this information in the warrant**

10 **request.**

11 Q.   Okay.  I will rephrase my question, sir.  Can you

12   direct me to evidence in the record that caused

13   Officer Oliver to link Ms. Woodruff to Trinidad or the

14   female suspect other than Mr. Walker's identification,

15   just on all the materials?  Can you point me to

16   something, please?

17 **A.   That caused her to do it?  I don't know why she did**

18 **it, sir.**

19 Q.   Okay.

20 **A.   That's what I keep telling you.  I don't know why an**

21 **objectively reasonable police officer would have taken**

22 **the actions that Officer Oliver did.  I don't know.**

23 Q.   Sir, there isn't anything.  You can't point me to any

24   evidence.  I'm asking for evidence, sir.  Records,

25   documents, reports.  Can you direct me to anything



Timothy Dixon, J.D.
09/04/2024                              Page 102

1      that I can look at?  The answer is no, isn't?

**2  A.   Sir, to do what?**

3  Q.   That would connect Ms. Woodruff to the female suspect.

**4  A.   There is no evidence, and that's --**

5  Q.   Okay, okay.

**6  A.   The problem is your officer said there was, and there**

**7       is not.  And no, I cannot speculate on why she would**

**8       have done it.  I find it --**

9  Q.   Okay.  So I'm correct that --

**10  A.   I find it astounding that she came to that conclusion**

**11      to do that.**

12  Q.   So I am correct then?  The only thing in the record --

**13  A.   Sir, you're not correct.  Sir, you're not correct.**

**14      I'm not agreeing with you.**

15  Q.   Okay, sir.  Can you show me the page number or Bates

16      stamp or document name of evidence that tied Ms.

17      Woodruff to the female suspect other than Mr. Walker's

18      identification?

19           MR. LAND:  Asked and answered.

20           MR. PADDISON:  No.  Apparently he says I'm not

21      correct, that there isn't anything.

22  BY MR. PADDISON:

23  Q.   So tell me, what document?

**24  A.   Sir, the only thing that's tying is your detective's**

**25      statements in the warrant.  That is the problem.  And**



1      **they're not truthful.  That's what's tying**

2      **Ms. Woodruff to this Trinidad person.**

3   Q.   I'm not asking --

4   **A.   That is the issue, sir.**

5   Q.   Sir, perhaps you're misunderstanding my question.  I'm

6        not asking what ties in this document.  I'm saying

7        that led Officer Oliver to identify her as -- identify

8        Ms. Woodruff as Trinidad, that led to that.  I'm not

9        asking what's in this document.  I'm asking what led

10       to it, aside from Mr. Walker's identification.

11            Can you point me to a document?  It's a yes

12       or no.  If the answer is yes, let's pull the document

13       out.  If the answer is no, we can move on.

14  **A.   Sir, if I'm not mistaken, you're asking me to explain**

15       **why Officer Oliver did the actions that I'm**

16       **disagreeing with, and what I'm telling you is I don't**

17       **know why she did it.  You would have to ask her what**

18       **her motive was and what led her to believe what she**

19       **believed.**

20            **All I can do is express an opinion as to**

21       **what she did and whether those actions followed**

22       **generally accepted policing practices and principles**

23       **or not, and they did not.**

24  Q.   According to you and what you say.  But again, the

25       answer is no, you can't point my to anything?



Timothy Dixon, J.D.
09/04/2024                                    Page 104

1   A.   Sir, I think you want me to agree with you, but I

2        can't agree with you.

3   Q.   Okay.  Let me ask you this.

4   A.   I don't even know what the last question was, sir.

5   Q.   Let me ask you this very simply then.  Let's ignore

6        Officer Oliver for a moment, okay.

7   A.   I don't think I can, sir.

8   Q.   No, it's very simple.  Is there any other evidence

9        that you've reviewed that links Ms. Woodruff to the

10       female suspect aside from Walker's identification?

11  A.   Officer Oliver is the only thing, sir, and I've

12       expressed that.

13  Q.   Okay.  So --

14  A.   Her statements and her actions, sir.

15  Q.   Okay.  Which were based on the identification from

16       Mr. Walker, okay.  So you --

17  A.   They weren't solely based on that.  Some of the things

18       she made up, okay, when --

19  Q.   What did she make up?  What did she make up?

20  A.   Going back to page 12 of my report, "I observed

21       several vehicles pull into the lot and Defendant

22       Woodruff approaching them."  That is not true.

23  Q.   Yeah, we don't need to read them all again because I

24       think wasn't back, last time we had Ms. Spencer read

25       from the record, and you identified that she made that



1   connection based on the hit and the victim's

2   unreliable statement.  Now, again --

**3   A.   She made -- sir, she made it after, okay.  She put**

**4        that in the warrant afterward.  But her motive for**

**5        putting it in there, I don't know why.  You want me to**

**6        reason her mindset, her intent, and I can't do that.**

7   Q.   So again, we acknowledge then that her identification

8        of Woodruff in this warrant is based on Mr. Walker's

9        unreliable witness statement?

10            MR. LAND:  Asked and answered for the --

**11            THE WITNESS:  No, sir.  That's not what I**

**12       said.**

13  BY MR. PADDISON:

14  Q.   You've already testified to it.  It's --

**15  A.   Sir, if you believe that -- if that's what you**

**16       believe, I'm not going to try to change that, but that**

**17       is not what I said nor what I meant.**

18  Q.   Well, it's what you said because Ms. Spencer read the

19       record back.  So if it's not what you meant, then

20       we've got a problem here, and we may have to back this

21       whole thing up again.

22            I thought it was pretty clear that Officer

23       Oliver made the connection to Defendant Woodruff based

24       on the facial recognition hit and the unreliable

25       witness identification of Mr. Walker.  That was your



1    prior testimony.  Ms. Spencer read it back.

2              All I'm asking you, is there anything else

3    you're aware of that's documented that would connect

4    Ms. Woodruff to the female suspect?  That's a very

5    simple question.

**6  A.   Sir, I think you're mischaracterizing most things that**

**7       I've said today, so I don't know what you're asking me**

**8       now that I haven't already answered.**

9  Q.   It's not a complicated question, sir, and I don't know

10      why it's so difficult, okay.  We know that Officer

11      Oliver identifies the female suspect as Defendant

12      Woodruff in this warrant request.  We agree on that,

13      right?

**14  A.  That she -- I'm sorry, the question again?**

15  Q.   Okay.  That Officer Oliver identified or attributes or

16      suggests or states that the female suspect is

17      Ms. Woodruff in this warrant.  That's what she says,

18      correct?

**19  A.  She says that Ms. Woodruff is the person who**

**20      participated in the robbery.**

21  Q.   And she also says that Ms. Woodruff is the person that

22      Mr. Walker had sex with, correct?

**23  A.  She doesn't say that.  She says that Ms. Woodruff is**

**24      the person who participated in the robbery, she says**

**25      Ms. Woodruff is the person she sees in the video.**



1  Q.  Okay.  Just to be clear, I'm going to read back from

2      page two.  "Mr. Walker stated he met Defendant

3      Woodruff who he named" --

**4  A.  Sir, where are you, sir?**

5  Q.  Paper two of the warrant request because I don't want

6      us to have any misunderstandings here.

**7  A.  Okay.  Where at on page two, sir, so I can follow**

**8      you?**

9  Q.  Page two, the paragraph that starts on February 2nd,

10     2023.  On the third line, at the start of the third

11     line, "Mr. Walker stated after he met Defendant

12     Woodruff, who he named as Trinidad, at Hoover

13     Market located at 19934 Hoover, the two went to

14     Bellagio Liquor parking lot where they engaged in

15     sexual intercourse."

16            So Officer Oliver connects the female

17     suspect to Ms. Woodruff in this warrant request,

18     correct?

**19  A.  It is Officer Oliver saying that Ms. Woodruff is**

**20      Trinidad.**

21  Q.  All right.  If that's the way you want to phrase it,

22     fine.  We agree with that.  And we agree Ms. Woodruff

23     is not Trinidad.  We agree on that, right?

**24  A.  I would have to, based on the information.**

25  Q.  I certainly hope so, or this is all for nothing,



1      right.  And we agree -- whether it was reliable or

2      unreliable, that's a separate conversation, but based

3      on the record, Mr. Walker identified Ms. Woodruff as

4      Trinidad, as the person he had sex with, correct?

5  A.  **That's what Officer Oliver writes.  She writes that**

6      **Trinidad is the person he had sex with, and she says**

7      **that that person is Ms. Woodruff.**

8              **There is the problem, that it is not**

9      **Ms. Woodruff.  And when she wrote that in the**

10     **application, she had no reason to believe it was**

11     **Ms. Woodruff other than the lead.**

12 Q.  And as you said before, Mr. Walker's unreliable

13     witness identification, as you testified before?

14 A.  **Sir, I also testified that he does not say that the**

15     **person he picked out of the photo array was in fact**

16     **the person who was there at the robbery.**

17 Q.  Okay.

18 A.  **He said he only picked that person out because he**

19     **spent hours with them prior to the robbery.**

20             THE COURT REPORTER:  Can we take a break,

21     Greg?

22             MR. PADDISON:  Yeah, that's fine.

23             (There was a recess taken

24             from 12:01 p.m. until 12:21 p.m.)

25 BY MR. PADDISON:



Timothy Dixon, J.D.
09/04/2024                                    Page 109

1  Q.   Mr. Dixon, I know we established that in your role as

2       a prosecutor you didn't approve warrants, but you did

3       submit them during your tenure as a police officer,

4       correct?

5  A.   Yes.

6  Q.   And then for whatever reason, we submitted a FOIA

7       request.  That was with Baltimore Police Department,

8       correct?

9  A.   Yes.

10 Q.   Do you have happen to recall how many warrant requests

11      you submitted?

12 A.   Oh.  I can't even speculate on that.  Between arrest

13      warrants and search and seizure warrants, I wouldn't

14      be able to speculate.

15 Q.   Just to arrest, any idea?

16 A.   No, sir.

17 Q.   Okay.  Do you recall the names of any of the criminal

18      Defendants for which you submitted criminal arrest

19      warrants?

20 A.   No, I don't.

21 Q.   Do you know if there is a way to search for that?

22      Because apparently they were saying it's very

23      difficult to look up case files based on the officer

24      requesting the warrant as opposed to the criminal

25      Defendant.



1  A.   Sir, I can only speculate that you'd have to contact

2       the Baltimore Police Department and, you know, ask

3       them to go through their records.

4  Q.   Okay.

5  A.   Yeah.  I don't know.

6  Q.   I'm sorry.

7  A.   Yeah, you have to remember, I was a police officer

8       20 years ago before I became a prosecutor.  More

9       than 20 years ago, so --

10 Q.   Okay.  So then is it fair to assume that you -- being

11      that it was 20 years ago, that you weren't involved as

12      a police officer in investigations that involved

13      facial recognition, the use of facial recognition?

14 A.   As a sworn police officer?

15 Q.   Correct?

16 A.   No.  The technology didn't exist then.

17 Q.   That's kind of what I was getting at.  I don't mean to

18      call you old.  I was just trying to get to that.  And

19      then as a prosecutor, did you prosecute any cases

20      involving identifications assisted by facial

21      recognition technology?

22 A.   No.  The technology didn't exist then.

23 Q.   In other capacities have you reviewed or been involved

24      in criminal prosecutions or warrant requests in any

25      way involving the use of facial recognition



1      technology?

2  A.  **Not prosecutions because my prior role was an**

3      **instructor and a trainer.**

4  Q.  When you say not prosecutions, are there other areas

5      in which you have been involved?

6  A.  **When we've had policy discussions at Baltimore Police**

7      **Department, I've been involved in some of those.  We**

8      **aren't training on it yet.  In graduate school I've**

9      **studied it.  As a matter of course in supervising the**

10     **legal education unit I read about it.  It's topical in**

11     **policing today, so it's something that, you know, I**

12     **think we all keep abreast of if they're in this**

13     **industry.**

14 Q.  Do you agree when conducting photo lineups it's a good

15     police practice to have an attorney present?

16 A.  **Yeah, I think it can be helpful.  It depends on who**

17     **the attorney is and which party they're representing.**

18     **I guess you'd have to be a little more specific about**

19     **who the attorney is and what role they would play.**

20 Q.  Sure.  Like so with DPD, when they do lineups they

21     often have a stand-in attorney to just make sure that

22     things are done procedurally correct.  As a general

23     practice, would you agree that's a strong police

24     procedure?

25 A.  **It's a stand-in attorney representing the Defendant?**



 1  Q.   Generally, it's someone who will serve as a

 2       court-appointed attorney in some cases.  No, it's not

 3       someone that represents the officers, no.

 **4  A.   No, I said the Defendant.**

 5  Q.   Correct, yes, yes, an independent attorney not

 6       representing the officers.

 **7  A.   No.  My question is, does the attorney represent the**

 **8       interests of the Defendant?**

 9  Q.   I believe the way it's done here is in the more

10       generic sense.  Yes, they haven't been assigned until

11       obviously there are charges brought.  You know,

12       obviously once there are formal charges they can

13       be assigned, but it's an attorney who stands in is

14       basically to ensure that the lineup is done with

15       proper procedures.

**16  A.   I suppose it could be helpful, again, depending on the**

**17       quality and experience of the attorney.  There are a**

**18       lot of variables, but could it a step in a good**

**19       direction to ensure equity?  Sure.**

20  Q.   In addition to the materials that are listed in your

21       report that you reviewed, are there any additional

22       materials that you've reviewed?

**23  A.   In preparation for -- in writing the report or --**

24  Q.   In writing the report or preparing for today's

25       deposition?



Timothy Dixon, J.D.
09/04/2024                                    Page 113

1  A.   I did read the expert reports from the Defendants.

2  Q.   Which ones?

3  A.   I think the reports written by Mr. Johnson and Ashley.

4  Q.   Okay.

5  A.   They would not be listed in my report because I didn't

6       have them at the time I wrote my report.

7  Q.   And aside from Mr. Land, have you talked to anyone

8       else regarding this case?

9  A.   No.

10              MR. PADDISON:  That's all I have for now.

11      Thank you, sir.

12              MR. LAND:  Thank you, Counsel.

13 EXAMINATION BY MR. LAND:

14 Q.   So I'm going to try and go in chronological order,

15      Mr. Dixon, to try and make everything easier.  I might

16      bounce around towards the end, but for the most part,

17      I'm going to try and go in chronological order, okay,

18      Mr. Dixon.  Are you aware that the arrest for this

19      matter occurred on January 29th, 2023?

20 A.   The arrest of which person, sir?

21 Q.   I'm sorry, the arrest of Larry, I believe, Mr. White.

22      Hold on one second.  Let me get the correct name.  No,

23      excuse me.  Excuse me.  Are you aware that the alleged

24      victim was robbed on January 29th, 2023?

25 A.   Yeah, I believe that's the date of the incident.



Timothy Dixon, J.D.
09/04/2024                                    Page 114

1   Q.   And did you review any material that stated that he

2        gave a description of the alleged assailant being

3        23 to 25 years of age, a Black male, braids and

4        weighed 135 pounds?

5   A.   **If I'm not mistaken, I think that's what he told the**

6        **initial officers responding.**

7   Q.   Now, so his initial description was 25 to 23, Black

8        male, braids and weighed 135, okay.  The next day,

9        Detective -- or OIC, excuse me, Oliver was appointed

10       to the case, okay.

11              Now, on January 31st she went out

12       and interviewed -- OIC Oliver went out and interviewed

13       the victim in this case, and during her interview,

14       some additional information was added.

15  A.   **I'm aware of that date.**

16  Q.   And do you know what was added?

17  A.   **If I'm not mistaken, when she spoke to the victim, he**

18       **mentioned a different location, he mentioned his cell**

19       **phone, he mentioned a woman -- no, I'm sorry.  He**

20       **didn't mention a woman.  He mentioned the location on**

21       **Van Dyke.**

22              **I think those things were added to the**

23       **conversation, and that he had gotten his cell phone**

24       **back or something like that, and that he had been to**

25       **the -- I guess Van Dyke is where the gas station is,**



Timothy Dixon, J.D.
09/04/2024                                    Page 115

1      but he mentioned that.

2  Q.  With what you know as an officer, with him receiving

3      his cell phone back, would it be important for

4      investigative to properly take the cell phone in as

5      evidence to determine whether or not calls were made,

6      text messages were made?

7  A.  **I would have thought that Officer Oliver would have**

8      **explored as to how he got his cell phone back if in**

9      **fact he were robbed, particularly at a different**

10     **location.**

11            **I would have also have thought that based on**

12     **him getting his cell phone back, that the officer**

13     **would have at least investigated the people working**

14     **there to try to make some determination how those**

15     **things occurred.**

16            **And if she suspected that the person may**

17     **have called, I mean, she certainly could have gotten**

18     **a warrant, made a warrant request to get information**

19     **relating to the cell phone.  If she thought there**

20     **was evidence on the cell phone, she could have**

21     **certainly seized the cell phone appeared gotten a**

22     **warrant.**

23  Q.  And more importantly, she should have questioned him

24      as to how he --

25            MR. PADDISON:  Object to form.


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

Timothy Dixon, J.D.
09/04/2024                                Page 116

1              MR. LAND:  Pardon me?

2              MR. PADDISON:  Object as to form, leading.

3              MR. LAND:  Okay.

4    BY MR. LAND:

5    Q.   Mr. Dixon, should she have -- do you believe she

6         should have done some investigation into how he got

7         the phone back?

8    **A.   Yes.  I would have thought that that would have struck**

9         **her as peculiar that he got his phone back, but his**

10        **other property -- I mean, his car was taken, he was**

11        **told to take off all of his clothes.**

12                  **I mean, it seemed like a pretty traumatic**

13        **encounter, but the fact that he got his cell phone**

14        **back and the person -- he went to the gas station to**

15        **get it and was able to pick it up, yeah, I would have**

16        **thought that that would have prompted more**

17        **investigation, particularly once she saw the video.**

18   Q.   And more importantly, she was told the initial

19        officers that interviewed him, he did not tell them,

20        almost as if he were hiding that he had sex with her,

21        this particular individual?

22             MR. PADDISON:  Object to form.

23             **THE WITNESS:  No, he didn't mention it**

24        **initially to the officers, but I thought it was a very**

25        **important detail about the encounter, particularly**



Timothy Dixon, J.D.
09/04/2024                           Page 117

1      when we learned about Ms. Woodruff and that she was

2      expecting at the time, and that would have been

3      something that had Mr. Walker had sex with

4      Ms. Woodruff that I would have thought he would have

5      noticed.

6  BY MR. LAND:

7  Q.   And do you believe that OIC Oliver should have gotten

8       some descriptions of the individual, physical

9       descriptions of the individual that he had sex with?

10 A.   I would have thought that, yes.  I mean,

11      particularly -- I mean, that's such and intimate act,

12      that scars, marks or tattoos would have been exposed

13      to the person.  But again, when we find out that

14      Ms. Woodruff is in fact pregnant, that would have

15      excluded her -- it would have been exculpatory

16      and maybe even excluded her from having been the

17      suspect.

18              So again, that goes to the generally

19      accepted policing practice of conducting an

20      investigation that's full, and she didn't.  And that's

21      part of why we find ourselves here.

22 Q.   Do you believe that the initial description that the

23      victim gave should have been put in the arrest

24      warrant?

25 A.   The arrest warrant of Ms. Woodruff --



1          MR. PADDISON:  Object to form.

2          **THE WITNESS:  I'll distinguish between the**

3     **arrest warrant of Ms. Woodruff.  He gave no initial**

4     **description of a woman having been involved in it.**

5   BY MR. LAND:

6   Q.   Let me clarify because I'm trying to get to his

7        reliability.  He mentioned a lot -- Counsel mentioned

8        a lot about isn't he reliable.  He picked out

9        another -- he picked out another victim, he nailed

10       them on the head.  Do you remember all that language?

11  **A.   I do remember that discussion.**

12  Q.   Okay.

13  **A.   And as it goes to Ms. Woodruff, his initial comments**

14       **to police don't mention a woman having been involved.**

15       **It's later on that he mentions to Officer Oliver that**

16       **a woman was -- that he had had contact with a woman.**

17       **I didn't see anywhere in any of the reporting where he**

18       **mentions that a woman in fact participated in the**

19       **robbery.**

20  Q.   Yes.

21  **A.   And I think that goes to reliability as well, that if**

22       **in fact what he's saying is true, how come he didn't**

23       **remember those things.  Could it be because he was**

24       **under the influence, could it be because he was**

25       **drugged, could it be a voluntary intoxication in**



Timothy Dixon, J.D.
09/04/2024                          Page 119

1       addition to the drugging, could it be that it didn't

2       occur, could it be that he's engaging in some other

3       sort of conduct.  I don't know.

4                   I just know that he did not mention

5       those things initially.  And many of those things --

6       much of that information goes to exculpate

7       Ms. Woodruff.

8   Q.  Well, I want to speak -- I'm speaking on the male

9       suspect and the reason why he spent a lot of time

10      bolstering that he picked out the male suspect, so I

11      want to focus on the male suspect.  He initially

12      stated that the male suspect was between 23 to 25,

13      Black male with braids and weighed 135 pounds.

14                  MR. PADDISON:  Objection as to form, leading.

15  BY MR. LAND:

16  Q.  Do you remember the description that he gave for the

17      Black male, the initial description for the Black

18      male?

19  A.  I do, and that's different of the person who was

20      arrested with the vehicle.

21  Q.  And as a matter of fact, do you believe that

22      information, the initial description that was given

23      when the incident first occurred on January 29th,

24      2023, do you believe the initial description should

25      have been placed in the arrest warrant?



Timothy Dixon, J.D.
09/04/2024                              Page 120

 1  A.   I think the fact that the initial description does not

 2       mention a woman at all is very important toward

 3       Ms. Woodruff.

 4  Q.   Okay.

 5  A.   The fact that it's a male of any kind, it excludes

 6       Ms. Woodruff of having -- it's exculpatory as to

 7       Ms. Woodruff's involvement.  So I do think it's

 8       important in that respect.

 9            As to the other person who was arrested, I

10       think it's exculpatory towards him because he didn't

11       fit that description.  As I recall from the video, I

12       think he had short hair or was bald, and he was of a

13       different complexion than Mr. Walker's description of

14       the person who robbed him.

15  Q.   Do you remember the age?

16  A.   I think the suspect was 20 something, and this person

17       seemed to be older than that.  I didn't focus very

18       much on him, other than the fact that I felt that the

19       misdescription went to reliability of the victim and

20       his statements.

21  Q.   Okay.  So January 31st she learned that the cell phone

22       was returned, okay.  And do you remember viewing the

23       video when the cell phone is returned?

24  A.   I remember viewing the video of the return, of what

25       was said to be the return of the cell phone to the gas


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO    313.567.8100

1    station, yes.

2  Q.  Yes.  Do you remember what the video depicted?

3  A.  I remember looking at it, yes.

4  Q.  Was something strange about the video, bizarre about

5      the video, if you remember?

6  A.  Well, I thought it was unique that the person, number

7      one, who -- there's no mention of the woman having

8      been a suspect in a robbery, but a woman returns a

9      cell phone.  She returns it to the gas station.

10             She's allowed into the -- what I would call

11     secured area of the gas station behind the counter by

12     the people who are managing the gas station.  There's

13     conversations.  It looks like there's something

14     humorous going on because they're laughing.

15             I thought that was peculiar, and I thought

16     that's something that an ordinary and objectively

17     reasonable detective and adhering to generally

18     accepted policing practices would have investigated.

19     And I didn't see anywhere where Officer Oliver pursued

20     that either.

21 Q.  And there was a lot of mention about the timing of

22     when this report was made, okay, the arrest warrant

23     was made, which was February the 4th, 2023, okay.  So

24     you understand that she reviewed these videos prior to

25     making the arrest warrant?



Timothy Dixon, J.D.
09/04/2024                              Page 122

1  A.    Yes.

2  Q.    Do you believe what was depicted in the video with the

3        individual being behind the secured area holding a

4        conversation with the gas station --

5              MR. PADDISON:  Objection as to form, leading.

6  BY MR. LAND:

7  Q.    Do you believe that that should have been in the

8        arrest warrant?

9  A.    I think the idea that we're able to view the person

10       period, and had she, again, adhered to ordinary

11       policing practices found out who Ms. Woodruff was,

12       that she would have known that it wasn't her, and she

13       might not have even attempted to get a warrant.

14             So I think it's -- I think it's a twofold

15       issue, not whether it should have been in the warrant,

16       but there shouldn't have been a warrant for Ms.

17       Woodruff in the first place.  She shouldn't have been

18       placed in the photo array.  She should have been

19       excluded, and the officer didn't do that.

20             She instead treated the lead, okay, as a

21       suspect, and she didn't distinguish between the two.

22       And she continues on to the point that she says things

23       that are just verifiably, demonstrably not true in

24       the warrant.  So the idea should she have put that in

25       the warrant, she shouldn't have applied to the



Timothy Dixon, J.D.
09/04/2024                              Page 123

1    warrant.

2    Q.   Now, there was also video that was extracted from the

3         night of the robbery, January 29th, 2023.  Did you

4         view that?

5    A.   **You're referring to the body worn camera of the**

6         **officers who responded?**

7    Q.   No.  I'm speaking of the video from the gas station.

8         Detective Oliver went back out and viewed the video of

9         the gas station on the night of the incident.

10   A.   **Oh, the interactions between the person at the gas**

11        **station and Mr. Walker?**

12   Q.   That is correct, sir.

13   A.   **Yes.**

14   Q.   In Detective Oliver's arrest warrant, she mentioned

15        that, and I quote, "Both the Defendant Woodruff and

16        male suspect can be observed pulling and tugging on

17        Mr. Walker, who was in the driver's seat."  Do you

18        remember what the video depicted?

19   A.   **I remember reviewing the video, yes, at the gas**

20        **station.**

21   Q.   Do you remember if the video depicted Mr. Walker ever

22        being tugged and pulled on?

23   A.   **There is interaction between the female and male and**

24        **Mr. Walker, assuming that's him in the car.  Again, I**

25        **don't know, but if I'm operating under the assumption**



Timothy Dixon, J.D.
09/04/2024                    Page 124

1      that that's Mr. Walker in the vehicle, there's some

2      interaction between them.

3              The thing that I find striking about that is

4      that's not where Mr. Walker says the robbery occurred,

5      so, so what?  And I think that's what's confusing

6      about what Officer Oliver is saying.

7              In the warrant application, she seems to be

8      attributing that behavior to being part of the

9      robbery, when that's not where he said the robbery

10     occurred.  And then she attributes that behavior to

11     being Ms. Woodruff.

12             So even if in fact it were Ms. Woodruff,

13     it's not, and I think we all agree that it's unanimous

14     that it's not Ms. Woodruff.  But even if that were

15     true, that's not the robbery.

16             And to place it in the warrant in the way

17     that she did, saying that she observed Ms. Woodruff

18     having the interaction, it's misleading on more than

19     one level.

20  Q.   That leads me into the next question.  It also states

21     in the report, I quote, "Defendant Woodruff can be

22     observed on video taking what appeared to be an item

23     from Mr. Walker."  If you remember, do you remember

24     if the video even depicted that, an item being

25     removed?



Timothy Dixon, J.D.
09/04/2024                    Page 125

 1  A.    The quality of the video is not very good, so I can't

 2        say whether that person is taking or removing

 3        something from Mr. Walker or not.  What I can say is

 4        that we know it's not Ms. Woodruff, and she says it

 5        is Ms. Woodruff, and that's the problem, that she

 6        says --

 7               She writes in the warrant as if show knows

 8        that that is Ms. Woodruff, that she in fact knows it.

 9        She doesn't say that it's speculative, she doesn't say

10        that she got this information from a victim who may

11        have been under the influence and wasn't necessarily

12        reliable, that she qualified that he was now sober and

13        in his right mind.

14               She doesn't say that she spoke to the people

15        at the location.  It doesn't say she did anything.

16        She says that she observed Ms. Woodruff.  She saw

17        Ms. Woodruff on various occasions involved in this

18        interaction.  And to me, that's the telling sign that

19        she put information in the warrant that's just not

20        true.

21  Q.   And do you agree that that would mislead anyone?

22               MR. PADDISON:  Objection, speculation and

23        foundation.

24               THE WITNESS:  Would you like me to --

25  BY MR. LAND:



Timothy Dixon, J.D.
09/04/2024                                 Page 126

1   Q.   I guess he --

2              MR. PADDISON:  The objection is to speculation

3        because he can't testify to what anyone else would do,

4        and I'm going to object as to foundation because, as a

5        prosecutor, he never reviewed a warrant, so he's not

6        qualified to give that testimony.  But subject to

7        those objections, he can answer.

8              MR. LAND:  That's okay.  I don't want to do

9        that, Counsel.  You're okay.  Just calm down.  We

10       gotta be respectful to each other.

11             MR. PADDISON:  I just placed a concise

12       objection on the record, sir.

13             MR. LAND:  Okay.

14  BY MR. LAND:

15  Q.   Mr. Dixon, do you believe that the facial recognition,

16       according to policy, is just a lead?

17  **A.   Yes.**

18             MR. PADDISON:  Objection as to relevance, form

19       and foundation.

20  BY MR. LAND:

21  Q.   And do you believe that OIC Oliver should have done

22       other things to determine who this particular female

23       was?

24  **A.   Yes.  I agree that the policy says it's a lead, that's**

25  **     not probable cause for arrest, and I think I testified**


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO        313.567.8100

1      to the other counsel and I wrote in my report that

2      yeah, more was required for Officer Oliver to make

3      that determination, to even put her in a photo array,

4      okay, and also to find out if she had the ability and

5      the opportunity to commit this crime.

6                    I think that that's the problem, that she

7      didn't, and she also put things in there attributing

8      them to Ms. Woodruff that just were not true.

9  Q.  Do you believe that OIC Oliver should have qualified

10     this witness in some kind of way?

11 A.  You're referring to Mr. Walker?

12 Q.  That is correct.

13 A.  Yeah.  Police officers know when they interview a

14     witness that the witness's state of mind or ability to

15     have seen and to tell and to give information and the

16     reliability of the information is important.

17                   She had already gotten information that he

18     may have been voluntarily intoxicated that night

19     because he says he was drinking with a woman.  He also

20     said that he believed he might have been drugged.

21                   Before even allowing him to view a photo

22     array, she should have made some determinations;

23     number one, did he have the ability to view the photo

24     array, could he in fact have remembered the person,

25     because if you show someone a photo array, the person



1      just might pick someone out regardless if in fact

2      they're involved in it or not.

3              Whether the photo array was suggestive I

4      won't comment on, but whether he should have been

5      allowed to have viewed the photo array I think is

6      something that is missing from Officer Oliver's

7      report, if in fact she did qualify him to ensure that

8      he was somebody who should be shown the photo array.

9      I don't know that she did or didn't because it's not

10     in her report.

11  Q.  Do you think because of this victim being drunk and

12     drugged he was unreliable, his identification was

13     unreliable?

14  A.  I think that it could have been, and fact that it's

15     not addressed in her reporting leaves the door open

16     that it could have been unreliable.

17              I think that, again, that's part of the

18     problem, that if she's relying on any information that

19     Mr. Walker gives in making her determinations and

20     she's not corroborating that with other people or

21     other things she's learned during her investigations,

22     that she's not conducting a full and -- I don't want

23     to say full and fair, but a full investigation of the

24     incident.

25              And then, of course, we go back to what she



1       put in the arrest warrant, the application for an

2       arrest warrant, the request for the arrest warrant.

3       She puts information in there that she could not

4       believe is true because it did not happen.

5  Q.   So you don't believe she was candid in the arrest

6       warrant?

7  A.   No, I don't.

8              MR. LAND:  What's the problem, Mr. Paddison?

9              MR. PADDISON:  I'm just looking forward to

10      recross.  This is going to be fun.

11 BY MR. LAND:

12 Q.   Let me ask you, Mr. Dixon, what are some investigative

13      leads that she could have explored?

14 A.   Things that I thought someone who was objectively

15      reasonable in this situation would have explored?

16 Q.   Yes.

17 A.   It's always based on the circumstances.

18 Q.   Okay.

19 A.   How about talking to a clerk at the store who allowed

20      the person to return the phone?  I didn't see any

21      information reporting that she in fact -- she or

22      anyone else -- because she's the lead, she could have

23      asked someone else to do.

24             Police are, for lack of a better term,

25      fungible.  So anybody could have went back and spoken



1    to her and asked who that person was.

2              I would have thought that before she put

3    Ms. Woodruff in a photo array that she would have

4    tried to locate her or at least speak to her over the

5    phone, okay, if not in person, to make a determination

6    whether or not she had the ability and opportunity to

7    commit the crime.

8              She saw the video of the store.  There are

9    other people in the store, there are other employees

10   there, there are other citizens who would have been at

11   the gas station prior to the event that might have

12   been able to explain the interactions.

13             I didn't see where she went back to the

14   location of where the crime actually occurred and

15   canvassed that area to find more people who would have

16   been potential witnesses.  I thought there were a lot

17   of things she could have done.

18             As to even the person who was arrested in

19   the vehicle, how about asking him about Porcha

20   Woodruff?  Has he seen her before, does he know her?

21   How about asking Porcha Woodruff does she know the

22   person who was in the car, is there a connection

23   between them.

24             This is a very serious offense, you know.

25   It would have required more time and effort than she



Timothy Dixon, J.D.
09/04/2024                                    Page 131

1   made, and also not putting statements in the warrant

2   that she didn't know to be truthful.

3  Q.   Did you view the video of the male suspect that was

4       arrested in the vehicle?

5  A.   **The interrogation of that person?**

6  Q.   Yes.

7  A.   **Yes.**

8  Q.   Do you recall what that video depicted and what he

9       stated in the video?

10 A.   **I remember some of what he stated.  I remember him**

11      **being interrogated by two detectives.**

12 Q.   Do you remember him stating anything in the video

13      regarding Trinidad?

14 A.   **If memory serves me correct, I think he acknowledged**

15      **having heard of someone named Trinidad, if memory**

16      **serves me correct.  I think he acknowledged having**

17      **heard of someone named Trinidad.**

18 Q.   But you do agree that he was arrested on February 2nd,

19      2023?

20 A.   **I don't remember which date he was arrested, but that**

21      **sounds like it could have been the date.**

22 Q.   And it was a video made from the Detroit Detention

23      Center?

24 A.   **Umm-hmm.**

25 Q.   And there were two officers -- two Black officers that



1    interviewed Mr. White.  Do you remember that?

2 A.  I remember two police officers and -- I'll just say

3    officers.  I don't know their rank.  But yes, him

4    being interviewed by two officers, two members of the

5    Detroit PD.

6 Q.  Do you remember they showed him a cell phone photo of

7    someone that he identified as Trinidad?

8 A.  I remember them talking about the person, and I

9    remember him saying that -- I remember an

10    acknowledgement of him acknowledging someone named

11    Trinidad.  Now, I don't remember the exact

12    circumstances.  I'd have to see the video again

13    because --

14 Q.  Let me ask you, what if this individual stated he was

15    Facebook friends with Trinidad?  Would that be

16    important?

17 A.  I think the fact that he may have known who Trinidad

18    was, was important.  I think if he had said he didn't

19    know who Trinidad was, that was important.

20          And I also think that him -- whether he knew

21    Ms. Woodruff or not would have been important enough

22    that officers, or the lead officer, Oliver in this

23    case, would have explored that, particularly since he

24    was the person caught in the car.

25          It doesn't mean he carjacked him, okay, but



1    is it evidence.  He's in possession of stolen -- he's

2    in possession of stolen goods, okay, the car.  So that

3    is a crime in most states.

4              So the fact that he's in possession of the

5    car should have prompted some discussion between he

6    and Ms. Woodruff before putting her in a photo array

7    or asking for an arrest warrant, particularly since he

8    doesn't mention that the woman participated in the

9    robbery.

10 Q.   And the report never mentions that the woman

11      participated in the robbery?

12 A.   It did not.

13              MR. PADDISON:  Objection, mischaracterizes

14      evidence.

15 BY MR. LAND:

16 Q.   And it was information in there that she did,

17      basically stating that something was taken from him at

18      the gas station where the victim basically did not

19      state that's where the robbery occurred?

20 A.   Yeah.  The victim doesn't say he was robbed at the gas

21      station.  As a matter of fact, he says he drove away

22      from the gas station with the person in the car.

23              So if the person that we see in the video is

24      the robber, then I think we have to presume that he

25      then drove away with the robber in the car and went to



1    another location where he was again robbed.  But this

2    time, his car was taken and he was told to strip and

3    all those other things.

4              It's not logical what Officer Oliver is

5    describing as evidence of a robbery, when in fact

6    that's not what the victim says is a robbery.

7  Q.  And as far as the statement of certainty, you believe

8    that that was misleading to the magistrate as well,

9    the statement where she added the street address, and

10   can you explain that?

11 A.  Okay.  The statement of certainty, you have to point

12   me out to where that is.  We've looked at a lot of

13   documents today, so --

14 Q.  The statement of certainty is in your report on

15   page -- give me one second.

16 A.  Are you referring to the photo array?

17 Q.  No, I'm sorry.  I am referring -- I believe I

18   misplaced this.  All right, I have it.  I'm speaking

19   of the -- it would be in your report.  It would be at

20   the top of page 16.

21 A.  Yes, okay.  Yeah.  That's what Mr. Walker was given,

22   okay, after the photo array, and that's where he

23   makes the statement as to why he picked Ms. Woodruff

24   out.

25             He doesn't say she robbed him, he doesn't



1    say she participated in the robbery, okay.  He says

2    that he picked her out, okay.  I'm going to try to

3    read it.  "I picked out number two based on seeing the

4    individual in person for multiple hours prior to me

5    being carjacked."

6           He's given an opportunity to say she

7    carjacked him, he's given the opportunity to say she

8    robbed him or she helped.  He doesn't say that.  He

9    says he believes that she's the woman he was with for

10   hours prior to that.

11          And Officer Oliver, in her warrant

12   application or her warrant request, takes this

13   information and says that he identified her as being

14   involved, okay.  And she then makes a --

15          She then says that this is the same person

16   she sees in the video, that Porcha Woodruff is that

17   person.  And that's not truthful.  She didn't see

18   Porcha Woodruff in the video.

19 Q.  I want to ask you something that was not touched on.

20     Can you go to the arrest warrant again?

21 A.  Okay.

22 Q.  And you are an attorney, and you are familiar with --

23     have you ever heard of the term mere presence?

24 A.  I've heard of it, yes.

25 Q.  So mere presence is not enough.  Are you familiar with



1      that term?

2  A.  I've heard of it, yes.

3  Q.  I take you to the final page of the report, the arrest

4      warrant.

5  A.  Sorry, I'm trying to get there.  You said the last

6      page of the warrant?

7  Q.  Yes.

8  A.  I think I'm there.

9  Q.  Is it the page where it says in bold Confession and

10     Admissions?

11 A.  Yes.

12 Q.  I want to take you to the sentence just above that,

13     okay, and I'm going to read it to you.  "I asked

14     Mr. Walker if Defendant Woodruff attempted to help

15     him during or after the carjacking, and he replied

16     no."  Can you tell me, in your opinion, is that a

17     crime?

18 A.  Not to assist someone who's being the victim of a

19     crime?

20 Q.  Yes.

21 A.  Generally no, generally.  I mean, are there some

22     circumstances where I could imagine?  I'd have to

23     think hard.  But not in this situation, it would not

24     be not helping him, but assisting the perpetrator

25     could be a crime, but not helping him.  But again, the



1      problem with this is she's saying it's Defendant

2      Woodruff, and it's not.

3              MR. LAND:  I just wanted to go over that.

4      Okay.  I have no further questions, Counsel.

5              MR. PADDISON:  A couple quick follow-ups.

6              MR. LAND:  Okay.

7  REEXAMINATION BY MR. PADDISON:

8  Q.  From the comment Mr. Land just asked you where the

9      victim was asked about whether the female suspect

10     tried to assist during the carjacking and you said no,

11     you were asked about that correct?

12 A.  **That's not what he asked.  He asked from the statement**

13     **as Mr. Walker was asked if Defendant Woodruff**

14     **attempted to help him during and after the carjacking,**

15     **and I said generally no, a person doesn't have a**

16     **duty to help someone else who's a victim of a crime.**

17     **But in this case, the problem is it's not Defendant**

18     **Woodruff that's even involved in this.**

19 Q.  That I understand.  Let's assume he said instead of

20     saying "Defendant Woodruff" he said the "female

21     suspect" and he said no.  Basically, the substance of

22     the message is, that the female suspect didn't attempt

23     to assist him in the carjacking or after the

24     carjacking; is that fair?

25 A.  **I don't agree with what you're saying, Counsel,**



1    because we can't remove the fact that the officer

2    clearly identifies Porcha Woodruff in this

3    application.

4  Q.   Okay.  I get that.

5  **A.   So I can't get past that being improper.**

6  Q.   If it didn't name Ms. Woodruff, if he said did the

7       woman -- did the woman help you during or after the

8       carjacking, okay, and he says no, effectively

9       Mr. Walker is communicating the woman didn't help me,

10      right, because that's not a crime, right?

11 **A.   Generally, it's not.**

12 Q.   But he didn't say no, she wasn't there, did he?  He

13      didn't say no, I dropped her off earlier, did he?

14 **A.   Well, she didn't ask him -- well, sir, I don't --**

15 Q.   She said did you help him during or after the

16      carjacking, and he said no, correct?

17 **A.   Sir, you're asking me multiple questions.  The first**

18     **question is does it say that she was there or she**

19     **wasn't there.  Well, he says in his statement that at**

20     **the time --**

21 Q.   I'm asking about what was just read.  I'm asking about

22      the warrant, sir, that we just discussed.  Mr. Land

23      just asked you about it.

24 **A.   Umm-hmm.**

25 Q.   The question was -- and all we're changing is instead



Timothy Dixon, J.D.
09/04/2024                              Page 139

1      of Defendant Woodruff, we're saying did the female

2      suspect or did the woman.  So it would read, did the

3      woman help you during or after the carjacking and he

4      responded no, correct?

5   A.   He just --

6             MR. LAND:  Objection, it calls for facts

7      that's not in evidence.  It doesn't state that they

8      ran to the store.

9             MR. PADDISON:  Can you pull that up?  Because

10     I'm having a little trouble locating that particular

11     line.  I want to take a look at that line.  Can you

12     put that up on the share screen, please?

13            MR. LAND:  Who?

14            MR. PADDISON:  If you've got it in front of

15     you.  I'm looking for what line you're talking about,

16     and I'm not seeing it.

17            MR. LAND:  I'm in hard form.  I don't have it

18     on computer.  My apologies.

19            MR. PADDISON:  Can you hold it to your screen

20     just so I can make sure I've got it?

21            MR. LAND:  Okay.  Hold on one second.  Let me

22     turn the lights back on.  Hold on.

23            MR. PADDISON:  I don't have that one pulled up

24     in front of me.

25            MR. LAND:  All right.  Just hold on one



1    second.

2              MR. PADDISON:  Yeah, no problem.

3              MR. LAND:  You ready?

4              MR. PADDISON:  Yeah.  Let's see here.

5              MR. LAND:  Can you see it?

6              MR. PADDISON:  The line -- okay.  Oh, there

7    we go.  All right.  Now I know what you're talking

8    about.  I overlooked that.  All right, okay.  Oh,

9    that's different than the one -- you've got a

10   different one there from the one -- you're talking

11   about the actual warrant itself, not the Request For

12   Warrant, right?

13             MR. LAND:  No, it's the Request For Warrant.

14             MR. PADDISON:  Request For Warrant?  And

15   that's on the last page?

16             MR. LAND:  Yeah.  Just before the Confessions

17   and Admissions.  Go right above the Confessions and

18   Admissions.

19             MR. PADDISON:  Oh, I got you.

20             MR. LAND:  Yeah, yeah.

21             MR. PADDISON:  Right, okay.

22   BY MR. PADDISON:

23   Q.   So he responds that the woman who Officer Oliver

24        identified as Defendant Woodruff, which we know is

25        incorrect, he asked if she helps assist during or



1      after the carjacking, right?  Is that correct?

2  **A.    Yes, I think that's the question she asked him.**

3  Q.    And the response was no, right?

4  **A.    Yes.**

5  Q.    The response was not, she wasn't there or I left her

6        or I had dropped her off?  It was just no, correct?

7                MR. LAND:  Assuming facts not in evidence.  We

8        don't know --

9                MR. PADDISON:  I'm asking him about what the

10       document is.

11               **THE WITNESS:  He replied "No" is what she**

12       **wrote.**

13  BY MR. PADDISON:

14  Q.    And would you expect that if she wasn't there anymore,

15        if she had left, if he had dropped her off, he would

16        have said yeah, I just dropped her off, I didn't --

17                MR. LAND:  Calls for speculation, Counsel.

18                MR. PADDISON:  Okay, fair enough.  Fair

19        enough, fair enough.  We can't know what Mr. Walker

20        would have said in that situation, and we probably

21        shouldn't try to interpret what he said?

22                MR. LAND:  Yeah.

23  BY MR. PADDISON:

24  Q.    We've established that you and I just interpret the

25        phrase "prior to" differently.  When you hear the



Timothy Dixon, J.D.
09/04/2024                                    Page 142

1       words "prior to," you mean not and continuing, you

2       just mean prior to and it stops, so we got through

3       that.

4               You thought it was irrelevant that there was

5       discussion in the warrant request because there

6       was -- there was discussion in the warrant request

7       regarding what was observed at the gas station, when

8       that's not where the robbery occurred, but earlier you

9       agreed that establishing a timeline is relevant,

10      correct?

11  A.  **Sir, I'm not sure I understand your question.**

12  Q.  Just a moment ago, when you were talking about some of

13      the issues you took with the Request For Warrant with

14      Mr. Land, you mentioned that there was some discussion

15      about what had happened at the gas station, and the

16      gas station isn't where the robbery occurred.  Do you

17      recall that?

18  A.  **I recall some points of that discussion.**

19  Q.  Earlier today during your deposition, you did agree

20      with me that establishing a timeline is important to a

21      criminal investigation, correct?

22  A.  **I do agree that if a timeline can be established,**

23      **that's important.**

24  Q.  Okay.  I'm just trying to work in reverse order here.

25      You mentioned that Ms. Woodruff -- or excuse me --



Timothy Dixon, J.D.
09/04/2024                          Page 143

1    Officer Oliver should have asked the male suspect,

2    Mr. White, about Woodruff.  Do you recall that?

3  A.  **That it would have been objectively reasonable to do**

4    **that, yes.**

5  Q.  You acknowledge that Officer Oliver was not the one

6    who interviewed Mr. White, correct?

7  A.  **Yes.  And when I say that her asking him would have**

8    **been that just like when she had others show the photo**

9    **array to Mr. Walker, she's the lead detective.  She**

10   **can give instructions, she can ask other detectives to**

11   **do things for her.**

12          **She's the lead.  She's in charge of the**

13   **case.  So when I say her doing it, doesn't mean that**

14   **she physically has to do every aspect of it, but she**

15   **should cause it to be done.**

16 Q.  You said that Officer Oliver could have talked to the

17   clerk at the gas station, correct?

18 A.  **She could have done it or caused it to be done, so**

19   **when I -- again, when I say her doing it, it means her**

20   **either doing it or causing it to be done.  And I**

21   **thought that that would have been important for her to**

22   **do or have it done.**

23 Q.  And you reviewed Officer Oliver's deposition

24   transcript, right?

25 A.  **I did.**



Timothy Dixon, J.D.
09/04/2024                          Page 144

1   Q.   So you saw where Mr. Land asked her about going to the

2        gas station and she went and talked to the clerk.  You

3        recall that?

4   A.   **Yes, she mentioned she talked to her, but she didn't**

5        **mention that she got into the details surrounding**

6        **the phone being brought back, the circumstances, why**

7        **the woman was allowed behind the counter.**

8             **And even though that's during the**

9        **deposition, that's not during the criminal**

10       **investigation.  Had she done it prior to asking for**

11       **this arrest warrant, we may not be here today.**

12  Q.   You're suggesting that after the arrest warrant is

13       when she went and talked to her?  Because I think

14       Mr. Land's questions are pretty clear.  I can go

15       back --

16  A.   **No.  I'm suggesting that the deposition were**

17       **afterward, that if in fact that had she had done a**

18       **full investigation prior to the arrest warrant, prior**

19       **to the arrest warrant, not merely just going there**

20       **and speaking to her so that she could see the video,**

21       **but asking more questions after she saw the video**

22       **about the cell phone being returned, the person**

23       **returning it, the relationship, and what she may**

24       **have observed the night of the incident.  She**

25       **certainly spoke to her because she was allowed to see**



1      the video.

2  Q.  And I believe that in the deposition -- I'm trying to

3      find it here -- that they said that they spoke about

4      the incident, and the clerk indicated she didn't

5      know the woman's name, but that she frequented the

6      gas station.  So Officer Oliver did talk to the

7      clerk?

8  A.  **I assume she spoke to her.  I just would have thought**

9      **she would have done more -- a more in-depth interview**

10     **of her.**

11 Q.  Okay.  And if she just said I don't know who she is,

12     she just frequents here often, in your mind, that's

13     not enough?

14 A.  **For such an incident, and the fact that you believe**

15     **that this woman is a suspect.  Now, if you don't**

16     **believe these a suspect, then I don't think it**

17     **matters.  I don't know what Officer Oliver was**

18     **believing at the time.**

19 Q.  All right.

20 A.  **But if she didn't believe the woman to be a suspect,**

21     **then it probably wouldn't have mattered.  But if she**

22     **didn't believe she was a suspect.  Then she should not**

23     **equated Porcha Woodruff with being her and gotten an**

24     **arrest warrant for her.**

25 Q.  There were some questions you were asked about the



Timothy Dixon, J.D.
09/04/2024                                        Page 146

1    victim, Mr. Walker, drinking voluntarily and perhaps

2    being drugged involuntarily.  And you agree that there

3    are references to that contained in the Request For

4    Warrant?

5  A.  **That he may have been under the influence?**

6  Q.  That Officer Oliver indicates that Mr. Walker stated

7    that he had been drinking and suspected he may have

8    been drugged.  That is contained in the warrant,

9    correct?

10 A.  **I think there's some allusion to him drinking.  The**

11   **drug part, I'd have to go back and look.  But I think**

12   **the real point of that is that it casts -- it should**

13   **cast some concern about reliability on Mr. Walker's**

14   **statements and her accepting his statements as being**

15   **truthful.**

16 Q.  Certainly we've discussed that ad nauseam.  We've

17   discussed the fact that it would certainly be a factor

18   in how reliable it is.  And that would be a factor not

19   only for Officer Oliver, but for her supervisor, the

20   prosecutor, and the judge as well, correct?

21 A.  **I would think so.**

22 Q.  Okay.

23 A.  **But in a different way.  Let's understand they all**

24   **have different jobs, too.**

25 Q.  Right.



Timothy Dixon, J.D.
09/04/2024                                  Page 147

1  A.    And the prosecutor's job versus the judge's job versus

2        the police job.

3  Q.    They're all different, right, yeah.  So the

4        prosecutor -- a lot of your criticisms here -- and I

5        don't want to beat a dead horse here, but a lot of

6        this is based on our interpretations of what is said

7        in the Request For Warrant.

8              If Garrett Garcia, the assistant prosecuting

9        attorney who signed off on it, said no, I knew exactly

10       what Oliver was saying, then that kind of negates any

11       of these deficiencies.

12             If he says, oh, I knew that she was talking

13       about viewing it on the video, I knew that Officer

14       Oliver never met with her, I knew that Mr. Walker had

15       been drinking and thought he might have been drugged,

16       well, at that point then, the deficiencies in the

17       warrant are kind of null and void, right, because you

18       understand Brady?  Once the officer turns over the

19       information, their duties are done?

20  A.   Well, no, I wouldn't agree with that.  First of all,

21       the prosecutor is not the finder of fact, and the fact

22       that the prosecutor allows the warrant to go forward

23       doesn't mean there's not false or misleading

24       information in there.

25             I really think that it would be the



Timothy Dixon, J.D.
09/04/2024                    Page 148

1    interpretation, and the finder of fact would have to

2    make a determination based on what a judge would

3    have done.  Would the judge have approved the warrant

4    if the false and misleading information is not in

5    there.

6              And sadly to say, prosecutors, even by

7    mistake, and there's been evidence that on occasion

8    intentionally allow warrants to go forward with false

9    and misleading information in there.

10             It's not the prosecutor's determination,

11   okay, or whether they would have caught it.  And also,

12   prosecutors operate under I would say a presumption

13   that when a police officer puts something in there,

14   that it's truthful, unless they have information

15   otherwise.

16   Q.  Okay.

17   A.  I would think that the captain would operate under the

18       assumption that it's true.

19   Q.  Sir, sir, sir.  I think we're getting to speculation

20       because you testified you never approved a warrant,

21       so I don't want to go down this speculation here,

22       okay.

23             Now, whether it's a supervisor, a prosecutor

24       or a judge, if they determine that there's not

25       enough there for probable cause, they can certainly



1    reject the warrant, right?  They have that option?

2 A.  **Okay.  Again, sir, you're asking me to decide if in**

3    **fact they would have rejected this warrant.**

4 Q.  I'm not saying would have.  I'm not saying would have.

5    My question, very simple, is just because a police

6    officer submits a Request For Warrant to a prosecutor

7    doesn't mean the prosecutor has to approve it, does

8    it?

9 A.  **No.  And it doesn't mean if they do approve it that in**

10   **fact there's not false or misleading information in**

11   **it.**

12 Q.  And just because the prosecutor approves it doesn't

13   mean the judge has to sign it, right?

14 A.  **It does not.**

15 Q.  Okay.

16 A.  **And it doesn't mean that they if they do sign it that**

17   **the information in there is truthful.**

18 Q.  Okay.  And then --

19 A.  **But there's a presumption that if a police officer**

20   **puts --**

21 Q.  Sir, that's not my question.  Sir, my question --

22   you're not answering the question.

23          MR. LAND:  Let him finish, Counsel.  Let him

24   finish.

25          MR. PADDISON:  No.  That wasn't my question.



```
 1                MR. LAND:  You're not --

 2                MR. PADDISON:  Mr. Land, Mr. Land, my question

 3        was very simple.  My question was very simple.

 4  BY MR. PADDISON:

 5  Q.    And a prosecutor has the option to ask the police

 6        officer to go back and do more, correct?

 7  A.    I don't understand what you mean, sir.

 8  Q.    So if a police officer submits a Request For Warrant

 9        and the prosecutor determines no, I need more, he can

10        tell the police officer, no, you've got to get me more

11        before I'm going to approve this, right?

12  A.    You're asking me to speculate on if they believe that

13        it requires more as opposed to my opinion in this

14        case, sir, which is --

15  Q.    I'm speaking about --

16  A.    -- which if it's not truthful, and that they know it's

17        not truthful --

18  Q.    Sir, my question was not what happened.  It's can.

19        Does the prosecutor have the ability, in this case, in

20        any single criminal case you want to talk about --

21                MR. LAND:  He answered you.  He answered you.

22  BY MR. PADDISON:

23  Q.    Do they have the ability --

24                MR. LAND:  He answered you.

25  BY MR. PADDISON:
```



Timothy Dixon, J.D.
09/04/2024                                    Page 151

1  Q.  -- to tell the police officer, I need more, you need

2      to go get me more?

3  A.  **Sir, I have to tell you, I don't know the practice in**

4      **Michigan.  In many states, like Maryland, prosecutors**

5      **aren't even involved in getting arrest warrants but in**

6      **certain serious situations.  So your practice in**

7      **Michigan is unique in a way.  But in this case, could**

8      **she have asked for more?  I would assume that she**

9      **could have.**

10 Q.  Okay.

11 A.  **But again, that assumes that she doesn't believe that**

12     **there's any information or misinformation or**

13     **misleading information in there.**

14 Q.  Okay.  Sir --

15 A.  **Because if she believed that, then she probably would**

16     **have said hey, there's a bigger problem here.**

17 Q.  Right, okay.  Let me see this.  I'm not sure if you

18     reviewed this.  Were you provided with the records --

19     the phone records for Officer Oliver?

20 A.  **I may have been, but sir, you're going to have to**

21     **display them to me because I --**

22 Q.  Well, I'm not asking about phone numbers, sir.  I just

23     want to check here.  Let's see.  Let's see if I can

24     find this here.  I don't see this list in the items

25     you reviewed.



Timothy Dixon, J.D.
09/04/2024                                    Page 152

1              So then I take it that you are not aware

2         that Officer Oliver made five separate phone calls

3         immediately after speaking -- actually speaking with

4         Ms. Woodruff to Wayne County prosecutors?  Were you

5         aware of that?

6    A.   **That after Ms. Woodruff was arrested that Officer**

7         **Oliver contacted the prosecutors?**

8    Q.   Well, there's a little step in between.  I mean, just

9         a little bit of background that maybe isn't as

10        directly related to what you're covering, but

11        Ms. Woodruff was arrested in the morning, Officer

12        Oliver was at mandatory firearms training.

13             When she finished that, she came down to the

14        Detroit Detention Center and immediately realized,

15        that's not my suspect.  They spoke for about

16        20 minutes, and then Officer Oliver's phone records

17        show she made about five separate calls in the span of

18        about 30, 40 minutes to different Wayne County

19        prosecutors.  Were you aware of that?

20   A.   **Sir, I don't know that I accept your rendition of**

21        **exactly what happened, but I am aware that after**

22        **Ms. Woodruff was arrested, that Officer Oliver met**

23        **with her, saw that she was eight months pregnant, and**

24        **then contacted prosecutors about it because she**

25        **realized she could not have been the suspect.**



Timothy Dixon, J.D.
09/04/2024                                    Page 153

1    Q.    Okay.

2    A.    **If that's your question, yes.**

3    Q.    And are you aware that at some point, I believe it was

4          with assistance of another officer, they actually were

5          able to speak to the magistrate while this actually --

6          I believe it was during Ms. Woodruff's arraignment.

7          Were you aware of that?

8    A.    **I'm aware that --**

9                MR. LAND:  That's assuming facts not in

10         evidence.  No.

11               MR. PADDISON:  Mr. Land, I believe it's your

12         statement at the preliminary exam.

13               MR. LAND:  I was speculating.  I was told

14         that.  I was told that.  I just said wait a minute,

15         hold on.  This is supposed to be dismissed.  So I

16         agreed with --

17               MR. PADDISON:  Actually, well, it is not a

18         fact it's not in evidence because the case notes

19         evidence they spoke to Judge Acharta and explained the

20         situation.  That is actually in evidence.

21               MR. LAND:  Where is that at?

22               MR. PADDISON:  It's in the case notes I sent

23         you -- let's see here.

24               MR. LAND:  The one that -- yeah, okay.  No

25         problem.  Yeah, you can use it all day because it's



1   going to be -- the one that's dated April 16th?

2           MR. PADDISON:  Mr. Land, you do realize that's

3   the print date, sir.

4           MR. LAND:  Okay, okay.  Let's do it.  Because

5   you have to remember, you submitted your -- don't

6   forget you submitted your --

7           MR. PADDISON:  It's an easy affidavit.  I can

8   have the individual who printed that, Officer Miller

9   from our office, file an affidavit that that was the

10  date and time she printed that document.

11  BY MR. PADDISON:

12  Q.  But yes, there is a case note that indicates that she

13      was able to speak with Magistrate Judge Acharta

14      during the arraignment of Woodruff, explained the

15      situation, and said that she needs a prosecutor or

16      judge to dismiss the warrant.  Were you aware of that?

17  **A.  So it's a question to me, Counsel?**

18  Q.  I'm asking, were you aware that in addition to the

19      phone calls to the prosecutor after realizing

20      Ms. Woodruff was not the right person, and during that

21      time she also spoke to the magistrate that was

22      handling the arraignments and explained we've got the

23      wrong person.  Were you aware of that?

24  **A.  I'm aware that after she finally saw Ms. Woodruff and**

25  **saw that she was pregnant, she realized that she could**



Timothy Dixon, J.D.
09/04/2024                                    Page 155

1    not have been the suspect, and that she did make

2    efforts to notify the prosecution, and she notified

3    others the problem.  That's not the issue that I have

4    with it, as I said.  The issue is --

5 Q.  I wasn't asking about that.  I was asking --

6         MR. LAND:  What issue?  What issue do you

7    have, Counsel?

8         MR. PADDISON:  Well, I'm getting to it,

9    Mr. Land.

10        MR. LAND:  Counsel, you're asking --

11        MR. PADDISON:  Excuse me, Mr. Land.  Excuse

12   me, sir.

13 BY MR. PADDISON:

14 Q.  So Mr. Dixon, would you agree with me, and I believe

15   you just said it, and I want to make sure we're in

16   agreement here, that when Officer Oliver realized that

17   Ms. Woodruff was not the right person, she took steps

18   to try and get her out of jail, to try and cancel the

19   prosecution?  Would you agree with that?

20 A.  Yes.  When she finally realized, that rather than

21   having realized it earlier, like an ordinary

22   reasonable officer would have.

23 Q.  So then, taking that back to the warrant request, it

24   doesn't make sense that Officer Oliver would

25   intentionally mislead the identity of Ms. Woodruff as



1    a suspect, and then realize all of a sudden, oh, no,

2    that's not the right person, and try to get her out.

3    That doesn't neighboring sense to you, does it?

4  A.  **Are you asking me her motive for doing it?**

5  Q.  I'm asking just from a practical standpoint.  If you

6    factor that into the equation, you're not asserting

7    that Officer Oliver intentionally put Ms. Woodruff's

8    name in this warrant, knowing that she wasn't the

9    right suspect?

10 A.  **What I'm saying, to be perfectly clear, is that**

11   **Officer Oliver put Ms. Woodruff's name into the**

12   **warrant, not knowing that she was the person in the**

13   **video, but putting it in the warrant in such a way**

14   **that it misled others into believing that she was the**

15   **very person in the video.**

16       **And then once she was arrested, she realized**

17   **that she's eight months pregnant, so she couldn't**

18   **possibly be the persona, and she goes back and she**

19   **contacts prosecutors and judges.**

20       **So did she intentionally put her name in the**

21   **warrant?  Yes, she did.  Did she intentionally say**

22   **Porcha Woodruff did those things, yes, she did.**

23       **She wrote those things.  She wrote those**

24   **things under oath, she gave it to her supervisor, she**

25   **gave it to the prosecutor, and she gave it to the**


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO      313.567.8100

1        judge.  So it is intentional.

2   Q.   I want to back up there.  So you said she misled

3        others into believing.  Now, on the initial cross you

4        testified --

5   **A.   That's not what I said, sir.**

6   Q.   Can you read it back, please, Jennie?

7   **A.   I said she misled others into believing that she knew**

8       **that Porcha Woodruff was the person in the video.**

9   Q.   Fair.  Okay, thank you.  All right.  And aside from

10       Mr. Land, you haven't talked to anyone else about this

11       case, correct?

12  **A.   Not other than here today.**

13  Q.   So then for you to say misled others into believing,

14       that's speculation, isn't it?  We already agreed we

15       don't speculate.

16  **A.   Well, certainly her supervisors reviewed it, the**

17      **prosecutors reviewed it and the judge reviewed it, so**

18      **those are the others.**

19  Q.   But if you haven't spoken to them, then you don't know

20       whether they interpreted this as Officer Oliver saying

21       this is on video.  You don't know that because you

22       haven't spoken to them.  So to say it misled others is

23       speculation.

24  **A.   Was that a question or a statement?  I'm sorry.**

25  Q.   Well, sir, you understand that you cannot guess as to



1      someone else's state of mind or reasoning, right?

2  A.  I'm not guessing because I would not think that a

3      police captain would review an affidavit and believe

4      it to be untruthful and approve it, so --

5  Q.  Okay.  But you haven't spoken to --

6  A.  -- I believe they believed what Officer Oliver said

7      because I know that one of the safeguards, her

8      supervisor or the prosecutor or the judge, if they

9      did not believe what Officer Oliver put in the

10      affidavit to be truthful, they would have taken the

11      appropriate steps in their position to stop it from

12      going forward.

13  Q.  But the basis for why they did what they did, you

14      don't know and you can't speculate, right?

15  A.  I assume that they were doing what --

16  Q.  Well, you're assuming.

17  A.  Well, sir, I assume the judge was doing justice, I

18      assume the prosecutors do their job, which is justice,

19      and I assume that police fairly, impartially enforce

20      the law.

21           Now, if you're suggesting that they were

22      part of the belief that Officer Oliver was doing it,

23      then I think that your issue is bigger than mine

24      because I don't necessarily believe that.  There's no

25      evidence that anyone else knew what Officer Oliver was



1      saying was untruthful other than she.

2   Q.   But wait a minute now, sir.  Hold on.  Because just a

3        moment ago --

4   A.   I'm sorry.

5   Q.   Excuse me.

6   A.   Counsel, I'm sorry.  There's a noise and I can't hear

7        you.  Can you hold on one moment?

8   Q.   Sure.

9              (Brief discussion off the record.)

10             MR. PADDISON:  Miss Spencer, can you please

11       read back just the last statement from Mr. Dixon?

12             (The record was read back by the

13             court reporter as follows:

14             "Answer:  Well, sir, I assume the judge was

15             doing justice, I assume the prosecutors do

16             their job, which is justice, and I assume that

17             police fairly, impartially enforce the law.

18               "Now, if you're suggesting that they were

19             part of the belief that Officer Oliver was

20             doing it, then I think that your issue is

21             bigger than mine because I don't necessarily

22             believe that.  There's no evidence that anyone

23             else knew what Officer Oliver was saying was

24             untruthful other than she.")

25   BY MR. PADDISON:



1  Q.   So Mr. Dixon, I have to confess, I take issue with

2       that because less than two minute ago, I thought we

3       agreed that Officer Oliver didn't intentionally make

4       any misrepresentations, so she didn't know that what

5       she putting in there was untrue.  I thought we agreed

6       on that.

7  A.   **We did not agree on that, sir, and we've talked about**

8       **that all day.**

9  Q.   Okay.

10 A.   **As a matter of fact, I said she intentionally put**

11      **those things in there.**

12 Q.   Okay.

13 A.   **For whatever reasons that she intentionally did it,**

14      **and she never corrected it, sir.  Not until after**

15      **Ms. Woodruff was arrested and she saw that she was**

16      **eight months pregnant did she take any steps to**

17      **correct what she had done.**

18 Q.   But at the time she wrote this -- I thought we

19      acknowledged at the time she wrote this, she thought

20      she was observing Woodruff.  I thought we acknowledged

21      that.

22 A.   **No, we didn't, sir.  And in fact, sir --**

23 Q.   So now you're saying -- your testimony now is --

24 A.   **I mean, if you want to cut me off that's fine,**

25      **but that's --**



Timothy Dixon, J.D.
09/04/2024                          Page 161

1  Q.  Hold on, hold on.  I have a very quick question.

2  A.  **That's not what I said, sir.  I said when she was**

3      **watching the video, okay, that she did not know that**

4      **that was Woodruff, but she said it was Woodruff, and**

5      **she wrote it in the warrant application.  I've said it**

6      **repeatedly.**

7  Q.  Right.  And she did that based --

8  A.  **And you haven't made me change my mind at this point,**

9      **when the evidence --**

10 Q.  Right.  And she did that based on the hit and the

11     questionable identification?

12 A.  **That's not what I said.  I said --**

13 Q.  Ms. Spencer read it off, and I actually wrote that one

14     down.

15 A.  **Fine, sir.  We're going to have to agree to disagree**

16     **again.**

17 Q.  Thankfully, we have a transcript, sir.  Listen.  I

18     have a few more questions here, and I'm done.  You

19     suggested that because the individual, Mr. White, that

20     was picked up driving the stolen vehicle that was also

21     identified, but the victim initially identified his

22     attackers having hair, but Mr. White was bald, that

23     should have raised some suspicions, correct?

24 A.  **It should have caused the detective to ask more**

25     **questions about the incident.**



1  Q.  Okay.

2  **A.  And not that alone, but the fact that he was under the**

3      **influence, voluntarily and involuntarily.  There's**

4      **inconsistencies in his statement; the fact that he**

5      **left out that he had sex with this woman that he**

6      **picked up.  There's lots of details that should have**

7      **caused Officer Oliver to ask more questions.**

8  Q.  Sir, I'm asking right now just about the fact of being

9      bald.  That's the only question on the table.  You did

10     address that, correct?

11 **A.  I understand bald, sir.**

12 Q.  Okay.

13 **A.  I am myself bald.**

14 Q.  Right.  And I've had a few times where I've shaved it

15     down, which brings me to my point.  In your time as a

16     police officer, if someone was involved in a crime,

17     are you aware of any efforts to change their

18     appearance?

19 **A.  Yes.**

20 Q.  And how long does it take for someone to shave their

21     head?

22 **A.  Sir, I don't know, I mean, but in this case he would**

23     **have to shave his head and change his complexion and**

24     **his age.**

25 Q.  But you understand a complexion can be affected by



1    light as well, right?

2  **A.   I did not interpret his description of the person as**

3  **being something that this guy could go from being a**

4  **light-complected Black person to a I believe**

5  **dark-complected Black person in a matter of days.**

6  Q.   I'm talking more about perspective, but that's an

7       aside.  And again, you mentioned the whole having sex,

8       but again, Officer Oliver did include the fact that

9       the victim engaged in sexual intercourse.  That is in

10      the warrant, correct?

11 **A.   She did mention it.**

12 Q.   Now, it was interesting, because you were talking

13      about, you know, that that needed to be addressed in

14      the warrant because, you know, then you can identify

15      more, you know, scars and different body details,

16      right.

17            At what page of your report is that on?

18      That was a really good point, actually.  Do you recall

19      what page of your report that's on?

20 **A.   I can look through it for you, sir.**

21 Q.   I'm trying to find it here real quick.  Give me a

22      minute.  In any event, the general sentiment of that

23      statement was that -- let's see here.  Okay.

24            You reference it on page 14, but it was just

25      with Mr. Land's testimony that, you know, that



1      intimate act I think was the term you used can help

2      someone identify distinguishing characteristics,

3      scars, things like that, correct?

4   A.  **That had she asked more questions about the sexual**

5      **contact, that the fact that Ms. Woodruff was eight**

6      **months pregnant would have been something that would**

7      **have easily noticeable by the victim.**

8   Q.  Right.  I agree with you there.  But at the point this

9      arrest warrant was submitted, we didn't know that

10     Ms. Woodruff was eight months pregnant.  Now, my

11     question is --

12  A.  **Is that a question or a statement, sir?**

13  Q.  I said, now my question is, in addition to observing

14     scars or tattoos or piercings or other distinguishing

15     features, engaging in an intimate act such as sex

16     would mean that they were probably close to one

17     another, which means the victim would have gotten a

18     real good look at this female suspect.  So wouldn't

19     that reinforce or affirm or strengthen the reliability

20     of the identification?

21  A.  **It could.  In this situation, however, he's drunk, he**

22     **passes out, and he forgets many other details.  In**

23     **fact, it seems that he even forgot that he had sex**

24     **with the person because he doesn't mention it the**

25     **night of the report.  Again, I think that goes against**



Timothy Dixon, J.D.
09/04/2024                                    Page 165

1   his reliability and should have caused the officer to

2   conduct a more thorough investigation.

3  Q.  And then there was a mention that initially there

4       wasn't even a mention to a woman being involved in the

5       robbery.  Do you recall that?

6  A.  Yes.

7  Q.  Okay.  Well, see, that's a bit of an issue, because I

8       know if we look at both page two of the Request For

9       Warrant and the correlating document -- and I can pull

10      this up for you here because this one is actually

11      probably better off --

12              It is the warrant on page two.  Can you see

13      the screen in front of you here?  Let me pull it up.

14      Can you see the screen here?  It's got a white line

15      across it, or a yellow line?

16  A.  I see it.  You'll have to make it a little bigger.

17  Q.  Okay.  We've got the Reporting Officer Narrative,

18      correct?  We see that here?

19  A.  I'm sorry.  Give me one second.  I'm trying to

20      position the screen.  Yes.

21  Q.  And just for reference, this is OCA 230129 dash 0262,

22      all right.  And we see date and time reported,

23      January 29th at 19:53, correct?

24  A.  Yes.

25  Q.  And that's the date of the incident, correct?



Timothy Dixon, J.D.
09/04/2024                                    Page 166

1   A.   Yes.

2   Q.   So here we have, "Victim Lawrence Walker stated he

3        picked up an unknown female in the area of Seven Mile

4        and Hoover.  He drove the female to the area of

5        Gratiot and Bessemore to drop her off.

6             "When Mr. Walker parked the vehicle to allow

7        the female to get out, he noticed her then get

8        into a black Tahoe that parked was on the other side

9        of street.  A male then exited that vehicle and

10       approached Mr. Walker stating, 'She forget her phone

11       in your car.'"

12            Okay.  Did I read that correctly?

13  A.   Yes.

14  Q.   Okay.  "Mr. Walker then exited his vehicle to look for

15       the female's phone, at which time the male produced a

16       handgun and told the male take everything off, where

17       is ace the gun."  Right?

18  A.   Yes.

19  Q.   So Mr. Walker initially did indicate that there was a

20       female present at the time of the robbery, right?

21  A.   **Sir, that's not what I said.  I said the female being**

22       **involved in the robbery.**

23  Q.   And then we also see in here -- I don't know if this

24       is up on your screen now -- on the Request For Warrant

25       basically they recite that same testimony.


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

Timothy Dixon, J.D.
09/04/2024                    Page 167

1          Now, this brings me to my last two little

2     bits here.  Actually, excuse me, last three.  Involved

3     in a robbery.  Is someone who drives a getaway car

4     involved in a robbery?

5  A.  **They could be.**

6  Q.  Is someone who sets someone up to be robbed involved

7     in a robbery?

8  A.  **They could be, yeah, if they're an accomplice or an**

9     **accessory before or after.  I don't know what your**

10    **state law is.**

11 Q.  Okay, right.  There's an accessory before the act,

12    accessory after the fact, yeah, all those

13    terminologies.

14 A.  **Accomplice.**

15 Q.  Right, accomplice.  We can choose our language.  So in

16    other words, you agree that someone legally does not

17    have to be directly involved in the criminal act

18    itself to be involved?

19 A.  **No, sir.  I don't think I --**

20 Q.  Let me rephrase.  That was a terribly worded question.

21    So for instance, if someone were to set someone up to

22    get carjacked and robbed, but they didn't pull a gun,

23    they didn't do it themselves, they can still be

24    implicated as an accomplice, correct?

25 A.  **If someone is an accomplice, they're involved, yes.**



Timothy Dixon, J.D.
09/04/2024                                    Page 168

1  Q.  Okay, fair.  Now, I'm going to ask you, and you can

2      answer as both a police officer or in your time with

3      the prosecutor's office.  Either one is fine.

4            But in your career, have you had an

5      experience there's a warrant that gets signed, there's

6      a preliminary exam, it's bound over, and then you

7      continue investigating, gathering more information as

8      you prepare for trial?  Have you ever been involved in

9      a situation like that?

10  **A.  I want to make sure I understand what you're asking**

11      **me.  You're saying that there's an arrest warrant,**

12      **someone is arrested, but the investigation continues**

13      **even after they've been charged?**

14  Q.  Yes.

15  **A.  And have I experienced that as a police officer or a**

16      **prosecutor?**

17  Q.  Correct.

18  **A.  Yes.**

19  Q.  Okay.  So you would agree that an investigation is

20      isn't over necessarily at the time an arrest warrant

21      is submitted or signed, or even at the preliminary

22      exam?

23  **A.  Not necessarily.  Sometimes they are, sometimes they**

24      **aren't.**

25  Q.  And my last question, assuming we don't have anything



1       else come up here.  You were asked about getting the

2       information from Mr. Walker's cell phone is one of the

3       things Officer Oliver could have done, correct?

**4   A.    I'm not sure I understand your question.**

5   Q.    Okay.  We were talking about all the different things

6         that Officer Oliver could have done during the course

7         of this investigation.

8               One of the things that was mentioned was she

9         could have gone -- and the victim, when she found out

10        he had his cell phone back, could have gone and gotten

11        that phone to gather information as far as if there

12        were any calls made while it was stolen, locations,

13        thing like that, correct?

**14  A.    I think you're conflating what I said regarding the**

**15        investigation of how he got the cell phone back, and**

**16        if she thought that was valuable information on there,**

**17        what steps she could have taken.**

**18              But yes, the manner in which he got the cell**

**19        phone back after the robbery I thought was important,**

**20        and that it would have been objectively reasonable for**

**21        her to delve into those circumstances more than she**

**22        did.**

23  Q.    Okay, okay.  And the information that was being

24        referenced -- I don't know if it was you or Mr. Land

25        that referenced it, but one little note I may was, for


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

1       example, if there were any phone calls made while the

2       phone had been stolen, right?  Do you recall that?

3    A.  **I don't, but I'll try to answer your question.**

4    Q.  Well, let me ask you this.  If there were any phone

5       calls made from Mr. Walker's phone while it was not in

6       his possession, that could be valuable information,

7       correct?

8    A.  **It could have been in this case, yes.**

9    Q.  And obviously cell phones you can track by the towers

10      think ping at.  That could have been valuable

11      information as far as where the cell phone was moving

12      around the city; is that fair?

13   A.  **Yes.**

14   Q.  Yeah, okay.  And Mr. Walker was complying with this

15      investigation, correct?

16   A.  **That I don't know, sir.**

17   Q.  Well, Mr. Walker reported the crime, didn't he?

18   A.  **Mr. Walker reported a crime, but he left out very**

19      **important details in his reporting.  He also made**

20      **statements that were inconsistent to the initial**

21      **officers and Detective Oliver.**

22   Q.  But he also spoke with Officer Oliver on a second

23      occasion, correct?

24   A.  **He did, apparently.**

25   Q.  And he also voluntarily came down to the Detroit



Timothy Dixon, J.D.
09/04/2024                    Page 171

1       Detention Center for a lineup, correct?

2   A.  I don't know it was voluntarily.  I just know that it

3       says he came there.  I don't know what was said to him

4       to get him to cause him to get there.  I don't know

5       the manner in which he got there.

6   Q.  I don't want you to speculate on it.  I don't want you

7       to speculate.  So he did come down to the DDC on a

8       separate date to do the lineup, correct?

9   A.  I don't know if he came there knowing he was going

10      to do the lineup.  I just know that he came there.

11      I don't know the purpose for which he came there.  I

12      just know that she says that once he was there,

13      that he did do a lineup.

14              I don't know if she told him before he came,

15      hey, we're going to do a lineup.  So the idea of why

16      he came, was he cooperative?  Again, I can't answer

17      that for you, sir.

18  Q.  Okay.  Well, let me ask you this.  Is there anything

19      in any of the evidence -- and I don't want you to

20      speculate -- in any of the evidence that suggests that

21      Mr. Walker wasn't complying or participating in the

22      investigation?

23  A.  Yes, there's evidence.  Again, he wasn't candid,

24      okay.  He didn't tell the entire truth.  He bring

25      up facts and details days later, his relationship,



Timothy Dixon, J.D.
09/04/2024                          Page 172

1      the fact that he says he had sex with this woman.

2      There's a lot of things there that aren't very

3      consistent.  And his behavior toward the officers

4      initially.

5                 I can understand that he was traumatized,

6      but he did withhold information from the police on

7      more than one occasion, so that does cast some doubt

8      on him being cooperative with the police.

9   Q. So now the suggestion is that his memory was fine; he

10     just wasn't cooperating, not that he had a poor memory

11     because he was drugged or had alcohol?  That's your

12     suggestion now?

13  A. No, sir.  I'm saying I don't know why he did what he

14     did.  I'm just saying that he did do that.

15  Q. But if it's unintentional, if he's doing the best he

16     can, he's still complying then, right?  He's still

17     cooperating?

18  A. If he's under the influence and -- no, he's not.  If

19     he's not able to cooperate because he's under the

20     influence, then he's not cooperative.

21  Q. Okay.

22  A. I'm not speculating as to the reason why he was not

23     cooperative.  I'm just saying that his behavior lends

24     itself to not being cooperative.  I don't know if it

25     was intentional, I don't know if he was under the



Timothy Dixon, J.D.
09/04/2024                              Page 173

1     influence, or if it was a combination of both.  I

2     mean we've seen situations where witnesses and victims

3     are under the influence and they're still not

4     cooperative.

5  Q.  Okay.  This is my last question.  Wouldn't you agree

6     that it's more important to try and gather information

7     that -- to use a phrase you used I believe -- is

8     fungible, that could disappear or vanish?

9  A.  I'm sorry.  Could you repeat that, sir?

10  Q.  As a police officer conducting an investigation, would

11     you agree that it's often a greater priority to try to

12     obtain evidence that's fungible, that could be

13     destroyed or could vanished or could be erased?

14  A.  If you're talking about evanescent evidence like hair

15     fibers or blood or DNA -- is that what you're

16     referring to?

17  Q.  How about something as simple as this.  Most

18     surveillance systems are on a loop.  They record for a

19     certain period and eventually just re-record over

20     themselves.  Are you aware of that?

21  A.  I don't know that to be true, sir.

22  Q.  Well, I can assure you it is true, all right.  If

23     that's the situation, and you have something that if

24     you don't get to it soon enough it's gone, wouldn't

25     that be more important than something you can come


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO      313.567.8100

Timothy Dixon, J.D.
09/04/2024                                    Page 174

1    back to later?

2  A.    I'm not sure I understand your question.

3  Q.    Let's assume, just for the sake of argument, that the

4        recordings from the BP gas station were on a seven-day

5        loop, so the recordings were preserved for seven days,

6        and eventually they'd be recorded over, all right.

7        And then we have information on Mr. Walker's cell

8        phone that's in his possession.

9              Wouldn't it make sense that your first

10       priority would be getting the video from the

11       BP gas station before it gets erased or recorded

12       over?

13 A.    Sir, I mean, if you're going to ask me to compare

14       those two things, I mean, they're both digital

15       evidence, and either could be as easily destroyed.  So

16       I would think that if you think there's important

17       information there, with the resources that a large

18       metropolitan police department has, you could pursue

19       both at the same time.

20             Looking for evidence of one versus the

21       other, they're not mutually exclusive, you know.  You

22       can do both.  Police are pretty good at their jobs

23       generally, and they can walk and chew gum at the same

24       time.

25 Q.    A large metropolitan police force.  Do you know how



Timothy Dixon, J.D.
09/04/2024                              Page 175

1    many officers are in the CAT unit, the Commercial Auto

2    Theft unit?

**3    A.    No.**

4    Q.    Do you know what that unit's budget is on an annual

5          basis?

**6    A.    No, I don't.**

7    Q.    Do you know how much auto thefts or carjackings are

8          reported in the City of Detroit of every year?

**9    A.    No.**

10   Q.    So you really don't know what resources they have

11         available, do you?

**12   A.    I know that there's more than one officer working in**

**13         the entire Detroit Police Department, and she has**

**14         access to other police, other resources.  This is a**

**15         serious crime, someone having been carjacked.  It's a**

**16         very serious crime.**

**17               So I mean, she's not limited by just what**

**18         she's able to do, sir.  I mean, I won't accept that as**

**19         being factual.  We will have to agree to disagree on**

**20         that.**

21   Q.    But you don't know?

**22   A.    No, sir, I would not know the budget of the Detroit**

**23         Police Department.**

24               MR. PADDISON:  All right.  Thank you very

25         much, sir.  I appreciate your time.



1          THE WITNESS:  Thank you.  It was nice meeting

2      everyone.

3  REEXAMINATION BY MR. LAND:

4  Q.   Mr. Dixon?

5  **A.   Yes, sir.**

6  Q.   Do you think Porcha Woodruff gives a damn about the

7       Detroit Police Department?

8          MR. PADDISON:  Objection it as to relevance.

9  BY MR. LAND:

10  Q.   Does she care?  You can answer.

11         MR. PADDISON:  Objection.  The same

12      objections.  I mean, I don't believe he's a damages

13      expert, sir.  I believe he's been identified as a

14      police procedures expert.

15  BY MR. LAND:

16  Q.   I won't do what he did.  I've got some questions.

17      Quick question.  If a victim didn't show up for a

18      preliminary exam -- you guys were talking about being

19      cooperative.  If the victim didn't show up for a

20      preliminary exam, would that be an indication that he

21      was not cooperating with the authorities?

22         MR. PADDISON:  Speculation.

23         **THE WITNESS:  So when you say preliminary**

24      **exam, I'm assuming -- is that a preliminary hearing or**

25      **inquiry or it's a court -- they've been summoned to**


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO    313.567.8100

1      court?

2   BY MR. LAND:

3   Q.   He did not show up for the Defendant White's exam, he

4        missed it, and the case was dismissed for Defendant

5        White.  Would that be an indication that he's not

6        cooperating?

7   **A.   Yeah.  If a witness is summoned --**

8             MR. PADDISON:  Same objection.  Let me place

9        my objection.  That's speculation, foundation.

10            **THE WITNESS:  If a witness does not -- if a**

11       **witness is summoned to court and doesn't show up, yes,**

12       **I would say they're being uncooperative.**

13  BY MR. LAND:

14  Q.   As far as other investigative leads, Ms. Woodruff was

15       posting that she was pregnant on Facebook.  Is that a

16       lead that the detective should have pursued?

17            MR. PADDISON:  Objection, form, foundation,

18       assumes facts not in evidence.

19  BY MR. LAND:

20  Q.   You can answer it.

21  **A.   If in fact Officer Oliver suspected that Porcha**

22       **Woodruff was involved in this, combing social media**

23       **for information about the person is -- it's a common**

24       **investigative technique now, and had she done that and**

25       **discovered she was pregnant, then she probably -- I**


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

1      would assume she would not have placed her in the

2      warrant.  So this again goes to following general

3      accepted policing practices, that you check those

4      things, if that is the question.

5  Q.  I've got two more questions.  He asked you -- he

6      mentioned about an accomplice.  When police determine

7      whether a person is an accomplice before the fact or

8      after the fact, there should be some evidence that you

9      would, as an officer, review.  There should be some

10     type of evidence that you would make them be an

11     accomplice before you --

12           MR. PADDISON:  Objection as to form.  This is

13     not an adverse witness, Mr. Land.

14           MR. LAND:  I have to keep going because we're

15     in a rush, so --

16           MR. PADDISON:  But you can't lead your

17     witness.

18           MR. LAND:  Okay, okay.

19  BY MR. LAND:

20  Q.  Go ahead and answer the question.

21  A.  So if the question is in order for someone to be an

22     accomplice or an accessory before or after, would

23     there have to be evidence of it, yes.

24  Q.  Okay.  Last question.  He mentioned to you that it

25     doesn't make sense for Detective Oliver to get an



1    arrest warrant, turn around and have her released.  It

2    doesn't make sense.  But tell me, does this make

3    sense.  Did you hear the recording where Detective

4    Oliver refused to give Porcha Woodruff her cell phone

5    back a day after her arrest?

6  A.  **Based on the materials that I reviewed, it seemed that**

7    **Ms. Woodruff's cell phone was -- that the officers**

8    **had it, that the police department had it, and didn't**

9    **immediately release it.  Now, as to her motive for**

10   **wanting her release, is that your question, or --**

11 Q.  He mentioned to you it doesn't make sense for her to

12   write her arrest warrant and then try to have her

13   released by the prosecutor's office, and then I asked

14   you --

15 A.  **So yes, it does make sense.  It makes sense that she**

16   **didn't do a thorough investigation, she puts things in**

17   **the warrant that were not true, she got the wrong**

18   **person arrested, and when she realized it, she was**

19   **like, oh, my God, I shouldn't have done that, and she**

20   **wants to -- she wants to try to fix it.**

21   **But it's too late.  Ms. Woodruff's already**

22   **been arrested.  She's already been subject to charges**

23   **for things she could not have committed, okay.  So I**

24   **mean, that happens.**

25   **People do things that are wrong, and when**



1      they're -- when it's brought to light that they're

2      wrong, they want to try to fix it.  And that's the way

3      I interpreted her actions.

4  Q.  Let me try to fix it.  She refused to release the cell

5      phone because she said she was still investigating her

6      after she knew she was pregnant.  Does that make

7      sense?

8           MR. PADDISON:  Objection, leading, foundation,

9      assumes facts not in evidence.  Mr. Land, you do not

10     get to describe the evidence.

11 BY MR. LAND:

12 Q.  Go ahead, you can answer.

13 A.  I don't know Officer Oliver's motive for continuing

14     the investigation after she knew that Ms. Woodruff

15     could not possibly have been involved in the crime.  I

16     can't speculate on her motive for doing it.  I mean,

17     did she continue it?  Yes, she did.  But I don't know

18     why.

19 Q.  And also, are you familiar with the search warrant she

20     submitted to obtain evidence from her phone from a

21     different prosecutor as well as to a judge?  Does that

22     make sense?

23 A.  It doesn't make sense in the fact that she now knows

24     that Ms. Woodruff could not have been involved in the

25     crime, okay.  To continue to submit affidavits under



Timothy Dixon, J.D.
09/04/2024                                    Page 181

1    oath after she knows Ms. Woodruff could not have been
2    involved in the crime, again, is submitting false and
3    misleading information.  So her motive I can't
4    speculate on.  Did she do it again and continue with
5    the act?  Yeah.
6              MR. LAND:  I'm finished.  Thanks.
7    REEXAMINATION BY MR. PADDISON:
8  Q.  One follow-up, and that's -- well, two, if I can get
9       straight answers.  One, Mr. Dixon, are you aware that
10      the search warrant was never executed?
11 A.  I don't know if it was executed or not, no.
12 Q.  Number two, did you listen to that recording?
13 A.  Which recording, sir?
14 Q.  The recording of the follow-up conversation between
15      Oliver and Woodruff regarding the cell phone.  Did you
16      listen to that?
17 A.  Did I listen to that?  If I did, I don't recall the
18      content of it.  There was a lot of material, so I
19      don't remember what the content of it was.
20 Q.  Maybe this will spark your memory.  Do you recall
21      Officer Oliver explaining that she was trying to
22      obtain the warrant to prove that Ms. Woodruff was not
23      involved in the carjacking?
24 A.  No, but that doesn't make sense.  Why would you get a
25      criminal -- first of all, search and seizure warrants



Timothy Dixon, J.D.
09/04/2024                           Page 182

1   are always for criminal investigations.  They are not

2   used to exclude people who you already know are not

3   suspects because they don't have the opportunity or

4   the ability to commit the crime, which Ms. Woodruff

5   didn't.

6           I don't understand why a police officer

7   would even think that that's reasonable or logical,

8   and that makes me even more curious.  Did she tell the

9   judge, hey, the reason why I'm getting this warrant is

10  because I want to exclude this person because I

11  already had her arrested once based on information

12  that I put in a warrant that wasn't truthful.

13          I don't understand how that makes sense, but

14  if that's what you're saying she did, then that

15  doesn't change my opinion about her conduct.  I think

16  it makes it worse.

17          MR. PADDISON:  Very well, Mr. Dixon.  Thank

18  you very much.  Ms. Spencer, you've been a trooper.

19  Thank you so much, I really appreciate it.  Could I

20  please get an e-trans, please, in ordinary PDF format.

21          MR. LAND:  Same to me.

22          (The deposition was concluded

23          at 1:54 p.m.)

24

25



**Timothy Dixon, J.D.**
09/04/2024                                        Page 183

1                    CERTIFICATE OF NOTARY

2   STATE OF MICHIGAN    )

3                        ) SS

4   COUNTY OF OAKLAND    )

5       I, Jennifer L. Ward, Certified Shorthand Reporter,

6   a Notary Public in and for the above county and state,

7   do hereby certify that the above deposition was taken

8   before me at the time and place hereinbefore set forth;

9   that the witness was by me first duly sworn to testify

10  to the truth, and nothing but the truth, that the

11  foregoing questions asked and answers made by the

12  witness were duly recorded by me stenographically and

13  reduced to computer transcription; that this is a true,

14  full and correct transcript of my stenographic notes so

15  taken; and that I am not related to, nor of counsel to

16  either party nor interested in the event of this cause.

17

18                  _Jennie R. Spencer_

19           _____

20           Jennie R. Spencer, CSR-3717

21           Notary Public,

22           Oakland County, Michigan

23

24  My Commission expires:  10-27-2025

25



**Timothy Dixon, J.D.**
**09/04/2024**                                              1

**0**

**0262**  165:21

**1**

**1,000**  93:12

**10:01**  4:3

**11**  11:18,22 12:8 13:6 50:13

**11:30**  91:22,25

**11:41**  91:19,22,25

**11:45**  95:11

**12**  13:7 54:5 61:3 72:18,20 96:6 104:20

**12:01**  108:24

**12:21**  108:24

**13**  67:18,19,21

**135**  114:4,8 119:13

**14**  78:11 163:24

**16**  77:23 78:8 79:22 80:23 81:6 134:20

**16th**  154:1

**18**  5:9,11

**188**  37:10

**19**  13:1

**19934**  79:5 87:15 107:13

**19:53**  165:23

**1:54**  182:23

**2**

**20**  13:1 39:13 110:8,9,11 120:16 152:16

**2023**  20:16 21:16 28:17,20,23 33:9,13,16,20 34:3,18 35:1 36:9 56:9,11 57:15 59:11,13, 21 60:14 78:24 107:10 113:19,24 119:24 121:23 123:3 131:19

**2024**  4:2 5:9

**21**  13:1

**23**  114:3,7 119:12

**230129**  165:21

**25**  114:3,7 119:12

**257**  37:21

**29th**  20:16 21:15 60:14 113:19,24 119:23 123:3 165:23

**2nd**  27:23 28:2,23 34:3,10,17 56:9 57:3,15 58:12 59:24 60:3 77:2,10 78:24 79:25 87:6 107:9 131:18

**3**

**30**  152:18

**30th**  28:17 33:9,13 56:11 57:2 59:10

**31st**  28:20 33:16,20 56:10,11 57:2 59:13,16,21 60:2 114:11 120:21

**365**  37:10

**3rd**  34:18,25 35:3,9 36:1,9,13 70:21

**4**

**4**  4:2

**40**  152:18

**4th**  21:4,11 27:22 28:5,6 35:22 70:20 73:20 76:24 77:11 121:23

**5**

**5-23-cv-11886**  4:9

**5:53**  20:16 21:15 60:13

**6**

**63**  37:11

**636**  37:13,18,19

**6420**  87:19

**6th**  82:12

**9**

**9**  5:12

**90**  37:15,17

**94**  37:12,14

**942**  37:21

**9963**  82:18 86:21

**9th**  5:9

**A**

**a.m.**  4:3 91:19,22

**A000018**  12:12 13:1

**ability**  12:18 32:22 54:25 63:6 64:24 65:4 127:4,14,23 130:6 150:19,23 182:4

**abreast**  111:12

**Absolutely**  37:8

**academies**  66:12

**accept**  64:3 66:9 88:18 152:20 175:18

**acceptable**  10:10 15:20 16:4 17:2,9 24:7

**accepted**  15:22 63:4 64:21 65:3,9,10,12,23 66:1,7 96:22 103:22 117:19 121:18 178:3

**accepting**  66:7 146:14

**access**  175:14

**accessory**  167:9,11,12 178:22

**accomplice**  167:8,14,15,24,25 178:6,7,11,22

**accurate**  36:8 78:5 92:24 93:5 94:16,17

**accurately**  89:15 90:1



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**accused** 38:9 44:22

**ace** 166:17

**Acharta** 153:19 154:13

**acknowledge** 105:7 143:5

**acknowledged** 44:6 131:14,16
160:19,20

**acknowledgement** 132:10

**acknowledging** 132:10

**act** 117:11 164:1,15 167:11,17
181:5

**action** 6:16

**actions** 30:18 67:13 88:15
101:22 103:15,21 104:14
180:3

**actual** 6:16 7:13 8:23 74:12
81:21 88:20 91:4 95:17
140:11

**ad** 146:16

**add** 45:24 47:6 81:13

**added** 114:14,16,22 134:9

**adding** 26:12

**addition** 112:20 119:1 154:18
164:13

**additional** 38:8 112:21 114:14

**additions** 5:13

**address** 134:9 162:10

**addressed** 128:15 163:13

**adequate** 38:4

**adhere** 65:2

**adhered** 122:10

**adhering** 63:4 121:17

**Admissions** 136:10 140:17,18

**admitted** 43:7

**adverse** 178:13

**advised** 20:9 60:7 77:4

**advising** 17:14

**affected** 162:25

**affects** 41:18

**affidavit** 23:16 24:10 26:22
30:3 34:15 35:20 51:20,21
78:13 81:19 154:7,9 158:3,10

**affidavits** 24:11 180:25

**affirm** 81:14 164:19

**afterward** 105:4 144:17

**age** 114:3 120:15 162:24

**agency** 68:1

**agree** 6:21,25 7:2 8:22 9:1,2,
11 11:23,25 14:6 18:6 23:21
25:1,22,23 26:1,5 27:21 29:16
30:1,24 31:3 35:13,20 36:6,7
38:12,23 40:3,8 41:21 45:11
48:16,20,22 50:17 51:10
56:22 59:25 60:3 63:13,15,23,
24 64:4 67:5 70:10,12 73:21
75:10 76:3,24 78:10 83:25
89:3 90:12 95:18 97:6 98:4,9
104:1,2 106:12 107:22,23
108:1 111:14,23 124:13
125:21 126:24 131:18 137:25
142:19,22 146:2 147:20
155:14,19 160:7 161:15 164:8
167:16 168:19 173:5,11
175:19

**agreed** 56:5,24 57:13 59:22
76:11 142:9 153:16 157:14
160:3,5

**agreeing** 43:5,6 102:14

**agreement** 9:17 155:16

**ahead** 13:7 16:17 22:23 42:12
69:12,21 77:25 178:20 180:12

**Ahlers** 36:18 37:10

**aid** 75:23

**albeit** 36:9

**alcohol** 47:13 75:3 172:11

**alive** 54:24 65:5

**alleged** 113:23 114:2

**allowable** 4:14

**allowed** 121:10 128:5 129:19
144:7,25

**allowing** 127:21

**allusion** 146:10

**American** 23:22

**annual** 175:4

**answering** 69:20 78:2,4
149:22

**answers** 25:9 181:9

**anymore** 141:14

**apologies** 139:18

**apologize** 28:5 53:4

**apparently** 8:15 102:20
109:22 170:24

**appearance** 162:18

**appeared** 73:8 115:21 124:22

**appears** 29:23 32:5 89:9

**application** 17:7 33:24 34:15
51:22 60:25 91:15 108:10
124:7 129:1 135:12 138:3
161:5

**applied** 122:25

**appointed** 114:9

**appointments** 30:15

**apprehended** 42:1 43:11
44:13 45:13,23 47:3

**approached** 82:22 86:25
166:10

**approaching** 13:14,17,24
14:13,23,24 15:5 16:7,21 17:1
72:22 104:22

**approve** 52:20 53:3 64:19
109:2 149:7,9 150:11 158:4

**approved** 32:16 39:2 51:25
52:4 64:14,15,16 148:3,20

**approves** 53:19 149:12

**approximately** 20:16 21:15
60:13



**Timothy Dixon, J.D.**
**09/04/2024**
**3**

April 154:1

area 87:24 121:11 122:3
130:15 166:3,4

areas 111:4

argument 174:3

arraignment 153:6 154:14

arraignments 154:22

array 5:20 6:3,5,7,13,17,20,22,
24 7:4,15,16 8:2,7,9,12,24
9:3,5,10 36:13 42:18 43:24
44:4 45:3 75:2,5 79:18 81:14
84:19 88:11 108:15 122:18
127:3,22,24,25 128:3,5,8
130:3 133:6 134:16,22 143:9

arrays 9:22

arrest 5:19 6:11,12 10:4 19:16
38:5 39:20,24 53:18 57:7
109:12,15,18 113:18,20,21
117:23,25 118:3 119:25
121:22,25 122:8 123:14
126:25 129:1,2,5 133:7
135:20 136:3 144:11,12,18,19
145:24 151:5 164:9 168:11,20
179:1,5,12

arrested 24:20 42:16 64:11
67:1 97:10 119:20 120:9
130:18 131:4,18,20 152:6,11,
22 156:16 160:15 168:12
179:18,22 182:11

Ashley 113:3

aspect 143:14

assailant 114:2

asserting 156:6

assigned 28:16,19 33:9,13
59:10 112:10,13

assist 136:18 137:10,23
140:25

assistance 153:4

assistant 147:8

assisted 110:20

assisting 136:24

assume 7:2 19:18 30:14,15
46:23 51:18 52:6 62:17 65:2
94:11 110:10 137:19 145:8
151:8 158:15,17,18,19
159:14,15,16 174:3 178:1

assumed 6:4 57:10 64:20

assumes 151:11 177:18 180:9

assuming 39:2 53:20,25 69:14
84:2 123:24 141:7 153:9
158:16 168:25 176:24

assumption 123:25 148:18

assure 173:22

astounding 102:10

attackers 161:22

attempt 54:9 61:11 137:22

attempted 122:13 136:14
137:14

attempting 25:21 26:19

attention 47:12

attorney 11:2 29:8 48:17
50:10 111:15,17,19,21,25
112:2,5,7,13,17 135:22 147:9

attribute 92:13

attributes 88:15 106:15
124:10

attributing 124:8 127:7

authorities 176:21

auto 28:18 33:8 51:5 59:10
175:1,7

avoid 18:12

aware 9:19 10:16 22:9 44:24
45:1,2,4,5 106:3 113:18,23
114:15 152:1,5,19,21 153:3,7,
8 154:16,18,23,24 162:17
173:20 181:9

---

**B**

---

back 21:12 27:24 56:4,20
57:16,18,21,22,24 58:16,21
59:2 61:3,22 67:18 68:25 69:2

72:18 76:22 78:17 80:23
93:14 96:6 104:20,24 105:19,
20 106:1 107:1 114:24 115:3,
8,12 116:7,9,14 123:8 128:25
129:25 130:13 139:22 144:6,
15 146:11 150:6 155:23
156:18 157:2,6 159:11,12
169:10,15,19 174:1 179:5

background 50:8,9 152:9

balances 63:20 64:2

bald 120:12 161:22 162:9,11,
13

Baltimore 7:10 39:9 62:17
65:18 109:7 110:2 111:6

base 30:17 89:19

based 25:12 26:20 29:19,22
30:21,23 31:9 45:12 47:20
49:4 51:23 52:6 53:21 54:1
61:15 62:22 64:18 68:11,16,
18 69:6 71:9,14 77:16 84:13
89:9 90:7 91:11 94:24,25
99:20,21 100:3,12 101:1
104:15,17 105:1,8,23 107:24
108:2 109:23 115:11 129:17
135:3 147:6 148:2 161:7,10
179:6 182:11

basically 11:9 45:8 112:14
133:17,18 137:21 166:25

basing 89:14

basis 13:23 39:18,24 40:7
48:14 91:8 158:13 175:5

Bates 12:11 102:15

beat 147:5

beginning 5:25 20:5

begins 82:10

begun 19:25

behavior 124:8,10 172:3,23

belief 158:22 159:19

believed 15:9 26:25 35:19
92:11 103:19 127:20 151:15
158:6



Timothy Dixon, J.D.
09/04/2024

**4**

**believes**  22:3 82:18 86:20 135:9

**believing**  145:18 156:14 157:3,7,13

**Bellagio**  79:6 87:16 107:14

**Bessemore**  36:5 81:11 87:24 166:5

**big**  62:23

**bigger**  151:16 158:23 159:21 165:16

**bit**  44:16 152:9 165:7

**bits**  167:2

**bizarre**  121:4

**black**  72:25 82:21 86:24 114:3,7 119:13,17 131:25 163:4,5 166:8

**blame**  89:21

**blind**  71:2

**blood**  173:15

**board**  47:1

**body**  123:5 163:15

**bold**  62:23,24 136:9

**bolded**  13:16,20 14:4 15:24 28:9,14 59:5

**bolding**  13:24 14:7

**bolstering**  119:10

**book**  66:19

**bottom**  34:18 76:13 77:2

**bounce**  113:16

**bound**  168:6

**BP**  20:10 60:8 77:5 87:18,24 90:8 174:4,11

**Brady**  147:18

**braids**  114:3,8 119:13

**break**  5:4 15:1 33:7 108:20

**bring**  171:24

**brings**  61:3 162:15 167:1

**broaden**  53:1

**brought**  58:14,15 112:11 144:6 180:1

**budget**  175:4,22

**bullet**  13:10

**C**

**call**  6:4 49:1 101:3 110:18 121:10

**called**  115:17

**calling**  57:4

**calls**  16:8,11,13 30:15 115:5 139:6 141:17 152:2,17 154:19 169:12 170:1,5

**calm**  25:16 126:9

**camera**  123:5

**cancel**  155:18

**candid**  129:5 171:23

**canvassed**  130:15

**capacities**  110:23

**captain**  52:1,4,10 64:13 82:2 148:17 158:3

**car**  42:8,16 43:11,16,18 44:14 45:13,23 47:3 82:23 87:1 116:10 123:24 130:22 132:24 133:2,5,22,25 134:2 167:3

**car.'**  166:11

**care**  176:10

**career**  168:4

**careers**  50:20,22

**carjacked**  20:10 36:5 40:23 60:8 77:5 81:11 83:7 84:14,16 87:25 91:13 132:25 135:5,7 167:22 175:15

**carjacking**  25:24 34:6 51:7 79:2 87:10 88:5,12,13 92:6 136:15 137:10,14,23,24 138:8,16 139:3 141:1 181:23

**carjackings**  175:7

**carry**  54:25

**cars**  43:15

**case**  4:9 21:8 28:16 33:9,13 36:18,23,25 37:4 38:24 40:11, 22 47:10,21 49:25 51:25 59:10 72:3 109:23 113:8 114:10,13 132:23 137:17 143:13 150:14,19,20 151:7 153:18,22 154:12 157:11 162:22 170:8 177:4

**cases**  37:7,25 38:17 49:15,20 110:19 112:2

**cast**  146:13 172:7

**casts**  146:12

**CAT**  175:1

**caught**  132:24 148:11

**caused**  45:3 101:4,12,17 143:18 161:24 162:7 165:1

**causing**  143:20

**cease**  22:13

**cell**  114:18,23 115:3,4,8,12, 19,20,21 116:13 120:21,23,25 121:9 132:6 144:22 169:2,10, 15,18 170:9,11 174:7 179:4,7 180:4 181:15

**Center**  34:19 131:23 152:14 171:1

**certainty**  81:17 134:7,11,14

**chance**  5:3 62:2

**change**  105:16 161:8 162:17, 23 182:15

**changing**  138:25

**characteristics**  164:2

**characterize**  32:8

**charge**  46:24 143:12

**charged**  168:13

**charges**  112:11,12 179:22

**check**  151:23 178:3



checked  20:11 60:9 77:6

checks  63:20 64:2

chest  82:25 87:3

Chevy  20:15 21:14 60:12
82:20 86:24

chew  174:23

choose  6:21 167:15

choosing  8:11

chronological  113:14,17

circuit  36:18,21,23,25 38:13,
24

Circuits  38:1

circular  55:6

circumstances  48:20 74:22
129:17 132:12 136:22 144:6
169:21

citation  65:22,24 66:3,19 67:1

cite  67:9,11 72:19

cites  37:6

citing  38:20

citizens  130:10

city  4:11 170:12 175:8

CIU  97:9

civil  4:15 66:24

clarification  50:7

clarified  70:24

clarify  22:10 93:18 118:6

Clark  36:23 37:12,15

clear  10:9 26:16,19 28:25 45:4
61:19 74:9 75:12 76:3 105:22
107:1 144:14 156:10

cleared  69:11

clerk  129:19 143:17 144:2
145:4,7

close  50:11 164:16

clothes  116:11

cobbling  74:6

coincidence  42:11,14,17
43:21,23

collecting  6:17

college  49:6

combination  173:1

combing  177:22

comment  128:4 137:8

comments  80:23 118:13

Commercial  28:18 33:8 59:9
175:1

commit  63:7 64:23,24 127:5
130:7 182:4

committed  79:15 97:4 179:23

common  42:4 43:9 177:23

commonly  66:10

communicating  138:9

community  49:6

compare  174:13

complaint  20:22 21:4,6

completeness  11:4,8 83:22

complexion  120:13 162:23,25

complicated  106:9

complying  170:14 171:21
172:16

compounded  56:17

computer  139:18

concept  30:22 48:4,18 49:8,10

concern  97:17 146:13

concise  126:11

concluded  182:22

concluding  91:9

conclusion  97:3 102:10

conduct  17:15 44:25 45:2
119:3 165:2 182:15

conducting  10:24 111:14

117:19 128:22 173:10

confess  160:1

Confession  136:9

Confessions  140:16,17

conflating  169:14

confused  7:12 65:13 76:10

confusing  124:5

confusion  18:13

connect  99:11 102:3 106:3

connecting  99:4

connection  99:2 105:1,23
130:22

connects  99:3 107:16

considered  11:11

consistent  26:11 172:3

Constitution  66:13

contact  110:1 118:16 164:5

contacted  28:20 33:16 59:13
152:7,24

contacts  156:19

contained  55:7 81:25 85:22
146:3,8

content  181:18,19

contention  26:16 55:1 56:12
62:4

context  83:24 95:9

continuance  77:13

continue  69:18 168:7 180:17,
25 181:4

continues  21:24 77:9 122:22
168:12

continuing  142:1 180:13

contribute  88:15

contributed  67:13

contributes  99:9

contributing  92:12



**Timothy Dixon, J.D.**
**09/04/2024**                                    6

**controlled** 41:16

**conversation** 27:10 53:14 97:6 108:2 114:23 122:4 181:14

**conversations** 121:13

**cooperate** 172:19

**cooperating** 172:10,17 176:21 177:6

**cooperative** 171:16 172:8,20, 23,24 173:4 176:19

**copies** 39:10

**copy** 5:2 7:5 18:19

**correct** 5:10,23 6:13 7:24 8:2, 5 9:11,17,25 10:10,14 11:2,5, 16,24 12:14 13:2,4,17,21 14:8 15:10 18:6 20:22,25 21:2,5,7, 10,19,22 22:4 23:19,23 25:3 27:22 28:3,5,9,17,21,23 29:2, 14 30:9 34:11 35:9,18,25 36:21 39:3,21 41:5,18 42:2,9 48:2,5,8,11,14,19 51:5 52:1, 12 53:4,16,19,24 54:19 59:21 60:16 66:3,4 67:7 69:15,23 70:17,18 71:5 76:16 79:12 80:10 85:10 89:6 91:20,23,25 94:16 95:3 96:20 97:18 98:15 99:7 101:5 102:9,12,13,21 106:18,22 107:18 108:4 109:4,8 110:15 111:22 112:5 113:22 123:12 127:12 131:14, 16 137:11 138:16 139:4 141:1,6 142:10,21 143:6,17 146:9,20 150:6 157:11 160:17 161:23 162:10 163:10 164:3 165:18,23,25 167:24 168:17 169:3,13 170:7,15,23 171:1,8

**corrected** 160:14

**correctly** 5:8,21 13:14 14:16 20:12,17 21:16 22:1 33:10 36:10 54:12 59:11 60:10 68:3 78:21 79:7 81:22 83:2 87:4 90:14 96:10 166:12

**correlating** 165:9

**corroborate** 54:10 61:12

**corroborating** 128:20

**coulds** 44:12

**counsel** 6:9 8:6 9:12 14:2 16:22 19:1,24 22:5,15,16 24:16,22 25:5 26:5 31:18 32:18 35:14 37:6 46:8 56:18 58:18,25 60:18 62:15,20 80:5, 6 85:14 113:12 118:7 126:9 127:1 137:4,25 141:17 149:23 154:17 155:7,10 159:6

**Counselor** 22:12

**counter** 121:11 144:7

**County** 152:4,18

**couple** 20:5 49:6 54:2 137:5

**coupled** 70:1 72:8

**court** 4:10,14 69:3 108:20 159:13 176:25 177:1,11

**court-appointed** 112:2

**courtesy** 9:14

**covering** 152:10

**crime** 10:18,23 54:25 56:10 63:7 64:24 74:12,19 76:5 81:16 96:24 97:4,11 127:5 130:7,14 133:3 136:17,19,25 137:16 138:10 162:16 170:17, 18 175:15,16 180:15,25 181:2 182:4

**crimes** 50:23

**criminal** 23:21 66:25 92:20 109:17,18,24 110:24 142:21 144:9 150:20 167:17 181:25 182:1

**critical** 94:22 97:17

**criticisms** 147:4

**cross** 157:3

**curiosity** 36:17

**curious** 182:8

**cut** 9:13 17:20,23 18:1 22:13 24:22 57:19 58:24,25 68:23 69:18 160:24

**cutting** 18:2 46:7

**CV** 5:2

---

**D**

**D-I-X-O-N** 4:24

**daily** 48:14

**damages** 176:12

**damn** 176:6

**dangerous** 41:16

**dark-colored** 82:20 86:24

**dark-complected** 163:5

**dash** 165:21

**date** 5:12 7:15 20:21,22 21:4, 6,8 27:25 28:4 35:24 57:16 77:1 113:25 114:15 131:20,21 154:3,10 165:22,25 171:8

**dated** 5:9 27:21 58:12 76:25 154:1

**dates** 33:4 57:1

**day** 25:14 43:4 47:13 49:13, 18,19 50:19 57:24 58:1 76:24 114:8 153:25 160:8 179:5

**days** 34:5 56:11 79:1 87:8 163:5 171:25 174:5

**DDC** 171:7

**dead** 147:5

**deal** 51:3,4

**dealing** 71:10

**dealt** 48:13

**decide** 149:2

**decision** 6:19 7:3

**deeper** 48:18 49:8 50:15

**defect** 44:8 45:9,20,21

**defects** 46:6

**Defendant** 5:18 13:13,17,24 14:13,23,24 15:4,8,9,13,14,15 16:1,2 21:25 22:7,8 23:2,6,8,



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

9,12,15 24:2,5,8 25:2 27:6,8
34:22 35:4 36:2 55:19,20 61:1
68:11 69:5 72:11,15,16,17,21,
24 73:3,7,18 76:16 77:15
78:12 79:3 80:1 81:9,18
87:11,13,21,22 88:19 93:9
94:2,14 95:1 98:11,13 99:23
104:21 105:23 106:11 107:2,
11 109:25 111:25 112:4,8
123:15 124:21 136:14 137:1,
13,17,20 139:1 140:24 177:3,
4

**Defendants** 109:18 113:1

**deficiencies** 95:23 147:11,16

**deficient** 98:2

**definition** 90:20

**delve** 169:21

**delved** 83:21

**demanding** 83:1 87:3

**demonstrably** 122:23

**denied** 32:16

**department** 39:9 65:17,18
67:22 109:7 110:2 111:7
174:18 175:13,23 176:7 179:8

**department's** 66:17

**departments** 8:16

**depending** 112:16

**depends** 49:12,18 50:19
111:16

**depicted** 121:2 122:2 123:18,
21 124:24 131:8

**deposition** 4:8,13 7:23 8:1
17:25 31:22 91:20 112:25
142:19 143:23 144:9,16 145:2
182:22

**Deputy** 7:20 8:4 71:1

**describe** 25:21 26:19 180:10

**describing** 18:5,7 22:3 25:1
26:1,8 27:2,16 35:6,9,10
59:18 60:1,2 80:8 134:5

**description** 114:2,7 117:22
118:4 119:16,17,22,24 120:1,
11,13 163:2

**descriptions** 117:8,9

**destroyed** 173:13 174:15

**detached** 54:8 61:5,10

**detail** 116:25

**details** 34:6 77:20 79:1 87:9
144:5 162:6 163:15 164:22
170:19 171:25

**detective** 5:21 6:5,7,10,12,14,
18,21 7:3 8:11 11:19 14:22
17:4,14 30:2 44:20 45:3,5
47:9 49:16 81:3 82:5,13,16
83:10 85:7,21 86:9,19 88:7,14
92:7 99:3 114:9 121:17 123:8,
14 143:9 161:24 170:21
177:16 178:25 179:3

**detective's** 102:24

**detectives** 6:16 9:5 50:22
70:24 131:11 143:10

**Detention** 34:19 131:22
152:14 171:1

**determination** 97:25 115:14
127:3 130:5 148:2,10

**determinations** 127:22 128:19

**determine** 53:23 115:5 126:22
148:24 178:6

**determines** 150:9

**detract** 86:11

**Detroit** 4:1,11 8:15 11:19
12:13,23 19:14,21 34:19 50:5
65:16 67:11,22 76:8 131:22
132:5 152:14 170:25 175:8,
13,22 176:7

**differently** 141:25

**difficult** 19:5 106:10 109:23

**digital** 18:19 174:14

**direct** 19:10,20 85:14 101:12,
25

**direction** 112:19

**directly** 152:10 167:17

**disagree** 161:15 175:19

**disagreeing** 41:20 103:16

**disagreement** 22:5 84:7 92:16

**disappear** 173:8

**discovered** 177:25

**discovery** 4:8

**discussed** 35:22 56:8 58:11
138:22 146:16,17

**discussion** 118:11 133:5
142:5,6,14,18 159:9

**discussions** 111:6

**dismiss** 154:16

**dismissed** 153:15 177:4

**display** 151:21

**dispute** 93:2

**distinguish** 118:2 122:21

**distinguishing** 164:2,14

**District** 4:10

**Dixon** 4:4,8,18,23,24,25 9:7
14:6 18:4 22:11,14,21 24:21,
25 25:12 27:11 32:13 38:10
39:1 40:19 41:1 43:5 44:6
46:22 58:4 62:1,4,16,22 63:13
77:25 91:19 92:18 99:17,20
100:18,24 109:1 113:15,18
116:5 126:15 129:12 155:14
159:11 160:1 176:4 181:9
182:17

**DNA** 173:15

**document** 11:9,10,16 19:13,
16,19 102:16,23 103:6,9,11,
12 141:10 154:10 165:9

**documented** 29:17 106:3

**documenting** 28:25 29:3,23
30:9,25

**documents** 19:17 29:10 30:7
31:9 51:23 101:25 134:13



**Don** 85:9

**Donald** 7:20,21 8:4

**door** 72:24 73:1 128:15

**double** 71:2

**double-blind** 6:5 8:16 9:22

**doubt** 172:7

**DPD** 10:16,21 74:10 111:20

**drafted** 39:6,10

**draw** 14:11,12,15 88:1,6

**drawing** 14:7

**drew** 51:21

**drinking** 40:23,25 43:7 72:4
  127:19 146:1,7,10 147:15

**driver's** 72:24 73:5 123:17

**drives** 167:3

**driving** 42:1,8,16 44:14 45:13,
  23 47:3 161:20

**drop** 166:5

**dropped** 138:13 141:6,15,16

**dropping** 82:19 86:22

**drove** 87:18,24 133:21,25
  166:4

**drug** 146:11

**drugged** 40:25 41:5 43:8 72:5
  98:25 118:25 127:20 128:12
  146:2,8 147:15 172:11

**drugging** 119:1

**drugs** 47:13 75:3

**drunk** 128:11 164:21

**duly** 4:5

**duties** 147:19

**duty** 38:7 137:16

**Dyke** 87:19 114:21,25

---
**E**
---

**e-trans** 182:20

**earlier** 57:13 138:13 142:8,19
  155:21

**easier** 113:15

**easily** 164:7 174:15

**Eastern** 4:10

**easy** 25:19 154:7

**education** 49:5 50:7 111:10

**educational** 50:9

**effectively** 138:8

**effort** 15:15 130:25

**efforts** 155:2 162:17

**else's** 158:1

**emphasis** 14:7,11,12,15 16:1
  18:9

**employees** 130:9

**encounter** 116:13,25

**end** 5:5,17,25 25:5 37:9 61:6
  82:12 113:16

**enforce** 158:19 159:17

**enforcement** 38:3

**engaged** 79:6 87:17 107:14
  163:9

**engaging** 119:2 164:15

**enlarge** 12:16

**ensure** 64:2 112:14,19 128:7

**entire** 11:24 12:1 13:22,23
  33:17 50:20 88:9 89:1,2
  171:24 175:13

**entirety** 5:4 11:11,16 34:13
  93:8

**entitled** 38:3

**entry** 34:16 58:12

**Envoy** 73:1

**equated** 145:23

**equation** 156:6

**equity** 112:19

**erased** 173:13 174:11

**establish** 38:4

**established** 38:7 96:5,7,8
  109:1 141:24 142:22

**establishing** 92:19 142:9,20

**et al** 4:11

**evanescent** 173:14

**evening** 79:20 88:9

**event** 21:18 75:22 92:2,4
  130:11 163:22

**events** 56:14 79:2 87:10

**eventually** 173:19 174:6

**everything's** 46:25 47:1,5

**evidence** 4:15 9:19 30:4,22,23
  31:5,6,10 38:8 53:8,16 54:10
  55:11 61:12 73:23 75:24 91:2,
  4 94:24 95:1 98:3,5 99:20,21
  100:3,12,24 101:2,12,24
  102:4,16 104:8 115:5,20
  133:1,14 134:5 139:7 141:7
  148:7 153:10,18,19,20 158:25
  159:22 161:9 171:19,20,23
  173:12,14 174:15,20 177:18
  178:8,10,23 180:9,10,20

**exact** 10:22 12:6 57:16,24
  82:6,17 86:7,16,19 132:11

**exam** 153:12 168:6,22 176:18,
  20,24 177:3

**EXAMINATION** 4:17 113:13

**examine** 94:18,19 95:9

**examined** 4:5 95:12

**exception** 26:6,7 92:25 93:4

**excerpts** 84:4

**exchange** 43:15

**exclude** 182:2,10

**excluded** 117:15,16 122:19

**excludes** 120:5

**exclusive** 174:21

**Timothy Dixon, J.D.**
**09/04/2024**

9

exculpate 38:9 119:6

exculpatory 117:15 120:6,10

excuse 15:23 17:24 20:20
27:23 96:18 113:23 114:9
142:25 155:11 159:5 167:2

executed 181:10,11

exhibit 7:7 11:10,16

exist 110:16,22

exited 72:25 82:21 86:23,24
166:9,14

exiting 21:25 23:2

exits 82:20

expect 49:7 50:15 51:11 53:6,
9,10,13,15 141:14

expecting 117:2

experience 32:13,21 49:2,3,19
52:25 53:1 72:6 112:17 168:5

experienced 168:15

expert 16:12,14,15 17:8,10,13
32:23 97:15 113:1 176:13,14

explain 32:7 62:3 80:5,6
103:14 130:12 134:10

explained 153:19 154:14,22

explaining 181:21

explored 115:8 129:13,15
132:23

exposed 72:5 117:12

express 95:11 103:20

expressed 104:12

extent 26:17

extracted 123:2

eyewitness 38:3,14 39:19,25
40:6 41:16 72:2

——————————

**F**

F.2d 37:21

F.3d 37:10

F.4th 37:13

F.4th. 37:16,17

F3d 37:11

face-to-face 60:21

Facebook 132:15 177:15

facial 10:17 67:12,24 68:9,16,
19 69:14,22,24 72:9 76:1,4
77:16 96:15 97:8 105:24
110:13,20,25 126:15

fact 6:2,7 7:3,17 8:12 15:4,5
18:9 23:15 24:5,9 27:1 42:6,
10 43:6 44:12 45:12,22 49:4
56:2 62:7 63:15 65:5,6 68:12
69:6 70:6 73:10 74:5 79:16,19
81:2 84:10,11 88:9 95:6
108:15 115:9 116:13 117:14
118:18,22 119:21 120:1,5,18
124:12 125:8 127:24 128:1,7,
14 129:21 132:17 133:4,21
134:5 138:1 144:17 145:14
146:17 147:21 148:1 149:3,10
153:18 160:10,22 162:2,4,8
163:8 164:5,23 167:12 172:1
177:21 178:7,8 180:23

factor 146:17,18 156:6

facts 139:6 141:7 153:9
171:25 177:18 180:9

factual 175:19

factually 94:24

failed 78:12

fair 11:11 27:7,17 29:20,21,25
36:17 37:5 38:15 41:11,20,23
45:14 63:17 94:11 99:25
110:10 128:23 137:24 141:18,
19 157:9 168:1 170:12

fairly 28:25 158:19 159:17

false 13:9,21 55:23 147:23
148:4,8 149:10 181:2

falsely 44:21

familiar 11:4 36:18 38:10
74:10 135:22,25 180:19

familiarity 37:3

faster 41:2

favor 43:12

features 164:15

February 21:4,11 27:22,23
28:2,5,6,23 34:3,10,17,18,25
35:3,9,22 36:1,9,13 56:9 57:3,
15 58:12 59:24 60:3 70:20,21
73:20 76:24 77:2,10,11 78:24
79:25 87:6 107:9 121:23
131:18

Federal 4:14,15

felonies 51:5

felony 51:5,8,12

felt 34:13 120:18

female 16:21,25 24:1 25:3
36:3 41:9 71:4 78:14,20 79:10
80:9 81:10 82:19,20,22 86:22,
23 87:1 93:10 94:3,6 97:11
99:23 101:5,14 102:3,17
104:10 106:4,11,16 107:16
123:23 126:22 137:9,20,22
139:1 164:18 166:3,4,7,20,21

female's 20:1 166:15

fibers 173:15

figure 65:10,16

file 154:9

files 109:23

final 136:3

finally 154:24 155:20

find 15:15 18:23 49:10 102:8,
10 117:13,21 124:3 127:4
130:15 145:3 151:24 163:21

finder 147:21 148:1

finding 75:23

fine 4:19 18:21,24 40:21 45:7
57:18,20 58:24 79:24 107:22
108:22 160:24 161:15 168:3
172:9

finish 9:12,13 24:16 57:19
69:20 74:3 78:2 149:23,24



finished  42:12 152:13 181:6

firearms  152:12

fit  120:11

fix  179:20 180:2,4

Fletcher  82:5,13,16 86:9,19

Fletcher's  85:21

focus  100:4 119:11 120:17

FOIA  39:8 109:6

folks  24:20

follow  107:7

follow-up  181:8,14

follow-ups  137:5

font  14:7 18:15 28:14 62:24

force  174:25

forget  154:6 166:10

forgets  164:22

forgot  164:23

form  14:7 64:1 115:25 116:2,
22 118:1 119:14 122:5 126:18
139:17 177:17 178:12

formal  112:12

format  182:20

forward  129:9 147:22 148:8
158:12

found  122:11 169:9

foundation  125:23 126:4,19
177:9,17 180:8

four-page  53:7

fourth  36:21,23,25 37:25
38:13,24 82:9

frequented  145:5

frequently  90:6

frequents  145:12

Friday  4:2

friends  132:15

front  11:20,22 25:6 46:14

139:14,24 165:13

frustrated  31:18,20 100:21

full  4:21 17:15 27:7 28:10,13
61:9 82:4 86:2,14 117:20
128:22,23 144:18

fully  24:7 69:25

fun  129:10

fundamental  25:19

fungible  129:25 173:8,12

―――――――――――――

G

gain  76:5

game  62:17

Garcia  147:8

Garrett  147:8

gas  20:10 60:8 77:5 83:11,14
87:18,24 89:4,5,8 98:21
114:25 116:14 120:25 121:9,
11,12 122:4 123:7,9,10,19
130:11 133:18,20,22 142:7,
15,16 143:17 144:2 145:6
174:4,11

gather  169:11 173:6

gathering  168:7

gauged  79:12

gave  114:2 117:23 118:3
119:16 156:24,25

general  11:8 40:3 50:18
111:22 163:22 178:2

generally  14:6 15:20,22 24:6
38:11 51:10 63:4 64:21 65:2,
9,10,12,20,21,23 66:1,7 96:22
103:22 112:1 117:18 121:17
136:21 137:15 138:11 174:23

generate  6:7

generic  112:10

germane  34:14

getaway  167:3

give  32:12 37:6 38:22 43:15
56:19 62:2 72:18 126:6
127:15 134:15 143:10 163:21
165:19 179:4

giving  56:7

God  179:19

gold  20:15 21:14 60:12

good  38:17 64:8 111:14
112:18 125:1 163:18 164:18
174:22

goods  133:2

gotta  58:18 126:10

graduate  111:8

graduated  49:7

grant  87:12

Gratiot  36:5 81:12 82:18 86:21
87:25 166:5

great  11:1,14 56:4 88:23,24

greater  173:11

Greenwald  7:21 8:4 71:1

Greg  108:21

guess  57:18 76:9 100:13
111:18 114:25 126:1 157:25

guessing  39:5 158:2

guilty  23:23

gum  174:23

gun  166:17 167:22

guy  42:7 44:15 163:3

guys  176:18

―――――――――――――

H

hair  120:12 161:22 173:14

halfway  82:9

handgun  20:1 82:25 87:2
166:16

handles  51:12



Timothy Dixon, J.D.
09/04/2024

11

handling 51:12 154:22

hanging 83:5

happen 39:11 50:6 109:10
129:4

happened 42:7,16,18 43:19
50:2,5 62:16 89:3 142:15
150:18 152:21

happy 22:18

hard 136:23 139:17

haves 44:11

head 118:10 162:21,23

hear 39:22 141:25 159:6 179:3

heard 131:15,17 135:23,24
136:2

hearing 176:24

hearings 49:16

helped 135:8

helpful 111:16 112:16

helping 136:24,25

helps 140:25

hey 151:16 171:15 182:9

hiding 116:20

high 49:5

history 23:23

hit 40:10 68:12 69:7,15,17,22,
23 77:16 105:1,24 161:10

hold 98:9 113:22 139:19,21,
22,25 153:15 159:2,7 161:1

holding 122:3

honestly 26:24

Hoover 79:4,5 87:14,15
107:12,13 166:4

hope 52:8 107:25

horse 147:5

hours 22:17 31:23 36:4 81:10
84:14 85:2 91:12 108:19
135:4,10

huge 42:11

humorous 121:14

hundreds 32:15,16

hung 76:9

─────────────

I

ID 70:21 94:12

ID'D 45:12

idea 8:7 42:23 44:1,2 52:10
90:23 98:18 109:15 122:9,24
171:15

identification 26:6 38:4,15
39:19 40:1,5,6 41:8 44:16
45:25 47:7 67:25 68:2,8,13,
16,18,20 69:8 70:1,2 71:15,
18,21 73:21 74:20 75:13,16,
18 77:17 81:20 97:2 98:23
99:6,10,25 101:3,14 102:18
103:10 104:10,15 105:7,25
108:13 128:12 161:11 164:20

identifications 71:23 110:20

identified 10:23 23:6,8 36:3,8
41:23 42:6 43:17,19 44:13
45:22 62:10 71:4,10 73:9
76:15 77:15 78:14 80:21 81:9
96:10,15,16 97:10 104:25
106:15 108:3 132:7 135:13
140:24 161:21 176:13

identifies 47:2 80:17 106:11
138:2

identify 71:13,17 73:12,15,16
74:16,17 76:1 103:7 163:14
164:2

identifying 74:13 79:14 92:25

identity 155:25

IDS 71:19,20

ignore 104:5

image 74:19 89:6

imagine 136:22

immediately 152:3,14 179:9

impartially 158:19 159:17

implicated 167:24

imply 92:3

important 32:6 35:19 40:10
47:18 77:19 92:19 115:3
116:25 120:2,8 127:16
132:16,18,19,21 142:20,23
143:21 169:19 170:19 173:6,
25 174:16

importantly 115:23 116:18

improper 138:5

in-depth 145:9

inaccuracies 93:21 95:2

inaccuracy 94:4

inaccurately 90:16

inactions 30:19

incident 28:1 34:6 75:15 78:7
79:2 85:21 87:10 113:25
119:23 123:9 128:24 144:24
145:4,14 161:25 165:25

include 55:9 76:7 163:8

included 9:10 34:22 36:2 81:8

including 35:4

inclusive 57:11

inconsistencies 93:19 162:4

inconsistent 93:14,18 170:20

incorrect 99:16 140:25

incorrectly 36:9

independent 112:5

indicating 60:25 92:11

indication 65:6 176:20 177:5

indicia 45:11,24 47:6

individual 84:13 90:8 91:12
116:21 117:8,9 122:3 132:14
135:4 154:8 161:19

industry 111:13

inference 88:6



**influence** 41:15 47:12 75:3
118:24 125:11 146:5 162:3
172:18,20 173:1,3

**inform** 54:7 61:4,9 79:11

**information** 6:6 7:14 17:4
23:18 24:11 26:12,22 29:19,
22 41:25 43:24 47:21 53:11,
21 54:1 57:11 62:9,12,15
71:14 74:6 83:8 89:10 90:15,
16 91:6 92:10 98:23 101:9
107:24 114:14 115:18 119:6,
22 125:10,19 127:15,16,17
128:18 129:3,21 133:16
135:13 147:19,24 148:4,9,14
149:10,17 151:12,13 168:7
169:2,11,16,23 170:6,11
172:6 173:6 174:7,17 177:23
181:3 182:11

**informed** 91:5

**inherently** 41:17 72:7

**initial** 85:13,21 114:6,7 116:18
117:22 118:3,13 119:17,22,24
120:1 157:3 170:20

**initially** 116:24 119:5,11
161:21 165:3 166:19 172:4

**innocent** 23:23

**inquiry** 176:25

**instance** 167:21

**instances** 72:19

**instructions** 143:10

**instructor** 111:3

**insulting** 49:11

**Intelligence** 10:18,23 76:5

**intent** 105:6

**intentional** 157:1 172:25

**intentionally** 148:8 155:25
156:7,20,21 160:3,10,13

**interacted** 58:7

**interacting** 88:8

**interaction** 123:23 124:2,18
125:18

**interactions** 74:25 75:7,9
87:21 123:10 130:12

**intercourse** 79:7,12 87:17
88:3 107:15 163:9

**interest** 70:16

**interesting** 39:8 80:13,14
163:12

**interests** 112:8

**interior** 47:12

**interpret** 33:18,21,22 141:21,
24 163:2

**interpretation** 11:17 38:24
62:22 76:12 85:1 91:3 148:1

**interpretations** 147:6

**interpreted** 157:20 180:3

**interpreting** 87:13

**interprets** 87:20,23

**interrogated** 131:11

**interrogation** 131:5

**interrupt** 8:19

**interview** 114:13 127:13 145:9

**interviewed** 114:12 116:19
132:1,4 143:6

**intimate** 117:11 164:1,15

**intoxicated** 42:5 98:24 127:18

**intoxication** 118:25

**investigate** 38:8 54:10 55:12
61:12 66:11 69:25 85:8

**investigated** 115:13 121:18

**investigates** 9:23

**investigating** 24:7 47:4,8
49:17 50:23 96:23 168:7
180:5

**investigation** 6:15 8:8 9:4
17:15 23:14 27:7 28:9,14
29:1,16,24 31:1 32:4 33:5,8
34:14 35:18 46:24 47:4 55:8
56:24 59:5 63:18 64:5,9 78:23
85:22 87:7 92:20 94:1 116:6,

17 117:20 128:23 142:21
144:10,18 165:2 168:12,19
169:7,15 170:15 171:22
173:10 179:16 180:14

**investigations** 64:7,8 110:12
128:21 182:1

**investigative** 70:11,12,15 76:6
83:20 115:4 129:12 177:14,24

**investigator** 75:23

**investigator's** 12:11 20:25
21:1 76:23

**investigators** 65:1

**involuntarily** 41:15 146:2
162:3

**involved** 91:9 97:11 110:11,
12,23 111:5,7 118:4,14
125:17 128:2 135:14 137:18
151:5 162:16 165:4 166:22
167:2,4,6,17,18,25 168:8
177:22 180:15,24 181:2,23

**involvement** 120:7

**involving** 6:3 110:20,25

**irrelevant** 14:1 32:18,19
62:19,20 142:4

**isolate** 11:15

**issue** 23:3,6,8,25 24:1,4 25:3
103:4 122:15 155:3,4,6
158:23 159:20 160:1 165:7

**issued** 35:22

**issues** 24:3 142:13

**item** 11:10 73:8 124:22,24

**items** 151:24

---

## J

**J.D.** 4:4

**jail** 155:18

**January** 20:16 21:15 28:17,20
33:9,13,16,20 56:10 57:2
59:10,13,16,21 60:2,14
113:19,24 114:11 119:23



HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

**Timothy Dixon, J.D.**
**09/04/2024**                                                    13

120:21 123:3 165:23

**Jennie** 157:6

**job** 64:8 96:22 147:1,2 158:18
159:16

**jobs** 146:24 174:22

**Johnson** 113:3

**judge** 25:6 33:23 46:15 52:15
53:15,19 55:16 57:8 59:19
62:13 63:25 64:16 82:2
146:20 148:2,3,24 149:13
153:19 154:13,16 157:1,17
158:8,17 159:14 180:21 182:9

**judge's** 147:1

**judges** 52:16 156:19

**July** 5:9,12

**jump** 5:1,7,16 54:3 77:25

**jurisprudence** 23:22

**justice** 158:17,18 159:15,16

**juvenile** 49:15 50:21

―――――――― K ――――――――

**kind** 54:3 55:6 94:13 110:17
120:5 127:10 147:10,17

**knew** 26:23 47:14 78:20 79:10
94:15 132:20 147:9,12,13,14
157:7 158:25 159:23 180:6,14

**Knight** 85:9

**knowing** 156:8,12 171:9

**knowledge** 48:24

―――――――― L ――――――――

**labeled** 19:16 21:1

**lack** 98:5 129:24

**lacking** 64:10

**laid** 79:22

**Land** 5:2 9:12 14:1 16:8,11,13,
16,17 17:11,23,24 18:1,25
19:4,7 22:15,22 24:22 25:4,7,

9,15,17 31:12,14,15,17,19,21,
22 32:18,20,24 37:6,11,14,17,
19,22 40:14 46:1,7,12,13,17,
19 56:17 58:18,24 62:19 80:5
85:17,20 93:11,16 96:17
99:18 100:5,9,14,15,16,19,22
102:19 105:10 113:7,12,13
116:1,3,4 117:6 118:5 119:15
122:6 125:25 126:8,13,14,20
129:8,11 133:15 137:3,6,8
138:22 139:6,13,17,21,25
140:3,5,13,16,20 141:7,17,22
142:14 144:1 149:23 150:1,2,
21,24 153:9,11,13,21,24
154:2,4 155:6,9,10,11 157:10
169:24 176:3,9,15 177:2,13,
19 178:13,14,18,19 180:9,11
181:6 182:21

**Land's** 144:14 163:25

**language** 19:23 31:2 72:10
118:10 167:15

**large** 174:17,25

**larger** 12:21 18:15

**Larry** 113:21

**late** 179:21

**laughing** 121:14

**law** 23:24 38:2,17,24 48:8,9,10
49:7 50:12 158:20 159:17
167:10

**Lawrence** 166:2

**lead** 6:6,14,18 7:3 45:2 55:15
69:24,25 70:11,12,15 72:8
75:25 76:6 108:11 122:20
126:16,24 129:22 132:22
143:9,12 177:16 178:16

**leading** 8:8 116:2 119:14
122:5 180:8

**leads** 23:13 124:20 129:13
177:14

**learned** 117:1 120:21 128:21

**leaves** 128:15

**leaving** 77:19 87:18

**led** 9:3 103:7,8,9,18

**left** 21:12 82:22 87:1,23 141:5,
15 162:5 170:18

**legal** 4:21 11:8 38:11 97:24
111:10

**legally** 167:16

**lends** 172:23

**letters** 62:23

**letting** 74:3

**level** 49:19 124:19

**Lewis** 62:18

**liability** 66:25

**licensed** 11:2 48:16

**lies** 83:9

**light** 163:1 180:1

**light-complected** 163:4

**lights** 139:22

**limited** 100:24 175:17

**lines** 20:5 60:6 86:17

**lineup** 7:5 10:19 34:20,22 35:4
36:1 42:15 44:25 47:16 70:17
71:19,20 73:25 81:8 84:20
112:14 171:1,8,10,13,15

**lineups** 10:24 71:24 111:14,20

**link** 101:4,13

**linked** 10:17

**links** 104:9

**Liquor** 79:6 87:16 107:14

**list** 151:24

**listed** 112:20 113:5

**listen** 161:17 181:12,16,17

**live** 34:19

**locate** 54:9,21 61:11 130:4

**located** 79:5 87:14,19 107:13

**locating** 96:24 139:10

**location** 20:11 56:13 60:9 77:6



83:12,15 88:17 92:13 114:18,
20 115:10 125:15 130:14
134:1

**locations**  75:24 169:12

**logical**  134:4 182:7

**long**  5:9,11 39:15 162:20

**longer**  31:24

**looked**  54:14 134:12

**loop**  173:18 174:5

**lot**  13:13 15:11 16:6,20,25
20:15 21:15 31:23 41:2 58:11
60:13 71:23 72:21 76:20 79:6
87:16 104:21 107:14 112:18
118:7,8 119:9 121:21 130:16
134:12 147:4,5 172:2 181:18

**lots**  162:6

**love**  25:7,8

---

### M

**M-O-N-R-O-E**  4:24

**made**  7:3 15:14,17 20:10
30:14,15 42:20,21 54:9 60:9
61:11 77:5 81:19 104:18,25
105:3,23 115:5,6,18 121:22,
23 127:22 131:1,22 152:2,17
161:8 169:12 170:1,5,19

**magistrate**  34:9,24 35:8 54:8
58:6 61:5,10 63:25 134:8
153:5 154:13,21

**make**  12:20 50:18 66:19 76:22
86:5 97:2,24 104:19 111:21
113:15 115:14 127:2 130:5
139:20 148:2 155:1,15,24
160:3 165:16 168:10 174:9
178:10,25 179:2,11,15 180:6,
22,23 181:24

**makes**  6:18 41:19 81:3 95:24
134:23 135:14 179:15 182:8,
13,16

**making**  46:25 96:2 99:12
121:25 128:19

**male**  41:24 42:7,15 43:22
44:13 45:1,12,22 47:2 72:25
73:4 82:21,24 86:24 87:2
114:3,8 119:8,10,11,12,13,17,
18 120:5 123:16,23 131:3
143:1 166:9,15,16

**males**  20:1

**Malibu**  20:15 21:14 22:1 23:3
60:12 72:25

**man**  58:19 75:2

**managing**  121:12

**mandatory**  152:12

**manner**  169:18 171:5

**manual**  67:22

**marked**  7:7

**Market**  79:5 87:14 107:13

**marks**  117:12

**Maryland**  11:6 36:21 51:6
151:4

**material**  30:8 40:9 47:17 114:1
181:18

**materially**  81:21

**materials**  10:7 30:21 36:11
38:19 52:22 80:20,25 83:4
89:20 94:18,19 101:15
112:20,22 179:6

**matter**  5:8 42:11 57:25 84:10
111:9 113:19 119:21 133:21
160:10 163:5

**mattered**  145:21

**matters**  145:17

**means**  15:25 50:12 65:21
143:19 164:17

**meant**  68:17,20,21 69:22
105:17,19

**media**  177:22

**medical**  47:12

**meet**  43:13 54:16,18,21 55:2
62:8

**meeting**  176:1

**members**  132:4

**memory**  131:14,15 172:9,10
181:20

**mention**  65:7 78:12,19 79:10
114:20 116:23 118:14 119:4
120:2 121:7,21 133:8 144:5
163:11 164:24 165:3,4

**mentioned**  10:3 55:18 114:18,
19,20 115:1 118:7 123:14
142:14,25 144:4 163:7 169:8
178:6,24 179:11

**mentioning**  65:9

**mentions**  56:14 58:13 118:15,
18 133:10

**mere**  45:22 135:23,25

**message**  137:22

**messages**  115:6

**met**  54:9 55:17 56:1 61:5,6,10,
17 62:6 71:16 79:3 80:1 87:11
107:2,11 147:14 152:22

**metropolitan**  174:18,25

**Michigan**  4:1,10 10:10 11:7
51:8 53:20 151:4,7

**Michigan's**  11:6

**middle**  28:7 34:17 59:6 82:4

**Mile**  166:3

**Miller**  154:8

**mind**  63:9 71:18 125:13
127:14 145:12 158:1 161:8

**mindset**  32:7 105:6

**mine**  50:11 158:23 159:21

**minute**  153:14 159:2 160:2
163:22

**minutes**  152:16,18

**mis-counting**  89:12

**mischaracterizes**  133:13

**mischaracterizing**  91:17
106:6



misdescription 120:19

misinformation 151:12

mislead 125:21 155:25

misleading 11:15 13:9,21
14:17,21 15:10 16:23 24:14
26:17 27:1 55:24 56:16 88:21
91:17 98:8 124:18 134:8
147:23 148:4,9 149:10 151:13
181:3

misled 156:14 157:2,7,13,22

misplaced 134:18

misrepresentations 160:4

misrepresents 91:5

missed 177:4

missing 128:6

mistake 148:7

mistaken 71:25 103:14 114:5,
17

misunderstand 76:21

misunderstanding 6:9 103:5

misunderstandings 107:6

moment 69:1 77:12 78:8
104:6 142:12 159:3,7

Monroe 4:23

months 56:2 152:23 156:17
160:16 164:6,10

morning 152:11

mother 99:12

mother's 28:21 33:17 59:14

motivation 100:25

motivations 100:13

motive 99:12,15 100:1 101:9
103:18 105:4 156:4 179:9
180:13,16 181:3

mouth 67:3,4

move 4:25 10:3 103:13

moving 170:11

mugshot 10:22

mugshots 10:12

multiple 72:14 84:14 91:12
135:4 138:17

mutually 174:21

---

**N**

nailed 118:9

named 79:4 80:2,9 87:14 97:4
99:2 107:3,12 131:15,17
132:10

names 73:16 109:17

narrative 40:17 77:10 165:17

narrow 8:20 9:16

nauseam 146:16

navigate 19:6

necessarily 34:12 125:11
158:24 159:21 168:20,23

needed 163:13

negates 147:10

negative 41:19

neighboring 156:3

neutral 54:8 61:4,9

Ng 36:23 37:12,15

nice 176:1

night 40:23 83:6 123:3,9
127:18 144:24 164:25

noise 159:6

Nonetheless 5:18

north 82:18 86:21

note 154:12 169:25

noted 67:17

notes 67:18 153:18,22

noticeable 164:7

noticed 117:5 166:7

notified 155:2

notify 155:2

notion 48:10

null 147:17

number 4:9 12:6 21:9 28:21
33:17 50:11 59:14 84:13
91:11 102:15 121:6 127:23
135:3 181:12

numbers 151:22

---

**O**

oath 4:6 156:24 181:1

object 85:17 115:25 116:2,22
118:1 126:4

objection 14:1 16:8 17:11
46:1 62:19 119:14 122:5
125:22 126:2,12,18 133:13
139:6 176:8,11 177:8,9,17
178:12 180:8

objections 126:7 176:12

objectively 63:3 101:21
121:16 129:14 143:3 169:20

observations 83:10

observe 14:24 15:13 16:2

observed 13:12,16,24 14:12,
16,18,21,23 15:2,3,4,7,8,23,
24 16:1,5,20,24 20:14 21:24
23:1,25 27:5 55:19 56:8 57:14
58:9 60:12 72:14,15,17,20,23
73:4,8,13,14 87:20 91:8 93:3
96:7 98:12 104:20 123:16
124:17,22 125:16 142:7
144:24

observing 60:15 160:20
164:13

obstructive 31:24

obtain 173:12 180:20 181:22

obtained 34:4 78:24 87:7

obtaining 75:15,17

OCA 165:21

occasion 148:7 170:23 172:7

**Timothy Dixon, J.D.**
**09/04/2024**                                                  16

occasions 125:17

occur 83:11 119:2

occurred 21:18 56:10 60:15
83:13,15 88:17 92:13 113:19
115:15 119:23 124:4,10
130:14 133:19 142:8,16

occurrence 74:13

offense 130:24

offer 75:25

offered 37:9

office 154:9 168:3 179:13

officer 6:2,25 7:16,19,23 8:22
9:9,23 14:17,22 17:9 18:4,11,
18 22:25 24:15,25 25:21 26:1,
7,9,18 27:2,15 28:16 32:2,5,
13,21 33:4 34:8 38:3,7,14
39:5,13,15,23 40:4,22 41:4,7
42:13 44:25 45:6 46:23 47:9
48:1,19 49:2,4,23 50:4,9,16
51:15,25 52:3 53:11,13 54:15
55:16 56:6,12,23 58:5 60:20
61:16 62:5,22 63:3,4,14,25
65:6 76:8,14 78:19 79:11,14
80:18 85:13 87:12,20,23
88:18 89:11,14,24 90:14,16
91:4 92:8,10 93:2,9 95:24
96:2,21 98:17 99:22 101:4,13,
21,22 102:6 103:7,15 104:6,
11 105:22 106:10,15 107:16,
19 108:5 109:3,23 110:7,12,
14 115:2,7,12 118:15 121:19
122:19 124:6 127:2 128:6
132:22 134:4 135:11 138:1
140:23 143:1,5,16,23 145:6,
17 146:6,19 147:13,18 148:13
149:6,19 150:6,8,10 151:1,19
152:2,6,11,16,22 153:4 154:8
155:16,22,24 156:7,11 157:20
158:6,9,22,25 159:19,23
160:3 162:7,16 163:8 165:1,
17 168:2,15 169:3,6 170:22
173:10 175:12 177:21 178:9
180:13 181:21 182:6

officer's 49:22 99:15

officers 24:10,18 45:10 48:24

49:11 50:8,22,24 63:19,22
64:8 65:2 66:11,20 85:9
112:3,6 114:6 116:19,24
123:6 127:13 131:25 132:2,3,
4,22 170:21 172:3 175:1
179:7

offices 51:3

oftentimes 43:14

OIC 28:18 33:8 34:3 59:9
78:24 87:7 114:9,12 117:7
126:21 127:9

older 120:17

Oliver 5:19 6:2,10,21,25 8:22
9:9,23 14:17,22 17:4,9,14
18:4 23:1 24:15 25:1,21 26:1,
8,9,18 27:2,15 28:16,18 30:2
32:2,5 33:8 34:3,8 40:22 41:4
44:20,25 47:10 50:4 54:15
55:16 56:6,12,23 58:5 59:9
60:20 61:17 62:5,23 63:14
65:6 76:14 78:12,19,24 79:11
81:18 85:7 87:7,13,20,23
88:7,14,18 89:12,15,24 90:14,
16 91:4 92:8,10 93:2,9 95:24
96:2,21 98:18 99:22 101:4,13,
22 103:7,15 104:6,11 105:23
106:11,15 107:16,19 108:5
114:9,12 115:7 117:7 118:15
121:19 123:8 124:6 126:21
127:2,9 132:22 134:4 135:11
140:23 143:1,5,16 145:6,17
146:6,19 147:10,14 151:19
152:2,7,12,22 155:16,24
156:7,11 157:20 158:6,9,22,
25 159:19,23 160:3 162:7
163:8 169:3,6 170:21,22
177:21 178:25 179:4 181:15,
21

Oliver's 7:23 8:11 11:19
18:11,18 50:9 81:15 123:14
128:6 143:23 152:16 180:13

omission 62:15

omitted 62:12

open 72:24 128:15

operate 52:8 148:12,17

operating 123:25

opine 63:17

opinion 16:12 30:18 89:19
95:11 103:20 136:16 150:13
182:15

opinions 11:2 58:23 75:7

opportunity 42:22 54:25 63:6
64:23 127:5 130:6 135:6,7
182:3

opposed 109:24 150:13

option 149:1 150:5

options 90:13

order 53:24 113:14,17 142:24
178:21

ordinary 121:16 122:10
155:21 182:20

overlooked 140:8

**P**

p.m. 60:13 108:24 182:23

Paddison 4:7,17 9:15 14:3,5
16:9,12,14,18 17:16,24 18:3
19:2,5,11 22:17,20,24 24:24
25:7,11,17,20 31:13,16,19,22
32:1,20 33:1,2 37:8,12,15,18,
20,23,24 40:16,18 46:2,9,10,
13,18,20,21 56:20,21 58:20
59:1 62:21 68:25 69:10 80:7
85:20,23 93:13,17,20 96:18,
19 99:19 100:7,10,11,15,17,
22,23 102:20,22 105:13
108:22,25 113:10 115:25
116:2,22 118:1 119:14 122:5
125:22 126:2,11,18 129:8,9
133:13 137:5,7 139:9,14,19,
23 140:2,4,6,14,19,21,22
141:9,13,18,23 149:25 150:2,
4,22,25 153:11,17,22 154:2,7,
11 155:8,11,13 159:10,25
175:24 176:8,11,22 177:8,17
178:12,16 180:8 181:7 182:17

paged 77:23


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Timothy Dixon, J.D.**
**09/04/2024**

**pages** 5:9,11 12:1,6 13:4

**Paper** 107:5

**paragraph** 26:16 27:1,14 28:7, 11,13,23 33:18 34:3 56:15 59:15,24 60:1,2 76:12 77:8, 13,14 82:4,11 86:2,13,14 89:1,2 93:7 107:9

**paragraphs** 76:17

**paraphrased** 61:6

**Pardon** 116:1

**parked** 166:6,8

**parking** 20:15 21:15 60:13 79:6 87:16 107:14

**part** 54:20 74:2 82:1 113:16 117:21 124:8 128:17 146:11 158:22 159:19

**participated** 77:22 79:20,21 80:22 91:16 92:5 106:20,24 118:18 133:8,11 135:1

**participates** 81:2

**participating** 171:21

**participation** 81:4

**party** 111:17

**passed** 40:25

**passenger** 21:25 23:2

**passenger's** 73:1

**passes** 164:22

**past** 10:3 21:19 53:7 56:5 60:15 138:5

**patience** 19:10

**patronize** 78:2

**PD** 132:5

**PDF** 182:20

**peculiar** 116:9 121:15

**penalty** 66:21

**people** 43:14,16 53:22 66:10, 25 71:23,24 72:1 87:22 94:7 115:13 121:12 125:14 128:20

**people's** 24:19

**perfect** 34:2

**perfectly** 74:9 156:10

**period** 122:10 173:19

**perpetrator** 136:24

**person** 15:14,15 23:13 31:7 43:1,10,18 54:12 55:22 56:3 61:1,14 62:10 63:9,12 64:23 65:4 67:25 71:10,25 73:10,18 76:1 77:22 79:14,15,19 80:22 81:1,15 83:16,17 84:11,14 85:4 88:9,10 91:12,15 92:5 94:6,10,12 95:22 96:14,25 97:8,21 98:2,6,19,21 103:2 106:19,21,24,25 108:4,6,7,15, 16,18 113:20 115:16 116:14 117:13 119:19 120:9,14,16 121:6 122:9 123:10 125:2 127:24,25 129:20 130:1,5,18, 22 131:5 132:8,24 133:22,23 135:4,15,17 137:15 144:22 154:20,23 155:17 156:2,12,15 157:8 163:2,4,5 164:24 177:23 178:7 179:18 182:10

**persona** 88:7 156:18

**personal** 25:16 52:25

**personalized** 94:7

**personally** 14:18 26:18 27:3, 15 58:7 60:20 61:17 62:6,25

**perspective** 95:12 163:6

**phone** 20:1 28:21 30:14 33:17 59:14 82:22,24 87:1,2 114:19, 23 115:3,4,8,12,19,20,21 116:7,9,13 120:21,23,25 121:9 129:20 130:5 132:6 144:6,22 151:19,22 152:2,16 154:19 166:10,15 169:2,10, 11,15,19 170:1,2,4,5,11 174:8 179:4,7 180:5,20 181:15

**phones** 170:9

**photo** 5:20 6:3,5,7,13,17,19, 22,24 7:4,5 8:2,7,9,12,24,25 9:2,3,5,10,22,24 10:19,24

130:9,15 179:25 182:2

**photograph** 5:19 6:11,12,22, 23 7:1 8:23 9:20 10:4,7,17,22

**photographs** 10:13

**photos** 6:18 7:17

**phrase** 16:5,19 107:21 141:25 173:7

**physical** 117:8

**physically** 8:7 143:14

**pick** 43:25 71:23,24 116:15 128:1

**picked** 36:12 42:15,23,24 43:2,3 44:1,3 47:16 77:20 81:15 84:12 88:11 91:11 108:15,18 118:8,9 119:10 134:23 135:2,3 161:20 162:6 166:3

**picking** 42:19 71:25

**picks** 43:10

**pieces** 56:19

**piercings** 164:14

**ping** 170:10

**place** 8:11 32:6 34:14 47:16 53:25 86:16 122:17 124:16 177:8

**places** 6:14 8:8 72:14

**plainly** 44:9

**Plaintiff** 5:19 10:4 17:5 54:9 61:11

**play** 23:11 111:19

**plenty** 64:6

**point** 6:10 17:3,18 30:4 35:3 40:10 50:7 52:11 57:25 68:5,7 76:17 88:23,24 91:2 92:10 94:3 96:13 98:1 101:15,23

**people** 34:22 35:4 36:1,2,13 42:15,18 43:24 44:4,25 73:25 75:2,5 79:18 80:21 81:8,9,14,20 84:19,20 88:11 108:15 111:14 122:18 127:3,21,23,25 128:3, 5,8 130:3 132:6 133:6 134:16, 22 143:8



**Timothy Dixon, J.D.**
**09/04/2024**                                                18

103:11,25 122:22 134:11
146:12 147:16 153:3 161:8
162:15 163:18 164:8

**pointed** 61:18 82:25 87:2

**points** 13:10 142:18

**police** 11:19 12:13,23 19:14,
21 24:10,18 32:13,21 38:13
39:5,9,13,15,23 41:7 42:13
45:5 46:23 48:1,19,24 49:2,4,
11,21,22 50:8,16,21,22,24
51:15 52:3 63:3,4,18 64:5,8
65:1,16,18 66:11,12,17,20
67:2,11,22 74:11,18 75:13
76:8 78:15 90:6 101:21 109:3,
7 110:2,7,12,14 111:6,15,23
118:14 127:13 129:24 132:2
147:2 148:13 149:5,19 150:5,
8,10 151:1 158:3,19 159:17
162:16 168:2,15 172:6,8
173:10 174:18,22,25 175:13,
14,23 176:7,14 178:6 179:8
182:6

**policies** 65:17,19 66:18 67:6

**policing** 15:20 24:7 63:4 64:21
65:15 66:1,7 96:23 97:16
103:22 111:11 117:19 121:18
122:11 178:3

**policy** 10:10,12,16,21 67:11,
23 68:1 70:3,5,6,10,14 74:10
111:6 126:16,24

**poor** 172:10

**Porcha** 4:11 54:11,23 55:25
58:1 61:13 68:1 70:9 130:19,
21 135:16,18 138:2 145:23
156:22 157:8 176:6 177:21
179:4

**portion** 13:19 85:16 86:2

**portions** 14:4

**position** 97:23 158:11 165:20

**positive** 67:24 68:2,8,16,18
71:15,18,21

**positively** 36:3 71:9,13,17
76:15 77:15 81:9

**possession** 133:1,2,4 170:6
174:8

**possibility** 89:14

**possibly** 31:11 54:11 61:13
63:11 156:18 180:15

**posting** 177:15

**potential** 130:16

**pounds** 114:4 119:13

**practical** 156:5

**practice** 11:7 74:11,18 75:13
96:23 111:15,23 117:19
151:3,6

**practices** 15:20 24:7 63:5
64:21 65:3,11,12,14,15,17,18,
23 66:1,8 67:5 97:16 103:22
121:18 122:11 178:3

**practicing** 29:8 50:12

**pregnant** 56:2 117:14 152:23
154:25 156:17 160:16 164:6,
10 177:15,25 180:6

**preliminary** 153:12 168:6,21
176:18,20,23,24

**premise** 64:4

**preparation** 42:21 112:23

**prepare** 8:2,14 9:5 168:8

**prepared** 5:7 6:2 7:15,16 8:4,
13 43:25

**preparing** 7:20 8:7 112:24

**presence** 135:23,25

**present** 6:19 81:16 85:24
111:15 166:20

**presentation** 7:13

**presented** 5:20 52:15

**presenting** 6:16

**preserved** 174:5

**presume** 48:7 53:2 133:24

**presumption** 148:12 149:19

**pretty** 4:25 50:11 80:16

105:22 116:12 144:14 174:22

**previous** 20:23

**previously** 58:10

**Prince** 94:13

**principle** 11:8 40:3

**principles** 38:11 65:3,9,14
96:23 103:22

**print** 154:3

**printed** 154:8,10

**prior** 5:19 6:11,12 10:4 20:10
56:11 60:8 77:5 79:2 84:14,
15,23 87:10 88:11 91:12,22,
25 92:2 106:1 108:19 111:2
121:24 130:11 135:4,10
141:25 142:1,2 144:10,18

**priority** 173:11 174:10

**probable** 38:4,6 39:18,25
40:7,8,9 48:4,11,14,18 49:8
50:16,25 53:23 64:3 70:11
97:21,22 98:5,7 126:25
148:25

**problem** 49:25 50:1 54:20
55:23 61:2 62:11 64:13,14,16
72:12 79:13 83:9 93:13 102:6,
25 105:20 108:8 125:5 127:6
128:18 129:8 137:1,17 140:2
151:16 153:25 155:3

**procedurally** 111:22

**procedure** 4:16 8:15 10:1
111:24

**procedures** 67:6 112:15
176:14

**process** 44:8,19,21 45:9,20,21
46:6 47:14 50:4 51:24 52:2,6
53:20,25

**produced** 20:1 30:7 31:10
82:25 87:2 166:15

**profession** 49:12

**professional** 9:14

**prohibits** 10:16,22



**Timothy Dixon, J.D.**
**09/04/2024**

19

promise 46:15

prompted 9:4 116:16 133:5

proper 74:11,18 112:15

properly 10:1 47:9 67:13
  96:22 115:4

property 83:1 87:3 116:10

proposition 38:1

prosecute 110:19

prosecutes 49:15

prosecuting 50:10 147:8

prosecution 155:2,19

prosecutions 110:24 111:2,4

prosecutor 32:14,22 33:12,19,
  22,23 34:9,24 35:8 39:2 41:7
  42:13 48:7,9,13,17 49:1,6,14,
  21 50:15 51:1,11 52:5,7,10,19
  53:2,3,6,14 55:15 58:6 59:19
  64:15 82:2 83:24 84:1,2 92:18
  97:12,16 109:2 110:8,19
  126:5 146:20 147:4,21,22
  148:23 149:6,7,12 150:5,9,19
  154:15,19 156:25 158:8
  168:16 180:21

prosecutor's 21:8 147:1
  148:10 168:3 179:13

prosecutors 48:23 50:20 51:3,
  15 62:13 148:6,12 151:4
  152:4,7,19,24 156:19 157:17
  158:18 159:15

prosecutors' 51:2

prove 181:22

proven 23:23

provide 7:13 13:8

provided 56:22 91:6 151:18

providing 32:2 33:4 35:16
  37:3

provision 74:10

pull 8:25 9:1 12:9 13:13 16:6,
  20,25 18:13,15 20:15 60:12
  84:3 103:12 104:21 139:9

165:9,13 167:22

pulled 21:14 123:22 139:23

pulling 72:21 73:4 123:16

punishment 66:24

purchased 43:16,18

pure 95:13

purpose 171:11

purposes 4:14 66:6 74:20
  75:12,15,17,21

pursue 174:18

pursued 98:18 121:19 177:16

put 7:4 18:25 24:11 29:18
  35:10,20 46:22 55:13 57:1,6
  62:23 66:14 72:9 78:6 93:10
  95:21 98:7 105:3 117:23
  122:24 125:19 127:3,7 129:1
  130:2 139:12 156:7,11,20
  158:9 160:10 182:12

puts 129:3 148:13 149:20
  179:16

putting 19:8 101:9 105:5
  131:1 133:6 156:13 160:5

---

**Q**

qualified 47:10 75:1 125:12
  126:6 127:9

qualify 128:7

quality 112:17 125:1

question 6:9 7:12 8:18,20,25
  9:7,8,16 10:20 16:17,22
  22:12,21 25:19 27:4,12,19
  29:11 31:9,16,25 32:24 33:6
  36:10 40:11,16 46:3,5,9,12,18
  47:25 52:24 55:6,10,14 58:5
  68:24 69:21 70:3,4,7 78:3
  85:11 91:1 92:16 93:21,23
  94:23 97:20 101:11 103:5
  104:4 106:5,9,14 112:7
  124:20 138:18,25 141:2
  142:11 149:5,21,22,25 150:2,
  3,18 153:2 154:17 157:24
  161:1 162:9 164:11,12,13

167:20 168:25 169:4 170:3
  173:5 174:2 176:17 178:4,20,
  21,24 179:10

questionable 161:11

questioned 115:23

questioning 97:1

questions 36:16 40:15 50:3
  64:20 69:19 92:9 137:4
  138:17 144:14,21 145:25
  161:18,25 162:7 164:4 176:16
  178:5

quick 5:5 20:19 33:7 137:5
  161:1 163:21 176:17

quickly 5:1

quote 38:2 81:7 123:15 124:21

quoting 38:6,17 81:12

---

**R**

raised 161:23

ran 62:17 139:8

random 43:18

rank 132:3

Ravens 62:17

Ray 62:18

re-record 173:19

read 5:21 13:14 14:16 20:8,12,
  17 21:16 22:1 33:3,10,17
  34:1,7,10,25 52:6 54:12
  59:11,14 60:10,20 61:9,22
  64:18 68:3,25 69:2 78:20 79:7
  81:22 83:1,23 84:2 85:16
  86:2,7,10 87:4 96:6 104:23,24
  105:18 106:1 107:1 111:10
  113:1 135:3 136:13 138:21
  139:2 157:6 159:11,12 161:13
  166:12

reading 21:13 23:13 82:14

reads 19:25 21:14 82:5

ready 140:3



**real** 33:7 95:22 146:12 163:21
164:18

**realistically** 90:13

**reality** 68:15

**realize** 154:2 156:1

**realized** 152:14,25 154:25
155:16,20,21 156:16 179:18

**realizing** 154:19

**realtime** 27:16 60:20

**reason** 11:14 36:15 38:14 40:4
55:9 57:1 93:2 98:6 99:8
105:6 108:10 109:6 119:9
172:22 182:9

**reasonable** 63:3 101:21
121:17 129:15 143:3 155:22
169:20 182:7

**reasoning** 158:1

**reasons** 160:13

**recall** 34:6 79:1 87:9 109:10,
17 120:11 131:8 142:17,18
143:2 144:3 163:18 165:5
170:2 181:17,20

**recalls** 20:9 60:7 77:4

**recanting** 96:9

**receive** 5:2

**received** 47:21 53:21 54:1
89:10

**receiving** 115:2

**recess** 108:23

**recitation** 93:3

**recite** 166:25

**reckless** 26:25

**recognition** 10:18 60:21
67:12,24 68:9,17,19 69:14,23,
24 72:9 76:1,4 77:16 96:15
97:8 105:24 110:13,21,25
126:15

**recognized** 56:1 63:11 72:11,
13

**record** 4:7,12,21 29:19,23
30:4,6 69:2 90:7,11 91:3,4
94:24 95:1 99:20,21 100:3,12,
24 101:2,12 102:12 104:25
105:19 108:3 126:12 159:9,12
173:18

**recorded** 174:6,11

**recording** 42:19 75:14 179:3
181:12,13,14

**recordings** 174:4,5

**records** 101:24 110:3 151:18,
19 152:16

**recount** 90:1

**recounting** 88:20 89:15

**recross** 129:10

**reduce** 18:22

**REEXAMINATION** 137:7
176:3 181:7

**reference** 84:8 85:2,4 163:24
165:21

**referenced** 169:24,25

**references** 146:3

**referencing** 11:9 50:8 80:23

**referred** 80:8

**referring** 69:14 76:18 85:14
86:1 93:9 123:5 127:11
134:16,17 173:16

**reflect** 4:7,12

**refused** 179:4 180:4

**reinforce** 164:19

**reject** 149:1

**rejected** 149:3

**related** 94:18,20 152:10

**relating** 115:19

**relationship** 144:23 171:25

**relayed** 90:15,17

**release** 179:9,10 180:4

**released** 179:1,13

**relevance** 126:18 176:8

**relevant** 10:5,6 32:22 34:13
35:17 47:18 59:20 89:3,4
142:9

**reliability** 40:11 41:18 42:6
43:8,12 45:11,25 47:6 118:7,
21 120:19 127:16 146:13
164:19 165:1

**reliable** 41:10,13,20 42:9 43:2
44:16 47:18 54:10 61:12 71:3
72:1,2 97:2 108:1 118:8
125:12 146:18

**rely** 38:3

**relying** 128:18

**remember** 12:5 44:15 68:13
69:8 83:22 110:7 118:10,11,
23 119:16 120:15,22,24
121:2,3,5 123:18,19,21
124:23 131:10,12,20 132:1,2,
6,8,9,11 154:5 181:19

**remembered** 127:24

**remove** 138:1

**removed** 124:25

**removing** 125:2

**rendition** 152:20

**repeat** 10:20 16:22 90:25
173:9

**repeatedly** 161:6

**rephrase** 16:3 22:25 27:14
93:25 101:11 167:20

**replace** 94:2 98:13

**replaced** 95:2

**replied** 136:15 141:11

**report** 5:7,9,14,17 11:18 12:11
13:6 14:3,4,16 18:8,11,14,17
20:25 21:1 23:13 26:4 27:21
28:1 29:18 32:11 42:3 54:2,5
61:3 65:22,24 66:6 67:9,19,
21,24 68:2 70:20 71:6 72:19,
20 76:23 77:23 78:6 79:22



85:21,22 89:8 93:22 94:1,4,
16,22 104:20 112:21,23,24
113:5,6 121:22 124:21 127:1
128:7,10 133:10 134:14,19
136:3 163:17,19 164:25

**reported** 165:22 170:17,18
175:8

**reporter** 69:3 108:20 159:13

**reporting** 83:20 118:17 128:15
129:21 165:17 170:19

**reports** 101:25 113:1,3

**represent** 55:2,5 112:7

**represented** 58:6

**representing** 56:13 111:17,25
112:6

**represents** 112:3

**request** 11:20,24 12:1,13,24
18:18 19:14,15,21 27:25 28:2,
8,12 30:3 35:21 39:9 49:22
51:16,17,18 52:21,23 53:7
54:14 55:7 56:6,22 57:6,10,12
58:21 61:16 62:5 68:5,7 71:12
76:13 77:14 78:13,18 81:7,12,
19,24 82:1,8,12 86:3 93:8
94:22 95:3 97:18,23 101:10
106:12 107:5,17 109:7 115:18
129:2 135:12 140:11,13,14
142:5,6,13 146:3 147:7 149:6
150:8 155:23 165:8 166:24

**requested** 52:3

**requesting** 109:24

**requests** 109:10 110:24

**require** 12:20 30:11 75:8

**required** 127:2 130:25

**requires** 150:13

**resources** 76:8 174:17
175:10,14

**respect** 120:8

**respectful** 126:10

**respects** 94:23

**responded** 123:6 139:4

**responding** 85:13 114:6

**responds** 140:23

**response** 141:3,5

**responses** 31:24

**responsible** 83:24

**rest** 59:14 93:4 94:16

**result** 64:10 65:8

**results** 62:14

**return** 120:24,25 129:20

**returned** 97:9 120:22,23
144:22

**returning** 144:23

**returns** 121:8,9

**reverse** 142:24

**review** 10:9 33:24 52:21
53:10,15 64:1 82:3 114:1
158:3 178:9

**reviewed** 7:23 10:21 32:15
36:11 44:24 51:24 57:8,24
58:1 60:23,24 83:4 104:9
110:23 112:21,22 121:24
126:5 143:23 151:18,25
157:16,17 179:6

**reviewing** 123:19

**rewrite** 17:8

**rewritten** 16:24

**right-hand** 86:17

**rights** 24:19

**robbed** 113:24 115:9 120:14
133:20 134:1,25 135:8 167:6,
22

**robber** 133:24,25

**robberies** 49:17

**robbery** 77:22 79:15,21 80:22
81:2,4 83:12,15 84:17,23,24
85:7,10 88:16,17,20 91:16
92:12 98:20 106:20,24
108:16,19 118:19 121:8 123:3

124:4,9,15 133:9,11,19 134:5,
6 135:1 142:8,16 165:5
166:20,22 167:3,4,7 169:19

**role** 109:1 111:2,19

**rubber** 49:21,24 52:16

**rule** 11:4,7,8 83:22

**rules** 4:14,15 15:19,23

**rush** 178:15

---

**S**

**sadly** 148:6

**safeguards** 158:7

**sake** 174:3

**sanctions** 25:13

**sat** 74:4

**scaring** 25:15

**scars** 117:12 163:15 164:3,14

**Schebil** 36:19 37:10

**school** 48:8,9,10 49:5,7 111:8

**screen** 7:6,8 12:10,15 18:22,
25 86:12 139:12,19 165:13,
14,20 166:24

**screenshot** 11:19,23

**scroll** 13:1 20:19 21:12 28:10

**search** 109:13,21 180:19
181:10,25

**seasoned** 48:24

**seat** 21:25 23:2 73:6 123:17

**Secretary** 10:13

**section** 86:16

**secured** 121:11 122:3

**sees** 106:25 135:16

**seized** 115:21

**seizure** 109:13 181:25

**select** 6:25 8:22 9:9

**selected** 9:20



Timothy Dixon, J.D.
09/04/2024                                                22

semantics 23:11

senior 51:25 63:22,25

sense 42:4 43:10 112:10
155:24 156:3 174:9 178:25
179:2,3,11,15 180:7,22,23
181:24 182:13

sentence 24:4 49:16 54:7
68:17 136:12

sentiment 163:22

separate 108:2 152:2,17 171:8

September 4:2

series 56:14

serve 40:7 112:1

serves 131:14,16

set 25:25 167:21

sets 167:6

seven-day 174:4

sex 78:14,19 106:22 108:4,6
116:20 117:3,9 162:5 163:7
164:15,23 172:1

sexual 79:7,12 87:17 88:3
107:15 163:9 164:4

share 139:12

shave 162:20,23

shaved 162:14

she'd 97:2

sheer 42:14 43:21

shepardized 38:18

shootings 49:17

short 120:12

show 6:8 7:5 70:24 72:13
74:12,18 75:14 102:15 125:7
127:25 143:8 152:17 176:17,
19 177:3,11

showed 70:16,23 73:23,25
74:4 132:6

showing 7:6,7 97:1

shown 75:1,4,22 128:8

side 46:15 86:17 166:8

sign 125:18 149:13,16

signature 5:12 13:2

signed 50:10 53:18,24 63:21
64:1 147:9 168:5,21

similar 7:10,17 11:12

simple 22:21 25:18 31:16,25
44:10 46:9,18 104:8 106:5
149:5 150:3 173:17

simply 15:17 18:4 104:5

single 23:22 63:18 65:24 66:3
94:13 150:20

sir 4:18 5:24 7:11 9:17 10:5
12:21 17:17,19,21,25 18:19,
24 20:24 23:8,17,19,21 26:21
27:4,25 29:8,21 30:1,6,11
31:2,6 32:7,11 33:11,21 35:2
37:2 38:16 39:14,22 40:12,21
42:10,17 43:14,23 44:17 45:7
46:4 52:13 55:10 56:25 57:4,
19,23 58:14 60:22 61:8,21,24
63:2,16,21,23 64:4 65:11,25
66:9 67:4,20 68:10,21,23
69:4,12,16,18 70:7,19,23
71:13,22 72:12 74:3 75:20
76:7,17 77:19 79:8 80:14,25
82:7 83:2 84:1,5 86:1,5,11
87:5 88:6,25 89:13 90:10,22
91:21,24 92:1,15 93:6,23
94:9,22 95:4,20 96:12,21
97:15,24 98:16 100:3,7 101:6,
8,11,18,23,24 102:2,13,15,24
103:4,5,14 104:1,4,7,11,14
105:3,11,15 106:6,9 107:4,7
108:14 109:16 110:1 113:11,
20 123:12 126:12 138:14,17,
22 142:11 148:19 149:2,21
150:7,14,18 151:3,14,20,22
152:20 154:3 155:12 157:5,25
158:17 159:2,14 160:7,14,22
161:2,15,17 162:8,11,22
163:20 164:12 166:21 167:19
170:16 171:17 172:13 173:9,
21 174:13 175:18,22,25
176:5,13 181:13

situation 19:9 74:24 75:25
129:15 136:23 141:20 153:20
154:15 164:21 168:9 173:23

situations 151:6 173:2

Siwinski 37:1,20

sixth 36:18 37:25 38:13,24
86:8

Slow 56:18

small 12:15 86:12

smoother 41:2

SNAP 10:10

snapshot 67:22

sober 41:10,14 125:12

social 177:22

solely 68:12 69:6 75:17,20
104:17

sorely 98:23,24

sort 23:14 72:5 119:3

sounds 11:12 74:14 131:21

span 152:17

spark 181:20

speak 119:8 130:4 153:5
154:13

speaking 14:6 51:10 65:20
119:8 123:7 134:18 144:20
150:15 152:3

specific 9:10 19:13 111:18

specifically 17:17

speculate 29:9,12 30:12 35:15
44:7,22,23 45:9,17,19,20
47:22,24 71:8 75:6,10,11
90:19 94:8,21,25 95:5,16
96:21 99:15,17,21 100:2,25
101:8 102:7 109:12,14 110:1
150:12 157:15 158:14 171:6,
7,20 180:16 181:4

speculating 16:15 43:23
44:10 46:6,11 89:11,13
153:13 172:22


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**speculation** 16:8,11,13 89:21 90:21 91:3 95:13 125:22 126:2 141:17 148:19,21 157:14,23 176:22 177:9

**speculative** 125:9

**spell** 4:21

**Spencer** 68:25 104:24 105:18 106:1 159:10 161:13 182:18

**spend** 50:20,22

**spent** 58:10 108:19 119:9

**spoke** 114:17 125:14 144:25 145:3,8 152:15 153:19 154:21 170:22

**spoken** 20:6,8 60:7 77:3 129:25 157:19,22 158:5

**spot** 86:7

**stamp** 12:11 49:21,24 52:16 102:16

**stand** 38:1

**stand-in** 111:21,25

**standpoint** 156:5

**stands** 112:13

**start** 5:6 13:7 18:12 52:25 54:5 86:15 107:10

**started** 86:16

**starts** 19:23 77:8 82:12 107:9

**state** 4:21 10:9,13 13:9 34:21 51:8 127:14 133:19 139:7 158:1 167:10

**stated** 34:5 78:13,25 79:3 80:1 82:13,16,17 85:19 86:9,19,20 87:8,11 107:2,11 114:1 119:12 131:9,10 132:14 146:6 166:2

**statement** 13:20,22,23 15:12, 17 16:23 23:4 27:17 34:4 36:7 49:11 50:18 61:8 78:25 81:13, 15,16,21 84:20,21 85:18 87:7 99:13 105:2,9 134:7,9,11,14, 23 137:12 138:19 153:12 157:24 159:11 162:4 163:23

164:12

**statements** 11:15 13:8 55:18, 24 56:8 57:14 58:9 61:18 81:3,19 85:3 95:24 96:3,4,10 98:14 102:25 104:14 120:20 131:1 146:14 170:20

**states** 4:9 68:1 106:16 124:20 133:3 151:4

**stating** 20:2 86:25 131:12 133:17 166:10

**station** 20:10 60:8 77:5 83:11, 14 87:18,24 89:4,5,8 90:8 98:21 114:25 116:14 121:1,9, 11,12 122:4 123:7,9,11,20 130:11 133:18,21,22 142:7, 15,16 143:17 144:2 145:6 174:4,11

**stayed** 82:5

**steal** 43:14

**step** 112:18 152:8

**steps** 155:17 158:11 160:16 169:17

**stolen** 42:2,8,16 43:11 44:14 45:13,23 47:3 133:1,2 161:20 169:12 170:2

**stop** 17:22 46:7 79:23 158:11

**stops** 142:2

**store** 129:19 130:8,9 139:8

**straight** 181:9

**strange** 121:4

**street** 82:6,17 86:20 134:9 166:9

**streets** 82:18 86:21

**strengthen** 164:19

**stricken** 25:12

**strictly** 67:2

**striking** 124:3

**strip** 134:2

**strong** 111:23

**struck** 116:8

**studied** 48:10 111:9

**subject** 73:4 95:6,7,8 126:6 179:22

**subjected** 66:24

**submit** 97:22 109:3 180:25

**submits** 149:6 150:8

**submitted** 32:14 51:21 52:4, 23 97:14 109:6,11,18 154:5,6 164:9 168:21 180:20

**submitting** 181:2

**substance** 36:7 41:16 72:6 95:17 137:21

**sudden** 156:1

**suggest** 14:17 27:15 40:8 41:8 42:9 44:14 61:17 83:5,8 90:19

**suggested** 43:25 90:18 161:19

**suggesting** 13:20 24:15 27:18 32:21 43:20 50:1,3 55:24 56:15 58:8 60:19 63:1,2 66:9 74:11,14,17,21 75:8,12 76:14 78:18 88:2,8 89:24 92:21 144:12,16 158:21 159:18

**suggestion** 172:9,12

**suggestions** 42:20

**suggestive** 47:14,15 128:3

**suggests** 26:17 27:2 30:5 59:15 62:6 91:14 106:16 171:20

**summary** 78:5

**summation** 30:1

**summoned** 176:25 177:7,11

**supervised** 65:1

**supervising** 111:9

**supervisor** 34:8,23 35:8 59:19 62:13 64:25 146:19 148:23 156:24 158:8

**supervisors** 33:23 157:16

Timothy Dixon, J.D.
09/04/2024

24

**supplemental** 6:17

**supplements** 5:13

**suppose** 112:16

**supposed** 15:18 153:15

**surrounding** 144:5

**surveillance** 173:18

**suspect** 6:15 7:14 15:9 16:21,
25 23:2,7,21 24:1 25:3 40:4
41:9,24 42:7,15 43:22 44:13
45:1,13,22 47:2 68:3 71:4
74:17,19 78:14,20 80:9 93:10
94:3,6 96:24,25 97:11 99:23
101:5,14 102:3,17 104:10
106:4,11,16 107:17 117:17
119:9,10,11,12 120:16 121:8
122:21 123:16 131:3 137:9,
21,22 139:2 143:1 145:15,16,
20,22 152:15,25 155:1 156:1,
9 164:18

**suspected** 41:4 43:7 115:16
146:7 177:21

**suspects** 7:18 182:3

**suspicions** 161:23

**sustain** 38:5

**sworn** 4:5 110:14

**systems** 173:18

---

**T**

**T-I-M-O-T-H-Y** 4:23

**table** 162:9

**tagging** 73:4

**Tahoe** 82:21 86:24 166:8

**takes** 6:6 135:12

**taking** 25:16 73:8 91:19
124:22 125:2 155:23

**talk** 22:15,16 67:15 71:2 145:6
150:20

**talked** 76:20 113:7 143:16
144:2,4,13 157:10 160:7

**talking** 17:22 21:18 44:5 60:14
71:11 129:19 132:8 139:15
140:7,10 142:12 147:12
163:6,12 169:5 173:14 176:18

**tattoos** 117:12 164:14

**taught** 66:11,12,13,21

**technique** 177:24

**technology** 68:9 76:4 110:16,
21,22 111:1

**telling** 29:15,17 33:19,22,23,
25 34:8,23 66:22 97:13
101:20 103:16 125:18

**tells** 33:12

**ten** 5:17,22

**tenure** 109:3

**term** 28:9 94:2 129:24 135:23
136:1 164:1

**terminologies** 167:13

**terms** 31:5 74:13

**terribly** 167:20

**testified** 4:6 8:1 77:12 105:14
108:13,14 126:25 148:20
157:4

**testify** 32:23 53:4 84:1 97:15
126:3

**testimony** 4:12 69:1,11 72:2
93:15 106:1 126:6 160:23
163:25 166:25

**text** 5:25 115:6

**Thankfully** 161:17

**theft** 28:18 33:9 51:5 59:10
175:2

**thefts** 175:7

**thing** 44:10 83:23 88:14 92:3
102:12,24 104:11 105:21
124:3 169:13

**things** 8:9 14:8 18:7,10 24:11
26:18 29:3,12 30:5,8 31:6,7
41:8 47:15,20,23,25 54:2
59:17 66:14 67:15 71:9 76:20

**85:19 97:3 98:7 104:17 106:6**
111:22 114:22 115:15 118:23
119:5 122:22 126:22 127:7
128:21 129:14 130:17 134:3
143:11 156:22,23,24 160:11
164:3 169:3,5,8 172:2 174:14
178:4 179:16,23,25

**thinks** 35:16 59:20 72:4

**thought** 27:24 32:6 35:2 52:2
56:5 58:10 59:8 65:13 101:1
105:22 115:7,11,19 116:8,16,
24 117:4,10 121:6,15 129:14
130:2,16 142:4 143:21 145:8
147:15 160:2,5,18,19,20
169:16,19

**thousands** 32:15,16

**tickets** 51:4

**tie** 99:22

**tied** 102:16

**ties** 103:6

**time** 20:11 23:10 26:10 39:1,5,
23 58:11,22 60:9 77:6 81:14,
16,20 85:6,10,25 88:4,12 92:4
98:20 104:24 113:6 117:2
119:9 130:25 134:2 138:20
145:18 154:10,21 160:18,19
162:15 165:22 166:15,20
168:2,20 174:19,24 175:25

**timeline** 32:3 33:4 35:16 56:7,
23 57:3,4 70:9 92:19 142:9,
20,22

**times** 56:15 93:12 162:14

**timing** 121:21

**Timothy** 4:4,8,23

**today** 5:1 38:21 95:11 106:7
111:11 134:13 142:19 144:11
157:12

**today's** 112:24

**told** 17:14 37:2 40:22 41:4
45:17 62:12,16 85:12 89:16
90:1 114:5 116:11,18 134:2
153:13,14 166:16 171:14



**top** 7:19 12:13,23 19:25 21:13 35:24 62:24 71:11 72:19 76:14 77:13 134:20

**topic** 54:4 58:4

**topical** 111:10

**Torchinsky** 36:25 37:20

**touched** 135:19

**towers** 170:9

**track** 170:9

**traffic** 49:15 50:21 51:4,12

**trained** 24:10,18 48:4

**trainer** 111:3

**training** 67:2 111:8 152:12

**transcript** 7:24 8:1 61:22 143:24 161:17

**traumatic** 72:6 116:12

**traumatized** 172:5

**treated** 69:24 122:20

**trial** 168:8

**Trinidad** 78:15,20 79:4,11,15 80:2,9,17 87:14 93:1 94:11, 12,15,19 95:2,8,22 96:1,10, 12,13,15,16 97:4,9,10 98:14, 18,19,20,22 99:3,4,23 101:4, 13 103:2,8 107:12,20,23 108:4,6 131:13,15,17 132:7, 11,15,17,19

**Trinidad's** 95:22

**trooper** 182:18

**trouble** 139:10

**true** 15:6,12,18 17:6,13 24:12 26:3,14,23 43:4 66:14 71:7 74:8 95:4 96:11,20 97:12 98:10,14,16 104:22 118:22 122:23 124:15 125:20 127:8 129:4 148:18 173:21,22 179:17

**trust** 44:19

**truth** 66:18,20,22 171:24

**truthful** 23:18 26:13 53:13 95:25 96:3,4 98:8 103:1 131:2 135:17 146:15 148:14 149:17 150:16,17 158:10 182:12

**tugged** 123:22

**tugging** 73:5 123:16

**turn** 20:14 34:16 78:11 139:22 179:1

**turns** 147:18

**twofold** 122:14

**tying** 102:24 103:1

**type** 178:10

---

**U**

**umm-hmm** 8:21 40:2 131:24 138:24

**unanimous** 124:13

**uncooperative** 177:12

**understand** 5:8 16:4 24:18 27:4 29:11 30:22 33:6 51:24 55:10 57:5,6 58:23 75:10 83:24 90:25 91:1 93:6,23 121:24 137:19 142:11 146:23 147:18 150:7 157:25 162:11, 25 168:10 169:4 172:5 174:2 182:6,13

**understanding** 11:13 13:19 36:10 48:18 49:8 50:16,25 77:17 78:6

**understood** 59:9

**unintentional** 172:15

**unique** 121:6 151:7

**unit** 10:18 28:19 76:5 111:10 175:1,2

**unit's** 175:4

**United** 4:9

**unknown** 94:10 166:3

**unreliable** 38:15 40:5 41:17 43:3 68:13,19 69:7 70:2 71:3 72:7 77:16 98:24 99:6,24

**101:3** 105:2,9,24 108:2,12 128:12,13,16

**untrue** 160:5

**untrustworthy** 40:6

**untruthful** 158:4 159:1,24

---

**V**

**valuable** 169:16 170:6,10

**Van** 87:19 114:21,25

**vanish** 173:8

**vanished** 173:13

**variables** 112:18

**vehicle** 42:2 73:2 82:21 86:25 119:20 124:1 130:19 131:4 161:20 166:6,9,14

**vehicles** 13:13 16:6,20,25 72:21 104:21

**verifiably** 122:23

**verified** 55:21 60:25 63:5,9 64:22

**verify** 24:5 54:23 62:9 65:3

**verifying** 23:14 74:8 96:24

**versus** 4:11 8:7 11:15 36:19, 23,25 37:10,12,15,20 147:1 174:20

**veteran** 48:24

**victim** 5:20 6:8 39:25 40:22 41:3,23 42:6,14 43:17,19 44:12 45:12,22 47:2 68:14 69:9 70:1,17,23,25 71:3 73:22 74:12,16,18 75:14 77:17 78:13 79:10 83:5 84:20 113:24 114:13,17 117:23 118:9 120:19 125:10 128:11 133:18,20 134:6 136:18 137:9,16 146:1 161:21 163:9 164:7,17 166:2 169:9 176:17, 19

**victim's** 81:13,20 105:1

**victims** 75:22 173:2



**video** 14:19 15:5,14 18:5,8,10
20:11 21:22,24 22:4,8 23:2
24:1 25:22 26:2,4,8,9,10,12,
20 54:12 55:22 56:3,15 57:14,
17,25 58:1,2,15 60:10,17,23,
24 61:1,14,20 62:10 63:10,12
67:25 71:11 72:11,15,23 73:8,
10,24 74:1,5,12 75:14 76:2,16
77:6 79:14 83:14 88:16,21
89:9 92:11 93:3 96:8,9,25
106:25 116:17 120:11,23,24
121:2,4,5 122:2 123:2,7,8,18,
19,21 124:22,24 125:1 130:8
131:3,8,9,12,22 132:12
133:23 135:16,18 144:20,21
145:1 147:13 156:13,15
157:8,21 161:3 174:10

**videos** 75:22 121:24

**view** 18:7 21:21 34:19 42:14
122:9 123:4 127:21,23 131:3

**viewed** 14:18 26:2 27:3 34:21
35:4 36:1 57:17 81:8 123:8
128:5

**viewing** 18:5 26:4,8,9,20
81:14 120:22,24 147:13

**violated** 24:20

**violates** 15:19

**violation** 67:23 70:5,6

**violent** 51:4

**void** 147:17

**voluntarily** 41:15 127:18
146:1 162:3 170:25 171:2

**voluntary** 118:25

---

**W**

**wait** 92:16 153:14 159:2

**walk** 174:23

**Walker** 20:9,14 28:20 33:16
34:4,18,21 35:4 36:1,8,12
41:24 42:1,23 43:2,16 44:1,2
59:13 60:7 68:15 73:2,5,9,22,
23 74:4,25 75:7 77:4,21 78:25
79:3,17,18,25 80:1,8,11,21

81:1,8 82:5,10,13,16,25 84:8,
21 85:12,18,24 86:9,18 87:8,
11,18,22 88:2 89:4,7,15 90:1,
14 91:5,10,18 96:9,14,15
97:1,9 99:5 104:16 105:25
106:22 107:2,11 108:3 117:3
123:11,17,21,24 124:1,4,23
125:3 127:11 128:19 134:21
136:14 137:13 138:9 141:19
143:9 146:1,6 147:14 166:2,6,
10,14,19 170:14,17,18 171:21

**Walker's** 60:12 72:25 73:1
83:1 85:3 87:3 98:23 99:6,10,
24 101:3,14 102:17 103:10
104:10 105:8 108:12 120:13
146:13 169:2 170:5 174:7

**wanted** 14:12,15 34:14 81:5,6
137:3

**wanting** 179:10

**warrant** 11:20,24 12:1,13,24
15:19 17:3,6 18:18 19:14,15,
16,22 23:16 27:9,25 28:2,8,12
30:3 32:6 33:3 34:15 35:10,21
39:18,20,24 49:22 50:11
51:13,16,17 52:12,21,22 53:8,
18,24 54:14 55:7,13 56:6,22
57:7 58:22 60:25 61:16 62:5
64:1 66:14 68:7 71:12 72:9,10
76:13 77:14 78:13,17 81:7,12,
18,24,25 82:8 86:3 91:14 93:8
94:5,9,23 95:3,6,7,8,17,23,24
96:20 97:13,18,23 98:2,8
101:9 102:25 105:4,8 106:12,
17 107:5,17 109:10,24 110:24
115:18,22 117:24,25 118:3
119:25 121:22,25 122:8,13,
15,16,24,25 123:1,14 124:7,
16 125:7,19 126:5 129:1,2,6
131:1 133:7 135:11,12,20
136:4,6 138:22 140:11,12,13,
14 142:5,6,13 144:11,12,18,
19 145:24 146:4,8 147:7,17,
22 148:3,20 149:1,3,6 150:8
154:16 155:23 156:8,12,13,21
161:5 163:10,14 164:9 165:9,
12 166:24 168:5,11,20 178:2
179:1,12,17 180:19 181:10,22
182:9,12

**warrants** 32:15,17 39:2,6,10
51:12 53:3 63:21,22 94:7
109:2,13,19 148:8 151:5
181:25

**watching** 161:3

**Wayne** 152:4,18

**weighed** 114:4,8 119:13

**white** 113:21 132:1 143:2,6
161:19,22 165:14 177:5

**White's** 177:3

**widespread** 65:21

**withhold** 172:6

**witness's** 47:6 127:14

**witnessed** 26:18 27:16

**witnesses** 130:16 173:2

**woman** 16:6 74:6 83:6,9 84:8,
24 85:3,6,10,24 88:2,4 93:1
114:19,20 118:4,14,16,18
120:2 121:7,8 127:19 133:8,
10 135:9 138:7,9 139:2,3
140:23 144:7 145:15,20 162:5
165:4 172:1

**woman's** 145:5

**women** 84:25

**Woodruff** 4:11 6:3,13,24 7:4
8:8,11,23 9:3,24 13:13,17,24
14:13,23,24 15:4,8,9,13,14,16
16:1,2 21:25 22:7,8 23:7,9,10,
12,15 24:2,6,9 25:2,23 26:7
27:6,8 34:23 35:5 36:2,8,12
41:9 42:25 43:3 44:3,5,21
54:11,16,23 55:17,19,20,21,
25 58:2,8 60:21 61:1,6,13,18
62:6,25 63:6,9 64:11,22 68:1,
11 69:6 70:10 71:4,10,16
72:11,15,16,17,22,24 73:3,7,
10,19 76:15 77:15,21 79:4,16,
19 80:1,21 81:1,9 83:11 84:12
87:12,13,21,23 88:19 91:8,9,
15 92:14,25 93:4,9 94:2,14,20
95:1,5,18,21 96:12 98:13
99:4,23 101:5,13 102:3,17
103:2,8 104:9,22 105:8,23
106:4,12,17,19,21,23,25



107:3,12,17,19,22 108:3,7,9,
11 117:1,4,14,25 118:3,13
119:7 120:3,6 122:11,17
123:15 124:11,12,14,17,21
125:4,5,8,16,17 127:8 130:3,
20,21 132:21 133:6 134:23
135:16,18 136:14 137:2,13,
18,20 138:2,6 139:1 140:24
142:25 143:2 145:23 152:4,6,
11,22 154:14,20,24 155:17,25
156:22 157:8 160:15,20 161:4
164:5,10 176:6 177:14,22
179:4 180:14,24 181:1,15,22
182:4

**Woodruff's** 96:1 120:7 153:6
156:7,11 179:7,21

**word** 14:15,21 15:2,3,23,24
51:7 59:5 65:21 67:3,4 69:22
72:13 73:12,13 86:17

**worded** 167:20

**words** 13:16 14:12 35:16
56:25 66:6 68:10 69:4 88:10
142:1 167:16

**work** 18:21 43:11 90:6 100:20
142:24

**working** 50:21,23 115:13
175:12

**works** 42:5 43:8 49:15

**world** 59:20 63:18

**worn** 123:5

**worse** 182:16

**write** 39:18,24 68:15,17,20,21
78:12 179:12

**writes** 21:13 51:16 72:20
81:18 88:10 108:5 125:7

**writing** 28:7 85:18 89:19,23,25
112:23,24

**writings** 80:12

**written** 16:23 17:12 20:21 23:1
28:2,6 67:6,7 73:20 76:23
77:11 113:3

**wrong** 15:1,3 26:24 71:23,25
95:18 154:23 179:17,25 180:2

**wrongfully** 67:1

**wrote** 5:18 17:3,9 22:2 25:2
26:4 30:2 32:5,11 54:7 60:11
61:4 68:21 70:20 72:10 90:14,
16 108:9 113:6 127:1 141:12
156:23 160:18,19 161:5,13

---

### Y

**year** 175:8

**years** 39:13,16,17 48:2 49:1,2,
6,18 50:13 110:8,9,11 114:3

**yellow** 165:15

**yesterday** 5:2

**yield** 68:23

---

### Z

**zoom** 12:17,22 19:2 86:12

# EXHIBIT
# 4

# CHAPTER 117 **Malicious Prosecution**

## M Civ JI 117.01  Malicious Prosecution—Criminal Proceeding

The elements of malicious prosecution are the following:

(a)    a prosecution caused or continued by one person against another

(b)    termination of the proceeding in favor of the person who was prosecuted

(c)    absence of probable cause for initiating or continuing the proceeding

(d)    initiating or continuing the proceeding with malice or a primary purpose other than that of bringing the offender to justice

*Comment*

*Matthews v Blue Cross & Blue Shield*, 456 Mich 365; 572 NW2d 603 (1998); *Drobczyk v Great Lakes Steel Corp*, 367 Mich 318; 116 NW2d 736 (1962); *Rivers v Ex-Cell-O Corp*, 100 Mich App 824; 300 NW2d 420 (1980).

See MCL 600.2907 and *Camaj v S S Kresge Co*, 426 Mich 281; 393 NW2d 875 (1986), for the availability of treble damages where the underlying action was a "straw-party" suit.

*History*

M Civ JI 117.01 was added September 1982.

# EXHIBIT
# 5

**Porcha Woodruff**
**01/12/2024**


UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN – SOUTHEASTERN DIVISION

PORCHA WOODRUFF,

    Plaintiff,

                        Case No. 5:23-cv-11886
                        Hon. Judith E. Levy
vs.

CITY OF DETROIT and LASHAUNTIA OLIVER,

    Defendants.

_____/

DEPOSITION OF PORCHA WOODRUFF

    Taken by counsel for the Defendant, at the law offices of

Ivan L. Land, P.C., located at 25900 Greenfield Road,

Suite 210, Oak Park, Michigan 48237, on Friday, January

12, 2024, commencing at 10:03 a.m.

APPEARANCES:

For the Plaintiff:           IVAN L. LAND SR. (P65879)
                          Law Offices of Ivan L. Land, P.C.
                          25900 Greenfield Road
                          Suite 210
                          Oak Park, Michigan 48237
                          (248) 968-4545
                          Ill4law@aol.com

For the Defendant:          GREGORY B. PADDISON (P75963)
                          City of Detroit Law Department
                          2 Woodward Avenue
                          Suite 500
                          Detroit, Michigan 48226
                          (313) 237-0435
                          paddisong@detroitmi.gov


Reported by:               Megan M. Harder, CER 15895
                          Certified Electronic Reporter



**Porcha Woodruff**
**01/12/2024**                                          **Page 2**

TABLE OF CONTENTS

WITNESS                                                    PAGE

PORCHA WOODRUFF

        Direct Examination by Mr. Paddison          3
        Cross-Examination by Mr. Land               64
        Redirect Examination by Mr. Paddison       106
        Recross-Examination by Mr. Land 132
        Redirect Examination by Mr. Paddison  142

EXHIBITS

        (None)

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Porcha Woodruff
01/12/2024                                              Page 3

1       Oak Park, Michigan

2       Friday, January 12, 2024 - 10:03 a.m.

3                    -    -    -

4       COURT REPORTER:  Can you raise your right hand

5       for me, please.  Thank you.

6            Do you solemnly swear or affirm that the

7       testimony that you're about to give will be the truth, the

8       whole truth, and nothing but the truth?

9            MS. WOODRUFF:  Yes.

10                       PORCHA WOODRUFF,

11       HAVING BEEN CALLED BY THE DEFENDANT AND SWORN:

12            COURT REPORTER:  Thank you.

13                    DIRECT EXAMINATION

14   BY MR. PADDISON:

15   Q   Let the record reflect this is a deposition of Ms. Porcha

16       Woodruff, taken case number 523-CV-11886 until Porcha

17       Woodruff versus City of Detroit, Lashauntia Oliver.  Let

18       the record further reflect that the testimony taken during

19       this deposition may be used for any and all purposes

20       allowable under the Federal Court Rules, Federal Rules of

21       Evidence, and Federal Rules of Civil Procedure.  Good

22       morning, Ms. Woodruff.

23   **A   Good morning.**

24   Q   For the record, could you please state and spell your full

25       legal name.



Porcha Woodruff
01/12/2024                                    Page 4

1  A    Porcha Amya Woodruff.  Porsha, P-O-R-C-H-A.  Amya, A-M-Y-

2       A, Woodruff, W-O-O-D-R-U-F-F.

3  Q    Okay.  And Ms. Woodruff, have you ever had your deposition

4       taken before?

5  A    No.

6  Q    Okay.  I'm sure your attorney probably explained this to

7       you already, but just to go over some ground rules, a

8       deposition is simply a question-and-answer session.  Okay?

9       Where I'll ask you questions, and you respond to them

10      truthfully and accurately to the best of your ability.  As

11      you know, you were just sworn in by the court reporter,

12      which means everything you testify to today is under oath.

13      Do you understand that?

14 A    Yes.

15 Q    Understand that we have a wonderful court reporter here

16      today with us who's taking down everything we say, and in

17      a conversational setting such as this, there's a tendency

18      for people to do things like uh-huh, or uh-uh, shrug our

19      shoulders, or nod our heads.  And as awesome as our court

20      reporter is, it's very difficult for her to take down,

21      okay?  So, try to make sure that all of your responses are

22      verbal.  Good?

23 A    Okay.

24 Q    If you don't understand a question I ask, please feel free

25      to ask me to rephrase the question or in a way that you



1    can understand.  But if you do give me a response, I'm

2    going to assume that you understood my question.  Okay?

**3  A   Okay.**

4  Q   Another thing is, again, in a conversational setting such

5        as this, there may be occasions where you already know

6        what question I'm going to ask before I finish asking it,

7        but just so that we have a clear record, please allow me

8        to finish my question before responding.  Okay?

**9  A   Okay.**

10  Q   There may be occasions during the course of this

11       deposition where your attorney places an objection on the

12       record during this deposition, unless you're instructed

13       otherwise, you're still required to answer the question.

14       Okay?

**15  A   Okay.**

16  Q   I don't anticipate that this deposition will take very

17       long, but if for some reason you need to take a break,

18       that's fine.  Just let your attorney know.  The only thing

19       I would ask is that if I've asked you a question that you

20       respond to that question before we take a break, okay?

**21  A   Okay.**

22  Q   All right.  Ms. Woodruff, the first thing I'd like to do

23       in a deposition such as this is try and speed things up.

24       I like to move quickly.  So, quite some time ago we sent

25       some written questions to your attorney that you probably



Porcha Woodruff
01/12/2024                                    Page 6

1    came in and I don't know if you actually came in or spoke

2    over the phone or whatever but have a take a look at this.

3    It's just the interrogatories --

4              MR. LAND:  It's just the questions you came in

5    and you answered, remember.

6              THE WITNESS:  Okay.

7              MR. LAND:  I sent them to him.  So, he's just

8    making sure that everything's right.

9              DIRECT EXAMINATION (Continuing)

10   BY MR. PADDISON:

11   Q   Do you recall coming in and answering those questions?

12   A   Yes.

13   Q   Okay.  And so my question very simply is there's anything

14       that's changed since the date you answered those questions

15       until now that would require you to change any of those

16       answers?

17   A   Yes --

18   Q   Okay.  And just to be clear for the record, this is in

19       response to interrogatory question number seven?

20   A   Yes.

21   Q   Requesting any and all media, social media outlets that

22       Ms. Woodruff may, or attorney may have spoken with.  And

23       we're adding CNN?

24              MR. LAND:  Again, another CNN.

25              MR. PADDISON:  Okay.  And what was the other



**Porcha Woodruff**
**01/12/2024**                                    **Page 7**

1    one?

2              MR. LAND:  The other ones were, we had already

3    posted it, but it was who?  Chris Cuomo?  No.

4              **THE WITNESS:  I'm not sure who he's with.**

5              MR. LAND:  I'll get you the actual interviewer's

6    names.  Because it was like three CNN you know how they do

7    different segments.

8              MR. PADDISON:  -- right.

9              MR. LAND:  And also, we are, I got to supplement

10   it because we're doing some London interviews as well as

11   someone from Singapore.  I mean, they're all over the

12   place.  So, but I'll get you, I'll supplement that as

13   well, but I'll get you the three CNN names.

14             MR. PADDISON:  Actually, we can go off the

15   record for just a second.

16             (At 10:07 a.m., off-record)

17             (At 10:09 a.m., back on the record)

18             DIRECT EXAMINATION (Continuing)

19   BY MR. PADDISON:

20   Q    Okay.  So, Ms. Woodruff, aside from the media outlets, any

21        other answers in those discovery responses that need to be

22        changed?

23   **A    No.**

24   Q    Okay.  Everything else looks good.

25   **A    Everything else looks good.**



1  Q    All right.  Excellent.  Thanks.

**2  A    Everything looks good.**

3  Q    All right.  And obviously under the Federal Court Rules

4       and your attorney knows this, that if something does

5       change and you need to change those, you let him know.  I

6       just use this as an opportunity to go over it.  Okay?

**7  A    Okay.**

8  Q    All right.  Now, I'll -- you here the complaint that was

9       filed on your behalf and understand that all attorneys do

10       this when they file a complaint, they put in just almost

11       every claim they can think of because they want to cover

12       their rear ends.  Right.  And so, part of our goal during

13       this case, and, and I've spoken briefly with Mr. Land

14       before this deposition started, this case is a little

15       unique in that there's really not a whole lot of

16       discrepancy as far as what happened.  Right.  But there

17       are a couple things I want to try and narrow down and see

18       if we can narrow the issues in this case.  Okay.  So,

19       walking through this and I've got some of my notes here

20       and some of this, again, I'm not trying to put anybody

21       down, we're just trying to narrow issues.  Paragraph 32

22       reads,

23             "Detective Oliver interviewed the male suspect."

24       Do you know the names of the male suspect or the victim?

**25  A    I learned his name.  I think is it Daniel?**



1   Q    Daniel White.  Right.  And then the victim was Mr.

2        Lawrence Walker.  Okay.  And if I get these names mixed

3        up, I apologize.

4   **A    I was given that because I didn't know who it was for a**

5        **very long time --**

6   Q    Right, right.  Okay.  So, paragraph 32 states here,

7             "Detective Oliver interviewed the male suspect who

8        admitted that he knew a female named Trinidad.  I guess

9        it's the street name of the individual he had encountered.

10       But Detective Oliver failed to show the suspect of a

11       photo."

12       Now, I'm looking at this here, and this is I believe you

13       signed a document very similar to this when you were

14       interviewed.

15  **A    I did, yes.**

16  Q    Right.  And this was the interview of the suspect, Daniel,

17       I believe it's, I can't read the middle name, but Daniel

18       White.  And it appears based on this document that the

19       interview was done by Officers Glover and Corporal Gray.

20       Do you see that there?

21  **A    Okay.**

22  Q    Okay.  And you would agree that Officer Oliver's name

23       doesn't appear on that, correct?

24  **A    Correct.**

25  Q    Okay.  Do you have any evidence or anything that you're



**Porcha Woodruff**
**01/12/2024**                                    **Page 10**

1    aware of that supports the allegation that Detective

2    Oliver was the one who interviewed Mr. White?

**3   A    I wouldn't think so.**

4    Q    Okay.  All right.  As I said, I try and move pretty

5         quickly here.  All right.  Paragraph 33, victim.  And that

6         would be, Mr. Walker was shown a six-pack lineup, and this

7         is when we're trying to identify the suspects.

**8   A    Okay.**

9    Q    Victim was shown a six-pack lineup and victim allegedly

10        identified plaintiff Porcha Woodruff as the female who was

11        present when the robbery and carjacking occurred.  Now,

12        the only reason I'm asking about this paragraph, and this

13        is good work by your attorney to put the word allegedly in

14        there.  Right.  But we see here the lineup instructions.

15        You see this?

**16  A    Yes.**

17   Q    And we see it was signed by Mr. Walker, correct?

**18  A    Correct.**

19   Q    Okay.  Let me turn the page here.  And, for the record,

20        and this is a document titled Victim Witness Photographic

21        Lineup Statement, correct?

**22  A    Correct.**

23   Q    All right.  And just for the record, could you read that

24        what's stated here by the statement of the statement of

25        circa --



Porcha Woodruff
01/12/2024                          Page 11

1  A    I picked number two, based on seeing the individual in, is

2       that supposed to be person.

3  Q    If you can't read it, you can't read it.

4  A    All I see is multiple hours to me being carjacked.

5  Q    Okay.  And it does say I picked number two, correct?

6  A    It does.

7  Q    All right.  And on the following photograph, we have the

8       six-pack of photographs, correct?

9  A    Correct.

10 Q    And your photograph is number two, correct?

11 A    Correct.

12 Q    All right.  Now in that paragraph in the complaint where

13      it says allegedly, do you have any reason to believe or

14      any evidence that Mr. Walker did not select you as the

15      person he identified?

16 A    Repeat the question, just to make sure I heard --

17 Q    Certainly.  Okay.  In the complaint, it states victim was

18      shown a six-pack lineup and victim allegedly identified

19      plaintiff Porcha Woodruff as the female who was present

20      when the robbery and carjacking occurred.  Now, after

21      reviewing this statement and the six-pack lineup, do you

22      have any evidence or any reason to believe that Mr. Walker

23      did, did not pick you?

24 A    If I'm assuming the question is correct, I'll answer to

25      the best of my ability.  Based on what I seen and how it



1  was told to me they went off the video.  He also went off

2  the video, but when he was, when he picked the lineup, I

3  know I ended up finding out later that the victim was

4  intoxicated, so I can believe he probably possibly did

5  pick out two or have some type of influence of picking

6  the, the, the lineup out.  I'm not really sure.

7  Q  Okay.  Okay.  Let me ask this.  Do you have any evidence

8     that you're aware of that he picked someone else or that

9     he didn't pick --

10 A  I don't have any evidence, no.

11 Q  Okay.  Okay.  And again, we're just trying to narrow down

12    some of the issues, the actual discrepancies here.  All

13    right.  And the next paragraph here, it states that the

14    photo used in the lineup of plaintiff was from an arrest

15    in Canton, Michigan in 2015.  Is that correct?

16 A  Correct.

17 Q  Okay.  Now, looking at this is, have you ever seen this

18    before?  This is from the Crime Intelligence Unit, it's

19    the real time crime center facial recognition.  Have you

20    ever seen that before?

21 A  I have not.  Okay.

22 Q  Okay.  Now, I'm showing you this because this is the

23    photograph that the facial recognition program, or I guess

24    technology, whatever phrase you want to use, as well as

25    the reviewers matched to the suspect.  Okay.  And if I'm



1   reading this correctly, this is a mugshot from an arrest

2   in 2019, correct?

**3  A   Correct.**

4   Q   Okay.  But the photograph that was included here was from

5       a 2015 arrest?

**6  A   Correct.**

7   Q   Okay.  Now, you would agree, well, let me ask you this,

8       would you agree with me that it would've made more sense

9       to use the photograph from 2019 instead of the photograph

10      from 2015?

**11 A   Yes.**

12  Q   That would seem to --

**13 A   More recent --**

14  Q   Right.  That would seem to make more sense, correct.  Now,

15      I'm going to show you a policy from the Detroit Police

16      Department manual that this was actually developed with

17      the assistance of the ACLU.  Okay?  Do you know what the

18      ACLU is?

**19 A   Yes.**

20  Q   Okay.  And I'm going to hit -- this is section 203.11-43.

**21 A   Okay.**

22  Q   All right.  I'm going to have you take a look at that, the

23      highlighted section there.  Number one, can you read that

24      for the record?

**25 A   When creating a photo or a members shall follow the below**



Porcha Woodruff
01/12/2024                                    Page 14

1     guidelines, do not use a facial recognition derived image.

2  Q  Okay.  In other words, when creating a lineup, the

3     officers are not allowed to use the photo that was matched

4     by the facial recognition software.  Okay?

5  A  Okay.

6  Q  So, does that make sense to you?  Now, why instead of

7     using the arrest photo from 2019, they might have used the

8     arrest photo from 2015.  Does that make sense?

9  A  It makes a little sense, yes.

10 Q  Okay.  Now, moving to paragraph 35, despite having access

11    to plaintiff's current driver's license, it was not used

12    in the photo lineup.  Now, paragraph 35, we get your -- do

13    you still have the same license photograph?

14 A  I do.

15 Q  Do you know when that photograph was taken?

16 A  I think my driver's -- can I see.

17 Q  Yeah, this page I don't have any notes on.  You can go

18    ahead and take it.

19 A  I just wanted to see the expiration it expires.  So, it

20    was issued in 2021.  I believe the issue date is correct

21    as far as the driver's license.

22 Q  So, that would've been good.  Sometimes you get it renewed

23    and you don't have to get it --

24 A  Yeah, I believe, I think, I believe, I got it issued that

25    same day.



Porcha Woodruff
01/12/2024                                    Page 15

1   Q   That's a really good photograph too.

2   **A   Well, almost.  Thank you.**

3   Q   All right.  And so, you would think it would make sense

4       that, that it would use the most recent photograph?

5   **A   The most recent.**

6   Q   Okay.  Well, I'm going to show you here is a document

7       called the Michigan State Police Statewide Network of

8       Agency Photos, acceptable use policy.  Okay?

9   **A   Okay.**

10  Q   And we look, turn to section four, which says, Michigan

11      Department of State Images, driver's license photos, or

12      state ID photographs.

13  **A   Okay.**

14  Q   Under Section A, can you read what it says there?

15  **A   When possible other photographs e.g., criminal mugshot,**

16      **personal photographs should be used rather than MDOS**

17      **images.**

18  Q   Okay.  Now, when I read that, I understand it is, if

19      you've got mugshots, you should use those instead of

20      driver's license photos.

21  **A   Okay.**

22  Q   Is that fair?  Do you agree with that?

23  **A   I agree.**

24  Q   Okay.  So, does that make some sense then?  And part of

25      this also, this is on the side, is I want you to



1    understand that I've spoken with Detective Oliver, and she

2    feels terrible about this happening.  And I understand

3    that you're upset, you spent a day in jail for on

4    suspicions of crime you didn't commit.  I understand why

5    you're upset, but I think at the -- by the end of this,

6    I'm hoping that at least you can understand that Detective

7    Oliver didn't intentionally do anything to harm you or, or

8    anything like that.  And maybe just have a different

9    perspective.  It doesn't mean you don't have a right to be

10   upset, but maybe not with her specifically, I guess is

11   what I'm saying.

**12   A    Okay.**

13   Q    So, does this make sense to you then why the photograph

14        from 2015 would've been used instead of your driver's

15        license photo?

**16   A    It makes a little, to be honest, it makes a little sense.**

17   Q    I'm not asking if you agree with it.

**18   A    I get what you're saying.**

19   Q    Right.

**20   A    It makes sense according to how it's broke down in the**

**21        policy.**

22   Q    Right.  Unofficially, and not that my opinion matters, I

23        think they should use the most recent photograph no matter

24        what.  But that's not what it says.  Right.

**25   A    Right.**


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO      313.567.8100

**Porcha Woodruff**
**01/12/2024**                                    **Page 17**

1  Q    Okay.  All right.  Let's see here.  I told you I'm going

2       to try and move through this fast.

3  **A    You're fine.**

4  Q    All right.  Okay.  Paragraph 54, while being booked, and

5       I'm assuming that means at the Detroit Detention Center.

6  **A    Okay.**

7  Q    Plaintiff disclosed that she was diagnosed with

8       gestational diabetes from her pregnancy.

9  **A    Yes.**

10 Q    All right.  Are you a licensed physician?

11 **A    I am a medical assistant.  I'm currently in school for**

12     **surgical technician.**

13 Q    Okay.  Let me ask you this.  Would you be qualified to

14     testify as an expert to medical diagnoses?

15 **A    I'm not quite sure, but I do have a medical record.**

16 Q    Okay.  So, you've probably got a better idea of what this

17     stuff means than I do.

18 **A    Absolutely.**

19 Q    So, just in your -- in terms of your understanding, what

20     is gestational diabetes?

21 **A    Gestational diabetes occurs when you're in the second to**

22     **third trimester.  It is sugar that can be, I guess, it**

23     **comes from, my son was overweight, so during my pregnancy**

24     **I was having complications.  It gave me different,**

25     **different types of complications while I was pregnant,**



Porcha Woodruff
01/12/2024                           Page 18

1        while I was pregnant with my son.  The gestational

2        diabetes, because of my age range, it made the pregnancy

3        difficult.

4    Q   Okay.  And when were, I guess, when were you diagnosed

5        with the gestational diabetes?

6    A   My second trimester, I believe four months pregnant.

7        Three or four months pregnant.

8    Q   Okay.  Okay.  And I reviewed the body-worn camera footage

9        and the in-car video of the officers that actually came

10       and picked you up and transferred you to DDC.  When you

11       disclosed the gestational diabetes, like, and was that

12       while you were being fingerprinted or where in the --

13   A   When they very first took me in and they asked any

14       medical, do you have any medical conditions, they asked

15       the question.  When you, when they take you in, they make

16       you take your shoestrings out.  They make you give all

17       your items and everything to them.  They ask if you have

18       any medical conditions.

19   Q   Right.  Okay.  Now, was that to the let's just call them

20       jailers?  I don't know their official title, but was that

21       to the jailers at the Detroit Detention Center?

22   A   Absolutely, yes.

23   Q   Okay.

24   A   When I first came in.

25   Q   Okay.  It wasn't the officers that actually arrested you


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO      313.567.8100

Porcha Woodruff
01/12/2024                                    Page 19

1    and brought you in, it was for the people at the DDC?

2  A **No, the officers didn't ask anything besides how many**

3    **months pregnant was I.**

4  Q  Okay.

5  A **-- was the only question they asked, and I told them.**

6  Q  Okay.  And the only reason I'm asking that is because we

7    have the, the Detroit Police Detainee input sheet -- that

8    this filled out by the officers, and you would agree here

9    under medical conditions, they didn't identify anything?

10  A **Absolutely, they --**

11  Q  Okay.  All right.  But that's, again, this is what the

12    arresting officers filled out, not the jailers at the DDC.

13  A **Okay.**

14  Q  All right.  Is that -- okay?  So, that's fair.

15  A **Yes.**

16  Q  Okay.  Paragraph 62, despite knowing that plaintiff, and

17    this is after you'd been interviewed by Detective Oliver

18    and there was one other officer in the room, correct?

19  A **Yes.**

20  Q  Okay.  Do you know who that individual was?

21  A **I'm not sure.  He was -- he's another detective or**

22    **something.  I can't remember his name.**

23  Q  If I told you the name was, it was actually Deputy Donald

24    Greenwald.

25  A **Greenwald.**



Porcha Woodruff
01/12/2024                                Page 20

1    Q    Okay.  Does that sound correct?

2    A    **Greenwald sounds correct.**

3    Q    All right.  And believe it or not, he actually isn't even

4         DPD, he's actually an Oakland County Sheriff.  He's part

5         of a joint task force, oddly enough.

6    A    **Okay.**

7    Q    Okay.  So, we're talking, this is after conversation with

8         Detective Oliver and Deputy Greenwald.  Paragraph 62 says,

9         despite knowing that plaintiff was not involved in the

10        robbery or carjacking, Detective Oliver directed plaintiff

11        back to the holding cell.  Now, I'm going to represent to

12        you that Detective Oliver did in fact realize pretty

13        quickly you were not the right person.

14   A    **Correct.**

15   Q    All right.  Is it your impression or your understanding

16        that a police officer, when they realize that, can just

17        release you on their own?

18   A    **I thought under the impression that I will be taken with**

19        **her and walked out of the cell, not have to go back,**

20        **honestly, because here it is, you know I'm not guilty.**

21        **This isn't me.  I'm not really sure of the protocol or**

22        **what, whatever had to happen.  But seeing that, that was**

23        **the first time I had even been aware of what was going on.**

24        **Hey, this isn't me.  I would've thought I would've walked**

25        **out with the officers once they did the interview.**



**Porcha Woodruff**
**01/12/2024**                              Page 21

1  Q   Right.  Do you have any understandings that's changed

2      about that process since then?

3  **A   I've asked since then.**

4  Q   Okay and what --

5  **A   What the process was.  I'm still kind of unsure because I**

6  **guess DDC has changed some policies or something.  I'm not**

7  **really quite sure.**

8  Q   No, and, and this is not, this is more, again, I promised

9      to Officer Oliver that I would do this.  This is not so

10     much me asking you questions, but I will represent to you

11     and your attorney can certainly disagree if he chooses.

12     But once the warrant is signed, this would've been

13     different if they would've just brought you in for

14     questioning without a warrant.

15 **A   Okay.**

16 Q   But once the warrant's signed, DPD no longer has the

17     authority just to release you on their own.  Okay.  Even

18     the magistrate judge who did your arraignment can't just

19     release you.  Okay.  That has to be approved by the Wayne

20     County Prosecutor's Office.  Did you know that?

21 **A   No.**

22 Q   Okay.  Does it make a little more sense to you now why

23     Detective Oliver might say, hey, you have to go back to

24     your cell?

25 **A   It makes sense.**



1    Q    Okay.  All right.  Now, paragraph 65, plaintiff was

2         released from the Detroit Detention Center at

3         approximately 7:00 PM, is that correct?

4    **A    Yes.**

5    Q    All right.  And I think you were initially arrested, what?

6         It was about seven or eight in the morning?

7    **A    Yes, right before I took my children to school.**

8    Q    Okay.  And this is, I am not trying to, I'm just trying to

9         get a timeline here.

10   **A    No, you're fine.**

11   Q    This was one of the, it's a medical record excerpt that

12        was attached to your complaint from Ascension St. John's.

13        And the earliest time I could find on there from the 16th,

14        was 22:47.

15   **A    Okay.**

16   Q    Okay.  And in military time, that's 10:47 P.M.

17   **A    Okay.**

18   Q    All right.  And I'm curious here, because in the history

19        of present illness, it states here, well go ahead and read

20        the highlighted portion.

21   **A    Patient states that she was pulled out of a lineup and**

22        **wrongfully accused of a crime but was detained from 7:00**

23        **A.M. to about an hour prior to arrival.**

24   Q    Okay.  And so, this is where, I'm just trying to clear

25        this up.  An hour prior to that would've been roughly,



**Porcha Woodruff**
**01/12/2024**                                      **Page 23**

1    looks like 9:45 P.M.  All right.

2  **A**    **Yes.**

3  Q    And you were released at seven?

4  **A**    **I was released at seven.  I didn't get picked up until**

5        **almost an hour later.  When I was picked up, we tried to**

6        **retain, we tried to go and retrieve my phone.  Once we**

7        **tried to retrieve my phone, then I was taken to the --**

8  Q    There we go.  Okay.  All right.  So, while you were, talk

9        to me about what you were experiencing at the Detroit

10       Detention Center.

11 **A**    **Well, when I first got there, like I said, I was trying to**

12       **figure out why I was even there to begin with.  I had no**

13       **idea what was going on.**

14 Q    That's fair.

15 **A**    **Yeah.  I had no idea what was going on.  I was -- it was**

16       **more so like, I was in shock, this can't, this is not real**

17       **because I'm pregnant.  I'm here being accused of**

18       **something.  And then at that point, even with me being**

19       **pregnant, nobody was listening to me.  I was trying to**

20       **find out how to talk to somebody.  I kept at asking the**

21       **guards like, hey, what's going on?  How long do I have to**

22       **be here?  It was, it was a lot of emotions and everything**

23       **going on because I was trying to figure out why am I even**

24       **here?  Just like I spoke to and told the officers when**

25       **they came to the door, why are you guys here?  Why am I**



1    going to jail?  What is going on?  So, ultimately, as I'm

2    going through all those emotions, I'm still thinking about

3    my child, which is first and foremost, because I was eight

4    months pregnant.  And like I stated, I was already having

5    an issue.  My pregnancy was difficult.  So, on top of

6    that, I'm having to deal with something I have no clue

7    about.

8  Q   Right.  Right.

9  A   So, that was the biggest thing for me.  And it's like,

10    okay, nobody's even listening to what I'm saying.

11    Nobody's giving me information about what's going on.  I

12    have no idea what's going on.  Tell me what's going on.

13    So, that was the major thing.  And then on top of that, my

14    child was the ultimate concern.  Even though I could be

15    sitting in here pregnant with my child if nobody even

16    believes what the hell I'm saying.

17  Q   Right.

18  A   So, that was my biggest concern.  And having to go through

19    that and deal with that on top of me trying to maintain my

20    sanity, trying to maintain not going into labor with my

21    child, trying to deal with having contractions.  Because I

22    was having contractions in the hospital, I mean, in the in

23    the, in the detention center, trying to refrain, just

24    trying to, I don't know, keep calm about what's going on

25    with the situation.  Because if someone were, were to put



Porcha Woodruff
01/12/2024                          Page 25

1    you in that type of position as a woman pregnant, what are

2    you thinking?

3  Q  Right.

4  A  What is the thing that's going to come to mind?  It's like

5    I'm sitting here with no idea what the hell is going on

6    and why I'm even here.  So, on top of that, me dealing

7    with that, I'm not knowing what's going on with my health.

8    With the background that I do have, I'm like, I could

9    possibly lose it and lose my child in here.  So, that's

10   what was going on.  And I'm thinking the whole time and

11   the guards, because I'm there as a criminal.  I was

12   disregarded, pregnant and all.

13 Q  Right.  I want just, and I don't mean to interrupt, but I.

14 A  Go ahead.

15 Q  Just sometimes it moves quicker if I can kind of guide

16   where we're going.  So --

17 A  -- go ahead.

18 Q  I watched -- watching the initial arrest at your home and

19   the transport, you're obviously upset.  I mean, you have

20   every right to be upset.

21 A  Upset, emotional, crying.  I went to the -- I'm sorry.

22 Q  Well, and but watching it, it looked to me as though,

23   although you're upset, the officers that were there, they,

24   they, they weren't throwing you to the ground, they

25   weren't doing that stuff.  They handled themselves.  And I



1    think one of them says, look, we don't do the

2    investigation.  We just come and pick people up.  Is that

3    fair?

**4    A    That's fair.**

5    Q    And I, from the car view, I think one of the officers, I

6    think it was Officer McBee, you guys even had a small

7    conversation during the car ride from your house to the

8    DDC.  Is that correct?

**9    A    Asking them why were they taking me to the detention**

**10        center?  Is that the officer that was in the --**

11   Q    I don't know if he was the driver or the passenger --

**12   A    I think it was the passenger.  Because I was like, well,**

**13        what am I going to do?  Why am I even going to the**

**14        detention center?**

15   Q    Right.  And again, you know that at that point you're

16   obviously upset.  But in terms of the contractions and the

17   anxiety, did that start right away?  Or was that more like

18   when you're actually at the jail going, okay, what is

19   really going on here?

**20   A    It was through the whole process because like I said, why**

**21        am I even going and I'm trying to maintain myself.  Like I**

**22        said, I had to, when they came to the door and they were**

**23        telling me like, you have to go with me.  I had to pause**

**24        and take a breath and like get my -- gather myself.**

**25        Because I started crying.  I'm like, what the hell?**



1  Q   Okay.

2  A   **That's why it took me so long to even come back to the**

3      **officers for them to take me.  Because I started crying**

4      **and I'm just talking, as you can see, my mother was on the**

5      **phone during the video.**

6  Q   Right.

7  A   **She's trying to calm me down.  My children are sitting**

8      **there crying.  You know, that was a, that was really what**

9      **kind of pissed me off and made me upset during that**

10     **process because I'm telling you, why are you here at my**

11     **door?  Even though they, I'm not knowing the policy, I'm**

12     **not knowing anything.  I'm just trying to get somebody to**

13     **understand and listen to me.  Excuse me.  I kept telling**

14     **them that.  So, ultimately, I'm thinking, okay, they're**

15     **taking me to the detention center.  And, and that's what I**

16     **told my fiance.  Like, why do I even have to go?**

17 Q   Right.  Right.  And I understand that.  I mean, and look,

18     I want to make this clear.  You have every right to be

19     upset about what happened.  You really do.  But and again,

20     I'm just trying to parse through, and we see these things

21     like you know, you start crying and I watch the video and

22     I'm just being blunt.  I didn't observe you crying at that

23     point in --

24 A   **No.  I went.  I was still in the house when I went to the**

25     **back and as I was getting dressed, then that's what was**



Porcha Woodruff
01/12/2024                              Page 28

1    going on.  Because I was trying to get myself together,

2    getting myself dressed to go with them.  Because my whole

3    thing, I battled my fiance for a while.  I battled my mom.

4    Like, why do I have to go?  Why do I have to go?  This

5    isn't me.  Why should I have to go with them?

6 Q   Right.  Okay.  But if you, just for a moment assume it's

7    true that the officers that actually came to arrest you,

8    that they were truthful when they said, we don't handle

9    the investigation.  We don't do that.  Our job is simply

10    when someone's name appears on a warrant to go pick them

11    up.  Okay.  I want you to assume for the moment that's

12    true.  You can believe me or not believe me.  But assuming

13    that's true, do you have any issues with how the officers

14    that came to your house handled the situation?

15 A   No.  The only issue I had originally was when I kind of

16    had to pull it out of the female officer that came to the

17    door.  Because I kind of had to ask her like, hey, well

18    what's going on?  Well, no, you can step out here.  No,

19    I'm not stepping out anywhere.  Tell me what's going on.

20 Q   Right.  But aside from that, aside from her --

21 A   -- aside, yes.

22 Q   Once she showed you the warrant and everything.

23 A   Yes.

24 Q   Do you have any issues with how they handled themselves?

25 A   I wouldn't say.



Porcha Woodruff
01/12/2024                                    Page 29

1  Q    Okay.  All right.  Paragraph 71.  Plaintiff was discharged

2       from the hospital and instructed to take medication,

3       maintain a healthy, this is after you've been released,

4       gone to the hospital.  Plaintiff was discharged from the

5       hospital and instructed to take medication, maintain a

6       healthy diet, stay hydrated, ensure ample rest to

7       safeguard the wellbeing of her unborn child who was

8       impacted by the situation.  Okay.  And I've, we've sent

9       subpoenas to all of your medical providers, and I think

10      we're waiting on a couple of them, but you've got a

11      medical background.  So, if you could, from a medical

12      standpoint, explain to me how the child was impacted by

13      this.

14  A    **My baby's blood, his blood pressure and heart rate was**

15      **lower.**

16  Q    Okay.

17  A    **So, during that time I was eight months pregnant.  I could**

18      **have went into labor.  That's why the contractions, I**

19      **could have went into labor premature.  Prematurely and had**

20      **him early.**

21  Q    Okay.  So, he had, his blood pressure was low.  Was that

22      just a result of the dehydration or?

23  A    **Dehydration, stress, and the pain that I had been going,**

24      **going through while I was sitting in the DDC.**

25  Q    Okay.  You didn't start having contractions until you were



**Porcha Woodruff**
**01/12/2024**                                           **Page 30**

1          at the DDC, correct?

**2    A    Correct.**

3    Q    Okay.  So, any of the -- and we use these words in the

4          legal community, objective issues where a, a doctor could

5          look at it and it is not just saying I have anxiety.

6          That's not objective.  Right.  My wife's a therapist, so

7          it's like, well, that's just how you feel.  Objective is

8          something you can measure, you can see.

**9    A    Absolutely.**

10   Q    So, objectively, all of the -- any of the medical issues

11         arose while you were at the DDC, correct?

**12   A    Any other additional, yes.**

13   Q    Okay.  And that was as a result of, well, what do you

14         attribute that to being a result of?

**15   A    As far as the -- my baby's, his blood, excuse me, his**

**16         blood pressure and heart rate.**

17   Q    Just basically what, anything, I mean, we get the anxiety

18         of being arrested and I, now, I would imagine if you get

19         arrested, they take you to the DDC, because they normally

20         do arraignments twice a day.  They do them, I believe at

21         11:00 and 3:00.  Is it -- 11:00 and 2:30.  They would've

22         got you in, got you arraigned at 11:00, you're released by

23         12:00.  I'm assuming this, the impact might've been less

24         than having to be there all day.  Is that fair?

**25   A    Possibly.  It possibly could have.  I can't say, I**



1    wouldn't say, I don't know.  I would say --

2  Q   Okay.

3  A   I'm not sure.

4  Q   But at what point did you start having or experiencing

5      objective issues as a result of your time at the DDC?

6  A   I would say from the time that I got there, being there

7      over time, of course increased it.

8  Q   Okay.

9  A   I was going through the motions of, like I said, being

10     there, not knowing what's going on.  And I think the

11     mental state kind of put me in the stress mode.  It

12     triggered different things going to go on with me that I

13     hadn't been experiencing prior to me being there.

14 Q   Right.  And that's fair.  Like my doctor doubles my blood

15     pressure medication anytime I have to go to trial because

16     he knows my anxiety goes up.  Right.

17 A   Absolutely.

18 Q   Right.  And did you report, and I believe you've already

19     said this, and I apologize, I just want to make sure we

20     have a clear record.

21 A   You're fine.

22 Q   I believe you stated that you informed the jailers or the

23     people there at the DDC, hey, this is my issue.  Correct?

24 A   Correct.

25 Q   And did you inform them, hey, I need water, or I need


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO          313.567.8100

1    this.

2  **A    I did before I even went in.**

3  Q    Okay.

4  **A    Yes.**

5  Q    And did, was there any considerations given to that?

6  **A    No.  Truthfully, honest, I was looked at like, hey, you're**

7  **a criminal.  So, they didn't, they disregarded that.**

8  Q    Okay.  Are you aware that the DDC is not operated by the

9    Detroit Police?  It's actually the Michigan Department of

10    Corrections that operates that.  Okay.  And part of it,

11    again, and this is because this case has gotten a lot of

12    attention, our hope is that whether we can, I doubt we're

13    ever going to see eye to eye on everything, but we at

14    least want to have you have an understanding of what's

15    going on.  Okay.

16  **A    Okay.**

17  Q    So, anything that happened while you were at the DDC,

18    that's actually the Michigan Department of Corrections and

19    not the Detroit Police Department.  You weren't aware of

20    that?

21  **A    Okay.  I'm aware now.**

22  Q    Okay.  Now, we're getting into count one.  And this states

23    here in the warrant affidavit, which was, this is before

24    you were arrested, Detective Oliver omitted the fact that

25    plaintiff's facial recognition photo was eight years old.



1      And plaintiff's recent driver's license photo was

2      available.  Detective Oliver, and then the next paragraph,

3      paragraph 84, Detective Oliver deliberately omitted facts

4      because a magistrate would've possibly denied the warrant.

5      Now, we've already learned that the reason why they didn't

6      use your driver's license photo.  Right.  Is that -- we've

7      learned that reason.  Right?  And we also learned why they

8      didn't use your 2019 arrest photo.  Right?

**9   A    Yes.**

10  Q    Okay.  Now, I have you take a look at, where did I put

11       this?  I know I have it somewhere.  Where did I put that

12       document?  I missed one -- give me one moment.  I

13       apologize.  Let me go off the record for a sec.  I got to

14       find something here.

15                 (At 10:39 a.m., off-record)

16                 (At 10:39 a.m., back on the record)

17                 DIRECT EXAMINATION (Continuing)

18  BY MR. PADDISON:

19  Q    We're going back to the six-pack lineup here.  And it

20       actually says the name of who prepared the photo lineup.

21       Do you see that?

**22  A    Officer -- Okay.**

23  Q    What does it say?

**24  A    Deputy Donald --**

25  Q    Greenwald.  Right?



**Porcha Woodruff**
**01/12/2024**                                        **Page 34**

1  A   **Where?**

2  Q   At the top.

3  A   **Okay.**

4  Q   Yep.  So, it was in fact Deputy Greenwald that prepared

5      the photo lineup, not Officer Oliver.  Does that make

6      sense?

7  A   **Okay.**

8  Q   All right.  Do you have any reason to believe that or have

9      any evidence that Officer Oliver knew when that photograph

10     was taken?

11 A   **I don't have any evidence.**

12 Q   Okay.  All right.  It also says here that Detective Oliver

13     deliberately omitted facts because the magistrate would've

14     possibly denied the warrant.  What evidence do you have

15     that she did that intentionally or that she just didn't

16     know?

17             MR. LAND:  Objection, legal, calls for a legal

18     conclusion.

19             MR. PADDISON:  You can answer.  Do you have any?

20             **THE WITNESS:  I don't have, I don't have any --**

21             **DIRECT EXAMINATION (Continuing)**

22 BY MR. PADDISON:

23 Q   Okay.  Now, Detective or excuse me, Officer Oliver and

24     Detective Greenwald had a pretty brief interview with you

25     based on, it looks like the interview started at roughly



**Porcha Woodruff**
**01/12/2024**                                              Page 35

1      3:00 P.M. and it looks as though it concluded at roughly

2      3:25 P.M.

**3    A    Okay.**

4    Q    Is that about right?  Does that seem about right, based on

5         what you remember?

**6    A    Yes.**

7    Q    Okay.  Now, do you happen to know if Detective or Officer

8         Oliver did anything after that interview?

**9    A    No.**

10   Q    Okay.  Lemme show you something here.  It's kind of

11        interesting.  Detective Oliver actually provided us with

12        her phone log.  And I know this isn't that clear, but

13        hopefully you can read the highlighted phone numbers

14        there.  Do you see all those?  I'm asking did you just see

15        where they're highlighted?

**16   A    I see where it's highlighted.**

17   Q    Okay.  And if we look at the times, it looks like the

18        first one is at 15:48.

**19   A    Okay.**

20   Q    Does that make sense?  Does that look right?

**21   A    Yes.**

22   Q    Okay.  And military time, that would be 3:48 P.M.

**23   A    Okay.**

24   Q    All right.  So, that would be roughly about 20 minutes

25        after they finished their interview with you.



Porcha Woodruff
01/12/2024                                         Page 36

1   A   Okay.

2   Q   And now this is, I'm not actually expecting to know the

3       answer to this.  But do you know who all those phone

4       numbers are?

5   A   No.

6   Q   What if I told you those were all phone numbers to the

7       Wayne County Prosecutor's Office?  And that Detective

8       Oliver's going to testify that after real -- the brief

9       interview, she actually called the prosecutor's office and

10      tried to get them to stop the prosecution and get you

11      released.

12  A   Okay.

13  Q   Did you know that?

14  A   No.

15  Q   Okay.  Were you aware that one of Detective -- Officer

16      Oliver's partners actually got ahold of the magistrate

17      judge?  Judge Ashartay -- I think it is.

18  A   Is that the --

19  Q   The arraignment.  The judge that did the arraignment.

20  A   Okay.  That arraigned -- okay.

21  Q   Were you aware that they were actually able to reach the

22      judge who handled the arraignment?

23  A   No.

24  Q   Okay.  And your attorney's going to take the depositions

25      of several officers and DPD, and they will testify that



Porcha Woodruff
01/12/2024                                    Page 37

1    they were able to get ahold of the magistrate and say, we

2    got the wrong person.

3  **A    Okay.**

4  Q    And that the magistrate says, well, I can't just release

5    him.  That's only the prosecutor's office.  And that you

6    were released on a personal bond, correct?

7  **A    I was.  I was.**

8  Q    Okay.  So why, if Detective Oliver was, why would she do

9    that if she was intentionally omitting facts or was just

10    trying to jam you up?

11            MR. LAND:  Objection.  Speculation.  You can,

12    you don't have to.  She doesn't know.

13            MR. PADDISON:  Well, if she doesn't know --

14            MR. LAND:  Objection, speculation.

15            DIRECT EXAMINATION (Continuing)

16  BY MR. PADDISON:

17  Q    Let me ask you this, are you aware of any evidence that

18    would tend to oppose the fact that Detective Oliver

19    actually was trying to get you released?

20  **A    No, I wouldn't.  My only question if I'm able to ask.**

21  Q    Absolutely.

22  **A    When I was arraigned the, they ended up only changing the**

23  **personal -- they changed the -- changed from a cash to a**

24  **personal because the prosecutor told her that I was**

25  **pregnant and they wanted to also give me a tether, because**



Porcha Woodruff
01/12/2024                              Page 38

1    as she was looking, she was looking at the record of me

2    being arrested for armed robbery.  She wanted to the

3    magistrate wanted to put me on a tether.

4  Q   The magistrate did?

5  A   She was going to put me on a tether.

6  Q   Really and --

7  A   She was going to put me on a tether.

8  Q   And that was at the request of the prosecutor's office?

9  A   No, it wasn't at the request as they were going through,

10    and she was trying to get the hundred thousand dollars

11    cash, originally, cash bond.  Once the prosecutor notified

12    her, hey, she's pregnant, can we get a personal bond?  She

13    was additionally going to add on me being on tether

14    because I was pregnant.  And I guess, I would've been a

15    risk.

16 Q   A flight risk.

17 A   Because I'm getting out -- because of posting a personal

18    bond.

19 Q   Okay.  But you didn't end up having to do a tether?

20 A   She didn't do a tether.  When the prosecutor --

21 Q   Okay.  So, moving forward here, paragraph 108, the arrest

22    and imprisonment of were unlawful.  As Detective Oliver

23    was aware, the plaintiff had not committed the crime

24    alleged prior to plaintiff's arraignment.  That's true.

25    And Detective Oliver failed to take any actions to have



**Porcha Woodruff**
**01/12/2024**                                          Page 39

1  plaintiff released.  Now, assuming that what I'm

2  representing with these phone records are true, does that

3  sound like that might be a misstatement.

4          MR. LAND:  Objection calls for speculation.

5          MR. PADDISON:  You can answer.

**6          THE WITNESS:  I'm not sure.**

7          MR. PADDISON:  Well, let me ask you this.

8  Assuming that these were all calls Detective Oliver made

9  to the Wayne County Prosecutor's Office to try and say,

10  hey, we've got the wrong person, is it fair to say that

11  she failed to take any action to have you released?

12          MR. LAND:  Objection calls for speculation.

13          MR. PADDISON:  You can answer.

**14          THE WITNESS:  I'm not sure.**

15          MR. PADDISON:  So, well, let me ask this.  How,

16  wouldn't that be an attempt to have you released by

17  calling the prosecutor's office and telling them they have

18  the wrong person?

19          MR. LAND:  Objection.  She doesn't --

**20          THE WITNESS:  I'm not, I have no clue what the**

**21  phone calls even --**

22          MR. PADDISON:  Right, I'm asking --

**23          THE WITNESS:  Okay.**

24          MR. PADDISON:  If assuming that's true, that she

25  did call the Wayne County Prosecutor's Office as it's


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO  313.567.8100

1   suggested by these phone records, what evidence, wouldn't

2   that be an attempt to get you released?

3          MR. LAND:  Objection.  She doesn't know what the

4   conversation with the Wayne County Prosecutor's Office

5   was.

6          MR. PADDISON:  Unfortunately, they were all

7   messages.  You'll notice they were all one-minute phone

8   calls.  But if that's true, if she was trying to do that,

9   then she did take a step to try and get you released,

10  didn't she?

**11          THE WITNESS:  I can only assume.  I would assume**

**12  that --**

13         MR. LAND:  She doesn't know.  Objection.  Calls

14  for speculation.  She doesn't know what those phone calls

15  were.

16         MR. PADDISON:  Okay.  Okay.  All right.  Let's

17  assume this, assuming if Officer Oliver made phone calls

18  to the prosecutor's office, that would be an attempt to

19  have you released.  Correct.  Is that a yes?

**20          THE WITNESS:  I would say that, that is**

**21  possible.**

22         MR. PADDISON:  Okay.  Okay.

23         MR. LAND:  Counsel, how much time do you have?

24         MR. PADDISON:  Not a lot.

25         MR. LAND:  Okay.



Porcha Woodruff
01/12/2024                                    Page 41

1        MR. PADDISON:  I mean, hopefully.

2        MR. LAND:  All right.

3        MR. PADDISON:  So, let's see how much of this

4    we, we agree on.  All right.  We, we agree that there was

5    a carjacking, correct?

6        **THE WITNESS:  There was.**

7        MR. PADDISON:  And we agree there was a

8    female suspect --

9        MR. LAND:  Objection calls for speculation.  How

10   would she know?

11       MR. PADDISON:  Well, I'm assuming she

12   understands the background facts of the case.  Well, let

13   me ask you this.  What do you know about the underlying

14   criminal investigation, about the event itself?

15       MR. LAND:  Objection.  Speculation.

16       MR. PADDISON:  I asked what she knows.  I'm not

17   asking her to speculate.

18       **THE WITNESS:  The only thing I know about was I**

19   **was named one of the persons of interest and I was**

20   **actually named a suspect.**

21              **DIRECT EXAMINATION (Continuing)**

22   BY MR. PADDISON:

23   Q   Okay.  Why don't we do it this way.

24   **A   Okay.**

25   Q   Do you have any reason to dispute that there was a



Porcha Woodruff
01/12/2024                                          Page 42

1    carjacking?

**2  A    No.**

3    Q    Do you have any reason to dispute that there was a female

4         suspect involved in the carjacking?

**5  A    No.**

6    Q    Do you have any reason to dispute that the female suspect

7         returned the cell phone to a gas station the day after?

8              MR. LAND:  Objection calls for speculation.

9              DIRECT EXAMINATION (Continuing)

10   BY MR. PADDISON:

11   Q    Do you have any reason to dispute it?

**12 A    No.**

13   Q    Okay.  Do you have any reason to dispute that DPD pulled

14        images from surveillance video at that gas station?

**15 A    That, I don't, because that was one of the things that I**

**16       pointed out.  The suspect wasn't pregnant.**

17   Q    Right.  But I'm asking, do you have any reason to dispute

18        the fact that --

**19 A    -- no.**

20   Q    That that photo was pulled?

**21 A    No.**

22   Q    Okay.  Do you have any reason to believe that Officer

23        Oliver, before she ever met you, would've known that you

24        were pregnant?

**25 A    Repeat that.**


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

Porcha Woodruff
01/12/2024                                    Page 43

1  Q   Okay.  Do you have any reason to believe that before the

2      time that she interviewed you and saw you, that she

3      would've known that you were pregnant?  Did you ever see

4      her at a social setting, been friends on Facebook?

5  A   **No.**

6  Q   Okay.  So, is there anything you can think of that

7      would've put her on notice that you were pregnant before

8      she met you?

9  A   **I believe she would've known.  She had my Facebook, and it**

10     **was posted on my Facebook that I was pregnant.**

11  Q   Okay.

12  A   **They had that information.  I did find out later that they**

13     **had that information.  It was known and posted on my**

14     **Facebook and my socials that I was pregnant.  Pictures**

15     **were of me being pregnant, were posted on my socials.**

16     **When I was pregnant.**

17  Q   Okay.

18  A   **So, that was the information that I ended up finding out**

19     **later on that she did have access to.**

20  Q   Okay.  So, on your Facebook, it was posted that you were

21      pregnant?

22  A   **Yes.**

23  Q   All right.  Do you have those images?  Because I've tried

24      to look at your Facebook profile.  I can't find it.

25  A   **A lot of them were locked.  But they're posted on there.**



Porcha Woodruff
01/12/2024                                    Page 44

1      They were locked and some of them were public.

2   Q   Okay.  Do you recall which ones?  Because I can't see any

3       of them.

4   A   I may be able to pull it.  I haven't had --

5               MR. LAND:  Can you go off the record for a

6       minute?

7               (At 10:49 a.m., off-record)

8               (At 10:50 a.m., back on the record)

9               DIRECT EXAMINATION (Continuing)

10  BY MR. PADDISON:

11  Q   All right.  Do you have any reason to dispute that based

12      on a comparison of your mugshot photograph from 2019, and

13      the image from surveillance, that facial recognition

14      technology identified you as an investigative lead.

15  A   You said, do I have any --

16  Q   Reason to dispute that?

17  A   No.

18  Q   Okay.  Do you have any reason to dispute that that match

19      was reviewed by criminal intelligent officers?

20  A   The criminal intelligence --

21  Q   That a human being reviewed the computer's finding and

22      agreed with what the computer found.  Do you have any

23      reason to dispute that?

24  A   Okay.  No.

25  Q   Okay.  Do you have any reason to dispute that that was



1    reviewed by a second intelligence officer?

2              MR. LAND:  Objection.  Calls for speculation.

3              MR. PADDISON:  I'm asking if she has a reason.

4    If she doesn't, she doesn't.  If she does, she does.

5              **THE WITNESS:  No.**

6              **DIRECT EXAMINATION (Continuing)**

7    BY MR. PADDISON:

8  Q   Okay.  Do you have any reason that, to believe that or any

9      reason to dispute that the victim identified you from the

10     six-pack lineup?

11 **A   Yes, and -- no, I'll get back to that later.**

12 Q   Okay.  All right.  So, what I'd like to do now, and I've

13     got this, and then one more thing, and then I think we're

14     about done, which might be near record time.  Okay.  So, I

15     want to walk through here on the investigative report.

16     It's the request for warrant.  Now, we know that you were

17     not involved in this.  Okay.  But I want to walk through

18     this and let's look at what we can find that is untrue in

19     this statement.  Now, if you go ahead and take a look at

20     this and understanding that you, in fact, were not

21     involved, we know that, that's not true.

22 **A   Okay.**

23 Q   But other than that if we can find what in this request

24     for warrant is inaccurate.  Okay?

25 **A   You want me to read it?**



1  Q   Yeah.  You just go walk through it and let me know what

2      you find.

**3  A   Okay.**

4          MR. LAND:  This calls for speculation.  How

5      would she know that?

6          MR. PADDISON:  That's what I'm asking.  I'm

7      asking if there's any evidence or anything I should be

8      aware of.

9          (At 10:52 a.m., off-record)

10          (At 10:53 a.m., back on the record)

11          DIRECT EXAMINATION (Continuing)

12  BY MR. PADDISON:

**13  A   Now, you're asking what's not true about the --**

14  Q   Right.  Right.

**15  A   As far -- I like, I wouldn't, I'm not understanding what,**

**16      what, how would I know what's true as far as the**

**17      statement?**

18  Q   Well, one of the allegations is that there was misleading

19      information put into this request for warrant.  And I want

20      to know what you're aware of, what evidence there is that

21      what's in here is misleading or untrue.

**22  A   I couldn't really say.  I'm not quite sure.  I can't say.**

23  Q   Okay.  So, as far as you know, you're not aware of

24      anything that would suggest that anything that's written

25      in here is inaccurate or untrue, aside from the fact that



```
 1       you were identified as the person, as the suspect?  Other

 2       than that.

 3   A   Identified by the victim.

 4   Q   Victim.

 5   A   Okay.

 6   Q   Wrongly identified by the victim as, as the suspect.

 7       Other than that, is there anything else in here that

 8       you're aware of that's untrue?

 9   A   I wouldn't say, no.

10   Q   No.  Okay.  Now, after you were released from the Detroit

11       Detention Center, a couple hours later you went to

12       Ascension St. John's, correct?

13   A   Yeah.

14   Q   That's based on the medical records that were attached to

15       the complaint?

16   A   Absolutely.  I left, after I was picked up, I had to wait

17       on my ride.  I didn't have my phone.  They had my phone.

18       That's why I tried to retrieve my phone.  My ride got

19       there about maybe 30, 45 minutes later, got there and

20       picked me up, told him that what was going on.  I was

21       telling him to take me to the hospital.  We tried to get

22       my phone first.

23   Q   Right.

24   A   That's why he went to the Ninth Precinct.  They didn't

25       gimme my phone.  They gave me Detective Oliver's number.
```



Porcha Woodruff
01/12/2024                                    Page 48

```
 1  Q   Right.

 2  A   After we left the precinct, then I was taken to the

 3      hospital.

 4          MR. PADDISON:  Okay.  I want to, so that I may

 5      have misled -- I might have one more issue.

 6          MR. LAND:  Okay.

 7          DIRECT EXAMINATION (Continuing)

 8  BY MR. PADDISON:

 9  Q   All right.  So, how long were you at Ascension St. John's

10      that day?

11  A   I left about three o'clock that morning if I'm not

12      mistaken.

13  Q   Okay.  So, you were there for about four or five hours?

14  A   Yeah.

15  Q   Okay.  And what did they do at Ascension St. John's?

16  A   They wanted to monitor me, my heart rate, the baby's heart

17      rate, see what all the causes and issues were that I was

18      going through, and make sure that I was out of the risk of

19      preterm labor.

20  Q   Okay.  All right.  And they put you on some fluids?

21  A   They did.

22  Q   Okay.  And when they discharged you, did they give you any

23      special instructions?

24  A   Just to make sure that I stay rested, make sure I take the

25      pain medications that, because I was telling them about
```


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

Porcha Woodruff
01/12/2024                              Page 49

1     the pain that I was experiencing while being there, and

2     they told me to make sure that I follow up with the doctor

3     after, because they didn't want it.  They stopped the

4     contractions that I was having.  They didn't want me to go

5     into labor, so she told me to make sure that I follow up,

6     the nurse that was doing the intake.

7  Q  Okay.  And did you follow up with your primary care

8     physician?

9  A  I did.

10 Q  Or your, would it be obstetrician?

11 A  My OB.

12 Q  OB.  I apologize.

13 A  You're fine.

14 Q  I'm a guy.  I'm ignorant to a lot of those things.

15 A  No, no, no, you're fine.  Understood.

16 Q  Okay.  And when and when was the -- when did you follow up

17    afterwards?

18 A  I was told to follow up the next day.

19 Q  Okay.

20 A  But I had to wait to get my phone because I didn't have my

21    doctor's information accessible.

22 Q  Okay.  And when did you eventually follow up with your OB?

23 A  I called her that afternoon once I got my phone back and

24    she told me to come to the office the following business

25    day.



Porcha Woodruff
01/12/2024                                                Page 50

1  Q    And what was the name of your OB?

**2  A    My OB is Dr. Paladino.**

3  Q    Paladino?  Where is his or her office?

**4  A    She is in -- can I look at?**

5  Q    Absolutely.

**6  A    The actual.**

7  Q    I don't think we've, we, we requested these records yet,

8       so.

9             (At 10:57 a.m., off-record)

10            (At 10:59 a.m., back on the record)

11            DIRECT EXAMINATION (Continuing)

12  BY MR. PADDISON:

13  Q    And what happened at that follow-up appointment?

**14  A    When I have seen her at the follow-up?**

15  Q    Correct.

**16  A    She told me to make sure that I get, I stayed rested**

**17      because I could go into labor still having everything**

**18      going on that happened.  I still wasn't out of the water**

**19      as far as delivering the baby early.**

20  Q    Okay.  And you followed your doctor's instructions?

**21  A    I did.**

22  Q    Okay.  And when was the baby ultimately born?

**23  A    The baby was born March 21st.**

24  Q    March 21st.  And what was the original due date?

**25  A    March 24th, I believe.  March 24th.**



**Porcha Woodruff**
**01/12/2024**                                          Page 51

 1  Q   So, the baby was three days early.

 2  A   **I was induced.**

 3  Q   You were induced?

 4  A   **I was.**

 5  Q   Okay.  All right.  So, as far as the timing of the birth,

 6      it looks like because you followed your doctor's

 7      instructions, it didn't cause any delays or acceleration.

 8      Is that fair?

 9  A   **Yes.**

10  Q   Okay.  Fingers crossed here; baby born healthy?

11  A   **No, no complications that I noticed right now at the -- as**

12      **of the moment, but he's still developing.**

13  Q   Right.  As of right now though.  And obviously things

14      change, but as of now there's no complications, thank God.

15      Right?

16  A   **Mhmm.**

17  Q   Okay.  Aside from going to Ascension St. John's that day

18      and then following up with your OB, Dr. Paladino, was that

19      the two days later?

20  A   **When did I go in Sunday, Monday.  What was that date?**

21  Q   Let's see here.  I think the actual, let's see, the

22      arrest, I believe was on the 16th of February.

23  A   **Which would've been, that was, was that a Sunday.  No,**

24      **that was a weekday.**

25  Q   Yeah.



Porcha Woodruff
01/12/2024                                    Page 52

1  A    That was a weekday.

2  Q    Let's scroll up the calendar here.  February 16th would've

3       been a Thursday.

4  A    Okay.  Thursday, Friday.  So, that I remember I had to

5       wait to see her.

6  Q    So, probably Monday, then?

7  A    That Monday.

8  Q    Okay.  All right.  Aside from Ascension St. John's and

9       your follow-up, any other medical appointments or

10      treatments following the meeting with Dr. Paladino?

11 A    Any other?

12 Q    Right.  Aside from your regularly scheduled checkups, were

13      there any other, I'm having issues, I need to go in to see

14      the doctor?

15 A    At that moment.  No.

16 Q    Okay.

17 A    After.

18 Q    When was the next time?  And again, I'm not including in

19      this question regular checkups.  My wife and I don't have

20      kids, so, I'm a little dumb in this area, but I would

21      imagine that as you get closer and closer to the due date,

22      there's regularly scheduled checkups.  Is that fair?

23 A    Absolutely.

24 Q    Okay.  So, those are not included in this question.

25 A    Okay.



1   Q   When was the next time that you actually sought any type

2       of medical treatment related to this event?

3   **A   I was, at that time, seeing her once or twice a week.**

4   Q   Okay.  And that was normal, correct?

5   **A   That was normal.  They wanted to monitor, but that's what,**

6   **when they decided to induce because it was the**

7   **complications that I was having prior.  She didn't want to**

8   **put me under any additional stress that was already**

9   **caused.**

10  Q   Right.  Okay.  So, ignoring regularly scheduled

11      appointments, any other treatments, doctor's offices,

12      doctor visits, of any kind?

13  **A   At that time, I didn't want to go.**

14  Q   Okay.

15  **A   I was trying to figure out what was the best thing, of**

16  **just having a baby at that point?  That was mainly, that**

17  **was my main focus.**

18  Q   Okay.

19  **A   Just to make sure that I had my son.**

20  Q   All right.  And then after the birth of your son, have you

21      gone to seek any specific medical treatment related?

22  **A   I have been going to physical therapy, the physical**

23  **therapist is out in Dearborn.  I've been seeing a physical**

24  **therapist.**

25  Q   Physical therapist.  And what's the physical therapist's



Porcha Woodruff
01/12/2024                                    Page 54

1     name?

2  A   They're in my emails, US Rehabilitation and Health

3      Services.

4  Q   US Rehab --

5  A   And Health Services.

6  Q   And Health Services.  Okay.  And what's the reason for

7      going to US Rehab and Health Services.

8  A   Back pain.

9  A   Okay.

10 Q   Anything else?

11 A   They were treating me for back pain.  Back, basically my

12     back, my back and neck pain that I had been experiencing.

13 Q   Okay.  When was the first time you experienced this back

14     or neck pain?

15 A   When was the first time I was experiencing it?

16 Q   Correct.

17 A   I had been, I don't have a date for that.

18 Q   How many children do you have?

19 A   This makes my third.

20 Q   Okay.  Again, I'm a guy.  I don't know, but I imagine, I

21     know my mother dealt with back pain after two kids.  I

22     mean, is it --

23 A   Not really.  Like I said, when I was there, when I was

24     there sitting on the bench, just me not having, because

25     they gave me a pad, I was going to try to lay down.  Like



1    I said, my son was heavy.  He was a big baby, so it was

2    hard already to carry him.  When I was sitting there, I

3    was trying to get in different positions besides sitting

4    in the DDC to kind of alleviate the pressure.  Alleviate

5    the pain and everything that was going on, sitting there

6    for that long.  I had asked them if it was something they

7    can give me, it was like a little, I don't even know what

8    to call it, like maybe a sleeping bag or something, but

9    being there, sitting on the bench, like I said, that

10   position, sitting in that position standing, sitting in

11   that position, that put more strain on me already.

12 Q  Right.  And that was while you were at the DDC?

13 A  Yes.

14 Q  All right.  And that's when the, the corrections officers

15   weren't really taking your --

16 A  Paying me any, yeah.

17 Q  They weren't taking this stuff seriously and I'm very

18   sorry that happened.  I've been to the DDC a few times.

19   It's not a great place.  I recognize that.

20 A  I would say a lot, but I'm going to keep my comment --

21 Q  Okay.  Well, like I said I have some say when it comes to

22   Detroit Police, but not Department of Corrections.  How,

23   when was the first time you went to US Rehab and Health

24   Services?

25 A  That I would have to, that I would have to find out.  I



Porcha Woodruff
01/12/2024                                      Page 56

1    can't --

2  Q    Was it, it was after your son was born?

3  A    **It was after my son was born.**

4  Q    Okay.  I don't need the exact dates here.  Do you just

5       recall roughly how long it was after your son was born?

6  A    **He was old enough for someone to watch him that I wouldn't**

7       **be scared to watch him.  So, maybe a little bit after like**

8       **seven or eight weeks old.**

9  Q    All right.  And when did you start experiencing the back

10      and neck pain?  I mean, obviously sitting on an

11      uncomfortable bench for a while, you're going to

12      experience it, but normally --

13 A    **The strain.  Yeah.**

14 Q    -- sleep it off, then it eventually goes away.  But to

15      have recurring back and neck.  When did that start?

16 A    **It started then it, it continued to go on more so, like I**

17      **said, from that point on, for me, just that position,**

18      **you're in a comfortable seat right now.  You're in a --**

19      **you have cushion kind of sitting under you, that bench and**

20      **me already having a strain on my back in the lower part of**

21      **my stomach, my belly, finally getting pregnant was enough.**

22      **Like the position that I was put in.**

23 Q    Right.  I guess what I'm getting at is --

24 A    **Sitting in, not put in.**

25 Q    What I'm getting at is, the older I get, sometimes I roll



Porcha Woodruff
01/12/2024                              Page 57

1    out of bed in the morning, I'm like, oh my back.  And

2    normally by four in the afternoon, all right, it loosened

3    up and then, it's been constant.  You've had no

4    alleviation?

5  A   **I'm slouched over now.**

6  Q   Okay.  So, it has been every day?

7  A   **Continuously.  I'm slouched over now.  That's why I'm not**

8      **sitting straight back.**

9  Q   Okay.  How frequently do you go to US Rehab and Health

10     Services?

11 A   **I've run the frequency down because I'm in school right**

12     **now, so I haven't picked back up on going as much.  I**

13     **probably see them maybe once, twice every two weeks now or**

14     **something.**

15 Q   Okay.  And what type of activities do you, or exercises do

16     you do there?

17 A   **They have me pull on pull on some bands.  I see the**

18     **chiropractor, they put me in a they put me on this chair**

19     **that pulls like, I guess the back spaces apart.  What else**

20     **is the other thing?  They'll have some, they'll make me do**

21     **the ball roll on the front and part -- front part and back**

22     **part of my back.  What else?  It was another exercise that**

23     **they helped me do, and they'll tell me to go home and make**

24     **sure I do them, do them at home as well.**

25 Q   The home exercises, stretches.



1  A    **Yeah.**

2  Q    Things like that.  You try like yoga or anything like

3       that?

4  A    **Yoga, not just yet.**

5  Q    Not just yet.  Working towards it.

6  A    **Yeah.**

7  Q    Fair enough.  Any prescribed medications?

8  A    **Motrin.**

9  Q    Motrin.  Okay.  What about like the Biofreeze or, like the

10      Icy Hot patches?

11 A    **Yeah.  They had me order an ice pack.  I have a few**

12      **patches of Icy Hot.  And the Aleve cream.**

13 Q    Okay.  Aleve cream?

14 A    **Yeah.**

15 Q    Yeah.  Is that just a different brand of the same thing?

16      Okay.  And I think this is it.  And this is one I, it's

17      also more of a under that we understand each other.  When

18      your attorney takes the deposition of Officer Oliver,

19      she's going to testify that, with respect to your phone.

20      Are you aware that she actually wanted to return it to you

21      but was told she couldn't?

22 A    **She told me that.**

23 Q    Yeah.  And again, that goes back to the fact that as long

24      as there were charges pending with Wayne County, she can't

25      release.  Because at that point, if you were a suspect,



Porcha Woodruff
01/12/2024                                    Page 59

```
 1    would you agree that your phone could be evidence?
 2  A   Could be.  I had a question with that.  I know you
 3        probably can't answer, when originally, I was going to
 4        leave my phone --
 5              MR. LAND:  I got you.  Don't do that.  I got
 6        you.
 7              THE WITNESS:  Okay.
 8              MR. PADDISON:  Okay.
 9              DIRECT EXAMINATION (Continuing)
10  BY MR. PADDISON:
11  Q   No, that's fine.  I mean, you were -- so you were aware
12        that she wanted to return it, but was told she couldn't.
13  A   She told me that she couldn't return it.
14  Q   Right.  Okay.  And that was until they got confirmation
15        that Wayne County was going to drop the charges.
16  A   Okay.
17  Q   All right.  And then that, and you did get your phone
18        back?  I think it was the following day.
19  A   The following day.
20  Q   Okay.  And then, so that would've been the 17th, because
21        you were arrested on the 16th, so that would've been the
22        17th, correct?
23  A   Correct.
24  Q   And did she call you to tell you that you could get your
25        phone back or did you call her again?
```



Porcha Woodruff
01/12/2024                                    Page 60

1   A    I called her.

2   Q    Okay.  And do you recall what time you called her?

3   A    I had been calling her since that morning.  I called and

4        left her a message when they gave me the number at the

5        precinct.  I called her and left her a message.  She

6        returned the call that morning.  Then I called her back to

7        see if I could get it before the afternoon.  She called me

8        and told me, well, she returned the call and told me she

9        can call me back when she gets some information.

10  Q    Right.  Okay.  And then we, this is going back to

11       Detective Oliver.  What I have represented as Detective

12       Oliver's phone log.  We see all of these calls up here,

13       correct?  One the 16th, we looked at earlier.

14  A    Okay.

15  Q    All right.  And then we see one additional call that was

16       six minutes.  So, another Wayne County Prosecutor's Office

17       and you see what time that one is.

18  A    Okay.

19  Q    And that would be the next morning, correct?

20  A    Okay.

21  Q    And that would seem to coincide with you getting your

22       phone returned, correct?

23  A    Around 9:00.

24  Q    Well, it looks as though she spoke, actually spoke at 9:48

25       in the morning, correct?



1  A    Okay.

2  Q    And you were able to retrieve your phone that afternoon,

3       correct?

4  A    Later that afternoon.

5  Q    Okay.  All right.  Now, one thing that I don't know, and I

6       don't know if your attorney knows, but I'd love to find

7       out is, let me ask you this.  So, you're arraigned, you

8       get your attorney, they go to the preliminary exam.  What

9       actually happened at the preliminary exam, that you

10      recall?

11  A   I'm not sure.  I just know I ended up with another court

12      date.

13  Q   Right.  Well, I think there was one that you -- to have a

14      court appointed attorney assigned to you, and then you

15      actually had your preliminary exam.  I looked at your

16      register of actions and I think that's kind of the order

17      it went.

18  A   You said I didn't have it?

19  Q   Let's see.  So, here's your register of actions and, this

20      is not, I'm trying to understand this.  So, looks as

21      though the arrest on the 16th, arraigned, and then we have

22      a date here.  On the February 27th, that gets adjourned to

23      a and that says here scheduled for examination, bond

24      continued, order for point court appointed attorney

25      granted.  So, what do you remember about the February



Porcha Woodruff
01/12/2024                                    Page 62

```
 1      17th?  Because I couldn't find a transcript or anything

 2      from the court on that date.

 3  A   February 17th?

 4  Q   I'm sorry.  I'm sorry.  That's incorrect.  On February

 5      27th.

 6  A   Okay.

 7  Q   Do you recall what happened that day?

 8  A   They ended up just -- Attorney Land was my attorney.

 9  Q   Okay.  Because --

10  A   -- already.

11  Q   I think his name appears for the first time on March 7th,

12      which would've been your preliminary exam.

13  A   Okay.

14  Q   So, this would've been as looks like a virtual hearing.

15      Do you recall any --

16  A   He was in attendance.  We both were.

17  Q   Okay.  So, there was a virtual hearing held on the 27th.

18      Do you have any recollection of that?

19  A   Was that the first one that happened?  Yeah, he was in

20      attendance.  I'm not sure.

21              MR. LAND:  I'm getting ready to go over that.

22      Don't worry.

23              MR. PADDISON:  Okay.

24              THE WITNESS:  Okay.  I'm not sure why it was

25      noted on that, but he was in attendance.
```



```
 1                  DIRECT EXAMINATION (Continuing)

 2   BY MR. PADDISON:

 3   Q    Okay.  And then on March 7th was in person, correct?  That

 4        was your preliminary exam?

 5   A    No, that was video as well.  Both were video.

 6   Q    Both were video.  Okay.  Do you -- and I have not been

 7        able to find a transcript of that.  Do you recall what

 8        happened?

 9   A    They ended up, was it the second one?  They finally -- I'm

10        not quite sure.

11   Q    And here's why I'm getting at this, and this is more just

12        understanding.

13   A    Okay.

14   Q    It's not so much a part of evidence of this case.  But

15        what I'm trying to figure out is that on the 17th, Oliver

16        was finally able to speak with the Wayne County

17        Prosecutor's Office, say, this isn't the right person.

18   A    Okay.

19   Q    Right.  And that's why she was allowed to return your

20        phone.  Why they didn't just dismiss the charges, why they

21        went forward with the preliminary exam?  That's what I'm

22        trying to figure out.

23   A    I asked my attorney that as well.  I don't, I'm not sure.

24   Q    Because we've, I sent a subpoena to Wayne County

25        Prosecutor's Office, and they always fight us on getting
```



**Porcha Woodruff**
**01/12/2024**                                    **Page 64**

1    stuff to us and I'm getting it back.  I'm trying to figure

2    out why they didn't just dismiss the charges and why they

3    made you go to a preliminary exam.

**4   A    I asked my attorney that, because I thought it was going**

**5         to be on the first appearance and they didn't.  We ended**

**6         up having a second court date.**

7   Q    Okay.  So, hopefully Wayne County eventually gets a

8         response to my subpoena and gets us that information.

9         Because I'd like to know that question too.  Because

10        that's the only reason Oliver was allowed to return your

11        phone.  So, why they made you show up for a preliminary

12        exam?  I don't know.  So, I'm just trying to figure that

13        out, ma'am, at this point, I think that's all I have for

14        you.

15                   MR. LAND:  You ready?

**16                   THE WITNESS:  Ready.**

17                   CROSS-EXAMINATION

18   BY MR. LAND:

19   Q    Okay, let's start over.  So, I'm going to take you back to

20        the very first day the police officer came and knocked at

21        your door, okay?

**22   A    Mhmm.**

23   Q    They knocked at your door like it was a drug raid.  Am I

24        correct?

25                   MR. PADDISON:  Objection as to form.



1    Foundation.  Assumes facts not in evidence.

2                CROSS-EXAMINATION (Continuing)

3  BY MR. LAND:

4  Q    They knocked at your door very hard.  Am I correct?

**5  A    Yes.**

6  Q    Okay.  You came down to your door and answered your door.

7        Am I correct?

8                MR. PADDISON:  Same objections.

9                MR. LAND:  What's the same objection, Counsel.

10               MR. PADDISON:  Form, foundation, assumes facts

11       not in evidence.

12               CROSS-EXAMINATION (Continuing)

13  BY MR. LAND:

14  Q    Did you answer your door?

**15  A    Yes.**

16  Q    Okay.  Did -- what did the officers tell you?

**17  A    I had a warrant for my arrest.**

18  Q    Did you try to question the officers as to what the

19       warrant was about?

**20  A    Yes.**

21  Q    Okay.  Were they -- did they tell you?

**22  A    She eventually told me, yes.**

23  Q    In between the time, were your children there?

**24  A    Yes.**

25  Q    Okay.  Was your fiance there?



Porcha Woodruff
01/12/2024                                    Page 66

1  A    Yes.

2  Q    Okay.  And you tried to tell them that it wasn't you, am I

3       correct?

4  A    Yes.

5  Q    Okay.  At some point you went back up into your home and

6       you were there for a long period of time.

7  A    Yes.

8              MR. LAND:  Go ahead, Counsel.

9              MR. PADDISON:  I'll just place an ongoing

10      objection as to form, foundation, assumes facts not in

11      evidence.

12              CROSS-EXAMINATION (Continuing)

13  BY MR. LAND:

14  Q    Okay.  So, where did you go when you went back into your

15      home?

16  A    I went to the backroom.  I was talking to my mom, trying

17       to get dressed and trying to calm myself down for a

18       minute.

19  Q    How did you feel at that point?

20  A    Crying.  I was upset.

21  Q    Why were you upset?

22  A    Because I was going, I was told I was going.  I had a

23       warrant for my arrest, so I was kind of, I was confused.

24  Q    For what?

25  A    Carjacking.



Porcha Woodruff
01/12/2024                                    Page 67

1  Q   Okay.  At the time were you pregnant?

**2  A   Yes.**

3  Q   How many months pregnant were you?

**4  A   Eight.**

5  Q   Were you visibly showing?

**6  A   Yes.**

7  Q   Okay.  Did the officer see you were visibly showing?

8            MR. PADDISON:  Objection.  Speculation.

9            CROSS-EXAMINATION (Continuing)

10 BY MR. LAND:

11 Q   Well, did you -- did the officers, did any officers say

12     anything to you about being pregnant?

**13 A   No.**

14 Q   Did officers could see you were pregnant?

**15 A   They could see I was pregnant.**

16 Q   Did they ask you about how many months along you were?

**17 A   Yes.  The female officer.**

18 Q   She asked you how many months -- did you tell her how many

19     months?

**20 A   Yes.**

21 Q   At some point did you ask her when the incident occurred?

**22 A   Yes.**

23 Q   And what did she say?

**24 A   At first, she said it was a year.**

25 Q   A year ago?



Porcha Woodruff
01/12/2024                              Page 68

1  A    A year ago.  Then she came back with information, said

2       that it had happened --

3  Q    Don't.  Just answer my questions.

4  A    Okay.

5  Q    So, the officer told you it was a year ago.

6  A    Okay.

7  Q    So at that point, in your opinion, do you think the

8       officers knew the facts of the armed robbery, carjacking?

9  A    No.

10              MR. PADDISON:  Objection.  Speculation.

11              MR. LAND:  -- you, at that point when they told

12     you a year and you learned later that the carjacking

13     actually happened a month ago, do you think they knew the

14     facts of the case?

15              MR. PADDISON:  Objection, speculation.

16              MR. LAND:  It's just your opinion.

17              MR. PADDISON:  No, you're asking her what the

18     officers knew.  That is the --

19              MR. LAND:  It's just her opinion.  You did the

20     same thing.

21              MR. PADDISON:  No, no.  I'm asking her if she

22     had evidence, you're asking her what another person

23     thought.

24              MR. LAND:  That's fine.

25              CROSS-EXAMINATION (Continuing)



**Porcha Woodruff**
**01/12/2024**                                    **Page 69**

1  BY MR. LAND:

2  Q    Okay.  Now, you were at some point taken to the Detroit

3       Detention Center?

4  **A    Yes.**

5  Q    Who took you to the Detroit Detention Center?

6  **A    Detroit Police Department.**

7  Q    Detroit Police Department.  Now, Counsel mentioned

8       something about that the Detroit Detention Center is not

9       ran by the Detroit Police.  It's ran by the State of

10      Michigan.

11 **A    Okay.**

12 Q    Do you care who the Detroit Detention Center is ran by?

13 **A    No.**

14 Q    Does that matter to you?

15 **A    No.**

16 Q    Because of the way you got to the Detroit Detention

17      Center, it's because of the officers, Detroit Police

18      officers taking you there?

19 **A    Yes.**

20 Q    Okay.  Now, you were taken to the Detroit Detention

21      Center.  Were you placed in handcuffs?

22 **A    Yes.**

23 Q    Okay.  Were you placed in handcuffs, were your children

24      watching?

25 **A    Yes.**



1          MR. PADDISON:  Objection speculation.  She can't

2     speculate to what her children saw.

3                    CROSS-EXAMINATION (Continuing)

4  BY MR. LAND:

5  Q    Were your children home that day?

6  **A    Yes.**

7  Q    Did your children witness what was going on?

8              MR. PADDISON:  Objection, speculation.

9                    CROSS-EXAMINATION (Continuing)

10  BY MR. LAND:

11  Q    You can answer the question.

12  **A    Yes.**

13  Q    Were they crying?

14  **A    Yes.**

15  Q    Were they asking you what was going on, mommy?

16  **A    Yes.**

17  Q    So, you went to the Detroit Detention Center, am I

18     correct?

19  **A    Yes.**

20  Q    Okay.  And you were handcuffed?

21  **A    Yes.**

22  Q    Were you booked?

23  **A    Yes.**

24  Q    What did the booking consist of?  Did they take your

25     photo?



Porcha Woodruff
01/12/2024                                     Page 71

1  A    **Yes.**

2  Q    Let me go back.  Were you handcuffed -- what time was it

3       when you were, when they arrived at your door?

4  A    **I'm not sure of the accurate time.  It was like 7:00 in**

5       **the morning.**

6  Q    So, it was daylight outside.

7  A    **Yes.**

8  Q    For all the neighbors to see?

9  A    **Yes.**

10  Q    And you were handcuffed?

11  A    **Yes.**

12  Q    Were you placed in the back of a police car?

13  A    **Yes.**

14  Q    Okay.  And you were taken to the Detroit Detention Center?

15  A    **Yes.**

16  Q    Okay.  Now, and you were placed in a cell?

17  A    **Yes.**

18  Q    Do you remember whether or not any of the officers told

19       you how long you would be there in the Detroit Detention

20       Center?

21  A    **About two hours.**

22  Q    About two hours.  Okay.  Were you there two hours?

23  A    **No.**

24  Q    Okay.  Now, so you were placed in a cell, am I correct?

25  A    **Yes.**



Porcha Woodruff
01/12/2024                                    Page 72

1  Q    And you told the officers, do you, you told the officers

2       that you had gestational diabetes?

**3  A    Yes.**

4            MR. PADDISON:  Objection, mischaracterizes prior

5       testimony.  I think we differentiated between the officers

6       and the corrections officers.  I'd like to make that clear

7       for the record.

8            CROSS-EXAMINATION (Continuing)

9  BY MR. LAND:

10 Q    Okay.  You made it clear, but you did tell -- at some

11      point you were booked by the Detroit Police when you got

12      there.

**13 A    Yes.**

14 Q    And the Detroit Police asked you, they were, they could

15      physically see you and fingerprinted you and took your

16      photo?

**17 A    Yes.**

18 Q    Okay.  And at that point, did you tell them you had

19      gestational diabetes?

**20 A    Yes.**

21 Q    Okay.  Now you were placed in a cell, correct?

**22 A    Yes.**

23 Q    And you were making phone calls to your family trying to

24      get you released.

**25 A    Yes.**



Porcha Woodruff
01/12/2024                                    Page 73

1  Q   Correct?

**2  A   Correct.**

3  Q   And at some point, you learned that because there was a

4      warrant, you couldn't be released on a Writ of Habeas

5      Corpus, am I correct?

**6  A   Correct.**

7  Q   Okay.  At some point, Detective Oliver came to visit you?

**8  A   Yes.**

9  Q   Okay.

**10  A   Yes.**

11  Q   And you had an interview with Detective Oliver?

**12  A   Yes.**

13  Q   Okay.  And at some point, Detective Oliver admitted that

14      she knew you were not --

15          MR. PADDISON:  Objection as to form, foundation,

16      assumes facts not in evidence.

17          CROSS-EXAMINATION (Continuing)

18  BY MR. LAND:

19  Q   Detective Oliver interviewed you?

**20  A   Yes.**

21  Q   Okay.  And you had a conversation with Detective Oliver?

**22  A   Yes.**

23  Q   The exchange was about whether the suspect female suspect

24      was pregnant?

**25  A   Yes.**



**Porcha Woodruff**
01/12/2024                                    Page 74

1  Q   And Detective Oliver did admit to you that the suspect was

2      not pregnant?

**3  A   Yes.**

4  Q   Okay.  Now, you heard Counsel state that Detective

5      Oliver's, it's a policy once a warrant is written that you

6      could not be released without going through the system.

**7  A   Yes.**

8  Q   Okay.  Does that policy mean anything to you?

**9  A   No.**

10 Q   Do you understand that the Detroit Police could have did

11     other things to accommodate you?

12              MR. PADDISON:  Objection, assumes facts not in

13     evidence.  Calls for speculation.

14              CROSS-EXAMINATION (Continuing)

15 BY MR. LAND:

16 Q   You can still answer.

**17 A   Yes.**

18 Q   They didn't have to take you back to the cell.

19              MR. PADDISON:  Objection, speculation.  Assumes

20     facts not in evidence and form.

**21              THE WITNESS:  I didn't know.  I wasn't sure.  I**

**22     didn't know that I was --**

**23              CROSS-EXAMINATION (Continuing)**

24 BY MR. LAND:

25 Q   You were taken back to the cell.



Porcha Woodruff
01/12/2024                                    Page 75

1  A    I was taken back to the cell.  I didn't know I would have

2       to go back after that -- after the interview.

3  Q    You were under the assumption that once she admitted to

4       you that she knew you were not the suspect.

5  A    That I would walk out.

6  Q    Yes.  Okay.  Did that upset you?

7  A    Yes.

8  Q    Okay.  Did the initial arrest upset you?

9  A    Yes.

10  Q   You were taken in front of your children?

11  A   Yes.

12  Q   Okay.

13              MR. LAND:  Now, Counsel, can I see that phone

14       record?

15              MR. PADDISON:  This is just the one page.

16              MR. LAND:  Yes.

17              CROSS-EXAMINATION (Continuing)

18  BY MR. LAND:

19  Q   So, counsel did not mark these, but I'm going to try to

20       identify because it's not marked, it should be marked.

21       Okay.  So, just get that on the record.  This is a phone

22       log that defense counsel alleges, that is Detective

23       Oliver's.  And on this phone log, it's probably 25 numbers

24       written.  And in the 25 numbers, there's a highlighted

25       area in gray of five different phone numbers.  And counsel



 1     is alleging that these telephone calls were to the Wayne

 2     County Prosecutor's Office.

**3  A    Okay.**

 4  Q    Okay.  Now, you okay?

**5  A    Mhmm.**

 6  Q    You all right?

**7  A    I'm okay.**

 8  Q    He alleges that these are to the Wayne County Prosecutor's

 9     Office.  Okay.  Now, so these phone calls, he's alleging

10     they're made on February the 16th.  Okay.  Trying to have

11     you -- stating that you're the wrong person.  And what

12     another thing that he alleges is that Detective Oliver is

13     very sorry for what happened.  Okay?  Now, that's on

14     February 16th.  He's alleging that she admits, she's

15     sorry.  And she knew that it wasn't you.  So, she was

16     trying to have you released, okay.  You were placed back

17     into a cell and subsequently arraigned.  Okay?

**18  A    Okay.**

19  Q    And he alleges that they tried to make a call to the

20     magistrate.  You were doing an interview.  You were -- the

21     court appointed attorney conducted an interview with you,

22     yes, or no?

**23  A    Yes.**

24  Q    And at some point, did the court appointed attorney learn

25     that you were pregnant?



Porcha Woodruff
01/12/2024                                    Page 77

1  A    At some point?

2  Q    Yes.

3  A    Yes.

4  Q    And how did she learn that?

5  A    The prosecutor told her.

6  Q    The prosecutor told her?

7  A    No --

8  Q    No.  Listen to what I'm asking you.

9  A    Okay.

10 Q    You were being interviewed by an attorney.

11 A    Oh, the -- okay.

12 Q    The attorney was asking you questions.

13 A    Okay.

14 Q    And how did she learn that you were pregnant?

15 A    When she asked about my medical condition.

16 Q    Okay.  At that point, did the attorney take a break?

17 A    Yes.

18 Q    Okay.  And she communicated to the magistrate that you

19      were pregnant?

20 A    Yes.

21 Q    Okay.  The magistrate was going to give you, from what you

22      remember, a hundred thousand dollars cash bond?

23 A    Yes.

24 Q    With a tether?

25 A    Yes.



```
 1   Q    And the court appointed attorney talked the magistrate out

 2        of it?

 3   A    Yes.

 4   Q    Did you hear anything about Detective Oliver communicating

 5        with the magistrate?

 6             MR. PADDISON:  Objection.  Mischaracterizes

 7        prior testimony.

 8             THE WITNESS:  No.

 9             CROSS-EXAMINATION (Continuing)

10   BY MR. LAND:

11   Q    Did you hear anything about Detective Oliver communicating

12        and trying to get in touch with the magistrate?

13   A    No.

14   Q    Okay.  Did you hear anything about Detective Oliver

15        communicating with a prosecutor?

16   A    No.

17   Q    Okay.  He gave you a lot of things.  Remember when he was

18        saying, well, let me just tell you this.  Well, let me

19        just tell you this.  During these arraignments, there are

20        prosecutors right in the courtroom at 36th District Court.

21        So, she didn't really have to make any calls.  The

22        prosecutor's right in the courtroom, and I'm just copying,

23        piggybacking off of what he gave you.  A lot of

24        characterizations, or let me give you this, and let me

25        give you that.  So, there were prosecutors right in the
```



Porcha Woodruff
01/12/2024                                    Page 79

1      courtroom, okay.  That was on February 16th.  Now, were

2      you and your husband, excuse me, your fiance planning on

3      getting married?

**4   A    Yes.**

5   Q    Did this arrest that day stop you from traveling to

6      Chicago to look at a wedding dress?

**7   A    Yes.**

8   Q    Okay.  Did this bother you?

**9   A    Yes.**

10  Q    Did it emotionally bother you?

**11  A    Yes.**

12  Q    Okay.  Now, he showed you these wonderful calls Detective

13      Oliver made, am I correct?

**14  A    Correct.**

15  Q    The very next you went to the gas, you went to the

16      hospital, you were rushed to the hospital that day?

**17  A    Okay.**

18  Q    Okay.  This was something that really bothered you.  When

19      you first came to my office, you were really bothered

20      because they almost, they told you that you can leave your

21      phone.  The officers that were there told you can leave

22      your phone.  Am I correct?

**23  A    Yes.**

24  Q    Then they said, no, grab it because you're going to need

25      to make a phone call when you get out.



Porcha Woodruff
01/12/2024                                          Page 80

1  A    Yes.

2  Q    Is that what happened?

3  A    Yes.

4  Q    Okay.  After you got out, you inquired about your phone?

5  A    Yes.

6  Q    You went to a precinct?

7  A    Yes.

8  Q    They didn't have your phone there?

9  A    No.  They didn't have it, yes.

10 Q    Did this upset you?

11 A    Yes.

12 Q    Who did they tell, who did they tell you had your phone?

13 A    Detective Oliver.

14 Q    Okay.  Detective Oliver.  Okay.  Now, with Detective

15      Oliver, at some point, did you get in contact with her?

16 A    Yes.  I got her number, I called her.

17 Q    You got in touch with Detective Oliver --

18 A    Yes.

19 Q    The next, that day or the next day?

20 A    The next day.

21 Q    Okay.  Did you have a conversation with Detective Oliver?

22 A    Yes.

23 Q    At some point you knew it was about to be some bull crap.

24      Am I correct?

25           MR. PADDISON:  Objection to form, foundation.



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Porcha Woodruff
01/12/2024                                    Page 81

```
1                  CROSS-EXAMINATION (Continuing)

2   BY MR. LAND:

3   Q    You knew it was about to be an issue?

4   A    Yes.

5   Q    Okay.  And you recorded the conversation?

6   A    Yes.

7   Q    Okay.  Do you agree that Detective Oliver did not mention

8        to you about a prosecutor's office?

9   A    Yes.

10  Q    What she mentioned to you is we need to scan your phone to

11       determine if you were in the area when the crime happened?

12  A    Yes.

13  Q    She was still treating you like a suspect?

14  A    Yes.

15  Q    And she knew a day prior you were not the suspect?

16  A    Yes.

17  Q    Now, before that, you had just left the hospital with your

18       heart rate low, told you to get rest, told you to get bed

19       rest.  Did Detective Oliver's actions upset you when

20       dealing with your phone?

21  A    Yes.

22  Q    Okay.  Now, that's on the 17th, he gave you this very sob

23       story about how Detective Oliver's so sorry, she's so

24       sorry what happened to you.  What did Detective Oliver do

25       on February the 18th?  That you know.  Do you know
```



Porcha Woodruff
01/12/2024                                    Page 82

1   anything she did on February the 18th.

2 A   **The afternoon she gave me my phone.**

3 Q   That was February 17th.  I'm asking you about February

4     18th.  Do you know if she did anything on February 18th?

5 A   **No.**

6 Q   Do you know if she did anything on February 19th?

7 A   **No.**

8 Q   Do you know if she did anything on February 20th?

9 A   **No.**

10 Q   Do you know if she did anything on February 21st?

11 A   **No.**

12 Q   Do you know if she did anything on February 22nd?

13 A   **No.**

14 Q   Do you know if she did anything on February 23rd?

15 A   **No.**

16 Q   February 24th?

17 A   **No.**

18 Q   February 25th?

19 A   **No.**

20 Q   February 26th?

21 A   **No.**

22 Q   February 27th was the day of the PCC.  Did she do anything

23     that day?

24 A   **No.**

25 Q   As a matter of fact, you came to the PCC, you thought the



1     case was being dismissed, did you not on February 27th?

**2**  **A**    **Yes.**

3     Q     Did you think the case was getting dismissed on February

4           27th?

**5**  **A**    **Yes.**

6     Q     You did?

**7**  **A**    **I did.**

8     Q     Okay.  Did you have to go back and tell your family it

9           didn't get dismissed?

**10** **A**    **Yes.**

11    Q     Did you have to tell your family you must appear at court

12          on March 6th?

**13** **A**    **Yes.**

14    Q     Was Detective Oliver anywhere to be found?

**15** **A**    **No.**

16    Q     Okay.  Let's continue.  So, now you, you didn't get

17          dismissed and I was the attorney there with you?

**18** **A**    **Yes.**

19    Q     What did Detective Oliver do February 28th that you know

20          of?

**21** **A**    **Nothing.**

22    Q     What did Detective Oliver do February 29th?

23                MR. PADDISON:  Speculation if you know.

24                CROSS-EXAMINATION (Continuing)

25    BY MR. LAND:



Porcha Woodruff
01/12/2024                                      Page 84

1   Q   Well, let me ask you something.  Did counsel tell you

2       anything Detective Oliver did February 29th?

**3   A   No.**

4   Q   Did he tell you anything she did March 1st?

**5   A   No.**

6   Q   Did she tell you anything she did March 2nd?

**7   A   No.**

8   Q   Did she, did he tell you anything she did March 3rd?

**9   A   No.**

10  Q   Did she tell you anything she did March 4th?

**11  A   No.**

12  Q   Did she tell you anything she did March 5th?

**13  A   No.**

14  Q   As a matter of fact, you learned that I went and talked to

15      the prosecutor.  Am I correct?

**16  A   Correct.**

17  Q   So, she didn't do anything.

18          MR. PADDISON:  Objection calls for speculation.

19          CROSS-EXAMINATION (Continuing)

20  BY MR. LAND:

21  Q   Well, he's saying it calls for speculation.  Was your case

22      dismissed February 27th, at the PCC?

**23  A   No.**

24  Q   Okay.  Now, and Detective Oliver knew that you were not

25      the suspect in this case?



1  A    Yes.

2  Q    Okay.  And you were charged with armed robbery and

3       carjacking.

4  A    Yes.

5  Q    Right?

6  A    Yes.

7  Q    As a matter of fact, I'm going to show you what's been

8       named as 36th District Court register of action case

9       number, 2305544002.  State of Michigan versus Porcha

10      Woodruff.  Okay.  Do you see that?

11 A    Yes.

12 Q    Okay.  Let's turn to the back page.  This is in

13      chronological order.  It tells you what happened.

14      Proceedings held, Judge Aliyah Sabree, Prosecutor

15      Alexander Keeler, attorney Ivan Land in person hearing

16      held.  Was these hearings in person?

17 A    No.

18 Q    It was over Zoom?

19 A    Yes.

20 Q    Okay.  Dismissed by the party.  Did you dismiss this case?

21 A    No.

22 Q    Dismiss without prejudice for insufficient evidence.

23      Okay.  Do you know what dismissed without prejudice means?

24 A    That they can bring it, can they bring the case back up?

25 Q    Yes.  So, you are not out of the water with this yet.  As



1    a matter of fact, what's your oldest daughter's name?

**2  A    Chantel.**

3  Q    Chantel is so concerned about this, she went to the 36th

4       District Court register of action and she constantly asks

5       you, mom, they can arrest you again?

6              MR. PADDISON:  Objection as to form, foundation,

7       assumes facts not -- sir, I'm not, look, you can't tell

8       your client the story and ask her to agree with you.

9       That's improper form.

10             MR. LAND:  I will.  Okay.  Just object.  Don't

11      get up.  Don't get upset.  I'll let you go.  So --

12             MR. PADDISON:  I'm not upset, it's just wasting

13      time.

14             CROSS-EXAMINATION (Continuing)

15  BY MR. LAND:

16  Q    Listen.  Listen.  Did your daughter do some research?

**17  A    Yeah.  She found it.**

18  Q    And she's concerned?

**19  A    Yes.**

20  Q    What is she concerned about?

**21  A    That I could still be charged with a crime.**

22  Q    Okay.  You've been hearing news clippings that the Wayne

23      County Prosecutor has stated?

**24  A    Yes.**

25  Q    And have you heard that she said that the case was



Porcha Woodruff
01/12/2024                                    Page 87

1    dismissed because the witness did not show up?

**2  A    Yes, I do remember --**

3    Q    Okay.  Does this concern you?

**4  A    Yes.**

5    Q    Okay.  Now, is this still, if your name is researched

6         through the 36th District Court, this still appears on

7         your record?

**8  A    Yes, it does.**

9    Q    There's no way to get this removed.

**10 A    It still appear.**

11   Q    Still appears.

**12 A    It still appears.**

13   Q    Okay.  Now, this case was dismissed, am I correct?

**14 A    Yes.**

15   Q    Okay, Counsel, can I see that document you showed her with

16        you -- I'm sorry.  I'm sorry.

17             MR. PADDISON:  Which one?

18             MR. LAND:  The one you showed her -- the

19        investigative report.

**20            THE WITNESS:  Can I take --**

21             MR. LAND:  Yes.  Go ahead.  Go ahead.

22             Can she take a break, Counsel?

23             MR. PADDISON:  Yeah.

24             (At 11:38 a.m., off-record)

25             (At 11:45 a.m., back on the record)



**Porcha Woodruff**
**01/12/2024**                                  **Page 88**

1                     CROSS-EXAMINATION (Continuing)

2  BY MR. LAND:

3  Q    Okay.  Now, counsel showed you a document that has not

4       been marked as an exhibit, but I'm going to try to clarify

5       it.  At the top of the document, it says Detroit Police

6       request for warrant.  Okay.  And it said it's

7       investigative report and it's dated February 4th, 2003.

8  **A    Okay.**

9  Q    Okay.  Now, what counsel asked you to do was review this

10      document.  Okay.  And when he asked you to review this

11      document, he asked you to review it and to determine

12      whether anything in this document was, do you dispute any

13      of the facts in this document?

14 **A    Okay.  Okay.  Now I get you.**

15 Q    Other than that you were not the defendant.

16 **A    Right.**

17 Q    Okay.  You wouldn't know about this document?

18 **A    Right.**

19 Q    You do agree after reviewing this document that he

20      allegedly pointed you out as the suspect -- female

21      suspect.  Do you agree?

22 **A    Yes.**

23 Q    Okay.  Now, do you agree that when you were pointed out as

24      a suspect, you were immediately identified in this

25      document as Defendant Woodruff?



Porcha Woodruff
01/12/2024                                    Page 89

1  A    Yes.

2  Q    Do you agree?

3  A    Yes.

4  Q    Okay.  So, with -- after you were identified first, you

5       were chosen from a facial recognition photo, correct?

6  A    Yes.

7  Q    The victim identified you?

8  A    Yes.

9  Q    And you were subsequently put in a report?

10  A    Yes.

11  Q    That identified you as a defendant?

12  A    Yes.

13  Q    Okay.  Did you think that was fair?

14  A    No.

15  Q    Okay.  Did you receive any type of investigation, any type

16       of cause prior to this arrest warrant?

17  A    No.

18  Q    Being drawn up?

19  A    No.

20  Q    You didn't?  Okay.  Now, you have a Facebook page?

21  A    Yes.

22  Q    Am I correct?

23  A    Yes.

24             MR. LAND:  Counsel, can I see that one page

25       where she's on there --



```
1              MR. PADDISON:  This one?

2              MR. LAND:  Yes.

3              CROSS-EXAMINATION (Continuing)

4   BY MR. LAND:

5   Q    You saw a Facebook page, correct?  And I'm going to

6        identify this as the Real Time Crime Center crime facial

7        recognition sheet.  At the top of the sheet, it says page

8        one of two.  The request number is 23-0006.  Okay.  The

9        original image on the photos, says original image.

10       There's an African American woman on there with a knit

11       cap.  Am I correct?

12  A    Correct.

13  Q    And it has curly knit cap, correct.  Curly hair coming out

14       of the knit cap, right?

15  A    Yes.

16  Q    The second image headed towards the right is an inquiry

17       image.  It has the same photo of the young lady, and it

18       says security camera from 6240 Van Dyke.  And the first

19       photo, original image also has 6240 Van Dyke.

20             MR. LAND:  Am I talking too fast?

21             COURT REPORTER:  No, you're fine.

22             CROSS-EXAMINATION (Continuing)

23  BY MR. LAND:

24  Q    Okay.  And the last image says investigative lead.  Okay?

25  A    Yes.
```


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

```
 1   Q   And it says snap arrest.  And up under that it says 10 of

 2       2019.  Okay?

 3   A   Yes.

 4   Q   Then it goes on towards the bottom and it says name,

 5       Porcha Woodruff.  It says date of birth, October 16th,

 6       1990.  And it has some other things.  And it also has your

 7       driver's license number, which is W 361 690 6066 797.  Up

 8       under that it says social media.  Ms. Woodruff, I would

 9       like you to look at that social media and tell me if

10       that's your social media page.

11   A   Yes.

12   Q   Okay.  Now, again, this photo was generated, this was from

13       February 1st, 2023.  Okay?

14   A   Yes.

15   Q   When was your baby?  When were you -- when did you expect

16       your baby?

17   A   The original due date was March 24th.

18   Q   So, approximately how many weeks, months pregnant were

19       you?

20   A   I was eight months pregnant.

21   Q   Okay.  Now, that is your Facebook page.  What was

22       significant about your Facebook page towards the end of

23       January and the beginning of February?

24   A   My baby shower announcement.

25   Q   What did, tell me what your baby shower announcement said.
```



1  A    It gave the date of the baby shower.

2  Q    And what were you -- what was the -- tell me what the

3       announcement said.

4  A    Basically, making my friends and family aware about the

5       date of the baby shower and helping us welcome our baby

6       boy.  If you have any questions or concerns, text, call,

7       or inbox me.

8  Q    Did you show a picture of yourself?

9  A    Yes.

10  Q    Did it show you were pregnant?

11  A    Yes.

12  Q    Okay.  And so, that was made loud and clear to the public?

13            MR. PADDISON:  Objection.  Assumes facts not in

14       evidence.

15            CROSS-EXAMINATION (Continuing)

16  BY MR. LAND:

17  Q    That was posted on your Facebook page?

18  A    Yes.

19  Q    Okay.  Now, you had a business.

20  A    Yes.

21  Q    And when viewing the video when the officers were at your

22       door --

23  A    Yes.

24  Q    They had some papers in their hand?

25  A    Yes.


HANSON RENAISSANCE    hansonreporting.com
COURT REPORTERS & VIDEO        313.567.8100

Porcha Woodruff
01/12/2024                                    Page 93

1  Q   Okay.  And you noticed that your business page was one of

2      the documents that were in their hand?

3  A   Yes.

4  Q   Okay.  And on your business page, did you announce that

5      you were pregnant?

6  A   Yes.

7  Q   Okay.  So, is that business page different from this

8      Facebook page?

9  A   They're connected.

10 Q   They're connected, but the business page that they had

11     within their hands?

12 A   Yes.

13 Q   On February the 16th, your business page, did --

14 A   The information.

15 Q   -- display that you were pregnant and with pictures

16     showing of you being pregnant?

17 A   Yes.

18 Q   Okay.  Now.  So, Detective Oliver, you understand that

19     she's the officer in charge of this investigation?

20 A   Yes.

21 Q   Did she ever knock on your door?

22 A   No.

23 Q   And attempt to call you?

24 A   No.

25 Q   Okay.  Did she ever attempt to reach you on Facebook?



1  A   No.

2  Q   Okay.  Do you know whether or not she did any

3      investigation prior to you being arrested, to determine

4      whether or not you were the suspect?

5  A   No.

6  Q   Okay.  Now, counsel mentioned something about there's

7      policy regarding whether what kind of images could be

8      used, and that's just a simple policy that someone came up

9      with.  It's not law.  Do you agree that the photo -- do

10     you agree that you don't look the same today as you did

11     eight years ago?

12 A   I agree, yes.

13 Q   Do you agree you don't look the same as you did four years

14     ago?

15 A   Yes.

16 Q   A more accurate photo would be of your driver's license?

17 A   Yes, sir.

18 Q   As a matter of fact, when we looked at the documents in

19     the police officer's hands, you noticed the photo they had

20     of you was your driver's license, along with two other

21     pictures?

22 A   Yes.

23 Q   When you reviewed the video?

24 A   Yes.

25 Q   Am I correct?



```
 1  A    Correct.

 2  Q    Now, you subsequently found out through reading these

 3       police reports that the alleged victim in this case stated

 4       that he and this whoever this individual was were

 5       drinking?

 6  A    Yes.

 7  Q    Okay.  Am I correct?

 8  A    Yes.

 9  Q    Okay.  And that upset you more because you don't believe

10       that they should have relied on a photo that was eight

11       years old, correct?

12  A    Yes.

13  Q    As a matter of fact, you would've hoped that you were

14       taken --

15              MR. PADDISON:  Do you mind if I borrow --

16              MR. LAND:  Okay -- go ahead.

17              CROSS-EXAMINATION (Continuing)

18  BY MR. LAND:

19  Q    You would've hoped that they would, would've taken you and

20       put you in a lineup?

21  A    Yes.

22  Q    Instead of just rushing to place you under arrest for a

23       crime you did not commit?

24  A    Yes.

25  Q    Okay.  All right.  Now, again, these charges were
```



1      subsequently dismissed against you.

**2    A     Yes.**

3    Q     Am I correct?

**4    A     Yes.**

5    Q     But not with prejudice.  Without prejudice.

**6    A     Yes.**

7    Q     Okay.  So, you were falsely arrested.

8                  MR. PADDISON:  Objection.  Calls for legal

9      conclusion.

10                  CROSS-EXAMINATION (Continuing)

11   BY MR. LAND:

12   Q     Were you arrested?

**13   A     Yes.**

14   Q     Was it you?

**15   A     No.**

16   Q     Did the detective tell you she knew it wasn't you?

**17   A     Yes.**

18   Q     Okay.  You were false imprisonment.

19                  MR. PADDISON:  Same objection.

20                  CROSS-EXAMINATION (Continuing)

21   BY MR. LAND:

22   Q     Okay.  Were you placed, were you placed into a cell?

**23   A     Yes.**

24   Q     Were you restrained from leaving that cell?

**25   A     Yes.**



Porcha Woodruff
01/12/2024                                    Page 97

```
 1  Q   When you were arraigned, did the magistrate tell you, you
 2      could not leave Michigan?
 3  A   Yes.
 4  Q   So, your freedom was restrained because you could not
 5      leave?
 6  A   Yes.
 7  Q   You could not.  You were -- you were not free to go on a
 8      vacation.  You were not free to go out of town.  Were you
 9      free to go on a vacation?
10  A   No.
11  Q   Were you free to go out of town?
12  A   No.
13  Q   Okay.  Now, you've been hearing a lot about facial
14      recognition, am I correct?
15  A   Yes.
16  Q   And you've learned that it misidentifies black, young
17      black women at a higher rate than others.
18          MR. PADDISON:  Objection to form and foundation,
19      assumes facts not in evidence.
20          CROSS-EXAMINATION (Continuing)
21  BY MR. LAND:
22  Q   Have you learned that?
23  A   Yes.
24  Q   Okay.  And did this upset you?
25  A   Yes.
```



Porcha Woodruff
01/12/2024                                        Page 98

1   Q   Okay.  Even though the policy, some policy that he -- is

2       not law, some policy that counsel showed you talked about

3       facial recognition.  Do you believe that if your driver's

4       license was shown instead of those eight-year-old photos,

5       that you would be sitting here today?

6               MR. PADDISON:  Objection, speculation.

7               CROSS-EXAMINATION (Continuing)

8   BY MR. LAND:

9   Q   Answer the question.

**10  A   Yes.**

11  Q   Do you believe you would still be sitting here, or you'd

12      be -- believe you would've been exonerated?

**13  A   No.**

14  Q   Okay.  You don't believe you would be sitting here today,

15      right?

**16  A   Yes.**

17  Q   Okay.  You think you would, you would've never been

18      arrested and never been charged, never been false

19      imprisonment?

20              MR. PADDISON:  Objection, speculation.  Calls

21      for legal conclusion.

22              MR. LAND:  Well, it's just her opinion,

23      Counsel.

24              MR. PADDISON:  No, it's asking for a legal

25      conclusion.



1           CROSS-EXAMINATION (Continuing)

2   BY MR. LAND:

3   Q    Let me ask you, so we've done investigations, correct?

4   **A    Yes.**

5   Q    And through your investigation, have you learned that the

6        Wayne County Prosecutor's Office does not sign off on

7        warrants for facial recognition?

8                **THE WITNESS:  Yes.**

9                MR. PADDISON:  Objection, form.  Assumes facts

10        not in evidence.

11                CROSS-EXAMINATION (Continuing)

12   BY MR. LAND:

13   Q    Okay.  So, as you sit here today, do you know any type of

14        investigation that Detective Oliver did prior to asking

15        for a warrant for your arrest?

16   **A    No.**

17   Q    So, you were going to get married before this?

18   **A    Yes.**

19   Q    Is your wedding still on?

20   **A    No.**

21   Q    Okay.  Is your wedding, has your wedding been cancelled as

22        a result of what happened to you in this case?

23   **A    Yes.**

24   Q    And why is that?

25   **A    We don't have the money to pay for it.**



Porcha Woodruff
01/12/2024                                    Page 100

1  Q   Did this arrest cause a strain on your relationship?

2  A   **Yes.**

3  Q   How so?

4  A   **We're not, I don't know --**

5  Q   We are not in church, tell whatever, we are not in church.

6      You have to tell them what's going on with your

7      relationship.

8  A   **We're not, I guess, at that point in love anymore.  As far**

9      **as, once he found out about the -- once the paperwork came**

10     **to him and he was questioned, we kind of got into it in**

11     **the beginning about me knowing the guy and what they were**

12     **trying to say I did.  We had issues.**

13 Q   So, what you're saying is when he learned of the facts of

14     this case, he questioned your loyalty?

15 A   **Yes.**

16 Q   Okay.  And so, you think that's been a strain on you and

17     your fiance getting married?

18 A   **Yes.**

19 Q   Okay.  Let's head to your oldest daughter.  How has this

20     affected her?

21 A   **She's continuously asking me about the case and asking me.**

22     **She was asking what happened.  She keeps looking it up.**

23     **She thinks I can go back to jail.  Her and my youngest**

24     **daughter keeps questioning me about it.  Why it happened.**

25 Q   So, do you think that's do you think that they need



1      counseling?

2   A   **Yes.**

3   Q   Okay.  He mentioned to you, have you sought any

4       professional counseling?

5   A   **Not professional.  I have been talking to my mom and my**

6       **dad about the situation.**

7   Q   How often do you talk to your mom and dad about the

8       situation?

9   A   **Every day.**

10  Q   Why have you not sought any professional counseling?

11  A   **I feel comfortable talking to them about it more so than**

12      **anybody else at the moment.**

13  Q   But you finally have been convinced that you need to get

14      some professional help, correct?

15  A   **Yes.**

16  Q   And you are scheduled, you were actually scheduled for an

17      appointment for some professional help.  Am I correct?

18  A   **Yes.**

19  Q   But you cancelled?

20  A   **I did.**

21  Q   And so what do you -- what are some of the things you

22      talked to your mother and father about?

23  A   **How it could have caused the effect of me technically**

24      **being in jail or in prison.  While I was locked up with my**

25      **son, how that could have affected him even more.  How it**



Porcha Woodruff
01/12/2024                              Page 102

1     could have affected me.  And I guess the fact that I

2     wouldn't even be here right now, trying to defend myself.

3     Because there was no one to -- in defense for me.

4   Q   And you understand that black women lose their children on

5       a higher rate than any other race?

6              MR. PADDISON:  Objection as to relevance, form,

7       calls for speculation.

8              THE WITNESS:  Yes.

9              CROSS-EXAMINATION (Continuing)

10  BY MR. LAND:

11  Q   You were worried about that while you were incarcerated?

12  A   Yes.

13  Q   Okay.  And the things that you, what were some of the

14      things you were doing while you were in jail?

15  A   Checking my pulse.  Trying to trying to get into a

16      comfortable position.  I kept reaching out to my family,

17      checking my pulse, just checking, trying to maintain a

18      stable heart rate.  Walking around the cell, sitting down.

19      It was a lot of different things that I was going through

20      and doing at that point in time.

21  Q   Well, how did you feel when the City of Detroit, no one

22      from the City of Detroit, reached out to you?  As soon as

23      it happened and apologized?

24  A   I felt like it was just another case that, just another

25      situation that happened that was not taken serious.



Porcha Woodruff
01/12/2024                                    Page 103

1    Q    How did you feel when this Counsel started this hearing

2         and didn't apologize?

3              MR. PADDISON:  Objection.  I believe that right

4         out of the gate, I said so.

5              **THE WITNESS:  This is all just this --**

6              **CROSS-EXAMINATION (Continuing)**

7    BY MR. LAND:

8    Q    How did you feel when he didn't have the decency to ask

9         about your two girls?  How does that feel?

10   A    **It's a lot.**

11   Q    So, it's a lot, isn't it?

12   A    **This is all, it's a lot.**

13   Q    Did you do anything to cause this?

14   A    **No.**

15   Q    You did nothing.

16   A    **No.**

17   Q    How are you holding up?

18   A    **This is stressful.  This is mental.  It's a lot, every**

19        **single day.  Like even still now, here doing this, going**

20        **through this.  This is a lot.**

21   Q    Let's talk about what happens when you get a knock at the

22        door, when someone just might put a loose leaf, or some

23        kids might be selling candy.  What happens?  Tell them

24        what happened like three times that's happened.  What

25        happened?



Porcha Woodruff
01/12/2024                                    Page 104

1  A    My kids and myself, they have been scared.  Like it's a

2       repeat of what happened that day.

3  Q    What happens when you see a police officer riding down the

4       street?

5  A    My heart sinks into my stomach.  I get nervous.

6  Q    What happens with your children?

7  A    They get nervous and scared.

8  Q    Give me an example.  What do they say to you?

9  A    Are you going to jail?  Are you getting pulled over?

10 Q    As a matter of fact.  Tell me about, well, tell us about

11      how one of your kids teases your newborn.

12 A    They asked, they made the statement saying that he was

13      locked up before he was even born -- seeing that I was

14      pregnant with him -- while I was, when this happened.

15 Q    So you have to have -- go ahead.  I'm sorry.

16 A    I tried to explain it to my youngest daughter, my oldest

17      daughter tried to talk to her about it and explain that to

18      her.

19 Q    That you didn't do anything wrong.

20 A    Right.

21 Q    Well, okay.  So, let's, your newborn.  So, your heart rate

22      lower, his heart rate lower, correct?

23 A    Correct.

24 Q    At this point, you've been told only time will tell if

25      he's okay?



Porcha Woodruff
01/12/2024                                              Page 105

1  A    Yes.

2  Q    Do you worry about that?

3  A    Yes.

4  Q    What do you worry about?

5  A    His development.  If it'll be okay in the future.  What

6       effects it could have on him, what issues he may have.

7  Q    People look at this as it, this was just an 11-hour ordeal

8       because that's how long you were incarcerated.  But what,

9       has this still affected you, now?  You just mentioned it,

10      but can you elaborate on how has it affected you?

11 A    It's still affecting me.

12 Q    How?

13 A    It's embarrassing, the whole situation that it happened.

14      I don't, I just don't feel like this is one of those type

15      of situations where you can say, oh, it was a mistake and

16      just let it be that, because it could've, I could've been

17      still fighting a case.  I could've been in jail right now

18      for something I didn't do, just because of how I look.

19 Q    So, you thinking, you thank the higher powers that you

20      were pregnant?

21 A    Yes.  I would tell anybody, me being pregnant saved me.

22 Q    As well as your matter.  You mentioned sometimes, well,

23      what else --

24 A    What I'm saying is me being pregnant, being able to, that

25      little, that big detail was able to set me aside from the



1    person that originally did it.  That's what I mean by

2    that.

3              MR. PADDISON:  Okay.  I might have some follow

4    up.  You can go ahead.

5                        REDIRECT EXAMINATION

6  BY MR. PADDISON:

7  Q    Yeah, I got a couple, actually.  I have a quick few follow

8       ups.  I'm just trying to decide what order to go in.  All

9       right.  Let's just kind of go back at time here.  So, when

10      the fugitive apprehension team arrived at your house, you

11      tried to explain to them that this wasn't you, you had

12      nothing to do with this carjacking.  Correct?

13  A   Correct.

14  Q   Do you think that if you just had to guess here, do you

15      think that anytime they arrest someone they try and come

16      up with an alibi or a story or tell them it wasn't them to

17      avoid being arrested?

18              MR. LAND:  Objection.  Calls for speculation.

19                  REDIRECT EXAMINATION (Continuing)

20  BY MR. PADDISON:

21  Q   Whether it's true or not.

22  A   I'm not sure.  I did see on the camera though, they were

23      joking as if like, oh, well maybe she'll run out the side

24      of the door.  Like, I'm still, like, I'm telling you, I'm

25      getting dressed.  I'm trying to gather what's going on,



Porcha Woodruff
01/12/2024                                    Page 107

1    and you making jokes about me running out of the house.

2    Like I'm going to run away from something, from something

3    I didn't do.

4  Q  That's what you recall from the video?

5  A  **That's what I, yes, I watched and heard on the video.**

6  Q  Okay.  Because when I watched and heard it said, she's not

7    running, she's pregnant, she's not running.

8  A  **That was after they had the discussion amongst each other.**

9  Q  Right.  Okay.  But you wouldn't find it unusual for

10    officers whose job it is to arrest people who have arrest

11    warrants, to be met with stories alibis, excuses,

12    whatever, that --

13  A  **Absolutely.  I have nothing against the officers.  I have**

14    **nothing against police.  Like I want them to do their**

15    **jobs.  I'm all for that, that to protect and serve.  And**

16    **I'm one of the ones that calls if help is needed, but I**

17    **don't want to be a suspect of something that I didn't do**

18    **or weren't, was not involved in.**

19  Q  Now, I brought this out because it is something a lot of

20    people don't understand.  They think that if you didn't do

21    something, you get arrested for it.  That's a false

22    arrest.  And that's actually not the law.

23  A  **Okay.**

24  Q  In fact, I just printed this out.  It's a United States

25    Supreme Court case, and it says right here, the



Porcha Woodruff
01/12/2024                                    Page 108

1      Constitution does not guarantee that only the guilty will

2      be arrested.  All right.  So, that's not what a false

3      arrest is.  And I think it's a common misconception.  I

4      think it's important you understand that.  When you were

5      handcuffed, that was not on your porch, right?

**6   A    That was while I was --**

7   Q    Out by the car.

**8   A    taken to the --**

9   Q    Out by the car.

**10   A    Yes.**

11   Q    Out by the cars.  And at that point, your children were

12        still inside the home, correct?

**13   A    They were standing at the door.**

14   Q    Okay.  But they were inside the home.

**15   A    They were inside the home.**

16   Q    All right.  And you were out in front of the car, correct?

**17   A    I was in front of the house.  You can, it's an angle in my**

**18        house that you could see right where the -- because**

**19        originally, we had a camera right there.  The camera**

**20        rolled -- camera ended up rolling it back.  Because they**

**21        end up watching it back on the camera, but it just didn't**

**22        record.**

23   Q    Okay.  So, it was a traumatic experience and despite it

24        being a traumatic experience, there was an attempt to go

25        back and re-watch it.  So, this event that was



Porcha Woodruff
01/12/2024                                    Page 109

1    traumatizing to your children, you wanted them to see it

2    again?

3  A  **Yeah, absolutely.  My thing is they were trying to**

4    **understand why their mother was being arrested.  The fact**

5    **that they were watching it and it was going on.  I**

6    **couldn't even stop my daughter from crying.  So, yeah,**

7    **absolutely.**

8  Q  Okay.  And you were handcuffed in front of your body, not

9    behind your body, correct?

10 A  **Yes.  My belly.  My belly was too big --**

11 Q  Something I just want to clear up because we've used these

12   terms interchangeably.

13 A  **Okay.**

14 Q  So, let's talk about the officers that came to your house.

15   Let's refer to them as police officers.

16 A  **Okay.**

17 Q  And the MDOC individuals that worked for the jail, let's

18   call them corrections officers.

19 A  **Okay.**

20 Q  All right.  Now, you arrive at the DDC.  And when you told

21   them about your gestational diabetes, that was to the MDOC

22   officers, not the officers that transported --

23            MR. LAND:  Objection.  Leading.  Objection.

24   Leading.

25            MR. PADDISON:  It's cross, it's an adverse



Porcha Woodruff
01/12/2024                              Page 110

1    witness.  I'm allowed to lead.

2                MR. LAND:  Well.  You, go ahead.

3                THE WITNESS:  You said when I told them -- the

4        officers?

5                MR. PADDISON:  It was at the Detroit Detention

6        Center.

7                THE WITNESS:  That's -- yes.

8                MR. LAND:  Objection.  Objection.  You have to,

9        how does she know?

10               REDIRECT EXAMINATION (Continuing)

11   BY MR. PADDISON:

12   Q    Well, I'm asking if it was the officers that transported

13        her or if it was the officers that were at the jail and

14        she told them.  So, presumably she knows who she said it

15        to.  So, was it the MDOC officers or the police officers?

16   A    The officers at the jail.

17   Q    Okay.  So, it wasn't the Detroit police officers.  Thank

18        you.  All right.  You said, as a result of this arrest,

19        you couldn't go look at a wedding dress in Chicago, right.

20   A    Okay.

21   Q    Is that, that's what you testified to.

22   A    Okay, yes.

23   Q    Yes.  Okay.  Were you going to go get fitted for a dress

24        or just go look at it?

25   A    We were looking.



1  Q    Okay.  Why were you going to Chicago to look at wedding

2       dresses?

3  A    **It was one online boutique that I had found.**

4  Q    Okay.  And was there a reason you couldn't go after you

5       were let out or after you were released from jail after

6       this was done?

7  A    **I couldn't go anywhere.**

8  Q    Okay.  No.  But after the case was dismissed, is there a

9       reason why you couldn't go and look at the dress then?

10 A    **I wasn't thinking about a wedding at that point in time.**

11 Q    Okay.  And, but so you were eight months pregnant at that

12      time of this and it was a difficult pregnancy?

13 A    **It definitely was.**

14 Q    Okay.  And how were you going to get to Chicago?

15 A    **My fiance has a truck.**

16 Q    Okay.  So, it was just going to be a day trip?

17 A    **It was just a turnaround, that weekend.**

18 Q    All right.  It's about, what, four and a half hours to

19      Chicago?

20 A    **Depends on where you go.**

21 Q    Well, what do you, did you --

22 A    **Give or take.**

23 Q    Yeah, is four and a half a fair estimate?

24 A    **Yeah.**

25 Q    So, at eight months pregnant during a difficult pregnancy,



Porcha Woodruff
01/12/2024                                    Page 112

1    you were going to spend nine hours in a car?

2  A   No.

3  Q   Well, you were going to drive to Chicago, look at a dress

4      and drive back four and a half hours each way.  That's

5      nine hours.

6  A   No, that's give or take, because if we would've, if we

7      would've went or could've went, we could've did a

8      turnaround or we could've stayed there.  That wasn't what

9      we were deciding at that point in time.  It was just to

10     pretty much take a look and see what type of, I guess,

11     style that I was looking for at the time.

12 Q   Okay.  And maybe I misheard what you said before.  Because

13     I thought it was supposed to be a there and back, but

14     maybe I misheard that.

15 A   Okay.

16 Q   As far as your phone, are you aware if there was ever a

17     search of your phone conducted?

18 A   Yes.  Detective Oliver did say that they wanted to get a

19     ping.  She asked me for which, which phone service I had.

20     I told her Xfinity.  She said she wanted to reach out to

21     Xfinity to get a ping of where I was at that day that the

22     crime happened.

23 Q   Okay.  Do you know if that search ever actually happened?

24 A   She said that she was going to do it.  That's why, why she

25     was still holding onto my phone.



1  Q    Okay.  But do you know if they ever actually did the

2       search?

**3  A    I'm not aware.**

4  Q    Okay.  I'll let you know that they didn't do the search.

**5  A    Okay.**

6  Q    There was some discussion about what, so we talked about

7       the phone calls and your attorney asked you questions.

8       Detective Oliver made these calls on the 16th and the 17th

9       to try and clear this up.  And then it was, what did she

10      do on the 18th, and the 19th, and the 20th, and the 21st?

11      You remember those questions?

**12  A    Yes.**

13  Q    And we didn't know if she did anything, as far as you

14      know, she didn't do anything.

**15  A    I don't know.**

16  Q    Okay.  And at that time, you thought that when you went to

17      court the first time it was going to be dismissed,

18      correct?

**19  A    I did.**

20  Q    Okay.  Do you have any reason to think that she didn't

21      think the same thing?

**22  A    I don't know.**

23  Q    So, if there, it could be very possible that she thought

24      the case was just going to be dismissed outright anyways,

25      right?  And at that point there wouldn't be anything for



**Porcha Woodruff**
**01/12/2024**                                          **Page 114**

1       her to do, would there?

**2   A**   **Right.**

3   Q   So, you understand what a dismissal without prejudice is,

4       right?

**5   A**   **Yes.**

6   Q   And your case was dismissed without prejudice?

**7   A**   **Yes.**

8   Q   Okay.  Do you know that you can file a motion to have an

9       order of dismissal with prejudice entered?

**10  A**   **Okay.  Meaning I would have to go to the 36th District,**

**11**      **file a motion, get it approved, and then it would have to**

**12**      **be put through the system to be dismissed.**

13  Q   Yeah.  Basically, just file a motion to reopen the case

14      for purposes of entry of an order of dismissal with

15      prejudice.  It's about a three-page motion.  Do you know

16      that that could be done?

**17  A**   **Okay.**

18  Q   Well, you do.  And that would make things a lot easier for

19      you, right?

**20  A**   **Okay.  It would.**

21  Q   Yeah.  Because then you wouldn't have to worry about this

22      hanging over your head.  You just file a three-page

23      motion, and you can also file a motion to expunge your

24      record.

**25  A**   **Yes.**



Porcha Woodruff
01/12/2024                                    Page 115

1  Q    Okay.  So, you could file these two motions and have this

2       entire thing wrapped up forever, cleared away.  Did you

3       know that?

4  A    I don't know.

5  Q    Okay.  Now, I was preparing for this deposition.  I went

6       to this Facebook page and no page exists.

7  A    Probably after.

8  Q    Okay.

9  A    Yeah.  Probably after it, yeah.  I checked my page now.

10 Q    Okay.  Now, you used to be there when this case was first

11      filed.  I remember I was able to pull it up.  Now, what

12      did I know that for me, I have, I treat mine a little

13      differently, but I have privacy settings, where I can post

14      things that are public or just friends only or friends of

15      friends.  Is your account, was your account completely

16      open or was it?

17 A    It was both.  It's my privacy settings are set like that.

18      Some things are private, some things are public.

19 Q    Okay.  And sitting here today, do you remember

20      specifically what posts you made public, what posts you

21      made private?

22 A    Some of them I do.  Some of them I don't, but not offhand.

23      Because I haven't even been on there in a long time, so I

24      couldn't tell you offhand off the bag.  I cannot tell you

25      what's public or private.



Porcha Woodruff
01/12/2024                                    Page 116

1  Q   Okay.  And are you aware that in order to look at someone

2      else's Facebook account, you yourself have to have a

3      Facebook account?

**4  A   Yes.**

5  Q   Right, that's true?

**6  A   True.**

7  Q   Right.  Do you know if Detective Oliver has a Facebook

8      account?

**9  A   I don t know.**

10 Q   Now, you mentioned that you were upset when you were

11     reviewing the reports, and it was mentioned that the

12     victim was drinking the night he was attacked.  That

13     upsets you, right?

**14 A   Yes.**

15 Q   Okay.  And tell me if you agree with this, I think that

16     makes his identification a little less reliable.

**17 A   Absolutely.**

18 Q   Do you agree with that?

**19 A   Yeah.**

20 Q   Right.  Okay.  So, what I'd like to do.

**21 A   And -- I'm sorry.**

22 Q   Go ahead.

**23 A   I also, the fact that he left out the sexual encounter as**

**24     well.**

25 Q   When the first time he reported?



**Porcha Woodruff**
**01/12/2024**                                          **Page 117**

1  **A**   **Yes.**

2  Q   And then he came back and told --

3  **A**   **-- and then came back.  And so, I felt like that was the,**

4      **the biggest detail to be able to say, hey, I was having**

5      **sex with her, and she was pregnant.  If that was the case.**

6  Q   Right, right.  Well, I'm looking here at the request for

7      warrant and starting here it says February 2nd, 2023, I,

8      officer in charge, OIC Oliver, obtained a written

9      statement from Mr. Walker.  Mr. Walker stated as a few

10     days had gone by, he was able to recall more details.  He

11     wanted to state that after he met the defendant, because

12     at this point, they still thought it was you.  Who he

13     named as Trinidad, the two the two went to Bellagio Liquor

14     where they began engaging in sexual intercourse.  That's,

15     I read that correctly?

16 **A**   **Yes.**

17 Q   Okay.  Let's see.  He also mentions, let's see here.  And

18     then back on the top here, he talks about how he met

19     members of commercial -- Mr. Walker stated earlier in the

20     day, this is on January 29th, he met a black female at

21     19934 Hoover.  Mr. Walker, the female was upset and

22     crying, asked if she wanted to talk, went into the vehicle

23     and began drinking liquor.  Did I read that correctly?

24 **A**   **Mhmm.**

25 Q   So, this request for warrant prepared by Detective Oliver



1    included the fact that the victim was drinking, right?

**2  A    Yes.**

3  Q    And it included the fact that his story got, I don't know

4       if changed, but it got added to?

**5  A    Yes.**

6  Q    Correct?

**7  A    Correct.**

8  Q    And it included the fact that the victim engaged in sexual

9       intercourse with the female suspect, correct?

**10  A    Correct.**

11  Q    Okay.  Now, those things all tend to make his

12       identification a little less reliable.  Would you agree

13       with that?

**14  A    Yes.**

15  Q    Yet Detective Oliver included that in her warrant request?

**16  A    Yes.**

17  Q    Right.  So, doesn't that suggest that she wasn't trying to

18       hide anything?

**19  A    Yes.**

20  Q    Okay.  And your attorney and I had this conversation

21       actually before you came in about facial recognition.  Do

22       you know that facial recognition didn't actually identify

23       you, at all?

**24  A    I was told something different.**

25  Q    Okay.  And this is something that I've learned, all facial



Porcha Woodruff
01/12/2024                    Page 119

1      recognition does, is it scans thousands and thousands of

2      photographs looking for certain, what they call biometric

3      indicators.  Like how far your corner of your eyes to your

4      ears or your nose to your lip.  And it just produces a

5      list of all these people who match.  Right.

6  **A**    **Okay.**

7  Q    And then from there, it's individuals who go through and

8      parse through the results.  So, in fact, facial

9      recognition technology didn't identify you at all.  It

10     just said you have matching features to the suspect, and I

11     just want you to understand how facial recognition

12     technology works.  Does that make sense?  All right.  You

13     said part of the reason that the wedding didn't go

14     through, and I want to breeze through this.  I know this

15     is a tough topic to talk about.

16 **A**    **Yes.**

17 Q    Just didn't have the money for it.  But according to the

18     records I have found, you weren't forced to incur any

19     court fees, right?  You didn't have to pay anything for

20     the court.

21 **A**    **No.**

22 Q    And your attorney was court appointed, so you didn't have

23     to pay your attorney, right?  Is that correct?

24 **A**    **Correct.**

25 Q    Okay.  And you weren't working at this time because you



Porcha Woodruff
01/12/2024                                        Page 120

1    were eight months pregnant, right?

2              MR. LAND:  Objection.  Who, what attorney are

3    you referring to?

4              MR. PADDISON:  The court appointed attorney.

5              **THE WITNESS:  The court appointed for when?**

6              **REDIRECT EXAMINATION (Continuing)**

7    BY MR. PADDISON:

8    Q    According to this, the register of actions right here, and

9         I'm just trying to understand this.

10   **A    Yeah, I think that's because we were just, I had, I didn't**

11   **      have a court appointed.  Ivan was already my attorney.**

12   Q    Okay.  So, you hired your attorney?

13   **A    Yes.  Ivan was hired from the very beginning.  That's when**

14   **      he tried to get the writ and everything, right?**

15   Q    Okay.

16   **A    He was hired from the beginning.**

17   Q    And I'm not, I don't want to know anything about the

18        communications with your attorney.  That's not relevant.

19        What I would like to ask though, is how much did you pay

20        your attorney?

21   **A    My fianc  was the one that handled the fees.**

22   Q    Do you have any idea?

23   **A    I didn't.  I couldn't give you a number.  I'm not sure.**

24   **      That would have to be something that you discussed with**

25   **      him.**


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

1           MR. PADDISON:  I hate to go down this road.

2     It's just, it's relevant.  Ivan, do you happen to recall

3     what it was?

4           MR. LAND:  No, I don't.

5           REDIRECT EXAMINATION (Continuing)

6  BY MR. PADDISON:

7  Q   Okay.  All right.  But so what, in other words, you said

8      that you didn't have enough money to pay for the wedding,

9      but you would've, but for this incident, right?

10 **A   Yeah, we were saving up for it.**

11 Q   Okay.  So, the but the only -- actual out-of-pocket money

12     you had to pay was to your attorney?  Okay?

13 **A   Yes.**

14 Q   All right.  Talk about counseling for your children.  Have

15     they actually gone to counseling --

16 **A   My daughter sees her counselor at high school.  She's been**

17     **talking to her.  My youngest daughter.  We haven't set up**

18     **anything for her just yet because we're still trying to**

19     **get her to understand what's going on.  So, right now,**

20     **just like myself and my oldest daughter, we kind of still,**

21     **like I said, talk to my parents about what's going on.**

22 Q   Okay.  And that's a school social worker, I'm assuming,

23     your daughter?

24 **A   Counselor not, I wouldn't even say a social worker.  She's**

25     **just her school counselor.**



Porcha Woodruff
01/12/2024                                    Page 122

1   Q   Okay.  And then you have not sought therapy or

2       psychological help, correct?

3   A   **I'm not seeing anyone as of right now.**

4   Q   Okay.  And but they're trying to convince you to do that?

5   A   **No.**

6   Q   I thought you said, you.

7   A   **You said, no --**

8   Q   Convinced, you were convinced to get professional help.

9       Was that --

10              MR. LAND:  When I asked about the doctor you

11      were going to see --

12              **THE WITNESS:  Okay.**

13              MR. LAND:  When you didn't want to go, you were

14      seeing with your mother and father, so.

15              **THE WITNESS:  Okay.  Yeah.**

16              MR. PADDISON:  Yeah.

17              **THE WITNESS:  Absolutely.  Yes.**

18              **REDIRECT EXAMINATION (Continuing)**

19  BY MR. PADDISON:

20  Q   Okay.  And you were talking about this incident as being

21      stressful, that you didn't do anything to cause it.  That

22      it is embarrassing.  And when you say that, do you mean

23      just the arrest itself or the arrest itself and --

24  A   **The whole ordeal.**

25  Q   And everything?



Porcha Woodruff
01/12/2024                              Page 123

1   A   **Everything.**

2   Q   Everything that's happened.

3   A   **Everything.**

4   Q   It's all embarrassing.  It's all stressful.

5   A   **Yes.  It's over the media, the news, all that.  It's**

6       **everywhere.  So yeah, the fact that it happened is**

7       **definitely embarrassing.**

8   Q   Okay.

9   A   **Because those that don't know me or know anything about**

10      **me, hey, she might've did it.  Hey, she could've did it,**

11      **or it could've been either way because it's something I'm**

12      **defending is basically my word against the what is the --**

13      **what am I looking for?**

14  Q   Actually, in this case, I don't think it's your word

15      against anybody.

16  A   **You know --**

17  Q   So, the whole ordeal is embarrassing and, but I guess my

18      question then is, if it's embarrassing and it's stressful,

19      why are we doing interviews with ABC News, multiple CNN

20      networks, Democracy Now, the New York Times, People

21      magazine, the Washington Post.

22  A   **To clear my name.  Oh, I'm sorry, go ahead.**

23  Q   But NBC News, CBS News, Sky News and AP News.  And you

24      said to clear your name?

25  A   **Yeah, because it when, like I said, when it aired, the**



```
 1       first thing, carjacking, woman arrested while eight months

 2       pregnant.  And you, everybody's wondering, how did you

 3       arrest someone at eight months?  That's eight months

 4       pregnant for carjacking.  So, with me being able to talk

 5       to them and let them know what's going on, because

 6       everybody asked the questions.  It's just, as you sitting

 7       here, when the interviewers come in, they ask me the

 8       questions like, how did this even happen?  What happened?

 9       How did you get placed here and named as a person being

10       arrested?  I mean being, being involved in a carjacking

11       and armed robbery.

12   Q   The only reason there was media reports, because they were

13       notified of it.  Right?

14   A   They were notified of the lawsuit?

15   Q   Right.

16   A   They were notified.  They, if I'm not mistaken, I'm not

17       sure about them being notified of the lawsuit.  I don't

18       know how that works.  I can't say.

19   Q   You would agree with me that the news media doesn't,

20       especially the national, international news media, doesn't

21       report on every single time a case is dismissed at 36th

22       District Court.  That's fair, isn't it?

23   A   Repeat that question.

24               MR. LAND:  -- calls for speculation.

25               REDIRECT EXAMINATION (Continuing)
```



**Porcha Woodruff**
01/12/2024                                    Page 125

1  BY MR. PADDISON:

2  Q    Let me ask you this.  Let me ask you this.  When you were

3       there at 36th District Court, you weren't the only case

4       that was going that day, were you?

5  **A    I wasn't the only case.  I was the only unique case.**

6  Q    Right.  But those cases were all -- some of those cases,

7       I'm assuming, were dismissed and we don't hear news media

8       about those cases, right?

9  **A    I'm not sure that that was different.  They may have been**

10      **guilty.  May have not been guilty.  I wasn't guilty.**

11 Q    What was the first time there was a news media report

12      about this incident?

13 **A    I waited.  I'm not sure of the dates or when it was**

14      **actually --**

15            MR. LAND:  If you don't know, say you don't

16      know.

17            **THE WITNESS:  I don't know.**

18            MR. LAND:  Don't try to guess.

19            REDIRECT EXAMINATION (Continuing)

20 BY MR. PADDISON:

21 Q    That was a report where you and your attorney were

22      interviewing for the news, right?

23 **A    Yes.**

24 Q    Okay.  So, if it's embarrassing and it's stressful, why do

25      the interview?  Because it would seem to me, they're not



**Porcha Woodruff**
**01/12/2024**                                    Page 126

1    going to do the story if we're not making --

2  A   It still is.  It still is.  But that's how I'm expressing

3      myself.  You asking about me going to therapy, me seeking

4      help, and me talking to someone, I'm talking to them on

5      the, on my behalf of how I feel about the whole ordeal.

6  Q   Right.  But you would agree that had we not talked to the

7      media, there wouldn't have been any stories?

8  A   I definitely wanted to because this was the situation of

9      being arrested and not being the person that -- that did

10     the actual crime.  You wouldn't want anyone to know about

11     that?

12 Q   Right.  So you, so you wanted the story to be told?

13 A   I wanted the defense to be made on my behalf.

14 Q   Okay.

15 A   I wanted to defend myself.

16 Q   Right.  But had there never been any conversations with

17     the media, the only people that would've known about this

18     would've been yourself, your immediate family, and maybe

19     some neighbors, right?

20 A   The police officers that arrested me, the detective that

21     interviewed me, me going to the jail, me -- the officers

22     being there, it was other people that knew about it.

23 Q   And have any of them talked to the media as far as you

24     know?

25 A   I'm not sure.



Porcha Woodruff
01/12/2024                                    Page 127

1  Q    Okay.  So, the fact that this is continuing on is really a

2       result of the fact that filing this lawsuit and you

3       talking to the media, right?

4  A    **I'm assuming, I guess, I can't really say, I don't even**

5       **know how they got word of what was going on.  I don't know**

6       **how it gets out, how it got out as far as the media**

7       **getting ahold to what's going on.  I thought those were**

8       **public.**

9  Q    Right.  But there was never any --

10 A    **Situations that they find out about when it's an actual**

11      **lawsuit going on.**

12 Q    But as far as you know, the first time this was ever

13      reported in the media was an occasion where you and your

14      attorney were interviewed for TV, correct?

15 A    **Correct.**

16 Q    Okay.  And would you assume that it had you not done that

17      interview, that all the stories, all the news media would

18      not have followed?

19 A    **I wouldn't say -- I don't know.**

20           MR. LAND:  Calls for speculation.  She doesn't

21      know.  How would she know that, Counsel?

22           **THE WITNESS:  Yeah.**

23           REDIRECT EXAMINATION (Continuing)

24 BY MR. PADDISON:

25 Q    Okay.  So, the reality is now you're kind of, it seems to



1    me like you're kind of in a tough spot because in one

2    sense you want your story to be told.  You want people to

3    know that you didn't, had nothing to do with this

4    carjacking, which the city acknowledges, right?  But on

5    the other side, by doing that, you're creating more stress

6    and more people talking about this.  Right?

7  A  **Okay.**

8  Q  Do you agree with that?

9  A  **I wouldn't say creating more stress.  It was stressful to**

10    **begin with when the arrest happened.  Every, it's just a**

11    **trickling effect.  Like I said, when it originally**

12    **happened, I wouldn't have had to do an interview had I not**

13    **been arrested.  There wouldn't have been a story had I not**

14    **been arrested.  It all goes back to the arrest.**

15  Q  Right.

16  A  **I was arrested for nothing.**

17  Q  I'm not arguing that point.  My point is, all the hoopla,

18    not just the arrest, but the arrest, the lawsuit, the

19    interviews, the deposition, if all of that.

20  A  **All of that is stressful --**

21  Q  Is stressful --

22  A  **Yes.**

23  Q  Would you agree that at least as far as the media portion

24    is concerned, part of that is, and not saying that you're

25    wrong for doing it, but part of that is your own doing.



1  A    No, I wouldn't agree with that.

2  Q    Okay.  Did someone force you to do depositions?

3  A    No.

4  Q    Or excuse me, force you to do interviews?

5  A    No.

6  Q    So, you chose to do them?

7  A    I did.

8  Q    Okay.  And those interviews sparked more news media.

9            MR. LAND:  Objection, how -- she doesn't know

10       that.

11           MR. PADDISON:  Let me ask --

12           MR. LAND:  Where are you going with this,

13       Counsel?

14           MR. PADDISON:  It's very simple.  If she's

15       claiming psychological and emotional damages, as a result

16       of the whole ordeal, my point is very simply, had this

17       never been made a news story and just simply filed a

18       lawsuit, then chances are there aren't any interviews and

19       there isn't the media.  So, I'm just simply trying to

20       acknowledge, and I get that you're in a tough space.  You

21       want your story to be told.  And I think it should be,

22       it's a story that should be told.  But at the same time,

23       if it's stressful and it's embarrassing, there are some

24       people that have major stories.  They just don't want to

25       talk about it.  Right?



1          THE WITESS:  Mhmm.

2          MR. PADDISON:  So, do you understand that

3    there's, it's kind of a -- you're in a bit of a catch.

4          MR. LAND:  Calls for speculation.

5          **THE WITNESS:  I'm not sure everybody copes**

6    **differently.  Everybody copes when it comes to death, when**

7    **it comes to anything, everyone copes differently.  So, I**

8    **can't really say and say, oh, that made the situation**

9    **worse.  It's still stressful.  The whole ordeal, even with**

10   **the interviews, even with this, even with the arrest from**

11   **start to finish, it has been stressful.  And it has been**

12   **causing issues with me mentally to have to deal with it.**

13   **Because ultimately, had I not been arrested, we wouldn't**

14   **be here.**

15         **REDIRECT EXAMINATION (Continuing)**

16   BY MR. PADDISON:

17   Q   And one, I guess, my last question on that topic then is

18       well, you've, you've provided the list of all of the media

19       outlets you've spoken to, and we noted we have to

20       supplement that today.  Has there been any media outlet

21       that's reached out to you for an interview that you turned

22       down?

23   **A   Yes.**

24   Q   Which one?

25   **A   I can't recall.  It's been an actual, a few.  It's been a**



1      few media outlets that's been reaching out that I

2      declined.

3   Q    Okay.  And you don't you remember any of them?

4   A    I think ABC, in the beginning.

5                  MR. LAND:  Inside Edition.

6                  THE WITNESS:  Inside Edition.

7                  MR. LAND:  Inside Edition.

8                  REDIRECT EXAMINATION (Continuing)

9   BY MR. PADDISON:

10  Q    Inside Edition.  Why did you turn down Inside Edition?

11  A    At that time I think that was, it was the trickle effect

12       of all the other ones that had already been going.  I

13       didn't want to.  I didn't feel like doing anymore at that

14       point in time.  It was another --

15                 MR. PADDISON:  Is that noted for the record that

16      they'll produce the additional outlets for that question?

17                 COURT REPORTER:  Yes, I think that was in the

18      beginning --

19                 MR. LAND:  Yeah, we'll get you --

20                 MR. PADDISON:  As long as --

21                 MR. LAND:  You want the ones that she turned

22      down?

23                 MR. PADDISON:  Right.

24                 MR. LAND:  Okay, you want those?

25                 MR. PADDISON:  Yeah.



1          MR. LAND:  Okay.

2          (At 12:32 p.m., off-record)

3          (At 12:35 p.m., back on the record)

4          MR. PADDISON:  Okay.  And, I actually, I think

5     that brought us to the end for now.  Yep.

6                    RECROSS-EXAMINATION

7  BY MR. LAND:

8  Q    Okay.  So, he brought up the fact that the officers that

9       came out to the location was pretty kind and didn't

10      handcuff you on the porch.  Do you remember him stating

11      that?

12 **A    Yes.**

13 Q    Is it your opinion, you believe that the officer should

14      have reached out to someone since they had the documents

15      in their hand that never mentioned about eight months

16      pregnant?

17 **A    Yes.**

18 Q    Did they ever pick up the phone and call investigating

19      officers or anyone?

20 **A    No.**

21 Q    Okay.  You also mentioned that your children learned about

22      everything, saw everything that was going on.

23 **A    Yes.**

24 Q    As a matter of fact, you were getting them prepared for

25      school.



Porcha Woodruff
01/12/2024                                          Page 133

1   A   Yes.

2   Q   And they couldn't go to school that day?

3   A   Yes.

4   Q   And you also stated that they rewatched the video.

5   A   Yes.

6   Q   Do you think it's important to allow them to watch the

7       video?  Why?

8   A   Yes.  To understand that you could possibly, I don't know.

9       It's numerous reasons behind them watching the video, I

10      had to discuss.  I had the discussion with them.  I had to

11      talk to them, and I felt like that was something I don't,

12      I guess, but as far as replaying back to that day to try

13      to help.

14  Q   Is this something that you would want to hide from your

15      children?

16  A   No.

17  Q   You would want to be straightforward with them?

18  A   Yes.

19  Q   I didn't do it.

20  A   Yes.

21  Q   There was a mistake?

22  A   Yes.

23  Q   Okay.  Now, he mentioned something about the DDC?

24  A   Yes.

25  Q   He mentioned that when you go to the DDC, he mentioned


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

Porcha Woodruff
01/12/2024                                    Page 134

1      about the correction officers, and the Detroit police

2      officers.  He differentiated between those two?

3    A   Yes.

4    Q   Okay.  Do you remember entering into the DDC?

5    A   Yes.

6    Q   You sit down in the chairs with, inside of a room?

7    A   Yes.

8    Q   Okay.  Then you go through the sliding doors.

9    A   Yes.

10   Q   And then they put you in a chair and they strip you?

11   A   Yes.

12   Q   Then you go off to a location, way out, correct?

13   A   Yes.

14   Q   Okay.  Now, do you understand that the beginning of the

15       location, you were still dealing with those arrest

16       officers at when you first walked into the DDC?

17   A   Yes.

18   Q   You go to the side of the DDC, which is on the east side

19       of the building, the fence slides back, correct?

20   A   Yes.

21   Q   And you go through a side door?

22   A   Yes.

23   Q   You down the -- all you see is Detroit police officers?

24   A   Yes.

25   Q   And they're either wearing black uniforms or gray and


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO        313.567.8100

1     black if they're special ops officers, gray and green and

2     black pants.  I don't know if you ran.  Oh, they, these

3     were special op officers?

**4   A   Yes.**

5   Q   Right.  But when you go to the opposite location, about a

6     mile and away, a half, away ahead, a mile away, half a

7     mile away, these officers were wearing gray uniforms?

**8   A   Yes.**

9   Q   You, all right?

**10  A   Mhmm.**

11  Q   Okay.  Am I correct?

**12  A   Yes.**

13  Q   Okay.  Those are corrections officers in the gray

14    uniforms.  Okay.  And that was a different location.

15    Okay.  Now, he mentioned that -- about a trip to Chicago

16    when you were pregnant, correct?

**17  A   Correct.**

18  Q   You saw a dress on, it doesn't matter.  You can travel

19    anywhere you want to when you're pregnant.  Am I correct?

**20  A   Yes.**

21  Q   It could be mixed into a vacation or whatever, right?

**22  A   Yeah.**

23  Q   There's nothing wrong with that.  So, don't let that,

24    don't let that confuse you.  And he had stated something

25    to you that floored me.  Ms. Woodruff, did you create this



**Porcha Woodruff**
01/12/2024                                    Page 136

1    situation?

**2  A    No.**

3  Q    Did you have anything to do with this situation?

**4  A    No.**

5  Q    You were sitting in the comfort of your home with your

6       daughters getting them ready for school?

**7  A    Yes.**

8  Q    So, why is it that you have to file a motion to get the,

9       your fingerprints destroyed?  Why do you have to file a

10      motion to have this matter dismissed with prejudice?

11      Answer that, you didn't cause it, so why do you have to do

12      it?

**13  A    I don't know.  I'm not sure.**

14  Q    Does that make sense to you?

**15  A    No.**

16  Q    Let's get to what, what's stressful is, in a roundabout

17      way, they're blaming you.  You should do these things.  He

18      mentioned whether or not, do you know if Detective Oliver

19      had a Facebook account, huh?

**20  A    Correct.**

21  Q    Do you care whether she had a Facebook account?

**22  A    No.**

23  Q    Because you are aware that someone in the Detroit Police

24      Department had a Facebook account?

**25  A    Yes.**



1  Q    Right.  But it's just does Detective Oliver have one.  You

2       got it.  That's it.  Just Detective Oliver.  Don't go tap

3       nobody else on the shoulders.  Just Detective Oliver.

4            MR. PADDISON:  Is there a question?

5                      RECROSS-EXAMINATION

6  BY MR. LAND:

7  Q    Also, you saw the arrest warrant.  He showed you the

8       arrest warrant.  He showed you this wonderful job she did

9       with -- put in there.  He's drinking, put in there, he's

10      doing all this.  But do you agree he left out the most

11      important fact?

12 A    Yes.

13 Q    Did she put in there that she was identified from an

14      eight-year-old photo?

15 A    Yes.

16 Q    Did she put that in there?

17 A    No.

18 Q    Did she put in there?  She never even picked up.  She

19      never even picked up the telephone to call you from your

20      business address?

21 A    No, but the police did reach out to me.

22 Q    When?

23 A    They were saying somebody at my professional building --

24 Q    Yes.

25 A    Was trying to break in or something.  And I think, I



1    believe, strongly that's had something, because my shutter

2    was down at that time.  So, it would've had been up for

3    them to contact me and get my telephone information.

4  Q   Okay.

5  A   **They reached out and said it was something totally**

6      **different though.**

7  Q   But she did not put in the arrest warrant that the photo

8      was eight years old.

9  A   **She didn't.**

10  Q   And she did not put in the arrest warrant, she did no

11      follow up.

12  A   **She didn't.**

13  Q   Okay.  He mentioned, counsel mentioned something about

14      out, out of pocket proceeds.  Okay?

15  A   **Yes.**

16  Q   And he also mentioned, so that's all you really spent.

17      Okay.  Now, you were, you couldn't go back to work, could

18      you?

19  A   **No.**

20  Q   Could your fianc  go to work?

21  A   **No.**

22  Q   And it was because he, why was he not able to go back to

23      work and you had to use your wedding funds?  Because what

24      counsel was asking you, he believed it was just, he stated

25      that it was just for legal fees.  But your funds --



```
 1      explain to how your -- explain to counsel how your funds

 2      were depleted.

 3  A   We still have bills and stuff to take care of.  Not even

 4      just that.  Just the counsel and everything else.

 5  Q   Okay.  Counsel mentioned that media reached out to you.

 6      You've been doing media interviews.  Okay.  Do you agree

 7      that I contacted you and I told you that the city of

 8      Detroit is not really liked.  Okay.  And I said they

 9      sometimes unfairly, they research every one of their

10      cases.  Am I correct?

11  A   Yes.

12  Q   Okay.  Through PACER.  I'm sorry -- media.

13                  MR. PADDISON:  I mean, can we go off the record?

14                  MR. LAND:  Yeah, go off the record.  I'm sorry.

15      Because I want to be straightforward.

16                  (At 12:43 p.m., off-record)

17                  (At 12:44 p.m., back on the record)

18                        RECROSS-EXAMINATION

19  BY MR. LAND:

20  Q   I mean, Ms. Woodruff.  So, the media outlets, did those,

21      did doing the media help you.

22  A   You said did doing the interviews.

23  Q   Did they help you?

24  A   I felt like it helped me.

25  Q   As you as you read the blogs.  Were you feeling better?
```



Porcha Woodruff
01/12/2024                                    Page 140

1  A   Yes.

2  Q   How much people cared?

3  A   Yes.

4  Q   You've been reached out to all over the country and people

5      told you they're sorry?

6  A   Yes.

7  Q   Okay.  Let me say this to you.  As a matter of fact, a

8      famous actor put you on her page.

9  A   Yes.

10 Q   Who's that actor's name?  Actress's name?

11 A   I just -- said her name the other day.  She played in The

12     Help.

13 Q   Because her mother was in jail when?

14 A   When she was pregnant.

15 Q   Pregnant.

16 A   Yeah.

17 Q   And she really, and you just, it just took off.  And

18     people from you -- you attended high school in Arkansas?

19 A   Yes.

20 Q   Am I correct?

21 A   Yes.

22 Q   Okay.  And even people from Arkansas reached out to you?

23 A   Yes.

24 Q   Okay.  So, your kids became proud of you after seeing

25     these, after seeing these things, right?



1  A    Yes.

2  Q    They really knew it wasn't you.

3  A    Yes.

4  Q    So, it helped, but you did turn down some interviews with

5       Inside Edition.

6  A    Yes.

7  Q    Inside Edition was trying to be too intrusive.  They

8       wanted to come to your home.  They wanted to --

9  A    Names.

10 Q    They wanted names.  And every person that wanted to come

11      to your home and be too intrusive and did not want to give

12      a five-minute interview, you turned them down.

13 A    Yes.

14 Q    This is not about trying to embarrass anyone, am I

15      correct?

16 A    Correct.

17 Q    You're not trying to embarrass anyone.

18 A    Right.

19 Q    But seeing how many, the four million, eight million blogs

20      you received, telling you to hang in there, was that

21      therapy.

22 A    Yes.

23 Q    So, I understand counsel says you are causing a lot of

24      this yourself, but actually that's not part of it.  So, I

25      just wanted to get that out to counsel.  I'm finished,



**Porcha Woodruff**
**01/12/2024**                                              Page 142

1    Counsel.

2                    MR. PADDISON:  -- real quick.

3                         REDIRECT EXAMINATION

4    BY MR. PADDISON:

5    Q    All right.  So, celebrities have posted about this in

6         support of you?

7    **A    Yes.**

8    Q    Okay.  And you've received, the number I just heard was

9         four to eight million different blogs or posts in support

10        of you?

11   **A    Yes.**

12   Q    Okay.  And your kids are proud of you?

13   **A    Yes.**

14   Q    Okay.  So, what about this is embarrassing to you.

15   **A    The arrest, the whole, it's --**

16   Q    It sounds like people are referring to you like you're a

17        hero.

18   **A    No.  I think the circumstances and situations being able**

19        **to stand up for myself after something like this**

20        **happening.**

21   Q    Okay.

22   **A    That's what the hero aspect comes from because dealing**

23        **with something like this, a lot of people wouldn't even**

24        **speak out.  It is happened more than a few times.  And**

25        **then, me being one of the women that this happened to and**



Porcha Woodruff
01/12/2024                                    Page 143

1   speaking about it and not really just being quiet about

2   the whole ordeal and situation because it was embarrassing

3   and because I should've never been, I should've never went

4   to jail while I was pregnant.  It's one of those type of

5   situations.

6   Q   All right.  As far as your wedding's concerned you had to

7       pay the legal fees?

8   A   **Okay.**

9   Q   And then you said you had bills and stuff, right?

10  A   **We still have bills, yes.**

11  Q   Right.  But that's true regardless of this event.

12  A   **Absolutely.**

13  Q   Right.  Okay.  You mentioned that the officers that

14      actually came to your house to arrest, that they should

15      have called someone.  Right.  Presumably they should have

16      called the officer in charge.  That's what you think they

17      should have done.

18  A   **Yes.**

19  Q   Right.  Do you think it's important for police officers to

20      undergo training?

21  A   **Absolutely.  Some follow some type of protocol?  I'm not**

22      **sure what type of protocol, but I know sometimes when**

23      **officers are involved --**

24  Q   I'm not talking about this specifically, I'm just saying

25      generally, in general, officers should receive training.



**Porcha Woodruff**
01/12/2024                                    Page 144

1   Do you agree?

**2  A   Yes.  Absolutely.**

3   Q   And do you agree that officers should receive training,

4       not just when they start, but should continue to receive

5       training while they work?

**6  A   Absolutely.**

7   Q   And that it should be mandatory that they do that?

**8  A   Absolutely.**

9   Q   Okay.  Were you aware that on the morning of your arrest

10      Officer Oliver was at mandatory training?

**11  A   I wasn't aware.**

12  Q   Yeah.  She was actually at mandatory firearms training

13      that morning.

**14  A   Yeah.  She didn't arrest me though.  The officers did.**

15  Q   Right.  But if they were going to call someone, they'd

16      called the officer in charge, right?

**17  A   Absolutely.**

18  Q   So, even if they would've called her, she would've been at

19      mandatory firearms training.

**20  A   Okay.**

21  Q   Okay.  So, that really wouldn't have changed anything.

**22  A   What question?  Is there any, some, is it, is there a**

**23      superior over her that they could have contacted or**

**24      reached out to as just the second, just some type of**

**25      thinking beyond the box, thinking outside of the box.**



Porcha Woodruff
01/12/2024                                    Page 145

1    Like, hey, this lady is pregnant on this information that

2    I have right here in front of my face.

3 Q  Right.

4 A  It's not listed.  It doesn't have those details that she's

5    eight months pregnant.  This man possibly couldn't have

6    had sex with her or a carjacking, armed robbery, with this

7    woman that she's pregnant.  Even if you had me in

8    question.

9 Q  Well, let me ask you this.  So, the officer in charge

10   handles it.  You'll have to understand any given time,

11   there's all, and I don't work for the police.

12 A  Okay.

13 Q  But they've got, in Detroit, there's a lot of carjackings,

14   unfortunately.  So, the cats unit is a very busy unit.

15 A  Understood.

16 Q  Right.  So, and actually, I want to circle back and wasn't

17   it the officers, were they trying to get you moving really

18   quickly when they first arrived to get you to go to the

19   DDC?

20 A  I was trying to like I said, go back and forth.  They

21   were, you're talking about the officers that took --

22 Q  Yeah.  Yeah.  Because what, look, I'm just going to tell

23   this point blank.

24 A  Go ahead.

25 Q  The officers that arrived, they're not there to question



1    whether or not you actually were the right suspect.

2    That's not their job.  Their job is to, we have a valid

3    warrant.  We're we got to take you in.  But because you

4    were pregnant and you'll learn this, I've already put it

5    out in record.  So, this isn't attorney client -- is if

6    there's any issue, we can get her in for the 9:30

7    arraignment, try and get her in and out.  And apparently,

8    they couldn't get you in and processed quick enough, which

9    is why you had to wait until the, I think it was a 3:00

10   o'clock arraignment.

11  A   It was two arraignments that the one -- I was already

12      there.  They said I wasn't even anywhere on the list to

13      be.

14  Q   Okay.

15  A   -- to be arraigned.

16  Q   So, they did try to get you in as quickly as possible to

17      do the morning arraignment.

18  A   The officers?

19  Q   Right.  The ones that actually arrested you?

20  A   They were saying that's what they stated at the door.

21  Q   All right.  That's, so they were trying to get you in and

22      out as quickly as possible.  Is that fair?

23  A   Okay.

24  Q   Okay.  All right.  And we've already covered this once,

25      but there, the photo that was used that the victim



Porcha Woodruff
01/12/2024                                    Page 147

1    identified you as the female suspect that was eight years

2    old, correct?

**3  A   Correct.**

4  Q   And we've established that that photo lineup, it was

5      actually prepared by Deputy Donald Greenwald, not by

6      Officer Oliver.  We saw those documents.  Right?

**7  A   Okay.**

8  Q   And I think we also established that we don't have any

9      evidence to suggest that Officer Oliver knew how old that

10     photograph was.

**11 A   You said you don't have any --**

12 Q   Is there any evidence that --

**13 A   I don't know.  I'm not sure.**

14 Q   So, if she didn't know that the photograph was eight years

15     old there, would there be any reason for her, she couldn't

16     have written that in the warrant request.  Is that fair?

**17 A   I'm not sure about that either, because I don't know if**

**18     she, if she would it.  Okay.  Her being the leading**

**19     officer, wouldn't she know how old the photo was?**

20 Q   Well, not necessarily.  If she didn't prepare the lineup.

**21 A   Yeah.  I don't know.**

22 Q   If she is assuming -- because Officer Deputy Greenwald

23     will testify that he prepared the lineup.

**24 A   Okay.**

25 Q   Okay.  So, if Officer Oliver didn't know how old the



Porcha Woodruff
01/12/2024                                    Page 148

1      photograph was, she can't, would you agree with this

2      simple statement.  She can't include something in the

3      arrest warrant that she doesn't know?

4   A  **I don't know to that one.  Because I'm not, maybe I'm not,**

5      **not getting the question right.  But I don't know.**

6   Q  Okay.  And then the last one, and this is just more of,

7      did you know, did you know that an eyewitness, whether

8      it's a victim or an eyewitness, their identification of

9      someone by itself is enough for probable cause for an

10     arrest?

11  A  **Probable cause for an arrest?**

12  Q  Yes.

13  A  **Not questioning.**

14  Q  Yep.  Unless there's an obvious reason to know.  Just

15     right there in the face, if they interview a victim and it

16     says that's the person, that by itself is enough for

17     probable cause for an arrest.

18  A  **Not in-person lineup.**

19  Q  Mhmm.

20  A  **Oh, wow.**

21  Q  And trust me, that's one of the things we're revisiting

22     with our policies and our discussions with the ACLU, which

23     as on the side, they're the reason we couldn't use the

24     state of Michigan.  All those limitations on what photos

25     we could use.  Because the ACLU is saying no, it's an



**Porcha Woodruff**
01/12/2024                                    Page 149

1   invasion of privacy, so you might be right.  But as we

2   saw, they're not allowed to use them.  So, I think that's

3   all I got, Ms. Woodruff.  I hope this wasn't too painful

4   for you.

5               (At 12:53 p.m., deposition was concluded)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1

2                           CERTIFICATION

3    STATE OF MICHIGAN    )

4    COUNTY OF WAYNE      )

5

6            I, Megan M. Harder, do hereby certify that this

7    transcript, consisting of one-hundred-fifty (150) pages, is a

8    complete, true, and correct record of the testimony of Porcha

9    Woodruff taken in this case on Friday, January 12, 2024.

10

11

12

13           _____

14           Megan M. Harder, CER 15895

15           Notary Public

16           Macomb County Michigan

17   My Commission Expires:    April 1, 2030

18

19

20

21

22

23

24

25



**Porcha Woodruff**
**01/12/2024**                                                                1

---
1
---

**10**  91:1

**108**  38:21

**10:03**  3:2

**10:07**  7:16

**10:09**  7:17

**10:39**  33:15,16

**10:47**  22:16

**10:49**  44:7

**10:50**  44:8

**10:52**  46:9

**10:53**  46:10

**10:57**  50:9

**10:59**  50:10

**11-hour**  105:7

**11:00**  30:21,22

**11:38**  87:24

**11:45**  87:25

**12**  3:2

**12:00**  30:23

**12:32**  132:2

**12:35**  132:3

**12:43**  139:16

**12:44**  139:17

**12:53**  149:5

**15:48**  35:18

**16th**  22:13 51:22 52:2 59:21
  60:13 61:21 76:10,14 79:1
  91:5 93:13 113:8

**17th**  59:20,22 62:1,3 63:15
  81:22 82:3 113:8

**18th**  81:25 82:1,4 113:10

**1990**  91:6

**19934**  117:21

**19th**  82:6 113:10

**1st**  84:4 91:13

---
2
---

**20**  35:24

**2003**  88:7

**2015**  12:15 13:5,10 14:8 16:14

**2019**  13:2,9 14:7 33:8 44:12
  91:2

**2021**  14:20

**2023**  91:13 117:7

**2024**  3:2

**203.11-43**  13:20

**20th**  82:8 113:10

**21st**  50:23,24 82:10 113:10

**22:47**  22:14

**22nd**  82:12

**23-0006**  90:8

**2305544002**  85:9

**23rd**  82:14

**24th**  50:25 82:16 91:17

**25**  75:23,24

**25th**  82:18

**26th**  82:20

**27th**  61:22 62:5,17 82:22 83:1,
  4 84:22

**28th**  83:19

**29th**  83:22 84:2 117:20

**2:30**  30:21

**2nd**  84:6 117:7

---
3
---

**30**  47:19

**32**  8:21 9:6

**33**  10:5

**35**  14:10,12

**361**  91:7

**36th**  78:20 85:8 86:3 87:6
  114:10 124:21 125:3

**3:00**  30:21 35:1 146:9

**3:25**  35:2

**3:48**  35:22

**3rd**  84:8

---
4
---

**45**  47:19

**4th**  84:10 88:7

---
5
---

**523-CV-11886**  3:16

**54**  17:4

**5th**  84:12

---
6
---

**6066**  91:7

**62**  19:16 20:8

**6240**  90:18,19

**65**  22:1

**690**  91:7

**6th**  83:12

---
7
---

**71**  29:1

**797**  91:7

**7:00**  22:3,22 71:4

**7th**  62:11 63:3

---
8
---

**84**  33:3



Porcha Woodruff
01/12/2024                                                                    2

**9**

**9:00** 60:23

**9:30** 146:6

**9:45** 23:1

**9:48** 60:24

**A**

**A-M-Y-** 4:1

**a.m.** 3:2 7:16,17 22:23 33:15,
16 44:7,8 46:9,10 50:9,10
87:24,25

**ABC** 123:19 131:4

**ability** 4:10 11:25

**absolutely** 17:18 18:22 19:10
30:9 31:17 37:21 47:16 50:5
52:23 107:13 109:3,7 116:17
122:17 143:12,21 144:2,6,8,
17

**acceleration** 51:7

**acceptable** 15:8

**access** 14:10 43:19

**accessible** 49:21

**accommodate** 74:11

**account** 115:15 116:2,3,8
136:19,21,24

**accurate** 71:4 94:16

**accurately** 4:10

**accused** 22:22 23:17

**acknowledge** 129:20

**acknowledges** 128:4

**ACLU** 13:17,18 148:22,25

**action** 39:11 85:8 86:4

**actions** 38:25 61:16,19 81:19
120:8

**activities** 57:15

**actor** 140:8

**actor's** 140:10

**Actress's** 140:10

**actual** 7:5 12:12 50:6 51:21
121:11 126:10 127:10 130:25

**add** 38:13

**added** 118:4

**adding** 6:23

**additional** 30:12 53:8 60:15
131:16

**additionally** 38:13

**address** 137:20

**adjourned** 61:22

**admit** 74:1

**admits** 76:14

**admitted** 9:8 73:13 75:3

**adverse** 109:25

**affected** 100:20 101:25 102:1
105:9,10

**affecting** 105:11

**affidavit** 32:23

**affirm** 3:6

**African** 90:10

**afternoon** 49:23 57:2 60:7
61:2,4 82:2

**age** 18:2

**Agency** 15:8

**agree** 9:22 13:7,8 15:22,23
16:17 19:8 41:4,7 59:1 81:7
86:8 88:19,21,23 89:2 94:9,
10,12,13 116:15,18 118:12
124:19 126:6 128:8,23 129:1
137:10 139:6 144:1,3 148:1

**agreed** 44:22

**ahead** 14:18 22:19 25:14,17
45:19 66:8 87:21 95:16
104:15 106:4 110:2 116:22
123:22 135:6 145:24

**ahold** 36:16 37:1 127:7

**aired** 123:25

**Aleve** 58:12,13

**Alexander** 85:15

**alibi** 106:16

**alibis** 107:11

**Aliyah** 85:14

**allegation** 10:1

**allegations** 46:18

**alleged** 38:24 95:3

**allegedly** 10:9,13 11:13,18
88:20

**alleges** 75:22 76:8,12,19

**alleging** 76:1,9,14

**alleviate** 55:4

**alleviation** 57:4

**allowable** 3:20

**allowed** 14:3 63:19 64:10
110:1 149:2

**American** 90:10

**ample** 29:6

**Amya** 4:1

**angle** 108:17

**announce** 93:4

**announcement** 91:24,25 92:3

**answering** 6:11

**answers** 6:16 7:21

**anticipate** 5:16

**anxiety** 26:17 30:5,17 31:16

**anymore** 100:8 131:13

**anytime** 31:15 106:15

**AP** 123:23

**apologize** 9:3 31:19 33:13
49:12 103:2

**apologized** 102:23


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

apparently  146:7

appearance  64:5

appears  9:18 28:10 62:11 87:6,11,12

appointed  61:14,24 76:21,24 78:1 119:22 120:4,5,11

appointment  50:13 101:17

appointments  52:9 53:11

apprehension  106:10

approved  21:19 114:11

approximately  22:3 91:18

area  52:20 75:25 81:11

arguing  128:17

Arkansas  140:18,22

armed  38:2 68:8 85:2 124:11 145:6

arose  30:11

arraigned  30:22 36:20 37:22 61:7,21 76:17 97:1 146:15

arraignment  21:18 36:19,22 38:24 146:7,10,17

arraignments  30:20 78:19 146:11

arrest  12:14 13:1,5 14:7,8 25:18 28:7 33:8 38:21 51:22 61:21 65:17 66:23 75:8 79:5 86:5 89:16 91:1 95:22 99:15 100:1 106:15 107:10,22 108:3 110:18 122:23 124:3 128:10, 14,18 130:10 134:15 137:7,8 138:7,10 142:15 143:14 144:9,14 148:3,10,11,17

arrested  18:25 22:5 30:18,19 32:24 38:2 59:21 94:3 96:7,12 98:18 106:17 107:21 108:2 109:4 124:1,10 126:9,20 128:13,14,16 130:13 146:19

arresting  19:12

arrival  22:23

arrive  109:20

arrived  71:3 106:10 145:18,25

Ascension  22:12 47:12 48:9, 15 51:17 52:8

Ashartay  36:17

asks  86:4

aspect  142:22

assigned  61:14

assistance  13:17

assistant  17:11

assume  5:2 28:6,11 40:11,17 127:16

assumes  65:1,10 66:10 73:16 74:12,19 86:7 92:13 97:19 99:9

assuming  11:24 17:5 28:12 30:23 39:1,8,24 40:17 41:11 121:22 125:7 127:4 147:22

assumption  75:3

attached  22:12 47:14

attacked  116:12

attempt  39:16 40:2,18 93:23, 25 108:24

attendance  62:16,20,25

attended  140:18

attention  32:12

attorney  4:6 5:11,18,25 6:22 8:4 10:13 21:11 58:18 61:6,8, 14,24 62:8 63:23 64:4 76:21, 24 77:10,12,16 78:1 83:17 85:15 113:7 118:20 119:22,23 120:2,4,11,12,18,20 121:12 125:21 127:14 146:5

attorney's  36:24

attorneys  8:9

attribute  30:14

authority  21:17

avoid  106:17

aware  10:1 12:8 20:23 32:8, 19,21 36:15,21 37:17 38:23

46:8,20,23 47:8 58:20 59:11 92:4 112:16 113:3 116:1 136:23 144:9,11

awesome  4:19

---

**B**

baby  50:19,22,23 51:1,10 53:16 55:1 91:15,16,24,25 92:1,5

baby's  29:14 30:15 48:16

back  7:17 20:11,19 21:23 27:2,25 33:16,19 44:8 45:11 46:10 49:23 50:10 54:8,11,12, 13,21 56:9,15,20 57:1,8,12, 19,21,22 58:23 59:18,25 60:6, 9,10 64:1,19 66:5,14 68:1 71:2,12 74:18,25 75:1,2 76:16 83:8 85:12,24 87:25 100:23 106:9 108:20,21,25 112:4,13 117:2,3,18 128:14 132:3 133:12 134:19 138:17,22 139:17 145:16,20

background  25:8 29:11 41:12

backroom  66:16

bag  55:8 115:24

ball  57:21

bands  57:17

based  9:18 11:1,25 34:25 35:4 44:11 47:14

basically  30:17 54:11 92:4 114:13 123:12

battled  28:3

bed  57:1 81:18

began  117:14,23

begin  23:12 128:10

beginning  91:23 100:11 120:13,16 131:4,18 134:14

behalf  8:9 126:5,13

believed  138:24

believes  24:16



Porcha Woodruff
01/12/2024                                                4

**Bellagio** 117:13

**belly** 56:21 109:10

**bench** 54:24 55:9 56:11,19

**big** 55:1 105:25 109:10

**biggest** 24:9,18 117:4

**bills** 139:3 143:9,10

**Biofreeze** 58:9

**biometric** 119:2

**birth** 51:5 53:20 91:5

**bit** 56:7 130:3

**black** 97:16,17 102:4 117:20
134:24 135:1,2

**blaming** 136:17

**blank** 145:23

**blogs** 139:25 141:19 142:9

**blood** 29:14,21 30:15,16 31:14

**blunt** 27:22

**body** 109:8,9

**body-worn** 18:8

**bond** 37:6 38:11,12,18 61:23
77:22

**booked** 17:4 70:22 72:11

**booking** 70:24

**born** 50:22,23 51:10 56:2,3,5
104:13

**borrow** 95:15

**bother** 79:8,10

**bothered** 79:18,19

**bottom** 91:4

**boutique** 111:3

**box** 144:25

**boy** 92:6

**brand** 58:15

**break** 5:17,20 77:16 87:22
137:25

**breath** 26:24

**breeze** 119:14

**briefly** 8:13

**bring** 85:24

**broke** 16:20

**brought** 19:1 21:13 107:19
132:5,8

**building** 134:19 137:23

**bull** 80:23

**business** 49:24 92:19 93:1,4,
7,10,13 137:20

**busy** 145:14

---

**C**

---

**calendar** 52:2

**call** 18:19 39:25 55:8 59:24,25
60:6,8,9,15 76:19 79:25 92:6
93:23 109:18 119:2 132:18
137:19 144:15

**called** 3:11 15:7 36:9 49:23
60:1,2,3,5,6,7 80:16 143:15,
16 144:16,18

**calling** 39:17 60:3

**calls** 34:17 39:4,8,12,21 40:8,
13,14,17 41:9 42:8 45:2 46:4
60:12 72:23 74:13 76:1,9
78:21 79:12 84:18,21 96:8
98:20 102:7 106:18 107:16
113:7,8 124:24 127:20 130:4

**calm** 24:24 27:7 66:17

**camera** 18:8 90:18 106:22
108:19,20,21

**cancelled** 99:21 101:19

**candy** 103:23

**Canton** 12:15

**cap** 90:11,13,14

**car** 26:5,7 71:12 108:7,9,16
112:1

**care** 49:7 69:12 136:21 139:3

**cared** 140:2

**carjacked** 11:4

**carjacking** 10:11 11:20 20:10
41:5 42:1,4 66:25 68:8,12
85:3 106:12 124:1,4,10 128:4
145:6

**carjackings** 145:13

**carry** 55:2

**cars** 108:11

**case** 3:16 8:13,14,18 32:11
41:12 63:14 68:14 83:1,3
84:21,25 85:8,20,24 86:25
87:13 95:3 99:22 100:14,21
102:24 105:17 107:25 111:8
113:24 114:6,13 115:10 117:5
123:14 124:21 125:3,5

**cases** 125:6,8 139:10

**cash** 37:23 38:11 77:22

**catch** 130:3

**cats** 145:14

**caused** 53:9 101:23

**causing** 130:12 141:23

**CBS** 123:23

**celebrities** 142:5

**cell** 20:11,19 21:24 42:7
71:16,24 72:21 74:18,25 75:1
76:17 96:22,24 102:18

**center** 12:19 17:5 18:21 22:2
23:10 24:23 26:10,14 27:15
47:11 69:3,5,8,12,17,21 70:17
71:14,20 90:6 110:6

**chair** 57:18 134:10

**chairs** 134:6

**chances** 129:18

**change** 6:15 8:5 51:14

**changed** 6:14 7:22 21:1,6
37:23 118:4 144:21

**changing** 37:22



**Chantel** 86:2,3

**characterizations** 78:24

**charge** 93:19 117:8 143:16 144:16 145:9

**charged** 85:2 86:21 98:18

**charges** 58:24 59:15 63:20 64:2 95:25

**checked** 115:9

**checking** 102:15,17

**checkups** 52:12,19,22

**Chicago** 79:6 110:19 111:1, 14,19 112:3 135:15

**child** 24:3,14,15,21 25:9 29:7, 12

**children** 22:7 27:7 54:18 65:23 69:23 70:2,5,7 75:10 102:4 104:6 108:11 109:1 121:14 132:21 133:15

**chiropractor** 57:18

**chooses** 21:11

**chose** 129:6

**chosen** 89:5

**Chris** 7:3

**chronological** 85:13

**church** 100:5

**circa** 10:25

**circle** 145:16

**circumstances** 142:18

**city** 3:17 102:21,22 128:4 139:7

**Civil** 3:21

**claim** 8:11

**claiming** 129:15

**clarify** 88:4

**clear** 5:7 6:18 22:24 27:18 31:20 35:12 72:6,10 92:12 109:11 113:9 123:22,24

**cleared** 115:2

**client** 86:8 146:5

**clippings** 86:22

**closer** 52:21

**clue** 24:6 39:20

**CNN** 6:23,24 7:6,13 123:19

**coincide** 60:21

**comfort** 136:5

**comfortable** 56:18 101:11 102:16

**comment** 55:20

**commercial** 117:19

**commit** 16:4 95:23

**committed** 38:23

**common** 108:3

**communicated** 77:18

**communicating** 78:4,11,15

**communications** 120:18

**community** 30:4

**comparison** 44:12

**complaint** 8:8,10 11:12,17 22:12 47:15

**completely** 115:15

**complications** 17:24,25 51:11,14 53:7

**computer** 44:22

**computer's** 44:21

**concern** 24:14,18 87:3

**concerned** 86:3,18,20 128:24 143:6

**concerns** 92:6

**concluded** 35:1 149:5

**conclusion** 34:18 96:9 98:21, 25

**condition** 77:15

**conditions** 18:14,18 19:9

**conducted** 76:21 112:17

**confirmation** 59:14

**confuse** 135:24

**confused** 66:23

**connected** 93:9,10

**considerations** 32:5

**consist** 70:24

**constant** 57:3

**constantly** 86:4

**Constitution** 108:1

**contact** 80:15 138:3

**contacted** 139:7 144:23

**continue** 83:16 144:4

**continued** 56:16 61:24

**continuing** 6:9 7:18 33:17 34:21 37:15 41:21 42:9 44:9 45:6 46:11 48:7 50:11 59:9 63:1 65:2,12 66:12 67:9 68:25 70:3,9 72:8 73:17 74:14,23 75:17 78:9 81:1 83:24 84:19 86:14 88:1 90:3,22 92:15 95:17 96:10,20 97:20 98:7 99:1,11 102:9 103:6 106:19 110:10 120:6 121:5 122:18 124:25 125:19 127:1,23 130:15 131:8

**continuously** 57:7 100:21

**contractions** 24:21,22 26:16 29:18,25 49:4

**conversation** 20:7 26:7 40:4 73:21 80:21 81:5 118:20

**conversational** 4:17 5:4

**conversations** 126:16

**convince** 122:4

**convinced** 101:13 122:8

**copes** 130:5,6,7

**copying** 78:22

**corner** 119:3



**Corporal** 9:19

**Corpus** 73:5

**correct** 9:23,24 10:17,18,21, 22 11:5,8,9,10,11,24 12:15,16 13:2,3,6,14 14:20 19:18 20:1, 2,14 22:3 26:8 30:1,2,11 31:23,24 37:6 40:19 41:5 47:12 50:15 53:4 54:16 59:22, 23 60:13,19,22,25 61:3 63:3 64:24 65:4,7 66:3 70:18 71:24 72:21 73:1,2,5,6 79:13,14,22 80:24 84:15,16 87:13 89:5,22 90:5,11,12,13 94:25 95:1,7,11 96:3 97:14 99:3 101:14,17 104:22,23 106:12,13 108:12, 16 109:9 113:18 118:6,7,9,10 119:23,24 122:2 127:14,15 134:12,19 135:11,16,17,19 136:20 139:10 140:20 141:15, 16 147:2,3

**correction** 134:1

**corrections** 32:10,18 55:14,22 72:6 109:18 135:13

**correctly** 13:1 117:15,23

**could've** 105:16,17 112:7,8 123:10,11

**counsel** 40:23 65:9 66:8 69:7 74:4 75:13,19,22,25 84:1 87:15,22 88:3,9 89:24 94:6 98:2,23 103:1 127:21 129:13 138:13,24 139:1,4,5 141:23, 25 142:1

**counseling** 101:1,4,10 121:14,15

**counselor** 121:16,24,25

**count** 32:22

**country** 140:4

**County** 20:4 21:20 36:7 39:9, 25 40:4 58:24 59:15 60:16 63:16,24 64:7 76:2,8 86:23 99:6

**couple** 8:17 29:10 47:11 106:7

**court** 3:4,12,20 4:11,15,19 8:3 61:11,14,24 62:2 64:6 76:21,

24 78:1,20 83:11 85:8 86:4 87:6 90:21 107:25 113:17 119:19,20,22 120:4,5,11 124:22 125:3 131:17

**courtroom** 78:20,22 79:1

**cover** 8:11

**covered** 146:24

**crap** 80:23

**cream** 58:12,13

**create** 135:25

**creating** 13:25 14:2 128:5,9

**crime** 12:18,19 16:4 22:22 38:23 81:11 86:21 90:6 95:23 112:22 126:10

**criminal** 15:15 25:11 32:7 41:14 44:19,20

**cross** 109:25

**CROSS-EXAMINATION** 64:17 65:2,12 66:12 67:9 68:25 70:3,9 72:8 73:17 74:14,23 75:17 78:9 81:1 83:24 84:19 86:14 88:1 90:3,22 92:15 95:17 96:10,20 97:20 98:7 99:1,11 102:9 103:6

**crossed** 51:10

**crying** 25:21 26:25 27:3,8,21, 22 66:20 70:13 109:6 117:22

**Cuomo** 7:3

**curious** 22:18

**curly** 90:13

**current** 14:11

**cushion** 56:19

## D

**dad** 101:6,7

**damages** 129:15

**Daniel** 8:25 9:1,16,17

**date** 6:14 14:20 50:24 51:20 52:21 54:17 61:12,22 62:2

64:6 91:5,17 92:1,5

**dated** 88:7

**dates** 56:4 125:13

**daughter** 86:16 100:19,24 104:16,17 109:6 121:16,17, 20,23

**daughter's** 86:1

**daughters** 136:6

**day** 14:25 16:3 30:20,24 42:7 48:10 49:18,25 51:17 57:6 59:18,19 62:7 64:20 70:5 79:5,16 80:19,20 81:15 82:22, 23 101:9 103:19 104:2 111:16 112:21 117:20 125:4 133:2,12 140:11

**daylight** 71:6

**days** 51:1,19 117:10

**DDC** 18:10 19:1,12 21:6 26:8 29:24 30:1,11,19 31:5,23 32:8,17 55:4,12,18 109:20 133:23,25 134:4,16,18 145:19

**deal** 24:6,19,21 130:12

**dealing** 25:6 81:20 134:15 142:22

**dealt** 54:21

**Dearborn** 53:23

**death** 130:6

**decency** 103:8

**decide** 106:8

**decided** 53:6

**deciding** 112:9

**declined** 131:2

**defend** 102:2 126:15

**defendant** 3:11 88:15,25 89:11 117:11

**defending** 123:12

**defense** 75:22 102:3 126:13

**dehydration** 29:22,23



delays 51:7

deliberately 33:3 34:13

delivering 50:19

Democracy 123:20

denied 33:4 34:14

Department 13:16 15:11 32:9,
18,19 55:22 69:6,7 136:24

Depends 111:20

depleted 139:2

deposition 3:15,19 4:3,8 5:11,
12,16,23 8:14 58:18 115:5
128:19 149:5

depositions 36:24 129:2

Deputy 19:23 20:8 33:24 34:4
147:5,22

derived 14:1

destroyed 136:9

detail 105:25 117:4

details 117:10 145:4

detained 22:22

Detainee 19:7

detective 8:23 9:7,10 10:1
16:1,6 19:17,21 20:8,10,12
21:23 32:24 33:2,3 34:12,23,
24 35:7,11 36:7,15 37:8,18
38:22,25 39:8 47:25 60:11
73:7,11,13,19,21 74:1,4 75:22
76:12 78:4,11,14 79:12 80:13,
14,17,21 81:7,19,23,24 83:14,
19,22 84:2,24 93:18 96:16
99:14 112:18 113:8 116:7
117:25 118:15 126:20 136:18
137:1,2,3

detention 17:5 18:21 22:2
23:10 24:23 26:9,14 27:15
47:11 69:3,5,8,12,16,20 70:17
71:14,19 110:5

determine 81:11 88:11 94:3

Detroit 3:17 13:15 17:5 18:21
19:7 22:2 23:9 32:9,19 47:10
55:22 69:2,5,6,7,8,9,12,16,17,
20 70:17 71:14,19 72:11,14
74:10 88:5 102:21,22 110:5,
17 134:1,23 136:23 139:8
145:13

developed 13:16

developing 51:12

development 105:5

diabetes 17:8,20,21 18:2,5,11
72:2,19 109:21

diagnosed 17:7 18:4

diagnoses 17:14

diet 29:6

differentiated 72:5 134:2

differently 115:13 130:6,7

difficult 4:20 18:3 24:5
111:12,25

DIRECT 3:13 6:9 7:18 33:17
34:21 37:15 41:21 42:9 44:9
45:6 46:11 48:7 50:11 59:9
63:1

directed 20:10

disagree 21:11

discharged 29:1,4 48:22

disclosed 17:7 18:11

discovery 7:21

discrepancies 12:12

discrepancy 8:16

discuss 133:10

discussed 120:24

discussion 107:8 113:6
133:10

discussions 148:22

dismiss 63:20 64:2 85:20,22

dismissal 114:3,9,14

dismissed 83:1,3,9,17 84:22
85:20,23 87:1,13 96:1 111:8
113:17,24 114:6,12 124:21
125:7 136:10

display 93:15

dispute 41:25 42:3,6,11,13,17
44:11,16,18,23,25 45:9 88:12

disregarded 25:12 32:7

District 78:20 85:8 86:4 87:6
114:10 124:22 125:3

doctor 30:4 31:14 49:2 52:14
53:12 122:10

doctor's 49:21 50:20 51:6
53:11

document 9:13,18 10:20 15:6
33:12 87:15 88:3,5,10,11,12,
13,17,19,25

documents 93:2 94:18 132:14
147:6

dollars 38:10 77:22

don 116:9

Donald 19:23 33:24 147:5

door 23:25 26:22 27:11 28:17
64:21,23 65:4,6,14 71:3 92:22
93:21 103:22 106:24 108:13
134:21 146:20

doors 134:8

doubles 31:14

doubt 32:12

DPD 20:4 21:16 36:25 42:13

drawn 89:18

dress 79:6 110:19,23 111:9
112:3 135:18

dressed 27:25 28:2 66:17
106:25

dresses 111:2

drinking 95:5 116:12 117:23
118:1 137:9

drive 112:3,4

driver 26:11

driver's 14:11,16,21 15:11,20
16:14 33:1,6 91:7 94:16,20
98:3



**Porcha Woodruff**
**01/12/2024**                                                    8

drop 59:15

drug 64:23

due 50:24 52:21 91:17

dumb 52:20

Dyke 90:18,19

---

**E**

e.g. 15:15

earlier 60:13 117:19

earliest 22:13

early 29:20 50:19 51:1

ears 119:4

easier 114:18

east 134:18

Edition 131:5,6,7,10 141:5,7

effect 101:23 128:11 131:11

effects 105:6

eight-year-old 98:4 137:14

elaborate 105:10

else's 116:2

emails 54:2

embarrass 141:14,17

embarrassing 105:13 122:22
  123:4,7,17,18 125:24 129:23
  142:14 143:2

emotional 25:21 129:15

emotionally 79:10

emotions 23:22 24:2

encounter 116:23

encountered 9:9

end 16:5 38:19 91:22 108:21
  132:5

ended 12:3 37:22 43:18 61:11
  62:8 63:9 64:5 108:20

ends 8:12

engaged 118:8

engaging 117:14

ensure 29:6

entered 114:9

entering 134:4

entire 115:2

entry 114:14

established 147:4,8

estimate 111:23

event 41:14 53:2 108:25
  143:11

eventually 49:22 56:14 64:7
  65:22

everybody's 124:2

everything's 6:8

evidence 3:21 9:25 11:14,22
  12:7,10 34:9,11,14 37:17 40:1
  46:7,20 59:1 63:14 65:1,11
  66:11 68:22 73:16 74:13,20
  85:22 92:14 97:19 99:10
  147:9,12

exact 56:4

exam 61:8,9,15 62:12 63:4,21
  64:3,12

examination 3:13 6:9 7:18
  33:17 34:21 37:15 41:21 42:9
  44:9 45:6 46:11 48:7 50:11
  59:9 61:23 63:1 106:5,19
  110:10 120:6 121:5 122:18
  124:25 125:19 127:23 130:15
  131:8 142:3

Excellent 8:1

excerpt 22:11

exchange 73:23

excuse 27:13 30:15 34:23
  79:2 129:4

excuses 107:11

exercise 57:22

exercises 57:15,25

exhibit 88:4

exists 115:6

exonerated 98:12

expect 91:15

expecting 36:2

experience 56:12 108:23,24

experienced 54:13

experiencing 23:9 31:4,13
  49:1 54:12,15 56:9

expert 17:14

expiration 14:19

expires 14:19

explain 29:12 104:16,17
  106:11 139:1

explained 4:6

expressing 126:2

expunge 114:23

eye 32:13

eyes 119:3

eyewitness 148:7,8

---

**F**

face 145:2 148:15

Facebook 43:4,9,10,14,20,24
  89:20 90:5 91:21,22 92:17
  93:8,25 115:6 116:2,3,7
  136:19,21,24

facial 12:19,23 14:1,4 32:25
  44:13 89:5 90:6 97:13 98:3
  99:7 118:21,22,25 119:8,11

fact 20:12 32:24 34:4 37:18
  42:18 45:20 46:25 58:23
  82:25 84:14 85:7 86:1 94:18
  95:13 102:1 104:10 107:24
  109:4 116:23 118:1,3,8 119:8
  123:6 127:1,2 132:8,24
  137:11 140:7

facts 33:3 34:13 37:9 41:12
  65:1,10 66:10 68:8,14 73:16



**Porcha Woodruff**
**01/12/2024**

9

fighting 105:17

figure 23:12,23 53:15 63:15,
22 64:1,12

file 8:10 114:8,11,13,22,23
115:1 136:8,9

filed 8:9 115:11 129:17

filing 127:2

filled 19:8,12

finally 56:21 63:9,16 101:13

find 22:13 23:20 33:14 43:12,
24 45:18,23 46:2 55:25 61:6
62:1 63:7 107:9 127:10

finding 12:3 43:18 44:21

fine 5:18 17:3 22:10 31:21
49:13,15 59:11 68:24 90:21

fingerprinted 18:12 72:15

fingerprints 136:9

Fingers 51:10

finish 5:6,8 130:11

finished 35:25 141:25

firearms 144:12,19

fitted 110:23

five-minute 141:12

flight 38:16

floored 135:25

fluids 48:20

focus 53:17

follow 13:25 49:2,5,7,16,18,22
106:3,7 138:11 143:21

follow-up 50:13,14 52:9

footage 18:8

force 20:5 129:2,4

forced 119:18

foremost 24:3

forever 115:2

form 64:25 65:10 66:10 73:15

74:12,20 86:7 88:13 92:13
97:19 99:9 100:13

failed 9:10 38:25 39:11

fair 15:22 19:14 23:14 26:3,4
30:24 31:14 39:10 51:8 52:22
58:7 89:13 111:23 124:22
146:22 147:16

false 96:18 98:18 107:21
108:2

falsely 96:7

family 72:23 83:8,11 92:4
102:16 126:18

famous 140:8

fast 17:2 90:20

father 101:22 122:14

features 119:10

February 51:22 52:2 61:22,25
62:3,4 76:10,14 79:1 81:25
82:1,3,4,6,8,10,12,14,16,18,
20,22 83:1,3,19,22 84:2,22
88:7 91:13,23 93:13 117:7

Federal 3:20,21 8:3

feel 4:24 30:7 66:19 101:11
102:21 103:1,8,9 105:14
126:5 131:13

feeling 139:25

feels 16:2

fees 119:19 120:21 138:25
143:7

felt 102:24 117:3 133:11
139:24

female 9:8 10:10 11:19 28:16
41:8 42:3,6 67:17 73:23 88:20
117:20,21 118:9 147:1

fence 134:19

fianc 120:21 138:20

fiance 27:16 28:3 65:25 79:2
100:17 111:15

fight 63:25

forward 38:21 63:21

found 44:22 83:14 86:17 95:2
100:9 111:3 119:18

foundation 65:1,10 66:10
73:15 80:25 86:6 97:18

free 4:24 97:7,8,9,11

freedom 97:4

frequency 57:11

frequently 57:9

Friday 3:2 52:4

friends 43:4 92:4 115:14,15

front 57:21 75:10 108:16,17
109:8 145:2

fugitive 106:10

full 3:24

funds 138:23,25 139:1

future 105:5

---

**G**

gas 42:7,14 79:15

gate 103:4

gather 26:24 106:25

gave 17:24 47:25 54:25 60:4
78:17,23 81:22 82:2 92:1

general 143:25

generally 143:25

generated 91:12

gestational 17:8,20,21 18:1,5,
11 72:2,19 109:21

gimme 47:25

girls 103:9

give 3:7 5:1 18:16 33:12 37:25
48:22 55:7 77:21 78:24,25
104:8 111:22 112:6 120:23
141:11



Porcha Woodruff
01/12/2024
10

giving 24:11

Glover 9:19

goal 8:12

God 51:14

good 3:21,23 4:22 7:24,25 8:2 10:13 14:22 15:1

grab 79:24

granted 61:25

gray 9:19 75:25 134:25 135:1, 7,13

great 55:19

green 135:1

Greenwald 19:24,25 20:2,8 33:25 34:4,24 147:5,22

ground 4:7 25:24

guarantee 108:1

guards 23:21 25:11

guess 9:8 12:23 16:10 17:22 18:4 21:6 38:14 56:23 57:19 100:8 102:1 106:14 112:10 123:17 125:18 127:4 130:17 133:12

guide 25:15

guidelines 14:1

guilty 20:20 108:1 125:10

guy 49:14 54:20 100:11

guys 23:25 26:6

**H**

Habeas 73:4

hair 90:13

half 111:18,23 112:4 135:6

hand 3:4 92:24 93:2 132:15

handcuff 132:10

handcuffed 70:20 71:2,10 108:5 109:8

handcuffs 69:21,23

handle 28:8

handled 25:25 28:14,24 36:22 120:21

handles 145:10

hands 93:11 94:19

hang 141:20

hanging 114:22

happen 20:22 35:7 121:2 124:8

happened 8:16 27:19 32:17 50:13,18 55:18 61:9 62:7,19 63:8 68:2,13 76:13 80:2 81:11,24 85:13 99:22 100:22, 24 102:23,25 103:24,25 104:2,14 105:13 112:22,23 123:2,6 124:8 128:10,12 142:24,25

happening 16:2 142:20

hard 55:2 65:4

harm 16:7

hate 121:1

head 100:19 114:22

headed 90:16

heads 4:19

health 25:7 54:2,5,6,7 55:23 57:9

healthy 29:3,6 51:10

hear 78:4,11,14 125:7

heard 11:16 74:4 86:25 107:5, 6 142:8

hearing 62:14,17 85:15 86:22 97:13 103:1

hearings 85:16

heart 29:14 30:16 48:16 81:18 102:18 104:5,21,22

heavy 55:1

held 62:17 85:14,16

hell 24:16 25:5 26:25

helped 57:23 139:24 141:4

helping 92:5

hero 142:17,22

hey 20:24 21:23 23:21 28:17 31:23,25 32:6 38:12 39:10 117:4 123:10 145:1

hide 118:18 133:14

high 121:16 140:18

higher 97:17 102:5 105:19

highlighted 13:23 22:20 35:13,15,16 75:24

hired 120:12,13,16

history 22:18

hit 13:20

holding 20:11 103:17 112:25

home 25:18 57:23,24,25 66:5, 15 70:5 108:12,14,15 136:5 141:8,11

honest 16:16 32:6

honestly 20:20

hoopla 128:17

Hoover 117:21

hope 32:12 149:3

hoped 95:13,19

hoping 16:6

hospital 24:22 29:2,4,5 47:21 48:3 79:16 81:17

Hot 58:10,12

hour 22:23,25 23:5

hours 11:4 47:11 48:13 71:21, 22 111:18 112:1,4,5

house 26:7 27:24 28:14 106:10 107:1 108:17,18 109:14 143:14

human 44:21

hundred 38:10 77:22



**Porcha Woodruff**
**01/12/2024**                                    **11**

husband 79:2

hydrated 29:6

---

**I**

ice 58:11

Icy 58:10,12

ID 15:12

idea 17:16 23:13,15 24:12
25:5 120:22

identification 116:16 118:12
148:8

identified 10:10 11:15,18
44:14 45:9 47:1,3,6 88:24
89:4,7,11 137:13 147:1

identify 10:7 19:9 75:20 90:6
118:22 119:9

ignorant 49:14

ignoring 53:10

illness 22:19

image 14:1 44:13 90:9,16,17,
19,24

images 15:11,17 42:14 43:23
94:7

imagine 30:18 52:21 54:20

immediately 88:24

impact 30:23

impacted 29:8,12

important 108:4 133:6 137:11
143:19

impression 20:15,18

imprisonment 38:22 96:18
98:19

improper 86:9

in-car 18:9

in-person 148:18

inaccurate 45:24 46:25

inbox 92:7

incarcerated 102:11 105:8

incident 67:21 121:9 122:20
125:12

include 148:2

included 13:4 52:24 118:1,3,8,
15

including 52:18

incorrect 62:4

increased 31:7

incur 119:18

indicators 119:3

individual 9:9 11:1 19:20 95:4

individuals 109:17 119:7

induce 53:6

induced 51:2,3

influence 12:5

inform 31:25

information 24:11 43:12,13,18
46:19 49:21 60:9 64:8 68:1
93:14 138:3 145:1

informed 31:22

initial 25:18 75:8

initially 22:5

input 19:7

inquired 80:4

inquiry 90:16

inside 108:12,14,15 131:5,6,7,
10 134:6 141:5,7

instructed 5:12 29:2,5

instructions 10:14 48:23
50:20 51:7

insufficient 85:22

intake 49:6

intelligence 12:18 44:20 45:1

intelligent 44:19

intentionally 16:7 34:15 37:9

interchangeably 109:12

intercourse 117:14 118:9

interest 41:19

interesting 35:11

international 124:20

interrogatories 6:3

interrogatory 6:19

interrupt 25:13

interview 9:16,19 20:25 34:24,
25 35:8,25 36:9 73:11 75:2
76:20,21 125:25 127:17
128:12 130:21 141:12 148:15

interviewed 8:23 9:7,14 10:2
19:17 43:2 73:19 77:10
126:21 127:14

interviewer's 7:5

interviewers 124:7

interviewing 125:22

interviews 7:10 123:19 128:19
129:4,8,18 130:10 139:6,22
141:4

intoxicated 12:4

intrusive 141:7,11

invasion 149:1

investigating 132:18

investigation 26:2 28:9 41:14
89:15 93:19 94:3 99:5,14

investigations 99:3

investigative 44:14 45:15
87:19 88:7 90:24

involved 20:9 42:4 45:17,21
107:18 124:10 143:23

issue 14:20 24:5 28:15 31:23
48:5 81:3 146:6

issued 14:20,24

issues 8:18,21 12:12 28:13,24
30:4,10 31:5 48:17 52:13
100:12 105:6 130:12



**Porcha Woodruff**
**01/12/2024**
12

items 18:17

Ivan 85:15 120:11,13 121:2

---

**J**

jail 16:3 24:1 26:18 100:23
101:24 102:14 104:9 105:17
109:17 110:13,16 111:5
126:21 140:13 143:4

jailers 18:20,21 19:12 31:22

jam 37:10

January 3:2 91:23 117:20

job 28:9 107:10 137:8 146:2

jobs 107:15

John's 22:12 47:12 48:9,15
51:17 52:8

joint 20:5

jokes 107:1

joking 106:23

judge 21:18 36:17,19,22 85:14

---

**K**

Keeler 85:15

kids 52:20 54:21 103:23
104:1,11 140:24 142:12

kind 21:5 25:15 27:9 28:15,17
31:11 35:10 53:12 55:4 56:19
61:16 66:23 94:7 100:10
106:9 121:20 127:25 128:1
130:3 132:9

knew 9:8 34:9 68:8,13,18
73:14 75:4 76:15 80:23 81:3,
15 84:24 96:16 126:22 141:2
147:9

knit 90:10,13,14

knock 93:21 103:21

knocked 64:20,23 65:4

knowing 19:16 20:9 25:7
27:11,12 31:10 100:11

---

**L**

labor 24:20 29:18,19 48:19
49:5 50:17

lady 90:17 145:1

Land 6:4,7,24 7:2,5,9 8:13
34:17 37:11,14 39:4,12,19
40:3,13,23,25 41:2,9,15 42:8
44:5 45:2 46:4 48:6 59:5 62:8,
21 64:15,18 65:3,9,13 66:8,13
67:10 68:11,16,19,24 69:1
70:4,10 72:9 73:18 74:15,24
75:13,16,18 78:10 81:2 83:25
84:20 85:15 86:10,15 87:18,
21 88:2 89:24 90:2,4,20,23
92:16 95:16,18 96:11,21
97:21 98:8,22 99:2,12 102:10
103:7 106:18 109:23 110:2,8
120:2 121:4 122:10,13 124:24
125:15,18 127:20 129:9,12
130:4 131:5,7,19,21,24 132:1,
7 137:6 139:14,19

Lashauntia 3:17

law 94:9 98:2 107:22

Lawrence 9:2

lawsuit 124:14,17 127:2,11
128:18 129:18

lay 54:25

lead 44:14 90:24 110:1

leading 109:23,24 147:18

leaf 103:22

learn 76:24 77:4,14 146:4

learned 8:25 33:5,7 68:12 73:3
84:14 97:16,22 99:5 100:13
118:25 132:21

leave 59:4 79:20,21 97:2,5

leaving 96:24

left 47:16 48:2,11 60:4,5 81:17
116:23 137:10

legal 3:25 30:4 34:17 96:8
98:21,24 138:25 143:7

---

Lemme 35:10

license 14:11,13,21 15:11,20
16:15 33:1,6 91:7 94:16,20
98:4

licensed 17:10

limitations 148:24

lineup 10:6,9,14,21 11:18,21
12:2,6,14 14:2,12 22:21
33:19,20 34:5 45:10 95:20
147:4,20,23 148:18

lip 119:4

liquor 117:13,23

list 119:5 130:18 146:12

listed 145:4

listen 27:13 77:8 86:16

listening 23:19 24:10

location 132:9 134:12,15
135:5,14

locked 43:25 44:1 101:24
104:13

log 35:12 60:12 75:22,23

London 7:10

long 5:17 9:5 23:21 27:2 48:9
55:6 56:5 58:23 66:6 71:19
105:8 115:23 131:20

longer 21:16

looked 25:22 32:6 60:13 61:15
94:18

loose 103:22

loosened 57:2

lose 25:9 102:4

lot 8:15 23:22 32:11 40:24
43:25 49:14 55:20 78:17,23
97:13 102:19 103:10,11,12,
18,20 107:19 114:18 141:23
142:23 145:13

loud 92:12

love 61:6 100:8



**Porcha Woodruff**
**01/12/2024**                                                    13

low  29:21 81:18

lower  29:15 56:20 104:22

loyalty  100:14

---

**M**

made  13:8 18:2 27:9 39:8
40:17 64:3,11 72:10 76:10
79:13 92:12 104:12 113:8
115:20,21 126:13 129:17
130:8

magazine  123:21

magistrate  21:18 33:4 34:13
36:16 37:1,4 38:3,4 76:20
77:18,21 78:1,5,12 97:1

main  53:17

maintain  24:19,20 26:21 29:3,
5 102:17

major  24:13 129:24

make  4:21 11:16 13:14 14:6,8
15:3,24 16:13 18:15,16 21:22
27:18 31:19 34:5 35:20 48:18,
24 49:2,5 50:16 53:19 57:20,
23 72:6 76:19 78:21 79:25
114:18 118:11 119:12 136:14

makes  14:9 16:16,20 21:25
54:19 116:16

making  6:8 72:23 92:4 107:1
126:1

male  8:23,24 9:7

man  145:5

mandatory  144:7,10,12,19

manual  13:16

March  50:23,24,25 62:11 63:3
83:12 84:4,6,8,10,12 91:17

mark  75:19

marked  75:20 88:4

married  79:3 99:17 100:17

match  44:18 119:5

matched  12:25 14:3

matching  119:10

matter  16:23 69:14 82:25
84:14 85:7 86:1 94:18 95:13
104:10 105:22 132:24 135:18
136:10 140:7

matters  16:22

Mcbee  26:6

MDOC  109:17,21 110:15

MDOS  15:16

Meaning  114:10

means  4:12 17:5,17 85:23

measure  30:8

media  6:21 7:20 91:8,9,10
123:5 124:12,19,20 125:7,11
126:7,17,23 127:3,6,13,17
128:23 129:8,19 130:18,20
131:1 139:5,6,12,20,21

medical  17:11,14,15 18:14,18
19:9 22:11 29:9,11 30:10
47:14 52:9 53:2,21 77:15

medication  29:2,5 31:15

medications  48:25 58:7

meeting  52:10

members  13:25 117:19

mental  31:11 103:18

mentally  130:12

mention  81:7

mentioned  69:7 81:10 94:6
101:3 105:9,22 116:10,11
132:15,21 133:23,25 135:15
136:18 138:13,16 139:5
143:13

mentions  117:17

message  60:4,5

messages  40:7

met  42:23 43:8 107:11 117:11,
18,20

Mhmm  51:16 64:22 76:5
117:24 130:1 135:10 148:19

Michigan  3:1 12:15 15:7,10
32:9,18 69:10 85:9 97:2
148:24

middle  9:17

might've  30:23 123:10

mile  135:6,7

military  22:16 35:22

million  141:19 142:9

mind  25:4 95:15

mine  115:12

minute  44:6 66:18

minutes  35:24 47:19 60:16

mischaracterizes  72:4 78:6

misconception  108:3

misheard  112:12,14

misidentifies  97:16

misleading  46:18,21

misled  48:5

missed  33:12

misstatement  39:3

mistake  105:15 133:21

mistaken  48:12 124:16

mixed  9:2 135:21

mode  31:11

mom  28:3 66:16 86:5 101:5,7

moment  28:6,11 33:12 51:12
52:15 101:12

mommy  70:15

Monday  51:20 52:6,7

money  99:25 119:17 121:8,11

monitor  48:16 53:5

month  68:13

months  18:6,7 19:3 24:4
29:17 67:3,16,18,19 91:18,20
111:11,25 120:1 124:1,3
132:15 145:5



**morning** 3:22,23 22:6 48:11
57:1 60:3,6,19,25 71:5 144:9,
13 146:17

**mother** 27:4 54:21 101:22
109:4 122:14 140:13

**motion** 114:8,11,13,15,23
136:8,10

**motions** 31:9 115:1

**Motrin** 58:8,9

**move** 5:24 10:4 17:2

**moves** 25:15

**moving** 14:10 38:21 145:17

**mugshot** 13:1 15:15 44:12

**mugshots** 15:19

**multiple** 11:4 123:19

---

**N**

**named** 9:8 41:19,20 85:8
117:13 124:9

**names** 7:6,13 8:24 9:2 141:9,
10

**narrow** 8:17,18,21 12:11

**national** 124:20

**NBC** 123:23

**necessarily** 147:20

**neck** 54:12,14 56:10,15

**needed** 107:16

**neighbors** 71:8 126:19

**nervous** 104:5,7

**Network** 15:7

**networks** 123:20

**newborn** 104:11,21

**news** 86:22 123:5,19,23
124:19,20 125:7,11,22 127:17
129:8,17

**night** 116:12

**Ninth** 47:24

**nobody's** 24:10,11

**nod** 4:19

**normal** 53:4,5

**nose** 119:4

**noted** 62:25 130:19 131:15

**notes** 8:19 14:17

**notice** 40:7 43:7

**noticed** 51:11 93:1 94:19

**notified** 38:11 124:13,14,16,
17

**number** 3:16 6:19 11:1,5,10
13:23 47:25 60:4 80:16 85:9
90:8 91:7 120:23 142:8

**numbers** 35:13 36:4,6 75:23,
24,25

**numerous** 133:9

**nurse** 49:6

---

**O**

**Oak** 3:1

**Oakland** 20:4

**oath** 4:12

**OB** 49:11,12,22 50:1,2 51:18

**object** 86:10

**objection** 5:11 34:17 37:11,14
39:4,12,19 40:3,13 41:9,15
42:8 45:2 64:25 65:9 66:10
67:8 68:10,15 70:1,8 72:4
73:15 74:12,19 78:6 80:25
84:18 86:6 92:13 96:8,19
97:18 98:6,20 99:9 102:6
103:3 106:18 109:23 110:8
120:2 129:9

**objections** 65:8

**objective** 30:4,6,7 31:5

**objectively** 30:10

**observe** 27:22

**obstetrician** 49:10

**obtained** 117:8

**obvious** 148:14

**occasion** 127:13

**occasions** 5:5,10

**occurred** 10:11 11:20 67:21

**occurs** 17:21

**October** 91:5

**oddly** 20:5

**off-record** 7:16 33:15 44:7
46:9 50:9 87:24 132:2 139:16

**offhand** 115:22,24

**office** 21:20 36:7,9 37:5 38:8
39:9,17,25 40:4,18 49:24 50:3
60:16 63:17,25 76:2,9 79:19
81:8 99:6

**officer** 9:22 19:18 20:16 21:9
26:6,10 28:16 33:22 34:5,9,23
35:7 36:15 40:17 42:22 45:1
58:18 64:20 67:7,17 68:5
93:19 104:3 117:8 132:13
143:16 144:10,16 145:9
147:6,9,19,22,25

**officer's** 94:19

**officers** 9:19 14:3 18:9,25
19:2,8,12 20:25 23:24 25:23
26:5 27:3 28:7,13 36:25 44:19
55:14 65:16,18 67:11,14 68:8,
18 69:17,18 71:18 72:1,5,6
79:21 92:21 107:10,13
109:14,15,18,22 110:4,12,13,
15,16,17 126:20,21 132:8,19
134:1,2,16,23 135:1,3,7,13
143:13,19,23,25 144:3,14
145:17,21,25 146:18

**offices** 53:11

**official** 18:20

**OIC** 117:8

**older** 56:25

**oldest** 86:1 100:19 104:16
121:20



**Oliver** 3:17 8:23 9:7,10 10:2
16:1,7 19:17 20:8,10,12 21:9,
23 32:24 33:2,3 34:5,9,12,23
35:8,11 37:8,18 38:22,25 39:8
40:17 42:23 58:18 60:11
63:15 64:10 73:7,11,13,19,21
74:1 76:12 78:4,11,14 79:13
80:13,14,15,17,21 81:7,24
83:14,19,22 84:2,24 93:18
99:14 112:18 113:8 116:7
117:8,25 118:15 136:18
137:1,2,3 144:10 147:6,9,25

**Oliver's** 9:22 36:8,16 47:25
60:12 74:5 75:23 81:19,23

**omitted** 32:24 33:3 34:13

**omitting** 37:9

**one-minute** 40:7

**ongoing** 66:9

**online** 111:3

**op** 135:3

**open** 115:16

**operated** 32:8

**operates** 32:10

**opinion** 16:22 68:7,16,19
98:22 132:13

**opportunity** 8:6

**oppose** 37:18

**opposite** 135:5

**ops** 135:1

**ordeal** 105:7 122:24 123:17
126:5 129:16 130:9 143:2

**order** 58:11 61:16,24 85:13
106:8 114:9,14 116:1

**original** 50:24 90:9,19 91:17

**originally** 28:15 38:11 59:3
106:1 108:19 128:11

**out-of-pocket** 121:11

**outlet** 130:20

**outlets** 6:21 7:20 130:19
131:1,16 139:20

**outright** 113:24

**overweight** 17:23

---

**P**

**P-O-R-C-H-A** 4:1

**p.m.** 22:16 23:1 35:1,2,22
132:2,3 139:16,17 149:5

**PACER** 139:12

**pack** 58:11

**pad** 54:25

**PADDISON** 3:14 6:10,25 7:8,
14,19 33:18 34:19,22 37:13,
16 39:5,7,13,15,22,24 40:6,
16,22,24 41:1,3,7,11,16,22
42:10 44:10 45:3,7 46:6,12
48:4,8 50:12 59:8,10 62:23
63:2 64:25 65:8,10 66:9 67:8
68:10,15,17,21 70:1,8 72:4
73:15 74:12,19 75:15 78:6
80:25 83:23 84:18 86:6,12
87:17,23 90:1 92:13 95:15
96:8,19 97:18 98:6,20,24 99:9
102:6 103:3 106:3,6,20
109:25 110:5,11 120:4,7
121:1,6 122:16,19 125:1,20
127:24 129:11,14 130:2,16
131:9,15,20,23,25 132:4
137:4 139:13 142:2,4

**pain** 29:23 48:25 49:1 54:8,11,
12,14,21 55:5 56:10

**painful** 149:3

**Paladino** 50:2,3 51:18 52:10

**pants** 135:2

**papers** 92:24

**paperwork** 100:9

**paragraph** 8:21 9:6 10:5,12
11:12 12:13 14:10,12 17:4
19:16 20:8 22:1 29:1 33:2,3
38:21

**parents** 121:21

**Park** 3:1

**parse** 27:20 119:8

**part** 8:12 15:24 20:4 32:10
56:20 57:21,22 63:14 119:13
128:24,25 141:24

**partners** 36:16

**party** 85:20

**passenger** 26:11,12

**patches** 58:10,12

**Patient** 22:21

**pause** 26:23

**pay** 99:25 119:19,23 120:19
121:8,12 143:7

**Paying** 55:16

**PCC** 82:22,25 84:22

**pending** 58:24

**people** 4:18 19:1 26:2 31:23
105:7 107:10,20 119:5 123:20
126:17,22 128:2,6 129:24
140:2,4,18,22 142:16,23

**period** 66:6

**person** 11:2,15 20:13 37:2
39:10,18 47:1 63:3,17 68:22
76:11 85:15,16 106:1 124:9
126:9 141:10 148:16

**personal** 15:16 37:6,23,24
38:12,17

**persons** 41:19

**perspective** 16:9

**phone** 6:2 23:6,7 27:5 35:12,
13 36:3,6 39:2,21 40:1,7,14,
17 42:7 47:17,18,22,25 49:20,
23 58:19 59:1,4,17,25 60:12,
22 61:2 63:20 64:11 72:23
75:13,21,23,25 76:9 79:21,22,
25 80:4,8,12 81:10,20 82:2
112:16,17,19,25 113:7 132:18

**photo** 9:11 12:14 13:25 14:3,
7,8,12 16:15 32:25 33:1,6,8,
20 34:5 42:20 70:25 72:16
89:5 90:17,19 91:12 94:9,16,
19 95:10 137:14 138:7 146:25



Porcha Woodruff
01/12/2024                                                                                16

147:4,19

**photograph**  11:7,10 12:23
13:4,9 14:13,15 15:1,4 16:13,
23 34:9 44:12 147:10,14
148:1

**Photographic**  10:20

**photographs**  11:8 15:12,15,
16 119:2

**photos**  15:8,11,20 90:9 98:4
148:24

**phrase**  12:24

**physical**  53:22,23,25

**physically**  72:15

**physician**  17:10 49:8

**pick**  11:23 12:5,9 26:2 28:10
132:18

**picked**  11:1,5 12:2,8 18:10
23:4,5 47:16,20 57:12 137:18,
19

**picking**  12:5

**picture**  92:8

**pictures**  43:14 93:15 94:21

**piggybacking**  78:23

**ping**  112:19,21

**pissed**  27:9

**place**  7:12 55:19 66:9 95:22

**places**  5:11

**plaintiff**  10:10 11:19 12:14
17:7 19:16 20:9,10 22:1 29:1,
4 38:23 39:1

**plaintiff's**  14:11 32:25 33:1
38:24

**planning**  79:2

**played**  140:11

**PM**  22:3

**pocket**  138:14

**point**  23:18 26:15 27:23 31:4
53:16 56:17 58:25 61:24

64:13 66:5,19 67:21 68:7,11
69:2 72:11,18 73:3,7,13 76:24
77:1,16 80:15,23 100:8
102:20 104:24 108:11 111:10
112:9 113:25 117:12 128:17
129:16 131:14 145:23

**pointed**  42:16 88:20,23

**police**  13:15 15:7 19:7 20:16
32:9,19 55:22 64:20 69:6,7,9,
17 71:12 72:11,14 74:10 88:5
94:19 95:3 104:3 107:14
109:15 110:15,17 126:20
134:1,23 136:23 137:21
143:19 145:11

**policies**  21:6 148:22

**policy**  13:15 15:8 16:21 27:11
74:5,8 94:7,8 98:1,2

**porch**  108:5 132:10

**Porcha**  3:10,15,16 4:1 10:10
11:19 85:9 91:5

**Porsha**  4:1

**portion**  22:20 128:23

**position**  25:1 55:10,11 56:17,
22 102:16

**positions**  55:3

**possibly**  12:4 25:9 30:25 33:4
34:14 133:8 145:5

**post**  115:13 123:21

**posted**  7:3 43:10,13,15,20,25
92:17 142:5

**posting**  38:17

**posts**  115:20 142:9

**powers**  105:19

**precinct**  47:24 48:2 60:5 80:6

**pregnancy**  17:8,23 18:2 24:5
111:12,25

**pregnant**  17:25 18:1,6,7 19:3
23:17,19 24:4,15 25:1,12
29:17 37:25 38:12,14 42:16,
24 43:3,7,10,14,15,16,21
56:21 67:1,3,12,14,15 73:24

74:2 76:25 77:14,19 91:18,20
92:10 93:5,15,16 104:14
105:20,21,24 107:7 111:11,25
117:5 120:1 124:2,4 132:16
135:16,19 140:14,15 143:4
145:1,5,7 146:4

**prejudice**  85:22,23 96:5
114:3,6,9,15 136:10

**preliminary**  61:8,9,15 62:12
63:4,21 64:3,11

**premature**  29:19

**Prematurely**  29:19

**prepare**  147:20

**prepared**  33:20 34:4 117:25
132:24 147:5,23

**preparing**  115:5

**prescribed**  58:7

**present**  10:11 11:19 22:19

**pressure**  29:14,21 30:16
31:15 55:4

**preterm**  48:19

**pretty**  10:4 20:12 34:24
112:10 132:9

**primary**  49:7

**printed**  107:24

**prior**  22:23,25 31:13 38:24
53:7 72:4 78:7 81:15 89:16
94:3 99:14

**prison**  101:24

**privacy**  115:13,17 149:1

**private**  115:18,21,25

**probable**  148:9,11,17

**Procedure**  3:21

**Proceedings**  85:14

**proceeds**  138:14

**process**  21:2,5 26:20 27:10

**processed**  146:8

**produce**  131:16



**Porcha Woodruff**
**01/12/2024**                                                17

**produces** 119:4

**professional** 101:4,5,10,14,17
122:8 137:23

**profile** 43:24

**program** 12:23

**promised** 21:8

**prosecution** 36:10

**prosecutor** 37:24 38:11,20
77:5,6 78:15 84:15 85:14
86:23

**prosecutor's** 21:20 36:7,9
37:5 38:8 39:9,17,25 40:4,18
60:16 63:17,25 76:2,8 78:22
81:8 99:6

**prosecutors** 78:20,25

**protect** 107:15

**protocol** 20:21 143:21,22

**proud** 140:24 142:12

**provided** 35:11 130:18

**providers** 29:9

**psychological** 122:2 129:15

**public** 44:1 92:12 115:14,18,
20,25 127:8

**pull** 28:16 44:4 57:17 115:11

**pulled** 22:21 42:13,20 104:9

**pulls** 57:19

**pulse** 102:15,17

**purposes** 3:19 114:14

**put** 8:10,20 10:13 24:25 31:11
33:10,11 38:3,5,7 43:7 46:19
48:20 53:8 55:11 56:22,24
57:18 89:9 95:20 103:22
114:12 134:10 137:9,13,16,18
138:7,10 140:8 146:4

---

**Q**

---

**qualified** 17:13

**question** 4:24,25 5:2,6,8,13,

19,20 6:13,19 11:16,24 18:15
19:5 37:20 52:19,24 59:2 64:9
65:18 70:11 98:9 123:18
124:23 130:17 131:16 137:4
144:22 145:8,25 148:5

**question-and-answer** 4:8

**questioned** 100:10,14

**questioning** 21:14 100:24
148:13

**questions** 4:9 5:25 6:4,11,14
21:10 68:3 77:12 92:6 113:7,
11 124:6,8

**quick** 106:7 142:2 146:8

**quicker** 25:15

**quickly** 5:24 10:5 20:13
145:18 146:16,22

**quiet** 143:1

---

**R**

---

**race** 102:5

**raid** 64:23

**raise** 3:4

**ran** 69:9,12 135:2

**range** 18:2

**rate** 29:14 30:16 48:16,17
81:18 97:17 102:5,18 104:21,
22

**re-watch** 108:25

**reach** 36:21 93:25 112:20
137:21

**reached** 102:22 130:21 132:14
138:5 139:5 140:4,22 144:24

**reaching** 102:16 131:1

**read** 9:17 10:23 11:3 13:23
15:14,18 22:19 35:13 45:25
117:15,23 139:25

**reading** 13:1 95:2

**reads** 8:22

**ready** 62:21 64:15,16 136:6

**real** 12:19 23:16 36:8 90:6
142:2

**reality** 127:25

**realize** 20:12,16

**rear** 8:12

**reason** 5:17 10:12 11:13,22
19:6 33:5,7 34:8 41:25 42:3,6,
11,13,17,22 43:1 44:11,16,18,
23,25 45:3,8,9 54:6 64:10
111:4,9 113:20 119:13 124:12
147:15 148:14,23

**reasons** 133:9

**recall** 6:11 44:2 56:5 60:2
61:10 62:7,15 63:7 107:4
117:10 121:2 130:25

**receive** 89:15 143:25 144:3,4

**received** 141:20 142:8

**recent** 13:13 15:4,5 16:23 33:1

**recognition** 12:19,23 14:1,4
32:25 44:13 89:5 90:7 97:14
98:3 99:7 118:21,22 119:1,9,
11

**recognize** 55:19

**recollection** 62:18

**record** 3:15,18,24 5:7,12 6:18
7:15,17 10:19,23 13:24 17:15
22:11 31:20 33:13,16 38:1
44:5,8 45:14 46:10 50:10 72:7
75:14,21 87:7,25 108:22
114:24 131:15 132:3 139:13,
14,17 146:5

**recorded** 81:5

**records** 39:2 40:1 47:14 50:7
119:18

**RECROSS-EXAMINATION**
132:6 137:5 139:18

**recurring** 56:15

**REDIRECT** 106:5,19 110:10
120:6 121:5 122:18 124:25
125:19 127:23 130:15 131:8



**Porcha Woodruff**
**01/12/2024**                    18

142:3

**refer** 109:15

**referring** 120:3 142:16

**reflect** 3:15,18

**refrain** 24:23

**register** 61:16,19 85:8 86:4
  120:8

**regular** 52:19

**regularly** 52:12,22 53:10

**Rehab** 54:4,7 55:23 57:9

**Rehabilitation** 54:2

**related** 53:2,21

**relationship** 100:1,7

**release** 20:17 21:17,19 37:4
  58:25

**released** 22:2 23:3,4 29:3
  30:22 36:11 37:6,19 39:1,11,
  16 40:2,9,19 47:10 72:24 73:4
  74:6 76:16 111:5

**relevance** 102:6

**relevant** 120:18 121:2

**reliable** 116:16 118:12

**relied** 95:10

**remember** 6:5 19:22 35:5 52:4
  61:25 71:18 77:22 78:17 87:2
  113:11 115:11,19 131:3
  132:10 134:4

**removed** 87:9

**renewed** 14:22

**reopen** 114:13

**repeat** 11:16 42:25 104:2
  124:23

**rephrase** 4:25

**replaying** 133:12

**report** 31:18 45:15 87:19 88:7
  89:9 124:21 125:11,21

**reported** 116:25 127:13

**reporter** 3:4,12 4:11,15,20
  90:21 131:17

**reports** 95:3 116:11 124:12

**represent** 20:11 21:10

**represented** 60:11

**representing** 39:2

**request** 38:8,9 45:16,23 46:19
  88:6 90:8 117:6,25 118:15
  147:16

**requested** 50:7

**Requesting** 6:21

**require** 6:15

**required** 5:13

**research** 86:16 139:9

**researched** 87:5

**respect** 58:19

**respond** 4:9 5:20

**responding** 5:8

**response** 5:1 6:19 64:8

**responses** 4:21 7:21

**rest** 29:6 81:18,19

**rested** 48:24 50:16

**restrained** 96:24 97:4

**result** 29:22 30:13,14 31:5
  99:22 110:18 127:2 129:15

**results** 119:8

**retain** 23:6

**retrieve** 23:6,7 47:18 61:2

**return** 58:20 59:12,13 63:19
  64:10

**returned** 42:7 60:6,8,22

**review** 88:9,10,11

**reviewed** 18:8 44:19,21 45:1
  94:23

**reviewers** 12:25

**reviewing** 11:21 88:19 116:11

**revisiting** 148:21

**rewatched** 133:4

**ride** 26:7 47:17,18

**riding** 104:3

**risk** 38:15,16 48:18

**road** 121:1

**robbery** 10:11 11:20 20:10
  38:2 68:8 85:2 124:11 145:6

**roll** 56:25 57:21

**rolled** 108:20

**rolling** 108:20

**room** 19:18 134:6

**roughly** 22:25 34:25 35:1,24
  56:5

**roundabout** 136:16

**rules** 3:20,21 4:7 8:3

**run** 57:11 106:23 107:2

**running** 107:1,7

**rushed** 79:16

**rushing** 95:22

---

**S**

**Sabree** 85:14

**safeguard** 29:7

**sanity** 24:20

**saved** 105:21

**saving** 121:10

**scan** 81:10

**scans** 119:1

**scared** 56:7 104:1,7

**scheduled** 52:12,22 53:10
  61:23 101:16

**school** 17:11 22:7 57:11
  121:16,22,25 132:25 133:2
  136:6 140:18

**scroll** 52:2



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Porcha Woodruff**
**01/12/2024**                                                    19

search  112:17,23 113:2,4

seat  56:18

sec  33:13

section  13:20,23 15:10,14

security  90:18

seek  53:21

seeking  126:3

sees  121:16

segments  7:7

select  11:14

selling  103:23

sense  13:8,14 14:6,8,9 15:3,
  24 16:13,16,20 21:22,25 34:6
  35:20 119:12 128:2 136:14

serve  107:15

service  112:19

Services  54:3,5,6,7 55:24
  57:10

session  4:8

set  105:25 115:17 121:17

setting  4:17 5:4 43:4

settings  115:13,17

sex  117:5 145:6

sexual  116:23 117:14 118:8

she'll  106:23

sheet  19:7 90:7

Sheriff  20:4

shock  23:16

shoestrings  18:16

should've  143:3

shoulders  4:19 137:3

show  9:10 13:15 15:6 35:10
  64:11 85:7 87:1 92:8,10

showed  28:22 79:12 87:15,18
  88:3 98:2 137:7,8

shower  91:24,25 92:1,5

showing  12:22 67:5,7 93:16

shown  10:6,9 11:18 98:4

shrug  4:18

shutter  138:1

side  15:25 106:23 128:5
  134:18,21 148:23

sign  99:6

signed  9:13 10:17 21:12,16

significant  91:22

similar  9:13

simple  94:8 129:14 148:2

simply  4:8 6:13 28:9 129:16,
  17,19

Singapore  7:11

single  103:19 124:21

sinks  104:5

sir  86:7 94:17

sit  99:13 134:6

sitting  24:15 25:5 27:7 29:24
  54:24 55:2,3,5,9,10 56:10,19,
  24 57:8 98:5,11,14 102:18
  115:19 124:6 136:5

situation  24:25 28:14 29:8
  101:6,8 102:25 105:13 126:8
  130:8 136:1,3 143:2

situations  105:15 127:10
  142:18 143:5

six-pack  10:6,9 11:8,18,21
  33:19 45:10

Sky  123:23

sleep  56:14

sleeping  55:8

slides  134:19

sliding  134:8

slouched  57:5,7

small  26:6

snap  91:1

sob  81:22

social  6:21 43:4 91:8,9,10
  121:22,24

socials  43:14,15

software  14:4

solemnly  3:6

someone's  28:10

son  17:23 18:1 53:19,20 55:1
  56:2,3,5 101:25

sought  53:1 101:3,10 122:1

sound  20:1 39:3

sounds  20:2 142:16

space  129:20

spaces  57:19

sparked  129:8

speak  63:16 142:24

speaking  143:1

special  48:23 135:1,3

specific  53:21

specifically  16:10 115:20
  143:24

speculate  41:17 70:2

speculation  37:11,14 39:4,12
  40:14 41:9,15 42:8 45:2 46:4
  67:8 68:10,15 70:1,8 74:13,19
  83:23 84:18,21 98:6,20 102:7
  106:18 124:24 127:20 130:4

speed  5:23

spell  3:24

spend  112:1

spent  16:3 138:16

spoke  6:1 23:24 60:24

spoken  6:22 8:13 16:1 130:19

spot  128:1

St  22:12 47:12 48:9,15 51:17
  52:8



Porcha Woodruff
01/12/2024                                                    20

stable  102:18

stand  142:19

standing  55:10 108:13

standpoint  29:12

start  26:17 27:21 29:25 31:4
56:9,15 64:19 130:11 144:4

started  8:14 26:25 27:3 34:25
56:16 103:1

starting  117:7

state  3:24 15:7,11,12 31:11
69:9 74:4 85:9 117:11 148:24

stated  10:24 24:4 31:22 86:23
95:3 117:9,19 133:4 135:24
138:24 146:20

statement  10:21,24 11:21
45:19 46:17 104:12 117:9
148:2

states  9:6 11:17 12:13 22:19,
21 32:22 107:24

Statewide  15:7

stating  76:11 132:10

station  42:7,14

stay  29:6 48:24

stayed  50:16 112:8

step  28:18 40:9

stepping  28:19

stomach  56:21 104:5

stop  36:10 79:5 109:6

stopped  49:3

stories  107:11 126:7 127:17
129:24

story  81:23 86:8 106:16 118:3
126:1,12 128:2,13 129:17,21,
22

straight  57:8

straightforward  133:17
139:15

strain  55:11 56:13,20 100:1,16

street  9:9 104:4

stress  29:23 31:11 53:8 128:5,
9

stressful  103:18 122:21
123:4,18 125:24 128:9,20,21
129:23 130:9,11 136:16

stretches  57:25

strip  134:10

strongly  138:1

stuff  17:17 25:25 55:17 64:1
139:3 143:9

style  112:11

subpoena  63:24 64:8

subpoenas  29:9

subsequently  76:17 89:9 95:2
96:1

sugar  17:22

suggest  46:24 118:17 147:9

suggested  40:1

Sunday  51:20,23

superior  144:23

supplement  7:9,12 130:20

support  142:6,9

supports  10:1

supposed  11:2 112:13

Supreme  107:25

surgical  17:12

surveillance  42:14 44:13

suspect  8:23,24 9:7,10,16
12:25 41:8,20 42:4,6,16 47:1,
6 58:25 73:23 74:1 75:4
81:13,15 84:25 88:20,21,24
94:4 107:17 118:9 119:10
146:1 147:1

suspects  10:7

suspicions  16:4

swear  3:6

sworn  3:11 4:11

system  74:6 114:12

—————————

T

takes  58:18

taking  4:16 26:9 27:15 55:15,
17 69:18

talk  23:8,20 101:7 103:21
104:17 109:14 117:22 119:15
121:14,21 124:4 129:25
133:11

talked  78:1 84:14 98:2 101:22
113:6 126:6,23

talking  20:7 27:4 66:16 90:20
101:5,11 121:17 122:20 126:4
127:3 128:6 143:24 145:21

talks  117:18

tap  137:2

task  20:5

team  106:10

teases  104:11

technically  101:23

technician  17:12

technology  12:24 44:14
119:9,12

telephone  76:1 137:19 138:3

telling  26:23 27:10,13 39:17
47:21 48:25 106:24 141:20

tells  85:13

tend  37:18 118:11

tendency  4:17

terms  17:19 26:16 109:12

terrible  16:2

testified  110:21

testify  4:12 17:14 36:8,25
58:19 147:23

testimony  3:7,18 72:5 78:7



Porcha Woodruff
01/12/2024                                                                21

tether  37:25 38:3,5,7,13,19,20
77:24

text  92:9

therapist  30:6 53:23,24,25

therapist's  53:25

therapy  53:22 122:1 126:3
141:21

thing  5:4,18,22 24:9,13 25:4
28:3 41:18 45:13 53:15 57:20
58:15 61:5 68:20 76:12 109:3
113:21 115:2 124:1

things  4:18 5:23 8:17 27:20
31:12 42:15 49:14 51:13 58:2
74:11 78:17 91:6 101:21
102:13,14,19 114:18 115:14,
18 118:11 136:17 140:25
148:21

thinking  24:2 25:2,10 27:14
105:19 111:10 144:25

thinks  100:23

thought  20:18,24 64:4 68:23
82:25 112:13 113:16,23
117:12 122:6 127:7

thousand  38:10 77:22

thousands  119:1

three-page  114:15,22

throwing  25:24

Thursday  52:3,4

time  5:24 9:5 12:19 20:23
22:13,16 25:10 29:17 31:5,6,7
35:22 40:23 43:2 45:14 52:18
53:1,3,13 54:13,15 55:23
60:2,17 62:11 65:23 66:6 67:1
71:2,4 86:13 90:6 102:20
104:24 106:9 111:10,12
112:9,11 113:16,17 115:23
116:25 119:25 124:21 125:11
127:12 129:22 131:11,14
138:2 145:10

timeline  22:9

times  35:17 55:18 103:24
123:20 142:24

timing  51:5

title  18:20

titled  10:20

today  4:12,16 94:10 98:5,14
99:13 115:19 130:20

told  12:1 17:1 19:5,23 23:24
27:16 36:6 37:24 47:20 49:2,
5,18,24 50:16 58:21,22 59:12,
13 60:8 65:22 66:22 68:5,11
71:18 72:1 77:5,6 79:20,21
81:18 104:24 109:20 110:3,14
112:20 117:2 118:24 126:12
128:2 129:21,22 139:7 140:5

top  24:5,13,19 25:6 34:2 88:5
90:7 117:18

topic  119:15 130:17

totally  138:5

touch  78:12 80:17

tough  119:15 128:1 129:20

town  97:8,11

training  143:20,25 144:3,5,10,
12,19

transcript  62:1 63:7

transferred  18:10

transport  25:19

transported  109:22 110:12

traumatic  108:23,24

traumatizing  109:1

travel  135:18

traveling  79:5

treat  115:12

treating  54:11 81:13

treatment  53:2,21

treatments  52:10 53:11

trial  31:15

trickle  131:11

trickling  128:11

triggered  31:12

trimester  17:22 18:6

Trinidad  9:8 117:13

trip  111:16 135:15

truck  111:15

true  28:7,12,13 38:24 39:2,24
40:8 45:21 46:13,16 106:21
116:5,6 143:11

trust  148:21

truth  3:7,8

truthful  28:8

truthfully  4:10 32:6

turn  10:19 15:10 85:12 131:10
141:4

turnaround  111:17 112:8

turned  130:21 131:21 141:12

TV  127:14

type  12:5 25:1 53:1 57:15
89:15 99:13 105:14 112:10
143:4,21,22 144:24

types  17:25

## U

uh-huh  4:18

uh-uh  4:18

ultimate  24:14

ultimately  24:1 27:14 50:22
130:13

unborn  29:7

uncomfortable  56:11

undergo  143:20

underlying  41:13

understand  4:13,15,24 5:1 8:9
15:18 16:1,2,4,6 27:13,17
58:17 61:20 74:10 93:18
102:4 107:20 108:4 109:4
114:3 119:11 120:9 121:19
130:2 133:8 134:14 141:23



145:10

**understanding**  17:19 20:15
32:14 45:20 46:15 63:12

**understandings**  21:1

**understands**  41:12

**understood**  5:2 49:15 145:15

**unfairly**  139:9

**uniforms**  134:25 135:7,14

**unique**  8:15 125:5

**unit**  12:18 145:14

**United**  107:24

**unlawful**  38:22

**Unofficially**  16:22

**unsure**  21:5

**untrue**  45:18 46:21,25 47:8

**unusual**  107:9

**ups**  106:8

**upset**  16:3,5,10 25:19,20,21,
23 26:16 27:9,19 66:20,21
75:6,8 80:10 81:19 86:11,12
95:9 97:24 116:10 117:21

**upsets**  116:13

---

**V**

**vacation**  97:8,9 135:21

**valid**  146:2

**Van**  90:18,19

**vehicle**  117:22

**verbal**  4:22

**versus**  3:17 85:9

**victim**  8:24 9:1 10:5,9,20
11:17,18 12:3 45:9 47:3,4,6
89:7 95:3 116:12 118:1,8
146:25 148:8,15

**video**  12:1,2 18:9 27:5,21
42:14 63:5,6 92:21 94:23
107:4,5 133:4,7,9

**view**  26:5

**viewing**  92:21

**virtual**  62:14,17

**visibly**  67:5,7

**visit**  73:7

**visits**  53:12

---

**W**

**W-O-O-D-R-U-F-F**  4:2

**wait**  47:16 49:20 52:5 146:9

**waited**  125:13

**waiting**  29:10

**walk**  45:15,17 46:1 75:5

**walked**  20:19,24 134:16

**Walker**  9:2 10:6,17 11:14,22
117:9,19,21

**walking**  8:19 102:18

**wanted**  14:19 37:25 38:2,3
48:16 53:5 58:20 59:12 109:1
112:18,20 117:11,22 126:8,
12,13,15 141:8,10,25

**warrant**  21:12,14 28:10,22
32:23 33:4 34:14 45:16,24
46:19 65:17,19 66:23 73:4
74:5 88:6 89:16 99:15 117:7,
25 118:15 137:7,8 138:7,10
146:3 147:16 148:3

**warrant's**  21:16

**warrants**  99:7 107:11

**Washington**  123:21

**wasting**  86:12

**watch**  27:21 56:6,7 133:6

**watched**  25:18 107:5,6

**watching**  25:18,22 69:24
108:21 109:5 133:9

**water**  31:25 50:18 85:25

**Wayne**  21:19 36:7 39:9,25
40:4 58:24 59:15 60:16 63:16,

24 64:7 76:1,8 86:22 99:6

**wearing**  134:25 135:7

**wedding**  79:6 99:19,21 110:19
111:1,10 119:13 121:8 138:23

**wedding's**  143:6

**week**  53:3

**weekday**  51:24 52:1

**weekend**  111:17

**weeks**  56:8 57:13 91:18

**wellbeing**  29:7

**White**  9:1,18 10:2

**wife**  52:19

**wife's**  30:6

**WITESS**  130:1

**woman**  25:1 90:10 124:1
145:7

**women**  97:17 102:4 142:25

**wonderful**  4:15 79:12 137:8

**wondering**  124:2

**Woodruff**  3:9,10,16,17,22 4:1,
2,3 5:22 6:22 7:20 10:10
11:19 85:10 88:25 91:5,8
135:25 139:20 149:3

**word**  10:13 123:12,14 127:5

**words**  14:2 30:3 121:7

**work**  10:13 138:17,20,23
144:5 145:11

**worked**  109:17

**worker**  121:22,24

**working**  58:5 119:25

**works**  119:12 124:18

**worried**  102:11

**worry**  62:22 105:2,4 114:21

**worse**  130:9

**would've**  13:8 14:22 16:14
20:24 21:12,13 22:25 30:21
33:4 34:13 38:14 42:23 43:3,



7,9 51:23 52:2 59:20,21
62:12,14 95:13,19 98:12,17
112:6,7 121:9 126:17,18
138:2 144:18

**wow** 148:20

**wrapped** 115:2

**writ** 73:4 120:14

**written** 5:25 46:24 74:5 75:24
117:8 147:16

**wrong** 37:2 39:10,18 76:11
104:19 128:25 135:23

**wrongfully** 22:22

**Wrongly** 47:6

---

**X**

---

**Xfinity** 112:20,21

---

**Y**

---

**year** 67:24,25 68:1,5,12

**years** 32:25 94:11,13 95:11
138:8 147:1,14

**yoga** 58:2,4

**York** 123:20

**young** 90:17 97:16

**youngest** 100:23 104:16
121:17

---

**Z**

---

**Zoom** 85:18



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

# EXHIBIT
# 6

# PLAINTIFF'S EXPERT REPORT

PORCHA WOODRUFF

v.

CITY OF DETROIT

AND

LASHAUNTIA OLIVER

CASE 5:23-cv-11886-JEL-APP

# Plaintiff's Expert Report

Table of Contents

*I.*   *EXPERT REPORT OF TIMOTHY DIXON* ................................................................. *2*

*II.*   *QUALIFICATIONS OF TIMOTHY DIXON* .......................................................... *2*

*III.*   *MATERIALS REVIEWED IN MAKING OPINION* .............................................. *7*

*IV.*   *BACKGROUND* ....................................................................................................... *9*

*V.*   *SUMMARY OF OPINIONS* .................................................................................. *10*

*VI.  DEFENDANT OLIVER DEVIATED FROM GENERALLY ACCEPTED POLICING*

*PRACTICES* ...................................................................................................................... *11*

*VII.*   *CONCLUSION* ..................................................................................................... *17*

## I.    EXPERT REPORT OF TIMOTHY DIXON

My name is Timothy Dixon, and this is an expert report based on the information available at this time relating to the arrest of Plaintiff occurring on or about February 16, 2023, and the on-going lawsuit between Plaintiff and Defendants.

## II.    QUALIFICATIONS OF TIMOTHY DIXON

I was a police officer for 8 years in the Baltimore Police Department beginning in 1993 and I left the agency in 2001 as a Police Lieutenant and an attorney to become a prosecutor in the Baltimore City State's Attorney's Office.  While a Police Lieutenant, my job was to supervise police sergeants and command shifts of uniformed police officers. I also served as Associate Legal Counsel for the Baltimore Police Department.  My duties during that time included, but were not limited to, prosecuting civil forfeiture cases and responding to Maryland Public Information Act requests and answering criminal and civil litigation subpoenas. I also collaborated on policy development, including examining, writing, and revising police department rules, regulations, and policies ranging from stops, searches, and arrest, use of force policies to member discipline.  I also worked and collaborated on disciplinary matters relating to member misconduct which also included use of force, police misconduct, and other violations of departmental policy.

As a Police Sergeant my duties included, but were not limited to, supervision of uniformed patrol and plain clothed officers and agents in their daily performances of duties. I also acted as shift commander in the absence of a permanent ranked lieutenant. I issued daily assignments relating to law enforcement and public safety activities and ensured the chain of command and discipline was maintained within the operation of the units I supervised.  As a Sergeant, I worked in the Southwestern, Southern, Eastern Districts and supervised both

2

uniformed and plain clothed officers.  Also, as sergeant, I investigated and collaborated on investigations of uses of force incidents to include, but not limited to police officer involved shootings, discharging of firearms, and use of departmental issued weapons, and physical force to include those involving deaths of persons that also involved the police.  Part of my job was to also ensure that officers followed the law and departmental policies regarding stops, searches, and arrests.

As a Police Officer and Police Agent, I initially worked in uniform patrol, my primary responsibilities included, but were not limited to patrolling assigned areas in search of suspicious activity and violations of criminal statutes and to protect public safety, which included but was not limited to 911 emergency calls for services.  After a year in patrol, I was transferred to the Northern District Drug Enforcement Unit where we investigated street and mid-level drug traffickers.  I then voluntarily transferred to the Eastern District patrol and then the Eastern District Flex Operations Unit which was both uniformed and plain clothes crime suppression assignments.  I then was reassigned to the Eastern District Drug Enforcement Unit. Following that assignment, I was briefly assigned again to patrol and then promoted to the rank of police sergeant in my third year of service.  While in the rank of police officer and police agent, I also worked as district drug enforcement investigator. As a district drug enforcement investigator, my duties included, but were not limited to, compiling information and evidence necessary to investigate and initiate prosecution of mid-level drug traffickers and violations of the controlled substance statutes and other related criminal violations of the State of Maryland.

As an officer, I was involved in incidents of use of force ranging from use of my firearm to use of other department issued equipment as well as physical force and physical restraint

of individuals. I have made and/or participated in hundreds of arrests and many of them involved the use of force.

I have a Juris Doctor degree from the University of Baltimore School of Law, and I am admitted to practice law in the State of Maryland and Washington D.C.  I have also litigated criminal and civil cases in the state and federal courts in Maryland and Superior Court in Washington D.C.  I also have a Master's degree in Public Safety Leadership and Administration as well as two graduate certificates in Leadership in Diverse Organizations and Criminal Justice Administration from the University of Maryland, College Park.  My undergraduate studies include a bachelor's degree in United States History as well as an undergraduate certificate in African American Studies from the University of Maryland, College Park.

Following my time with the Baltimore Police Department, I served as an Assistant State's Attorney in Baltimore City where my duties were to prosecute persons charged with misdemeanor and felony violations of state and local criminal statutes which included preparing and investigating criminal cases for trials and hearings. My job duties also included preparing and interviewing witnesses for those trials and hearings.  I was also tasked to make decisions to prosecute or decline prosecution of criminal cases in accordance with the law and office policies at the time.

I also served as an adjunct faculty member in the criminal justice department at Baltimore City Community College. There, I instructed various courses including criminal procedure and criminal law, civil procedure, torts, other aspects of civil law, people's law, and contract law.  During the instruction, I facilitated group and panel discussions on multiple legal issues

4

as well as prepared and delivered lectures to undergraduate students on criminal law and criminal procedure.

As a criminal defense attorney, I have represented criminal defendants, including police officers in State and Federal Courts in all phases of criminal law process. As a member of Federal and State misdemeanor panels, I represented indigent defendants in both the state criminal court and United States District Court. In representing criminal defendants, I have managed and analyzed cases, prepared and filed legal documents, interviewed clients and witnesses and identified and presented defenses and recommended appropriate action in criminal proceedings. I have also litigated serious felony and misdemeanor criminal cases to verdict before judges and juries.

As a civil litigator I have represented plaintiffs in state and federal court who brought claims against defendants for violating their civil rights. I have also defended police officers accused of civil rights violations to include violations of state and federal constitutional rights as well as Title 42 § 1983 claims, constitutional and state law claims, to include Due Process Rights and excessive force causes of action in both State and Federal courts. I have litigated these types of cases to verdict before judges and juries as well.

I have also represented police officers accused of misconduct including violations of departmental policies, including allegations of violating state and federal constitutional rights in administrative departmental hearings as well as in state and federal courts. I have also litigated administrative departmental disciplinary matters for the Baltimore Police Department to include, but not limited to, initiating, and preparing administrative charging documents and assisting in prosecution of violations of departmental policy as Associate Legal Counsel for Baltimore Police Department. The representation of police officers has

included phases from the internal agency investigations stages of initial notice, through interrogations, and disciplinary board hearings.  I have also litigated in trial courts, Application for Show Cause Orders for the protection of due process rights of law enforcement officers.

I currently supervise the Legal Education Unit at the Education and Training Division of the Baltimore Police Department.  The Baltimore Police Department has more than 2000 sworn members and more than 500 professional employees.  I currently supervise a team of attorneys that instructs and advises members of the agency on state and constitutional law and departmental policy.  The unit I supervise also collaborates on the development and reviewing of departmental policies ranging from searches, seizures, and arrest to use of force policy as well as nearly every aspect of policing.

I am also a Maryland Police Correctional Training Commission (MPCTC) certified legal subject matter expert and a certified instructor.  I instruct both continuing education and entry-level legal education as well as other courses for sworn police and professional members including the command staff of the Baltimore Police Department.

I have been retained thirteen times as an expert witness since beginning working as an expert witness in 2021.  Each of the times involved cases of violations of constitutional rights among other allegations of police misconduct.  I have testified as an expert four times on matters involving policing practices.

My experience, training and background are more fully described in my CV/resume, which has been supplied.  My areas of expertise in policing practices include, but are not limited to: Policing, Civil Rights, Constitutional Law, Police Misconduct, Searches, Seizures,

Arrests, False Arrest, False Imprisonment, Wrongful Death, Law Enforcement and Police

Practices, Police Procedures, Excessive Force, and Use of Force.

My opinions in this report are to a reasonable degree of professional certainty in the areas

discussed and are based on the materials reviewed and information that I have learned of

during my work on this matter.

## III.   MATERIALS REVIEWED IN MAKING OPINION

I reviewed the following materials in making my opinions:

1.   (4) Plaintiff's Complaint and Demand for Jury Trial.pdf;

2.   Index of Exhibits to Plaintiff Porcha Woodruff's Complaint;

3.   Detroit Police Department Reports from the Incident.pdf;

4.   Arrest Warrant and Supporting Documents for Porcha Woodruff;

5.   Victim/Witness Photographic Lineup Statement

6.   DPD Manual Facial Recognition;

7.   PCC Transcript;

8.   State of Michigan-SNAP Acceptable Use Policy.pdf;

9.   Victim's Written Statements.pdf;

10.   6 Pack Photo Lineup used to identify Plaintiff.pdf;

11.   Plaintiff's Current Driver's License.pdf;

12.   Video footage of Plaintiff being arrested. Video footage was recorded by

Plaintiff's fiancé, Michael Short.pdf;

13.   Booking Bracelet from Detroit Detention Center when Plaintiff was processed.pdf;

14.   Hospital Records where the Plaintiff received treatment after being released from the

Detroit Detention Center.pdf;

7

15.  Audio of LaShauntia Oliver telling Plaintiff she can't have her cellphone returned until a search warrant was obtained.pdf;

16.  36th District Court Transcript from Preliminary Examination where the criminal case was dismissed March 7, 2023.pdf;

17.  Plaintiff's Facebook post during the relevant times.pdf;

18.  Plaintiff's photos from around the time of the incident showing that she was 8 months pregnant.pdf;

19.  Porcha Woodruff Tax Return.pdf;

20.  Deposition of Woodruff, Porcha 01-12-2024.pdf;

21.  Porcha Woodruff Interrogatory Answers.pdf;

22.  Defendants' Third Supplemental Disclosures.pdf;

23.  Ltr. to OC re Defs. Third Supplemental Disclosures.pdf;

24.  Woodruff Plaintiff's Rule 26(a)(1) Disclosures.pdf;

25.  Defendant OliverAudio.mp3;

26.  Second Woodruff Rule 37 Letter.pdf;

27.  Porcha Woodruff Second Request to Produce for Detroit.pdf;

28.  Facebook Post of Porcha Woodruff Near Alleged Incident.jpg

29.  Pages from Woodruff, Porcha Amaya - Wayne County Prosecutor's Office.pdf;

30.  Porcha Woodruff Initial Disclosures - reduced docs.pdf;

31.  PO Oliver Phone Records_Redacted.pdf;

32.  Porcha Woodruff - Ltr to OC re Defs Initial Disclosures.pdf;

33.  Porcha Woodruff - Fourth Supplemental Disclosures (Docs).pdf;

34.  Woodruff, Porcha - Wayne County Prosecutor's Office Subpoena (1).pdf;

8

35.   Woodruff, Porcha - Wayne County Prosecutor's Office Subpoena.pdf;

36.   Porcha Woodruff Initial Disclosures.pdf;

This expert report is based on materials reviewed up to this date.  If any subsequent information is received that might modify any of my opinions, I will supplement this report.

## IV.   BACKGROUND

On January 29, 2023, Laurence Walker (Victim) reported to the Detroit Police Department that he had been robbed at gunpoint for his personal property and his vehicle.  The victim stated the robbery occurred after meeting a woman at 6240 Van Dyke Detroit, MI 48213 (hereinafter "BP gas station").  Victim also stated that he was drinking and possibly drugged during the incident.  On January 30, 2023, Defendant Oliver, a Detroit Police detective from the commercial auto theft unit of the Detroit Police Department was assigned the case.

On January 31, 2023, Defendant Oliver contacted the Victim and was informed that victim's cellphone that was stolen during the robbery had been returned to the BP gas station. Defendant Oliver learned that the cellphone was returned to the BP gas station by a female. Defendant Oliver went to the BP gas station to view the video footage of the individual that returned the cellphone. She submitted an AVERT request to members of the Detroit Police Department to extract the video. Once the video was extracted, Defendant Oliver submitted a facial recognition request for the female that returned the cellphone. Facial recognition returned a report with a lead that PLAINTIFF (Porcha Woodruff) could possibly have been the person returning the cellphone. Plaintiff was one of several persons that the report identified as possibly being the person in the photograph and video.

Days later, on February 2, 2023, Defendant Oliver conducted an interview, the second police interview with the victim.  During the interview the victim disclosed different information

9

than he had previously stated, including that he met a female identified only as "Trinidad" at the Hoover Market on January 29, 2023. During the second interview, Victim Walker also stated that he and the female had engaged in sexual intercourse at a liquor store.  Nonetheless, Defendant Oliver used a prior arrest photograph of Plaintiff for a photo array that was presented to the victim by another detective.  After the presentation of the photo array and Plaintiff being picked out by the victim, Detective Oliver submitted an affidavit/request for an arrest warrant to a neutral and detached magistrate who then issued an arrest warrant for Plaintiff.

On February 16, 2023, at 7:50 a.m., Ms. Woodruff was preparing her children for school when she was confronted by six Detroit police officers at her home. They presented her with an arrest warrant for robbery and carjacking. The officers proceeded to arrest her.  At the time of this incident, Porcha Woodruff, was a 32-year-old resident of Detroit where she lived with her two children (ages 12 and 6), and her fiancé.  At the time of her arrest for robbery and carjacking, she was undisputedly and visibly (8 months) pregnant.

## V.    SUMMARY OF OPINIONS

I have reviewed and carefully considered the materials received.  I am of the opinion that Defendant Oliver placed false and misleading statements into the affidavit/request of the arrest warrant. She also demonstrated a reckless disregard for the truth by conveying untruthful information to the magistrate. Her actions also violated Detroit Police Department policies which are designed to prevent persons from being wrongfully charged and arrested for crimes they did not commit.  For the reasons stated herein, I have concluded to a reasonable degree of professional certainty that the actions of Defendant LaShauntia Oliver were not within generally accepted policing practices.

## VI. DEFENDANT OLIVER DEVIATED FROM GENERALLY ACCEPTED POLICING PRACTICES

On or about February 4, 2023, Defendant Oliver obtained an arrest warrant for Plaintiff. Within the information presented to the neutral and detached magistrate for evaluation as to whether probable cause existed that Plaintiff committed a crime were material statements that were false and misleading. Defendant Oliver, the affiant knowingly and intentionally, or with reckless disregard for the truth included false and misleading statements in the warrant affidavit/request. Police officers are taught to be truthful in all requests to the Court.

In addition, Defendant Oliver omitted information that would have conclusively demonstrated that Plaintiff could not have been the person suspected of committing the crime. See a screenshot from Defendant Oliver's, *Detroit Police Request for Warrant* below.

UD-94 (2-89)                                                        AUTHORITY: PA 59 of 1935
                                                                    Compliance Voluntary

**DETROIT POLICE REQUEST FOR WARRANT**

Gold Chevy Malibu pull into the parking lot at approximately 5:53pm on January 29, 2023. I observed on video, Defendant Woodruff exiting the passenger seat of the Malibu. Defendant Woodruff had bizarre behavior, she was wearing a red t-shirt no coat, coming in and out of the gas station several times, appearing to be arguing with someone over the phone, having many different interactions with people there, and I also observed several vehicles pull into the lot and Defendant Woodruff approaching them. I observed on video, a Black Chevy Tahoe, which was described earlier, and a Silver GMC Envoy with a black male exiting. I observed on video, Defendant Woodruff open the driver side door of Mr. Walker's Malibu and the black male who exited the Envoy at the passenger door of Mr. Walker vehicle. Both front doors were open and both Defendant Woodruff and the male subject can be observed pulling and tugging on Mr. Walker who was in the driver seat. Defendant Woodruff can be observed on video taking what appeared to be an item from Mr. Walker. Mr. Walker stated to OIC Oliver, he believed he may have been drugged by Defendant Woodruff because he stated he has never felt the way he did that night, Mr. Walker stated he was dazing off several times, falling asleep, and just did not feel like himself and knows that just from consuming liquor would not make him feel the way he did while in the presence of Defendant Woodruff. I OIC Oliver watched on video, Mr. Walker's brake lights and gas being pressed several times even though the vehicle was parked. This is odd behavior for one who is alert and aware. Mr. Walker did not mention to OIC Oliver he was being tugged and pulled on, I OIC Oliver strongly believe he may have not been aware of what was occurring due to him dazing off and coming in and out of his sleep.

Defendant Oliver made several false and misleading statements regarding Plaintiff in the affidavit/request for arrest warrant, specifically stating:

- o *"I also **observed** several vehicles pull into the lot and **Defendant Woodruff approaching them."***

- o *"**I observed on video, Defendant Woodruff** open the driver side door of Mr. Walker's Malibu and the black male who exited the Envoy at the passenger door of Mr. Walker vehicle."*

- o *"...both **Defendant Woodruff** and the male subject **can be observed** pulling and tugging on Mr. Walker who was in the driver seat."*

- o *"**Defendant Woodruff can be observed** on video taking what appeared to be an item from Mr. Walker."*

Each of these statements were individually and collectively false and misleading statements that Defendant Oliver placed in the warrant affidavit/request, because they were not truthful at the time she made them. She did not inform the neutral and detached magistrate that she had not met, seen, or ever made any attempted to locate Plaintiff to investigate and corroborate with reliable evidence that Porcha Woodruff could possibly have been the person in the video. Nor did Defendant Oliver seek to verify that Plaintiff had the opportunity or ability to commit the crimes before seeking a charging document.

In addition to inserting false and misleading statements in the affidavit/request for the arrest warrant, Defendant Oliver failed to follow other generally accepted policing practices. Had Detective Oliver followed all generally accepted policing practices during this investigation she would have conformed her actions to Detroit Police Department policy of continuing to investigate the matter thoroughly, including attempting to corroborate that Plaintiff had both the opportunity and ability to commit the crime alleged. Policy 307.5, the Facial Recognition Policy of Detroit Police Department dictates that the report identifying

Plaintiff is only to be considered as an investigative lead and is not positive identification of

any subject. Despite, this clearly defined policy, Defendant Oliver did not further investigate

to determine if Plaintiff Woodruff had the opportunity and ability to commit the reported

crime.  In fact, the Plaintiff did not have either.  Also, in violation of the policy she indicated

that the facial recognition report was a positive identification of the person in the video as

being Porcha Woodruff, when agency policy clearly states that the report was not a positive

identification of the suspect.  See the policy below.

## DETROIT POLICE DEPARTMENT MANUAL

### 307.5 Facial Recognition

b.  The outside agency is a law enforcement agency that is making the request based
on a valid law enforcement purpose that falls within the authorized uses listed in
this directive and the requestor provides a case number and contact information
(requestor's name, requestor's agency, address, and phone number) and
acknowledges an agreement with the following statement:

- "The result of a facial recognition search is provided by the Detroit Police
Department only as an investigative lead and IS NOT TO BE CONSIDERED A
POSITIVE IDENTIFICATION OF ANY SUBJECT.  Any possible connection or
involvement of any subject to the investigation must be determined through
further investigation and investigation and investigative resources."

Defendant Oliver stated that she saw Plaintiff in the video evidence recovered, when in

fact it was not and could not have been truthful at the time she stated it.  Defendant Oliver's

statements regarding seeing Plaintiff in the video recovered are not truthful because the

information was not verified yet was placed in the warrant.  But Defendant made no effort to

locate Porcha Woodruff to determine if she had the opportunity and ability to commit the

crime. Had she done so she would have learned that Plaintiff was 8 months pregnant and

could not have been the person depicted in the video and the identification by the victim in

the photo array was incorrect. Defendant Oliver is a trained police officer, in fact she was a detective.  There is a presumption that she knows and understands the importance of placing truthful information in all her communications and correspondences.  All police officers are trained from the beginning of their careers on the importance of being truthful in all of their communications whether oral or written.  Defendant Oliver was not truthful in several statements that she made in the request for an arrest warrant.



Defendant Oliver also failed to mention in the warrant affidavit/request that Victim stated that he had sex with the female suspect that he identified to police only as "Trinidad".  This is an important fact in identifying the person suspected of being involved in the crime.  A police detective acting within generally accepted policing practices would have considered this as important in identifying the suspect.  Police often ask victims if suspects had identifying scars, marks, tattoos, or other identifiable physical aspects.  But this defendant chose not to ask victim those important questions.  She also chose not to attempt to meet or interview Plaintiff.  If Plaintiff had been this person, it is reasonable to believe that Victim would have mentioned that the suspect was pregnant.  To fail to conduct such a basic criminal investigation and ignore

14

important information goes against generally accepted policing practices.  See Victim's

Statement to Def. Oliver, 02-02-23.



Defendant Oliver failed to follow the generally accepted policing practice of continuing to

investigate the alleged incident beyond the perspective of the victim. The victim stated on the

night of the incident and in the follow up statement to her that he may have been under the

influence of both drugs and alcohol at the time of the incident.  This should have caused any

objectively reasonable police investigator conforming with generally accepted policing practices

to consider that the information received from the victim, including his descriptions and

identification of any suspects may not have been reliable.  Yet, the detective chose not to

interview other potential witnesses regarding the veracity of the victim's somewhat inconsistent

versions of the events regarding the night of the crime.

The victim stated that at the time of the identification from the photo array, in his

Statement of Certainty, *"I picked #2 based on seeing the individual in person [unintelligible*

*word] multiple hours prior to me being carjacked."*  The victim specifically did not state that the

person picked from the photo array participated in the crime.  See the Victim/Witness

Photographic Statement below.

Despite, the victim making this statement, Defendant Oliver stated in the affidavit/request for arrest warrant that *"Walker viewed a photo lineup which included a photo of Defendant Woodruff and **positively identified her** as the female he was with for hours **and was with just before he was carjacked on Bessemore/Gratiot."** The victim statement at the time of viewing the photo array does not affirm Oliver's statement that the person he picked out was present at the time of the crime in his Statement of Certainty. Defendant Oliver writes in her warrant affidavit/request that both statements were made at the time of the photo identification despite Victim's actual statement being materially different. This is not in keeping with generally accepted policing practices.

    Indeed, based on Defendant Oliver's own reporting there was an employee of the store present and even visible in the video recording receiving the phone from the possible suspect. Based on the information received, it appears that she made no effort to corroborate her belief of a positive identification of Plaintiff as the suspect from the video by interviewing or showing the employee that received the phone or any other store employees a photo array

16

with Plaintiff in it.  Defendant Oliver relied on a lead that she was specifically told as a matter of departmental policy was not a positive identification and inconsistent information received by a victim that may have been under the influence of drugs and/or alcohol during the incident.  Each or any of these demonstrated examples false statements and misleading statements did not following generally accepted policing practices.  Further, these statements may have been considered by the magistrate that authorized the arrest warrant as to the existence of probable cause.

## VII.  CONCLUSION

As stated above, Defendant Oliver made several false and misleading statements in the affidavit/request for arrest warrant, which does not follow generally accepted policing practices.  Further, she also deviated from generally accepted policing practices by not following Detroit Police Department policies regarding the use of facial recognition leads by treating the lead as a positive identification of the suspect.  This was demonstrated by her not attempting to corroborate the lead with reliable information which should have been gain from conducting a thorough investigation prior to seeking an arrest warrant.  Defendant Oliver also chose to disregard evidence of unreliability of the victim, such his inconsistent statements regarding the incident made to her and other officers during the course of the investigation.  False statements, misleading statements, or statements made with a reckless disregard for the truth should not be present in an affidavit or request for a warrant.  The statements are not within generally accepted policing practices nor was Defendant Oliver's actions in conducting the investigation as stated within this report.

For the reasons stated above, it is my opinion that Defendant Oliver's actions during this matter were not within generally accepted policing practices.  My opinions are to a

17

reasonable degree of professional certainty.

In the previous 4 years I have testified 4 times in matters for which I was retained.

1. *Officer Clink v. Town of Minersville*, *Pennsylvania Police Dept.*, Defense Expert
   07/2022-Arbitration Hearing

2. *Officer Brown v. Town of Minersville*, *Pennsylvania Police Dept.*, Defense Expert
   07/2022-Arbitration Hearing

3. *Riggio, et al. v. Thomas Jefferson University Hospital,* Defense, 02/2023-Trial

4. *Gloria Merritt Vs. Baltimore County Police Department, et al.,* Defense, 03/2024-
   Trial

My services for this matter have been retained to be compensated at rate of $250.00 per hour for all services rendered in this matter.  For "in court" activities including travel to and from and attendance at trial, deposition or hearing is at a rate of $250 per hour plus expenses. Courtroom testimony is billed at a minimum rate of $1000 per half day (4 hours) and $2000 per whole day (8 hours) or if more than 4 hours on any day.

_____                              _____
Timothy M. Dixon                                              July 9, 2024
                                                                          Date