

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

PORCHA WOODRUFF,
an individual,
    Plaintiff,

Case No. 5:23-cv-11886
Hon. Judith E. Levy

v

~~CITY OF DETROIT~~
~~a municipal corporation,~~



JAN 0 6 2025

CLERK'S OFFICE
DETROIT

LaSHAUNTIA OLIVER,
City of Detroit Police Detective,
Individually, and in her Official Capacities
    Defendants.

---

## BULK EXHIBIT FILING

    This bulk filing is from ECF No. 25-1 Exhibit 12 (Page ID. 820) filed on November 8, 2024, and is being submitted to this court in accordance with Local Court Rule 5.1(d)(2) governing bulky exhibits that are not filed electronically.

Dated: January 6, 2025

Respectfully Submitted,

Ivan L. Land (P65879)
Law Offices of Ivan L. Land, P.C.
25900 Greenfield Rd., Suite 210
Oak Park, MI  48237-1267
248.968.4545 / (f) 248.968.4540
ill4law@aol.com
**Attorney for Plaintiff**

Lashauntia Oliver
05/14/2024

1            UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF MICHIGAN

3               SOUTHERN DIVISION

4

5   PORCHA WOODRUFF,

6                      Plaintiff,

7      vs.                          Case No. 5:23-cv-11886

8                                   Hon. Judith E. Levy

9   CITY OF DETROIT, a municipal

10  corporation, LASHAUNTIA OLIVER,

11  Individually, and in her Official

12  Capacities,

13                     Defendants.

14  _____/

15  PAGES 1 TO 148

16

17      The Video Deposition of LASHAUNTIA OLIVER,

18      Taken at 2 Woodward Avenue, Suite 500,

19      Detroit, Michigan,

20      Commencing at 1:36 p.m.,

21      Tuesday, May 14, 2024,

22      Before Tamora L. Thompson, CSR-5378.

23

24

25



Lashauntia Oliver
05/14/2024                                              **Page 2**

1   APPEARANCES:

2

3   IVAN L. LAND, ESQUIRE

4   Law Offices

5   25900 Greenfield Road, Suite 210

6   Oak Park, Michigan 48237

7   (248) 968-4545

8       Appearing on behalf of the Plaintiff.

9

10  GREGORY PADDISON, ESQUIRE

11  City of Detroit Law Department

12  2 Woodward Avenue, Suite 500

13  Detroit, Michigan 48226

14  (313) 237-0435

15  Paddison@detroitmi.gov

16      Appearing on behalf of the Defendants.

17

18  ALSO PRESENT:

19  Marc Myers, Videographer

20

21                          *   *   *   *   *

22

23

24

25

Lashauntia Oliver
05/14/2024                                             Page 3

1                        I N D E X

2    WITNESS:                                        PAGE:

3    LASHAUNTIA OLIVER

4    Examination by Mr. Land                            6

5    Examination by Mr. Paddison                       65

6    Re-examination by Mr. Land                       106

7    Re-examination by Mr. Paddison                   135

8    Re-examination by Mr. Land                       140

9    Re-examination by Mr. Paddison                   144

10   Re-examination by Mr. Land                       145

11   Re-examination by Mr. Paddison                   146

12

13   EXHIBITS:                                       MARKED:

14   Exhibit 1      Felony Warrant                      8

15   Exhibit 2      Request for Warrant                 8

16   Exhibit 3      Officer Narrative                   9

17   Exhibit 4      Interview Statement Walker         11

18   Exhibit 5      Interview Statement Walker         14

19   Exhibit 6      Photo                              18

20   Exhibit 7      Photo                              22

21   Exhibit 8      Line-up Statement Walker           22

22   Exhibit 9      Arrest Report                      25

23   Exhibit 10     Line-up Instruction                29

24   Exhibit 11     Line-up Statement Walker           31

25   Exhibit 12     Female Photos                      31



**Lashauntia Oliver**
**05/14/2024**                                                    **Page 4**

| 1  | EXHIBITS: | | MARKED: |
|---|---|---|---|
| 2  | Exhibit 13 | Supplemental Report | 34 |
| 3  | Exhibit 14 | Constitutional Rights Woodruff | 39 |
| 4  | Exhibit 15 | Phone Call List | 46 |
| 5  | Exhibit 16 | Tracking Notes | 52 |
| 6  | Exhibit 17 | Tracking Notes | 52 |
| 7  | Exhibit 18 | Tracking Notes | 52 |
| 8  | Exhibit 19 | Sworn Facts | 59 |
| 9  | Exhibit 20 | Search Warrant | 62 |
| 10 | Exhibit 21 | Affidavit White(Retained) | 109 |
| 11 | Exhibit 22 | Request for Video Extraction | 125 |
| 12 | (Attached) | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Lashauntia Oliver
05/14/2024                                              Page 5

1    Detroit, Michigan

2    Tuesday, May 14, 2024

3    About 1:36 p.m.

4              VIDEOGRAPHER:  We are now on the record.  This

5    is the video recorded deposition of Officer LaShauntia

6    Oliver being taken in Detroit, Michigan.  Today's date

7    is May 14, 2024.  The time is now 1:36 p.m.

8              At this time, will the attorneys please state

9    their appearance for the record and the court reporter

10   please swear in the officer.

11             MR. LAND:  Good afternoon.  I'm Attorney Ivan

12   Land on behalf of the Plaintiff Porcha Woodruff.

13             MR. PADDISON:  Good afternoon.  Gregory

14   Paddison on behalf of Defendant City of Detroit and

15   LaShauntia Oliver.

16                  LASHAUNTIA OLIVER,

17   having first been duly sworn, was examined and testified

18   on her oath as follows:

19             MR. LAND:  Yes, this is the case filed in the

20   United States District Court, Eastern District of

21   Michigan, Southeastern Division.

22             The caption is Porcha Woodruff, Plaintiff,

23   versus City of Detroit and LaShauntia Oliver,

24   Defendants, before the Honorable Judith Levy, case

25   number 5:23-cv-11886.



Lashauntia Oliver
05/14/2024                                    Page 6

1                          EXAMINATION

2  BY MR. LAND:

3  Q.    Good afternoon.

4  **A.    Good afternoon.**

5  Q.    I'm attorney Ivan Land and I represent Ms. Porcha

6        Woodruff in this matter.

7                    What is your -- where are you employed?

8  **A.    Detroit Police Department.**

9  Q.    How long have you been a Detroit Police Officer?

10  **A.    Five and a half years.**

11  Q.    Five and a half years.  What is your position as a

12        Detroit Police Officer?

13  **A.    Um, I was at commercial auto theft, and now I'm assigned**

14  **       to the 12th Precinct.**

15  Q.    You're at the 12th Precinct?

16  **A.    Yes.**

17  Q.    What did you do at commercial auto theft?

18  **A.    I handled carjacking, regular auto theft, driveaway**

19  **       scenes.  Those type of crimes, anything to do with a**

20  **       motor vehicle.**

21  Q.    What was your title in this position with Porcha

22        Woodruff?

23  **A.    I was a police officer -- or I am a police officer.**

24  Q.    Were you the officer in charge?

25  **A.    Yes, officer in charge.**



1   Q.   Okay.  So you were officer in charge.  How long have you

2        been performing those duties?

3   A.   **For just that case or --**

4   Q.   Before that.  How long had you been in that position?

5   A.   **I got down to commercial auto theft May of '21.  So**

6        **whenever -- or you're assigned a case, you become the**

7        **officer in charge.**

8   Q.   Okay.  And what kind of training did you receive to

9        become an officer in charge of commercial auto theft?

10  A.   **I did not receive any training within the unit.**

11  Q.   You did not receive any training within the unit?

12  A.   **No.**

13  Q.   Okay.

14  A.   **Not that I believe.**

15  Q.   Did you receive any training for facial recognition?

16  A.   **No.  I just know what types of crimes you're able to**

17       **submit for.  It's like level-one crimes.**

18  Q.   So you are allowed to use facial recognition technology,

19       but were not trained on how to use it?

20            MR. PADDISON:  Objection.  Form, foundation.

21            You can answer.

22  A.   **I don't run facial rec.  All I know -- or all I do is if**

23       **there is a picture or a video that's sufficient enough**

24       **for it to possibly be a match, if it's a clear photo,**

25       **clear video, I'm able to submit it to Crime Intel.  They**



1       are the unit who handles the facial rec.

2   Q.  So you didn't receive any training on when there is a

3       match on what to do?

4                   MR. PADDISON:  Object, same objection.

5                   You can answer.

6   A.  **From my understanding, if there is a -- depending on**

7       **what crime it is.  In my situation it was carjacking.**

8       **So by the policy, once you have a positive match, you**

9       **can -- it's just an investigative lead, so you have to**

10      **do a little further investigation with that.**

11  Q.  Okay.

12                      DEPOSITION EXHIBIT 1

13                      WAS MARKED BY THE REPORTER

14                      FOR IDENTIFICATION.

15                  MR. PADDISON:  Can I request these be marked

16      as separate because we have a felony warrant and

17      request?

18                  MR. LAND:  Yes, that will work.  Good catch.

19                      DEPOSITION EXHIBIT 2

20                      WAS MARKED BY THE REPORTER

21                      FOR IDENTIFICATION.

22  BY MR. LAND:

23  Q.  Can you take a look at that felony warrant as Exhibit 1.

24      Do you recognize that?

25  A.  **Yes.**



Lashauntia Oliver
05/14/2024                                          Page 9

1  Q.   Is that what you submitted to Magistrate Rodney Johnson?

2  A.   **Not this first or -- actually, yes.  This is what I**

3       **received back from the prosecutor's office.**

4  Q.   That is what you received, okay.  And this is what you

5       -- turn to Exhibit 2.  This is what you submitted to

6       Mr. Rodney Johnson the magistrate?

7  A.   **Yes.**

8  Q.   Okay.

9            MR. LAND:  And let the record reflect that

10      Exhibit 1 is the felony warrant.  And Exhibit 2 is the

11      Detroit Police Request for Warrant that was submitted to

12      Rodney Johnson, Magistrate Rodney Johnson, I believe it

13      was February 4, 2023.

14  BY MR. LAND:

15  Q.   Am I correct?

16  A.   **Sounds about right, yes.**

17  Q.   Okay.  All right.  Now what date, if you know, did that

18      incident occur?

19  A.   **January 29, 2023.**

20  Q.   Do you know if police officers came out?

21  A.   **Yes.**

22  Q.   Police went to where the victim was?

23  A.   **Yes.**

24                    **DEPOSITION EXHIBIT 3**

25                    **WAS MARKED BY THE REPORTER**



Lashauntia Oliver
05/14/2024                                        Page 10

1                        FOR IDENTIFICATION.

2  Q.  As the officer in charge, you review reports and things,

3       correct?

4  A.  Yes.

5  Q.  Before you go out and do your duties, correct?

6  A.  Yes.

7  Q.  Okay.  I want to show you what has been marked as

8       Exhibit 3, okay?  And it was prepared on January 29,

9       2023 at 1953, which is military time.  So that would be

10      7:53 p.m.  Am I correct?

11 A.  Yes.

12 Q.  It was prepared by PO Kelly Larson 2770, correct?

13 A.  Yes.

14 Q.  It says BWC, body camera worn?

15 A.  Yes.

16 Q.  Okay.  I want you to take a look at what is described as

17      the second paragraph.  Can you read it into the record?

18 A.  The male described as a black male, brown complexion,

19      short, slim build with short braids and a beard.

20      Unknown clothing description, armed with an unknown

21      black handgun.

22 Q.  Okay.  I want you to read the second paragraph.

23 A.  The female Mr. Walker picked up is described as a black

24      female, brown complexion, brown and blond long hair,

25      slim about 5'4" in height wearing a black jacket.



1  Q.   Does it mention anything about the female being

2       pregnant?

3  **A.   No.**

4  Q.   Does it mention anything that the female did?

5  **A.   It mentions that the female was with Mr. Walker.**

6  Q.   But does it mention any crime she committed?

7  **A.   No.**

8  Q.   Okay.

9            Can I have this marked as Exhibit 4?  It is

10       the witness statement that was given on January 23.  It

11       was a little later in the day and it's a handwritten

12       statement and it was taken by Detective Anthony Fletcher

13       D-4589.

14                 DEPOSITION EXHIBIT 4

15                 WAS MARKED BY THE REPORTER

16                 FOR IDENTIFICATION.

17  BY MR. LAND:

18  Q.   Okay.  I want you to take a look at this and read it

19       over.  I want you to particularly go to the second page

20       and, six lines up, no -- from the back, I'm so sorry.

21  **A.   Are you counting this?**

22  Q.   Yes.

23  **A.   Yes.**

24  Q.   Do you see where it says describe the person; do you see

25       where it says that?



1  A.  Yes.

2  Q.  Can you describe that person?

3  A.  **Black male, 25 to 27, 5'9" - 5'10", 135-150 pounds, slim**

4     **build, thin mustache.  I'm not sure what this is.**

5     **Beard, light complexion, wearing a black jacket.**

6  Q.  Okay.  I want you to go back to Exhibit 3.  Do you agree

7     that that description of the male he said brown

8     complexion?

9  A.  **In this report?**

10 Q.  Yes.

11 A.  **Yes.  Brown complexion.**

12 Q.  And then changed this to light complexion.  Do you

13    agree?

14 A.  **Yes.**

15 Q.  Okay.  So I want you to go back, please, to Exhibit 1.

16    We are going to keep referring back to Exhibit 1 --

17    excuse me, Exhibit 2.  I'm sorry.

18         Do you agree that a suspect's description is

19    important?

20 A.  **Yes.**

21 Q.  Do you agree that a suspect's description should not be

22    left out of an arrest warrant?

