**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Porcha Woodruff,

Plaintiff,

v.

LaShauntia Oliver,

Defendant.

Case No. 23-11886

Judith E. Levy
United States District Judge

Mag. Judge Anthony P. Patti

________________________________/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [23] AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [25]**

Before the Court is Defendant[1] LaShauntia Oliver's motion for summary judgment and Plaintiff Porcha Woodruff's motion for partial summary judgment. (ECF Nos. 23, 25.) The motions are fully briefed. (*See* ECF Nos. 29, 30, 31, 37.) On April 16, 2025, the Court held an in-person hearing on the motions and heard oral argument.

[1] On November 6, 2024, Defendant City of Detroit was dismissed from this case in a stipulated order. (ECF No. 24.)

Plaintiff's complaint alleges the following remaining[2] allegations under state and federal law:

- Count I: False Arrest and Imprisonment in violation of the Fourth Amendment
- Counts II: Malicious Prosecution in violation of the Fourth Amendment
- Count V: State Law False Arrest and Imprisonment
- Count VI: State Law Malicious Prosecution
- Count VII: State Law Intentional Infliction of Emotional Distress

(ECF No. 4.)

Defendant seeks summary judgment for all counts. Plaintiff's partial motion for summary judgment is limited to her state and federal false arrest/imprisonment and malicious prosecution claims.

For the reasons set forth below, Defendant's motion for summary judgment (ECF No. 23) is granted and Plaintiff's partial motion for summary judgment (ECF No. 25) is denied.

## I. Background

On January 29, 2023, at around 8:00 p.m., Laurence Walker called 911 from a liquor store in Detroit and reported that he was the victim of a carjacking at gunpoint. (ECF No. 23-1, PageID.329; ECF No. 23-4,

---

[2] Plaintiff voluntarily dismissed Count III and Count IV. (ECF No. 29, PageID.851.)

PageID.355.) The victim told Detroit Police Department ("DPD") officers that earlier that day, he was driving his gold Chevy Malibu and picked up a woman he did not know. (ECF No. 23-5, PageID.363.) At some point during their time together, he mentioned to her that he owned a gun. (*Id.*) Also during their time together, she called an unknown person over the phone and told them "she was getting a ride from someone." (*Id.*) Walker eventually dropped the woman off around Gratiot Avenue and Bessemore Street, where she got into a black Tahoe vehicle. (*Id.*) Then, a man exited the Tahoe, approached Walker, and told him she forgot her phone in his car. (*Id.*) When Walker exited his car to search for the phone, the unknown man pulled out a gun, ordered him to "take everything off" and asked him, "where's the gun?" (*Id.*) Walker took off his pants and shoes and the man got into Walker's car and drove away with Walker's phone and wallet. (*Id.*) Walker described the woman as "a black female, brown complexion, brown and blond long hair, slim build, about 5'4 in height, wearing a black jacket." (*Id.*) Walker also suggested that he may have been drugged by the unknown woman, stating that they drank liquor together, and then he "started feeling really tired" and "passed

out," and that he drank far less than she did. (ECF No. 61-1, PageID.1789.)

The next day, Defendant DPD Officer LaShauntia Oliver was assigned to this criminal investigation. (ECF No. 23-7.) On January 31, the victim informed Oliver that an unidentified woman returned Walker's stolen cellphone to a BP Gas Station on Van Dyke, and that he successfully retrieved it. (ECF No. 23-1, PageID.330; ECF No. 70-5, PageID.2029.)

Oliver went to the BP Gas Station and viewed surveillance footage of the unidentified woman returning the victim's phone on January 30, 2023. (*Id.*; ECF No. 23-25, PageID.484.) According to Oliver, the woman in the surveillance footage matched the description of the woman who Walker had spent time with prior to the carjacking. (ECF No. 70-5, PageID.2029.) On February 1, Oliver extracted and sent images of the woman from the surveillance video to DPD's Crime Intelligence Unit and requested a facial recognition search to try to identify her. (ECF No. 23-9.)

Investigator Nathan Howell performed the facial recognition search on February 2, 2023. (*Id.*) The search produced 73 candidates, and Howell

narrowed the candidates down to one lead: Plaintiff Porcha Woodruff. (*Id.*; ECF No. 61-3, PageID.1795.) Howell's identification of Plaintiff as a "lead" "was peer reviewed by Crime Analyst Kamrin Dean and confirmed by Executive Manager David Collins of the Crime Intelligence Unit." (*Id.* at PageID.1796.)

Also on February 2, Oliver interviewed Walker again. For the first time, he said the female suspect's name is "Trinidad," that they had sex in his car, and that they went to the same Van Dyke BP gas station around 6:30 p.m. to 7:15 p.m. before going to the location where he was carjacked. (ECF No. 61-4; ECF No. 23-25, PageID.541–542; ECF No. 70-5, PageID.2029.) Further, Walker represented that he saw the black Tahoe at the BP gas station when he and Trinidad were there, that Trinidad approached the passenger of the black Tahoe at the gas station and hugged him. This passenger later carjacked Walker. (ECF No. 61-4.) Walker stated that Trinidad stood in the street during the carjacking and did not do anything to help him. (*Id.*) Walker said he would recognize Trinidad and the man who carjacked him. (*Id.*) With this additional information, Oliver obtained video footage from the BP Gas Station for 5:53 p.m. until 7:27 p.m. on January 29, 2023, which is the length of time

the victim and the female suspect were there. (ECF No. 23-14, PageID.392–394.) In the video footage, the female suspect approached "several vehicles" in the gas station lot while the victim never exited his vehicle. (*Id.* at PageID.394; ECF No. 70-5, PageID.2030.) The female suspect and an unknown man "[could] be observed pulling and tugging on [the victim] who was in the driver['s] seat" and the female suspect appeared to take something from the victim. (*Id.*) Oliver stated that the victim's behavior was strange and that she "strongly believe[d] he may have not been aware of what was occurring" based on what she saw in the video. (*Id.*)

That same day, DPD officers found Walker's stolen vehicle being driven by a man named Daniel White. They arrested White and he was interrogated. (ECF No. 61-5, PageID.1799; ECF No. 64-9; *see also* ECF No. 41-2; ECF No. 61-7.) During the interrogation, White was shown an image of the alleged female accomplice, and he identified her as Trinidad Trinity (though he said shortly after that that he did not remember her last name) and said that they were Facebook friends. (ECF No. 64-9, 13:45–15:15; ECF No. 41-2, PageID.1646–1648.)

On February 3, the victim reviewed two photo lineup identifications — the first to see if he could identify White as the male suspect and the second to determine if Porcha Woodruff, the "lead" identified by the facial recognition search, was the female suspect.