23 A.  **Yes.**

24 Q.  Can you, please, look at Exhibit 2 and direct me to

25    where you put the suspect's description in there?



1  A.   Okay.

2  Q.   You can turn the page.

3  A.   Okay.

4  Q.   Do you see the suspect's description?

5  A.   Not on that paragraph, no.

6  Q.   Do you see it throughout the document?

7  A.   I'll have to read the entire document.  I'm not sure.

8       Do you want me to read it?

9  Q.   Yes, we've got time.  We can go off the record, please.

10          VIDEOGRAPHER:  Going off the record at 1:48

11      p.m.

12          (A short recess was taken)

13          VIDEOGRAPHER:  We are back on the record at

14      1:50 p.m.

15 A.   Only thing in here is black male.

16 BY MR. LAND:

17 Q.   So you did not put the description in there?

18 A.   No.

19 Q.   You think that's very important to have that in the

20      arrest warrant?

21          MR. PADDISON:  Objection as to form.

22          You can answer.

23 A.   Um, it is important.  But I mean, it says general black

24      male and his age right here.  Then I have put in there

25      black male in the description.



Lashauntia Oliver
05/14/2024                                          Page 14

1   Q.   But you didn't put the --

2   A.   **The light skin or brown skin, no.**

3   Q.   Okay.  All right.

4                        DEPOSITION EXHIBIT 5

5                        WAS MARKED BY THE REPORTER

6                        FOR IDENTIFICATION.

7   Q.   I want you to take a look this document.  It's a

8        document prepared by you, Police Officer Oliver.  This

9        was prepared on February 2, 2023 at 11:45.  It was

10       interview with the victim, okay.  I want to direct you

11       to the second question you asked him.

12  A.   **Okay.**

13  Q.   Can you read that into the record, please?

14  A.   **Question, is there anything you would like to add to**

15       **your original statement.**

16  Q.   How did you know he needed to add something to his

17       original statement?

18  A.   **I asked him.  We had a conversation and I was asking him**

19       **about this statement, you know, if there was anything he**

20       **left out, anything that he could remember since the day**

21       **or so went on.  He told me there was more.**

22  Q.   Okay.  So that's how you found out.  Was that strange,

23       to you, when he added something, something as serious as

24       having sex with someone?

25  A.   **I wouldn't say it's strange.  But sometimes people would**



1      leave out or may have forgotten, or he said he might

2      have been drugged or whatever, or he might have been

3      embarrassed.  I can't speak for him.  But no, sometimes

4      people leave things out.

5   Q.  That would make him --  you wouldn't think that would

6      make him unreliable?

7           MR. PADDISON:  Objection as to form.

8           You can answer.

9   A.  No.  I think that as the time went on, like I said, he

10     remembered certain things that, yes.  I wouldn't say

11     that he is -- I don't know.  No, I took what he said and

12     I listened to what he said.

13  BY MR. LAND:

14  Q.  Okay.

15  A.  He may have just left it out because he was embarrassed

16     or ashamed.  I don't know.  But I mean, what I can say

17     is even though his story had changed, after I received

18     this further information, I went back to the gas station

19     again and what he told me matched up.

20  Q.  I like that.  Let me ask you something.  So, what did he

21     tell you about the gas station?

22  A.  He said that the female was in and out of the car

23     talking to several different men.  In and out of the gas

24     station.  And he said that his memory was somewhat like

25     foggy, couldn't remember everything.  But the bits and



Lashauntia Oliver
05/14/2024                                    Page 16

1      pieces that he remembered, I could see the story that he

2      told me, I could see it on the video.

3  Q.  Okay.  Can you go back to Exhibit 2, please.

4  A.  Yes.

5  Q.  I want you to -- you see -- go to the second page of

6      Exhibit 2.

7  A.  Uh-huh.

8  Q.  Under investigation, second page, can you read that for

9      the record?

10  A.  I see Oliver, commercial auto theft was assigned this

11      case January 30, 2023.  January 31, 2023.  I contacted

12      Mr. Walker using his mother's phone number.  Mr. Walker

13      advised me he had a cell phone in his possession and

14      stated the cell phone was dropped off at 6420 Van Dyke

15      by a female and the clerk answered the phone when the

16      phone rang.  So that's how he was able to retrieve it.

17      I, OIC Oliver made the location 64 --

18  Q.  That's what I want.  So he had his phone?

19  A.  Uh-huh.

20  Q.  He was robbed, correct?

21  A.  Yes.

22  Q.  He got his phone?

23  A.  I don't know what time he got his phone.  But yes, he

24      did --

25  Q.  Did he call you?



1    A.    I'm not sure.  I don't believe so.

2    Q.    That's not strange that a person was robbed and they did

3          not tell the police that they retrieved their phone?

4          That wasn't strange to you?

5    A.    Um, I don't know.  I can't remember back then what I was

6          thinking at the time.  But I know I called him and he

7          told me all of that information.

8    Q.    I get you that.  Did you follow up and say why didn't

9          you call me when you got your phone?

10   A.    I don't remember.

11   Q.    Don't you think that phone would hold available

12         evidence?

13   A.    Yes.

14   Q.    It would hold valuable evidence, wouldn't it?

15              MR. PADDISON:  Objection as to form.

16              You can answer.

17   A.    Are you saying the phone had evidence inside of it or --

18   BY MR. LAND:

19   Q.    It had evidence, DNA evidence, fingerprint evidence.

20         Maybe the individual might have used the phone?

21   A.    Yes.

22   Q.    It would have that, correct?

23   A.    Yes, it could have that.

24   Q.    You didn't do any follow-up questions about that with

25         him, about that why he didn't contact --



Lashauntia Oliver
05/14/2024                                                    Page 18

1   A.   I don't remember what I asked him.

2   Q.   But it's not in this report though?

3   A.   I don't remember.

4   Q.   It's not in this report.  I know you don't remember.  Is

5        it -- did you put any follow-up questions what you asked

6        him in this report?

7   A.   Are you asking me if I asked him about the phone or why

8        didn't -- I don't remember if I asked him if or why

9        didn't he call me.  I'm not sure.

10  Q.   But you didn't put -- you don't read anything in Exhibit

11       2 that told you you questioned him about it, did you?

12  A.   No.

13  Q.   Okay.  All right.  Now after you went to the store -- to

14       the gas station after he told you, correct?

15  A.   Yes.

16  Q.   And you went and talked to a clerk, right?

17  A.   Yes.

18  Q.   She showed you the video, right?

19  A.   Yes.

20  Q.   Okay.

21                      DEPOSITION EXHIBIT 6

22                      WAS MARKED BY THE REPORTER

23                      FOR IDENTIFICATION.

24  Q.   I want to show you what is marked as Plaintiff's Exhibit

25       6.  Can you take a look at that?



1   A.   Yes.

2   Q.   Is that your handwriting?

3   A.   Yes.

4   Q.   Okay.  And you wrote that.  Could you explain what that

5        picture shows?

6   A.   **It shows the female who returned the phone or set it**

7        **down.  I think she set it down on the countertop.**

8   Q.   She set it down on the countertop?

9   A.   **Yes.**

10  Q.   Okay.  Where is she positioned at in that picture?

11  A.   **Behind the glass.**

12  Q.   What does that tell you that she's positioned behind the

13       glass?

14  A.   **What, can you repeat that?**

15  Q.   Do all customers -- are they allowed behind the glass?

16            MR. PADDISON:  Objection, speculation.

17  A.   **No.**

18            MR. PADDISON:  You can answer to the extent

19       you know.

20  A.   **Not that I'm aware of.  But I mean, if she felt like she**

21       **wasn't a threat or something, then she may have**

22       **obviously allowed her inside.  I mean, she's not a**

23       **threat to this person, but she is -- I believe, the**

24       **clerk said that she frequents that gas station.  I'm not**

25       **sure though.**



Lashauntia Oliver
05/14/2024                                            Page 20

1   BY MR. LAND:

2   Q.   What did you just say?

3   **A.   I said that I believe the clerk said that she seen her**

4   **     in the area and frequents the gas station.**

5   Q.   Ms. Oliver, you know this is a criminal investigation?

6   **A.   Yes.**

7   Q.   You had a conversation with the clerk?

8   **A.   Yes.**

9   Q.   You did, okay.  I need you to go back to Exhibit 2 and

10       show me where, in the conversation, that you stated you

11       had with the clerk.

12  **A.   There is no conversation.  I didn't state anything in**

13  **     here.  I just asked her, off my memory, hey, I was told**

14  **     that a cell phone was dropped off.  Can I see the**

15  **     cameras from such and such time.**

16  Q.   And you asked her, you just said you asked her and she

17       told you she frequents this --

18  **A.   I believe.  I believe that's what she said.**

19  Q.   What else did you ya'll talk about?

20  **A.   Nothing.**

21  Q.   That's it?

22  **A.   I mean, not that I can remember.**

23  Q.   Did she tell you why?

24  **A.   She didn't know her name.  I asked why did -- yes.**

25  Q.   Did you ask her why she was behind the glass.  That's



1    pretty dangerous at a gas station.

2              MR. PADDISON:  Objection, foundation.

3              You can answer.

4    BY MR. LAND:

5    Q.   Did you ask why she was behind in the secure area?

6    **A.   I don't remember asking.**

7    Q.   You don't remember asking that.

8    **A.   No.  But I mean, I did think maybe she -- I don't know.**

9    **She said that she didn't know her name.  But she said**

10   **she seen her a few times there, so she allowed her back**

11   **there.**

12   Q.   Do you think that was important to put in the arrest

13        warrant that the clerk knew her and she frequented the

14        gas station?

15   **A.   No.**

16             MR. PADDISON:  Objection.  Mischaracterizes

17        testimony.  I believe the testimony was the clerk

18        clearly said she did not know her name.

19   BY MR. LAND:

20   Q.   Do you think that's important the clerk told you that

21        she frequented the gas station?

22   **A.   I guess I would say that.**

23   Q.   But you didn't put it in Exhibit 2?

24   **A.   No.**

25   Q.   Let's move on.  So this is a still Exhibit 7.  Was this



1    the image that you received of the suspect?

2  A.  **From who?**

3                      **DEPOSITION EXHIBIT 7**

4                      **WAS MARKED BY THE REPORTER**

5                      **FOR IDENTIFICATION.**

6  Q.  The gas station.

7  **A.  Yes.**

8  Q.  From the gas station?

9  **A.  Yes.**

10  Q.  That's the image?

11  **A.  Yes.**

12  Q.  Okay.  This is the one you submitted to your facial rec

13     team?

14  **A.  Yes.**

15  Q.  Okay.  I'm going to show you what is going to be marked

16     8.  Do you remember interviewing Daniel White?

17  **A.  No, I did not speak to Daniel White.**

18                     **DEPOSITION EXHIBIT 8**

19                     **WAS MARKED BY THE REPORTER**

20                     **FOR IDENTIFICATION.**

21  Q.  You did not speak to Daniel white?

22  **A.  No.**

23  Q.  Do you remember preparing-- did you remember speaking to

24     the victim about Daniel White?

25  **A.  Yes.**



Lashauntia Oliver
05/14/2024                                    Page 23

1  Q.  Do you remember the victim pointing Daniel White out?

2  A.  **Yes.**

3  Q.  You remember he pointed him out.  Can you tell me, on

4      Exhibit 8, what the victim wrote?

5  A.  **I looked at the guy who robbed me and remembered key**

6      **featured, hair, body style, weight and skin color.**

7      **Number 3 resembled the guy who robbed and jacked me.  I**

8      **can't make out that word.**

9  Q.  Did he say hair?

10 A.  **Yes, hair.**

11 Q.  I'm not going to have these marked.  I'm going to show

12     you something.  For the record, I'm showing a group of

13     photos about black men with bald heads.  Do you

14     recognize these photos?

15 A.  **Yes.**

16 Q.  Are these the photos that you showed him?

17 A.  **Yes.**

18 Q.  Okay.  Now I want to take you back to Exhibit 3.  Read

19     the description he gave you again.

20 A.  **The male described as black male, brown complexion,**

21     **short slim build with braids and a beard, unknown**

22     **clothing description, armed with unknown black handgun.**

23 Q.  Okay.  Tell me which one of them have braids.

24 A.  **None of them.**

25 Q.  Did you question the victim about this discrepancy?



Lashauntia Oliver
05/14/2024                                    Page 24

1  A.   I can't remember.  But I know sometimes there are

2       discrepancies with hair descriptions.  I don't know if

3       he maybe was referring to -- I'm not sure.  There is a

4       driver and then there is Mr. White.  Sometimes yes, they

5       can make mistakes just like us.

6  Q.   So okay.  So you believed -- you disregard the braid

7       part?

8            MR. PADDISON:  Objection, foundation.

9       Mischaracterizes testimony.

10 BY MR. LAND:

11 Q.   Clarify yourself again.  You have said that they -- say

12      that again.  I'm sorry.

13 A.   There is times where descriptions can be -- or where you

14      can get descriptions incorrect.

15 Q.   Do you think this was important for you to tell the

16      Magistrate that he had this description incorrect?  If

17      you need to look back at Exhibit 2, you can.

18 A.   Okay.  Can I look at this statement?

19 Q.   You can look at anything you want.

20 A.   Okay.  So he told the officers -- yes, there was small

21      or short braids.  He never mentioned braids to Detective

22      Fletcher right after the -- or maybe hour or so.  I

23      don't know what the time was, but after the carjacking

24      took place.  So I don't know if he blurted that out.  I

25      don't know.