For the photo lineup of the female accomplice, Defendant was present for the lineup but did not select the photos; instead, Detective Greenwald selected and prepared the photo line-up that included Plaintiff's photo. (ECF No. 23-25, PageID.498, 547–548.) Plaintiff's line-up photo was not the photo produced from the facial recognition search.[3] (*See* ECF Nos. 61-6, 61-3.) Walker selected Plaintiff's photo, stating "I picked [Plaintiff's photo] based on seeing the individual in person for multiple hours, prior to be being carjacked." (ECF No. 23-18, PageID.412.) According to Defendant, she asked him, "are you sure this is the person," and "[h]e said yes." (ECF No. 23-25, PageID.498.)

On February 4, Defendant prepared the request for arrest warrant for both Daniel White and Plaintiff. (ECF No. 70-5, PageID.2028.) Defendant decided to prepare the request for arrest warrant because of

[3] Woodruff's line-up photo was an eight-year-old mug shot from 2015. (ECF No. 37-1, PageID.1259.)

the victim's identification of Plaintiff and after Defendant reviewed Plaintiff's criminal history. (ECF No. 23-25, PageID.496.) The request for warrant was approved by DPD Captain Anthony O'Rourke. (ECF No. 70-5, PageID.2028.) It was authorized by Garrett Garcia from the Wayne County Prosecutor's Office. (ECF Nos. 23-20, 61-8.) A magistrate of the 36th District Court signed the warrant. (ECF No. 61-8, PageID.1811.)

The approved warrant was provided to the Fugitive Apprehension Team ("FAST"), which conducts felony arrests after a warrant has been issued. (ECF No. 23-25, PageID.556.) FAST was given an "intelligence work up" before the officers arrested her, which contained information such as Plaintiff's address, contact information, her Facebook profile for her business, and additional photographs. (ECF No. 64-13.)

In the morning of February 16, Plaintiff was arrested by FAST. (ECF No. 61-10.) Woodruff, who was visibly pregnant, was in disbelief that there was a warrant for her arrest for carjacking but cooperated with the officers. (ECF No. 64-12.) The arresting officers also took possession of her cell phone. (ECF No. 23-25, PageID.521.)

Plaintiff was booked and processed at the Detroit Detention Center. (*Id.* at PageID.519.) Upon seeing Plaintiff, Defendant immediately

realized that Plaintiff could not be the female suspect because Plaintiff was 8-months pregnant, which did not match the suspect's description or appearance on the video footage. (*Id.* at PageID.510.) Woodruff also has a large tattoo of a rose on her right arm, which did not match the suspect's description. (*Id.* at PageID.508.) Defendant called her superior officer to explain that Woodruff could not be the suspect and was "told not to interrogate so much or not to take too much time or press her too much," and to "[j]ust [] be clear of her whereabouts and where she was, her alibi. Where she was on that day and see if she knew the victim or knew of anybody or frequented that gas station." (*Id.* at PageID.511.) According to Defendant, the decision to keep Plaintiff in custody was "above [her] at that time" because "there was a valid warrant" and she could not "just disregard the warrant." (*Id.* at PageID.511, 514.)

Around 3:00 p.m. that day, Defendant interrogated Plaintiff. She asked Plaintiff if she was involved in a carjacking on January 29, 2023, if she knew the victim, where she was on January 29, if she frequents that BP Gas Station, and if she knew anyone with a silver GMC Envoy. (*Id.* at PageID.506; ECF No. 61-11.) Afterwards, Plaintiff was escorted to a jail cell. (ECF No. 23-25, PageID.513, 515.) Defendant subsequently

tried to call Prosecutor Garrett Garcia and others at the Wayne County prosecutor's office to have the warrant dismissed, but she could not get in touch with anyone. (*Id.* at PageID.513–514, 517, 520; ECF No. 23-28.)

Woodruff testified that, while in detention, she experienced contractions and was concerned about her pregnancy. (ECF No. 37-1, PageID.1269–1270.) Plaintiff was arraigned later that day. (ECF No. 23-29, PageID.642.) During the arraignment, Defendant spoke to Magistrate Echartea and explained that they had arrested the wrong person. (ECF No. 23-25, PageID.534.) The magistrate told her that she needed either the prosecutor or a judge to dismiss the warrant but that she would take this information into consideration. (*Id.*) The magistrate ultimately gave Plaintiff a $100,000 personal bond, a probable cause conference date of February 27, and a preliminary exam date of March 6. (ECF No. 23-29.)

Plaintiff was released at 7:00 p.m. that day. Defendant refused to return Plaintiff's cellphone, stating that they could not return her cell phone until they checked her phone records to confirm that she was not present at the crime. (ECF No. 23-25, PageID.523.) According to Defendant, this was done because Defendant wanted to "clear her even

more.” (*Id.*) After leaving the Detroit Detention Center, Woodruff went to the hospital to check on her baby and her health. She was treated for her contractions and ultimately left the hospital at roughly 3:00 a.m. (ECF No. 37-1, PageID.1293–1294.)

In the morning of February 17, Oliver spoke with prosecutor Garrett Garcia and explained that Woodruff was not the suspect and was 34-weeks pregnant. (ECF No. 23-25, PageID.519–20.) According to Oliver, Garcia said he would “update the case.” (*Id.* at PageID.520.) Oliver and Woodruff also had a conversation that morning regarding Woodruff’s cellphone. (ECF No. 41-4.) Oliver told Woodruff that she was working on a warrant for Woodruff’s phone and could give Woodruff’s phone back once the warrant was signed. (*Id.* at PageID.1695.) Woodruff’s phone was returned later that day in the afternoon. (ECF No. 23-25, PageID.524; ECF No. 64-16; ECF No. 37-1, PageID.1307.)

On February 18, Oliver submitted a search warrant request for the “call detail records, cell site activity, cell site locations and historical billing records, s.m.s and m.m.s messaging” for Plaintiff’s cell phone number. (ECF No. 64-19.) The search warrant request states that the Affiant, Defendant Oliver, “has probable cause to believe” that this

information will "provide evidence" that would be helpful for the prosecution or investigation. The search warrant was submitted by Oliver and approved by Prosecutor Joseph Kurity. (*Id.*) Woodruff's pregnancy and tattoo were not mentioned in the search warrant request. (*See id.*) On February 22, the search warrant was signed by Judge Prentis Edwards, Jr. (ECF No. 64-20.) According to Defendant, the search was never executed and as set forth above, Plaintiff's phone was returned to her the day after her arrest, February 17. (ECF No. 23-25, PageID.524, 569.)