Lashauntia Oliver
05/14/2024                                          Page 25

1  Q.   You don't know?

2  A.   **I'm not sure.**

3  Q.   Okay.  We'll I'm glad you read that.  Keep that open.

4                      DEPOSITION EXHIBIT 9

5                      WERE MARKED BY THE REPORTER

6                      FOR IDENTIFICATION.

7                 MR. LAND:  This is going to be Exhibit 9.

8                 MR. PADDISON:  Okay.

9  BY MR. LAND:

10 Q.   Take a look at Exhibit 9.  Okay.  Now, tell me how old

11      the person he picked out is.

12 A.   **42.**

13 Q.   42, okay.  How much does he weigh?

14 A.   **190.**

15 Q.   190, okay.  Give me his description.  Give me the

16      description --

17 A.   **Black male, facial hair.**

18 Q.   What did he say --

19 A.   **Medium build.**

20 Q.   What did he say about his age?

21 A.   **25 to 27.**

22 Q.   What he say about his weight?

23 A.   **This is what he told the Detective Fletcher, his weight**

24      **would have been 135-150.**

25 Q.   Okay.  So now you're discrediting Fletcher's report?



Lashauntia Oliver
05/14/2024                                      Page 26

1   A.   No, I'm not discrediting anything actually.  I'm reading

2        off of this.  He told Detective Fletcher 5'9", 25 to 27,

3        130-150.

4   Q.   So the person that he chose, this is according to -- and

5        Exhibit 9 is the arrest record of Daniel White in this

6        matter.  So please give his description again.

7   A.   Again, medium build from the shoulders, I can't see what

8        he looks like.  If you want me to go off of this.

9   Q.   Yes, please.

10  A.   Black male, 5'10", 190 pounds.  Says hair color brown,

11       eye color brown.

12  Q.   Okay.  So that's a different description than what he

13       gave Officer Fletcher?

14            MR. PADDISON:  Objection, foundation.  Assumes

15       facts not in evidence.

16  Q.   Well, he gave Officer Fletcher a description on his

17       interview, correct?

18  A.   Yes.

19  Q.   Is that different than he gave what the actual person

20       that he chose is?

21  A.   Some differences, yes.

22  Q.   What is the difference?

23  A.   The age.

24  Q.   What is the difference in age?

25  A.   About ten years or so.



1  Q.   So if he said 25, 10 years is 35?

2  **A.   Okay.  So 15 years.**

3  Q.   What about the weight?

4  **A.   130 to 150.**

5  Q.   What is the difference in the weight?

6  **A.   Forty pounds.**

7  Q.   Okay.  So all right.  One of the descriptions, which the

8       description that he gave initially when he was robbed,

9       did mention braids?

10 **A.   Yes, he told the officer braids.**

11 Q.   Now is this discrepancy something that you should have

12      told a magistrate?

13 **A.   I wouldn't have told a magistrate that, no.  I did my**

14     **own -- this is what I go by, and then I have a**

15     **conversation with him.**

16 Q.   With who?

17 **A.   With Laurence Walker.**

18 Q.   Okay.  Show me, in your report, where you got a

19      description from him.

20 **A.   He mentions a light-skinned dude.  He said he would be**

21     **able to recognize the male and the female.**

22 Q.   So, but he didn't give you any age or weight?

23 **A.   He may have.  I didn't write it down, though, on here.**

24 Q.   You don't think that's important?

25              MR. PADDISON:  Objection.  Foundation, form.



1   BY MR. LAND:

2   Q.   Do you think it's important for you to write down the

3        description of what he told you?

4   A.   Um, yes.

5   Q.   But you did not write it down?

6              MR. PADDISON:  Objection, foundation.

7   BY MR. LAND:

8   Q.   You did not write down the description?

9              MR. PADDISON:  Same objections.  Please

10       restate the question.  Are you referencing that she

11       didn't write it down in this or anywhere?

12  BY MR. LAND:

13  Q.   Okay.  Did you write it down anywhere?

14  A.   I may have.  I may have put it in my notes.  I may have

15       had it on video.  I'm not sure.  But according to this,

16       no, it's not on my statement.

17  Q.   And you didn't -- if you need to refer back to it.  You

18       did not write it in the arrest warrant, the discrepancy

19       of him choosing someone that completely does not fit the

20       description?

21             MR. PADDISON:  Objection.  Assumes facts not

22       in evidence.  Form, argumentative.

23  BY MR. LAND:

24  Q.   You can answer.

25  A.   No, I did not.



Lashauntia Oliver
05/14/2024                                      **Page 29**

1  Q.   Okay.  Now moving along.  Let me try to get these in

2       some order.  Hold on one second.

3                    DEPOSITION EXHIBIT 10

4                    WAS MARKED BY THE REPORTER

5                    FOR IDENTIFICATION.

6  Q.   Next I want to show you what is going to be marked

7       Exhibit 10.

8              Can you take a look at this.

9  **A.   Okay.**

10 Q.   Can you read into the record, paragraph 3.

11 **A.   You should not feel compelled to make an identification.**

12     **Investigation will continue whether or not you select**

13     **someone.  If you make a selection of an individual who**

14     **is ultimately not involved in the crime, the individual**

15     **will not incur any charges or police action just because**

16     **you selected them.**

17 Q.   Okay.  So when you -- this states -- you did sign this

18     as well?

19 **A.   Yes.**

20 Q.   That is your signature.  And what date did you sign this

21     on?

22 **A.   February 3.**

23 Q.   For the record, it's Exhibit 10, Lineup Instructions.

24     You read that the investigation would continue whether

25     or not you select someone.



 1   A.   Yes.

 2   Q.   Okay.  He selected someone?

 3   A.   Uh-huh, yes.

 4   Q.   What investigation continued?

 5   A.   I'm not sure if this was after, but I know he never

 6        appeared in court.

 7   Q.   No.  February 3 is the date he selected someone.

 8   A.   Okay.

 9   Q.   What investigation happened after that?

10   A.   After this, Daniel White was interrogated.

11   Q.   Okay.  What else what happened as relates to Porcha

12        Woodruff?  What investigation did you do as it relates

13        to Porcha Woodruff?

14   A.   The victim looked at her line-up with her.

15   Q.   Okay.  That says you would do that, showing him the

16        line-up.  It says no matter who we select, the

17        investigation would continue.  I'm asking you, how did

18        the investigation continue on Porcha Woodruff?

19   A.   She was positively ID'd.  From there, I looked at her

20        criminal history.  And then once she became a suspect

21        after he picked her out and said this is who he was

22        with, that's when I typed a warrant, arrest warrant.

23   Q.   Okay.  So that's all you did, okay.  Let's go to the

24        next one.  Let me let you look at what is going to be

25        marked as Exhibit 11.



1          DEPOSITION EXHIBIT 11

2          WAS MARKED BY THE REPORTER

3          FOR IDENTIFICATION.

4   Q.   Let me show you what has been marked as Exhibit 11.  It

5        says victim witness photographic line-up statement.  I

6        am ready.  Can I have that marked as Exhibit 12, please.

7          DEPOSITION EXHIBIT 12

8          WAS MARKED BY THE REPORTER

9          FOR IDENTIFICATION.

10  Q.   I want you to take a look at Exhibits 11 and 12.  Can

11       you read what the victim stated?

12  **A.   I picked number 2 based on seeing the individual in**

13       **person for multiple hours prior to me being carjacked.**

14  Q.   Okay.  Now, did he state in here, in there in Exhibit 11

15       that she carjacked him, that number 2 carjacked him?

16  **A.   It wasn't put on here during -- while I was speaking to**

17       **him, he said that this is the person he had sex with and**

18       **was there at the time of carjacking.**

19  Q.   I got that.  But did he state that she --

20  **A.   No.**

21  Q.   Okay.  Now let me ask you something.  I want to go back

22       to Exhibit 10.  It says you make identification.  I'm

23       going to ask you to explain why you picked that person

24       and how to describe how confident you are in your

25       selection.  Can you tell me --



1   A.   Which one did you just read?

2   Q.   The last paragraph.

3   A.   Okay.

4   Q.   Did you ask him why he picked her?

5   A.   Yes.

6   Q.   What did he say?

7   A.   He said because -- well, not verbatim.  But something

8        along the lines of this is the person that he had been

9        with.

10  Q.   Okay.  Did you ask him how confident he was?

11  A.   Yes.

12  Q.   Where did he --

13  A.   It's not on here.  I asked him, are you sure this is the

14       person.  He said yes.

15  Q.   You didn't put that in this paperwork?

16  A.   No.

17  Q.   But your directions tell you to.  This line-up

18       instruction tells you to --

19  A.   Okay.

20  Q.   You didn't happen to clarify it in here?

21  A.   No.

22  Q.   Okay.

23            MR. PADDISON:  Objection, foundation.  Assumes

24       facts not in evidence.

25  BY MR. LAND:



Lashauntia Oliver
05/14/2024                                        Page 33

1   Q.   Now we are going to be on 13.  Take a look at Exhibit

2        13.  Can you take a look at that.  This was given to you

3        by Nathan Howell.  Do you remember receiving this?

4   A.   **Do you want me to read it?**

5   Q.   Do you remember receiving it?

6   A.   **Yes.**

7   Q.   Okay.  Now can you read into the record after probably 7

8        lines down after 9:30.  This is a case supplemental

9        report.  It was prepared by investigator Nathan Howell.

10       It is OCA number 2301290262.  And I'm asking the witness

11       to read after 9:30 which is approximately six lines

12       down.  Go ahead.

13  A.   **After 9:30 right here?**

14  Q.   Yes, ma'am.

15  A.   **Disclaimer was went to PA LaShauntia Oliver that facial**

16       **recognition is not to be used as probable cause to**

17       **arrest the suspect, nor is it a positive identification**

18       **for a suspect.  The result of a facial recognition**

19       **search is provided by the Detroit Police Department only**

20       **as an investigative lead and is not to be considered a**

21       **positive identification of any subject.**

22  Q.   Keep going.

23  A.   **Nor is it probable cause for an arrest.  Any possible**

24       **connection or involvement of any subject to the**

25       **investigation must be determined through further**



1       investigation and investigative resources.

2   Q.    Okay.  Now, I'm not going to mark this as an exhibit.

3               MR. PADDISON:  Okay.

4                   DEPOSITION EXHIBIT 13

5                   WAS MARKED BY THE REPORTER

6                   FOR IDENTIFICATION.

7   BY MR. LAND:

8   Q.    So this is Porcha Woodruff's address.  This is Detroit

9         Detention Center.  You do agree that February 3, 2023 he

10        identified Porcha Woodruff?

11  A.    Yes.

12  Q.    You do agree this document states that a positive ID

13        should not be used as probable cause to make an arrest?

14  A.    Yes.

15              MR. PADDISON:  Let's clarify.  Are we talking

16        about a positive ID through facial recognition or by a

17        victim?

18              THE WITNESS:  Right.

19              MR. LAND:  By a victim.

20              MR. PADDISON:  That's not what that says.

21              THE WITNESS:  No.

22              MR. LAND:  Listen --

23              MR. PADDISON:  We can read the entire section

24        if you're not going to stipulate to that.  That is what

25        it says.



<center>**Lashauntia Oliver**
05/14/2024</center>                                    **Page 35**

1          MR. LAND:  We can disagree on it.  We are

2     going to keep moving.  Take a look at that.

3  BY MR. LAND:

4  Q.    That's Porcha Woodruff's address.  How many minutes --

5     according to Google Maps, how many minutes would it have

6     taken you after you left the detention center to go to

7     Porcha Woodruff's home?

8  **A.    About 16 to 30 minutes.**

9  Q.    Okay.  16 to 30 minutes?

10  **A.    Yes.**

11  Q.    And that was on February 3 that you learned that she was

12     the suspect?

13  **A.    Yes.**

14  Q.    Okay.  I'm going to have you look at this.  This is not

15     going as an exhibit.  That's to the gas station.

16          MR. PADDISON:  Okay.

17  BY MR. LAND:

18  Q.    How many minutes --

19          That's the gas station address.  How many

20     minutes from the Detroit Detention Center would it have

21     taken you to go to the gas station?

22  **A.    8 to 16 minutes.**

23  Q.    And you didn't do that?

24  **A.    After we ID'd her?**

25  Q.    Yes.



**Lashauntia Oliver**
05/14/2024                                        Page 36

1   A.   No.

2   Q.   And you could have did that, correct?

3                MR. PADDISON:  Objection, form.

4                You can answer.

5   BY MR. LAND:

6   Q.   You can answer.

7   A.   I mean, I know that day was very busy.

8   Q.   Who was very busy?

9   A.   I was very busy that day.

10  Q.   Really, okay.  So what about the next day?

11  A.   So I don't know what I -- I know that whole week I was

12       working this case.

13  Q.   So it's your testimony that on February 3 you were busy?

14  A.   With this investigation, yes.

15  Q.   Yes.  And busy how?

16  A.   Well, I had training in the morning or in the day.  Then

17       after training, I went to the DDC and talked to Porcha

18       -- or no, I'm sorry.  I'm kind of ahead of myself.  On

19       the 3rd, was that the day, I'm not sure -- is that the

20       day I had training?

21  Q.   No, not the day you had training.

22  A.   Okay.  Yes.  So I mean, after you get a positive ID

23       there is multiple things you have to do after that.

24  Q.   What is that?

25  A.   You have to get their criminal history, do their



1     arraignment sheets, start on the investigator's report.

2     Get everything ready for the warrant packet.

3  Q.   But no further investigation?

4            MR. PADDISON:  Objection.  Mischaracterizes

5     testimony.

6  BY MR. LAND:

7  Q.   What other investigation did you do when you learned it

8     was Porcha Woodruff?

9  A.   I looked into her -- double checked.  I looked into her

10    criminal history again.

11 Q.   And that's --

12 A.   I'm not sure what else I did.  But I know I started on

13    my investigator's report.

14 Q.   Okay.  So you just -- okay.  So you take a warrant down

15    the next day?