On February 27, Woodruff's probable cause conference was held. Woodruff's attorney explained to the court that this was an incident of mistaken identity and that he thought the prosecutor planned to dismiss the case. (ECF No. 64-21, PageID.1981.) The prosecutor, Alexander Kerker, said he "[didn't] have any information on that." (*Id.* at PageID.1981–1982.) Discussion on dismissal was adjourned to the preliminary examination hearing. (*Id.*)

Woodruff's charges were ultimately dismissed on March 7 at her preliminary exam. (ECF No. 23-29, PageID.643.)

## II. Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)).

## III. Analysis

### A. The Supplemental Briefing

During oral argument on April 17, 2025, and a status conference on April 18, 2025, the Court noted that there are two different versions of the warrant request in the record with no indication of which was signed by the magistrate. (*See* ECF No. 61-2; ECF No. 4-1, PageID.85–88.) On April 22, 2025, Defendant submitted supplemental briefing and exhibits demonstrating that the warrant request attached to Plaintiff's complaint

was the final version. (ECF No. 70, PageID.2000; ECF No. 70-5, PageID.2028–2032; ECF No. 4-1, PageID.85–88.) Plaintiff does not dispute that this is the final version. (ECF No. 72.) As such, the Court will refer to the warrant request at ECF No. 70-5, PageID.2028–2032 in its analysis.

However, in her response to Defendant's supplemental brief, Plaintiff raises concerns that "Defendant went through great lengths to conceal this information disclosed in her supplemental brief." (ECF No. 72, PageID.2226.) According to Plaintiff, Defendant's supplemental brief demonstrates that she "was aware of the identity of the prosecutor at the time the initial disclosures was prepared," despite earlier stating that "an unknown prosecutor signed the warrant" and that the signed arrest warrant was not in Defendant's possession. (*Id.*)

As an initial matter, Plaintiff does not specify what, if any, relief she seeks for this alleged deficiency. Without such direction, the Court is unable to provide any relief that Plaintiff may be entitled to. *See* Fed. R. Civ. P. 37(a).

Moreover, Plaintiff has not demonstrated that she was prejudiced by Defendant or Defendant's counsel during the discovery process. First,

Plaintiff calls into question Defendant's truthfulness in her factual summary in their joint Rule 26(f) discovery plan, which was filed on September 23, 2023. In the factual summary, Defendant stated that the arrest warrant request was approved by "a presently unidentified assistant prosecuting attorney [] from the Wayne County Prosecutor's Office." (ECF No. 72, PageID.2226; ECF No. 11, PageID.181.) Plaintiff argues that Defendant actually knew at that time that Garrett Garcia was the prosecutor on Plaintiff's criminal case and, thus, had lied in the factual summary and/or in Defendant's initial disclosures (which were due on October 2, 2023). (ECF No. 72, PageID.2226; ECF No. 12.) However, Defendant's supplemental briefing demonstrates that her counsel received that information around February 16, 2024. (ECF No. 70-9.) Thus, Plaintiff has not demonstrated that Defendant's counsel was aware of the identity of the prosecutor at the time of the joint Rule 26(f) discovery plan or the initial disclosures. Plaintiff also does not explain why any inadequacies in a party's joint Rule 26(f) discovery plan factual summary (which is drafted before discovery commences) would have any bearing on the litigation of a case where that information was provided at a later date. Finally, there is no indication that Plaintiff was

prejudiced by these statements because Plaintiff became aware during discovery that Garrett Garcia approved the warrant.

Second, Plaintiff takes issue with Defendant's counsel's statement at Defendant's May 14, 2024 deposition that "he did not have the signed arrest warrant from APA Garcia" (ECF No. 72, PageID.2226; ECF No. 23-25, PageID.573) because the supplemental brief indicates that Defendant received the signed arrest warrant through a subpoena request around February 16, 2024. (ECF No. 70-9, PageID.2111.) Defendant's counsel responds that "he was stating [at the deposition] that the [signed arrest warrant] was not in the materials that he'd brought to the deposition," not that he did not have possession of the signed arrest warrant at all. (ECF No. 73, PageID.2239.) It is undisputed that Plaintiff received a copy of the signed arrest warrant after the deposition on May 14, 2024.[4] (ECF No. 72, PageID.2227.) Without more information, it is not clear how Plaintiff was prejudiced by Defendant's counsel's statement at the deposition.

---

[4] Defendant suggests that Plaintiff received a copy of the final arrest warrant earlier than May 14, 2024. (ECF No. 73, PageID.2239.)

Finally, Plaintiff argues that Defendant was not truthful in her June 10, 2024 response to Plaintiff's third discovery request, in which Defendant stated that she "cannot specifically recall whether this communication [with Garcia on the morning of February 4, 2023 regarding the arrest warrant request] was in-person, by telephone, or via email." (ECF No. 72, PageID.2227.) Plaintiff states that Defendant's "lack of truthfulness impaired Plaintiff's ability to litigate this matter" because "[i]f Defendant Oliver had been truthful in her answer, Plaintiff would have requested additional information." (ECF No. 72, PageID.2228.) Plaintiff does not explain how Defendant or her counsel acted in bad faith in her June 10, 2024 response. Plaintiff states vaguely that "[t]he level of communication between Defendant Oliver and APA Garcia regarding this arrest warrant was obvious," but does not explain why. (ECF No. 72, PageID.2228.) More importantly, it is not clear how Plaintiff was prejudiced by Defendant's discovery response. Prior drafts of the warrant requests do not have any bearing on Plaintiff's claims because the probable cause analysis is limited to review of the final, approved arrest warrant. *See infra* III.B.ii.

As such, Plaintiff's arguments in her response to Defendant's supplemental brief do not have an impact on the Court's consideration of the pending motions.

**B. False Arrest and Imprisonment**

42 U.S.C. § 1983 "provides a cause of action for individuals deprived of 'any rights, privileges, or immunities secured by the Constitutional and laws' of the United States, when the deprivation takes place 'under color' of state law." *Weser v. Goodson*, 965 F.3d 507, 513 (6th Cir. 2020). Plaintiff alleges that her rights under the Fourth Amendment were violated by Defendant when she was subjected to false arrest and imprisonment. "When a false-imprisonment claim arises out of an alleged false arrest," the Sixth Circuit has "refer[red] to those two claims together as a false-arrest claim." *Id*. In their briefs, the parties discuss the false arrest and false imprisonment claims together, which indicates that Plaintiff's false imprisonment claim arises out of her alleged false arrest. (*See* ECF No. 25, PageID.768; ECF No. 23-1, PageID.336.) As such, the Court will review Plaintiff's false arrest and false imprisonment claims together.