16 A.   I'm not sure.  I would have to see.  Yes, it was

17    prepared on the 4th.

18 Q.   Get this clear.  Just all you did was ran her criminal

19    record?

20 A.   I may have looked into her on LEIN, but I'm not sure.

21 Q.   But you didn't show the victim -- you didn't show the

22    victim her driver's license?

23 A.   No.

24 Q.   Were you aware -- this is big.

25            Were you aware that the photo -- that photo is



Lashauntia Oliver
05/14/2024                                    Page 38

1     from 2015?

2  A.  I'm not sure at the time if I knew that it was or not.

3  Q.  You're not sure?

4  A.  I didn't do the --

5  Q.  I didn't ask you that.  Listen to what I asked you.

6         Were you aware that this photo was from 2015?

7  A.  I don't remember.

8  Q.  That's fair.  Okay.  But you didn't show the victim her

9      driver's license, her current driver's license, right?

10 A.  Correct.

11 Q.  You didn't go back to the gas station to show the clerk

12     attendant who said she frequents the place her current

13     driver's license?

14 A.  Actually, no.  What I know, even if I went there, how, I

15     guess, I wouldn't have known until I did, if the clerk

16     was there or not.

17 Q.  Don't matter.  Doesn't matter.  Did you try?

18         MR. PADDISON:  Objection, argumentative.

19 BY MR. LAND:

20 Q.  Did you try?

21 A.  No.

22 Q.  Okay.  Now let's get to Porcha being arrested.  You

23     remember going to the DDC --

24 A.  Yes.

25 Q.  -- visiting Porcha.  I'm sorry.



Lashauntia Oliver
05/14/2024                                            Page 39

1                        DEPOSITION EXHIBIT 14

2                        WAS MARKED BY THE REPORTER

3                        FOR IDENTIFICATION.

4    Q.   I'm going to show you what is being marked as the

5         Plaintiff's Exhibit 14.  It is the sheet from the

6         Detroit Detention Center entitled Constitutional Rights

7         Certification and Notification, okay?

8    A.   Okay.

9    Q.   Is that her number -- is the information -- did you

10        write that information at the top?  I'm sorry.

11   A.   Yes.

12                   MR. LAND:  Greg, I'm sorry.

13                   MR. PADDISON:  Uh-huh.

14   BY MR. LAND:

15   Q.   That's her information?

16   A.   Yes.

17   Q.   And you questioned Ms. Woodruff that day?

18   A.   Yes.

19   Q.   And can you read into the record the questions you

20        asked?

21   A.   Question, do you understand this is a criminal

22        investigation.

23                   Answer, yes.

24                   Question, why were you arrested by Detroit

25        police.



Lashauntia Oliver
05/14/2024                                    Page 40

1          Answer, the police knocked on my door and told

2    me there was a warrant for my arrest and brought me

3    here.

4          Question, were you involved in a carjacking on

5    1-29-23.

6          Answer, no.

7          Question, do you know a Mr. Laurence Walker.

8          Answer, no.

9          Question, do you remember where you were on

10   1-29-23.

11         Answer, home.  I'm pregnant and been resting

12   due to just finding out I'm a diabetic.

13         Question, do you frequent the BP on 94 and Van

14   Dyke.

15         Answer no.

16         Question, do you know anyone with a silver GMC

17   Envoy.

18         Answer, no.

19         Question, is everything you told me the truth.

20         Answer, yes.

21         Question, were you promised anything to give

22   this statement.

23         Answer, no.

24   Q.   Okay.  You remember talking to her?

25   A.   Yes.



<center>**Lashauntia Oliver**
05/14/2024</center>                                      Page 41

1  Q.  And you did notice she was pregnant?

**2  A.  Yes.**

3  Q.  Do you remember asking her about some tattoos?

**4  A.  Yes.**

5  Q.  You did not note anything about tattoos, that she didn't

6       have any tattoos that you were looking for?

**7  A.  Not on here.  But I do believe in my notes there may**

**8       have been a sentence.**

9             MR. PADDISON:  I'll just note for -- is that

10      the complete statement or with exhibits or just the

11      statement form?

12            MR. LAND:  Statement.

13            MR. PADDISON:  I'd like to have the entirety

14      of it.

15            MR. LAND:  What else was to it?

16            MR. PADDISON:  That included, as well, her

17      arrest report as well as the interrogation record.

18            MR. LAND:  Her arrest report?

19            MR. PADDISON:  Yes.

20            MR. LAND:  Do you have it -- let me see is it,

21      Counsel, please?

22            MR. PADDISON:  Attachment -- so you have her

23      statement and then the documents that were sent to you,

24      you also have her arrest report as well as the

25      interrogation record.



Lashauntia Oliver
05/14/2024                                      Page 42

1               MR. LAND:  I don't have that.  If you can, we

2       can get it.

3               MR. PADDISON:  I just want to clarify --

4               MR. LAND:  That's fine.

5               MR. PADDISON:  -- she didn't put it in this

6       portion of the statement.

7   BY MR. LAND:

8   Q.   Did you ask her -- you saw video at the gas station --

9   A.   Yes.

10  Q.   -- of the night this incident happened?

11  A.   Yes.

12  Q.   And you saw tattoos on this female suspect's arm?

13  A.   No.  I believe Porcha had a rose tattooed on one of her

14       arms.

15  Q.   So the victim did not -- the suspect -- female suspect

16       at the gas station, what were you looking for with the

17       tattoos when you asked Porcha about the tattoos?

18  A.   When I asked Porcha about her tattoos, it was to further

19       clear her, to make it known that she was not the person

20       from video.

21  Q.   She did not -- Porcha had the tattoos and the individual

22       suspect did not?

23  A.   Right, yes.

24  Q.   You did not put that in this report?

25               MR. PADDISON:  Just to clarify, we are



Lashauntia Oliver
05/14/2024                                    Page 43

1    referencing just the statement, correct?

2                   MR. LAND:  Yes.

3   BY MR. LAND:

4   Q.   You did not put that in the -- Exhibit 14?

5   A.   **Okay.**

6   Q.   Am I correct?

7   A.   **Yes.**

8   Q.   Okay.  I want you to go back to Exhibit 2, and I want

9        you to show me in the Exhibit 2 which is this one.  I'm

10       sorry.

11                  MR. PADDISON:  Are you talking about the

12       investigator's report?

13                  MR. LAND:  Yes, here it is.  Yes.

14  BY MR. LAND:

15  Q.   Can you show me in there where you stated that Porcha

16       Woodruff did not have the -- had a tattoo and the --

17       stop.

18                  Can you show me in the report that Porcha

19       Woodruff had a tattoo that was not consistent with the

20       suspect in this case, meaning that Porcha had a tattoo,

21       but the person did not?

22                  MR. PADDISON:  Counsel, I'm going to place an

23       objection.  This report was prepared almost two weeks

24       prior to her meeting Ms. Woodruff.  She had never, when

25       she prepared this, she had never met Ms. Woodruff.  This



Lashauntia Oliver
05/14/2024                                          Page 44

1     was prepared on February 4.  Ms. Woodruff wasn't

2     interviewed until February 16.

3                MR. LAND:  Well, that's fine.

4  BY MR. LAND:

5  Q.   Can you show me in the report where you talked about any

6       tattoos?

7  A.   I'm not sure.  I mean, why would I talk about a tattoo

8       in here?  This was -- I didn't know anything about a

9       tattoo.  Or I mean, the video that I seen the lady or

10      the female suspect, I didn't see any tattoos.

11 Q.   Let me ask you this.  If you had noticed that Porcha

12      Woodruff had a tattoo and the suspect did not have a

13      tattoo, would you have noted that?

14 A.   Yes.

15 Q.   You are 100 percent sure you would have noted that?

16 A.   I believe that I did note it somewhere.

17 Q.   But that's pretty important, isn't it?

18 A.   Yes.

19 Q.   Okay.  All right.  Now, you knew that Porcha Woodruff

20      was not the suspect?

21 A.   When?

22 Q.   February 16 after you visited her.

23 A.   February 16, yes, I believe her -- or once I seen her, I

24      knew or suspected yes, she wasn't.

25 Q.   She was not?



1  A.  Yes.

2  Q.  And what did you attempt to do?

3  A.  I remember walking over to -- prior speaking with her, I

4      called -- made a phone call to superior officer

5      explaining the situation, what to do from there.  Yes, I

6      was -- I mean, it wasn't much I could do at that moment

7      because there was a valid warrant for her then.  So I

8      was told not to interrogate so much or not to take too

9      much time or press her too much.

10            Just to be clear of her whereabouts and where

11     she was, her alibi.  Where she was on that day and see

12     if she knew the victim or knew of anybody or frequented

13     that gas station.

14 Q.  So you reviewed footage from the gas station, correct?

15 A.  Yes.

16 Q.  How many minutes of footage did you review?

17 A.  The first time, it was -- I don't remember.

18 Q.  But you were well aware the suspect wasn't pregnant?

19 A.  Yes.

20 Q.  So you were aware of that, right?

21 A.  Yes.  Once I saw the video, yes.

22 Q.  And once you saw Porcha, you knew that you had the wrong

23     person?

24 A.  Yes.

25 Q.  And you attempted to do some things?



Lashauntia Oliver
05/14/2024                                              Page 46

1   A.   Yes.

2   Q.   And one of the things you attempted to do was call the

3        prosecutor's office?

4   A.   Yes.

5   Q.   According to -- you tried to call the prosecutor's

6        office, correct?

7   A.   Yes.

8               MR. LAND:  Can I have this marked as Exhibit

9        15.

10                    DEPOSITION EXHIBIT 15

11                    WAS MARKED BY THE REPORTER

12                    FOR IDENTIFICATION.

13              MR. PADDISON:  Just, are you going to lay a

14       foundation, or do you want me to do it?  Just that it is

15       what it purports to be, all I'm saying.  I can do it if

16       you like.

17  BY MR. LAND:

18  Q.   Do you remember -- do you know what I'm showing you?

19  A.   Yes.

20  Q.   What am I showing you?

21  A.   My call records.

22  Q.   From when?

23  A.   February 16.

24  Q.   Is that an accurate depiction of what your call records

25       were on February 16, 2023?



<center>Lashauntia Oliver<br/>05/14/2024</center>

<div align="right">Page 47</div>

1  A.   Yes.

2  Q.   As a matter of fact, you gave this information to your

3       attorney?

4  A.   Yes.

5  Q.   Okay.  Take a look at that.  You tried to call the

6       prosecutor's office?

7  A.   Yes.

8  Q.   And what happened?

9  A.   I wasn't able to get ahold of anyone at the prosecutor's

10       office.  I had a few people in the office that I worked

11       with trying to make some phone calls for me as well.  I

12       left voicemails.  I never heard anything back from the

13       prosecutor's office that day.

14  Q.   That day you didn't hear anything from the prosecutor's

15       office?

16  A.   No.

17  Q.   You understand that there was a woman being pregnant is

18       incarcerated incorrectly?

19  A.   Yes.

20  Q.   It's pretty hard on her, do you agree?

21  A.   Yes.

22  Q.   You led her back to the jail cell?

23  A.   Because I had to, yes.

24  Q.   You had to?

25  A.   Yes.



Lashauntia Oliver
05/14/2024                                      Page 48

1   Q.   Who said so?

2   A.   I was on the phone.  I had a conversation with my

3        superior officer because there was a valid warrant.  I

4        cannot allow -- I can't just disregard the warrant.

5   Q.   Who told you that?

6   A.   My supervisors.

7   Q.   So you told your supervisor?

8   A.   Yes, it's above me at that time.  All I can do is try to

9        do exactly what I did which was calling around the

10       prosecutor's office trying to get ahold of the

11       magistrate that was doing arraignments that day.

12  Q.   What were you going to tell them?

13  A.   Tell who?

14  Q.   The people you were trying to call.

15  A.   I left voicemails and I did have a conversation with a

16       magistrate and I told her then.

17  Q.   Okay.  Then what?

18  A.   She said that she would take -- not verbatim, but I

19       remember her saying that -- or the Magistrate was saying

20       that she would take what I told her into consideration.

21       I needed to speak with the judge or a prosecutor.

22  Q.   You were aware they were going to give her $100,000 bond

23       with a tether?

24  A.   No.

25  Q.   Until the court-appointed attorney spoke up?



**Lashauntia Oliver**
**05/14/2024**                                                   Page 49

1   A.   No.

2   Q.   You were not aware of that?

3   A.   No.

4   Q.   Well, tell me what time your call -- let me just go back

5        to Exhibit 14.  Exhibit 14 is the Constitutional Rights

6        Certification.  What time did your interview with

7        Ms. Woodruff end?

8   A.   3:25.

9   Q.   What time did you start making calls?

10  A.   3:48.

11  Q.   Okay.  We agree that you realized Ms. Woodruff was the

12       wrong person --

13  A.   Yes.

14  Q.   -- because she was pregnant?

15  A.   Yes.

16  Q.   You established that she had a tattoo?

17  A.   Yes.

18  Q.   That the individual suspect in the case did not have a

19       tattoo?

20  A.   Yes.

21  Q.   Okay.

22            MR. LAND:  Can I take a look, Counsel, that is

23       the Google Map.

24            MR. PADDISON:  Is that being marked as an

25       exhibit?



**Lashauntia Oliver**
**05/14/2024**                                     **Page 50**

1          MR. LAND:  No.

2          MR. PADDISON:  Okay.

3    BY MR. LAND:

4    Q.    This is says 144 St. Antoine, Detroit, Michigan.  Do you

5          know where that is?

6    **A.    The Wayne County Jail, I believe.**

7    Q.    It's Frank Murphy Hall of Justice where the prosecutors

8          are.  I got the Detention Center.  Tell me how fast you

9          could have got there.