Defendant asserts that Plaintiff cannot prove that she violated Plaintiff's right against false imprisonment, and in any event, that Defendant is entitled to qualified immunity. (ECF No. 23-1, PageID.336.)

Qualified immunity is an affirmative defense to § 1983 claims. *Regets v. City of Plymouth*, 568 F. App'x 380, 386 (6th Cir. 2014). When properly invoked, "qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). If a defendant asserts qualified immunity, the plaintiff bears the burden of showing that the defendant is not entitled to qualified immunity. *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019) (citing *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011)). To meet this burden, the plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Id*. (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

To bring a false arrest claim, Plaintiff must demonstrate "that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v.*

*Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005). Generally, "an arrest based on a facially valid warrant approved by a magistrate provides a complete defense." *Id.* However, even if a facially valid warrant for the arrest exists, Plaintiff may still prevail on her false arrest claim if she "prove[s] by a preponderance of the evidence" that the defendant, when procuring the warrant, "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood" and "such statements or omissions [we]re material, or necessary, to the finding of probable cause." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (quoting *Wilson v. Russo*, 212 F.3d 781, 786–87 (3d Cir. 2000)). "If the affidavit contains false statements or material omissions, we set aside the statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause." *Id.*

*i. Defendant's personal involvement*

Defendant first argues that she did not violate Plaintiff's Fourth Amendment rights because Defendant did not "personally" carry out the arrest. (ECF No. 23-1, PageID.337 (citing *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014)).)

The Court disagrees. Personal, physical involvement in the arrest is not required for a false arrest claim. Defendant did not provide, and the Court cannot locate any, caselaw that requires that level of involvement.

Here, Defendant's liability is based on her pivotal involvement in procuring the arrest warrant. Defendant led the investigation, wrote the affidavit in support of the arrest warrant, and submitted the warrant request to the magistrate. (ECF No. 29, PageID.856; ECF No. 70-5, PageID.2028–2032; ECF No. 61-8.) This level of involvement is sufficient for a false arrest claim. *See Trakhtenberg v. Cnty. of Oakland*, 661 F. App'x 413, 419 (6th Cir. 2016) (discussing a detective's liability for a false arrest/imprisonment claim on the basis that he sought the arrest warrant); *Snyder v. United States*, 590 F. App'x 505, 511 (6th Cir. 2014); *Schulz v. Gendregske*, 544 F. App'x 620, 625 (6th Cir. 2013) (discussing cases where officers were liable for false arrest claims even though the officers did not themselves conduct the arrest) (citing *Garcia v. Thorne*, 520 F. App'x 304, 307 (6th Cir. 2013); *Miller v. Prince George's Cnty.*, 475 F.3d 621, 630 (4th Cir. 2007)).

Defendant's reliance on *Robertson v. Lucas*, 753 F.3d 606, 618 (6th Cir. 2014), is also not convincing. There, the Sixth Circuit held that a false arrest claim against one defendant, Lucas, failed because Lucas had minimal, if any, involvement or role in the alleged false arrest. *Id.* Unlike Defendant, Lucas' involvement was limited to his grand jury testimony and there was no suggestion that his testimony was false.

As such, Defendant's argument regarding her personal involvement fails.

*ii. The Facial Validity of the Warrant*

Plaintiff also challenges the arrest warrant as lacking facial validity. (ECF No. 29, PageID.861–862.) A warrant is not facially valid if it lacks "sufficient indicia of probable cause such that it is unreasonable to believe that probable cause was established." *Fry v. Robinson*, 678 F. App'x 313, 318 (6th Cir. 2017); *see also Juillerat v. Mudd*, 735 F. App'x 887, 890 (6th Cir. 2018); *Webb v. Greene Cnty. Sheriff's Off.*, 494 F. Supp. 2d 779, 789 (S.D. Ohio 2007). In contrast, a warrant with sufficient indicia of probable cause has "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Sykes*, 625

F.3d at 306 (quoting *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005)).

Plaintiff argues that the affidavit lacked sufficient indicia of probable cause because "minimal further investigation would have exonerated the suspect." (ECF No. 29, PageID.862 (quoting *Weser*, 965 F.3d at 513).) She states that Defendant "failed to conduct any investigation once the Victim picked Plaintiff from the photo line-up" and "[i]f Defendant Oliver had [driven] fifteen minutes to Plaintiff's house or even conducted surveillance of Plaintiff's vehicle . . . Defendant Oliver would have learned that Plaintiff was eight months pregnant and was not the female subject." (*Id.* at PageID.861–862.) According to Plaintiff, "a minimal investigation would have cleared Plaintiff, and probable cause could not have been established." (*Id.* at PageID.862.)

Plaintiff's argument is insufficient to challenge the validity of the arrest warrant because "[r]eview of whether a warrant was supported by sufficient indicia of probable cause is limited to 'the four corners of the affidavit.'" *Fry*, 678 F. App'x 313, 318–19 (6th Cir. 2017) (quoting *United States v. Rose*, 714 F.3d 362, 367 (6th Cir. 2013)). Plaintiff does not explain why the affidavit, as written, lacks probable cause. Instead,

Plaintiff argues that Defendant should have taken further actions in her investigation. This is not a proper challenge to the validity of the arrest warrant because it concerns matters outside "the four corners of the affidavit." *Id.*

Plaintiff's citation to *Weser* is not convincing because it has little similarity with this case. (*See* ECF No. 29, PageID.862.) In *Weser*, the Court held that the warrantless arrest of Weser did not violate the Fourth Amendment because the officer had probable cause and noted that further investigation would not have led to a different conclusion by the officer. *Weser*, 965 F.3d at 514–15. Also, *Weser* does not address the validity of an arrest warrant.

Further, Plaintiff's description of the holding in *Weser* is not accurate. Plaintiff states, "[i]n *Weser*, the court held that[] 'probable cause does not exist when a minimal further investigation would have exonerated the suspect.'" (ECF No. 29, PageID.862 (quoting *Weser*, 965 F.3d at 513).) However, Plaintiff's quote from *Weser* comes from the opinion's description of appellant's argument, which quoted *Kuehl v. Burtis*, 173 F.3d 646 (8th Cir. 1999); there is no indication in *Weser* that the Sixth Circuit adopted *Kuehl*'s holding. *Weser*, 965 F.3d at 514–515.