10   **A.    12 to 24 minutes.**

11   Q.    12 to 24 minutes.  So you couldn't get in touch with

12         anyone, right?

13   **A.    Right.**

14         MR. PADDISON:  Objection.  Mischaracterizes

15         prior testimony.

16   BY MR. LAND:

17   Q.    Well, did you get in touch with someone on February 16

18         from the prosecutor's office?

19   **A.    From the prosecutor's office, no.  It was late in the**

20   **      day.  No.**

21   Q.    You did not?

22   **A.    No.**

23   Q.    You do agree that you could have drove down there?

24   **A.    Um, I don't know what time they go home for the day.**

25   Q.    Didn't ask.



Lashauntia Oliver
05/14/2024                                              Page 51

1   A.   Could I have, yes, I could have.  However, I thought

2        what I did was the right thing to do; go back to our

3        base and make those phone calls trying -- I called

4        everyone.  I called a lot of prosecutors.

5   Q.   You called a lot of prosecutors?

6   A.   Yes.

7   Q.   Give me the names.

8   A.   What did you say?

9   Q.   I want the names.

10  A.   Oh, I'm sorry.  I know I called Garrett Garcia.  I had

11       other people that were trying -- the other people on my

12       office that were calling as well.  There is a list of --

13       I don't know what -- you're asking for the name, no, I

14       can't tell you the name.

15  Q.   I want to know what you did.

16  A.   Okay.  What I did was called these numbers right here.

17  Q.   Okay.  And you didn't get an answer?

18  A.   No.

19  Q.   But you didn't -- you have a pregnant woman, wrong

20       person.  You didn't personally drive down there?

21  A.   No.

22  Q.   Okay.  That's fair.

23            MR. LAND:  Now, let the record reflect that we

24       turned -- both parties turned in a Joint Rule 26

25       Discovery Plan back, I believe, in August, around late



1    July, early August.  No, I'm sorry.  We submitted

2    discovery plan to the Federal Court in this matter on

3    September 24, 2023.  Counsel?

4              MR. PADDISON:  Okay.

5              MR. LAND:  Okay.  I want to have three things

6    marked.  For the record, I believe these documents were

7    prepared for the course of this litigation.  I do not

8    believe these documents were prepared when this instance

9    happened, and there will be an investigation behind

10   this.

11             I want to show you what has been marked as

12   People's 16.  Can you read the top of that 16 through

13   18?

14                  DEPOSITION EXHIBITS 16 -18

15                  WERE MARKED BY THE REPORTER

16                  FOR IDENTIFICATION.

17   A.   User is Miller N 715.

18   BY MR. LAND:

19   Q.   Who is that?

20   A.   I don't know.

21   Q.   You don't know.  What date is on that?

22   A.   Looks like 4-16-2024.

23   Q.   So that was almost a month ago?

24   A.   Yes.

25   Q.   Do you know what a discovery plan is?



Lashauntia Oliver
05/14/2024                                          Page 53

1   A.   No.

2   Q.   You don't know what a discovery plan is?

3   A.   **I don't know what it entails.**

4              MR. PADDISON:  Just place an objection as to

5        relevance.

6   BY MR. LAND:

7   Q.   Okay.  Again, Exhibit 17 -- again, we believe Exhibit 17

8        was prepared for the course of this litigation?

9              MR. PADDISON:  Can we go off just one second.

10             VIDEOGRAPHER:  Going off the record at 2:46

11       p.m.

12             (A short recess was taken)

13             VIDEOGRAPHER:  We are back on the record.  The

14       time is 2:49 p.m.

15  BY MR. LAND:

16  Q.   Okay.  Take a look at Exhibit 17, okay?

17  A.   **Okay.**

18  Q.   Can you read the very first line?

19  A.   **OIC Oliver and Detective Greenwald went to DDC today,**

20       **2-16-23, where we conducted an interrogation of Porcha**

21       **Woodruff.  Woodruff was picked up this morning by FAST.**

22  Q.   Okay.  Now can you go back to Exhibit 16.  Can you read

23       that top paragraph?

24  A.   **I, OIC Oliver, spoke with APA Garcia -- or Garrett**

25       **Garcia this morning 2-17-23.  I advised him that the**



1    woman in custody, Porcha Woodruff, is 34 weeks pregnant

2    and cannot be the woman responsible for the carjacking.

3    Gave all the info to Garcia who advised me he will

4    update the case.

5  Q.  Okay.  What does "I'll update the case" mean to you?

6  A.  He will look into what I told him.

7  Q.  But not dismiss it?

8  A.  Correct.  I didn't know if he --

9  Q.  Thank you for that.  I appreciate that.  I know this is

10     difficult, but I do appreciate.  Let me ask you this.

11             So, you didn't think -- it didn't mean

12     dismissal.  It just meant he would look further into.

13 A.  That he would look further into it.

14 Q.  Let me ask you, Detective Oliver.  When you learned that

15     it wasn't her, when you learned it wasn't Ms. Woodruff,

16     why did you take her phone from the Detroit Detention

17     Center?

18             MR. PADDISON:  Objection, foundation.

19             MR. LAND:  Form.

20 BY MR. LAND:

21 Q.  Okay.  Let me ask you something.  You remember going to

22     Detroit Detention Center?

23 A.  Yes.

24 Q.  And at some point after you finished interrogating

25     Porcha Woodruff, right, you took custody of her phone?



Lashauntia Oliver
05/14/2024                                        Page 55

1   A.   No.

2   Q.   You did not?

3   A.   No.

4   Q.   Who took custody of her phone?

5   A.   Arresting officer.

6   Q.   Did you take custody of her phone from the Detroit

7        Detention Center?

8   A.   No.

9   Q.   How did you get her phone?

10  A.   The arresting officer brought the phone to my desk, I'm

11       assuming, while I was in training that day.

12  Q.   They brought the phone to your desk?

13  A.   Yes.

14  Q.   Okay.  That's fair.  And do you remember Ms. Woodruff

15       having conversation with you about her phone?

16  A.   Yes.  After she was released?

17  Q.   Yes.

18  A.   Yes.

19  Q.   And you refused to give it to her?

20            MR. PADDISON:  Objection.  Form, foundation.

21  BY MR. LAND:

22  Q.   Okay.  You remember having a conversation with her?

23  A.   Yes.

24  Q.   Did she contact you over the phone?

25  A.   Yes.



<div align="center">

**Lashauntia Oliver**
05/14/2024
</div>

Page 56

1  Q.  Did she inquire about her phone?

2  **A.  Yes.**

3  Q.  Did she ask you for her phone?

4  **A.  Yes.**

5  Q.  Do you remember what you said?

6  **A.  Not verbatim.  But I do remember telling her that I need**

7  **the phone -- that I need the phone to do further**

8  **investigation to make sure or to see her whereabouts to**

9  **make sure or to further point out that she was nowhere**

10  **near the scene.**

11  Q.  So let's say, for instance, because Porcha's mother

12  lives around there.  Let's say, for instance, the phone

13  pinged on her.  She was in the area.

14  **A.  Of the carjacking?**

15  Q.  Uh-huh.  Then what?

16  **A.  Then that would be more information to put into the --**

17  **or to tell the prosecutors or once we got to court, that**

18  **would be something I would have told possibly.**

19  Q.  That would have been something you would have -- I'm

20  sorry.  I couldn't hear you.

21  **A.  I would have included that during court probably.**

22  Q.  You would have -- so even though you realized it wasn't

23  her?

24  **A.  You said if -- if the -- yes, even if I know that she or**

25  **I believe her not to be the person, if her phone record**



Lashauntia Oliver
05/14/2024                                    Page 57

1      showed her in the area of Gratiot and Bessemore at the

2      time of carjacking, I would have probably have said

3      something still.

4   Q.   You probably said something like what do you mean?

5   A.   I would have told that yes, put that phone -- or the

6        phone was in the area at the time of the carjacking.

7   Q.   So you do remember telling I can't give it to you?

8   A.   Yes, because I was trying to clear her even more.

9   Q.   You was trying to clear her?

10  A.   Yes.

11  Q.   How would you clear her?

12  A.   By proving that she -- or her phone wasn't in the area.

13  Q.   Well, that would be very important to mention to someone

14       that she didn't have tattoos -- that she had tattoos?

15       I'm sorry, right?

16  A.   Okay.

17  Q.   And the victim, the suspect did not have tattoos.  She

18       had tattoos, the suspect didn't, correct?

19  A.   Yes.

20  Q.   It would be important to mention that she was pregnant?

21  A.   I may have told the prosecutor that.  I mean, I don't

22       know verbatim.  But as I was telling the -- Garrett

23       Garcia the next day why I believed Porcha not to be the

24       suspect, that would have been something I probably would

25       have mentioned about the tattoos.



Lashauntia Oliver
05/14/2024                                    Page 58

1   Q.   And the pregnancy?

2   A.   **Yes, I did mention that.**

3   Q.   Because you wanted to get her out of this?

4   A.   **Yes.**

5                MR. LAND:  I need this marked as an exhibit.

6                (Discussion off the record.)

7   Q.   I'm going to -- it's been marked as Exhibit 2 from the

8        first witness Rachel Perkins.  Do you remember this?

9   A.   **Yes.**

10  Q.   Who was that a picture of?

11  A.   **Porcha Woodruff.**

12  Q.   What date was that taken on?

13  A.   **I believe the February 17.**

14  Q.   February 17?

15  A.   **I believe so.**

16  Q.   Was it the day you gave her her phone back?

17  A.   **Yes.**

18  Q.   Do you know when you gave her her phone back?

19  A.   **Can I look through my notes?  I believe it was February**

20       **17.**

21  Q.   I don't think that's going to show you, but --

22               MR. PADDISON:  I think the return of property

23       was in the file, yes.  I can pull it up here just to

24       confirm.  We can stip to that on the record.

25               MR. LAND:  It was February 17.



**Lashauntia Oliver**
**05/14/2024**                                                      **Page 59**

1           MR. PADDISON:  I think that's what

2      Ms. Woodruff testified to as well.

3  BY MR. LAND:

4  Q.   So this was -- you would have told prosecutors that, you

5       know, listen.  She has a tattoo, the victim doesn't.

6       That's just being straight forward, right?

7  **A.   Yes.**

8  Q.   Okay.  I want to show you what has been marked as

9       Exhibit 19.  This is a search warrant for the phone.

10          MR. LAND:  Yes.

11              DEPOSITION EXHIBIT 19

12              WAS MARKED BY THE REPORTER

13              FOR IDENTIFICATION.

14  BY MR. LAND:

15  Q.   Let me let you take a look at this.  Do you recognize

16       that?

17  **A.   Yes.**

18  Q.   What is that?

19  **A.   Search warrant for Porcha Woodruff's cell phone.**

20  Q.   Did you prepare that?

21  **A.   Yes.**

22  Q.   Okay.  Who did you submit that to?

23  **A.   APA Kurity.**

24  Q.   Okay.  So you just mentioned that you would like to be

25       straight forward and tell them she was pregnant and



Lashauntia Oliver
05/14/2024                                    Page 60

1      tattoos and things of that nature, right?

2  A.   Yes.

3  Q.   Okay.  I want you to take a look at paragraph 8.  And

4       read that into the record.  And let me just say this.

5       This was done after you visited her at the Detroit

6       Detention Center.

7  A.   Okay.

8  Q.   You can read it out loud.

9  A.   **February 16, 2023, Affiant was notified Porcha Woodruff**

10      **was in custody.  Woodruff's white Apple iPhone was**

11      **placed on evidence tag 69577-10.  During the**

12      **interrogation at the Detroit Detention Center, Woodruff**

13      **was advised of her Constitutional Rights.  Woodruff**

14      **stated to Affiant, her cell phone number is**

15      **(248)918-6561 and the provider is Xfinity Mobile.**

16 Q.   So you believe that you wrote that up in an effort to

17      clear her?

18 A.   **This, I believe that or I know that the facts in here**

19      **was what I was told by the victim and it was a lot of**

20      **maybe a copy and paste from my investigator's report.**

21 Q.   So missing the point.  I'm asking you, February 16,

22      after you visited Porcha Woodruff in jail and learned

23      that he was pregnant and learned that she had a tattoo,

24      that the suspect didn't have, you prepared this search

25      warrant?



1  A.   Yes.

2  Q.   And you did not place in the search warrant to let a

3       prosecutor know that she was pregnant, as well as she

4       had a tattoo on her arm that wasn't consistent with the

5       suspect?

6  A.   Correct, that's not in here.

7  Q.   Is that important?

8  A.   It could have been.  However, I wasn't -- this warrant

9       was not to -- I don't know how to say it.

10              The warrant was to show that she was not near

11       the scene to clear her.  So you can -- I mean, from your

12       understanding you have your point of view and I have

13       mine as well.  I know why I typed this up and it was to

14       show she was not anywhere near the scene and to have

15       this information just in case I needed it.

16  Q.   Okay.  Well, so at this point the investigation is still

17       continuing?

18  A.   Yes.

19  Q.   She is still being charged?

20              MR. PADDISON:  Objection.  Calls for

21       speculation.

22  BY MR. LAND:

23  Q.   Do you know whether or not she was still being charged?

24  A.   At that time, no, I don't.  I never -- I mean, like I

25       said, when I talked to the prosecutor, he never said to



Lashauntia Oliver
05/14/2024                                    Page 62

1      me that he was going to dismiss the case.

2   Q.   Okay.  So she was still being charged, right?

3   A.   Okay.  Yes.

4   Q.   You agree?

5   A.   Um --

6               MR. PADDISON:  Object to speculation.

7   BY MR. LAND:

8   Q.   Do you agree you didn't hear the case was dismissed?

9   A.   Correct.

10  Q.   Okay.

11              MR. LAND:  Let me have this marked as Exhibit

12      20.