A review of *Kuehl* also does not benefit Plaintiff's argument. In *Kuehl*, the Eighth Circuit concluded than an officer was not entitled to qualified immunity when he knew of but "ignored plainly exculpatory evidence" and conducted a warrantless arrest. *Kuehl*, 173 F.3d at 650–51. Here, Plaintiff does not argue that Defendant knew of but ignored evidence of Plaintiff's innocence; instead, she claims that Defendant had a duty to conduct additional investigation before seeking an arrest warrant. (ECF No. 29, PageID.862.) Plaintiff cites no applicable law to support her argument that Defendant had a duty to conduct additional investigation when she was not aware of exculpatory evidence. *See Ahlers v. Schebil*, 188 F.3d 365, 372 (6th Cir. 1999).

Plaintiff also suggests that Defendant lacked probable cause because the photo lineup instructions given to the identifying victim stated, "[i]f you make a selection of an individual who is ultimately not involved in the crime, that individual will not incur any charges or police action just because you selected them." (ECF No. 29, PageID.861 (quoting ECF No. 64-10).) This argument is also an improper challenge to the validity of the arrest warrant because it is not an argument that challenges information within the four corners of the affidavit. Moreover,

Plaintiff does not explain how this proviso possibly impacted the victim's selection of her photo in the array. Again, Plaintiff does not explain why the affidavit in support of the arrest warrant, as written, is insufficient to establish probable cause.

*iii. Material Omissions or Falsehoods*

Plaintiff also claims that Defendant made material false statements or omissions in her affidavit in support of her warrant request. (ECF No. 29, PageID.863–864.)

Plaintiff must demonstrate that Defendant "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood" and "such statements or omissions [we]re material, or necessary, to the finding of probable cause." *Sykes*, 625 F.3d at 305 (quoting *Wilson*, 212 F.3d at 786–87).

Regarding omissions, Plaintiff identifies three "key facts" that Defendant omitted from her affidavit:

- That the photo that was placed in the six-pack line-up of Plaintiff was not a current photo of the Plaintiff. The photo was eight-years old[.] (ECF No. 4, PageID.67)[]

- That Defendant Oliver obtained Plaintiff's criminal history record which indicated that Plaintiff had a tattoo on her right

arm. . . . According to Defendant Oliver the female subject didn't have a tattoo.

- That Plaintiff, Porcha Woodruff, was eight months pregnant and that the Victim in this case didn't state that the female subject was pregnant. Defendant Oliver might argue that she didn't know at the time she prepared the Request for Warrant that the Plaintiff was eight months pregnant. That is the danger Defendant Oliver faces when she does not conduct a proper investigation.

(ECF No. 29, PageID.863.)

Regarding the first alleged omission, it is undisputed that Plaintiff's photo in the array was eight years old at that time. (ECF No. 37-1, PageID.1384.) However, there is no indication that Defendant was aware that the photo was eight years old such that omission of the date of the photo in the affidavit was knowing and deliberate or displayed a "reckless disregard for the truth." Detective Greenwald, not Defendant, prepared the photo array. (ECF No. 23-25, PageID.498, 547–548.) More importantly, Plaintiff does not explain why the age of Plaintiff's photo is material, and she does not provide any cases showing that other courts have considered the age of a similarly-old photo used in a photo array to be such essential information in an affidavit that its omission is material.

Plaintiff's argument regarding the second alleged omission is also not convincing. The record reflects that Defendant reviewed Plaintiff's criminal history after the photo array was conducted and then drafted the affidavit for the arrest warrant. (ECF No. 23-25, PageID.496; ECF 67-1.) It is undisputed that the criminal history report communicates that Plaintiff has a tattoo on "UR ARM," which appears to mean "upper right arm." (*Id.*) Finally, it is undisputed that Defendant did not see a tattoo on the female suspect's right arm in the gas station video footage. (ECF No. 23-25, PageID.508.)

Despite these undisputed facts, the Court does not find that Defendant's omission of Plaintiff having a tattoo on her upper right arm was material, nor that Defendant's omission was knowing and deliberate, or displayed a reckless disregard for the truth. Defendant's failure to mention that Plaintiff's criminal history report states that she had a tattoo is not material because there are a multitude of possible reasons for that discrepancy, such as the tattoo being too small to be viewed, the tattoo having faded or been removed, or the tattoo being in a location on her upper arm that was not visible in the footage. The criminal history report does not describe the tattoo; specifically, it does not describe the

tattoo's size or location on her upper arm. Further, while sharing this discrepancy might have been a best practice—and Defendant's failure to do so may have been negligent—Plaintiff does not establish that Defendant's omission was knowing and deliberate or demonstrated a reckless disregard for the truth.

The third alleged omission is also not a proper challenge to the arrest warrant. There is no indication that Defendant knew that Plaintiff was eight months pregnant at the time she drafted the warrant request. Again, Plaintiff has not demonstrated that Defendant's alleged omission was knowing and deliberate or displayed a reckless disregard for the truth.

Plaintiff also argues that the affidavit included several material false statements. The affidavit affirmatively stated that "Defendant Woodruff" committed these acts and, as such, "[a]ny individual reading these statements would have believed that the female subject was Plaintiff, Porcha Woodruff." (ECF No. 29, PageID.864.) It appears that Plaintiff takes issue with the use of Plaintiff's name in the affidavit's description of certain events because Plaintiff did not actually commit those acts. Again, Plaintiff does not demonstrate that Defendant included

these statements "knowingly and deliberately, or with a reckless disregard for the truth." *Sykes*, 625 F.3d at 305 (quoting *Wilson*, 212 F.3d at 786–87). There is no evidence that Defendant knew that her statements were false at the time she wrote and submitted the affidavit. The use of a suspect's name in an affidavit before there is evidence beyond a reasonable doubt, is not evidence that Defendant knew that her statements were false.

*iv. Probable cause for the female suspect*

Finally, Plaintiff believes that her arrest was unlawful because there was no probable cause to arrest the female suspect at all because the female suspect's actions were not criminal. (ECF No. 29, PageID.864–866.)

To the extent Plaintiff challenges the sufficiency of the affidavit regarding probable cause for the female suspect, "Trinidad," her argument fails. The affidavit describes behavior from the female suspect that goes beyond witnessing the carjacking; instead, she appears to have "performed acts or g[iven] encouragement that assisted the commission of the crime." *People v. Bennett*, 290 Mich. App. 465, 472 (2010) (quoting *People v. Robinson*, 475 Mich. 1, 6 (2006)). In Michigan, "[e]very person

concerned in the commission of an offense, whether [she] directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may [] be prosecuted . . . as if [she] had directly committed such offense." Mich. Comp. Laws § 767.39.

According to the affidavit, the victim stated that, when he dropped "Trinidad" off, she entered a black Tahoe, and another man subsequently exited the Tahoe and carjacked the victim. (ECF No. 70-5, PageID.2028–2029.) Additionally, the affidavit states that Defendant observed video footage from the gas station of the female suspect and an unknown man "pulling and tugging" on the victim and perhaps taking something from him. (*Id.* at PageID.2030.) Finally, the affidavit represents that the victim believed he was drugged by the female suspect, and that his behavior in the video is consistent with being drugged. (*Id.* at PageID.2030.)