13                   DEPOSITION EXHIBIT 20

14                   WAS MARKED BY THE REPORTER

15                   FOR IDENTIFICATION.

16  BY MR. LAND:

17  Q.   This is a search warrant that was signed by Prentis

18      Edwards.  Can you take a look at that.  Do you remember

19      that?

20  A.   Yes.

21  Q.   Do you remember that?

22  A.   Yes.

23  Q.   What date did he sign that on?

24  A.   February 22, 2023.

25  Q.   Where did he sign it at?  Where did you go to get him to



**Lashauntia Oliver**
**05/14/2024**                                            Page 63

1      sign that at?

2                    MR. PADDISON:   Objection as to form,

3      foundation.

4   BY MR. LAND:

5   Q.   Did you take that somewhere?

6   A.   **Yes.**

7   Q.   Did you go in person to see Prentis Edwards?

8   A.   **Yes.**

9   Q.   Where did you go to see him at?

10  A.   **Frank Murphy.**

11  Q.   What floor is his courtroom on?

12  A.   **I'm not sure.**

13  Q.   Is it on the third floor?

14  A.   **I'm not sure.**

15  Q.   But it's in the Frank Murphy Hall of Justice?

16  A.   **Yes.**

17  Q.   Where is the prosecutor's office at?

18  A.   **Maybe the first floor.   I don't know.**

19  Q.   But the prosecutor's office is in Frank Murphy?

20  A.   **Yes.**

21  Q.   And you didn't go up to the prosecutor's office and give

22       them any documentation or written documentation or

23       anything?

24  A.   **No.   I already had a conversation with the --**

25  Q.   Garcia?



Lashauntia Oliver
05/14/2024                                              Page 64

1   A.   Yes.

2   Q.   You were relying on a verbal conversation as opposed to

3        having something written?

4             MR. PADDISON:  Objection.  Form, foundation,

5        and assumes facts not in evidence.

6             You can answer.

7   A.   **I didn't know that I had to have written documentation**

8        **because of the conversation that me and Garrett Garcia**

9        **had.  He knew the facts of what I told him.**

10  Q.   But he did not tell you he was dismissing the case?

11  A.   **Correct.**

12  Q.   Okay.  Let me go back to Exhibit 19.  I want you to read

13       what it states right here into the record.

14  A.   **Based upon the foregoing, along with affiant's training**

15       **and experience, Affiant has probable cause to believe**

16       **and do believe that information obtained from the call**

17       **detail records, cell site activity, cell site location**

18       **and historical billing records, s.m.s., messaging for**

19       **the target number (248) 918-6561, will provide evidence**

20       **aiding in discovery or persons responsible for the**

21       **aforementioned criminal investigation and/or provide**

22       **evidence to aid in said person's prosecution.  Specific**

23       **and --**

24  Q.   It don't matter.

25  A.   **Articulable, legal facts exist which shows that the**



1    disclosure of retained cellular records, cell site

2    activity and cell site locations is material to this

3    criminal investigation.

4  Q.   So you were still investigating for that crime?

5            MR. PADDISON:  Objection.  Assumes facts not

6        in evidence.  Form and foundation.

7  BY MR. LAND:

8  Q.   You were still investigating?

9            MR. PADDISON:  Same objection.

10           What paragraph is that?

11           MR. LAND:  That's the -- Counsel, it's nine

12       very bottom.

13 A.   What was your question?

14           (Record repeated as requested)

15           MR. PADDISON:  He was asking, you were still

16       investigating and then I said --

17 BY MR. LAND:

18 Q.   Were you still investigating at this point?

19 A.   Yes.

20           MR. PADDISON:  Thank you.

21           MR. LAND:  No. Further questions.

22                        EXAMINATION

23 BY MR. PADDISON:

24 Q.   Since we're on that topic, you were still investigating

25       this carjacking, correct?



HANSON RENAISSANCE
COURT REPORTERS & VIDEO          hansonreporting.com
313.567.8100

1   A.   Yes.

2   Q.   Okay.  And in the paragraph in which you just read, it

3        states that this would -- will provide evidence in

4        aiding and discovery of persons responsible, the

5        aforementioned criminal investigation and/or provide

6        evidence to aid in said prosecution, correct?

7   A.   Yes.

8   Q.   Does it aid in an investigation to absolve someone of

9        any wrongdoing, to knock someone out as a possible

10       suspect?

11  A.   Yes.

12  Q.   Okay.  Now we've got a couple things to back up on.  Do

13       you have your calendar on your phone?

14  A.   Yes.

15  Q.   Do you keep it?

16  A.   Oh, my calendar.

17  Q.   You keep a calendar on your phone?

18  A.   I have a calendar on my phone.

19  Q.   Do you have, without looking at your calendar, do you

20       happen know what you did on April 16 of this year?

21  A.   I think I came down here for my pre-deposition meeting.

22  Q.   Correct.  That's what I have in my notes as well.  We

23       don't want to get into any conversations that we had

24       specifically.  But it was during that meeting that I

25       came to know that there were notes that you had made



**Lashauntia Oliver**
05/14/2024                                    **Page 67**

1    that weren't attached to the printout that you had

2    originally given me, correct?

**3  A.   Yes.**

4  Q.   And then there was a nice lady that stepped in here a

5        few minutes ago.

**6  A.   Yes.**

7  Q.   Do you remember her coming in during our meeting?

**8  A.   Yes.**

9  Q.   Okay.  Do you remember asking me to get those notes?

**10  A.   Yes.**

11  Q.   Okay.  That would have been on April 16?

**12  A.   Yes.**

13  Q.   Okay.

14            MR. PADDISON:  Counsel, I need to take a

15    chance, make sure this doesn't have any attorney/client

16    privilege, but I will provide you with that.

17            MR. LAND:  You're fine.

18            MR. PADDISON:  I'm not sure which numbers

19    these were marked.  They were your case notes.  I'm not

20    sure which numbers these -- these are case notes.

21            MR. LAND:  It's fine.

22            MR. PADDISON:  We can go though them here.

23    I'm going to hand you one, two.

24            MR. LAND:  Are you giving them to her?

25            MR. PADDISON:  Yes.  I'll just read off the



Lashauntia Oliver
05/14/2024                                        Page 68

1      reference number.

2   BY MR. PADDISON:

3   Q.   So I'm looking at the first one that begins IOC Oliver

4        and Detective Greenwald.  Do you have that one in front

5        of you?

6   A.   Yes.

7   Q.   And I'm not sure which exhibit they have been marked as.

8        At the very end, the very last paragraph, can you read

9        that into the record, please?

10  A.   **I spoke to Magistrate Echartea today 2-16-23 during the**

11       **arraignment of Woodruff.  Echartea advised me I need a**

12       **prosecutor or a judge to dismiss the warrant, however**

13       **she will take into consideration of what I advised her**

14       **of.**

15  Q.   And then is it dated?

16  A.   **Yes.  2-16-2023, 1656.**

17  Q.   Okay.  1656 in military time translates to?

18  A.   **2:56 -- wait.  4:56.**

19  Q.   Okay.  So you spoke -- and so is that the time you

20       entered this note?

21  A.   **Yes.**

22  Q.   So at five minutes, four minutes before five is when you

23       entered that note, correct?

24  A.   **Yes.**

25  Q.   Turning next to the tracking note that begins, I, OIC



**Lashauntia Oliver**
05/14/2024                                          **Page 69**

1      Oliver, spoke with APA Garrett Garcia.  Do you see that

2      one?

3   A.   Yes.

4   Q.   What is the date at the end of that?

5   A.   2-7-2023, 11:01.

6   Q.   Is that a.m. or p.m.?

7   A.   A.m.

8   Q.   And is that the time you entered that note?

9   A.   Yes.

10  Q.   The third one states I, IOC Oliver, prepared three phone

11       warrants today.  Do you see that one?

12  A.   Yes.

13  Q.   And what date and time is that entered?

14  A.   2-17-2023, 2253.

15  Q.   If my math is correct, that would be roughly 10:53 p.m.

16       Is that the time you entered that note?

17  A.   Yes.

18  Q.   Okay.  There is quite a bit I want to go to.  I do

19       apologize.  I'm going to try and cover everything, kind

20       of go through it chronologically.

21              As far as your role with CATS, you indicated

22       you get specific training in terms of auto

23       investigations, correct?

24  A.   Correct.

25  Q.   Okay.  But as part of CATS, do you participate in



**Lashauntia Oliver**
05/14/2024                                              Page 70

1    on-the-job training, working with other officers?

2  A.    Yes.

3  Q.    Okay.  Do you participate in yearly required training

4        through the Detroit Police Department?

5  A.    Yes.

6  Q.    Just to be 100 percent clear.  You have no training in

7        the actual use of facial recognition technology,

8        correct?

9  A.    Correct.

10  Q.   And you have no involvement or no role in the

11       performance of any facial recognition searches, correct?

12  A.   Correct.

13  Q.   Okay.  Now I want to walk through this.  So the -- what

14       day did the underlying carjacking occur?

15  A.   January 29, 2023.

16  Q.   Okay.  At that point the victim gave their statement to

17       Detective Fletcher, correct?

18  A.   Yes.

19  Q.   All right.  You were technically assigned the case the

20       following day, correct?

21  A.   Yes.

22  Q.   But you didn't make contact with the victim until the

23       following day; is that correct?

24  A.   Yes.

25  Q.   Did you explain why you waited a day to make contact



1    with the victim?

2  A.   Yes.  Even though I start at whatever time, we do get

3       recalled.  I do remember being assigned this case later

4       on in the day.  But we were out of the office -- I don't

5       want to say the entire day, but we were out of the

6       office for quite some time that day.  So by the time I

7       had noticed that I had this carjacking case, it was

8       later in the day.  I said I'll get to it tomorrow.

9  Q.   Okay.  Then on January 31 is the date you first

10      contacted the victim of the carjacking?

11 A.   Yes.

12 Q.   Okay.  He informed you that the phone had been returned

13      to a gas station?

14 A.   Yes.

15 Q.   Okay.  So at that point, you had only known that you

16      were assigned this case for less than a full day?

17 A.   Yes.

18 Q.   Okay.  Is there any reason why you would have thought

19      that suddenly this phone returned, he should have run

20      out and notified you?

21 A.   No.

22 Q.   Okay.  Prior to you contacting the victim?

23            MR. LAND:  Objection.  Leading, man.

24 BY MR. PADDISON:

25 Q.   Prior to your first phone call with the victim on



Lashauntia Oliver
05/14/2024                                    Page 72

1       January 31, had you spoken to the victim before then?

2   A.  No.

3   Q.  So based on your knowledge, obviously you can't guess,

4       but would there have been any reason for the victim to

5       know that you had been assigned the OIC?

6   A.  No.

7   Q.  Now after you made the initial contact with the victim

8       where he informed you that the phone had been returned,

9       what did you do?

10  A.  I asked him to come into the office so we can -- I can

11      get another statement from him so I can talk to him.

12  Q.  He did that a few days later?

13  A.  I believe so.

14  Q.  Okay.  But on January 31, what did you do after you

15      spoke with the victim?

16  A.  After I spoke with the victim, I went -- so that's when

17      he told me that the phone was returned to the gas

18      station and I went to the gas station to watch the video

19      of her returning the phone.

20  Q.  Okay.  And we viewed some of the images that you had

21      reviewed at that point, correct?

22  A.  Yes.

23  Q.  And at that point, you made a request, correct?

24  A.  Yes.

25  Q.  What is that request called?



Lashauntia Oliver
05/14/2024                                    Page 73

1  A.  Avert request.

2  Q.  Just to the extent that you know, what is an avert

3      request?

4  A.  It's a unit within a department that specializes in

5      audio and video.  So I put in a request for a detective

6      or officer to make that location to retrieve that video

7      incident of her, of the female suspect returning the

8      cell phone.

9  Q.  Okay.  And why did you ask for that video to be pulled?

10 A.  Because at that time, that's -- once I reviewed the

11     video, the description that the victim gave me matched

12     the person who returned the cell phone.  It was

13     important to have a video.

14 Q.  And were you planning on doing anything with that video

15     once you got it?

16 A.  Yes.  If it was a good picture of the female, that's

17     when I requested a facial rec to be done.

18 Q.  And I believe you said that you can only request facial

19     rec on a certain type of crime?

20 A.  Yes.

21 Q.  What are those?

22 A.  Level one crimes such as criminal sexual conduct or --

23     not criminal sexual conduct.  Homicides, carjacking,

24     robberies.

25 Q.  Violent felonies?



Lashauntia Oliver
05/14/2024                                              Page 74

1  A.   Violent felonies.

2  Q.   And those are the only type of crimes you're allowed to

3       submit a facial recognition?

4  A.   Yes.

5  Q.   Now if there is something, maybe you made a mistake and

6       made incorrect request for facial recognition, and you

7       submit that to -- what is the organization you submit

8       that request to?

9  A.   Crime Intel.

10 Q.   Okay.  If let's say there was something wrong request

11      with your request, what happens in that situation?

12 A.   **I wouldn't be able to use the facial rec or they**

13      **wouldn't even perform the active facial rec.**

14 Q.   All right.  At the present time that you did this,

15      Ms. Woodruff, when you submitted the facial rec request,

16      she was not a suspect yet, correct?

17 A.   **Correct.**

18 Q.   She wasn't even an investigative lead yet?

19 A.   **Correct.**

20 Q.   You didn't even know her name yet?

21 A.   **No.**

22 Q.   So the following day, February 2, did you -- let me ask

23      you this.

24             When did you get notified of Ms. Woodruff's

25      name?  I just tried to dodge an objection there.



Lashauntia Oliver
05/14/2024                                   Page 75

1   A.   I was notified once I received the facial rec paperwork

2        back from Crime Intel.