Plaintiff is correct that "an individual's mere presence at a crime scene does not constitute probable cause for an arrest." (ECF No. 29, PageID.864 (quoting *Harris v. Bornhorst*, 513 F.3d 503, 515 (6th Cir. 2008)).) Although the female suspect herself did not commit carjacking or armed robbery, the affidavit establishes probable cause that she

assisted or encouraged the armed robbery and/or carjacking. As such, there is sufficient indicia of probable cause as to the female suspect.

Plaintiff also appears to argue that statements in the affidavit that the victim was drugged by the female suspect were material falsehoods, or that Defendant omitted evidence that the victim was not drugged. (ECF No. 29, PageID.866.) However, Plaintiff does not identify any evidence suggesting the victim was not drugged, or that Defendant knew that the victim had not been drugged.[5] As such, any alleged omission or false statement was not made knowingly or with reckless disregard for the truth.

---

[5] As evidence that the victim was not drugged, Plaintiff cites a letter from Samuel C. Gregerson, DO, which states in its entirety that the victim was "seen in Henry Ford Hospital Emergency Department on 1/30/2023" and that he "should remain out of work until 2/5/23." (ECF No. 65-3, PageID.1990.) The letter does not mention anything about Plaintiff's injuries or condition or whether or not he was drugged. To the extent Plaintiff claims that the letter's failure to mention that Plaintiff was drugged is evidence that he was not actually drugged, the Court disagrees. This letter was clearly written for the victim's employer; it would be entirely inappropriate for the doctor to inform his employer of what specifically happened to the victim, and a reasonable jury could not find that this letter is proof that the victim was not drugged. Additionally, there is no evidence that Defendant had possession of this letter at the time she drafted the affidavit and had it approved.

*v. Conclusion regarding Plaintiff's false arrest and imprisonment claims*

For the reasons set forth above, the Court grants summary judgment to Defendant regarding Count I because Plaintiff has not established that Defendant violated her statutory or constitutional rights, even viewing the record in the light most favorable to Plaintiff. Plaintiff's arrest and subsequent detention are troubling for many reasons. However, the arguments Plaintiff sets forth to avoid summary judgment are not viable under current law.

The Court applies the same analysis to Plaintiff's state-law false arrest and imprisonment claims. "To prevail on a [Michigan state law] claim of false arrest or false imprisonment, a plaintiff must show that the arrest was not legal, i.e., the arrest was not based on probable cause." *Peterson Novelties, Inc. v. City of Berkley*, 259 Mich. App. 1, 18 (2003). Again, Plaintiff has not demonstrated that her arrest was not based on probable cause, even viewing the record in the light most favorable to her. As such, her state-law false arrest and imprisonment claims are also dismissed.

*vi. The use of facial recognition technology*

As set forth above, Plaintiff does not demonstrate that Defendant lacked probable cause for Plaintiff's arrest. However, the Court clarifies that this opinion does not address whether the arrest warrant lacked sufficient indicia of probable cause due to the role of facial recognition technology in the investigation, as raised by Amici American Civil Liberties Union and the American Civil Liberties Union of Michigan ("ACLU Amici").

At oral argument and during a status conference on April 17, 2025, Plaintiff stated on the record that she is not bringing or adopting the ACLU Amici's argument regarding facial recognition technology and probable cause. In our adversarial system, the Court is usually "limited to addressing claims and arguments advanced by the parties." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). "To the extent that the amicus raises issues or makes arguments that exceed those [] raised by the parties, we may not consider those issues." *Self-Ins. Inst. of Am., Inc. v. Snyder*, 827 F.3d 549, 560 (6th Cir. 2016) (quoting *Cellnet Commc's, Inc. v. FCC*, 149 F.3d 429, 443 (6th Cir. 1998)); *see also United Parcel Serv., Inc. v. Mitchell*, 451 U.S. 56, 61 (1981) (declining to consider

amicus argument "since it was not raised by either of the parties here or below"); *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 226 (2013) (declining to consider an amicus' argument "[b]ecause this argument was not raised by the parties or passed on by the lower courts"). As such, the Court does not resolve whether Defendant's use of facial recognition technology improperly tainted the victim's consideration of the photo array, such that the identification of Plaintiff was improper, and no probable cause existed to support her arrest.

This is not to say that the ACLU Amici's arguments regarding the limitations of facial recognition technology were not compelling. As explained by the ACLU Amici, searches conducted through today's facial recognition technology may be fundamentally unreliable due to serious flaws in the technology itself and human operator errors. For example, if the quality of a photo is low, which it was in this case, then the technology's ability to recognize similar qualities in faces is limited. The photo of "Trinidad" that was used in the facial recognition search was a screenshot from security camera footage and was not high-definition, and "Trinidad" was wearing a hat that obscured her forehead, eyebrows, and hairline. (ECF No. 34, PageID.957; *see also* ECF No. 61-3, PageID.1795.)

These issues could have affected the accuracy of the facial recognition search.

Even more troubling, facial recognition technology often exhibits race, gender, and age bias. (ECF No. 34, PageID.958.) The ACLU Amici present reports and studies that demonstrate high rates of false matches when analyzing people of color, women, and young people. (ECF No. 34, PageID.958–959.) Race, sex, and age disparities may manifest in facial recognition searches because the technology is not trained on a diverse set of faces, or because lighting and color contrast issues often affect photos of people with darker skin. (*Id.* at PageID.959–960.)

Additionally, a facial recognition search's ability to identify a "true match" (i.e., a match that accurately identifies the unknown person) is nonexistent if the database does not include the true match. For example, it is unknown if the actual suspect of the carjacking (i.e., "Trinidad") appears in the DPD database. If the database used by DPD only includes Michigan arrest photos (which the ACLU Amici alleges is the case here), "Trinidad" would never have appeared as a match if she has never been arrested in Michigan. (*Id.* at PageID.954–955.)

The ACLU Amici also presents reports and studies demonstrating that human review of facial recognition search results may not be an effective check against its flaws and could, in fact, exacerbate these issues. Here, the record reflects that DPD Investigator Nathan Howell performed the facial recognition search on February 2, 2023. (ECF No. 23-9.) The search produced 73 candidates, and he narrowed the candidates down to Porcha Woodruff as the "lead." (*Id.*; ECF No. 61-3, PageID.1795.) His identification of Woodruff "was peer reviewed by Crime Analyst Kamrin Dean and confirmed by Executive Manager David Collins of the Crime Intelligence Unit." (*Id.* at PageID.1796.)