3   Q.   Do you recall what day that was?

4   A.   Maybe the -- I don't know.

5             MR. PADDISON:  Was that one of our exhibits?

6             MR. LAND:  Which one?

7             MR. PADDISON:  Just the Crime Intel Unit

8        that's sent back to her.

9             MR. LAND:  I don't think I have that.

10  BY MR. PADDISON:

11  Q.   Let me phrase it this way, Officer Oliver.  If I told

12       you that you were returned with Ms. Woodruff's name as

13       investigative lead on February 2, would you have any

14       reason to dispute that?

15  A.   No.

16  Q.   Okay.  Also on February 2, did you speak with the victim

17       again?

18  A.   Yes.

19  Q.   At this point this is when the victim recalled some

20       additional details about the encounter, correct?

21  A.   Yes.

22  Q.   I want to jump ahead.  I know this was marked as an

23       exhibit.  If you pull up the investigator's report and

24       the Request for Warrant.  Why don't we turn -- actually

25       in terms of details for of investigation, I'd like you



<center>**Lashauntia Oliver**
05/14/2024</center>                                    Page 76

1       to look at the second and third page.

2                       I don't need you to go through this line by

3       line.  Did you include the fact that the victim

4       remembered additional details and their story changed a

5       little bit?

6   A.  Yes.

7   Q.  Did you include in that that the victim indicated that

8       he had been drinking?

9   A.  Yes.

10  Q.  Did you include in that the victim suspected that he had

11      been drugged?

12  A.  Yes.

13  Q.  Is that something that you would typically include if

14      you are simply trying to get a warrant, or is that

15      something that you felt was necessary to include because

16      it was evidence in the case?

17  A.  **Just include it was evidence in the case.**

18  Q.  Okay.  Now during this conversation in addition to the

19      fact that the victim mentioned that they had been

20      drinking and they had sex and that he had suspected that

21      he had been drugged.  Did he give you any additional

22      information about what had happened that night at the

23      carjacking?

24  A.  **Just that they had been -- they went to the gas station**

25      **two times.  That the female was in and out of the**



Lashauntia Oliver
05/14/2024                                      Page 77

1      vehicle while at the gas station.

2  Q.   So that was the first time that you learned she had

3       actually been to that gas station earlier in the

4       evening?

5  A.   Can you repeat that?  I'm sorry.

6  Q.   During the second conversation with the victim, that's

7       when you learned that they actually been to that gas

8       station that night?

9  A.   Uh-huh.

10  Q.   Is that yes?

11  A.   Yes.

12  Q.   All right.  What did you do with that information?

13  A.   I went back to the gas station and followed up with more

14       video and I saw the incident where he said what

15       happened.

16  Q.   Stop you there.  So you went back to the gas station for

17       a second time?

18  A.   Yes.

19  Q.   And you looked at additional video?

20  A.   Yes.

21  Q.   Okay.  Now what did you observe on that video?

22  A.   I observed the female -- they were there for quite some

23       time.  I don't know exactly how long, but longer than 20

24       minutes.  The female was in and out of the vehicle.  In

25       and out of the gas station talking to several different



1      men at the gas station, then you see them pull away.

2  Q.   Did you observe any of the victim's behavior at the

3       time?

4  A.   Yes.

5  Q.   What did you observe in that context?

6  A.   At some point I believe -- I don't know who opened the

7       door.  But the driver's door was opened and I could see

8       the victim kind of slumped over or appeared to be drunk

9       maybe or just it appeared that might have been -- I

10      don't know.

11 Q.   In your opinion, did that seem to align with what he had

12      told you?

13 A.   Yes.  Yes.

14 Q.   And in your mind, did that lend credibility to what he

15      had told you?

16 A.   Yes.

17 Q.   Something else pretty significant happened on February

18      2, correct?

19 A.   Yes.  I believe that's when White was arrested.

20 Q.   And White was the other suspect, correct?

21 A.   Yes.

22 Q.   And you weren't a part, personally, of that arrest,

23      correct?

24 A.   Correct.

25 Q.   Okay.  Do you have an understanding of the general



Lashauntia Oliver
05/14/2024                                      Page 79

```
 1        circumstances of what happened at that arrest?
 2   A.   Yes.  They had -- it was actually my unit -- members of
 3        my new unit were in the area searching for the victim's
 4        vehicle and they observed the vehicle and observed White
 5        as the driver of the vehicle.
 6   Q.   Okay.  So Mr. White was actually driving the stolen
 7        vehicle when he was arrested?
 8   A.   Yes.  He was walking back to it.  I believe he walked
 9        into a Family Dollar or some store.
10   Q.   Okay.  Now with respect to the female suspect, we'll
11        call Trinidad so we don't have to keep calling her the
12        female suspect.
13   A.   Okay.
14   Q.   Now you did an avert request for the time she returned
15        the phone.  Did you do another avert request for the
16        additional video?
17   A.   Yes.
18   Q.   And on February 3, at this point suspect White had been
19        brought in custody, correct?
20   A.   Yes.
21   Q.   Okay.  Did you personally interrogate Mr. White?
22   A.   No.
23   Q.   Okay.  Do you recall who did?
24   A.   Officer Glover and Officer Gray.
25   Q.   So on February 3, Glover and Gray are interrogating
```



Lashauntia Oliver
05/14/2024                                    Page 80

1       White.  That's also the day that the victim came back to

2       the -- was it the DDC?  Was it the DDC or your precinct?

3   A.  **He was at our base which is like a precinct.  As I was**

4       **speaking with him, I heard our radio was going off.**

5       **They were following White and observed him.**

6   Q.  Now what was the reason of having the victim come back

7       down?

8   A.  **To get a statement from him on paper.**

9   Q.  Okay.  Was that on the 2nd or 3rd?

10  A.  **I think it was the 2nd, and then the 3rd was -- I would**

11      **have to see.**

12  Q.  You can check your notes, that's fine.

13  A.  **I don't have anything in front of me.  Let me see.  On**

14      **February 2, I obtained a statement from Mr. Walker.**

15      **Then February 3 is when we were at the DDC for the**

16      **lineup.**

17  Q.  And that's the day Glover and Gray were interrogating

18      White?

19  A.  **Yes.**

20  Q.  And you are doing the victim identification of the

21      suspects, correct?

22  A.  **Yes.**

23  Q.  Okay.  Now on that note -- first and foremost, were you

24      planning on doing a photo lineup or a live lineup?

25  A.  **A live lineup.**



Lashauntia Oliver
05/14/2024                                                    Page 81

1  Q.  Of both suspects or just one?

2  A.  **Just White.**

3  Q.  Why did you not end up doing a live lineup?

4  A.  **There weren't enough black males that resembled White at**

5      **the DDC at the time.**

6  Q.  Okay.  You decide to do a photo lineup of both?

7  A.  **Yes.**

8  Q.  Did you have anyone helping you?

9  A.  **Yes.**

10 Q.  Okay.  Who was helping you aside from Glover and Gray?

11 A.  **Detective Greenwald.**

12 Q.  If you could describe, for me, what did you do with

13     respect to the photo lineups and what did Detective

14     Greenwald do?

15 A.  **I asked Greenwald if he could prepare Ms. Woodruff's and**

16     **then I do White's while we were at the DDC.  Greenwald**

17     **was there and we read off the instructions for the**

18     **victim.**

19 Q.  Okay.  We'll get to that in a moment.  You did not

20     prepare Ms. Woodruff's photo lineup, correct?

21 A.  **Correct.**

22 Q.  So you don't know why Detective Greenwald picked the

23     photo he did?

24 A.  **Correct.**

25 Q.  Is there a policy about using the photo that was the



**Lashauntia Oliver**
**05/14/2024**                                              **Page 82**

1       match on the facial recognition side in a lineup?

2  A.   **Yes.  We are not allowed to use the facial rec photo**

3       **that we received back from Crime Intel.  You can't use**

4       **that photo in the lineup.**

5  Q.   Okay.  And then are you familiar with the Michigan State

6       Police SNAP policy?

7  A.   **Yes.**

8  Q.   Okay.  If you don't remember verbatim, that's fine.

9       What is the SNAP policy as far as using Secretary of

10      State or driver's license photos versus mugshots?

11 A.   **They recommend we use the -- it's in the policy to use**

12      **the mugshot photos, criminal mugshot photos.**

13 Q.   Is that whenever possible?

14 A.   **Yes.**

15 Q.   All right.  So that could be -- we don't know, but that

16      could be a reason why Detective Greenwald picked the

17      photo he did?

18 A.   **Yes, right.**

19 Q.   Now there was some discussion about the victim's

20      description of the male suspect.  You were asked several

21      questions about that, correct?

22 A.   **Yes.**

23 Q.   I apologize if anything I say here is even remotely off

24      key.  Have you been referred to as a black female?

25 A.   **Yes.**



**Lashauntia Oliver**
**05/14/2024**                                         **Page 83**

1   Q.   Has your complexion been described as brown?

2   **A.   Yes.**

3   Q.   Have you been described as light skinned?

4   **A.   Yes.**

5   Q.   Okay.  Also, there was discussion that at the time of

6        the carjacking, the victim stated that the male suspect

7        had short braids, correct?

8   **A.   Yes, he reported that to the reporting officers.**

9   Q.   Okay.  At the time Mr. White was arrested a couple days

10       later he had a shaved head, correct?

11  **A.   Yes.**

12  Q.   And that's why all the photographs you had picked men

13       with shaved heads, correct?

14  **A.   Yes.**

15  Q.   Just a shot in the dark here, how long do you think it

16       would take for someone to go to having braids to a

17       shaved head?

18  **A.   Two minutes.  Just not long.  Just shave his hair off.**

19  Q.   Okay.  And in your experience, is that something that

20       criminal suspects do to try and avoid detection?

21  **A.   Yes.**

22  Q.   Okay.  Looking back at your investigator report, I

23       believe this was Exhibit 2.  You got that?

24  **A.   Yes.**

25  Q.   Okay.  So on the first page, it might be partially



1      redacted.  But it does identify the male suspect as a

2      black male, correct?

3  A.   Yes.

4  Q.   Okay.  When you submit this Warrant Request and there is

5      -- we have looked at several police reports, several

6      investigation or report several statements, correct?

7  A.   Yes.

8  Q.   Are those provided to the prosecutor with your Warrant

9      Request?

10  A.   Yes.

11  Q.   Okay.  So is it fair to say this is really just a

12      summary of all the other materials that get turned over

13      to the prosecutor?

14  A.   Yes.

15  Q.   And in those materials it did have the victim

16      description of the suspect White, correct?

17  A.   Yes.

18  Q.   I'd like to talk about the actual lineup that was

19      presented to the victim, and I don't have this in front

20      of me.  Can I pull your copy?

21            MR. LAND:  Which one?

22            MR. PADDISON:  The understanding statement and

23      the identification.  I can pull it up here.

24            MR. LAND:  Which one?

25            MR. PADDISON:  It was the Statement of



**Lashauntia Oliver**
05/14/2024                                          Page 85

1    Understanding for the photo lineup.

2                    MR. LAND:  Lineup, okay.

3                    MR. PADDISON:  Thank you.

4    BY MR. PADDISON:

5    Q.   We have discussed what's marked as Exhibit 10, the

6         lineup instructions.  Do you recall that, correct?

7    A.   Yes.

8    Q.   Okay.  It states that the investigation is going to

9         continue regardless of whether the victim makes an

10        identification, correct?

11   A.   Yes.

12   Q.   All right.  There should also be this statement of how

13        sure they are, correct?

14   A.   Yes.

15   Q.   Okay.  Now I believe this is the Victim Witness

16        Photograph Lineup Statement which was marked as Exhibit

17        11, okay?  Under the series of numbers there is a part

18        where he handwrote something in.  Do you see that?

19   A.   The Statement of Certainty.

20   Q.   It's a Statement of Certainty.  What do you understand

21        that to mean?

22   A.   It's to explain how sure he is about his pick and his

23        choice.

24   Q.   And does it also explain why he is making the pick he

25        does?



Lashauntia Oliver
05/14/2024                                                   Page 86

1   A.   Yes.

2   Q.   Okay.  And based on your investigation, did the victim

3        spend more time with the female suspect or with the male

4        suspect?

5   A.   It had to have been just off of me remembering.  He went

6        straight to --

7   Q.   Let me clarify my question.  On the night of the

8        carjacking, did the victim spend more time with the

9        female suspect or the male suspect?

10  A.   I'm not sure actually.

11  Q.   Take a moment.

12  A.   You said the night of the carjacking?

13  Q.   Correct.

14  A.   So that would have been Detective Fletcher.

15  Q.   My question, I think I'm probably poorly phrasing my

16       question.

17            Based on what the victim told you, how much

18       time did he interact with the female suspect?

19  A.   Oh, more than the male for sure.

20  Q.   Okay.  And how long did it take the victim to identify,

21       at the photo lineup, Mr. White?

22  A.   I need to be certain.  I would need the paper, but it

23       wasn't long.

24  Q.   Okay.  Do you happen to know how long it took the victim

25       to identify Ms. Woodruff as the female suspect?



1  A.   Within a minute.

2  Q.   Within a minute?

3  A.   Yes.

4  Q.   Does it suggest to you anything about degree of

5       certainty?

6  A.   That he was very certain.

7  Q.   Okay.  Just to reiterate --

8            MR. LAND:  Objection.  Calls for speculation.

9       I want to put that on the record.

10 BY MR. PADDISON:

11 Q.   Based on your understanding and your experience.

12 A.   Yes.

13 Q.   Just to be clear, Mr. White was actually arrested again

14      while he was driving the stolen vehicle, correct?

15 A.   Yes.

16 Q.   Okay.  I believe that the victim stated to Detective

17      Fletcher in other notes that the male suspect was 5'9"

18      to 5'10"; is that correct?