There is no evidence in the record regarding *how* Howell narrowed his search down to Plaintiff. Defendant claims Howell's "training in 'Face Comparison and Identification' by the [FBI] enabled him to narrow the field of computer-generated matches to a single Investigative Lead," and that Dean, who reviewed and approved the findings, "is similarly trained by the FBI." (ECF No. 23-1, PageID.330.) The exhibits that Defendant cites (ECF Nos. 23-9, 61-3) do not provide evidence of their training or methodology.

Meanwhile, Defendant's expert, Steven L. Johnson, states that Howell "had completed the 'Face Comparison and Identification Program,'" a training sponsored by the FBI, and that this training was

> designed in accordance with existing, published standards and guidelines that were developed by the Facial Identification Scientific Working Group (FISWG), a working group established in 2009 to create documents that support the proper use of Facial Recognition technology.

(ECF No. 30-2, PageID.924.) While Johnson purports to provide information on Howell and Dean's training, he does not describe what documents he reviewed or steps he took in drafting his expert report; as such, it is unclear on what basis he knows about the DPD officers' training. (*Id.* at PageID.917 n.1 (referring to a "list of all materials provided to [him]" at "Attachment 'A,'" which is not included in the report).) Additionally, Johnson does not provide information on Howell or Dean's methodology in narrowing down the 73 results to Woodruff.

The ACLU Amici also presents evidence that a witness identification through a photo line-up is not likely to cure a misidentification by a facial recognition search. Because facial recognition searches present matches that, by their very design, look the closest to the true suspect, having a false match in a photo array is likely

to cause the false match to be selected. (ECF No. 34, PageID.964; *see also id*. at PageID.966 ("'[I]t is possible to taint the photo lineup by presenting a person who looks most like the suspect' but is not in fact the suspect." (quoting City of Detroit Gov't, *WATCH LIVE: Chief White Will Provide Updated Comments on a Lawsuit Filed Last Week*, Facebook (Aug. 9, 2023))).) The DPD has since changed its policies to ban the practice of seeking an arrest warrant "solely on the basis of an investigative lead developed through Facial Recognition technology in combination with a lineup identification" without "additional independent reliable evidence." (ECF No. 34, PageID.966–967.)

For those reasons, the ACLU Amici urges that the arrest warrant for Plaintiff lacked probable cause. (ECF No. 34, PageID.972.) As stated earlier, Plaintiff explicitly rejected these arguments, and the Court therefore declines to consider the issue.[6]

---

[6] Even if the Court found that the arrest warrant lacked probable cause due to the role of facial recognition technology in this investigation, Defendant would likely be entitled to qualified immunity. Government officials are entitled to qualified immunity if they did not have "fair warning" that their conduct was unconstitutional. *Moiser v. Evans*, 90 F.4th 541, 546 (6th Cir. 2024). Fair warning "usually requires a case with 'a fact pattern similar enough' to put the defendant on notice." *Id.* (quoting *Guertin*, 912 F.3d at 932). Here, neither the parties nor the ACLU Amici present a case that would have put Defendant on notice that the warrant lacked suitable indicia of probable cause due to her reliance on facial recognition technology. *See Moldowan*

### C. Federal Malicious Prosecution

Plaintiff also alleges she was subjected to a malicious prosecution.[7] For a federal malicious prosecution claim, Plaintiff must demonstrate that,

> (1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor.

*Robertson*, 753 F.3d at 616. Plaintiff need not demonstrate "malice" for a federal malicious prosecution claim. *Sykes*, 625 F.3d at 309.

Plaintiff's federal malicious prosecution claim fails because a reasonable jury could not find that Defendant "made, influenced, or participated in the decision to prosecute" in a manner that violated her Fourth Amendment rights. *Robertson*, 753 F.3d at 616.

---

*v. City of Warren*, 578 F.3d 351, 381–82 (6th Cir. 2009) (stating that "[i]n determining whether a right is clearly established, we may rely on decisions of the Supreme Court, decisions of this court and courts within this circuit, and in limited instances, on decisions of other circuits" (cleaned up)).

[7] The Court notes that "[t]he tort of malicious prosecution is entirely distinct from that of false arrest, as the malicious-prosecution tort remedies detention accompanied not by absence of legal process, but by wrongful institution of legal process." *Robertson*, 753 F.3d at 616 (quoting *Sykes*, 625 F.3d at 308).

Plaintiff argues that this element has been met because "Defendant Oliver requested the warrant for Plaintiff's arrest leading to her criminal charges." (ECF No. 29, PageID.868.) An officer may be liable for malicious prosecution if they provided false information in their investigatory materials, if the false information was knowingly included, and if it was reasonably foreseeable that these falsehoods could ultimately influence a prosecutor's decision to charge the plaintiff. *Sykes*, 625 F.3d at 314–15. As set forth earlier in this opinion, a reasonable jury could not find that Defendant knowingly provided false information in her investigatory materials. *See supra* III.B.

Additionally, for a malicious prosecution claim to proceed against an officer, the officer "must participate [in the decision to prosecute] in a way that aids in the decision, as opposed to passively or neutrally participating." *Sykes*, 625 F.3d at 308 n.5. Here, Defendant's actions after Plaintiff's arrest cannot reasonably be seen as "aiding" the decision to prosecute.

According to Defendant, after Plaintiff was brought into custody, Defendant told her supervisors that she believed Plaintiff was innocent, and she attempted to contact the prosecutor so Plaintiff could be released.

(ECF No. 23-25, PageID.511–512; ECF No. 23-28, PageID.639.) Defendant also spoke to Magistrate Echartea during Plaintiff's arraignment and explained that they had arrested the wrong person. (ECF No. 23-25, PageID.534.) Finally, Defendant informed the prosecutor, Garrett Garcia, on the morning of February 17 that Plaintiff was not the suspect. (*Id.* at PageID.519–520.)

Plaintiff appears to dispute whether Defendant contacted the prosecutor's office and, as evidence, points to Plaintiff's probable cause conference on February 27, 2023. (ECF No. 29, PageID.871; ECF No. 23-31.) At the probable cause conference, a different prosecutor, Alexander Kerker, stated that he "d[idn't] have any information" on Woodruff's mistaken identity or dismissal of her criminal case. (*Id.* at PageID.647–648.) Plaintiff believes this demonstrates that Defendant "failed to contact the prosecution regarding the fact that [Plaintiff] was not the female subject." (ECF No. 29, PageID.871.)