19 A.   I'm not sure.  I would need to look at it.

20           MR. LAND:  Which exhibit, Counsel?  I think

21      it's 4.

22           MR. PADDISON:  The statement of Fletcher.

23 A.   Yes.  5'9" to 5'10".

24 BY MR. PADDISON:

25 Q.   And based on Exhibit 9, how tall was Mr. White when he



1    was driving the vehicle at the time he was arrested?

2  A.  5'10".

3  Q.  Okay.  And again, this in occurred in January, correct?

4  A.  Yes.

5  Q.  In Detroit, correct?

6  A.  Yes.

7  Q.  Where it's typically cold, correct?

8  A.  Yes.

9  Q.  Okay.  And in your experience, does people wearing

10     winter clothes affect an eye witness or victim's ability

11     to give a physical description of the suspect?

12 A.  Yes.

13            MR. LAND:  Objection.  Leading, man.

14 BY MR. PADDISON:

15 Q.  Okay.  Besides you and Detective Greenwald, at the time

16     that victim made his identification, was there anyone

17     else present?

18 A.  Yes.

19 Q.  Do you know who that was?

20 A.  Attorney Wyatt Harris.

21 Q.  Do you know why they have an attorney there?

22 A.  He was present for the lineup for Mr. White and because

23     I know I needed to show Ms. Woodruff's lineup as well.

24     I showed it like back to back pretty much so I could

25     have him present as well.



**Lashauntia Oliver**
05/14/2024                                    Page 89

1   Q.   Did Attorney Wyatt Harris make any objection to the

2        photo lineup?

3   **A.   No.**

4   Q.   Okay.  Now up until this point Ms. Woodruff was not a

5        suspect, correct?

6   **A.   Correct.**

7   Q.   What was she considered?

8   **A.   An investigative lead.**

9   Q.   Okay.  Did that change after she was identified by the

10       victim?

11  **A.   Yes.**

12  Q.   Okay.  At that point she became a suspect?

13  **A.   Yes.**

14  Q.   Okay.  I know there has been some confusion.  But at the

15       time this incident occurred, was a victim's

16       identification of a suspect enough for probable cause?

17  **A.   Yes.**

18  Q.   Okay.  So based on that, you submitted this warrant that

19       I believe was marked as Exhibit 2 Request for Warrant,

20       correct?

21  **A.   Yes.**

22  Q.   Okay.  Now at that point you had Ms. Woodruff's name?

23  **A.   Yes.**

24  Q.   And her address?

25  **A.   Yes.**



**Lashauntia Oliver**
05/14/2024                                    **Page 90**

1  Q.   Okay.  And but it wasn't yourself or other members of

2       CATS that went to arrest her, correct?

**3  A.   Correct.**

4  Q.   Okay.  Does DPD or Detroit Police Department have

5       specialized units that handled apprehending people with

6       felony warrants?

**7  A.   Yes.**

8  Q.   And that is called what?

**9  A.   FAST.**

10  Q.   The Fugitive Apprehension Team?

**11  A.   Yes.**

12  Q.   So that's why the warrant for Ms. Woodruff was provided

13       to FAST?

**14  A.   Yes.**

15  Q.   And based on everything I have reviewed and hearing your

16       testimony, for about two weeks nothing else really

17       happens on this case, correct?

**18  A.   Correct.**

19  Q.   Okay.  So then we get to February 16.  That's the date

20       Ms. Woodruff was arrested, correct?

**21  A.   Yes.**

22  Q.   What were you doing that morning?

**23  A.   I was at the gun range qualifying for our department.**

24  Q.   Is that like mandatory or optional?

**25  A.   It's mandatory.**



1   Q.   Are you allowed to leave in the middle of it?

2   A.   No.

3   Q.   And how long does that run?

4   A.   From 7 a.m. to pretty close to 3:00, so like maybe 2:45.

5        Depending on the size of the class.

6   Q.   Do you recall when you were notified that Ms. Woodruff

7        had been taken into custody?

8   A.   Yes.  I believe it was like after lunch time.

9   Q.   Okay.  And so you find out Ms. Woodruff is in custody

10       and do you have -- you continue with your firearms

11       training?

12  A.   Yes.

13  Q.   What do you do after you complete your firearms training

14       at that point?  You worked about seven, eight hours?

15  A.   Yes.

16  Q.   Okay.  What did you do at that point?

17            MR. LAND:  Stop leading, man.

18  A.   After that I went to my base to get my paperwork and

19       asked Detective Greenwald to come with me so we can go

20       talk to Ms. Woodruff.  From there, we both went to the

21       DDC to speak with her.

22  BY MR. PADDISON:

23  Q.   Did you drive together or separate?

24  A.   Separate.

25  Q.   Okay.  And when you arrived at the DDC, and let's walk



Lashauntia Oliver
05/14/2024                                                Page 92

1       through this slowly, what happens?

2   A.  You check in, get the arrest report, then we walk over

3       to the female area where like building 500, I believe.

4       Ask the guards there for the person you want to speak

5       with, then they go bring them up.

6   Q.  Okay.  What happened when they brought Ms. Woodruff up?

7   A.  I observed her.  She was pregnant.

8   Q.  Okay.  And what information did you gather from that?

9   A.  That she could not be the person in the video.

10  Q.  Okay.

11  A.  Trinidad.

12  Q.  In your career, had you ever experienced something like

13      that?

14  A.  Never, no.

15  Q.  What did you do?

16  A.  I walked from both buildings or walked from building 500

17      and I tried to get ahold of my superiors where I spoke

18      with someone.  They told me, you know, am I sure, am I

19      sure.  I said yes, this person is pregnant.  They just

20      asked that I, at least, get an alibi and just to

21      somewhat make sure that it's known on paper that she was

22      not the person of interest or the suspect.

23  Q.  Okay.  Now looking at Ms. Woodruff's Constitutional

24      Rights Certificate and her statement, it looks as though

25      you began speaking with Ms. Woodruff at roughly 2:58



1      p.m.; is that correct?

2   A.   Yes.

3   Q.   And you concluded that discussion at roughly 3:25 p.m.,

4        correct?

5   A.   Yes.

6   Q.   So less than a half hour?

7   A.   Correct.

8   Q.   I'm curious, how long do interrogations of carjacking

9        suspects typically take?

10  A.   They typically take about two hours.

11  Q.   Okay.  This one took less than 30 minutes?

12  A.   Yes.

13  Q.   Before you concluded the conversation with Ms. Woodruff,

14       did you or detective -- did you hear Detective Greenwald

15       say anything to her?

16  A.   Yes.  Not verbatim.  But again, he was -- just we told

17       her that we were going to try to get her out.  We told

18       her that she was identified by a victim that we didn't

19       just pick her out because she thought we just randomly

20       came to her house to pick her up.  That wasn't the case.

21  Q.   You did tell her you were going to try and get her out?

22  A.   Yes.

23  Q.   And legally, and I believe brother counsel covered this.

24       Once someone with a signed felony warrant is

25       apprehended, do have the authority to unilaterally



1    release them, correct?

2  **A.   Correct.**

3  Q.   As far as you know, does anyone in your direct chain of

4       command have that authority?

5  **A.   No.**

6  Q.   What is your understanding of what it takes in order to

7       release someone in that circumstance?

8  **A.   From my understanding, I would need a prosecutor or the**

9       **judge.**

10 Q.   Okay.  After you finished your interview with

11      Ms. Woodruff, what do you do next?

12 **A.   I believe I called my supervisor and told him everything**

13      **that we talked about which wasn't much.  But it was just**

14      **alibi and just general conversation about if she knew**

15      **the victim, if she knew Mr. White.  Then I was told, or**

16      **I believe I was told, to come back to the base which is**

17      **our office and we'll figure it out.**

18 Q.   Okay.  We get back to the base.  We've got your phone

19      records here.  Are those available to you over there?

20 **A.   No.**

21 Q.   I believe they are marked as Exhibit 15.  Curious, how

22      long did it take you to get from the DDC back to your

23      base?  To walk -- from the time you finished the

24      interview with Ms. Woodruff at roughly 3:25 p.m., how

25      long did it take you to get back to your base?



1  A.  **About 15 minutes.**

2  Q.  There is a couple numbers that are highlighted here,

3      correct?

4  A.  **Yes.**

5  Q.  And all of the highlighted numbers begin with (313) 224,

6      correct?

7  A.  **Yes.**

8  Q.  Now are those all numbers you have saved in your phone?

9  A.  **I know I have -- I would have to double check right now.**

10      **I'm pretty sure I have some of them in my phone, yes.**

11 Q.  So the ones you might not have in your phone, where did

12      you get those numbers?

13 A.  **We have a list in our office the prosecutor's main line,**

14      **and then just the list of different prosecutor's names**

15      **and their phone numbers.**

16 Q.  Okay.  I just want to get the timeline here.  We finish

17      Ms. Woodruff's interview at roughly 3:25, 15 or so

18      minutes to get back to the base, correct?

19 A.  **Yes.**

20 Q.  And then the first call you make is at what time?

21 A.  **1548, 3:48.**

22 Q.  So that would be 3:48 p.m.?

23 A.  **Yes.**

24 Q.  And when is the next call?

25 A.  **1558.**



Lashauntia Oliver
05/14/2024                                              Page 96

1  Q.   Ten minutes later, correct?

2  A.   Yes.

3  Q.   When is the next call?

4  A.   1559.

5  Q.   That's one minute later?

6  A.   Yes.

7  Q.   And that's a different number, correct?

8  A.   Correct.

9  Q.   All right.  Then what is the next call?

10  A.   At 1601.

11  Q.   So that is 4:01, two minutes later, correct?

12  A.   Yes.

13  Q.   That's another new number, correct?

14  A.   Yes.

15  Q.   All right.  Then there is one more call that day.  What

16        time is that one?

17  A.   1618 so 4:18 p.m.

18  Q.   That's to the number ending 2699 again?

19  A.   Yes.

20  Q.   So by my math, I might be off here, but in the span of

21        30 minutes you made five separate calls to three

22        different Wayne County prosecuting attorneys?

23  A.   Yes.

24  Q.   Okay.  According to your notes that were discussed

25        earlier at some point that afternoon you spoke with



**Lashauntia Oliver**
05/14/2024                                    Page 97

1   Magistrate Echartea, correct?

2 A.   Yes.

3 Q.   Did you personally call her or how did that happen?  How

4      did you get in touch with her?

5 A.   **I had Officer Hebner helping me call around trying to**

6      **get ahold of someone.  I believe he had gotten ahold of**

7      **Magistrate Echartea and spoke to her on his desk phone.**

8 Q.   Okay.  At that time, did you think there was something

9      the Magistrate could do to help you out?

10 A.  Yes.

11 Q.  What did you think the Magistrate could do to help you

12     out?

13 A.  **I thought she would be able to dismiss it.  Maybe not**

14     **dismiss it, but it was something maybe with her bond or**

15     **something because I know the severity of the case was a**

16     **carjacking.  I just was trying to get some type of help.**

17     **I thought she would be able to help me.**

18 Q.  You had to make a note of that, correct?

19 A.  Yes.

20 Q.  And what time did you make that note?

21 A.  At 1656.

22 Q.  1656 so 4:56 p.m.?

23 A.  Yes.

24 Q.  At that point are you still at the base?

25 A.  Yes.



Lashauntia Oliver
05/14/2024                                              Page 98

1  Q.   Do you happen to know what time courts normally close?

2  A.   **I thought it was 4, but apparently maybe 5.**

3  Q.   4 or 5:00?

4  A.   **Yes.**

5  Q.   So but the time you spoke with Magistrate Echartea,

6       there was really no time left in the day for you to do

7       anything else.  Is that fair?

8  A.   **Yes.**

9  Q.   Now again, not verbatim.  Do you recall basically what

10      it was Magistrate Echartea told you?

11 A.   **She -- I told her everything.  She told me that -- not**

12      **verbatim.  But she, just off memory, that she would take**

13      **what I told her into consideration while speaking with**

14      **Ms. Woodruff and that I need a prosecutor or a judge**

15      **because there wasn't nothing she could do.**

16 Q.   Let's unpack that.  When Judge Echartea told you she

17      would take it into consideration, what did you

18      understand that to mean?

19 A.   **That she was helping me in some way or helping**

20      **Ms. Woodruff.**

21 Q.   Okay.  Did you -- at that point, did you have any idea

22      that she would be released on a bond with a tether?

23 A.   **I assumed that she -- I don't know.  Like I really**

24      **didn't know what was going to happen with the case.  I**

25      **just knew that by speaking with her and letting her know**



1      that we have someone in custody, she is the wrong

2      person, she would be able to help me.  I thought she

3      would be able to help me.

4   Q.  Did that mean be more lenient with Ms. Woodruff?

5   A.  Yes.

6   Q.  Okay.  Now let's go to the next day, February 17.

7   A.  Okay.

8   Q.  Let's talk about that.  Do you recall how you started

9      your day that day?

10  A.  Yes.  I had court in the morning.

11  Q.  Okay.  What did you do right after you got out of court?

12  A.  I called APA Garrett Garcia again.

13  Q.  Looking back at your phone records, the last one is

14     highlighted, looks like February 17 at 9:48 a.m.  Is

15     that Garcia's, the number that ends in 0585?

16  A.  Yes.

17  Q.  And that's the conversation where you finally spoke to a

18     prosecutor?

19  A.  Yes.

20  Q.  Prosecutor Garcia said he would look into it.  Did he?

21  A.  Yes.

22  Q.  Didn't say he was going to dismiss the case?

23  A.  Correct.

24  Q.  Now at this point, if I believe I heard your testimony

25     correctly, you had possession of Ms. Woodruff's phone?