The Court disagrees. A reasonable jury could not conclude that Defendant did not contact Garcia based only on the fact that Kerker said he "d[idn't] have any information on that" at Woodruff's probable cause

conference. Further, Plaintiff has not met her burden regarding qualified immunity.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To be clearly established, there must be controlling law or a "robust consensus of cases of persuasive authority" that "clearly prohibit" the officer's conduct in the relevant circumstances. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (cleaned up). For an official to have "fair warning" that her conduct was unconstitutional, there, "the contours of the right must have been sufficiently well-defined that 'every reasonable official' would have understood that his or her actions crossed the constitutional line." *Moiser v. Evans*, 90 F.4th 541, 546 (6th Cir. 2024) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam)). "That usually requires a case with 'a fact pattern similar enough' to put the defendant on notice." *Id.* (quoting *Guertin*, 912 F.3d at 932).

Plaintiff has not met her burden. She does not set forth cases that clearly prohibit Defendant's purported failure to inform the prosecutor of Plaintiff's innocence. Plaintiff cites *Webb v. United States*, 789 F.3d 647, 659–60 (6th Cir. 2015). (ECF No. 29, PageID.872; ECF No. 37, PageID.1024.) However, *Webb* does not concern a situation where an officer knew that a suspect was innocent, but failed to take action to stop the prosecution. Plaintiff has not presented a case with "a fact pattern similar enough" such that Defendant was on notice that her conduct was unconstitutional.

As such, Plaintiff's federal malicious prosecution claim must be dismissed.

**D. State Malicious Prosecution**

Plaintiff also brings a state law malicious prosecution claim. A malicious prosecution claim under Michigan law requires the plaintiff to prove four elements:

> (1) that the defendant has initiated a criminal prosecution against him, (2) that the criminal proceedings terminated in his favor, (3) that the private person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice.

*Peterson Novelties*, 259 Mich. App. at 21 (quoting *Matthews v. Blue Cross & Blue Shield of Michigan*, 456 Mich. 365, 378 (1998)).

Plaintiff's state law malicious prosecution claim also fails. Plaintiff argues that "a jury could find malice in Defendant Oliver's conduct" because "[a] jury could find that Detective Oliver didn't have probable cause for an arrest warrant." (ECF No. 29, PageID.870; *see also* ECF No. 25, PageID.779–780.) Michigan state courts have held that "[m]alice may be inferred from a lack of probable cause." *Hill v. City of Detroit*, No. 348798, 2021 WL 137381, at *5 (Mich. Ct. App. Jan. 14, 2021) (citing *Matthews*, 456 Mich. at 378 n.14); *but see Alman v. Reed*, 703 F.3d 887, 902 (6th Cir. 2013) ("A lack of probable cause itself cannot constitute malice, as that would render the third and fourth elements of the tort duplicative.").

However, for the reasons set forth earlier, Plaintiff does not establish that Defendant's arrest warrant lacked probable cause. Additionally, Plaintiff does not present other evidence of Defendant's alleged malice. As such, a reasonable jury could not conclude that Defendant's actions were "undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice."

*Peterson Novelties*, 259 Mich. App. at 21. The Court grants summary judgment to Defendant for Plaintiff's state law malicious prosecution claim.

**E. Intentional Infliction of Emotional Distress**

Plaintiff's final claim is for intentional infliction of emotional distress ("IIED"). In order to establish a prima facie claim of IIED, Plaintiff must present evidence of: "1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Walsh v. Taylor*, 263 Mich. App. 618, 634 (2004) (citing *Moore v. City of Detroit*, 252 Mich. App. 384, 389 (2002)). "Liability attaches only when a plaintiff can demonstrate that the defendant's conduct is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Id.* (quoting *Lewis v. LeGrow*, 258 Mich. App. 175, 196 (2003)). "It is for the trial court to initially determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. But where reasonable individuals may differ, it is for the jury to determine if the conduct was so extreme and

outrageous as to permit recovery." *Hayley v. Allstate Ins. Co*., 262 Mich. App. 571, 577 (2004) (citing *Teadt v. Lutheran Church Missouri Synod*, 237 Mich. App. 567, 582 (1999)) (cleaned up).

Plaintiff first argues that Defendant displayed "extreme and outrageous conduct" leading up to Plaintiff's arrest, when Defendant relied on the victim's photo line-up identification using an eight-year-old photo and did not conduct additional investigation before seeking an arrest warrant. (ECF No. 29, PageID.874.) As discussed earlier in this opinion, Plaintiff does not establish that Defendant lacked probable cause for Plaintiff's arrest. The Michigan Court of Appeals has held that an officer who had probable cause for the plaintiff's arrest "as a matter of law [] cannot be liable for intentional infliction of emotional distress." *Walsh*, 263 Mich. App. at 634–35 (citing *Cebulski v. Belleville*, 156 Mich. App. 190, 196 (1986)). Therefore, this argument fails.

To the extent Plaintiff claims that Defendant displayed "extreme and outrageous conduct" after Plaintiff's arrest, the Court disagrees. Plaintiff states, "a day after Plaintiff was released from custody for crimes that she didn't commit, Plaintiff attempted to retrieve her cellphone from Defendant Oliver who refused to release the cellphone

alleging that she is still investigating Plaintiff for the crimes." (ECF No. 29, PageID.875.)

Defendant's refusal to return Plaintiff's cellphone cannot reasonably be construed as extreme and outrageous conduct. It is undisputed that Woodruff contacted Oliver the morning after her arrest and release from custody, February 17, 2023, and asked for her cellphone to be returned. (ECF No. 41-4.) It is also undisputed that Woodruff's phone was returned that same day, February 17, in the afternoon. (ECF No. 23-25, PageID.524; ECF No. 64-16.) Although Defendant's refusal to release the cell phone when asked was not sensible, a reasonable jury could not find that it was "so outrageous in character," "beyond all possible bounds of decency," and "atrocious and utterly intolerable in a civilized community" to withhold Plaintiff's cellphone for a day. *Walsh*, 263 Mich. App. at 634 (quoting *Lewis*, 258 Mich. App. at 196). Even more importantly, Plaintiff has not established that Defendant withheld her phone for the purpose of causing emotional distress, or that Defendant should have known that severe emotional distress would result from her actions.

For these reasons, the Court grants Defendant's summary judgment motion as to Plaintiff's IIED claim.

## IV. Conclusion

Accordingly, the Court GRANTS Defendant's motion for summary judgment and DENIES Plaintiff's partial motion for summary judgment.

IT IS SO ORDERED.

Dated: August 5, 2025
Ann Arbor, Michigan

s/Judith E. Levy
JUDITH E. LEVY
United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 5, 2025.

s/William Barkholz
WILLIAM BARKHOLZ
Case Manager